IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Criminal Case No. C2-04-55 |
| vs. ) | |
| ) | |
| Alfonso Rodriguez, Jr., ) | |
| ) | |
| Defendant. ) | |

## ORDER ON THIRD ROUND OF PRETRIAL MOTIONS

The Court has before it several pretrial motions filed by Defendant (doc. ## 109, 112, 119, 121, and 123). A hearing was held on September 30, 2005, during which the Court took these motions under advisement. The Court has carefully considered the briefs submitted by the parties along with the arguments and statements of counsel at the hearing and now issues this memorandum opinion and order.

### SUMMARY OF RULINGS

I.   Because Defendant may not prove a constitutional violation based on the argument that others similarly situated did not receive the death penalty and because Defendant's statistics do not prove racial animus in death penalty decision making, the motion to bar the death penalty is **DENIED**.

II.  Because the non-statutory aggravating factor of "failure to obtain sexual offender treatment" does not conform to either the FDPA's statutory aggravating factors or the aggravating factors approved by the Supreme Court, and it relates to the non-statutory aggravating factor of "future dangerousness," the motion to strike it is **GRANTED**.

III. Because the current approach is to trifurcate capital trials, and trifurcation is a logical implementation of the FDPA, and trifurcation will conserve judicial resources, the motion to trifurcate is **GRANTED**.

IV.  Because the FDPA provides that evidence is admissible during the penalty phase even if it would not be admissible under the Federal Rules of Evidence, and the evidentiary standard applied during the penalty phase does not offend the Constitution, the motion to require the

1

Federal Rules of Evidence during the penalty phase is **DENIED**.

## MOTIONS

### I.  Bar Death Penalty

#### A.  Arbitrary and Infrequent Use

Defendant's first argument is that the death penalty should be barred in this case because it is rarely applied. According to statistics from the Federal Death Penalty Resource Counsel Project, from 1988 to June 2004, only 0.1% of federal capital defendants had been executed and only 1.5% were under a sentence of death. (Mem. Supp. Mot. Bar Death Penalty 3-4.) Defendant argues that one of the reasons the Supreme Court struck down the death penalty in Furman v. Georgia, 408 U.S. 238 (1972) was because it was imposed infrequently. At the time of the Furman opinion, only 20 percent of the defendants charged with capital crimes were actually sentenced to death. (Mem. Supp. Mot. Bar Death Penalty 4.)

It is difficult to divine the true holding of Furman from the opinion of the case itself since it was a per curiam decision with five separate concurrences. 408 U.S. at 239-40. However, later Supreme Court opinions have explained its holding. "Furman held *only* that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Gregg v. Georgia, 428 U.S. 153, 199 (1976) (emphasis added). Therefore, so long as there are sufficient standards guiding the decision maker, the imposition of the death penalty is constitutional under Furman. Defendant's argument about how often the death penalty is actually imposed is simply not a relevant consideration. Gregg, 428 U.S. at 199.

Defendant next argues that the death penalty is being applied arbitrarily in this case because

2

other federal cases of an allegedly more serious nature, based on the number of people killed, did not receive the death penalty. (Mem. Supp. Mot. Bar Death Penalty 6-9.) A defendant facing a death sentence "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." McCleskey v. Kemp, 481 U.S. 279, 306-07 (1987) (emphasis in original). The Supreme Court has noted numerous possible factors for why a death sentence was not sought, including the relative capabilities of the responsible law enforcement agencies; the strength of the available evidence; and witness availability, credibility, and memory. Id. at 307 n.28. Also, it does not violate the Constitution when a prosecutor affords an individual defendant mercy. Gregg, 428 U.S. at 199.

Some of the cases mentioned by Defendant were situations where the individual United States Attorney decided not to seek the permission of the Attorney General to seek a sentence of death. The remaining cases were situations where the Attorney General apparently granted permission to seek a sentence of death, but the United States Attorney then entered into a plea agreement with the defendant. Considering the prosecutor's wide discretion in this area, it would be improper for this Court to ask each prosecutor in those cases their reasons for the decisions they made. McCleskey, 481 U.S. at 296. There could be any number of permissible reasons to explain those decisions ranging from the relative strength of the case to the prosecutor's decision to be merciful. Id. at 307 n.28; Gregg, 428 U.S. at 199. Defendant cannot prove a constitutional violation simply because others similarly situated did not receive a sentence of death. McCleskey, 481 U.S. at 306-07. The fact remains that Defendant is alleged to have committed a crime for which the laws of the United States permit the imposition of the death penalty. Id. at 296-97. His argument that others similarly situated did not receive a sentence of death is insufficient to raise a constitutional violation.

