IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Criminal Case No. 2:04-cr-55 |
| vs. | ) | |
| | ) | |
| Alfonso Rodriguez, Jr., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON SIXTH ROUND OF PRETRIAL MOTIONS

The Court has before it several pretrial motions filed by Defendant.  Hearings were held on

April 21 and May 12, 2006,during which the Court took these motions under advisement. The Court

has carefully considered the briefs submitted by the parties along with the arguments and statements

of counsel at the hearing and now issues this memorandum opinion and order.

### SUMMARY OF RULINGS

I.      Because Defendant has not demonstrated a reasonable probability that a venue study of the
        Minneapolis/St. Paul area would aid in his defense or that the lack of this study would result
        in an unfair trial, the <u>Ake</u> Motion to Dismiss is **DENIED**.

II.     Because the media coverage of this case has been objective, straightforward, and factual and
        Defendant has not pointed to any inflammatory or accusatory coverage, there is no
        presumption of inherent prejudice, so the Motion to Change Venue is **DENIED**.

III.    Because evidence about the use of hypnosis in one of Defendant's prior convictions relates
        to whether he committed the crime as opposed to how he committed it, the motion to
        introduce such evidence is **DENIED**.

IV.     Because the mental health condition of two witnesses has been made an issue in this
        litigation, the psychotherapist-patient privilege has been impliedly waived, and any mental
        health records regarding these witnesses may be disclosed.

V.      To determine whether a reasonable jury could find that there is sufficient evidence to support
        the "serious bodily injury" allegation in convictions 5438 and 5447, the United States will

submit affidavits, and the Court will hold a hearing to allow the defense to cross-examine the witnesses.

## MOTIONS

### I.      <u>Ake</u> Motion Regarding Venue Study

In <u>Ake v. Oklahoma</u>, 470 U.S. 68, 74 (1985), the Court held that when an indigent defendant has made a sufficient showing that his sanity at the time of the offense is "likely to be a significant factor at trial," then the Constitution requires that a psychiatrist be provided at public expense. This holding has been extended to apply to nonpsychiatric experts. <u>Little v. Armontrout</u>, 835 F.2d 1240, 1243 (8th Cir. 1987). To receive the assistance of an expert at public expense, "a defendant must show more than a mere possibility of assistance from an expert." <u>Id.</u> at 1244. The defendant must demonstrate "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." <u>Id.</u> An indigent defendant is not entitled to all the assistance that his wealthier counterpart might buy, but he should be provided with the "basic tools" of an adequate defense. <u>Ake</u>, 470 U.S. at 77.

When a defendant's sanity at the time of the offense is a significant factor, a psychiatrist is necessary to identify the "elusive and often deceptive" symptoms of insanity that a lay witness cannot recognize. <u>Id.</u> at 81. In addition, the psychiatrist knows the probative questions that should be asked of the opposing party's psychiatrists and how to interpret the answers. <u>Id.</u> A psychiatrist is also able to translate his or her observations of the defendant into language the jury can understand and explain to the jury why these observations are relevant. <u>Id.</u>

When expanding the expert inquiry beyond the psychiatric realm, the issues are "how important the scientific issue is in the case, and how much help a defense expert could have given." <u>Little</u>, 835 F.2d at 1243. In <u>Little</u>, the only issue at trial was whether the defendant was the

perpetrator of the crime. Id. at 1242. The defendant alleged that the victim's identification of him had been tainted by hypnosis. Id. The court reasoned that an expert on hypnosis could have presented the limitations of hypnosis and explained the theories of memory. Id. at 1244. Since this information was an important scientific issue in the case, and a hypnosis expert would have been more effective than reading from a psychology textbook, the Little Court held that the defendant's due process rights were violated when he was not provided with a hypnosis expert at public expense. Id. at 1244-45.

In this case, Defendant sought funding to perform a public opinion survey on the pretrial publicity in this case. This survey was for the purpose of providing evidence on a change of venue motion. Defendant performed a survey in the Southeastern Division of North Dakota, but he wants to perform an additional survey in the Minneapolis/St. Paul area, which is the venue he proposes for the trial. Defendant alleges that the lack of funding for a political science professor and a telemarketing firm to perform this public opinion survey in the Minneapolis/St. Paul area has violated his right to due process.

