IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Plaintiff, | ) | **AND ORDER DENYING** |
| | ) | **MOTION TO DISMISS OR** |
| vs. | ) | **SUPPRESS EVIDENCE** |
| | ) | |
| Alfonso Rodriguez, Jr., | ) | Criminal File No. 2:04-cr-55 |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant's Motion to Dismiss or, in the Alternative, to Suppress Evidence Based Upon the Destruction of that Evidence. The United States filed a brief in opposition. The Court held a hearing on June 14, 2006, and an evidentiary hearing on July 28, 2006, and took the matter under advisement. Based upon the briefing, the evidence submitted, and the arguments of counsel, the Court issues the following opinion.

"Whatever duty the Constitution imposes on [law enforcement] to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984). Therefore, the government violates the Due Process Clause when it destroys evidence that possessed "an exculpatory value that was apparent before the evidence was destroyed," and the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 489. However, if the evidence is only "potentially useful" then the defendant must demonstrate bad faith on the part of the government actor in order to establish a due process violation. Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

1

**I. Apparent Exculpatory Value**

The exculpatory value inquiry is a question regarding the materiality of the evidence. Trombetta, 467 U.S. at 489. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Moore, 452 F.3d 382, 387 (5th Cir. 2006); United States v. Hernandez, 299 F.3d 984, 990 (8th Cir. 2002). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome of the proceeding. Hernandez, 299 F.3d at 990. Therefore, exculpatory evidence is evidence that would be sufficient to create a reasonable probability that the defendant did not commit the crime. See, e.g., People v. Hobley, 696 N.E.2d 313, 329 (Ill. 1998) (holding that the report showing the absence of the defendant's fingerprints on the gasoline can introduced at his arson trial was exculpatory evidence); Ex parte Geeslin, 505 So.2d 1246, 1248 (Ala. 1986) (holding that the results of the defendant's semen test showing the absence of gonorrhea was exculpatory because the semen in the rape victim contained gonorrhea); State v. Harwood, 495 P.2d 160, 162 (Idaho 1972) (holding that the ballistics report that contained the finding that the bullet in the goat carcass could not have been fired by a .270 Winchester Remington Model 721 Rifle was exculpatory evidence because the defendant's gun was a .270 Winchester Remington Model 721 Rifle).

Mere speculation about the potentially exculpatory nature of evidence is insufficient to establish its exculpatory nature under Trombetta. See United States v. Moore, 452 F.3d 382, 388 (5th Cir. 2006) (stating that conclusory and vague allegations about the evidence is insufficient to establish that the evidence is exculpatory); Bullock v. Carver, 297 F.3d 1036, 1056 (10th Cir. 2002) (stating that speculation about the exculpatory nature of evidence requires a showing of bad faith

2

to prove a due process violation). Also, the fact that the evidence "*may* have proven exculpatory," but it very well may have proven inculpatory is not sufficient to prove that the evidence is exculpatory. United States v. Martinez-Martinez, 369 F.3d 1076, 1087 (9th Cir. 2004) (emphasis in original).

In this case, Defendant has failed to establish that any of the evidence at issue was of an exculpatory nature that was apparent before the evidence was destroyed. Defendant alleges that this evidence inculpates him but that the evidence may also be exculpatory. This speculation is insufficient to demonstrate that the evidence is exculpatory. Moore, 452 F.3d at 388; Martinez-Martinez, 369 F.3d at 1087; Carver, 297 F.3d 1036, 1056.

Defendant offers United States v. Belcher, 762 F. Supp. 666 (W.D. Va. 1991) and People v. Walker, 628 N.E.2d 971 (Ill. Ct. App. 1993) for a different definition of "exculpatory." These two cases state that if the evidence is crucial or important to the prosecution, then it is exculpatory. Belcher, 762 F. Supp. at 672; Walker, 628 N.E.2d at 974.[1] This interpretation turns the concept of inculpatory versus exculpatory on its head. When evidence is important or crucial to show a defendant's guilt, that evidence is normally viewed as inculpatory as opposed to exculpatory.

