IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Plaintiff, | ) | **ORDER DENYING MOTION TO** |
| | ) | **EXCLUDE TESTIMONY OF** |
| vs. | ) | **DR. MICHAEL MCGEE** |
| | ) | |
| Alfonso Rodriguez, Jr., | ) | Criminal File No. 2:04-cr-55 |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant's Motion to Exclude the Testimony of Dr. Michael McGee and Motion for a Daubert Hearing. The United States filed a brief in opposition. The Court held a Daubert hearing on August 28, 2006. During the hearing, the Court ruled that Dr. McGee could testify. The following opinion incorporates by reference the lengthy explanation the Court gave for its ruling and expands on that reasoning.

**I. Acid Phosphatase**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). To be admitted under Rule 702, the expert testimony must meet the following three requirements: 1) it must be "based on scientific, technical, or other specialized knowledge [that would] be useful to the finder of fact in deciding the ultimate issue of fact . . . ."; 2) the expert must be qualified; and 3) "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . ." Id.

Defendant does not dispute the existence of these first two requirements. Defendant's arguments focus on the reliability of Dr. McGee's interpretation of the acid phosphatase levels.

1

When analyzing this third requirement, Rule 702 requires the following: "1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case." Lauzon, 270 F.3d at 686 (quoting Fed. R. Evid. 702 advisory committee's note). Daubert also provides the following list of nonexclusive factors that a court can apply in determining the relevance and reliability of the expert's testimony: "(1) whether the theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) whether the theory has been generally accepted." Lauzon, 270 F.3d at 686-87.

"Rule 702 does not state a preference for academic training over demonstrated practical experience." Davis v. United States, 865 F.2d 164, 168 (8th Cir. 1988). The rule permits a certain amount of speculation to form the basis of the expert's opinion. United States v. Conroy, 424 F.3d 833, 839 (8th Cir. 2005) (quoting Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 760 (8th Cir. 2003)). Only if the expert's opinion is so "fundamentally unsupported that it can offer no assistance to the jury" should the expert be excluded. Arkwright Mut. Ins. v. Gwinner Oil, Inc., 125 F.3d 1176, 1183 (8th Cir. 1997) (quoting Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995)).

In this case, the acid phosphatase findings from the vaginal and cervical swabs were determined by using the Beckman Dri-STAT test. Defendant's expert did not dispute the validity of this test to determine acid phosphatase levels. The vaginal swab result was 47.4 U/L of acid phosphatase and the cervical swab was 130.7 U/L of acid phosphatase. Dr. McGee testified that his lab had arrived at a cutoff number of 25 U/L, which meant that any test results above 25 U/L

indicated the presence of semen. Forensic laboratories across the country generally use a range of between 25 U/L and 50 U/L as the cutoff for the presence of semen. Therefore, Dr. McGee's opinion was that semen was present in Ms. Sjodin's body based on the vaginal and cervical swab results.

The defense expert, Dr. George Sensabaugh, explained that the Beckman Dri-STAT test is a very accurate test for measuring the amount of prostatic acid phosphatase present when it is applied to blood serum. However, when the test is performed on material from vaginal and cervical swabs, he testified that it is not as accurate a measure of the levels of prostatic acid phosphatase. He explained that the Beckman Dri-STAT test measures acid phosphatase levels based on acid phosphatase that is inhibited by tartrate. In addition to prostatic acid phosphatase, acid phosphatase that is endogenous to the vagina and lysosomal acid phosphatase[1] are also inhibited by tartrate. Therefore, the Beckman Dri-STAT results in this case could include endogenous and lysosomal acid phosphatase. Dr. Sensabaugh could not state what amount of endogenous acid phosphatase would be present normally nor could he state how much lysosomal acid phosphatase would exist in a corpse. However, he testified that acid phosphatase is present in high levels in the prostate, so a high level of acid phosphatase in a woman's body under the circumstances of this case would be "interesting," just "not dispositive."

Finally, Dr. Sensabaugh testified that many pathologists across the country would share Dr. McGee's opinion about the significance of the acid phosphatase results in this case. Dr. Sensabaugh stated that the scientists in his field would want more definitive proof of the presence of semen

---

[1] Lysosomal acid phosphatase is that acid phosphatase that is present in all tissues. During decomposition, this lysosomal acid phosphatase is released from the tissue.

beyond an elevated acid phosphatase test result.

The only dispute between these two experts is whether an acid phosphatase level that exceeds 25 U/L is sufficient evidence to prove the presence of semen. In Dr. McGee's scientific community, a level of approximately 25 U/L or slightly higher is sufficient to support this conclusion. These levels have been reached through these pathologists' years of experience in the field, and it has been generally accepted. Dr. Sensabaugh's scientific community, which is more data-driven, would require more proof than an elevated acid phosphatase test result to reach the conclusion that semen was present. This dispute does not go to the reliability of Dr. McGee's opinion; instead it goes to the weight of his opinion. Therefore, Dr. McGee will be permitted to testify regarding his opinion about the acid phosphatase levels.

### II. Degree of Certainty

Defendant seeks to exclude any opinions that Dr. McGee cannot state to a "reasonable degree of medical certainty." Medical opinion testimony is admissible even if it is not stated to a "reasonable degree of medical certainty." See Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998) (stating that the district court did not abuse its discretion in admitting testimony that the doctor could not state to a "reasonable degree of medical probability"). To be admissible, the expert's opinion needs to reflect a scientifically valid method. Id.

Defendant cites Grant v. Farnsworth, 869 F.2d 1149, 1152 (8th Cir. 1989) to argue that opinions must be stated to a "reasonable degree of medical certainty" to be admissible. However, the chiropractor who testified in Grant was only able to guess about the cause of the plaintiff's injury. Id. There is no allegation here that Dr. McGee is guessing to reach his conclusions, and Defendant does not challenge the scientific validity of his methods. Therefore, Dr. McGee's

opinions have a sufficient degree of certainty to be admissible.  <u>Clark</u>, 150 F.3d at 915.

## **DECISION**

Based on the foregoing, Defendant's Motion to Exclude Dr. McGee is **DENIED**.

**IT IS SO ORDERED**.

Dated this 14th day of September, 2006.

                                            /s/ Ralph R. Erickson
                                        Ralph R. Erickson, District Judge
                                        United States District Court