**B.     Discrimination**

Defendant next argues that the notice of intent to seek a sentence of death should be dismissed because he was targeted on the basis of race. A claim of discriminatory charging is analyzed as a selective prosecution claim. Belmontes v. Brown, 414 F.3d 1094, 1125 (9th Cir. 2005). The government has "broad discretion" when deciding who to prosecute and which charges to bring. Wayte v. United States, 470 U.S. 598, 607 (1985). The only restraint on this discretion is that the government may not selectively enforce criminal laws on the basis of race, religion, or other arbitrary classification. Id. at 608. To prove selective prosecution, a defendant must demonstrate "that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose." Id. To establish a discriminatory effect in a race case, the defendant must demonstrate that similarly situated individuals of a different race were not prosecuted. United States v. Armstrong, 517 U.S. 456, 465 (1996). A defendant may use statistics to demonstrate discriminatory effect, but those statistics must relate to the same charging authority that is prosecuting him. Belmontes, 414 F.3d at 1127. Statistics that relate to decisions made by scores of other prosecutors are not valid to prove discriminatory effect. McCleskey, 481 U.S. at 295-97.

Defendant alleges that as of September 12, 2000, there were nineteen men on federal death row and only four of them were white, thirteen were African-American, one was Hispanic, and one was designated as "other" race. (Mem. Supp. Mot. Bar Death Penalty 11.) In a study done by the Department of Justice, the department found that, in the period between 1995 and 2000, of the 682 cases that individual United States Attorneys chose to submit to the department for the death penalty decision-making procedures, 134 were White, 324 were Black, and 195 were Hispanic. U.S. Dep't Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols

4

for Capital Case Review 8 (2001), http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm [hereinafter FDP Study]. When the department later broadened the scope of its study to include capital cases the United States Attorneys did not submit for the death penalty decision-making procedures and cases where capital crimes could have been charged, it received a total of 973 defendants. From this broader pool, 166 were White, 408 were Black, and 350 were Hispanic. Id. at 10. These numbers translate into 17% White, 42% Black, and 36% Hispanic. Id. The proportions of cases submitted to the Department of Justice for review involving Black and Hispanic defendants were greater than the proportions of Blacks and Hispanics in the general population. Id. at 8. Defendant argues that these statistics are sufficient to demonstrate discriminatory effect.

Defendant also argues that the statistics related to plea agreements evidence discriminatory effect. Out of the cases the Attorney General authorized for the death penalty, individual United States Attorneys entered into plea bargains with 48% of White defendants compared to 25% of African-American defendants, 28% of Hispanic defendants, and 25% of "other" defendants. (Mem. Supp. Mot. Bar Death Penalty 12.)

There are several reasons why these statistics are legally insufficient to demonstrate discriminatory effect. First, these statistics do not compare the total number of people who are eligible for the death penalty with the total number of people who the Attorney General actually authorized for the death penalty. Therefore, these statistics do not meet the requirement that a defendant must show that similarly situated people of a different race were not authorized for the death penalty. Armstrong, 517 U.S. at 465.

Second, these statistics relate to many different decision makers. Defendant argues that the statistics only involve one decision maker: the Attorney General. However, this argument misses two crucial steps in the process that Defendant himself pointed out earlier in his brief. First, an

5

individual United States Attorney may never decide to seek the permission of the Attorney General to seek the death penalty on a case that is designated as a capital offense. Second, even after the Attorney General grants a United States Attorney the permission to seek the death penalty, an individual United States Attorney could unilaterally choose to enter into a plea bargain with the defendant that would remove the death penalty as an available punishment.[1] Since the statistics Defendant presents relate to decisions made by scores of other prosecutors, these are the same type of statistics that were rejected by the Supreme Court in McCleskey. Therefore, these are insufficient to demonstrate discriminatory effect.

The only statistic that can actually be attributed solely to the Attorney General does not even support Defendant's argument. Of those cases United States Attorneys chose to submit, the Attorney General decided to seek the death penalty for 38% of the White defendants, 25% of the Black defendants, and 20% of the Hispanic defendants. FDP Study, supra, at 8. The Attorney General authorized the death penalty more often against white defendants than against Black or Hispanic defendants. These statistics demonstrate that there is no discriminatory effect against Hispanics. Defendant has failed to prove a racial motive in the decision to seek the death penalty against him.