To determine whether there is a reasonable probability that these experts would aid in his defense and that the denial of these experts would result in an unfair trial, an examination of the change of venue standard is necessary. When a change of venue motion is based on pretrial publicity, a two-tiered analysis applies. United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002). The first tier of the analysis is a determination whether the pretrial publicity was so extensive and corrupting that unfairness of constitutional magnitude must be presumed. Id. If no such determination is made, then the analysis moves to the second tier, which is a determination "whether the jury-selection process established an inference of actual prejudice." Id. (quoting United States

v. Blom, 242 F.3d 799, 804 (8th Cir. 2001)).

The Eighth Circuit has had numerous opportunities to analyze the first tier of this test. When reaching a decision on this first question, the Eighth Circuit has not relied on public opinion polls of the current venue or expressed a need for them. See, e.g., Blom, 242 F.3d at 804 (no survey); United States v. Bliss, 735 F.2d 294, 298 (8th Cir. 1984) (no survey); United States v. Deggendorf, 626 F.2d 47, 53 (8th Cir. 1980) (no survey); United States v. Buttorff, 572 F.2d 619, 627 (8th Cir. 1978) (no survey). Similarly, none of these cases had surveys of the venue location that the defendant wanted for the trial. In fact, the Eighth Circuit has expressed a reluctance to even accept a public opinion poll as evidence to demonstrate jury bias. Shapiro v. Kauffman, 855 F.2d 620, 621 (8th Cir. 1988).

The focus of this first tier inquiry is whether the coverage is inflammatory or accusatory. United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002). An appropriate type of evidence for this inquiry is news articles about the defendants and the crime. Id. Since a change of venue motion can be decided without a public opinion survey, this information is not an important scientific issue in this case. Defendant has already received funds for a venue study in the current location, which is more than is needed to argue a change of venue motion based on pretrial publicity. To perform a venue study in the proposed trial location would go well beyond supplying the basic tools necessary for an effective defense. Defendant has not established an Ake violation.

## II.      Change of Venue

At oral argument on the change of venue motion, Defendant alleged that there were likely three different standards applicable to his change of venue motion. He alleged that the Rule 21(a) standard under the Federal Rules of Criminal Procedure was less demanding than the Sixth

Amendment standard.  It appears as if the standards are the same.  <u>Compare</u> <u>United States v. Malmay</u>, 671 F.2d 869, 875 (5th Cir. 1982) (stating that a defendant must demonstrate prejudicial pretrial publicity to receive a change of venue under Rule 21(a)) <u>with</u> <u>Pruett v. Norris</u>, 153 F.3d 579, 584-85 (8th Cir. 1998) (stating that a defendant must demonstrate corrupting pretrial publicity to receive a change of venue under the Sixth Amendment).  If anything, the Sixth Amendment standard is more protective of a defendant's right to a fair and impartial jury.  <u>Compare</u> <u>United States v. Buttorff</u>, 572 F.2d 619, 627 (8th Cir. 1978) (stating that a motion for a change of venue under Rule 21(a) based on pretrial publicity is merely addressed to the sound discretion of the court) <u>with</u> <u>Blom</u>, 242 F.3d at 803 (describing the standard for channeling the district court's discretion).

For his third standard, since Defendant alleges that venue would be proper in Minnesota, he argues that the standard for a transfer of venue to a district that also has jurisdiction is even lower than a change of venue based on pretrial publicity.  When venue would be proper in more than one district, Rule 21(b) of the Federal Rules of Criminal Procedure allows for the transfer of the case under specific circumstances.  2 Charles Alan Wright, <u>Federal Practice and Procedure</u> § 343, 394-95 (3d ed. 2000).  Pursuant to Rule 21(b), a court may transfer venue for the convenience of the parties and witnesses.  <u>United States v. Green</u>, 983 F.2d 100, 103 (8th Cir. 1992).  Since this motion is based on pretrial publicity and not on the convenience of the parties and the witnesses, Rule 21(b) does not apply.  <u>Id.</u>

As stated earlier, when a change of venue motion is based on pretrial publicity, a two-tiered analysis applies.  <u>Allee</u>, 299 F.3d at 1000.  The first tier of the analysis is a determination whether the pretrial publicity was so extensive and corrupting that unfairness of constitutional magnitude must be presumed.  <u>Id.</u>  If no such determination is made, then the analysis moves to the second tier,

5

which is a determination "whether the jury-selection process established an inference of actual prejudice." Id. (quoting Blom, 242 F.3d at 804).  The Eighth Circuit has repeatedly held that it prefers that the trial court wait until voir dire before ruling on a motion for a change of venue.  Bliss, 735 F.2d at 297 (quoting United States v. Poludniak, 657 F.2d 948, 955 (8th Cir. 1981)).  It is within a court's discretion to grant or deny a motion to change venue.  Deggendorf, 626 F.2d at 53.