In addition to being contrary to the holdings of the state and federal cases cited above, the holdings of Belcher and Walker are also likely contrary to Supreme Court precedent. As the Supreme Court recently explained, the Youngblood distinction between "exculpatory" and

---

[1] Even under this interpretation of "exculpatory," there is no violation of the Due Process Clause if the defendant has the full opportunity to inspect the evidence. United States v. Rabinowitz, 991 F. Supp. 760, 765 (W.D. Va. 1998). In this case, the United States offered the defense expert an opportunity to observe the tests performed on the evidence, and the defense declined this offer. Therefore, Defendant at least arguably had a full opportunity to inspect the evidence.

"potentially useful" applies even if the contested evidence is crucial to the outcome of the case. Illinois v. Fisher, 540 U.S. 544, 548-49 (2004). In Fisher, the most the defense could say about the contested evidence was that an additional test on the evidence might show that the police tests were mistaken. Id. at 549. The Court held that this evidence was only "potentially useful," so the bad faith test would apply. Id.

In this case, the most Defendant can allege is that if his expert had performed tests on the evidence that was consumed, the tests might have shown that the MN BCA's tests were mistaken. Therefore, this contested evidence is considered potentially useful, and Defendant must show that the United States acted in bad faith in order to establish a due process violation. Fisher, 540 U.S. at 549; Youngblood, 488 U.S. at 58.

### II. Bad Faith

#### A. Government Lawyers

Defendant alleges that the government lawyers acted in bad faith because they authorized the consumption of evidence without seeking the consent of a defense lawyer or the Court's permission. On July 29, 2005, this Court filed an order that stated, in pertinent part, "*with the exception of the ongoing testing that currently is being completed*, no further destructive testing shall be done that destroys an entire sample or specimen unless it is done with the consent of counsel or court order." (emphasis added). This order memorialized the same instruction that the Court gave verbally at the hearing on June 24, 2005. By its plain language, this order only required authorization for any destructive testing that was starting after June 24. Therefore, the government could not have acted in bad faith pursuant to this order if it did not seek authorization for consumptive testing prior to June 24 because the order did not apply to that testing.

From the correspondence submitted in support of this motion, the following is a summary of the relevant time line:

On June 1, 2004 the Minnesota Bureau of Criminal Apprehension (MN BCA) informed the US Attorney that testing would be done on June 16, 2004, and that this testing might consume the entire test sample. These tests involved samples taken from Sjodin's body, a knife and gloves from Rodriguez's car, and samples taken from Rodriguez's residence. On June 11, 2004 Attorney Hoy acknowledged receiving a copy of this June 1 letter, and he asked the US Attorney to delay the June 16 testing.

On February 10, 2005 the US Attorney wrote to Attorney Hoy and explained again that items would likely be consumed in testing. He explained that they would like to do testing within the next four weeks. The US Attorney asked if the defense team would like to have their DNA expert present to observe the testing. On May 10, 2005 Assistant US Attorney Anderson wrote to Attorney Hoy and asked again if he would like to have a DNA expert present when the testing was conducted.

On May 31, 2005 Attorney Hoy sent AUSA Anderson an email stating that the defense team would not send an expert to observe this testing. On June 9, 2005 the US Attorney informed the MN BCA to begin their testing of the previously identified items, and he informed the lab that the defense had chosen not to have their expert present for the testing. Again on June 10, 2005 Attorney Hoy informed the United States that the defense team would not have their expert present for the testing.

At least as early as June 9, the MN BCA had started testing on the items mentioned in the February 10 letter. Since this testing started before June 24, 2005, there was no violation of the

Court's order.

Even without a court order, the government always sought the defense team's consent before going ahead with potentially consumptive testing. In both June 2004 and February 2005, the US Attorney informed the defense of testing that may consume the samples. In May, the defense informed the government that it could go ahead with the testing because they would not have their expert present, and the defense also requested a deadline for when the testing would be completed. While the defense repeatedly expressed its skepticism that any samples would need to be consumed during testing, see, e.g., Hoy June 10, 2005 Letter at 2, this does not demonstrate any bad faith on the part of the government lawyers. The US Attorney was only acting on the information that the MN BCA was giving him, and the lab stated that it may have to consume the samples to perform proper testing. See, e.g., BCA June 1, 2004 Letter. Since there was no violation of the Court's July 29, 2005 Order, the government lawyers did not act in bad faith.