---

[1] After these statistics were compiled, the Department of Justice limited a United States Attorney's discretion with regard to plea bargains once the death sentence was authorized. Compare U.S. Dep't of Justice, United States Attorneys' Manual § 9-10.000(I) (1995) ("There is no need for the United States Attorney to obtain prior authority from the Attorney General to approve a plea agreement.") with U.S. Dep't of Justice, United States Attorneys' Manual § 9-10.100 (2001) ("[T]he United States Attorney may not enter into a plea agreement that requires withdrawal of the notice of intention to seek the death penalty without the prior approval of the Attorney General.").

## II.  Strike Non-Statutory Aggravating Factor of Failure to Undergo Sex Offender Treatment

Every aggravating circumstance in a capital case must meet three criteria.[2] First, the aggravating circumstance must not be overbroad; it cannot apply to every defendant convicted of murder. Tuilaepa v. California, 512 U.S. 967, 972 (1994); see also Zant v. Stephens, 462 U.S. 862, 877 (1983) (stating that it "must genuinely narrow the class of persons eligible for the death penalty . . . ."). Second, the aggravating circumstance may not be unconstitutionally vague. Zant, 462 U.S. at 877; Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). Third, the aggravating circumstance must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Zant, 462 U.S. at 877. This third requirement has been referred to as the relevancy inquiry. Lentz, 225 F. Supp. 2d at 671. Defendant argues that the "failure to undergo sex offender treatment" does not pass the relevancy inquiry.

Defendant relies on three district court cases to lay out a possible framework for determining the relevancy of a particular non-statutory aggravating factor. These courts allege that a court should determine the relevancy of a non-statutory aggravating factor by looking at the statutory aggravating factors in 18 U.S.C. § 3592(c). United States v. Bin Laden, 126 F. Supp. 2d 290, 302 (S.D.N.Y. 2001); United States v. Friend, 92 F. Supp. 2d 534, 544 (E.D. Va. 2000); United States v. Davis, 912 F. Supp. 938, 944 (E.D. La. 1996). The more similar a non-statutory aggravating circumstance is to those enumerated in 18 U.S.C. § 3592(c), the more likely it is to be relevant. Friend, 92 F. Supp. 2d at 544. However, another court, in the Eastern District of Virginia, disagrees with this analysis, arguing that it contradicts the requirement that there must be "individualized" sentencing. Lentz,

---

[2] While the Supreme Court cases cited in this section analyzed statutory aggravating factors, district courts have applied these rules to non-statutory aggravating factors as well. United States v. Lentz, 225 F. Supp. 2d 666, 671 (E.D. Va. 2002).

7

225 F. Supp. 2d at 672 n.3.

Looking at the statutory aggravating factors, approximately half of them describe circumstances of the offense that make the crime itself more heinous. Davis, 912 F. Supp. at 944. The remaining statutory factors deal with the prior criminal history of the defendant. Id. The prior criminal history relates to either very serious or repetitive felony offenses. Id.

Applying the assumption that non-statutory aggravating circumstances must be similar to statutory aggravating circumstances in order to be relevant, courts have found several circumstances to be irrelevant. In Friend, the court struck the circumstance that the defendant discussed killing a potential witness because it was nonadjudicated misconduct that did not itself constitute a crime since there was no overt act. 92 F. Supp. 2d at 544. In Davis, the court struck the circumstance that the defendant, a police officer, failed to investigate or arrest people he knew were engaged in criminal conduct. 912 F. Supp. at 945. The court explained that this conduct only amounted to the crime of "malfeasance in office," which was not a crime of comparable severity to the types of crimes considered in the statutory aggravating factors. Id. In Bin Laden, the court struck the circumstance of "disruption of governmental functions" because it did not rise to the level involving the type of serious human trauma contemplated by the statutory aggravating circumstances. 126 F. Supp. 2d at 302-03.

Failing to undergo sex offender treatment is not a crime, so it does not fall in that vein of aggravating factors that describe very serious of repetitive felony offenses. See Friend, 92 F. Supp. 2d at 544 (striking a non-statutory aggravating factor because it failed to constitute a crime); see also Davis, 912 F. Supp. at 945 (striking a non-statutory factor because it failed to state a serious crime on par with those described in the statutory aggravating factors). The failure to undergo sex offender treatment also does not describe the manner in which this particular crime was committed which

8

made it more heinous. Davis, 912 F. Supp. at 944. Since this non-statutory aggravating factor does not fit within the general framework of the statutory aggravating factors, it fails the relevancy test. Id.