Under the first tier of the analysis, the formation of a tentative impression about the case by some jurors is not enough.  Bliss, 735 F.2d at 298 (quoting United States v. Brown, 540 F.2d 364, 378 (8th Cir. 1976)).  Our democracy tolerates, even encourages, extensive media coverage of crimes such as murder and kidnapping, so extensive coverage of a case is also not enough to satisfy this first tier inquiry.  Blom, 242 F.3d at 803.  To create a presumption of inherent prejudice in the pretrial publicity, the coverage must be inflammatory or accusatory.  Allee, 299 F.3d at 1000.  However, isolated incidents of "intemperate commentary" about the crime and the perpetrator are not sufficient to demonstrate that the coverage was inflammatory or accusatory when the majority of the reporting was "objective and unemotional."  Id.

Objective, straightforward reporting about a criminal case does not tend to arouse lingering ill-will or vindictiveness in the local community.  Bliss, 735 F.2d at 299.  As long as the reporting is factual and describes the defendant as having "allegedly" commit the crime or refers to him as being "accused" of committing the crime, the publicity is not inflammatory or accusatory.  Simmons v. Lockhart, 814 F.2d 504, 509 (8th Cir. 1987).  Inflammatory language includes such statements as "the perpetrators 'should pay forever,'" and the perpetrators are "very dangerous individuals who do not have regard for life."  Allee, 299 F.3d at 1000.  Inflammatory language can also consist of a local radio station broadcasting a derogatory song about a defendant and a local weekly paper

naming a defendant the "Best Local Villain."  United States v. Tokars, 839 F. Supp. 1578, 1582-83 (N.D. Ga. 1993).

At the hearing, Defendant offered three articles about the defendant that were published in the Fargo Forum on August 1, 2, and 3, 2004, and he alleged that they contained inflammatory language.  A review of these articles reveals that they contain objective, straightforward, and factual reporting about the defendant's past and the current case.  When discussing the current case, the articles refer to Defendant as having been accused of the crime.  For example, one article states: "If prosecutors can prove at trial he kidnapped and killed . . ."  Therefore, these articles do not contain inflammatory or accusatory language.  Simmons, 814 F.2d at 509; Bliss, 735 F.2d at 299.

Defendant also presented a binder of newspaper articles about this case.  It covers the time period of November 25, 2003 through October 26, 2005, and it contains over two hundred articles.  If the purpose of this exhibit was to demonstrate the extent of the coverage of this case, then it is irrelevant.  As stated above, our society encourages the extensive coverage of crimes such as murder and kidnapping.  Blom, 242 F.3d at 803.  A defendant must prove more than extensive media coverage to demonstrate a presumption of inherent prejudice.  Id.

If the purpose of this binder was to demonstrate prejudicial coverage, counsel have not marked any articles that they believe contain inflammatory or accusatory language.  It is not a judge's duty to search through documents to find evidence to support a party's claim.  United States v. Jorgensen, 144 F.3d 550, 562 (8th Cir. 1998).  Defendant alleges that the lack of funding for an expert to analyze the media coverage is what prevents him from pointing to inflammatory language.  An expert is not necessary to identify articles that contain inflammatory or accusatory language.  See, e.g., Allee, 299 F.3d at 1000 (lawyers presented articles with prejudicial language); Tokars, 839

7

F. Supp. at 1582-83.  Defense counsel are both exemplary attorneys who know this, and the fact that they have not pointed to any inflammatory or accusatory news coverage of this case can only be taken as an indication that none exists.

While under no obligation, the Court did randomly select articles in the binder and read them.  All of these articles contained objective, straightforward, and factual reporting.  The articles always described the defendant as being "accused" of the crime.  Therefore, these articles do not establish a presumption of inherent prejudice.

In some district court cases, after the court has reached a decision on whether the pretrial publicity was inflammatory or accusatory, it then also looks at any public opinion polls that the defendant has presented.  See United States v. Wright, No. 401CR3040, 2002 WL 842208 (D. Neb. May 3, 2002); Tokars, 839 F. Supp. 1578; United States v. Holder, 399 F. Supp. 220 (D.S.D. 1975).  When analyzing public opinion results, the test is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality . . . ."  Wright, 2002 WL 842208, at *8 (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

In Wright, the court found that there was some inflammatory pretrial publicity, but it was insufficient to create a trial atmosphere completely corrupted by press coverage.  Id. at *3.  The defendant's public opinion survey found that of those people who were familiar with the crime, 60% thought that the defendant was "definitely guilty" and 26% thought that he was "probably guilty."  Id. at *7.  Despite these survey numbers and some inflammatory publicity, the court held that the pretrial publicity did not create a presumptively prejudicial effect in the case.  Id. at *8.