### B. Laboratory Technicians

The government does not act in bad faith when it follows their standard practice for destroying evidence. United States v. Gibson, 963 F.2d 708, 711 (5th Cir. 1992); United States v. Belden, 957 F.2d 671, 673-74 (9th Cir. 1992); see also United States v. Boswell, 270 F.3d 1200, 1206 (8th Cir. 2001) (stating that the blood samples were stored according to the laboratory's standard policies, but the samples deteriorated over time). There is no due process violation when the defendant has an adequate opportunity to impeach the reliability of a scientific test and the qualifications of the individual administering the test if the government failed, in good faith, to preserve a sample for testing. Trevino v. Dahm, 2 F.3d 829, 832 (8th Cir. 1993).

Defendant's expert, Dr. Dean Stetler, only testified about those pieces of evidence identified

by the parties as Items 14 and 15, which narrows this motion to those pieces of evidence. He explained that generally one can obtain a valid DNA profile from an extraction that contains between one and two nanograms of DNA material. With a "cutting" of evidence, one can usually divide that in half to save a portion for the defense, and with a swab of DNA material, one can usually divide that in half to save a portion. Based upon the total amount of DNA material present in Items 14 and 15, combined with the fact that they were either cuttings or swabs, Dr. Stetler's opinion was that these samples could have been divided in half, so that a sample could be saved for the defense.

The United States' expert, Ann Marie Gross, testified that Item 14 consisted of cuttings where the evidence on them was less than a millimeter in diameter. She explained that it was not physically possible to divide a sample that small. In her professional opinion, it was scientifically prudent to consume the samples that the lab did to obtain a valid DNA profile.

With swabs, Ms. Gross explained that there are a number of factors that weigh in the decision about whether there is a sufficient sample to allow the swab to be divided. One consideration is the coloring of the swab. If the sample is so small that the technician cannot even see material on the swab, it would not be prudent to divide it because one would not even know where the DNA was located. In her opinion, the swabs from Item 15 were too small to divide based on this coloration problem.

The Court finds Ms. Gross' testimony more credible and probative on the issue raised by this motion. She was actually in the position to view the evidence first-hand, and she has years of experience evaluating evidence from crime scenes. Her opinions were confirmed by Steven Fischer, another forensic scientist. Dr. Stetler's testimony was filled with statements about what "could"

have been done. However, much of this testimony related to opinions based on pristine conditions. He offered no opinion on how to divide a cutting that was the size of a millimeter, and he offered no opinion on how to divide a swab that had no coloration. Bad faith is not shown simply because a laboratory was not able to act in accordance with a procedure that would be possible under ideal circumstances.

Ms. Gross' affidavit states that the laboratory follows the Quality Assurance Standards for Forensic DNA Testing Laboratories. (Gross Aff. at 5.) Standard 7.2 states that "[w]here possible, the laboratory shall retain or return a portion of the evidence sample or extract." Ms. Gross states that this standard was followed in this case. (Gross Aff. at 5.) Her testimony at the hearing also confirmed this statement. Since the laboratory followed its standard protocol, it acted in good faith. Boswell, 270 F.3d at 1206.

### III. Other DNA Evidence

The foregoing discussion is sufficient to deny Defendant's motion to dismiss or suppress. However, it is worth noting another significant fact that weighs in favor of the decision reached. When a swab is taken from an area containing potential DNA evidence, the extraction point can still contain further evidence not absorbed by the swab. In some instances, these extraction points remain available for testing by the defense. In addition, there are other pieces of DNA evidence available for the defense to test. For example, with blood spatter on a cushion, there are additional spots of blood in close proximity to the one tested that remain available for the defense to test. These types of tests would allow the defense to either confirm the government's results or call the results into question if other blood drops belong to another person. In this case, not only can the defense thoroughly question the government's forensic experts, but it can also perform tests on

similar evidence to confirm or question the government's proof.

## **DECISION**

Defendant's Motion to Dismiss or, in the alternative, to Suppress is **DENIED**.

**IT IS SO ORDERED**.

Dated this 3rd day of August, 2006.

/s/ Ralph R. Erickson  
Ralph R. Erickson, District Judge  
United States District Court