Even if the Court chose not to look at the FDPA's statutory aggravating factors for guidance on relevance, this factor would still fail the relevancy test compared to other aggravating factors the Supreme Court has approved. Those factors include the following: whether a defendant was a "cold-blooded, pitiless slayer;" Arave v. Creech, 507 U.S. 463, 472 (1993); whether a defendant inflicted "mental anguish or physical abuse before the victim's death;" Walton v. Arizona, 497 U.S. 639, 654 (1990); and whether there is "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;" Jurek v. Texas, 428 U.S. 262, 267-68 (1976). Like the FDPA's statutory aggravating factors, these factors focus on the character of the defendant and the circumstances of the crime.

The government argues that Defendant's failure to attend sex offender treatment indicates something about his character by demonstrating that he knew he had unusual sexual proclivities. This non-statutory aggravating factor states: "Defendant's failure to avail himself of treatment for his sexual-predator proclivities: The defendant failed to avail himself of treatment for his sexual-predator proclivities." (Notice Intent Seek Sentence Death 4.) This factor in no way requires the jury to determine whether Defendant knew he had unusual sexual compulsions. It only asks whether Defendant attended sexual offender treatment. Contrary to the government's argument, this factor does not focus on Defendant's character.

The government also appears to argue that this failure to attend sex offender treatment made him a danger to society. (United States' Br. Opposing Def.'s Mot. Strike Non-Statutory Aggravating Factor Def. Failed Avail Himself Sexual Offender Treatment 7.) For example, if he had attended

9

the treatment, he would not have allegedly commit the present crime. This evidence could also be used to show that it's unlikely he will seek treatment in the future, which would continue to make him a danger to society.

As far as tending to show that the treatment would have prevented the current crime, the government has not cited a case to show that such an aggravating factor is permissible. Looking at the aggravating factors the Supreme Court has previously approved, none of them relate to conduct that would avoid commission of the capital crime.

As far as acting as evidence of whether Defendant would pose a future danger to society, that non-statutory factor has already been alleged. Courts typically strike aggravating factors that are "necessarily subsumed" by another aggravating factor on the basis of impermissible duplication. Bin Laden, 126 F. Supp. 2d at 298. The government appears to concede that "failure to attend sexual offender treatment" constitutes evidence of the other non-statutory aggravating factor of future dangerousness by including it under the future dangerousness factor in its recent expansion of the notice of intent to seek a sentence of death. If the government intends to offer it for that purpose, then it would be impermissible to offer it again as a separate aggravating factor. Id.

A final concern with this factor is the lack of inquiry required by the jury. For both the FDPA's statutory aggravating factors and those aggravating factors approved by the Supreme Court, a jury would have to make a searching inquiry into a particular subject matter. With this factor, the jury could only reach a simple yes or no answer. Defendant has already conceded that he did not attend sexual offender treatment, so the answer would require no thought on the jury's part. Under a vagueness analysis, an aggravating factor will be unconstitutional when it merely presents a specific proposition that the jury has to find to be true or false. Tuilaepa, 512 U.S. at 974. When an aggravating factor does not require a simple yes or no answer to a specific question, these

vagueness concerns are mitigated. Id. at 975. While the question presented in this case is not vague, these same concerns are prevalent. This non-statutory aggravating factor does not present a particular subject matter for the jury to look into. For all the reasons stated above, the "failure to obtain sexual offender treatment" factor will be struck as a separate non-statutory aggravating factor from the notice of intent to seek a sentence of death. Nothing in this ruling prevents the government from presenting evidence on Defendant's failure to undergo sex offender treatment as support for another relevant statutory or non-statutory aggravating factor.

### III.    Trifurcate Proceedings

Under the FDPA, there are two phases to a trial for a capital crime. Jones v. United States, 527 U.S. 373, 376 (1999). In the first phase, the jury determines whether the defendant is guilty of the crime. Id. This is often referred to as the "merits" phase of the trial. If the jury decides that the defendant is guilty, then the trial enters the second phase. Id. During this second phase, the jury determines whether to impose the death penalty. Id.

In this second phase, there are two distinct parts. For this case, the jury must first determine whether the defendant was eighteen years of age or older when the offense occurred, whether he committed any intentional act listed in 18 U.S.C. § 3591(a)(2), and whether an aggravating factor under 18 U.S.C. § 3592(c) exists. 18 U.S.C. § 3593(e)(2). Unless the jury finds these three factors, it may not consider whether to impose the death penalty on a particular defendant. For this reason, this process is often referred to as the "eligibility" phase of the trial.