In this case, the public opinion poll of the Southeastern Division found that, of the people who had read, seen, or heard something about this case, 42.5% thought that the defendant was

"definitely guilty" and 45.6% thought that he was "probably guilty."  From these answers, it is difficult to gauge the strength of the opinion formed.  For the sake of argument, the Court will take the "definitely guilty" answers as being a strongly held opinion.  The common understanding of "probably" is that something is likely true, but that there is room for doubt.  Random House Webster's Unabridged Dictionary 1541-42 (2d ed. 1997).  An opinion modified by "probably" would not be strongly held since the individual is open to an opposing viewpoint.  One should also keep in mind that these individuals have not been informed of the presumption of innocence.  Therefore, these results only demonstrate exactly what they purport to be: individuals' opinions based upon what they have read, seen, or heard.

Unlike the Wright case, there has been no inflammatory or accusatory press coverage of this case.  Also, compared to the 60% in Wright who thought that the defendant was "definitely guilty," here there are only 42.5% who thought that Defendant was "definitely guilty."  Even with the inflammatory press coverage and the high survey results, the Wright Court found that there was not a presumptively prejudicial effect in the case.  2002 WL 842208, *8.  Therefore, there is no presumptively prejudicial effect in the case at bar.  Id.

Even when there is a risk of presumed prejudice, there are certain measures a court can take to assure the selection of an unbiased jury, such as holding the trial a year after the initial, intense press coverage and assembling a larger-than-average jury pool.  Allee, 299 F.3d at 1000; Blom, 242 F.3d at 804.  In Blom, the court moved the case from Duluth to Minneapolis, assembled a jury pool three times the normal size, excluded the division where the crime occurred from the jury pool, required jurors to answer a questionnaire about their exposure to pretrial publicity, and increased the number of peremptory strikes for each side.  242 F.3d at 804.  In this case, the Court has moved

9

the case from Grand Forks to Fargo, assembled a jury pool more than twelve times the normal size, excluded the division where the kidnapping occurred, will have potential jurors answer a questionnaire about their exposure to pretrial publicity, and increased the number of peremptory strikes for the defendant.  The Court has gone beyond the measures taken in the <u>Blom</u> case.  In addition, this case will go to trial more than two years after the initial coverage of Ms. Sjodin's disappearance.  For over a year now, the press coverage of this case has only been about the court hearings and the resulting rulings, which only amounts to about three stories a month.  Even if there was some prejudice, these measures will likely be sufficient to assure the selection of an unbiased jury.  <u>Allee</u>, 299 F.3d at 1000; <u>Blom</u>, 242 F.3d at 804.

### III.     Presenting "Mitigating" Evidence

Defendant seeks to introduce at trial the allegation that, in the 6192 conviction, the victim "did not positively identify Mr. Rodriguez as her attacker until after undergoing a highly suggestive hypnotic session . . . ."  (Mem. Supp. Mot. Allow Def. Introduce Mitigating Evidence at 4.)  The Court has previously denied this request.  <u>United States v. Rodriguez</u>, No. Crim. 2:04-cr-55, 2006 WL 487117, *3 (D.N.D. February 28, 2006).  Defendant now argues that he is entitled to bring this information into the trial as mitigation.

Mitigating evidence is information that is relevant to a defendant's character, record, or the circumstances of the offense.  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 327-28 (1989).  Factors including the impaired capacity of the defendant, whether the defendant's participation in the crime was relatively minor, and the lack of significant prior criminal conduct are all relevant as mitigating evidence.  18 U.S.C. § 3592(a).

When looking at a defendant's prior criminal record, mitigating evidence may be presented

10

on how the defendant committed the crime.  See Summerlin v. Schriro, 427 F.3d 623, 635 (9th Cir. 2005) (stating that mitigation evidence for the defendant's prior conviction consisted of the fact that the defendant's victim had injured the defendant's wife, and the victim was not physically injured in any way); Mapes v. Coyle, 171 F.3d 408, 418 (6th Cir. 1999) (holding that the trial court erred in refusing to allow the defendant to present mitigating evidence that, while he did not deny the prior conviction, he was not the "triggerman" in the robbery).  However, the issue of whether the defendant committed the crime has never traditionally been allowed as mitigation at sentencing.  Oregon v. Guzek, 126 S.Ct. 1226, 1232 (2006).  Generally the law "discourages collateral attacks of this kind."  Id. at 1232-33.