Finally, if the jury does find that the defendant was at least eighteen years of age, that he committed a specified intentional act, and that an aggravating factor exists, it then moves on to decide whether to actually impose the death penalty in that case. For this third part of the process, the jury must decide whether the aggravating factors found to exist outweigh the mitigating factors

11

found to exist. 18 U.S.C. § 3593(e). For clarity, the Court will refer to this third phase as the "selection" phase.

It appears as if most courts split capital trials into these three phases: a "merits" phase, an "eligibility" phase, and a "selection" phase. See, e.g., United States v. Johnson, 362 F. Supp. 2d 1043, 1111 (N.D. Iowa 2005); United States v. Jordan, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005); United States v. Davis, 912 F. Supp. 938, 949 (E.D. La. 1996). The government argues that trifurcation will require it to call the same witnesses to the stand several times, and this will needlessly prolong the trial, which would waste judicial resources. However, when only statutory aggravating factors are considered in the eligibility phase, there often is very little new additional evidence offered at the eligibility phase that was not already presented in the merits phase. Johnson, 362 F. Supp. 2d at 1100-01. Based on the information listed in the government's notice of intent to seek a sentence of death, that would be the case here as well. Whichever specified intent factor or factors the government intends to prove under 18 U.S.C. § 3591(a)(2), these would be introduced into evidence during the merits phase as a part of the general description of what occurred. Most of the statutory aggravating factors listed in the notice would also be in evidence during the merits phase for the same reason. Likely the only new evidence during the eligibility phase would relate to Defendant's prior felonies. Therefore, trifurcating the proceedings would actually save time as opposed to prolonging the trial.

Trifurcating could also save time if the jury did not find any of the necessary eligibility factors. If the jury did not find all the necessary eligibility factors, there would not be a final penalty phase. 18 U.S.C. § 3593(e).

Based on the considerations above, the Court will trifurcate the trial into a merits phase, an eligibility phase, and a selection phase. The remaining issue is whether the eligibility phase should

12

include the non-statutory aggravating factors.

The FDPA states that a jury must find at least one aggravating factor "required to be considered" under 18 U.S.C. § 3592(c) during the eligibility phase. 18 U.S.C. § 3593(e)(2). In 18 U.S.C. § 3592(c), it states that the jury "shall" consider any of the enumerated aggravating factors that the government has given notice for. With respect to the non-statutory aggravating factors, it only says that the jury "may" consider them if the government has given notice. Based on the plain language of 18 U.S.C. § 3593(e)(2), those aggravating factors that would be "required to be considered" would be the specified statutory ones since they follow the word "shall." This plain language interpretation would explain why other courts have only included the statutory aggravating factors during the eligibility phase without any discussion of why the non-statutory aggravating factors were not included. Jordan, 357 F. Supp. 2d at 903-04; Davis, 912 F. Supp. at 949. Assuming Defendant is found guilty at the merits phase, and assuming Defendant is found eligible for the death penalty, the non-statutory aggravating factors will be introduced during the selection phase.

## IV.   Use of Federal Rules of Evidence During Penalty Phase

Defendant's motion requests that the Court apply the Federal Rules of Evidence during any penalty phase proceedings in this case. Mainly it appears as if Defendant is arguing that they should apply during the eligibility phase since he discusses the intent element and the statutory aggravating factors. Defendant also requests that the Federal Rules of Evidence not apply to him during the selection phase when he presents mitigating evidence.

The eligibility phase and the selection phase of a capital trial are to be held pursuant to the requirements of 18 U.S.C. § 3593. 18 U.S.C. §§ 3591(a) & 3593(e). Under § 3593, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ." Defendant argues that Ring requires this Court to apply the Federal Rules of

13

Evidence against the government in the eligibility and selection phases despite the clear wording of § 3593. Under the FDPA, evidence may be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). This evidentiary standard is constitutional following Ring. United States v. Lee, 374 F.3d 637, 648 (8th Cir. 2004). This Court will not require the use of the Federal Rules of Evidence if there is an eligibility or selection phase of the trial.

## DECISION

Defendant's Motion to Bar the Death Penalty is **DENIED**. Defendant's Motion to Strike the Non-Statutory Aggravating Factor of Failure to Undergo Sexual Offender Treatment is **GRANTED**. Defendant's Motion to Trifurcate is **GRANTED**. Defendant's Motion for Press Releases is **MOOT** because the government has agreed to supply them. Defendant's Motion to Require the Use of the Federal Rules of Evidence during any penalty phase of the trial is **DENIED**.

**IT IS SO ORDERED**.

Dated this 30th day of November, 2005.

*[signature]*

Ralph R. Erickson, District Judge
United States District Court