Defendant argues that presenting evidence that Ms. Whalen did not identify him as her attacker until after undergoing hypnosis is not a collateral attack.  This type of evidence goes directly to the identity of her attacker, which creates the implication that Defendant did not commit the crime.  This is the quintessential example of a collateral attack.  Since this allegation challenges *whether* Defendant committed the crime, not *how* he committed it, it will not be allowed at trial.  Id. at 1232.

Defendant also argues that if Ms. Whalen testifies, and she makes an in-court identification of Rodriguez, then he should be able to challenge the accuracy of that identification.  If that situation occurs, Defendant will be able to question her about the accuracy of the in-court identification because it relates to the weight and credibility of her testimony.  However, the Court will include an instruction to the jury that it may not consider such evidence as a collateral attack on the conviction.  The jury should only consider whether the prior conviction involved the infliction of, or attempted infliction of, serious bodily injury on Ms. Whalen.

11

## IV.    Mental Health Records

Defendant has brought a motion to compel production of the mental health records of Ms. Knudson and Ms. Iverson.  The government alleges that the defendant's previous crimes against these two women caused them serious mental trauma.

In federal court, mental health records are privileged and confidential.  See Jaffee v. Redmond, 518 U.S. 1, 9-10 (1996) (recognizing the psychotherapist-patient privilege); 45 C.F.R. § 164.508(a) (2005) (prohibiting the disclosure of mental health records).[1]  This privilege is impliedly waived when the mental condition is made an issue in the litigation.  E.E.O.C. v. Danka Indus., Inc., 990 F. Supp. 1138, 1142 (E.D. Mo. 1997).

As one of the aggravating factors in this case, the government has alleged that the defendant has previously been convicted of two or more felonies involving the infliction of, or attempted infliction of, serious bodily injury upon another person.  "Serious bodily injury" includes "protracted loss or impairment of the function of a . . . mental faculty."  18 U.S.C. § 1365(g)(3).  The government alleges that it will prove serious bodily injury by presenting evidence on the affect these crimes had on the mental faculties of Ms. Knudson and Ms. Iverson.  By alleging this aggravating factor and by testifying at trial, their mental condition has been made an issue in this case.  Therefore, the privilege has been impliedly waived.  Danka Indus., Inc., 990 F. Supp. at 1142.

If there are mental health records for Ms. Knudson or Ms. Iverson, they must be disclosed to the defense.  These records may be disclosed to defense counsel and any expert for the defense

---

[1] Defendant argues that the psychotherapist-patient privilege is a Federal Rule of Evidence, and since the Rules of Evidence do not apply in the eligibility and selection phases of the trial, these mental health records are not privileged.  The psychotherapist-patient privilege is a matter of federal common law.  Jaffee, 518 U.S. at 9-10.  If one were to accept the defendant's argument, then the attorney-client privilege would not exist during the eligibility and selection phases either.  See United States v. Zolin, 491 U.S. 554, 562 (1989) (stating that the attorney-client privilege in federal court is a matter of federal common law).

who is needed to aid in the interpretation of the records.  These records may not be disclosed beyond that scope without the permission of the Court.  If the defense needs a further order to compel disclosure pursuant to 45 C.F.R. § 164.512, the attorneys should notify the Court promptly.

### V.       Strike Prior Convictions

Defendant has brought motions to strike two of Rodriguez's prior convictions from consideration as evidence to support the 18 U.S.C. § 3592(c)(4) aggravating factor.  Defendant argues that no reasonable juror could find that either conviction involved the infliction of, or attempted infliction of, serious bodily injury upon another person based on the evidence the United States has provided.  To reach a decision on this issue, the Court has chosen the following procedure to receive the testimony:  1) the United States will submit the testimony of Ms. Knudson and Ms. Iverson in affidavit form and 2) at a hearing, defense counsel will be given an opportunity to cross-examine these witnesses on their affidavits.  At the June 2, 2006 hearing, the Court will set the deadline for submission of the affidavits, and it will set a hearing date.

**DECISION**

Defendant's <u>Ake</u> Motion to Dismiss is **DENIED**.  Defendant's Motion to Change Venue is **DENIED**.  Defendant's Motion to Introduce Mitigating Evidence is **DENIED**.  Defendant's Motion to Disclose the Mental Health Records of two witnesses is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 25th day of May, 2006.

Ralph R. Erickson, District Judge
United States District Court