IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER DENYING DEFENDANT'S** |
| vs. | ) | **MOTION FOR A NEW TRIAL** |
| | ) | |
| Alfonso Rodriguez, Jr., | ) | Criminal Case No. 2:04-cr-55 |
| | ) | |
| Defendant. | ) | |

Before this Court is Defendant's Motion for a New Trial (doc. #635). The United States
has offered a brief in opposition (doc. #644) to this motion. Defendant has additionally tendered
a reply (doc. #645). For many of the issues included in motion currently before this Court, the
Defendant and the United States incorporate earlier arguments by reference. This Court likewise
incorporates its earlier rulings where applicable, but sets forth its logic in the body of this
Memorandum Opinion and Order for the purposes of clarity.


**DEFENDANT'S ISSUE I:  THE COURT ERRED IN FAILING TO DECLARE THE
FEDERAL DEATH PENALTY ACT (FDPA) UNCONSTITUTIONAL AND IN FAILING
TO STRIKE THE SPECIAL FINDINGS FROM THE INDICTMENT.**

Defendant argues the Court erred in its July 29, 2005 Order (doc. #117) when it failed to
declare the Federal Death Penalty Act ("FDPA") unconstitutional and failed to strike the special
findings in the indictment. Both the Defendant and United States have incorporated by reference
the memoranda submitted to the Court prior to the July 29, 2005 ruling.

Defendant argues the FDPA in its current form violates the Fifth, Sixth, and Eighth
Amendments to the Constitution. Additionally, Defendant argues the failure to allege non-
statutory aggravating factors renders the indictment deficient. Consequently, Defendant

1

contends the Court erred in failing to strike the "special findings" from the indictment and prohibit the government from seeking the death penalty against Defendant.

Defendant contends the structure of the FDPA demonstrates that Congress intended aggravating factors to be "sentencing considerations" and not elements of the crime of capital murder. Thus, nothing in the FDPA contemplates aggravating factors to be taken to a grand jury and contained in the indictment. Defendant maintains the government essentially created a new crime by adding aggravating factors, which amounted to additional elements to an offense set out by statute. Defendant argues the attempt by the government to "fix" the FDPA and comply with Ring v. Arizona, 536 U.S. 584 (2002), by including the statutory intent requirements and the statutory aggravating factors in a "special findings" portion of an indictment failed under United States v. Booker, 534 U.S. 220 (2005), because only Congress has the constitutional authority to amend the FDPA. Defendant argues an alteration by the Department of Justice or the courts of the scheme Congress has enacted usurps the powers of Congress.

In contrast, the government argues no rewriting of the FDPA is necessary to comply with the Constitution. The indictment in this case contained the *mens rea* and statutory aggravating factors which increased the possible punishment for the charged offense from life imprisonment to death. This procedure cured any Fifth Amendment concerns without violating the plain language of the FDPA. Furthermore, by including more in the indictment, the government argues, Defendant was given more protection because he was notified earlier of the factors which made his prosecution death-eligible.

*Background of Federal Death Penalty Act*. The FDPA was enacted in 1994. At that time, Walton v. Arizona, 497 U.S. 639 (1990), represented the law concerning the procedures

required for the imposition of the death penalty.  In <u>Walton</u>, the Supreme Court held that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury."  <u>Id.</u> at 648 (quoting <u>Hildwin v. Florida</u>, 490 U.S. 638, 640-41 (1989)) (quotations omitted).  This meant it was constitutionally permissible for a judge, rather than a jury, to make factual findings necessary to raise the maximum possible sentence from life in prison to death.

The FDPA, however, provides a defendant more procedural protection than <u>Walton</u> required.  Under the FDPA, if the government believes that the circumstances of an offense justify a death sentence, it may, at a "reasonable time" before trial, serve on the defendant a notice stating that death will be sought and "setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death."  18 U.S.C. § 3593.  In order to lawfully impose a death sentence under the FDPA, a jury must first find beyond a reasonable doubt that a defendant convicted of a crime punishable by death acted with the requisite intent.  The jury must then find beyond a reasonable doubt that at least one enumerated statutory aggravating factor exists.  <u>See</u> 18 U.S.C. § 3593(c).  Only if these two preconditions are satisfied is a defendant eligible to receive a death sentence.

Whether death is, in fact, imposed depends on the outcome of a separate sentencing phase, at which the government may introduce proof of the aggravating circumstances of which it has given notice under § 3593 and the defendant may introduce evidence of mitigating circumstances.  In order to impose a sentence of death, the jury must balance the aggravating and mitigating factors it finds at the sentencing hearing to exist and then find by unanimous vote that a death sentence is warranted.  <u>See</u> 18 U.S.C. § 3593(e).

*Compliance with the Fifth Amendment*.  Defendant contends the FDPA is unconstitutional in light of several Supreme Court decisions.  Defendant argues that not only must the statutory aggravating factors be found by a jury under the Sixth Amendment, but also that they be found and returned in an indictment under the Fifth Amendment.  Defendant maintains a conflict arises between the constitutional requirement that the statutory aggravating factors be presented to the grand jury and the FDPA, which neither contains a provision for presentment of the statutory aggravating factors to a grand jury nor is there a provision permitting a grand jury to make "special findings," as contained in the indictment in this case.

The Fifth Amendment provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. amend. V.  Supreme Court decisions following the enactment of the FDPA – notably Jones, Apprendi, and Ring – cast constitutional doubt on the provision of the FDPA that notice by the government under § 3593 is an adequate alternative to grand jury screening.  In 1999, the Supreme Court decided Jones v. United States, 526 U.S. 227, 251 (1999).  In Jones, the Supreme Court expressly held that "[u]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."  526 U.S. at 243.  Likewise, in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Supreme Court reiterated that any fact increasing a penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.  Finally, in Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court applied Apprendi and overturned its previous decision in Walton v. Arizona, 497 U.S. 639

4

(1990), holding that the Sixth Amendment requires that aggravating circumstances necessary for imposition of the death penalty be found by a jury beyond a reasonable doubt.

Though the Supreme Court has established a defendant has a right under the Sixth Amendment to have capital aggravating factors proven to a jury beyond a reasonable doubt, it has yet to address whether the Fifth Amendment also requires such aggravating factors to be found by the grand jury and included in the indictment.  Nonetheless, several federal court decisions indicate that Defendant is correct in his contention that statutory aggravating factors are to be alleged in an indictment under the Fifth Amendment.  In United States v. Robinson, 367 F.3d 278, 284 (5th Cir. 2004), the Court determined the Sixth Amendment holding in Ring "applies with equal force in the context of a Fifth Amendment indictment clause challenge, even though the Supreme Court has yet to hold as much in a capital case."  In addition, the Eighth Circuit concluded that Ring "necessarily implies" a Fifth Amendment requirement that capital aggravating factors need to be found by the grand jury and included in the indictment.  United States v. Allen, 406 F.3d 940 (8th Cir. 2005); see also United States v. Jackson, 327 F.3d 273, 286-87 (4th Cir. 2003) (after Ring, aggravating factors necessary to impose death must be charged in the indictment); United States v. Quinones, 313 F.3d 49, 53 n. 1 (2d Cir. 2002) (statutory aggravating factors must now be alleged in the indictment and found by a jury in a capital case).

Thus, consistent with federal precedent and in light of Ring, Apprendi, and Jones, the Court finds the Fifth Amendment requires at least one statutory aggravating factor and the *mens rea* requirement to be found by the grand jury and charged in the indictment.  Allen, 406 F.3d 940; Robinson, 367 F.3d at 284; Jackson, 327 F.3d at 286-87; Quinones, 313 F.3d at 53 n. 1.

*The Constitutionality of the Federal Death Penalty Act in light of the Supreme Court's decisions in Ring, Apprendi, and Jones.* In this case, the grand jury returned an indictment charging the statutory aggravating factors that the government intended to prove at trial. Thus, the argument is not that the indictment did not satisfy Jones; instead, Defendant argues the indictment could not lawfully support a death sentence because the FDPA does not allow for aggravating circumstances to be presented to the grand jury and contained in the indictment. Defendant cites 18 U.S.C. § 3593 which provides:

> (a) **Notice by the government**. - If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice -
>
> > (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
> >
> > (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a).

Defendant argues there is no provision of law for a grand jury to make "special findings" and it is not up to the prosecutors or the courts to try to fill the procedural void created by Ring. Defendant urges this Court to declare the FDPA unconstitutional on the basis that the only way to construe the statute along with Jones and Ring would be to judicially rewrite it in a way that is not permitted under the "constitutional avoidance" doctrine.

Defendant's argument has been considered and rejected by other courts. The Fourth

Circuit in considering this same argument explained that "one flaw in [the defendant's] reasoning is the assumption that the Federal Death Penalty Act precludes the grand jury from charging aggravating factors in the indictment." United States v. Barnette, 390 F.3d 775, 789 (4th Cir. 2004).  There is simply no language in the FDPA that even mentions grand jury findings, let alone prohibits them with respect to facts constituting aggravating circumstances.  Id.  Moreover, there is nothing in the legislative history to indicate any such intent.  Id.  Thus, nothing in the FDPA must be "rewritten" to comply with Ring and Jones.  Read together, the FDPA and Ring provide: (1) The Department of Justice must find that the circumstances of an alleged offense justify the imposition of the death penalty; and (2) the Department of Justice finding is not alone sufficient to subject a defendant to a possible death sentence.  United States v. Sampson, 245 F.Supp.2d 327, 333 (D. Mass. 2003).

It is true, as Defendant argues, that when Congress enacted the FDPA, it did not specifically provide that the grand jury would play a role in deciding whether a defendant would be eligible for a death sentence if convicted of the crime charged.  Nonetheless, the FDPA does not manifest an intent to prohibit the grand jury from performing its historic, constitutional function.  The grand jury has traditionally been independent under the common law, and the Supreme Court has "insisted that the grand jury remain 'free to pursue its investigations unhindered by external influence or supervision so long as it does not trench upon the legitimate rights of any witness called before it.'"  United States v. Williams, 504 U.S. 36, 48 (1992) (quoting United States v. Dionisio, 410 U.S. 1, 17-18 (1973)).

Contrary to Defendant's contentions, the Court finds Ring does not render the FDPA unconstitutional.  It does not necessarily follow that the absence of specific language in the

FDPA authorizing the grand jury to indict on aggravating circumstances means Congress

intended to prohibit the grand jury from indicting, if necessary.  Every law must comport with

the Constitution.  However, Defendant has not cited any federal criminal statute that explicitly

directs prosecutors to present essential (or any) elements to a grand jury, even though such

presentment is constitutionally required.  Moreover, as one court noted when discussing whether

silence is a prohibition, "[i]t seems paradoxical to argue that an arson statute prohibits an

arsonist from requesting a trial by jury simply because the language of the statute does not

explicitly provide for such, or that Congress intended to deny a rapist an attorney because the

rape statute was silent on the issue."  United States v. Mikos, 02 CR 137-1,2003 WL 22110948,

*7 (N.D. Ill. Sept 9, 2003).

Furthermore, the fact that Ring requires decisions by the grand jury in addition to the

Department of Justice before a defendant is subject to the possible imposition of the death

penalty is consistent with the usual practice in criminal cases.[1]  Thus, Ring does not require that

any provision of the FDPA be rewritten.  United States v. Le, 327 F.Supp.2d 601, 610 (E.D. Va.

2004) (explaining the government can easily comply with its constitutional and statutory

obligations by first going to the grand jury and then filing notice of its intention to seek the death

penalty under § 3593(a)).  As explained earlier, Ring only requires that the grand jury perform its

traditional role concerning facts that are now deemed to be the functional equivalent of elements

for offenses for which Congress has decided the death penalty can be imposed.  It makes no

difference what label is put on the aggravating factors; if it has the potential to increase a

---

[1]Rule 7 of the Federal Rules of Criminal Procedure explicitly provides that an indictment should contain a "statement of the essential facts constituting the offense charged and must be signed by an attorney for the government."

defendant's punishment, it must be found by a jury beyond a reasonable doubt, see Ring, 536 U.S. at 602, and thus should be included in the indictment.

The Court's independent conclusion is consistent with many other reported federal court decisions which have uniformly determined that Ring does not render the FDPA unconstitutional.  Barnette, 390 F.3d 775; United States v. Robinson, 367 F.3d 278, 284-85 (5th Cir. 2004); Le, 327 F. Supp. 2d at 609-10; Sampson, 245 F. Supp. 2d at 333; United States v. Johnson, 239 F. Supp. 924, 943-43 (N.D. Iowa 2003); United States v. Denis, 246 F. Supp. 2d 1250, 1254-55 (S.D. Fla. 2002); United States v. Matthews, 246 F. Supp. 2d 137, 146-47 (N.D.N.Y. 2002); United States v. Regan, 221 F. Supp. 2d 672, 679-80 (E.D. Va. 2002); United States v. Church, 218 F. Supp. 2d 813, 814-15 (W.D. Va. 2002).

*The Federal Death Penalty Act Following the Supreme Court's decision in Booker.*
Defendant also presents an issue regarding the FDPA based on the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005).  Defendant argues the Supreme Court's decision in Booker, which refused to uphold the constitutionality of the Federal Sentencing Guidelines in their entirety by engrafting the Sixth Amendment jury trial right onto the Guidelines, mandated that this Court also strike down the FDPA under similar reasoning.  Defendant argues Booker stands for the proposition that a court should not read Apprendi, Jones, and Ring into an existing federal statute when to do so would be "plainly contrary to the intent of Congress."  By applying Booker to the FDPA, Defendant argues it is clear that reading into the FDPA the requirement that aggravating factors must be presented to the grand jury and contained in the indictment is plainly contrary to Congressional intent in light of the fact that when the FDPA was enacted the prevailing constitutional law was to treat the aggravating factors as "sentencing considerations."

9

Furthermore, Defendant asserts that Congress, in passing the FDPA, intended the government to have the sole authority to decide under which circumstances it would seek a sentence of death, not the grand jury. Because it is not within the authority of the prosecutors or the courts to fix a defective statute, Defendant argues this Court should declare the FDPA unconstitutional under a similar analysis as set forth by the Supreme Court in <u>Booker</u>.

In <u>Booker</u>, following a determination that the Federal Sentencing Guidelines violated the Sixth Amendment, the provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), was severed and excised as well as another statutory section regarding appellate review of a sentence which depended on the mandatory nature of the guidelines, 18 U.S.C. § 3742(e). The remedy in <u>Booker</u> was determined by looking to legislative intent. 543 U.S. at 246. The Supreme Court considered whether it would deviate less radically from Congress' intended system by (1) superimposing the constitutional requirement that the Sixth Amendment requires juries, not judges, to find facts relevant to sentencing; or (2) eliminating some provisions of the statute. <u>Id.</u> The Court concluded that if the constitutional requirement it announced in <u>Booker</u> was added onto the Sentencing Act, as currently written, the requirement would so transform the scheme that Congress created that Congress likely would not have intended the Act as modified to stand. <u>Id.</u> at 249.

According to Justice Breyer's opinion in <u>Booker</u>, retaining the Sentencing Act as written, while engrafting onto the existing Act the Sixth Amendment "jury trial" requirement, would fundamentally change the Guidelines by preventing the sentencing court from increasing a sentence on the basis of a fact that the jury did not find (or that the defendant did not admit). 543 U.S. at 246. Such a remedy would further undermine the sentencing statute's basic aim of

ensuring similar sentences for those who have committed similar crimes in similar ways and would create a system far more complex than Congress could have intended.  Id. at 252-53.

Thus, the Supreme Court in Booker focused on the idea that adding the constitutional requirement it announced onto the Sentencing Act would transform the scheme that Congress created and would create a sentencing system that Congress did not intend.  Justice Breyer's opinion does not necessarily denote that it is *per se* unconstitutional to engraft a new constitutional requirement onto a statute.  Instead, it points out that a new constitutional rule may render a statute unconstitutional when superimposing the rule on the statute transforms the scheme Congress intended.

In contrast to the Sentencing Act, the Court finds the FDPA, as currently written, provides for a scheme that would remain consistent as intended by Congress even in light of the constitutional determinations made by the Supreme Court since the FDPA's enactment.  The FDPA provides that the government shall give notice, within a reasonable time before trial, setting forth the aggravating factor or factors it proposes to prove as justifying a sentence of death, if the defendant is convicted of the charged offense.  18 U.S.C. § 3593(a).  The FDPA further provides for presentment of aggravating factors to the jury.  The burden of establishing the existence of any aggravating factor is on the government, and it is only satisfied by proof beyond a reasonable doubt.  18 U.S.C. § 3593(c).  A finding with respect to any aggravating factor must be unanimous.  18 U.S.C. § 3593(d).  Finally, the FDPA provides that consideration should be given to whether all the aggravating factors found to exist sufficiently outweigh all the mitigating factors found to exist to justify a sentence of death.  18 U.S.C. § 3593(e).  Based upon this consideration, the jury by unanimous vote shall recommend whether the defendant should be

sentenced to death.  Id.

When enacting the FDPA, Congress directed that the government shall give notice of aggravating factors it intends to rely upon to justify a sentence of death.  Further, Congress contemplated that aggravating factors should be presented to the jury and proven beyond a reasonable doubt.  Congress required that a finding with regard to any aggravating factor must be unanimous.  Permitting a grand jury now to consider the statutory aggravating factors does nothing more than augment the FDPA as it is currently written by providing one more level of procedural protection for a defendant.  The important role of the grand jury in our justice system has "the dual function of determining if there is probable cause to believe a crime has been committed and of protecting citizens against unfounded criminal prosecutions."  Branzburg v. Hayes, 408 U.S. 665, 686-87 (1972).  The statutory roles of the Department of Justice, the judge, and the jury as set out in the FDPA are not altered by also recognizing a role for the grand jury. Therefore, the Court finds the FDPA does not have to be rewritten to permit a grand jury to consider factors that have the potential to increase a defendant's sentence.

Defendant also argues by allowing the inclusion of statutory aggravating factors in the indictment, a new criminal offense was created with elements not enacted into law by Congress. However, this argument has been addressed and rejected by the Eighth Circuit.  In Lee, the defendant argued that since the FDPA also required proof of aggravating factors, it must be interpreted after Ring to create new common law offenses.  United States v. Lee, 374 F.3d 637, 648-49 (8th Cir. 2004), cert. denied 125 S.Ct. 2962 (2005).  The Eighth Circuit concluded that Ring simply held that for the maximum penalty to be imposed, the legislature had required findings of aggravating factors in addition to findings on the elements of the offense.  Id.  The

Supreme Court in <u>Ring</u> held that Arizona's enumerated statutory aggravating factors operate as the "functional equivalent of an element of a greater offense," but it did not hold that such factors actually become elements of a new substantive offense. <u>See Ring</u>, 536 U.S. at 609 (quoting <u>Apprendi</u>, 530 U.S. at 494 n. 19).

In conclusion, read together, the FDPA and the Supreme Court decisions provide: (1) the Fifth Amendment requires at least one statutory aggravating factor and the *mens rea* requirement to be found by the grand jury and charged in the indictment; (2) The Department of Justice must find that the circumstances of an alleged offense justify the imposition of the death penalty; (3) the government must provide notice of its intent to seek a sentence of death within a reasonable time before trial; and (4) aggravating factors must be found by a jury beyond a reasonable doubt before the death penalty can be imposed. The Court finds the constitutional mandate that aggravating factors are to be first submitted to a grand jury does not so transform the scheme Congress intended when it enacted the FDPA that it would not have intended the FDPA as so modified to stand. Thus, a finding that the Supreme Court's holdings following the enactment of the FDPA remain harmonious with the FDPA is the as Congress would have preferred and is most compatible with Congress' intent as embodied in the FDPA. As such, the Court is not persuaded that the FDPA must be struck down under the reasoning applied in <u>Booker</u>. Accordingly, defendant's motion to declare the FDPA unconstitutional and to strike special findings in the indictment was properly denied.

**DEFENDANT'S ISSUE II: THE COURT ERRED IN FAILING TO DECLARE THE RELAXED EVIDENTIARY STANDARD OF 18. U.S.C. § 3593(c) UNCONSTITUTIONAL**.

Defendant argues the Court erred in its July 29, 2005 Order when it denied Defendant's Motion to Declare the Relaxed Evidentiary Standard of 18 U.S.C. § 3593(c) Unconstitutional Under the Sixth Amendment and the Due Process Clause of the Fifth Amendment. Both the Defendant and United States have incorporated by reference the memoranda submitted to the Court prior to the July 29, 2005 ruling.

In his brief in support of his Motion, Defendant argues that the relaxed evidentiary standard of 18 U.S.C. § 3593(c) is unconstitutional because it provides that aggravating factors may be proven by information that does not conform to either the Federal Rules of Evidence or the Confrontation clause. Defendant contends this is in violation of the Sixth Amendment, the Due Process Clause of the Fifth Amendment, and the Eighth Amendment.

The government argues that nothing in <u>Ring</u> provides a basis upon which to mandate use of the Federal Rules of Evidence in a capital sentencing hearing. After <u>Ring</u>, as before it, courts are still bound by constitutional dimensions, so the evidentiary standard articulated in the FDPA remains constitutional.

The FDPA provides for a relaxed evidentiary standard during the sentencing hearing in order to give the jury an opportunity to hear all relevant and reliable information, unrestrained by the Federal Rules of Evidence. <u>United States v. Jones</u>, 132 F.3d 232, 241 (5th Cir. 1998). The FDPA provides:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. . . . The defendant may present any information relevant to a mitigating factor. The government may present any

14

information relevant to an aggravating factor for which notice has been provided
under subsection (a).  Information is admissible regardless of its admissibility
under the rules governing admission of evidence at criminal trials except that
information may be excluded if its probative value is outweighed by the danger of
creating unfair prejudice, confusing the issues, or misleading the jury. . . . The
government and the defendant shall be permitted to rebut any information
received at the hearing, and shall be given fair opportunity to present argument as
to the adequacy of the information to establish the existence of any aggravating or
mitigating factor, and as to the appropriateness in the case of imposing a sentence
of death.

18 U.S.C. § 3593(c).

Subject to the requirements of due process, "Congress has the power to prescribe what
evidence is to be received in the courts of the United States."  United States v. Brainer, 691 F.2d
691, 695 n.7 (4th Cir. 1982) (quoting Tot v. United States, 319 U.S. 463, 467 (1943)).  As a
result, Congress need not require the application of the Federal Rules of Evidence for proving
*mens rea* and aggravating factors, as long as the evidentiary scheme adopted comports with the
Fifth and Sixth Amendments.  United States v. Haynes, 269 F. Supp. 2d 970, 986 (W.D. Tenn.
2003).  The Eighth Circuit has addressed the evidentiary standard of § 3593(c) as being
constitutional:

The Federal Death Penalty Act (FDPA) erects very low barriers to the admission
of evidence at capital sentencing hearings.  Since the need to regulate the scope of
testimony is less at the penalty phase than at the guilt phase of trial, parties may
present evidence "as to any matter relevant to the sentence."  18 U.S.C. § 3593(c).
See also Williams v. New York, 337 U.S. 241, 247 (1949) (A judge or jury at a
capital sentencing hearing should "not be denied an opportunity to obtain
pertinent information by a requirement of rigid adherence to restrictive rules of
evidence properly applicable to the trial."); Gregg v. Georgia, 428 U.S. 153, 204-
04 (1976) (In capital sentencing hearings, it is "desirable for the jury to have as
much information before it as possible when it makes the sentencing decision").

United States v. Lee, 274 F.3d 485, 494 (8th Cir. 2001).  Defendant urged this Court to revisit
the issue following Ring.  Similarly, the Eighth Circuit was asked to reconsider the evidentiary

15

standard under the FDPA following Ring again in United States v. Lee, 374 F.3d 637, 648 (8th

Cir. 2004).  In Lee, the Eighth Circuit agreed with the Second Circuit that the evidentiary

standard under the FDPA is constitutional even in light of Ring, determining the FDPA standard

does not impair the reliability of the evidence admissible during the penalty phase.  374 F.3d at

648.  Rather, the Court concluded, "[T]he admission of more rather than less evidence during the

penalty phase increases reliability by providing full and complete information about the

defendant and allowing for an individualized inquiry into the appropriate sentence for the

offense."  Id. (citing United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004)).  Likewise, other

courts considering this issue have concluded the evidentiary standard under the FDPA is

constitutional in light of Jones, Apprendi, and Ring.  United States v. Taylor, 302 F. Supp. 2d

901, 905-06 (N.D. Ind. 2003); United States v. Haynes, 269 F. Supp. 2d 970, 985 (W.D. Tenn.

2003); United States v. Matthews, 246 F. Supp. 2d 137, 141-46 (N.D.N.Y. 2002); United States

v. Lentz, 225 F. Supp. 2d 672, 682-83 (E.D. Va. 2002); United States v. Regan, 221 F. Supp. 2d

672, 682-86 (E.D.Va. 2002).

        Thus, with regard to the Eighth Amendment, it is still desirable for the jury to have as

much information before it as possible when it makes the sentencing decision.  Gregg, 428 U.S.

at 204; United States v. Jones, 132 F.3d 232, 241-42 (5th Cir. 1998) (the relaxed evidentiary

standard does not impair the reliability or relevance of information at capital sentencing

hearings, but helps to accomplish the individualized sentencing required by the constitution).

Further, even though the sentencing hearing will not be governed by traditional evidentiary

restraints, the district court is permitted to exclude unfairly prejudicial information.  In fact, §

3593(c) specifically announces that the parties shall be given fair opportunity to present

16

argument as to the adequacy of the information to be presented at the sentencing hearing as well as the appropriateness of the information to the case. Thus, because the FDPA expressly supplants only the rules of evidence, not constitutional standards, the district court retains the authority and flexibility under the FDPA to impose upon the parties any standards of admissibility or fairness dictated by the Fifth and Sixth Amendments. Haynes, 269 F. Supp. 2d 970, 987 (W.D. Tenn. 2003). The judge, as gatekeeper, has the authority to control the evidence and make assurances that the information sought to be presented is reliable and fair. The Constitution is not suspended during the sentencing phase. Thus, questions regarding confrontation, due process, reliability, and probative value are issues the judge still has to consider, regarding sentencing evidence. As a result, § 3593(c) can be read in a manner consistent with the Constitution, even after Ring. Accordingly, Defendant's motion to declare the evidentiary standard of 18 U.S.C. § 3593(c) unconstitutional was properly denied.

## DEFENDANT'S ISSUE III: THE COURT ERRED IN FAILING TO STRIKE THE STATUTORY AGGRAVATING FACTOR THAT DEATH WAS CAUSED DURING THE COMMISSION OF THE CRIME OF KIDNAPPING.

Defendant raised this issue pre-trial (doc. #88). The Court considered Defendant's arguments, but ultimately rejected the motion (doc. #162). Defendant contends that the Court erred in so holding and incorporates his earlier argument as to this point. The Court similarly incorporates its earlier opinion where applicable.

Defendant was charged with knowingly kidnapping Dru Sjodin and willfully transporting her in interstate commerce. Among other things, the indictment also alleged that this kidnapping resulted in her death. In the government's "Notice of Intent to Seek a Sentence of Death," the first statutory aggravating factor states that the defendant "caused the death of Dru Katrina

17

Sjodin during the commission of a violation of 18 U.S.C. § 1201 (kidnapping) . . . ."  Defendant

alleges that this statutory aggravating factor merely duplicates an element of the crime.  Based

on this allegation, Defendant argues that this aggravating factor should be struck from the notice

because it does not narrow the class of persons eligible for the death penalty.

In United States v. Jones, 132 F.3d 232, 237 (5th Cir. 1998), the defendant was charged

with kidnapping resulting in the victim's death.  Just as in the present case, one of the statutory

aggravating factors was that "the defendant caused the death or injury resulting in the death of

[the victim] during the commission of the offense of kidnapping."  Id. at 238 n.1.  The Jones

court held that this aggravating factor was not an unconstitutional duplication of an element of

the crime.  Id. at 249.  The court explained that during the guilt phase of the trial, the jury only

determined whether the defendant was guilty of kidnapping with death resulting.  Id.  Only at the

penalty phase did the jury then determine whether the defendant had actually caused the death of

the victim during the commission of the crime of kidnapping.  Id.

Defendant argues that only when there are multiple defendants charged with kidnapping

could it be possible that the "causing the death" aggravating factor would not duplicate an

element of the crime.  However, there are any number of factual scenarios with a sole defendant

where the defendant would not have caused the death of his kidnapping victim.  For example, the

victim could die as a result of a risky escape, such as jumping out of a moving vehicle.  In that

situation, the kidnapper would not have "caused" the death.  Therefore, the government's first

statutory aggravating factor is not an unconstitutional duplication of an element of the crime.

Jones, 132 F.3d at 249.

Defendant argues that the reasoning in United States v. Kaczynski, No. CR-S-96-

18

259GEB GGH, 1997 WL 716487 (E.D. Cal. Nov. 7, 1997) and United States v. McVeigh, 944 F. Supp. 1478 (D. Colo. 1996) supports his argument.  In Kaczynski, the first statutory aggravating factor alleged that "[t]he death, or injury resulting in death, occurred during the commission or attempted commission of an offense under 18 U.S.C. § 844(d) which prohibits transportation of an explosive device in interstate commerce with intent to kill."  1997 WL 716487, at *1.  In McVeigh, two of the statutory aggravating factors alleged "[t]hat the deaths or injuries resulting in death occurred during the commission of an offense under . . . 18 U.S.C. § 844(f) (destruction of government property by explosives) . . . and 18 U.S.C. § 2332a (use of a weapon of mass destruction)."  944 F. Supp. 1488-89.  In both of these cases, the district courts struck these statutory aggravating factors because they were identical to counts in the indictments. Kacyznski, 1997 WL 716487, at **22-23; McVeigh, 944 F. Supp. at 1489-90.  Unlike the present case, these aggravating factors did not narrow the class of defendants that are eligible for the death penalty by alleging that the defendants had been the ones who actually caused the deaths.

Furthermore, the reasoning of the Kacyznski and McVeigh courts has been called into question by numerous other courts.[2]  As one district court observed, the McVeigh reasoning appears to come right out of the dissent from Lowenfield v. Phelps, 484 U.S. 231 (1988).  Llera Plaza, 179 F. Supp. 2d 464, 484 (E.D. Pa. 2001).  The flaw in the Kacyznski reasoning is that it starts from the assumption that the class of death-eligible defendants that must be narrowed is the class of all defendants that have committed the same offense as the defendant before the

---

[2] Cases that have reached the opposite conclusion of Kacyznski and McVeigh include United States v. Lentz, 225 F. Supp. 2d 666 (E.D. Va. 2002); United States v. Llera Plaza, 179 F. Supp. 2d 464 (E.D. Pa. 2001); and United States v. Johnson, 136 F. Supp. 2d 553 (W.D. Va. 2001).

court.  Id.  However, the Supreme Court cases of Tuilaepa v. California, 512 U.S. 967 (1994) and Arave v. Creech, 507 U.S. 463 (1993) explain that the class of defendants that must be narrowed is that class of defendants that have been convicted of any capital crime.

As the Court stated in Tuilaepa, "the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty."  512 U.S. at 976.  Defendant argues that the jury would have been able to consider the circumstances of the crime through the use of other factors included in the Notice of Intent to Seek a Sentence of Death such as the allegation that the defendant "intentionally inflicted serious bodily injury that resulted in the death of Dru Katrina Sjodin."  However, if the Court had removed the statutory aggravating factor, the jury would not have considered one circumstance of the crime: that the defendant caused her death during a kidnapping.  The fact that the death occurred during the commission of another crime appears nowhere else in the Notice.  Removing this aggravating factor would have violated the Supreme Court's holding that the sentencer must consider the circumstances of the crime when deciding whether to impose the death penalty.  Tuilaepa, 512 U.S. at 976.  The Court, therefore, did not err in denying Defendant's motion to strike the statutory aggravating factor that death was caused during the commission of a kidnapping.

**DEFENDANT'S ISSUE  IV:  THE COURT ERRED IN FAILING TO STRIKE THE CONVICTION IN POLK COUNTY CASE NUMBER 6192 FROM THE GOVERNMENT'S NOTICE.**

Defendant raised this issue pre-trial (doc. #90).  The Court considered the arguments raised, but ultimately rejected Defendant's motion (doc. #162).  Defendant opines that the Court erred in doing so, and incorporates his earlier argument as to this point.  The Court similarly incorporates its earlier ruling where applicable.

20

The relevant facts from the conviction in Polk County criminal case #6192 are as follows: On April 13, 1980, Rodriguez tried to kidnap a woman in Crookston, Minnesota. Rodriguez v. State, 345 N.W.2d 781, 784 (Minn. Ct. App. 1984). She fought him off and escaped with minor stab wounds. Id. It turned out that she was a portrait artist, so she drew a sketch of her attacker, but she was unable to pick Rodriguez's picture out of a lineup. Id. When the police showed her a second photographic lineup, she picked Rodriguez's picture as looking the most like her attacker, but she also thought the eyes of a man in another photograph looked familiar. Id. Following this second photo lineup, she drew a second sketch of her assailant, and this sketch "closely resembled" Rodriguez. Id.

The police then hypnotized the victim, and during hypnosis, she positively identified Rodriguez as her assailant. Rodriguez, 345 N.W.2d at 784. At trial, the court limited her testimony to her pre-hypnosis recollections. Id. at 785. Following Rodriguez's trial, the Minnesota Supreme Court held that testimony derived through the use of hypnosis may not be admitted at a criminal trial. State v. Mack, 292 N.W.2d 764, 772 (Minn. 1980).

While the trial judge did exclude all testimony elicited through hypnosis, Rodriguez, 345 N.W.2d at 785, Defendant argues that a violation of Mack occurred when the victim was allowed to identify Rodriguez at trial. It is not clear from the case how this occurred. The court only states: "During trial, Mrs. Whalen identified appellant as her assailant." Id. at 784. Did she simply repeat all of her pre-hypnosis recollections that identified Rodriguez as her attacker? Or did she actually point to Rodriguez in open court and identify him as her attacker? If the latter occurred, it is possible that the trial court had some procedural safeguards in place that required her to make this identification based solely on pre-hypnotic recollections. One of the concerns

21

about the reliability of hypnosis is that following hypnosis, the subject cannot distinguish

between actual memories and any memories that may have been invented during hypnosis.

Spryncynatyk v. Gen. Motors Corp., 771 F.2d 1112, 1120 (8th Cir. 1985).  "After hypnosis the

subject has one memory of the past event, the hypnotic memory, and that becomes hardened in

the subject's mind."  Id. (citing Mack, 292 N.W.2d at 769).  Therefore, if Mrs. Whalen's

identification of Rodriguez involved pointing to him in the courtroom, she may have been

subconsciously influenced by hypnosis, which would supposedly be a violation of Mack.

Therefore, that one small portion of her testimony might be inadmissible.

Defendant's biggest obstacle with respect to this argument is that it was considered and

rejected by the Minnesota courts.  Rodriguez, 345 N.W.2d at 786.  The Minnesota courts

recently rejected, on procedural grounds, a second, much later, petition for postconviction relief

making a similar collateral attack on the #6192 conviction.  Rodriguez v. State (II), No. A05-

2545, 2006 Minn. App. Unpub. LEXIS 1009 (Minn. App. Sept. 5, 2006), *review denied*, 2006

Minn. LEXIS 896 (Dec. 12, 2006).  When prior convictions are determined to be

unconstitutional by the state where they were obtained, any sentence based on those prior

unconstitutional convictions must be vacated.  United States v. Tucker, 404 U.S. 443, 449

(1972).  In the context of a death penalty case, any prior conviction that was overturned by the

state of origin could not be used as an aggravating factor for the death penalty.  Cf. id.  In this

case, the Minnesota courts upheld the conviction in case #6192 even when confronted with the

identical arguments Defendant raises now.[3]  Cf. id.  Since this conviction was not

---

[3] Defendant argues that State v. Koehler, 312 N.W.2d 108 (Minn. 1981) compels the conclusion that Rodriguez' conviction should be vacated.  However, the Minnesota courts had the Koehler precedent at the time they decided Rodriguez' hypnosis arguments, and they still upheld his conviction.

unconstitutional, it was properly admitted as an aggravating factor.  Cf. id.


**DEFENDANT'S ISSUE V:  THE COURT ERRED IN FAILING TO STRIKE THE POLK COUNTY CONVICTIONS IN 5447 AND 5438 BECAUSE THOSE CONVICTIONS DID NOT INVOLVE THE INFLICTION OF SERIOUS BODILY INJURY.**

The Defendant raised this issue pre-trial (doc. #92), which this Court rejected (doc. #162).  Defendant incorporates by reference his earlier memorandum on this issue.  The Court similarly incorporates its earlier Order where applicable.

In case # 5438, Rodriguez pled guilty to Attempted Aggravated Rape.  In case #5447, Rodriguez pled guilty to Aggravated Rape.  The government included these convictions in its Notice of Intent to Seek a Sentence of Death under the statutory aggravating factor that they are previous convictions that involved "serious bodily injury" pursuant to 18 U.S.C. § 3592(c)(4).  Defendant argues that neither of these convictions involve serious bodily injury according to United States v. Rivera, 83 F.3d 542 (1st Cir. 1996).

Rivera involved the interpretation of 18 U.S.C. § 2119, which is the federal carjacking statute.  83 F.3d at 544.  Under the carjacking statute, the maximum term of imprisonment is increased to twenty-five years if a "serious bodily injury" results from the commission of the crime.  18 U.S.C. § 2119.  "Serious bodily injury" was defined by referencing the definition used in 18 U.S.C. § 1365.  18 U.S.C. § 2119(2).  Under that statute, "serious bodily injury" means "bodily injury which involves–(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty . . . ."  18 U.S.C. § 1365(h)(3).

The Rivera court was confronted with the issue of whether a rape constituted "serious

bodily injury" within the meaning of this definition.  83 F.3d at 548.  The victim's testimony of

the incident did not include any specific description of the assault.  <u>Id.</u> at 547.  The medical

report indicated that there was no evidence of any physical trauma to her body.  <u>Id.</u>  She did not

receive any professional counseling or assistance after the assault.  <u>Id.</u> at 548.  While the court

acknowledged that a rape "is a unique and reprehensible physical and psychic invasion," it held

that the scant evidence before it relating to the assault did not meet the definition of "serious

bodily injury" under 18 U.S.C. § 1365.  <u>Id.</u>

  In this case, the term "serious bodily injury" appears in a section of the Federal Death

Penalty Act ("FDPA"), and, unlike the carjacking statute in <u>Rivera</u>, there is no cross-reference to

18 U.S.C. § 1365.  Defendant argues that the definition of serious bodily injury in 18 U.S.C. §

1365 should automatically be imputed to the FDPA even though Congress has not explicitly

indicated that it applies in this context.

  When interpreting a statute, a court must "presume that [the] legislature says in a statute

what it means and means in a statute what it says there."  <u>Bedroc Ltd. v. United States</u>, 541 U.S.

176, 183 (2004) (quoting <u>Connecticut Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992)).  If

the statute's text is unambiguous, the inquiry as to its meaning can begin and end with the words

used.  <u>Id.</u>  A court must give the words in a statute their ordinary meaning unless Congress has

given a reason to do otherwise.  <u>Ashley v. U.S. Dep't of Interior</u>, 408 F.3d 997, 1001 (8th Cir.

2005).

  The ordinary meaning of "serious" is "that which is of importance, grave, critical, or

somber."  Webster's Unabridged Dictionary 1749 (2d ed. 1997).  "Bodily" means "of or

pertaining to the body."  <u>Id.</u> at 232.  And "injury" means "harm or damage that is done or

sustained." Id. at 983.  Therefore, the ordinary meaning of "serious bodily injury" is a grave or critical harm done to or pertaining to the body.

If a defendant inflicted any critical physical injuries to his victim, those injuries would fit within the ordinary meaning of this phrase. The physical injuries would not have to be life-threatening or the "very highest degree" of physical injury in order to be considered "serious bodily injury."  See United States v. Demery, 980 F.2d 1187, 1190 (8th Cir. 1992) (interpreting the ordinary meaning of "serious bodily injury"); United States v. Webster, 620 F.2d 640, 642 (7th Cir. 1980) (same).  What is not clear from the ordinary meaning of this phrase is what kinds of injuries are encompassed by that part of the definition that states these injuries may "pertain to" the body.  Since it is not clear from the ordinary meaning of "serious bodily injury" whether impairment of mental faculty or mental injury, resulting from meets the definition, the Court must rely on other interpretive methods to determine the meaning of this phrase.  See Firstar Bank v. Faul, 253 F.3d 982, 987 (7th Cir. 2001) (stating that a court may rely on other canons of statutory interpretation when the ordinary definition does not provide a clear answer).

One canon of statutory interpretation is that "identical words used in different parts of the same act are intended to have the same meaning."  Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995).  Another canon states that where a phrase is given a consistent meaning throughout the United States Code, that phrase has the same meaning in any particular instance where that phrase is used.  See, e.g., Dir., Office of Workers' Comp. v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 129-30 (1995); W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 88-92 (1991).

As previously discussed, Congress has defined "serious bodily injury" at 18 U.S.C. §

1365(g)(3). Then it has used that same definition at 18 U.S.C. § 113 and 18 U.S.C. § 2119. The same definition for serious bodily injury appears in several different places in Title 18 of the United States Code. Therefore, the Court may apply that definition to the phrase when it is used in 18 U.S.C. § 3592(c)(4). Newport News, 514 U.S. at 129-30; W. Va. Univ. Hosps., 499 U.S. at 88-92.

Other district courts have reached this same conclusion. In the jury instructions for capital cases in the Southern District of Georgia and the Western District of North Carolina, both courts used the definition of "serious bodily injury" to define that phrase for the aggravating factor under 18 U.S.C. § 3592(c)(4). http://www.fjc.gov (follow "Educational Programs & Materials"; then follow "Resources for managing capital cases"; then follow "Resources for Managing Federal Death Penalty Trials"; then follow "dpen0029.pdf" and "dpen0031.pdf"). Defendant has also asked this Court to follow that definition. Based on all of these considerations, the Court applied the definition of "serious bodily injury" in 18 U.S.C. § 1365(g)(3) to 18 U.S.C. § 3592(c)(4).

Defendant argues that under this definition, rape may never constitute "serious bodily injury." This argument reads Rivera too broadly. The Rivera court explained that because the medical report revealed no physical injuries to the victim, and she did not receive any professional counseling or assistance after the rape, it could not find that she had suffered serious bodily injury. 83 F.3d at 547-49.

As to whether rape, as a matter of law, constitutes serious bodily injury under this definition, the Court was unable to find any cases on this issue. Defendant argues that United States v. Marcussen, 403 F.3d 982, 984 (8th Cir. 2005), holds that any decision regarding the

circumstances of a prior conviction is a legal issue. Marcussen involved the issue of whether a prior conviction met the definition of "crime of violence" under section 4B1.2 of the United States Sentencing Guidelines. Id. The court held that this determination is a question of law for the court to decide. Id. The underlying reasoning for this opinion explains this result.

"To determine the nature of a crime requires an examination of the elements which compose it." United States v. Moore, 38 F.3d 977, 979 (8th Cir. 1994) (citing Marcussen, 403 F.3d at 984). A determination of these basic elements does not require knowledge of the underlying facts. Id. Therefore, it is a question of statutory interpretation, which is a skill best left to the judge. Id. In the case of determining whether a crime constitutes a crime of violence, a court has to decide whether "by its nature it involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." Id. (quoting 18 U.S.C. § 924(c)(3)(B)). Since the court only has to determine whether a substantial risk of the use of physical force exists in the nature of that crime, it does not have to look to the specific facts of the conviction to determine whether physical force was actually used. Id.

This principle can be seen at work in the Eighth Circuit's conclusion that the burglary of a commercial building is a crime of violence. United States v. Fleck, 413 F.3d 883, 895 (8th Cir. 2005). The defendant could have entered a commercial building through an unlocked door when nobody was there, and it would still qualify as a crime of violence regardless of the actual facts of the crime. Id. Unlike the determination of whether a crime involved a substantial risk of the use of physical force, the determination of whether a crime involved the infliction of, or attempted infliction of, serious bodily injury is necessarily a question of fact. With serious

bodily injury, the court is not looking at whether the nature of the crime involves a risk that injury might occur, instead the court is looking at what actually happened to the victim of that particular crime.

Even physical injury notwithstanding, 18 U.S.C. § 1365(h)(3) (2002), provides that "serious bodily injury" includes the "protracted loss or impairment of the function of a . . . mental faculty." A serious bodily injury exists when the evidence establishes that, as a direct consequence of a rape, the victim is emotionally disturbed and suffers a chronic mental condition. United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1st Cir. 1998); see also United States v. Ramirez-Burgos, No. 96-1298, 1997 WL 268695, *7 (1st Cir. May 21, 1997) (stating that the victim was diagnosed with post-traumatic stress disorder and major depression as a result of the rape). It also constitutes serious bodily injury when a rape victim is "extremely tearful" during her testimony about the crime, and the victim has undergone at least ten months of counseling at a rape crisis center. United States v. Lowe, 145 F.3d 45, 53 (1st Cir. 1998).

The victim from the 5438 conviction, Ms. Iverson, testified that she has suffered from anxiety, depression, and nightmares as a result of the assault. For two years following the assault she went to counseling at the Rape Crisis Center in Moorhead, Minnesota and she received counseling from a pastor. The other victim, Ms. Volker, testified that she has suffered from anxiety attacks and depression as a result of the assault. She has also had problems maintaining healthy relationships with men as a result of the assault. Since 1987 she has sought counseling at various times, and some of the counseling related to the assault. Additioanlly, both women have exhibited symptoms of Post Traumatic Stress Disorder. The testimony from these two women presents sufficient information from which a reasonable jury could find that they

suffered a serious bodily injury. Lowe, 145 F.3d at 53.

Defendant argues that the government cannot prove serious bodily injury based on protracted loss or impairment of the function of a mental faculty without expert testimony. However, cases under both 18 U.S.C. § 1365(h)(3) and the Sentencing Guidelines have found the existence of serious bodily injury based on impairment of the function of a mental faculty without testimony of a mental health expert. United States v. Kills in Water, 293 F.3d 432, 436 (8th Cir. 2002); Lowe, 145 F.3d 45, 53 (1st Cir. 1998). The lack of any expert testimony to confirm the presence of impaired mental faculty would go to the weight of the victim's testimony as opposed to the issue of admissibility.

The Court's earlier ruling was correct under the law of the United States, the controlling legal precedent, and the facts of this case. Defendant's earlier motion to strike was properly denied.

## DEFENDANT'S ISSUE VI:  THE COURT ERRED IN FAILING TO BAR THE DEATH PENALTY DUE TO ITS ARBITRARY AND INFREQUENT USE AND DUE TO DISCRIMINATION BASED ON DEFENDANT'S ETHNIC BACKGROUND.

Defendant previously challenged the constitutionality of the Death Penalty under the FDPA (doc. #109), claiming the arbitrary and infrequent nature of the penalty violated the Eighth Amendment. Defendant similarly argued that the penalty is applied in a racially discriminatory manner. The Court rejected both contentions (doc. #200). Defendant maintains that the Court erred in doing so. Defendant has incorporated his earlier arguments as to these two points, and the Court similarly incorporates its previous Order where applicable.

### A.  Arbitrary and Infrequent Use.

Defendant's first argument is that the death penalty should be barred in this case because

it is rarely applied.  According to statistics from the Federal Death Penalty Resource Counsel Project, from 1988 to June 2004, only 0.1% of federal capital defendants had been executed and only 1.5% were under a sentence of death.  (Mem. Supp. Mot. Bar Death Penalty 3-4.) Defendant argues that one of the reasons the Supreme Court struck down the death penalty in Furman v. Georgia, 408 U.S. 238 (1972) was because it was imposed infrequently.  At the time of the Furman opinion, only 20 percent of the defendants charged with capital crimes were actually sentenced to death.  (Mem. Supp. Mot. Bar Death Penalty 4.)

It is difficult to divine the true holding of Furman from the opinion of the case itself since it was a per curiam decision with five separate concurrences.  408 U.S. at 239-40.  However, later Supreme Court opinions have explained its holding.  "Furman held *only* that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Gregg v. Georgia, 428 U.S. 153, 199 (1976) (emphasis added).  Therefore, so long as there are sufficient standards guiding the decision maker, the imposition of the death penalty is constitutional under Furman.  Defendant's argument about how often the death penalty is actually imposed is simply not a relevant consideration.  Gregg, 428 U.S. at 199.

Defendant next argues that the death penalty is being applied arbitrarily in this case because other federal cases of an allegedly more serious nature, based on the number of people killed, did not receive the death penalty.  (Mem. Supp. Mot. Bar Death Penalty 6-9.)  A defendant facing a death sentence "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty."  McCleskey v. Kemp, 481 U.S. 279,

306-07 (1987) (emphasis in original).  The Supreme Court has noted numerous possible factors for why a death sentence was not sought, including the relative capabilities of the responsible law enforcement agencies; the strength of the available evidence; and witness availability, credibility, and memory.  Id. at 307 n.28.  Also, it does not violate the Constitution when a prosecutor affords an individual defendant mercy.  Gregg, 428 U.S. at 199.

Some of the cases mentioned by Defendant were situations where the individual United States Attorney decided not to seek the permission of the Attorney General to seek a sentence of death.  The remaining cases were situations where the Attorney General apparently granted permission to seek a sentence of death, but the United States Attorney then entered into a plea agreement with the defendant.  Considering the prosecutor's wide discretion in this area, it would be improper for this Court to ask each prosecutor in those cases their reasons for the decisions they made.  McCleskey, 481 U.S. at 296.  There could be any number of permissible reasons to explain those decisions ranging from the relative strength of the case to the prosecutor's decision to be merciful.  Id. at 307 n.28; Gregg, 428 U.S. at 199.  Defendant cannot prove a constitutional violation simply because others similarly situated did not receive a sentence of death.  McCleskey, 481 U.S. at 306-07.  The fact remains that Defendant was convicted of a crime for which the laws of the United States permit the imposition of the death penalty.  Id. at 296-97.  His argument that others similarly situated did not receive a sentence of death is insufficient to raise a constitutional violation.

**B.    Discrimination**

Defendant next argues that the notice of intent to seek a sentence of death should be dismissed because he was targeted on the basis of race.  A claim of discriminatory charging is analyzed as a selective prosecution claim.  Belmontes v. Brown, 414 F.3d 1094, 1125 (9th Cir.

31

2005).  The government has "broad discretion" when deciding who to prosecute and which charges to bring.  Wayte v. United States, 470 U.S. 598, 607 (1985).  The only restraint on this discretion is that the government may not selectively enforce criminal laws on the basis of race, religion, or other arbitrary classification.  Id. at 608.  To prove selective prosecution, a defendant must demonstrate "that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose."  Id.  To establish a discriminatory effect in a race case, the defendant must demonstrate that similarly situated individuals of a different race were not prosecuted.  United States v. Armstrong, 517 U.S. 456, 465 (1996).  A defendant may use statistics to demonstrate discriminatory effect, but those statistics must relate to the same charging authority that is prosecuting him.  Belmontes, 414 F.3d at 1127.  Statistics that relate to decisions made by scores of other prosecutors are not valid to prove discriminatory effect.  McCleskey, 481 U.S. at 295-97.

Defendant alleges that as of September 12, 2000, there were nineteen men on federal death row and only four of them were white, thirteen were African-American, one was Hispanic, and one was designated as "other" race.  (Mem. Supp. Mot. Bar Death Penalty 11.)  In a study done by the Department of Justice, the department found that, in the period between 1995 and 2000, of the 682 cases that individual United States Attorneys chose to submit to the department for the death penalty decision-making procedures, 134 were White, 324 were Black, and 195 were Hispanic.  U.S. Dep't Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review 8 (2001), http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm [hereinafter FDP Study].  When the department later broadened the scope of its study to include capital cases the United States Attorneys did not submit for the death penalty decision-making

procedures and cases where capital crimes could have been charged, it received a total of 973 defendants. From this broader pool, 166 were White, 408 were Black, and 350 were Hispanic. Id. at 10. These numbers translate into 17% White, 42% Black, and 36% Hispanic. Id. The proportions of cases submitted to the Department of Justice for review involving Black and Hispanic defendants were greater than the proportions of Blacks and Hispanics in the general population. Id. at 8. Defendant argues that these statistics are sufficient to demonstrate discriminatory effect.

Defendant also argues that the statistics related to plea agreements evidence discriminatory effect. Out of the cases the Attorney General authorized for the death penalty, individual United States Attorneys entered into plea bargains with 48% of White defendants compared to 25% of African-American defendants, 28% of Hispanic defendants, and 25% of "other" defendants. (Mem. Supp. Mot. Bar Death Penalty 12.)

There are several reasons why these statistics are legally insufficient to demonstrate discriminatory effect. First, these statistics do not compare the total number of people who are eligible for the death penalty with the total number of people who the Attorney General actually authorized for the death penalty. Therefore, these statistics do not meet the requirement that a defendant must show that similarly situated people of a different race were not authorized for the death penalty. Armstrong, 517 U.S. at 465.

Second, these statistics relate to many different decision makers. Defendant argues that the statistics only involve one decision maker: the Attorney General. However, this argument ignores the fact that an individual United States Attorney may never decide to seek the permission of the Attorney General to seek the death penalty on a case that is designated as a capital offense. Since the statistics Defendant presents relate to decisions made by scores of other prosecutors, these are

the same type of statistics that were rejected by the Supreme Court in <u>McCleskey</u>.  Therefore, these are insufficient to demonstrate discriminatory effect.

The only statistic that can actually be attributed solely to the Attorney General does not even support Defendant's argument.  Of those cases United States Attorneys chose to submit, the Attorney General decided to seek the death penalty for 38% of the White defendants, 25% of the Black defendants, and 20% of the Hispanic defendants.  <u>FDP Study</u>, <u>supra</u>, at 8.  The Attorney General authorized the death penalty more often against white defendants than against Black or Hispanic defendants.  These statistics demonstrate that there is no discriminatory effect against Hispanics.  Defendant has failed to prove a racial motive in the decision to seek the death penalty against him and the court did not err to bar the death penalty on this ground.

The Court's previous ruling on this issue was correct under the law, and the Defendant has not set forth any new arguments that would demonstrate the Court erred.


**DEFENDANT'S ISSUE VII: THE COURT ERRED IN FAILING TO REQUIRE THE GOVERNMENT TO FOLLOW THE FEDERAL RULES OF EVIDENCE DURING THE PENALTY PHASE.**

Defendant contends that the Court erred in denying its earlier motion seeking that the Federal Rules of Evidence be used during any penalty phase proceedings in this case (docs. #123 and  200).  The eligibility phase and the selection phase of a capital trial are to be held pursuant to the requirements of 18 U.S.C. § 3593.  18 U.S.C. §§ 3591(a) & 3593(e).  Under § 3593, "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials . . . ."  Defendant argues that <u>Ring</u> requires this Court to apply the Federal Rules of Evidence against the government in the eligibility and selection phases despite

the clear wording of § 3593. Under the FDPA, evidence may be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). This evidentiary standard is constitutional following <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). <u>United States v. Lee</u>, 374 F.3d 637, 648 (8th Cir. 2004). The Court did therefore not err in refusing to apply the Federal Rules of Evidence in the eligibility or selection phases of the trial.


**DEFENDANT'S ISSUE VIII: THE COURT ERRED IN FAILING TO STRIKE THE "HEINOUS, CRUEL AND DEPRAVED" AGGRAVATING FACTOR AS UNCONSTITUTIONALLY VAGUE AND OVERBROAD.**

Defendant contends that the Court erred in failing to strike the "heinous, cruel, and depraved" aggravating factor as unconstitutional. The Defendant has raised this issue pre-trial (doc. #185). The Court denied this motion (doc. #259). Defendant believes that the Court's denial of this motion is error, and incorporates its earlier argument by reference. The Court similarly incorporates its earlier ruling in this matter below, where applicable.

Contrary to the procedure in civil cases where parties are permitted to challenge the sufficiency of the evidence through a summary judgment motion, there is no similar procedure in criminal cases. <u>United States v. Ferro</u>, 252 F.3d 964, 968 (8th Cir. 2001) (quoting <u>United States v. DeLaurentis</u>, 230 F.3d 659, 661 (3d Cir. 2000)). In a criminal case, the government is entitled to present all of its evidence at trial and then have its sufficiency tested by a motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. <u>Id.</u> (quoting <u>DeLaurentis</u>, 230 F.3d at 661). Here, the Court is satisfied that the evidence presented at trial was sufficient to support this factor.

Defendant also alleged that the jury was required to find both that there was torture and that there was serious physical abuse in order to decide that this factor is supported by the evidence because the Notice of Intent states that the killing "involved torture *and* serious physical abuse . . . ." (emphasis added). The statute states that a jury may find that the defendant committed the offense in an especially heinous, cruel, or depraved manner if it "involved torture *or* serious physical abuse to the victim." 18 U.S.C. § 3592(c)(6) (emphasis added). When a statute is worded in the disjunctive, federal pleading rules require the government to charge in the conjunctive "to inform the accused fully of the charges." United States v. Urkevich, 408 F.3d 1031, 1036 (8th Cir. 2005) (quoting United States v. Klein, 850 F.2d 404, 406 (8th Cir. 1988)). At trial, the court then instructs the jury in the disjunctive form, and the charge is satisfied if the jury finds any one of the requirements satisfied. Id. (quoting Klein, 850 F.2d at 406). A jury may then either find that the offense involved torture or serious physical abuse. Id. The Court, therefore, did not err in allowing the jury to find the "heinous, cruel and depraved" aggravating factor.

**DEFENDANT'S ISSUE IX: THE COURT ERRED IN HOLDING THAT SHEPARD v. UNITED STATES, 544 U.S. 13, 161 F. Ed. 2d 205, 125 D. Ct. 1254 (2005), DID NOT APPLY IN THE CONTEXT OF PROVING WHETHER THE CONVICTIONS IN 5447, 5438 AND 6192 INVOLVED THE INFLICTION OF SERIOUS BODILY INJURY.**

Defendant previously moved to limit the category of evidence that the government could offer to prove that two of Rodriguez's former convictions involved the infliction of, or attempted infliction of, serious bodily injury (doc. #177). Defendant argues that the government should have been limited to those categories of evidence announced in Shepard v. United States, 125 S. Ct. 1254,

1263 (2005). The Court considered, and denied, this motion (doc. #268).

The Shepard case involved the application of the Armed Career Criminal Act (ACCA). Id. at 1257. As a matter of statutory interpretation, the Supreme Court had previously held that burglary was only a predicate violent felony under the ACCA if it consisted of the "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." Id. (quoting Taylor v. United States, 495 U.S. 575, 599 (1990)). It was Congress' intent that the enhancement provisions of the ACCA be triggered by convictions that had certain specified elements. Taylor, 495 U.S. at 588. The ACCA would only apply if the defendant had commit certain crimes that had the potential for violence. Id. The Court referred to this as the "categorical approach" to the designation of predicate offenses. Id. Therefore, under the ACCA, a court is not concerned with whether the previous conviction actually involved a violent act, it just has to determine whether the previous conviction fits within an enumerated category of crimes that had the "potential" for violence. Id.

It was this categorical approach to the ACCA that served as the first basis for the Supreme Court's decision in Shepard. 125 S. Ct. at 1261. This categorical approach, however, has been rejected in the federal death penalty context. See, e.g., United States v. Higgs, 353 F.3d 281, 316 (4th Cir. 2003). The statutory aggravating factors talk about whether previous convictions "involved" certain specified behavior. See id. (discussing the factor at 18 U.S.C. § 3592(c)(2), which requires a previous crime "involving the use or attempted or threatened use of a firearm..."). Specifically, in this case, under 18 U.S.C. § 3592(c)(4) the previous convictions must be ones "involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." Given the difference in language between the ACCA and the FDPA, a court need not look

37

to whether the elements of a crime have the "potential" for serious bodily injury, instead the court must look at what actually transpired.  The use of the word involving "authorizes and likely requires the court to look past the elements of the offense to the offense conduct."  Higgs, 353 F.3d at 316; see also United States v. Chong, 98 F. Supp. 2d 1110, 1121 (D. Haw. 1999) (rejecting the categorical approach and permitting the introduction of evidence about the defendant's prior convictions).

The other basis for the Shepard decision is the Jones-Apprendi interpretation of the right to a jury.  Shepard, 125 S. Ct. at 1262.  Those cases held that "any fact other than a prior conviction sufficient to raise the limit of the possible federal sentence must be found by a jury . . . ."  Id.  Since the ACCA inquiry is performed by the judge and not a jury, the Court was concerned about the possible infringement of the defendant's jury rights if the scope of a judge's factfinding was unlimited.  Id. at 1263.  In the present case, the jury made the determination as to whether the previous convictions involved the infliction of serious bodily injury and Defendant's jury rights were not impinged upon.

Neither of the bases for the limitation on the evidence that may be considered regarding prior convictions is applicable here.  Therefore, the Court properly did not limit the government to the types of evidence mentioned in Shepard.  Indeed, to limit the government in such a manner would have been contrary to the FDPA provision that allows the government to "present any information relevant to an aggravating factor for which notice has been provided" and contrary to the Supreme Court's mandate to particularize capital sentencing proceedings.  Chong, 98 F. Supp. 2d at 1121.

Defendant argues that the Chong court did limit the type of evidence the government could introduce regarding a prior conviction.  While this is true, to argue that it limited the evidence to the

same extent as <u>Shepard</u> would be misconstruing the opinion.  The court stated that the information would be limited because it would "not permit either party to relitigate the merits underlying the convictions . . . ."  <u>Chong</u>, 98 F. Supp. 2d at 1121.  That same standard was applied here, and the Court limited both parties to evidence relevant to the aggravating factors.  The Court did not err in holding that <u>Shepard</u> was inapplicable in the context of proving whether Defendant's previous convictions involved the infliction of serious bodily injury.

**DEFENDANTS ISSUE X:  THE COURT ERRED IN FAILING TO DISMISS THE INDICTMENT FOR FACIAL INSUFFICIENCY.**

Defendant argues that the Indictment was facially insufficient.  The Defendant has raised this issue pre-trial (doc. #231).  The Court denied this motion (doc. #268).  Defendant believes that the Court's denial of this motion is error, and incorporates his earlier argument by reference. The Court similarly incorporates its earlier ruling in this matter below, where applicable.

"An indictment is sufficient if it apprises the defendant of the elements of the offenses charged, and enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense."  <u>United States v. Henderson</u>, 416 F.3d 686, 692 (8th Cir. 2005) (citing <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974)).  There is no requirement that an indictment use specific words, so long as by fair implication it alleges the charged offense. <u>Id.</u> at 693.  Generally an indictment is sufficient unless it is "so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant" is eventually convicted.  <u>United States v. Hernandez</u>, 299 F.3d 984, 992 (8th Cir. 2002) (quoting <u>United States v. Fleming</u>, 8 F.3d 1264, 1265 (8th Cir. 1993)).

In this case, Defendant is only challenging particular factors that made him eligible for the death penalty, so the inquiry is whether those factors are so defective that they would not support the sentence of death.  Id. (quoting Fleming, 8 F.3d at 1265).  The Notice of Special Findings portion of the Indictment tracks the language of the FDPA with respect to the mens rea factors, the "heinous, cruel, and depraved" factor, and the "substantial planning and premeditation" factor.  The courts have held that these factors are sufficient to uphold a sentence of death.  See, e.g., United States v. Paul, 217 F.3d 989, 996-997 (8th Cir. 2000) (upholding the jury's sentence of death decision that relied upon the mens rea factors); United States v. Sampson, 332 F. Supp. 2d 325, 333-34 (D. Mass 2004) (upholding the jury's sentence of death decision that relied upon the "heinous, cruel, and depraved" factor and the "substantial planning and premeditation" factor).  Since the factors in the Notice of Special Findings track the language of the statute, and those factors have been sufficient to support a sentence of death, the Indictment is facially sufficient, and the Court committed no error in denying Defendant's motion.


**DEFENDANT'S ISSUE XI: THE COURT ERRED IN FAILING TO DISMISS THE 18 U.S.C. § 35929(c)(4) AGGRAVATING FACTOR DUE TO PREJUDICIAL MISCONDUCT BEFORE THE GRAND JURY.**

The Defendant has previously raised this issue (doc. #233).  The Court denied this motion (doc. #268).  Defendant believes that the Court's denial of this motion is error, and incorporates his earlier argument by reference.  The Court similarly incorporates its earlier ruling in this matter below, where applicable.

Under 18 U.S.C. § 3592(c)(4), the defendant must have been convicted of two prior

offenses involving the infliction of, or attempted infliction of, serious bodily injury upon another person. To prove this factor, the United States Attorney presented evidence that Rodriguez had been convicted of aggravated rape, attempted aggravated rape, and kidnapping and assault. Defendant argues that the government engaged in misconduct by failing to inform the grand jury that aggravated rape and attempted aggravated rape, without more information, do not involve the infliction of, or attempted infliction of, serious bodily injury upon another person.

There is a strong presumption of regularity in grand jury proceedings. United States v. Exson, 328 F.3d 456, 459 (8th Cir. 2003). A party challenging grand jury proceedings has a heavy burden to overcome this presumption when seeking to strike a portion of the indictment. Id. Only when an error of constitutional proportions occurs during the proceedings may the court dismiss an indictment. Bank of Nova Scotia v. United States, 487 U.S. 250, 258 (1988). An error of constitutional proportions exists when people are excluded from serving on the grand jury on the basis of race or gender. Id. at 257. There is no constitutional requirement that the prosecutor give the grand jury legal instructions. United States v. Zangger, 848 F.2d 923, 925 (8th Cir. 1988).

One way to view Defendant's argument is as an assertion that the grand jury should have been informed of the holding in United States v. Rivera, 83 F.3d 542 (1st Cir. 1996). Looking at the issue from that perspective, Defendant's contention fails because there is no requirement that the prosecutor give the grand jury legal instructions. Zangger, 848 F.2d at 925.

The other way to view this argument is as an assertion that the grand jury should have never been informed of the prior convictions for aggravated rape or attempted aggravated rape because the prosecutor should have known that, standing alone, the convictions do not meet the

41

requirements of 18 U.S.C. § 3592(c)(4). It is important to note at the outset that <u>Rivera</u> is not binding authority upon this Court, as it is not a ruling from the Supreme Court or the Eighth Circuit. Second, the <u>Rivera</u> case was not even interpreting 18 U.S.C. § 3592(c)(4). Therefore, it is highly doubtful that the United States Attorney would even have viewed <u>Rivera</u> as having any relevance at the time this case was presented to the grand jury.

In addition, given the case law in the Eighth Circuit, the United States Attorney could have rationally concluded that aggravated rape and attempted aggravated rape were crimes that involved the infliction of, or attempted infliction of, serious bodily injury. The Eighth Circuit has approved the following jury instruction with respect to the definition of serious bodily injury: "'[s]erious bodily injury' means something more than slight bodily injury. It means bodily injury of a grave and serious nature. It does not require a high probability of death." <u>United States v. Demery</u>, 980 F.2d 1187, 1190 (8th Cir. 1992). Under the Sentencing Guidelines, serious bodily injury includes the mental impairment resulting from a rape. <u>United States v. Guy</u>, 282 F.3d 991, 994 (8th Cir. 2002). Given the intense mental trauma any victim undergoes as the result of a rape, one could rationally argue that the Eighth Circuit would find that aggravated rape and attempted aggravated rape involve the infliction of, or attempted infliction of, serious bodily injury.

Despite these indications from the Eighth Circuit, out of an abundance of caution, this Court chose to both apply the definition of serious bodily injury from 18 U.S.C. § 1365(h)(3) and to follow <u>Rivera</u>. There is no constitutional error in the government's inability to foresee how this Court would rule. Since there was no constitutional error in the grand jury proceedings regarding this factor, the Court properly declined to dismiss it.

42

**DEFENDANT'S ISSUE XII:  THE COURT ERRED IN FAILING TO STRIKE THE NON-STATUTORY AGGRAVATING FACTORS FOR FAILURE TO INCLUDE THEM IN THE INDICTMENT.**

Defendant argues that the Court erred in failing to strike the non-statutory aggravating factors from the Notice of Intent because they were not presented to the grand jury.  Under the Fifth and Sixth Amendments, any fact, other than prior conviction, that increases the maximum penalty for a crime must be charged in an indictment.  Allen, 406 F.3d at 942-43 (quoting Jones v. United States, 526 U.S. 227, 243 n.6 (1999)).  The two factors that increase the maximum penalty for a crime under the FDPA are the requisite mens rea factor and at least one statutory aggravating factor.  United States v. Purkey, 428 F.3d 738, 749 (8th Cir. 2005).  Non-statutory aggravating factors do not increase the maximum penalty for a crime.  Id.  Therefore, the government did not have to include the non-statutory aggravating factors in the indictment, and the Court did not err in failing to strike them.

**DEFENDANT'S ISSUE XIII:  THE COURT ERRED IN RULING THAT THE DISTRICT OF NORTH DAKOTA'S JURY-SELECTION PLAN DOES NOT VIOLATE THE SIXTH AMENDMENT OR THE JURY SELECTION AND SERVICE ACT OF 1968 (JSSA).**

The Defendant has raised this issue pre-trial (doc. #237).  The parties briefed the issue and the Court heard oral argument on the matter.  The Court ultimately denied Defendant's motion (doc. #268).  The Defendant renewed this motion, (doc. #507), which this Court again denied (doc. #523).  The Defendant now argues that the Court's denial of his challenge was error.  Defendant incorporates his earlier argument by reference.  The Court also incorporates its

earlier Order by reference, where applicable.

Defendant argues that the District of North Dakota's jury-selection plan violated his

Sixth Amendment right to be tried by a jury made up of a fair cross-section of the community.

To establish a prima facie violation of this Sixth Amendment right, Defendant must demonstrate

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the

representation of this group in venires from which juries are selected is not fair and reasonable in

relation to the number of such persons in the community; and (3) that this underrepresentation is

due to systematic exclusion of the group in the jury-selection process."  Duren v. Missouri, 439

U.S. 356, 364 (1979).

For the first prong, Defendant has selected Hispanics and African-Americans.  Since

there is no dispute that either of these groups represent a "distinctive" group in the community,

the first prong is satisfied.

For the second prong, Defendant has provided census statistics that indicate that

Hispanics comprise 0.8% of the population in the counties of the Southeastern Division of North

Dakota, but only 33% of Hispanics voted in all of North Dakota in the last election.  Applying

this state-wide percentage to the counties of the Southeastern Division, Hispanics would

constitute approximately 0.3% of the possible jury pool compared to constituting approximately

0.8% of the general population.

As to African-Americans, Defendant again provides census statistics indicating that they

comprise approximately 0.5% of the population in the counties of the Southeastern Division of

North Dakota.  Only 33% of African-Americans in all of North Dakota voted in the last election.

Again applying this state-wide percentage to the counties of the Southeastern Division, African-

44

Americans would constitute approximately 0.2% of the possible jury pool compared to constituting approximately 0.5% of the general population.

In <u>Duren</u>, the Court found that a 72% discrepancy between the percentage of women in the general population versus the percentage of women in the jury venire was sufficient to satisfy this prong of the analysis.  <u>See</u> 439 U.S. at 365-66 (stating that the difference between 53% of women in the general population and 15% of women in the jury venire was a "gross discrepancy").  In this case there was a 63% discrepancy for Hispanics and a 60% discrepancy for African-Americans.  Assuming the accuracy of Defendant's numbers, while the discrepancy is not as high as it was in <u>Duren</u>, it is likely that these statistics would satisfy the second prong of the analysis.  However, the government does not stipulate to the accuracy of these numbers.  The Court need not resolve this dispute because Defendant has failed to establish the third prong of this Sixth Amendment inquiry.

For the third prong, Defendant must demonstrate that the underrepresentation is due to systematic exclusion of the group in the jury-selection process.  <u>Duren</u>, 439 U.S. at 364.  "The mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make a jury selection system illegal or unconstitutional."  <u>United States v. Clifford</u>, 640 F.2d 150, 156 (8th Cir. 1981).

In <u>Duren</u>, the jury questionnaire allowed women to be excused from service simply if they requested to be excused.  439 U.S. at 361.  Men did not have the same option.  In addition, if women did not return their jury summons, they were treated as if they requested to be excused if they did not appear for jury service on the appointed day.  <u>Id.</u> at 362.  Men also did not have this same option.  Under these circumstances, the Court held that the under-representation of

women in the jury venire was due to their systematic exclusion in the jury-selection process.  Id.

at 366-67.

In this case, Defendant has failed to produce any evidence of systematic exclusion.

Instead, he simply cites back to his statistical data from the second prong, thereby conflating the

second and third prongs, which would render the third prong meaningless.  Under Defendant's

reasoning, all one would have to show to allege a Sixth Amendment violation is a significant

under-representation in the jury venire.  However, the Supreme Court and the Eighth Circuit

require more.  Duren, 439 U.S. at 366-67; United States v. Morin, 338 F.3d 838, 844 (8th Cir.

2003).

Since North Dakota uses voting lists for jury selection, Defendant must show that

Hispanics or African-Americans face obstacles to voting in presidential elections.  Morin, 338

F.3d at 844.  Defendant has not offered any evidence that they face obstacles to voting.  Since

Defendant has failed to establish that Hispanics or African-Americans are systematically

excluded from jury pools in the District of North Dakota, the use of voter lists for jury selection

does not violate the Sixth Amendment.  United States v. Greatwalker, 356 F.3d 908, 911 (8th

Cir. 2004); Morin, 338 F.3d at 844.  The Court's ruling as to this issue was therefore proper.


**DEFENDANT'S ISSUE XIV:  THE COURT ERRED IN DENYING DEFENDANT'S
MOTION TO DISMISS BASED UPON AN AKE v. OKLAHOMA VIOLATION.**

The Defendant has previously raised this issue (doc. #285).  The Court denied this

motion (doc. #355).  Defendant believes that the Court's denial of this motion is error, and

incorporates his earlier argument by reference.  The Court similarly incorporates its earlier ruling

in this matter below, where applicable.

46

In Ake v. Oklahoma, 470 U.S. 68, 74 (1985), the Court held that when an indigent defendant has made a sufficient showing that his sanity at the time of the offense is "likely to be a significant factor at trial," then the Constitution requires that a psychiatrist be provided at public expense. This holding has been extended to apply to nonpsychiatric experts. Little v. Armontrout, 835 F.2d 1240, 1243 (8th Cir. 1987). To receive the assistance of an expert at public expense, "a defendant must show more than a mere possibility of assistance from an expert." Id. at 1244. The defendant must demonstrate "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." Id. An indigent defendant is not entitled to all the assistance that his wealthier counterpart might buy, but he should be provided with the "basic tools" of an adequate defense. Ake, 470 U.S. at 77.

When a defendant's sanity at the time of the offense is a significant factor, a psychiatrist is necessary to identify the "elusive and often deceptive" symptoms of insanity that a lay witness cannot recognize. Id. at 81. In addition, the psychiatrist knows the probative questions that should be asked of the opposing party's psychiatrists and how to interpret the answers. Id. A psychiatrist is also able to translate his or her observations of the defendant into language the jury can understand and explain to the jury why these observations are relevant. Id.

When expanding the expert inquiry beyond the psychiatric realm, the issues are "how important the scientific issue is in the case, and how much help a defense expert could have given." Little, 835 F.2d at 1243. In Little, the only issue at trial was whether the defendant was the perpetrator of the crime. Id. at 1242. The defendant alleged that the victim's identification of him had been tainted by hypnosis. Id. The court reasoned that an expert on hypnosis could

have presented the limitations of hypnosis and explained the theories of memory.  Id. at 1244.

Since this information was an important scientific issue in the case, and a hypnosis expert would

have been more effective than reading from a psychology textbook, the Little Court held that the

defendant's due process rights were violated when he was not provided with a hypnosis expert at

public expense.  Id. at 1244-45.

In this case, Defendant sought funding to perform a public opinion survey on the pretrial

publicity in this case.  This survey was for the purpose of providing evidence on a change of

venue motion.  Defendant performed a survey in the Southeastern Division of North Dakota, but

additionally wanted to perform an additional survey in the Minneapolis/St. Paul area, which was

the venue he proposed for the trial.  Defendant alleges that the lack of funding for a political

science professor and a telemarketing firm to perform this public opinion survey in the

Minneapolis/St. Paul area has violated his right to due process.

In determining whether there was a reasonable probability that these experts would aid in

his defense and whether the denial of these experts would result in an unfair trial, the Court

examined the change of venue standard.  When a change of venue motion is based on pretrial

publicity, a two-tiered analysis applies.  United States v. Allee, 299 F.3d 996, 1000 (8th Cir.

2002).  The first tier of the analysis is a determination whether the pretrial publicity was so

extensive and corrupting that unfairness of constitutional magnitude must be presumed.  Id.  If

no such determination is made, then the analysis moves to the second tier, which is a

determination "whether the jury-selection process established an inference of actual prejudice."

Id. (quoting United States v. Blom, 242 F.3d 799, 804 (8th Cir. 2001)).

The Eighth Circuit has had numerous opportunities to analyze the first tier of this test.

48

When reaching a decision on this first question, the Eighth Circuit has not relied on public opinion polls of the current venue or expressed a need for them.  See, e.g., Blom, 242 F.3d at 804 (no survey); United States v. Bliss, 735 F.2d 294, 298 (8th Cir. 1984) (no survey); United States v. Deggendorf, 626 F.2d 47, 53 (8th Cir. 1980) (no survey); United States v. Buttorff, 572 F.2d 619, 627 (8th Cir. 1978) (no survey).  Similarly, none of these cases had surveys of the venue location that the defendant wanted for the trial.  In fact, the Eighth Circuit has expressed a reluctance to even accept a public opinion poll as evidence to demonstrate jury bias.  Shapiro v. Kauffman, 855 F.2d 620, 621 (8th Cir. 1988).

The focus of this first tier inquiry is whether the coverage is inflammatory or accusatory.  United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002).  An appropriate type of evidence for this inquiry is news articles about the defendants and the crime.  Id.  Since a change of venue motion can be decided without a public opinion survey, this information is not an important scientific issue in this case.  Defendant had already received funds for a venue study in the current location, which was more than is needed to argue a change of venue motion based on pretrial publicity.  To have performed a venue study in the proposed trial location would have gone well beyond supplying the basic tools necessary for an effective defense.  Defendant has not established an Ake violation, and the Court has committed no error.


**DEFENDANT'S ISSUE XV:  THE DISTRICT COURT ERRED IN FAILING TO TRANSFER THE TRIAL TO THE APPROPRIATE ALTERNATIVE VENUE OF THE DISTRICT OF MINNESOTA.**

This issue was raised pre-trial (doc. #320).  The Court ultimately rejected this motion after careful consideration (doc. #355).  Defendant again raises this issue and incorporates his

earlier argument.  The Court likewise incorporates its earlier Order where applicable.

Defendant alleged that there were likely three different standards applicable to his change of venue motion.  He alleged that the Rule 21(a) standard under the Federal Rules of Criminal Procedure was less demanding than the Sixth Amendment standard.  It appears, however, as if the standards are the same.  Compare United States v. Malmay, 671 F.2d 869, 875 (5th Cir. 1982) (stating that a defendant must demonstrate prejudicial pretrial publicity to receive a change of venue under Rule 21(a)) with Pruett v. Norris, 153 F.3d 579, 584-85 (8th Cir. 1998) (stating that a defendant must demonstrate corrupting pretrial publicity to receive a change of venue under the Sixth Amendment).

For his third standard, since Defendant alleged that venue would be proper in Minnesota, he argued that the standard for a transfer of venue to a district that also has jurisdiction is even lower than a change of venue based on pretrial publicity.  When venue would be proper in more than one district, Rule 21(b) of the Federal Rules of Criminal Procedure allows for the transfer of the case under specific circumstances.  2 Charles Alan Wright, Federal Practice and Procedure § 343, 394-95 (3d ed. 2000).  Pursuant to Rule 21(b), a court may transfer venue for the convenience of the parties and witnesses.  United States v. Green, 983 F.2d 100, 103 (8th Cir. 1992).  Since this motion is based on pretrial publicity and not on the convenience of the parties and the witnesses, Rule 21(b) does not apply.  Id.

As stated earlier, when a change of venue motion is based on pretrial publicity, a two-tiered analysis applies.  Allee, 299 F.3d at 1000.  The first tier of the analysis is a determination whether the pretrial publicity was so extensive and corrupting that unfairness of constitutional magnitude must be presumed.  Id.  If no such determination is made, then the analysis moves to

the second tier, which is a determination "whether the jury-selection process established an inference of actual prejudice." Id. (quoting Blom, 242 F.3d at 804). It is within a court's discretion to grant or deny a motion to change venue. Deggendorf, 626 F.2d at 53.

Under the first tier of the analysis, the formation of a tentative impression about the case by some jurors is not enough. Bliss, 735 F.2d at 298 (quoting United States v. Brown, 540 F.2d 364, 378 (8th Cir. 1976)). Our democracy tolerates, even encourages, extensive media coverage of crimes such as murder and kidnapping, so extensive coverage of a case is also not enough to satisfy this first tier inquiry. Blom, 242 F.3d at 803. To create a presumption of inherent prejudice in the pretrial publicity, the coverage must be inflammatory or accusatory. Allee, 299 F.3d at 1000. However, isolated incidents of "intemperate commentary" about the crime and the perpetrator are not sufficient to demonstrate that the coverage was inflammatory or accusatory when the majority of the reporting was "objective and unemotional." Id.

Objective, straightforward reporting about a criminal case does not tend to arouse lingering ill-will or vindictiveness in the local community. Bliss, 735 F.2d at 299. As long as the reporting is factual and describes the defendant as having "allegedly" commit the crime or refers to him as being "accused" of committing the crime, the publicity is not inflammatory or accusatory. Simmons v. Lockhart, 814 F.2d 504, 509 (8th Cir. 1987). Inflammatory language includes such statements as "the perpetrators 'should pay forever,'" and the perpetrators are "very dangerous individuals who do not have regard for life." Allee, 299 F.3d at 1000. Inflammatory language can also consist of a local radio station broadcasting a derogatory song about a defendant and a local weekly paper naming a defendant the "Best Local Villain." United States v. Tokars, 839 F. Supp. 1578, 1582-83 (N.D. Ga. 1993).

Defendant offered three articles about the defendant that were published in the Fargo Forum on August 1, 2, and 3, 2004, and he alleged that they contained inflammatory language. A review of these articles reveals that they contain objective, straightforward, and factual reporting about the defendant's past and the current case. When discussing the current case, the articles refer to Defendant as having been accused of the crime. For example, one article states: "If prosecutors can prove at trial he kidnapped and killed . . ." Therefore, these articles do not contain inflammatory or accusatory language. Simmons, 814 F.2d at 509; Bliss, 735 F.2d at 299.

Defendant also presented a binder of newspaper articles about this case. It covers the time period of November 25, 2003 through October 26, 2005, and it contains over two hundred articles. If the purpose of this exhibit was to demonstrate the extent of the coverage of this case, then it is irrelevant. As stated above, our society encourages the extensive coverage of crimes such as murder and kidnapping. Blom, 242 F.3d at 803. A defendant must prove more than extensive media coverage to demonstrate a presumption of inherent prejudice. Id.

If the purpose of the binder was to demonstrate prejudicial coverage, counsel did not mark any articles that they believe contain inflammatory or accusatory language. It is not a judge's duty to search through documents to find evidence to support a party's claim. United States v. Jorgensen, 144 F.3d 550, 562 (8th Cir. 1998). Defendant alleges that the lack of funding for an expert to analyze the media coverage is what prevents him from pointing to inflammatory language. An expert is not necessary to identify articles that contain inflammatory or accusatory language. See, e.g., Allee, 299 F.3d at 1000 (lawyers presented articles with prejudicial language); Tokars, 839 F. Supp. at 1582-83. Defense counsel are both exemplary attorneys who know this, and the fact that they have not pointed to any inflammatory or

52

accusatory news coverage of this case can only be taken as an indication that none exists.

While under no obligation, the Court did randomly select articles in the binder and read them. All of these articles contained objective, straightforward, and factual reporting. The articles always described the defendant as being "accused" of the crime. Therefore, these articles do not establish a presumption of inherent prejudice.

In some district court cases, after the court has reached a decision on whether the pretrial publicity was inflammatory or accusatory, it then also looks at any public opinion polls that the defendant has presented. See United States v. Wright, No. 401CR3040, 2002 WL 842208 (D. Neb. May 3, 2002); Tokars, 839 F. Supp. 1578; United States v. Holder, 399 F. Supp. 220 (D.S.D. 1975). When analyzing public opinion results, the test is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality . . . ." Wright, 2002 WL 842208, at *8 (quoting Irvin v. Dowd, 366 U.S. 717, 723 (1961)).

In Wright, the court found that there was some inflammatory pretrial publicity, but it was insufficient to create a trial atmosphere completely corrupted by press coverage. Id. at *3. The defendant's public opinion survey found that of those people who were familiar with the crime, 60% thought that the defendant was "definitely guilty" and 26% thought that he was "probably guilty." Id. at *7. Despite these survey numbers and some inflammatory publicity, the court held that the pretrial publicity did not create a presumptively prejudicial effect in the case. Id. at *8.

In this case, the public opinion poll of the Southeastern Division found that, of the people who had read, seen, or heard something about this case, 42.5% thought that the defendant was

53

"definitely guilty" and 45.6% thought that he was "probably guilty." From these answers, it is difficult to gauge the strength of the opinion formed. For the sake of argument, the Court will take the "definitely guilty" answers as being a strongly held opinion. The common understanding of "probably" is that something is likely true, but that there is room for doubt. Random House Webster's Unabridged Dictionary 1541-42 (2d ed. 1997). An opinion modified by "probably" would not be strongly held since the individual is open to an opposing viewpoint. One should also keep in mind that these individuals had not been informed of the presumption of innocence. Therefore, these results only demonstrate exactly what they purport to be: individuals' opinions based upon what they had read, seen, or heard.

Unlike the Wright case, there was no inflammatory or accusatory press coverage of this case. Also, compared to the 60% in Wright who thought that the defendant was "definitely guilty," here there are only 42.5% who thought that Defendant was "definitely guilty." Even with the inflammatory press coverage and the high survey results, the Wright Court found that there was not a presumptively prejudicial effect in the case. 2002 WL 842208, *8. Therefore, there is no presumptively prejudicial effect in the case at bar. Id.

Even when there is a risk of presumed prejudice, there are certain measures a court can take to assure the selection of an unbiased jury, such as holding the trial a year after the initial, intense press coverage and assembling a larger-than-average jury pool. Allee, 299 F.3d at 1000; Blom, 242 F.3d at 804. In Blom, the court moved the case from Duluth to Minneapolis, assembled a jury pool three times the normal size, excluded the division where the crime occurred from the jury pool, required jurors to answer a questionnaire about their exposure to pretrial publicity, and increased the number of peremptory strikes for each side. 242 F.3d at 804.

In this case, the Court moved the case from Grand Forks to Fargo, assembled a jury pool more than twelve times the normal size, excluded the division where the kidnapping occurred, had potential jurors answer a questionnaire about their exposure to pretrial publicity, and increased the number of peremptory strikes for the defendant.  The Court has gone beyond the measures taken in the Blom case.  In addition, this case went to trial more than two years after the initial coverage of Ms. Sjodin's disappearance.  Even if there was some prejudice, these measures were sufficient to assure the selection of an unbiased jury.  Allee, 299 F.3d at 1000; Blom, 242 F.3d at 804.  The Court properly denied Defendant's motion to transfer the trial to a different venue.


**DEFENDANT'S ISSUE XVI:  THE COURT ERRED IN DENYING DEFENDANT'S REQUEST TO INTRODUCE MITIGATING EVIDENCE REGARDING HIS PRIOR CONVICTION IN 6192.**

The Defendant has previously raised this issue (doc. #278).  The Court denied this motion (doc. #355).  Defendant believes that the Court's denial of this motion is error, and incorporates his earlier argument by reference.  The Court similarly incorporates its earlier ruling in this matter below, where applicable.

Defendant argues the Court erred in denying Defendant's request to introduce mitigating evidence regarding his prior conviction.  Defendant sought to introduce at trial the allegation that, in the 6192 conviction, the victim "did not positively identify Mr. Rodriguez as her attacker until after undergoing a highly suggestive hypnotic session . . . ."  (Mem. Supp. Mot. Allow Def. Introduce Mitigating Evidence at 4.).  The Court has twice previously addressed and denied Defendant's request. (docs. # 162 and 355).

Mitigating evidence is information that is relevant to a defendant's character, record, or

the circumstances of the offense.  <u>Penry v. Lynaugh</u>, 492 U.S. 302, 327-28 (1989).  Factors

including the impaired capacity of the defendant, whether the defendant's participation in the

crime was relatively minor, and the lack of significant prior criminal conduct are all relevant as

mitigating evidence.  18 U.S.C. § 3592(a).

When looking at a defendant's prior criminal record, mitigating evidence may be

presented on how the defendant committed the crime.  <u>See</u> <u>Summerlin v. Schriro</u>, 427 F.3d 623,

635 (9th Cir. 2005) (stating that mitigation evidence for the defendant's prior conviction

consisted of the fact that the defendant's victim had injured the defendant's wife, and the victim

was not physically injured in any way); <u>Mapes v. Coyle</u>, 171 F.3d 408, 418 (6th Cir. 1999)

(holding that the trial court erred in refusing to allow the defendant to present mitigating

evidence that, while he did not deny the prior conviction, he was not the "triggerman" in the

robbery).  However, the issue of whether the defendant committed the crime has never

traditionally been allowed as mitigation at sentencing.  <u>Oregon v. Guzek</u>, 126 S.Ct. 1226, 1232

(2006).  Generally the law "discourages collateral attacks of this kind."  <u>Id.</u> at 1232-33.

Defendant argued that presenting evidence that Ms. Whalen did not identify him as her

attacker until after undergoing hypnosis is not a collateral attack.  Rather, this type of evidence

goes directly to the identity of her attacker, which creates the implication that Defendant did not

commit the crime.  This is the quintessential example of a collateral attack.  Since this allegation

challenges *whether* Defendant committed the crime, not *how* he committed it, this evidence was

properly excluded from trial.  <u>Guzek</u>, 126 S.Ct. at 1232.

**DEFENDANT'S ISSUE XVII:  THE COURT ERRED IN OVERRULING
DEFENDANT'S <u>BATSON</u> CHALLENGE TO THE GOVERNMENT'S REMOVAL OF
THE ONLY AFRICAN-AMERICAN AND THE ONLY NATIVE AMERICAN FROM
THE JURY PANEL.**

The Defendant previously made a <u>Batson</u> challenge to two of the government's

peremptory strikes during jury selection.  The government used peremptory challenges on an

African-American woman and a Native American man.  The Court overruled the <u>Batson</u>

challenge, which the Defendant believes is error (doc. #500).

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 100 (1986), the Supreme Court held that it was

constitutionally impermissible for a party to a criminal trial to use race-based peremptory strikes.

Under <u>Batson</u>, the court engages in a three-part inquiry.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322,

328 (2003).  First, a defendant must make a prima facie showing that a peremptory challenge has

been exercised on the basis of race.  <u>Id.</u>  If the defendant makes that showing, then the

prosecution must offer a race-neutral basis for striking the juror in question.  <u>Id.</u>  Finally, the

court must determine whether the defendant has shown purposeful discrimination.  <u>Id.</u> at 328-29.

In this case, the only African-American and the only Native American in the panel were

taken off by the government's peremptory challenges.  This is sufficient to make a prima facie

showing.

At the second step of the inquiry, the prosecution must state a race-neutral explanation

for the exercise of its peremptory strike.  <u>Purkett v. Elem</u>, 514 U.S. 765, 767 (1995).  This reason

does not have to be persuasive or even plausible.  <u>Id.</u> at 768.  The ultimate burden of persuasion

on the issue of whether the challenge was race-based always rests with the opponent of the

peremptory challenge.  <u>Id.</u>

In <u>Purkett</u>, the prosecutor's explanation for striking an African-American man was

57

because "he had long, unkempt hair, a mustache, and a beard . . . ." Id. at 769.  The Supreme

Court held that this was a race-neutral reason that was sufficient to satisfy the second step of the

inquiry.  Id.

In this case, the government stated a number of reasons for using a peremptory challenge

on the African-American woman.  She graduated with a Theatre Arts degree from college, and

the government believed that this indicated that she was liberal, and people who are liberal are

more inclined to be opposed to the death penalty.  The government also explained that during

voir dire she talked about some views one of her college professors had shared with her about

the death penalty including the belief that it was not economical and it did not act as a deterrent.

Finally, her brother had spent some time in prison, and her answers on the questionnaire about

that incident demonstrated a possible bias against law enforcement.

For the Native American man, the government also expressed a number of reasons for the

use of its challenge.  On his questionnaire, he stated that he believed in the death penalty only in

"extreme circumstances," which the government viewed as a bias against imposing the death

penalty.  He was also a college professor in social studies, which the government believed

demonstrated his liberal leanings.  Finally, his brother had just recently gotten out of prison in

June, so the government had a concern about his possible bias against law enforcement.

All of these reasons could apply equally to any race.  See Purkett, 514 U.S. at 769

(quoting EEOC v. Greyhound Lines, Inc., 635 F.2d 188, 190 n.3 (3d Cir. 1980)) (stating that

"[t]he wearing of beards is not a characteristic that is peculiar to any race.").  When having

unkempt hair, a mustache, and a beard is sufficient to satisfy the race-neutral prong, the reasons

given by the government in this case were more than sufficient.  Id.

For the last step of this inquiry, the court must determine whether the prosecutor's race-neutral explanations are credible.  Miller-El, 537 U.S. at 339.  "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."  Id.

In this case, the prosecutor's demeanor came across as forthright and honest.  None of the explanations detailed above had any air of improbability to them.  The explanations appear reasonable in light of the fact that this was a death penalty case, and there were many law enforcement officers who testified.  The Defendant's Batson challenge was properly denied.


**DEFENDANT'S ISSUE XVIII: THE COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO STRIKE THE CONVICTIONS IN 5447 AND 5438 FOR INSUFFICIENT EVIDENCE THAT THESE CONVICTIONS INVOLVED THE INFLICTION OF SERIOUS BODILY INJURY.**

Defendant has previously moved to strike Defendant's convictions 5448 and 5438 for insufficient evidence that the convictions involved serious bodily injury (docs. #280 and 282). The Court rejected these motions (doc.#517), which the Defendant believes is error.  Defendant incorporates its earlier argument by reference.  The Court likewise incorporates its earlier opinion, where applicable.

Under 18 U.S.C. § 1365(h)(3) (2002), "serious bodily injury" includes the "protracted loss or impairment of the function of a . . . mental faculty."  A serious bodily injury exists when the evidence establishes that, as a direct consequence of a rape, the victim is emotionally disturbed and suffers a chronic mental condition.  United States v. Vazquez-Rivera, 135 F.3d 172, 177 (1st Cir. 1998); see also United States v. Ramirez-Burgos, No. 96-1298, 1997 WL

268695, *7 (1st Cir. May 21, 1997) (stating that the victim was diagnosed with post-traumatic stress disorder and major depression as a result of the rape). It also constitutes serious bodily injury when a rape victim is "extremely tearful" during her testimony about the crime, and the victim has undergone at least ten months of counseling at a rape crisis center. United States v. Lowe, 145 F.3d 45, 53 (1st Cir. 1998).

The victim from the 5438 conviction, Ms. Iverson, testified that she has suffered from anxiety, depression, and nightmares as a result of the assault. For two years following the assault she went to counseling at the Rape Crisis Center in Moorhead, and she received counseling from a pastor. The other victim, Ms. Volker, testified that she has suffered from anxiety attacks and depression as a result of the assault. She has also had problems maintaining healthy relationships with men as a result of the assault. Since 1987 she has sought counseling at various times, and some of the counseling was related to the assault. Both women have additionally exhibited symptoms of Post Traumatic Stress Disorder. The testimony from these two women presents sufficient information from which a reasonable jury could find that they suffered a serious bodily injury. Lowe, 145 F.3d at 53.

Defendant argues that the government cannot prove serious bodily injury based on protracted loss or impairment of the function of a mental faculty without expert testimony. However, cases under both 18 U.S.C. § 1365(h)(3) and the Sentencing Guidelines have found the existence of serious bodily injury based on impairment of the function of a mental faculty without testimony of a mental health expert. United States v. Kills in Water, 293 F.3d 432, 436 (8th Cir. 2002); Lowe, 145 F.3d 45, 53 (1st Cir. 1998). The lack of any expert testimony to confirm a psychological diagnosis would go to the weight the jury would give the victims'

testimony on their mental health as opposed to the issue of admissibility. These previous

convictions were properly admitted.


**DEFENDANT'S ISSUE XIX: THE COURT ERRED IN ALLOWING THE
GOVERNMENT TO INTRODUCE DEFENDANT'S PRIOR CONVICTIONS IN 5438
AND 5447 UNDER RULE 413.**

Defendant contends that the Court erred in allowing the government to introduce

Defendant's prior convictions 5438 and 5447 under Rule 413 as propensity evidence during the

guilt phase of the trial. The Court allowed Ms. Iverson and Ms. Knudson, the respective victims

in the above two cases, were allowed to testify about the Defendant's sexual assaults.

Defendant first argues that Rule 413 of the Federal Rules of Civil Procedure violates the

Due Process Clause of the Fifth Amendment. The Eighth Circuit, however, has squarely

addressed and rejected such an argument. United States v. Mound, 149 F.3d 799, 801 (8th Cir.

1998).

Defendant's second argument is that there is insufficient evidence to conclude that a

sexual assault took place during the kidnapping. Specifically, none of Defendant's sperm was

found and no male DNA was ever found on Ms. Sjodin's body. Rule 413, however, merely

requires that the Defendant be *accused* of a sexual assault. Rule 413 has two additional

requirements, that the prior offenses being offered against the defendant must also be "offenses

of sexual assault," Fed. R. Evid. 413(a), and the prior offenses must be relevant. United States

v. Guardia, 135 F.3d 1326, 1328 (10th Cir. 1998) (citing Fed. R. Evid. 402). Prior offenses of

sexual assault are relevant if they are similar to the current charge. United States v. Crawford,

413 F.3d 873, 876 (8th Cir. 2005).

The first element is satisfied in that the indictment states, in pertinent part, that Defendant kidnapped Ms. Sjodin "for the purpose of sexually assaulting her."  The second element is met in that convictions 5438 and 5447 both involved instances of sexual assault.  The Court, after weighing the various similarities of the facts of the present assault, and the facts of those previous, found that 5438 and 5447 were sufficiently similar to be admitted as propensity evidence under Rule 413.

Defendant also argues that the government was inconsistent in arguing that the Defendant committed a sexual assault in order to have 5447 and 5438 admitted under Rule 413, but later argued to the jury that the sexual assault need not be proven.  However, there is nothing inconsistent about the United States arguing that the kidnapping could have been for any purpose, and arguing to the Court that a reasonable jury could find that a sexual assault occurred.  The Court did not err in admitting Defendant's prior convictions 5438 and 5447 under Rule 413.

## DEFENDANT'S ISSUE XX: THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF DR. MICHAEL McGEE.

The Defendant has previously raised this issue (doc. #393).  The Court denied this motion (doc. #596).  Defendant believes that the Court's denial of this motion is error.  Defendant specifically contends that the Court erred in admitting the testimony of Michael McGee, particularly his opinion that the level of acid phosphatase present in swabs taken from Ms. Sjodin's vagina and cervix were sufficient to indicate the presence of semen.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).  To be admitted under Rule 702, the expert testimony must meet the following three requirements: 1) it must be "based on

scientific, technical, or other specialized knowledge [that would] be useful to the finder of fact in deciding the ultimate issue of fact . . . ."; 2) the expert must be qualified; and 3) "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . ." Id.

Defendant does not dispute the existence of these first two requirements. Defendant's arguments focus on the reliability of Dr. McGee's interpretation of the acid phosphatase levels. When analyzing this third requirement, Rule 702 requires the following: "1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and  3) the witness has applied the principles and methods reliably to the facts of the case." Lauzon, 270 F.3d at 686 (quoting Fed. R. Evid. 702 advisory committee's note). Daubert also provides the following list of nonexclusive factors that a court can apply in determining the relevance and reliability of the expert's testimony: "(1) whether the theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) whether the theory has been generally accepted." Lauzon, 270 F.3d at 686-87.

"Rule 702 does not state a preference for academic training over demonstrated practical experience." Davis v. United States, 865 F.2d 164, 168 (8th Cir. 1988). The rule permits a certain amount of speculation to form the basis of the expert's opinion. United States v. Conroy, 424 F.3d 833, 839 (8th Cir. 2005) (quoting Group Health Plan, Inc. v. Philip Morris USA, Inc., 344 F.3d 753, 760 (8th Cir. 2003)). Only if the expert's opinion is so "fundamentally unsupported that it can offer no assistance to the jury" should the expert be excluded. Arkwright Mut. Ins. v. Gwinner Oil, Inc., 125 F.3d 1176, 1183 (8th Cir. 1997) (quoting Hose v. Chicago

<u>Nw. Transp. Co.</u>, 70 F.3d 968, 974 (8th Cir. 1995)).

In this case, the acid phosphatase findings from the vaginal and cervical swabs were determined by using the Beckman Dri-STAT test. Defendant's expert did not dispute the validity of this test to determine acid phosphatase levels. The vaginal swab result was 47.4 µL of acid phosphatase and the cervical swab was 130.7 µL of acid phosphatase. Dr. McGee testified that his lab had arrived at a cutoff number of 25 µL , which meant that any test results above 25 µL indicated the presence of semen. Forensic laboratories across the country generally use a range of between 25 µL and 50 µL as the cutoff for the presence of semen. Therefore, Dr. McGee's opinion was that semen was present in Ms. Sjodin's body based on the vaginal and cervical swab results.

The defense expert, Dr. George Sensabaugh, explained that the Beckman Dri-STAT test is a very accurate test for measuring the amount of prostatic acid phosphatase present when it is applied to blood serum. However, when the test is performed on material from vaginal and cervical swabs, he testified that it is not as accurate a measure of the levels of prostatic acid phosphatase. He explained that the Beckman Dri-STAT test measures acid phosphatase levels based on acid phosphatase that is inhibited by tartrate. In addition to prostatic acid phosphatase, acid phosphatase that is endogenous to the vagina and lysosomal acid phosphatase[4] are also inhibited by tartrate. Therefore, the Beckman Dri-STAT results in this case could include endogenous and lysosomal acid phosphatase. Dr. Sensabaugh could not state what amount of endogenous acid phosphatase would be present normally nor could he state how much lysosomal

---

[4] Lysosomal acid phosphatase is that acid phosphatase that is present in all tissues. During decomposition, this lysosomal acid phosphatase is released from the tissue.

acid phosphatase would exist in a corpse. However, he testified that acid phosphatase is present in high levels in the prostate, so a high level of acid phosphatase in a woman's body under the circumstances of this case would be "interesting," just "not dispositive."

Finally, Dr. Sensabaugh testified that many pathologists across the country would share Dr. McGee's opinion about the significance of the acid phosphatase results in this case. Dr. Sensabaugh stated that the scientists in his field would want more definitive proof of the presence of semen beyond an elevated acid phosphatase test result.

The only dispute between these two experts is whether an acid phosphatase level that exceeds 25 µL is sufficient evidence to prove the presence of semen. In Dr. McGee's scientific community, a level of approximately 25 µL or slightly higher is sufficient to support this conclusion. These levels have been reached through these pathologists' years of experience in the field, and it has been generally accepted. Dr. Sensabaugh's scientific community, which is more data-driven, would require more proof than an elevated acid phosphatase test result to reach the conclusion that semen was present. This dispute does not go to the reliability of Dr. McGee's opinion; instead it goes to the weight of his opinion. The jury was free to accept or reject the testimony of Dr. McGee, and, if accepted, the testimony could assist the trier of fact. The Court committed no error in admitting the testimony of Dr. McGee.

**DEFENDANT'S ISSUE XXI: PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT OF THE GUILT PHASE REQUIRES THAT DEFENDANT'S CONVICTION BE SET ASIDE.**

Defendant contends during the closing arguments of the guilt phase of the trifurcated proceeding, the United States made a number of arguments that constituted prosecutorial misconduct. The Eighth Circuit has established a prosecutorial misconduct claim warrants a new

trial when "(1) the prosecutor's remarks or conduct were improper, and (2) the remarks or

conduct prejudicially affected the defendant's substantial rights so as to deprive him of a fair

trial." United States v. Mullins, 446 F.3d 750, 757 (8th Cir. 2006). Even if remarks are deemed

improper, whether the remarks actually deprived the defendant of a fair trial is determined by

looking at "the cumulative effect of the misconduct, the strength of the properly admitted

evidence. . . and any curative actions taken." Id. (citing United States v. Holmes, 413 F.3d 770,

774-75 (8th Cir. 2005)).

### A. Improper "Golden Rule" Argument

During closing argument, the United States stated that Ms. Sjodin "battled" every step of

the way, and that she "left us unmistakable messages as a result of the battle." The government

asked the jurors, "Can you feel her strength? Can you feel it?...she's right here. She's right here

with all of us today and you can feel her strength." Defendant contends that this rhetoric was an

exhortation to the jury place themselves in the shoes of Ms. Sjodin. If true, this would constitute

an improper "golden rule" argument. Roberts v. Delo, 205 F.3d 349, 351 (8th Cir. 1999).

The Court's inquiry is whether these statements were so egregious as to deny the

Defendant due process of law. Id.; Davis v. Wyrick, 766 F.2d 1197, 1203 (8th Cir. 1985)

(closing remarks must have "fatally infected the entire trial and deprived the petitioner of

fundamental fairness").

It appears to the Court that the above statements were not improper because they were

utilized for the permissible purpose of proving the aggravating factor of an especially "heinous,

atrocious, or cruel" offense. Grossman v. McDonough, 466 F.3d 1325, 1348 (11th Cir. 2006).

However, even assuming the comments were improper, the Defendant still must show the verdict

probably would have been different had the remarks not been made.  Roberts, 205 F.3d at 351

(citing Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996)).

Cased on the record before it, the Court cannot conclude that the statements were

improper.  The Defendant has offered nothing more than a subjective characterization to show

that such a statement would be an improper "golden rule" argument.  Standing alone, this

statement is conclusory and insufficient.  See Kennedy v. Dugger, 933 F.2d 905, 913 (11th Cir.

1991) (finding prosecutor's statement "Can you imagine, in your own living room, not bothering

a soul...and a total stranger, because you got in his way, destroys you" not to be improper).

The Defendant has not met the "heavy burden" of showing the statements materially

affected the verdict.  Mack, 92 F.3d at 643.

### B.  Disparaging Remarks of Defense Counsel and the Defense

The Defendant next asserts that the following comment made by the United States during

closing argument is disparaging of defense counsel and the proffered defense.

> These defendant arguments, ladies and gentlemen, they're inviting you to
> disregard a lifetime of human experience.  The scenario that they presented
> to you in opening arguments is a twist on words.  It is a lawerly verbal cartoon.
> It is nothing more.  Nothing more.

Defendant further states that the United States suggested that defense counsel is "counting on

you to ignore Judge Erickson's instructions."

The Eighth Circuit has acknowledged that a prosecutor's attacks on the honesty or

integrity of defense counsel are improper.  United States v. Lopez, 414 F.3d 954, 960 (8th Cir.

2005) (finding prosecutor's reference to defense counsel's "slick tactics" to be improper); Cline

v. United States, 395 F.2d 138, 141 (8th Cir. 1968).  The remarks must be examined to determine

whether such comments are misconduct and, if so, the Court must determine their cumulative

effect and weigh them against the strength of the evidence against the defendant and any curative actions taken by the Court.  United States v. Milk, 447 F.3d 593, 602-03 (8th Cir. 2006)(citing United States v. Beckman, 222 F.3d 512, 526 (8th Cir. 2000)).

While these comments approach the line, the Court reads the United States' remarks as to the "verbal cartoon" to be within the parameters of acceptable argument.  See United States v. Papajohn, 212 F.3d 1112, 1120 (8th Cir. 2000), *abrogated on other grounds by* Crawford v. Washington, 541 U.S. 36 (2004) (prosecutor's comments that suggested defense counsel misstated facts and that  defense's theory of the case was incredible were permissible arguments).  The further comment about the defense "counting on" the jury to "disregard [the Court's] instructions" is likely improper.  However, given the strength of the evidence presented to the jury indicative of the defendant's guilt, this comment is of such minimal force, that it can not fairly be said to have deprived the  Defendant of due process of law.

### C.  Prosecutor Repeatedly Called the Defendant a Liar

Defendant alleges the United States referred to the defendant as a liar six times during closing argument.  "As a general rule, a prosecutor may not express a personal opinion about a defendant's veracity."  United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001).  Of course, the "very nature of closing argument requires a detailed analysis of the testimony of each witness and the inferences to be drawn from the evidence."  United States v. Littrell, 439 F.3d 875, 883 (8th Cir. 2006).  Prosecutors are equally entitled to draw such inferences.  United States v. Schumacher, 238 F.3d 978, 981 (8th Cir. 2001).  Indeed, it "is permissible for a prosecutor to interpret the evidence as indicating that the defendant is not telling the truth."  White, 241 F.3d at 1023 (citing Papajohn, 212 F.3d at 1120); Littrell, 439 F.3d at 883 (prosecutor stating

defendant was not telling the truth was not improper); <u>United States v. French</u>, 88 F.3d 686, 688-89 (8th Cir. 1996) (prosecutor's statement "I think it is fair for you to conclude that he [the defendant] was lying to you" was not improper).  Here, the United States limited its comments to expressions of doubt as to the defendant's version of events, and did not engage in ad hominem attacks against the defendant.  Indeed, the United States never actually referred to the defendant as a "liar," and instead referred to specific statements as lies.  While this may seem like a distinction without a difference, it demonstrates the United States was trying to draw permissible inferences from the evidence, rather than attempting to portray the defendant as wholly dishonest or untrustworthy.  The Court finds that the United States' comments as to this issue were not misconduct.

### D.  Prosecutor's Misstatements of the Law and of the Court's Instructions

Defendant contends that the United States misstated the law by providing a legal explanation that was contrary to a jury instruction given by the Court.  The Court's instruction read:

> The term "interstate commerce" means commerce or travel between one state and another state.  The victim is willfully transported in interstate commerce, regardless of whether the victim was alive when transported across a State boundary, if the victim was alive at the moment the transportation began. The transportation of the victim began when she was willfully moved any distance whatsoever from the precise point or place of her abduction so long as that movement was not merely incidental to an offense other than the kidnapping charged in this Indictment.  The United States need not prove that the defendant knew that he was crossing a state line with the victim or the victim's body.

(Final Jury Instructions, No. 4).  Defendant maintains that the government misstated the law by continually stating that the defendant only needed to move Ms. Sjodin "a single step," "a single foot," or "one foot in the wrong direction" in order for transportation to begin.  As Defendant

correctly points out, the "single step" argument is untrue when the movement was merely

incidental to another crime.  For example, under Defendant's theory of the case, if Ms. Sjodin

was moved to the defendant's vehicle for the purposes of sexually assaulting her in that vehicle,

at that very location where the vehicle was parked, then a "single step" would not constitute

transportation, as it would have been merely incidental to the crime of sexual assault.  The Court

cannot, however, find that the United States misstated the law when the government's comments

are viewed in context.  The government did, in fact, explain to the jury that the transportation

needed to be more than simply incidental to another crime, stating:

> Say that you have a bank robber.  He goes into a bank and commits a robbery.
> And in the process of doing that he tells everybody up against the wall and they
> move like this up against the wall (indicating).  That's incidental to another crime,
> not kidnapping...Now if on the other hand the bank robber takes these bank
> employees or people in the bank across the street into another building, that's not
> incidental to the bank robbery.  That's transportation...The same thing can be
> applied in this case.  If the defendant was sexually assaulting Dru Sjodin right on
> the spot there in her car, for example, and that's where it ended, maybe those two
> feet don't make a difference...But it makes a big difference if he transports her
> from that spot to the car out into the country 30 miles away.  That's transportation
> no matter how you look at it...As long as he moved her against her will, one foot
> in the wrong direction towards his car, that's transportation and she's alive when
> that happens.

This statement clearly distinguishes the transportation requirement of the kidnapping charge

from the "movement was not merely incidental to an offense other than kidnapping" portion of

the Court's instructions.  The United States essentially made two arguments, that the movement

was not merely incidental to another crime and, that being true, the transportation of Ms. Sjodin,

under the law, only required a minimal amount of forced movement.  The Court also notes in

passing the logical inconsistency of Defendant accusing the United States of omitting the

"movement was not merely incident to..." statement of the law from their argument, while

simultaneously maintaining that is was error for the United States to use Rule 413 evidence in a

Rule 404 fashion in order to demonstrate to the jury that the movement of Ms. Sjodin was not

merely incidental to another offense.  See Issue XXI, Section E.

### E.  Improper Argument Regarding the Defendant's Prior Convictions

During the guilt phase, the United States introduced Defendant's prior convictions in

5438 and 5447 under Rule 413 to demonstrate had a propensity to sexually assault women.

Defendant argues that the government improperly used these convictions as Rule 404(b)

evidence, to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or

absence of mistake or accident."  Rule 404(b).  The United States made these arguments in the

course of attempting to show that Ms. Sjodin was not sexually assaulted in the parking lot of the

Columbia Mall, but that she was transported away from that location while still alive.  An

attorney for the United States argued:

> Now there's another way you know that he's not going to do it that way and that's
> from the way that he's done it before.  Is S.S. case he took S.S. to an abandoned
> house and S.S. said they drove around to the back, an area where there was
> nobody else...

Defense counsel objected at this time, and the Court sustained the objection and asked counsel

for the United States to move forward.  He did so, stating, "You heard E.K. testify that in that

case she was taken to a remote area..."  This statement also drew an objection which the Court

sustained.  Counsel then moved on from the prior assault of E.K. and stated:

> So you know it's not going to happen in the parking lot.  Apart from anything
> that happened to these other two women, do you think he's going to do it right
> there in the parking lot?

Defendant did not object to this last portion.  Defendant maintains that these statements comprise

classic examples of 404(b) evidence, in that the demonstrated a "common scheme" to

Defendant's previous attacks.

While the Court did sustain the objections, the Court is not entirely convinced that the statements comprised a "common scheme" argument.  While counsel does reference the details of Defendant's previous sexual assaults, his final and overarching point, which drew no objection from Defendant, was that it was nonsensical for Defendant to sexually assault a victim in the parking lot of a shopping mall during one of the busiest times of year.  Indeed, his statement "*Apart from anything that happened to these other two women*, do you think he's going to do it right there in the parking lot?" demonstrates counsel's incredulity that Defendant would sexually assault Ms. Sjodin in what may be the highest traffic area in the city of Grand Forks.  It similarly informs the jury that they should reach this conclusion apart from his earlier statements about the two prior victims, in compliance with the Court's rulings on Defendant's objections.

Even assuming the statements were used for a Rule 404 purpose, this would not necessarily be improper.  Rule 413(a) provides: "In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of other offense or offenses of sexual assault is admissible, and *may be considered for its bearing on any matter to which it is relevant.*"  (Emphasis added).  The Eighth Circuit has similarly noted "the policy articulated in Rule 413, unique to cases involving sexual assaults, renders the general prohibition on propensity evidence in Rule 404(b) inapposite."  United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006).  See also United States v. Medicine Horn, 447 F.3d 620, 623 (9th Cir. 2006) ("Rule 413 evidence was probative because it involved substantially offenses as the crimes charged....");  United States v. Benais, 460 F.3d 1059, 1063 (8th Cir. 2006) (The rape of the first and second

victim occurred under similar circumstances; evidence was probative and admissible under Rule

413).  While it is true that the evidence would not have been timely disclosed as 404(b)

evidence, it is difficult to tell what limits, other than constitutional limits, apply to Rule 413

evidence given the "may be considered for its bearing on any matter..." language.  The Court

concludes that the government's comments did not so fatally infect the proceeding as to deny

Defendant a fair trial.  Davis, 766 F.2d at 1203.

### F. Cumulative Effect of the Prosecutorial Misconduct.

Defendant next contends that the improper comments of the United States, taken in the

aggregate, require that the verdict be set aside.  A district court is afforded "broad discretion in

controlling closing arguments," and a conviction will be overturned "only when prosecutorial

misconduct could reasonably have affected the jury's verdict."  United States v. Chase, 451 F.3d

474, 481 (8th Cir. 2006).  Chase further holds:

> In examining whether prosecutorial misconduct warrants reversal, we determine
> whether the prosecutor's remarks or conduct were in fact improper and whether
> such remarks or conduct prejudicially affected the defendant's substantial rights
> so as to deprive him of a fair trial.  We assess the prejudicial effect of misconduct
> by considering: (1) the cumulative effect of the misconduct, (2) the strength of the
> properly admitted evidence of the defendant's guilt, and (3) the curative actions
> taken by the trial court.

Id.

The Court is careful not to unduly magnify the effect of an improper statement.  United

States v. Mullins, 446 F.3d 750, 757 (8th Cir. 2006).  In reviewing the arguments of both parties

and the applicable law, the Court concludes that the improper statements by attorneys for the

United States had minimal force and almost certainly no effect on the jury's verdict.  Aside from

the improper comments of the United States, the evidence of the Defendant's guilt was very

strong.  The Court also instructed the jury that the statements of the attorneys were not law, that the jury was to take the Court's instructions as given, and to be mindful when a party misstates any matter of law on which the Court instructed.  The Court made admonitions throughout the course of closing arguments reminding the jury of the duty to accept the law as given by the Court, particularly in response to objections by the Defendant.  The Court finds that the cumulative effect of prosecutorial misconduct did not deprive Defendant of a fair trial.

**DEFENDANT'S ARGUMENT XXII: PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT OF THE PENALTY PHASE REQUIRES THAT THE SENTENCE OF DEATH BE SET ASIDE.**

Defendant presents a number of arguments to establish that the government's closing arguments during the penalty phase of the trial involved numerous instances of prosecutorial misconduct.  In judging whether a new trial is warranted, the Court must determine whether the prosecutor's remarks or conduct were improper, and whether the remarks or conduct prejudicially affected the defendant's substantial rights so as to deprive him of a fair trial. United States v. Mullins, 446 F.3d 750, 757 (8th Cir. 2006).  Even if the comments are deemed improper, the Court must scrutinize the cumulative effect of the misconduct, the strength of the properly admitted evidence, and any curative actions taken.  Id. (citing United States v. Holmes, 413 F.3d 770, 774-75 (8th Cir. 2005)).

The closing arguments offered by both the United States and defense counsel were clearly geared towards creating powerful mental images and emotional responses in the jurors. The government emphasized the events surrounding the last moments of the victim's life.  The defense focused, instead, on the mitigating factors, including Defendant's mental capacity,

family, and childhood.

**A. Denigration of Defendant's Mitigation Evidence.**

    1.  General denigration of the mitigation case.

Defendant argues that the government made various general comments about the

mitigation factors that were inappropriate.  During closing, defense counsel discussed with the

jury a photograph depicting Defendant's large head and the testimony of Dr. Hutchinson that a

large head could be a sign of autism or retardation.  In its rebuttal, the government stated that the

argument was "nonsense" and that defense counsel had "put it up, [and] hope[d] it sticks."

Defendant argues these statements by the government were improper.

A district court has broad discretion in controlling closing arguments.  United States v.

Beckman, 222 F.3d 512, 526 (8th Cir. 2000).  Furthermore, provided the government does not

"'stray from the evidence and the reasonable inferences that may be drawn from it, they, no less

than defense counsel, are free to use colorful and forceful language in their arguments to the

jury.'"  United States v. Mullins, 446 F.3d 750, 759 (8th Cir. 2006) (quoting United States v.

Robinson, 110 F.3d 1320, 1327 (8th Cir. 1997)).

Here, the government's closing statements are not error.  Read in context, the

government's statements about the photograph are appropriate:

> Dr. Hutchinson took a look at the childhood photograph of the Defendant and
> proclaimed his head to be big.  Big compared to what?  Big how?  No
> measurements.  No medical records or doctors who examine the Defendant.
> Nothing Direct.  Just inferences.  Just mentioned it.  What utter nonsense in a
> court of law.  This is the nature of the case in mitigation.  Put it up, hope it sticks.
>
> Dr. Hutchinson claimed that when kids have big heads, that sometimes can signify
> autism or retardation.  Of course, you recall that Mr. Reisenauer caught that and

asked Dr. Hutchinson whether she was not claiming or had any evidence that the
Defendant is autistic or retarded.  No was her answer, neither of those.  She
should guess not.  I.Q. of 87, able to converse with psychiatrists for five hours,
500 books in a period of a couple years, rattle off all the authors.  Why mention
it then?  Just another cloud to blast up into the air hoping that no one is going to
notice.

The remarks made by the government about the photograph testimony were a response to
defense counsel's argument that Defendant could be autistic or mentally retarded.  Such a
response to opposing counsel's closing is not improper.  See United States v. Lopez, 414 F.3d
954, 960 (8th Cir. 2005) (prosecutor's statement that he was not "putting justice up for sale by
bringing in felons and thieves as witnesses" was not improper because it was a response to
defense counsel's closing).

The defense also argues the United States's comment, "regardless of what defense
experts are trying to sell you . . . " about the defense's mitigation case was improper.  The Court
finds such a reference is inappropriate and distasteful and should have been avoided by the
prosecution, but it does not rise to the level that it denied Defendant a fair trial.  See Lopez, 414
F.3d at 960.  In Lopez, a reference to the defense's "slick tactics" was considered improper, but
the Eighth Circuit concluded the isolated reference did not affect Defendant's substantial rights.
Id.  A new trial was ordered in United States v. Holmes, following prosecutorial misconduct
during closing arguments.  413 F.3d at 775.  However, Holmes involved numerous, more
damaging statements – references by the prosecution to defense's use of "smoke and mirrors,"
"red herrings," and statements accusing the defense counsel of convincing a witness to lie – all
in a relatively weak case.  Id.  The Court concludes this situation is more similar to Lopez than
Holmes, and the comments constituted harmless error.

## 2.  Arguing a nexus requirement between mitigation and the capital offense

In Buchanan v. Angelone, the United States Supreme Court set forth the standard for admission of mitigating evidence during the penalty phase of capital trials:

> In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence.  However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.

522 U.S. 269, 276 (1998) (citations omitted).  This "relevance" standard set forth for mitigating evidence is extremely liberal.  Virtually any evidence that might tend to show the defendant should not be put to death is admissible, even if it bears no nexus to the crime.  Tennard v. Dretke, 542 U.S. 274, 284-87 (2004).  Defendant argues some of the United States' arguments implied the necessity of a "nexus" between the mitigating factors and this specific offense.  In other words, the defense posits that the United States argued to the jury that evidence is only mitigating if it reduced Defendant's responsibility for what he did to the victim.[5]

Although the government may have been walking close to the line in making some of its arguments, the Court does not believe the boundaries of proper argument were breached.  The jurors were instructed to determine whether factors proven by the defense actually mitigated and, if so, the weight to assign to them.  The statements made by counsel speak to those latter two juror obligations, the relevancy and weight of the factors.  Furthermore, the jury was instructed properly, and there were no factors presented that the jury was precluded from considering.

---

[5] The government made such statements as "Does the factor explain what the Defendant did to Dru Sjodin or reduce the Defendant's responsibility?" and "[W]hat could [Defendant's mitigating factors] have to do with a 22-year-old girl the Defendant spotted in a mall, lusted after, kidnaped, assaulted and raped, and finally killed on November 22nd, 2003?"

Therefore, Defendant's constitutional rights were not violated.  See Simmons v. Bowersox, 235 F.3d 1124, 1137 (8th Cir. 2001) (holding that, despite prosecutor's improper argument that the defendant's age as a mitigating factor was irrelevant because it had no relevance to the crime, no prejudice was suffered by Defendant.  Jurors still knew defendant's age and were not prevented from considering it).

### 3.  Arguing the jury should not consider execution impact evidence

Defendant argues the United States improperly urged the jurors that under the law they need not consider the execution impact evidence as mitigating evidence when it stated: "[T]he issue of punishment for the Defendant is not an issue of how it affects his family, not under the law."

The Court recognizes that execution impact evidence is relevant mitigating evidence under the Federal Death Penalty Act.  However, read in context, this statement by the government is not improper.  The prosecution articulated, "[W]hen you consider the Defendant's list of proposed mitigation, the United States respectfully urges you to conclude that the pain that his intentional acts have caused his family should not be allowed to weigh in his favor now."   In context, the government was clearly arguing that, despite Defendant's family's love for him, the weight afforded this factor should not tip the balance of the scale away from the imposition of the death penalty.  Such an argument was appropriate and consistent with the Court's instructions.

> **4.  Arguing the jury did not have to consider mitigating factors unless Defendant proved the factors by a preponderance of the evidence and that the factors were mitigating**

The Defendant argues that the prosecution instructed the jurors that they could exclude mitigating factors from their consideration in the weighing process, whether or not the jurors found them to be proven by a preponderance of the evidence.  In its closing, the government stated, "And for each one of [the mitigating factors] you can ask yourselves:  Does it meet the test the judge gave us?  Does it meet it?  Is it proven?  Does it mitigate?  And even if it does, what weight does it have?"  A sentencer may not refuse to consider any relevant mitigating evidence, or give it no weight by excluding it from his or her consideration.  Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982).  However, there is an obvious distinction between ignoring or excluding the mitigating evidence, thereby giving it no weight, and affirmatively determining that the particular factor has no weight.

Defense counsel acknowledged at oral argument that some factors, though proven, may have a weight of nothing, and that this analysis is distinctly different from excluding a factor from consideration, thus giving it no weight.  Nothing in the government's arguments implies the jurors should exclude mitigating factors from consideration entirely; rather, the statements argued that some of the mitigating factors should weigh nothing.  This is a valid distinction, and the government's arguments were proper.

## B.  Improper Reference to the Government's Rejection of Defendant's Offer to Plead guilty to the Offense in the Present Case

Defendant argues the United States violated the Court's September 9, 2006 Order (doc. #588) by twice stating that Defendant had offered in March 2006 to plead guilty, and the government had rejected that offer.  The Court's Order stated:

79

> A defendant's offer to plead guilty is therefore relevant to the issue of acceptance
> of responsibility, and it may be admitted during the selection phase. . . .
> However, the scope of this evidence is strictly limited to a defendant's offer to
> plead guilty.  The government's response to a defendant's offer is not admissible.
> In addition, any assertions of personal belief by a prosecutor are not admissible. . .
> .  [T]he Court will limit this evidence to Defendant's offer to plead guilty.

(citations omitted).

During closing, the prosecution stated, "Mr. Ney informed you of the March 2006 letter he sent to me with an offer.  Let the Defendant plead and get a life sentence.  We did not agree to allow him to avoid the unpleasantness..."  At that point, defense counsel's objection was sustained.  Later, the prosecution stated, "[I]t is true that we rejected his attempt to avoid. . . punishment."  No cautionary instruction was given, and none of the jurors found that Defendant accepted responsibility for his actions by offering to plead guilty.

The government argues the Court's Order must have intended that "fair argument" be allowed on this point, but no such inference can legitimately be drawn.  The government's conduct here was clearly improper and violated a direct, clear Order of the Court.  However, every juror must have inferred that any plea offer that was made had been rejected, as evidenced by the fact that the Defendant went to trial.  Therefore, the error was harmless.

### C.  Prosecutor "speaks" for Ms. Sjodin

The defense argues the statement in closing, "Dru Sjodin is here, but I must speak for her," was improper.  Such "speaking for" statements are improper and inappropriate, but they have not usually been found to be reversible error.  People v. Brown et al., 624 N.E.2d 1378, 1388 (Ill. App. 1993); State v. Roberts, 838 S.W.2d 126, 131-32 (Mo. App. 1992).   Although it is improper for a prosecutor to make comments likely to inflame the jury and cause a verdict based on something other than evidence, prosecutors are generally free to use "colorful and

forceful language" when making arguments. <u>Mullins</u>, 446 F.3d at 759. This fleeting comment by the prosecution failed to even trigger an objection from Defendant. It consumed a few seconds of the government's hour of closing arguments. It was neither inflammatory nor prejudicial, and it is highly unlikely that the remarks resonated with the jury. This comment by the prosecutor did not constitute error requiring a new trial, in the Court's estimation or under the reasoning of <u>Brown</u> or <u>Roberts</u>. Defendant's argument is rejected.

### D. Arguing that a life sentence only punishes the kidnapping

The defense argues that the government was improper in its statements that "[a] prison sentence punishes the kidnapping alone" and "Dru Sjodin was not a freebie." Defendant argues that this is not only an incorrect statement of the law (i.e., there is not a mandatory life sentence for kidnappings not resulting in death), but it involves facts outside the record.

Statements made during closing arguments that compare the current case to other cases or crimes are improper. In <u>Young v. Bowersox</u>, the prosecutor made numerous comments during closing, comparing the crime at hand to others. 161 F.3d 1159, 1162 (8th Cir. 1998). He stated, "It's disgusting and it's as cold as anything I've ever seen" and "If the death penalty is an appropriate punishment, you tell me a situation where it's more appropriate than here." <u>Id.</u> Reviewed for plain error, the Eighth Circuit Court of Appeals concluded that the first statement was merely harmless error, and the second, rhetorical statement, could not even be considered improper.

Conversely, in <u>Copeland v. Washington</u>, the Court of Appeals vacated a habeas corpus petitioner's death sentence because the prosecutor's closing remarks drew a comparison to street gangs, made references to his own son and the defense attorney's son, and included a statement

that "there has never, ever been a more complete and utter disregard for the sanctity of human life as this case." 232 F.3d 969, 972 (8th Cir. 2000). In Copeland, the defense attorney failed to object during the closing, but because these statements were the crux of the prosecutor's short closing, the Court concluded reversal was necessary.

Here, unlike either Young or Copeland, defense counsel made several timely objections. The prosecution's arguments could be interpreted to be comparing this crime and this punishment to other kidnappings, or even other historical crimes in the states of Minnesota or North Dakota. Examined in a vacuum, these statements were possibly improper. Read in the context of an approximately hour-long closing argument, during which jurors heard numerous facts and argument and likely drew their own inferences about how this case compared to others, the statements constitute harmless error. It is not improper, and is, in fact, expected for a prosecutor in a death penalty case to state that the death penalty is appropriate. Young v. Bowersox, 161 F.3d 1159, 1162 (8th Cir. 1998). The particular statements were ambiguous and should have been avoided as they come close to the line for impermissible argument. The Court acknowledged that these statements could have been better articulated; however, as stated, no harm was suffered by Defendant.

### E. Misstatements Regarding Defendant's Prior Convictions

The defense argues the statements that Defendant had a "string of rape attacks," was a "multiple rape defendant," and that a "vicious knife attack followed [A.W.'s] refusal to become his latest sexual assault victim," were improper because they were misstatements of the facts of the convictions and argued facts not in evidence.

Whether the government's statements were even untrue is debatable. However, the issue

82

is moot.  The Court gave a curative instruction, stating:  "The jury is aware of the convictions and what the convictions are that you've previously found that fit within the aggravating factors are what you should consider, and that's the extent of it."  This curative instruction ameliorated any misstatement or confusion that may have occurred.  The government's statements were not error.

### F.  Cumulative Effect of the Prosecutorial Misconduct

The defense argues that the numerous improper statements, taken as a whole, combined with the minimal curative action taken by the Court, warrant a new trial.

In examining whether misconduct would warrant a new trial, the Court must determine whether the remarks at issue were, in fact, improper and, if so, whether such remarks deprived Defendant of a fair trial.  United States v. Chase, 451 F.3d 474, 481 (8th Cir. 2006).  The Court is to assess the prejudicial effect of misconduct by considering the cumulative effect of the misconduct, the strength of the properly admitted evidence of the defendant's guilt, and the curative actions taken by the trial court.  Id.

Here, it appears that a few statements made by the prosecution were improper and may be considered error.  Even so, "fleeting comments that passed without objection during the rough-and-tumble of closing argument in the trial court should not be unduly magnified when the printed transcript is subjected to painstaking review."  Mullins, 446 F.3d at 758.  Here, certainly many of the "fleeting comments" sustained objection.  Nevertheless, taken in the context of the government's hour of closing arguments, the "cumulative effect of the misconduct" is minimized.  The crux of the government's closing, focusing with great detail on the brutality of the crime, was not objectionable under the law.  Furthermore, the "strength of the

properly admitted evidence" was quite great. There was ample evidence showing the particularly heinous nature of the crime, illustrating Defendant's premediation of the crime, and establishing his prior criminal convictions. Taken at face value, the strength of the evidence supporting the aggravating factors could easily outweigh the mitigating factors. Finally, the Court took numerous curative actions, including repeatedly sustaining objections and reminding the jurors of the Court's instructions. In sum, the prosecution's closing arguments may have been flawed; however, not to an extent that they prejudiced the defendant or warrants a new trial.

**DEFENDANT'S ISSUE XXIII: THE COURT ERRED IN REMOVING FOR CAUSE HOWARD CARVER AND GORDON BRENNER UNDER <u>WITT</u>.**

Defendant argues that the Court erred in granting the government's challenge for cause to Howard Carver and Gordon Brenner, two potential jurors in the case. In <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985), the Supreme Court held that a prospective juror may be excluded for cause based on his or her views on capital punishment if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

The Court adhered to an exacting process while empaneling the jury. The Court initially sent out about 1,500 questionnaires to potential jurors. The Court then had approximately 600 of these jurors fill out a more thorough twenty page questionnaire. The Court then randomized these potential jurors and interviewed them individually. A table was placed in the center of the courtroom, at which this Judge sat with the lead prosecutor and defense attorney. Each prospective juror was interviewed at this table, and the Court allowed argument in open court and at sidebar after each juror had left the room. Several times, the Court opted to review the

transcript and consult case law in chambers before making a final determination.

Ordinarily, parties in a capital case are only entitled to receive twenty peremptory challenges. Fed. R. Crim. P. 24(b)(1). The Defendant moved for an additional ten peremptory challenges (doc. #263), which this Court granted (doc. #308) over the objections of the United States. The Court also provided Defendant with two additional challenges, as the Court sought to empanel two additional alternate jurors. The Court denied the United States' request to have an equivalent amount of peremptory challenges. In total, Defendant received thirty-two peremptory challenges, while the government received twenty-two.

The Court was equally exacting in deciding whether to grant or deny challenges for cause. Mr. Carver was properly excluded, as the Court concluded that his views would prevent or substantially impair the performance of his duties as a juror. He stated to Court and counsel that he would have difficulty imposing the death penalty and expressed his general opposition several times. He further was concerned whether he could impose the sentence of death given his profession as a physician's assistant. Most importantly, he expressly stated that he was concerned that his impartiality might be skewed. The Court believed that Mr. Carver's repeated statements concerning his substantial moral difficulty in this area would impair his ability to fully and fairly consider the application of the death penalty. Mr. Carver was properly excluded under Witt.

Mr. Brenner was also properly excluded. Mr. Brenner served in a leadership role in his Trinity Lutheran Church of Moorhead, Minnesota. Trinity Church is an Evangelical Lutheran Church in America (ECLA), an institution which has an official stance of being opposed to the death penalty. See ECLA Social Statement on the Death Penalty,

www.elca.org/socialstatements/deathpenalty (2007).  He had admittedly formed a strong moral

and ethical opposition to death penalty, which was in accord with his church's stance.  He also

expressed his belief, and his church's belief, that the death penalty was racially biased.  He did

state, however, that the death penalty was appropriate in some, albeit extremely limited, cases,

such as in instances of multiple murders or genocide, specifically indicating figures like Hitler

and Stalin.  The Court noted some inconsistency in his statements, particularly between what he

wrote in the questionnaire and what he verbally told the Court.  When asked if he considered the

Defendant innocent, in accordance with the presumption of innocence, he replied "yes."  At

Question No. 93, however, Mr. Brenner indicated that the Defendant was probably guilty, but

that he should only receive life.  He later explained that he had filled the questionnaire out

quickly and hadn't given it much thought.  This answer seemed at odds with his others

responses, which appeared to the Court to be uniformly thoughtful and considered.  The Court

believed that given his very strong beliefs on this issue, that Mr. Brenner would be substantially

impaired in his consideration of the death penalty.

　　　　The Court finds that the challenges for cause were properly granted.  The Court

committed no error as to this issue.


**DEFENDANT'S ISSUE XXIV: THE COURT ERRED IN OVERRULING
DEFENDANT'S MOTION TO DISMISS OR SUPPRESS EVIDENCE BASED UPON
DESTRUCTION OF EVIDENCE.**

　　　　Defendant argues that the Court erred in denying Defendant's Motion to Dismiss or, in

the Alternative, to Suppress Evidence Based Upon the Destruction of that Evidence.  The Court

held a hearing on June 14, 2006, and an evidentiary hearing on July 28, 2006, and issued an

order on August 3, 2006, denying the motion (doc. #488).

"Whatever duty the Constitution imposes on [law enforcement] to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984). Therefore, the government violates the Due Process Clause when it destroys evidence that possessed "an exculpatory value that was apparent before the evidence was destroyed," and the defendant would be unable to obtain comparable evidence by other reasonably available means. Id. at 489. However, if the evidence is only "potentially useful" then the defendant must demonstrate bad faith on the part of the government actor in order to establish a due process violation. Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

## A. Apparent Exculpatory Value

The exculpatory value inquiry is a question regarding the materiality of the evidence. Trombetta, 467 U.S. at 489. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Moore, 452 F.3d 382, 387 (5th Cir. 2006); United States v. Hernandez, 299 F.3d 984, 990 (8th Cir. 2002). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome of the proceeding. Hernandez, 299 F.3d at 990. Therefore, exculpatory evidence is evidence that would be sufficient to create a reasonable probability that the defendant did not commit the crime. See, e.g., People v. Hobley, 696 N.E.2d 313, 329 (Ill. 1998) (holding that the report showing the absence of the defendant's fingerprints on the gasoline can introduced at his arson trial was exculpatory evidence); Ex parte Geeslin, 505 So.2d 1246, 1248 (Ala. 1986) (holding that the results of the defendant's semen test showing

the absence of gonorrhea was exculpatory because the semen in the rape victim contained

gonorrhea); State v. Harwood, 495 P.2d 160, 162 (Idaho 1972) (holding that the ballistics report

that contained the finding that the bullet in the goat carcass could not have been fired by a .270

Winchester Remington Model 721 Rifle was exculpatory evidence because the defendant's gun

was a .270 Winchester Remington Model 721 Rifle).

      Mere speculation about the potentially exculpatory nature of evidence is insufficient to

establish its exculpatory nature under Trombetta. See United States v. Moore, 452 F.3d 382, 388

(5th Cir. 2006) (stating that conclusory and vague allegations about the evidence is insufficient

to establish that the evidence is exculpatory); Bullock v. Carver, 297 F.3d 1036, 1056 (10th Cir.

2002) (stating that speculation about the exculpatory nature of evidence requires a showing of

bad faith to prove a due process violation). Also, the fact that the evidence "*may* have proven

exculpatory," but it very well may have proven inculpatory is not sufficient to prove that the

evidence is exculpatory. United States v. Martinez-Martinez, 369 F.3d 1076, 1087 (9th Cir.

2004) (emphasis in original).

      In this case, Defendant has failed to establish that any of the evidence at issue was of an

exculpatory nature that was apparent before the evidence was destroyed. Defendant alleged that

this evidence inculpates him but that the evidence may also be exculpatory. This speculation is

insufficient to demonstrate that the evidence is exculpatory. Moore, 452 F.3d at 388; Martinez-

Martinez, 369 F.3d at 1087; Carver, 297 F.3d 1036, 1056.

      Defendant offered United States v. Belcher, 762 F. Supp. 666 (W.D. Va. 1991) and

People v. Walker, 628 N.E.2d 971 (Ill. Ct. App. 1993) for a different definition of "exculpatory."

These two cases state that if the evidence is crucial or important to the prosecution, then it is

88

exculpatory.  <u>Belcher</u>, 762 F. Supp. at 672; <u>Walker</u>, 628 N.E.2d at 974.[6]  This interpretation turns the concept of inculpatory versus exculpatory on its head.  When evidence is important or crucial to show a defendant's guilt, that evidence is normally viewed as inculpatory as opposed to exculpatory.

In addition to being contrary to the holdings of the state and federal cases cited above, the holdings of <u>Belcher</u> and <u>Walker</u> are also likely contrary to Supreme Court precedent.  As the Supreme Court recently explained, the <u>Youngblood</u> distinction between "exculpatory" and "potentially useful" applies even if the contested evidence is crucial to the outcome of the case. <u>Illinois v. Fisher</u>, 540 U.S. 544, 548-49 (2004).  In <u>Fisher</u>, the most the defense could say about the contested evidence was that an additional test on the evidence might show that the police tests were mistaken.  <u>Id.</u> at 549.  The Court held that this evidence was only "potentially useful," so the bad faith test would apply.  <u>Id.</u>

In this case, the most Defendant could allege is that if his expert had performed tests on the evidence that was consumed, the tests might have shown that the Minnesota Bureau of Criminal Apprehension ("MN BCA") tests were mistaken.  Therefore, this contested evidence is, at best, potentially useful, and Defendant must show that the United States acted in bad faith in order to establish a due process violation.  <u>Fisher</u>, 540 U.S. at 549; <u>Youngblood</u>, 488 U.S. at 58.

---

[6]  Even under this interpretation of "exculpatory," there is no violation of the Due Process Clause if the defendant has the full opportunity to inspect the evidence.  <u>United States v. Rabinowitz</u>, 991 F. Supp. 760, 765 (W.D. Va. 1998).  In this case, the United States offered the defense expert an opportunity to observe the tests performed on the evidence, and the defense declined this offer.  Therefore, Defendant at least arguably had a full opportunity to inspect the evidence.

**B. Bad Faith**

<u>1. Government Lawyers</u>

Defendant alleges that the government lawyers acted in bad faith because they authorized the consumption of evidence without seeking the consent of a defense lawyer or the Court's permission. On July 29, 2005, this Court filed an order that stated, in pertinent part, "*with the exception of the ongoing testing that currently is being completed*, no further destructive testing shall be done that destroys an entire sample or specimen unless it is done with the consent of counsel or court order." (emphasis added). This order memorialized the same instruction that the Court gave verbally at the hearing on June 24, 2005. By its plain language, this order only required authorization for any destructive testing that was starting after June 24. Therefore, the government could not have acted in bad faith pursuant to this order if it did not seek authorization for consumptive testing prior to June 24 because the order did not apply to that testing.

From the correspondence submitted in support of this motion, the following is a summary of the relevant time line:

On June 1, 2004 the MN BCA informed the U.S. Attorney that testing would be done on June 16, 2004, and that this testing might consume the entire test sample. These tests involved samples taken from Sjodin's body, a knife and gloves from Rodriguez's car, and samples taken from Rodriguez's residence. On June 11, 2004 Attorney Hoy acknowledged receiving a copy of this June 1 letter, and he asked the U.S. Attorney to delay the June 16 testing.

On February 10, 2005 the U.S. Attorney wrote to Attorney Hoy and explained again that items would likely be consumed in testing. He explained that they would like to do testing

within the next four weeks.  The U.S. Attorney asked if the defense team would like to have their

DNA expert present to observe the testing.  On May 10, 2005 Assistant U.S. Attorney Anderson

wrote to Attorney Hoy and asked again if he would like to have a DNA expert present when the

testing was conducted.

On May 31, 2005 Attorney Hoy sent Assistant U.S. Attorney Anderson an email stating

that the defense team would not send an expert to observe this testing.  On June 9, 2005 the U.S.

Attorney informed the MN BCA to begin their testing of the previously identified items, and he

informed the lab that the defense had chosen not to have their expert present for the testing.

Again on June 10, 2005 Attorney Hoy informed the United States that the defense team would

not have their expert present for the testing.

At least as early as June 9, the MN BCA had started testing on the items mentioned in the

February 10 letter.  Since this testing started before June 24, 2005, there was no violation of the

Court's order.

Even without a court order, the government always sought the defense team's consent

before going ahead with potentially consumptive testing.  In both June 2004 and February 2005,

the U.S. Attorney informed the defense of testing that may consume the samples.  In May, the

defense informed the government that it could go ahead with the testing because they would not

have their expert present, and the defense also requested a deadline for when the testing would

be completed.  While the defense repeatedly expressed its skepticism that any samples would

need to be consumed during testing, see, e.g., Hoy June 10, 2005 Letter at 2, this does not

demonstrate any bad faith on the part of the government lawyers.  The U.S. Attorney was only

acting on the information that the MN BCA was giving him, and the lab stated that it may have

to consume the samples to perform proper testing.  See, e.g., BCA June 1, 2004 Letter.  Since there was no violation of the Court's July 29, 2005 Order, the government lawyers did not act in bad faith.

### 2.  Laboratory Technicians

The government does not act in bad faith when it follows its standard practice for destroying evidence.  United States v. Gibson, 963 F.2d 708, 711 (5th Cir. 1992); United States v. Belden, 957 F.2d 671, 673-74 (9th Cir. 1992); see also United States v. Boswell, 270 F.3d 1200, 1206 (8th Cir. 2001) (stating that the blood samples were stored according to the laboratory's standard policies, but the samples deteriorated over time).  There is no due process violation when the defendant has an adequate opportunity to impeach the reliability of a scientific test and the qualifications of the individual administering the test if the government failed, in good faith, to preserve a sample for testing.  Trevino v. Dahm, 2 F.3d 829, 832 (8th Cir. 1993).

Defendant's expert, Dr. Dean Stetler, only testified about those pieces of evidence previously identified by the parties as Items 14 and 15, which narrowed Defendant's motion to those pieces of evidence.  He explained that generally one can obtain a valid DNA profile from an extraction that contains between one and two nanograms of DNA material.  With a "cutting" of evidence, one can usually divide that in half to save a portion for the defense, and with a swab of DNA material, one can usually divide that in half to save a portion.  Based upon the total amount of DNA material present in Items 14 and 15, combined with the fact that they were either cuttings or swabs, Dr. Stetler's opinion was that these samples could have been divided in half, so that a sample could be saved for the defense.

The United States' expert, Ann Marie Gross, testified that Item 14 consisted of cuttings where the evidence on them was less than a millimeter in diameter. She explained that it was not physically possible to divide a sample that small. In her professional opinion, it was scientifically prudent to consume the samples that the lab did to obtain a valid DNA profile.

With swabs, Ms. Gross explained that there are a number of factors that weigh in the decision about whether there is a sufficient sample to allow the swab to be divided. One consideration is the coloring of the swab. If the sample is so small that the technician cannot even see material on the swab, it would not be prudent to divide it because one would not even know where the DNA was located. In her opinion, the swabs from Item 15 were too small to divide based on this coloration problem.

The Court found Ms. Gross' testimony more credible and probative on the issue raised by Defendant's motion. She was actually in the position to view the evidence first-hand, and she has years of experience evaluating evidence from crime scenes. Her opinions were confirmed by Steven Fischer, another forensic scientist. Dr. Stetler's testimony was filled with statements about what "could" have been done. However, much of this testimony related to opinions based on pristine conditions. He offered no opinion on how to divide a cutting that was the size of a millimeter, and he offered no opinion on how to divide a swab that had no coloration. Bad faith is not shown simply because a laboratory was not able to act in accordance with a procedure that would be possible under ideal circumstances.

Ms. Gross' affidavit states that the laboratory follows the Quality Assurance Standards for Forensic DNA Testing Laboratories. (Gross Aff. at 5.) Standard 7.2 states that "[w]here possible, the laboratory shall retain or return a portion of the evidence sample or extract." Ms.

Gross states that this standard was followed in this case.  (Gross Aff. at 5.)  Her testimony at the hearing also confirmed this statement.  Since the laboratory followed its standard protocol, it acted in good faith.  Boswell, 270 F.3d at 1206.

The Court's earlier ruling was in accord with applicable law and controlling precedent, and the Court finds no error.


## DEFENDANT'S ISSUE XXV: THE COURT ERRED IN DENYING DEFENDANT'S SECOND AND THIRD MOTIONS TO SUPPRESS.

Defendant raised this issue pre-trial (doc. #255).  In this earlier motion, Defendant alleges that the search warrant for his automobile and the house he was living in lacked probable cause and lacked sufficient particularity.  Defendant also alleges that the search warrant of his person lacked probable cause.  The Court ultimately rejected these arguments (doc. #295).

### A.  Probable Cause

A search warrant is supported by probable cause when the affidavit in support of the warrant demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place."  United States v. Tyler, 238 F.3d 1036, 1038 (8th Cir. 2001) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  A court must took at the totality of the circumstances when deciding whether probable cause exists.  United States v. Caswell, 436 F.3d 894, 897 (8th Cir. 2006) (quoting Gates, 462 U.S. at 238).  Since the affidavits are normally drafted by nonlawyers, they are not held to technical requirements of elaborate specificity.  United States v. Sumpter, 669 F.2d 1215, 1218 (8th Cir. 1982) (quoting United States v. Ventresca, 380 U.S. 102, 103 (1965)).  The affidavit may not be viewed in a piecemeal fashion; instead, the court must look at the affidavit as a whole to decide whether probable cause exists.  United States v. Ryan, 293

94

F.3d 1059, 1062 (8th Cir. 2002) (quoting Gates, 462 U.S. at 243 n.13).

Probable cause is a "fluid concept," meaning the court should read the affidavit and apply common sense to the facts. Caswell, 436 F.3d at 897. Probable cause does not require a prima facie showing of criminal activity, and the affidavit does not have to state with particularity the criminal activity suspected. United States v. Horn, 187 F.3d 781, 787 (8th Cir. 1999). Finally, a reviewing court must accord great deference to the magistrate's determination that there was probable cause for the search warrant. United States v. Leon, 468 U.S. 897, 914 (1984).

The affidavits for the search warrants in this case contained the following relevant information:

On November 22, 2003, Dru Sjodin was working at the Victoria's Secret store in the Columbia Mall in Grand Forks until 4:00 p.m. She then shopped at the mall for about an hour, and left the Marshall Field's store at approximately 4:58 p.m. Ms. Sjodin placed a cell phone call to her boyfriend at approximately 5:00 p.m. and talked to him for approximately four minutes. The phone call ended abruptly with Ms. Sjodin saying something to the effect of "O.K., O.K." Her boyfriend then repeatedly attempted to get a hold of her by phone, but she never answered.

At 9:00 p.m., Ms. Sjodin was scheduled to work at the El Roco Lounge, and she never showed up. At that point, her boyfriend and Ms. Sjodin's roommate decided to report to the UND Police Department that she was missing. By the time the affidavit for the search warrants was prepared, over four days had passed since Ms. Sjodin had placed that phone call to her boyfriend, and no friends or family had heard from her. Her friends and family stated that it was out of character for her not to be in contact with them for such a long span of time.

The police located Ms. Sjodin's car in the Columbia Mall parking lot. The passenger door was unlocked, and the officer found a black nylon sheath bearing the words "Tool Shop" on the ground behind her car.

On November 25, the police found one of Ms. Sjodin's shoes under the Highway 75 Bypass bridge in Crookston, Minnesota. At that time, the Defendant was living in Crookston. On the same day that Ms. Sjodin was reported missing, the Defendant went to the Columbia Mall in Grand Forks in the late afternoon. He arrived back in Crookston at 8:30 p.m. Rodriguez told police that he watched "Once Upon a Time in Mexico" from approximately 4:30 p.m. to 7:30 p.m. at a theater near Columbia Mall on the day Ms. Sjodin disappeared. However this alibi did not check out because "One Upon a Time in Mexico" was not playing in Grand Forks theaters on that day. Rodriguez could not explain this inconsistency.

Rodriguez's criminal history was also included in the affidavit and a copy of the criminal complaint for one of the incidents was attached to the affidavit. His criminal history includes two charges of kidnapping, a charge of attempted kidnapping, a charge of false imprisonment, and sexual and physical assault charges. All of his victims were women, and the affidavit asserted that the victims were strangers to Rodriguez. In one case, Rodriguez used a knife to threaten his victim, and in another case, he stabbed his victim with a knife.

The police learned that a "Tool Shop" sheath, like the one found by Ms. Sjodin's car, is only sold with a black, folding, lockblade knife. The first time the police spoke with Rodriguez, he consented to a search of his car. The police discovered a black, folding, lockblade knife in the trunk, but it was not in a "Tool Shop" sheath. Later, the police purchased one of these "Tool Shop" knives and noticed it was very similar to the one found in the trunk of Rodriguez's car.

Applying common sense to this set of facts, and deriving the necessary inferences from them, the Court finds that there is probable cause to support these search warrants:  Ms Sjodin's phone call was abruptly cut short; her friends and family did not hear from her for days, which was not like her;  her car was found in the Columbia Mall parking lot with a knife sheath on the ground by it; and her shoe turns up by a bridge a few days later.  These were sufficient facts to conclude that a crime may have occurred.

At the time Ms. Sjodin disappeared, Rodriguez was at the same mall.  The Defendant had history of kidnapping and sexually assaulting women that he does not know.  In two instances, he used a knife on his victims.  The police found a knife sheath on the ground by Ms. Sjodin's car.  Rodriguez lied to the police about his whereabouts at the time Ms. Sjodin went missing.  One of Ms. Sjodin's shoes was found in the city where Rodriguez lives.  These facts demonstrated a fair probability that Rodriguez was responsible for Ms. Sjodin's disappearance.

Defendant argues that his criminal history is so old that it should not be considered in determining probable cause.  "It is axiomatic that probable cause must exist at the time of the search and not merely at some earlier time."  United States v. Kennedy, 427 F.3d 1136, 1141 (8th Cir. 2005).  There is no definite time period after which information becomes stale.  Tyler, 238 F.3d at 1039 (quoting United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993)).  The timeliness of the information in the affidavit depends on the totality of the circumstances, "including the nature of the crime under investigation and the property sought in the search."  Kennedy, 427 F.3d at 1141.  The focus of this timeliness inquiry is on whether evidence of a particular crime will be found in a particular location.  Id.

In this case, the suspected crime took place on the evening of November 22.  Less than

97

five days later, at 2:20 a.m. on November 27, the police applied for the search warrants. Given this short span of time, there was a fair probability that evidence of the crime could still be found on Rodriguez, in his car, or in his home.

The drug case cited by Defendant relates to using an uncorroborated statement from a confidential informant and a prior drug conviction as the basis for obtaining a search warrant three years after the conviction. State v. Lee, 624 A.2d 492, 495 (Md. 1993). In this case, there was suspected criminal activity only days before the warrant is issued, Rodriguez had engaged in similar behavior in the past, Rodriguez was at the same mall as Ms. Sjodin at the same time, and his alibi did not hold up under scrutiny. There is much more information in this case to sustain probable cause than there was in Lee.

Even if Rodriguez's criminal history was subject to a timeliness inquiry, the affidavit for the warrant also included information on where he had been for the previous twenty years. Since the time of his most recent conviction, had been in prison. He was released approximately six months before Ms. Sjodin's disappearance. Therefore, his criminal history is recent because he was unable to commit any new crimes of this nature for the past twenty years.

Defendant next argues that the magistrate could not rely on Rodriguez's prior charges, that he was not convicted of, to make a probable cause determination. The prosecutor has broad discretion in deciding whether to dismiss criminal charges. United States v. Martin, 287 F.3d 609, 623 (7th Cir. 2002). When reaching a plea agreement with a defendant, the prosecutor will often dismiss charges. This does not prevent a magistrate from looking at the specific facts underlying the previous convictions. The facts regarding the two 1974 incidents involved abduction and one of the charges the jury convicted him of for the 1980 incident was attempted

kidnapping. Therefore, the affidavit, along with the materials attached to the affidavit, contained sufficient information on Rodriguez's history of abducting women.

Finally, Defendant argues that the affidavit did not establish that evidence would be found in the places described or on Rodriguez. As for the car, Rodriguez used it, and he admitted that he drove it to Grand Forks on the day Ms. Sjodin disappeared. Since Ms. Sjodin's car was found in the mall parking lot, it was likely that Rodriguez used his own car to transport her. The police had already found one piece of likely evidence, the knife, in the car. Based on this information, there was a fair probability that more evidence could be found in the car.

As for the house, it was where Rodriguez was living at the time. The police had already found one of Ms. Sjodin's shoes in Crookston; it was possible that more of her clothing or personal effects would be found in the house. Based on the affidavit, there was a fair probability that evidence could be found in the house.

As for the warrant for the search of Rodriguez's person, an abduction would require physical contact with the victim. In addition, he had a history of sexually assaulting his victims. Physical contact, including sexual assault, could leave trace amounts of evidence of the victim on his person or clothing. Therefore, there was a fair probability that evidence could be found on Rodriguez. The warrants are supported by probable cause.

## B. Particularity

The Fourth Amendment requires a search warrant to particularly describe the place to be searched and the persons or things to be seized. Horn, 187 F.3d at 787. This particularity requirement is satisfied if the warrant is sufficiently definite to allow the police to identify the property to be seized. Tyler, 238 F.3d at 1039. "The degree of specificity required will depend

on the circumstances of the case and on the type of items involved. A warrant naming only a generic class of items may suffice if the individual goods to be seized cannot be more precisely identified at the time that the warrant is issued." Horn, 187 F.3d at 788.

Defendant objected to virtually all the categories of evidence mentioned in the warrant. He first objected to the search for items of clothing with blood, semen, bodily fluids, hair, and/or fibers. Given Rodriguez's history of sexually assaulting the women he abducted and the apparent presence of a knife, there was a fair probability that the police would find either his or her clothing containing this type of evidence.

Defendant also objected to various categories of evidence relating to items owned by Ms. Sjodin including notes, writings, photographs or other documents relating to her; a key chain with a key and auto entry pad for automobile; and cell phone or cell phone parts. Since Ms. Sjodin had some personal effects on her at the time she disappeared, there was a fair probability that if she was abducted, whoever took her might have kept these personal belongings. Her abductor could have kept any photographs she had or any other personal documents. Also, the police did not find the key and auto entry pad for her vehicle in her car, so her abductor could have had that as well. The police similarly did not find her cell phone in the car. Ms Sjodin's boyfriend received a second call from her cell phone at approximately 7:42 p.m., but there was only static and tones on the other end. This indicates a fair probability that whoever abducted Ms. Sjodin also had her cell phone. Defendant complained that the warrant did not specifically state that the cell phone had to belong to Ms. Sjodin. However, unless the cell phone was operational at the time police performed the search, it would be almost impossible to identify the owner of the cell phone. The warrant could not more precisely describe the cell phone at that

time.  Horn, 187 F.3d at 788.

Next Defendant objected to the category seeking indicia of ownership or occupancy of the premises.  This category was necessary to determine whether the suspect actually lived in the house being searched and whether he owned or drove the car being searched.  The description of the evidence sought is not overly broad.  See Horn, 187 F.3d at 788 (holding that the words "[r]ecords, documents, receipts, keys, or other objects showing access to, and control of, the residence" were not overly broad).

Finally, Defendant objected to the warrant including permission to look for telephone bills or records, bindings or ropes, and credit card receipts or bills.  The telephone bills could demonstrate some connection between Ms. Sjodin and Rodriguez, bindings or ropes are often used in abductions, and credit card receipts or bills could provide more information on where Rodriguez was when Ms. Sjodin disappeared.  The categories of evidence sought by the search warrant relate to the facts in the affidavit and the attachments to the affidavit, and the categories of evidence are described with reasonable particularity.

The search warrants were supported by probable cause and possessed sufficient particularity.  The Court committed no error in denying Defendant's second and third motions to suppress.

**DEFENDANT'S ISSUE XXVI: THE COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE RESULTING FROM A SEARCH WARRANT EXCEEDING THE SCOPE AUTHORIZED IN THE SEARCH WARRANT.**

This issue was raised pre-trial (doc. #397).  Defendant argues that the Court erred in denying his motion to suppress evidence obtained from a search that he alleges exceeded the

scope of the search warrant.  The Court rejected this contention (doc. #474).  Defendant

incorporates his earlier arguments as to this motion by reference, as did the United States in its

response.

On November 27, 2003, a Polk County Judge issued a search warrant for Rodriguez's

car.  The search warrant listed eleven categories of evidence that the police could look for

including clothing, personal belongings of Ms. Sjodin, instrumentalities of a kidnapping, indicia

of ownership, and receipts.  The search warrant also authorized the police to impound and tow

the vehicle to Bemidji, Minnesota so that the Minnesota BCA could conduct "a more thorough

search . . . ."

The application for this warrant was incorporated by reference in the search warrant.  The

application stated that the police were investigating a kidnapping, and the suspect was a level

three sex offender.  The application also explained that it appeared that a knife was involved in

the crime.

### A.  Plain View

Law enforcement may seize items not listed in a search warrant as long as they have

authority under an exception to the warrant requirement.  United States v. Robbins, 21 F.3d 297,

300 (8th Cir. 1994).  The plain view doctrine is an exception to the warrant requirement.  United

States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005).  An item not mentioned in a reasonably

specific search warrant may be seized if that item is "reasonably related to the crime for which

the warrant issued."  Taylor v. State, 466 F.2d 1119, 1121 (8th Cir. 1972).  In United States v.

Smith, 462 F.2d 456, 461 (8th Cir. 1972), the court upheld the seizure of documents

demonstrating control of the premises searched even though these documents were not

mentioned in the search warrant.  While these documents were not evidence of a crime, they

were reasonably related to the crime for which the warrant issued.  Id.

     To satisfy the plain view exception, the officer must have a lawful right to be in the area

where the object is found.  Horton v. California, 496 U.S. 128, 135 (1990) (quoting Coolidge v.

New Hampshire, 403 U.S. 443, 465-66 (1971)).  The object must be in plain view in that area,

and the object's incriminating character or its evidentiary significance must be immediately

apparent.  Khabeer, 410 F.3d at 482 (quoting United States v. Bustos-Torres, 396 F.3d 935, 944

(8th Cir. 2005)); Smith, 462 F.2d at 461 (quoting Coolidge, 403 U.S. at 465-66).  An item's

incriminating character is immediately apparent if the police have probable cause to associate the

piece of evidence with criminal activity.  Brayman v. United States, 96 F.3d 1061, 1065 (8th Cir.

1996).

     In this case, the search warrant gave law enforcement the right to be in Rodriguez's

vehicle.  Trace evidence such as hair, fibers, and blood would be in plain view inside the vehicle.

These items would be reasonably related to a kidnapping because they could prove whether Ms.

Sjodin had been in Rodriguez's vehicle.  Therefore, the incriminating character or evidentiary

significance of these trace materials would be immediately apparent.

     Defendant argues that the incriminating nature of the drops of blood on the seat cushion

and the seat belt was not immediately apparent.   However, law enforcement knew from the

search warrant that they were investigating a kidnapping that likely involved a knife.  The idea

that there might have been violence involved that would transfer Ms. Sjodin's blood to the

cushions and seat belt of his vehicle is a reasonable possibility based upon the information in the

warrant.  The "immediately apparent" element does not require the police to have actual

knowledge of incriminating evidence.  Arrick v. State, 107 S.W.2d 710, 719 (Tex. Ct. App.

2003).  Law enforcement had probable cause to believe that Rodriguez had kidnapped Ms.

Sjodin, therefore the incriminating nature of the blood drops was immediately apparent.

Brayman, 96 F.3d at 1065; Arrick, 107 S.W.2d at 719.

### B.  Inevitable Discovery

The trace evidence found in Rodriguez's car would also be admissible under the

inevitable discovery exception.  The test for the inevitable discovery exception is whether the

evidence would have been discovered without reference to the police misconduct.  United States

v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001).

This search warrant ordered law enforcement to transport the vehicle to the Minnesota

Bureau of Criminal Apprehension's Forensic Science Laboratory in Bemidji, Minnesota so that a

"more thorough search" could be conducted there.  This more thorough search by the BCA's

criminalists would result in the discovery of the blood evidence and the other trace evidence at

issue here.  Therefore, this evidence would have been discovered without law enforcement's

initial discovery of the blood.

Defendant speculates that the Polk County Judge added the instruction about towing and

impounding the car because the initial search was going to be conducted at night, and towing it

somewhere would allow another search during the day when it would be easier to see inside the

vehicle.  If Defendant's speculation were correct, then a more logical instruction would have

been to tow the vehicle to the Polk County Sheriff's impound lot or some other law enforcement

building in Crookston, Minnesota.  Instead, the judge ordered the car moved approximately

eighty miles away to a forensic science laboratory.  The plain implication of this instruction goes

beyond conducting a search during the day.  Since the forensic scientists at the Bemidji

laboratory would have inevitably discovered this evidence, the Court properly refused

Defendant's motion to suppress this evidence.

### C.  Good Faith

The purpose of the exclusionary rule is to deter law enforcement from engaging in

conduct that violates the Fourth Amendment.  United States v. Leon, 468 U.S. 897, 906 (1984).

When a search is performed pursuant to a warrant, the application of the exclusionary rule

should be decided on a case-by-case basis, and a court should only apply the rule when it will

further the deterrence purpose.  Id. at 918.  When law enforcement officers act reasonably, the

exclusionary rule should not be applied because it will not further the goal of deterrence.  Id.  A

court must allow "some latitude for honest mistakes" made by law enforcement when they

execute search warrants.  Maryland v. Garrison, 480 U.S. 79, 87 (1987).

In Garrison, the search warrant authorized the officers to search Lawrence McWebb's

apartment, which was described as the "2036 Park Avenue third floor apartment."  480 U.S. at

80.  When the officers conducted the search pursuant to the warrant, they "reasonably believed"

that there was only one third floor apartment.  Id.  However, in the process of conducting the

search, they discovered that there were two apartments on the third floor.  Id.  The Supreme

Court held that the police officers actions were reasonable; therefore the exclusionary rule did

not apply to the search that exceeded the scope of the warrant.  Id. at 88-89.

Other courts have similarly applied the good faith exception to searches that reasonably

exceed the scope of the warrant.  In United States v. Biles, 100 F. App'x 484, 494 (6th Cir.

2004), the court held that the evidence seized from the officers' search of a building that was

approximately 150 feet away from the residence would not be suppressed because the officers'

belief that the building was part of the curtilage was objectively reasonable.  In <u>United States v.</u>

<u>Olinde</u>, No. 04-31061, 2006 WL 1049048, *3 (5th Cir. Apr. 20, 2006), the warrant authorized a

search "in the day time-9:00 A.M. to 10:00 P.M."  The officers conducted the search before 9:00

a.m.  <u>Id.</u>  The court did not suppress the evidence from the search because it was reasonable to

rely on the description of daytime as "between 6:00 a.m. and 10:00 p.m." that is contained in

Rule 41 of the Federal Rules of Criminal Procedure.  <u>Id.</u>

      In this case, the warrant permitted the officers to search for items of clothing that

contained blood, hair, or fibers.  Since the warrant makes specific reference to the blood, hair,

and fibers on these items, it would be objectively reasonable for the officers to believe that the

warrant authorized the seizure of blood, hair, and fibers when those items are found on the

upholstery or floor of the vehicle.  In addition, the warrant incorporated by reference Agent

Ahlquist's application.  This application states that the officers were searching for evidence that

might lead to the discovery of Ms. Sjodin.  Since the blood, hair, fibers, and other similar trace

evidence could show Ms. Sjodin's presence in the vehicle, this evidence would aid in her

discovery.  Therefore, the officers' conduct was objectively reasonable.  If the officers exceeded

the scope of the warrant, they acted in good faith.  Thus, the exclusionary rule does not apply.

<u>Garrison</u>, 480 U.S. at 88-89; <u>Biles</u>, 100 F. App'x at 494.

      Based on the reasons proffered above, the Court did not err in denying Defendant's

Motion to Suppress.

**DEFENDANT'S ISSUE XXVII: THE COURT ERRED IN ITS INSTRUCTION REGARDING THE JURY'S CONSIDERATION OF MITIGATING FACTORS.**

Defendant contends that it was error for the Court to give the following instruction during

the Final Selection Phase:

> You must consider whether the defendant has established the existence of any mitigating factors.  Unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require unanimous agreement with regard to mitigating factors. *Any juror persuaded of the existence of a mitigating factor must consider it in this case.  Furthermore, any juror may consider a mitigating factor found by another juror, even if the first juror did not initially find that factor to be mitigating.*
>
> You are also permitted to consider anything else about the commission of the crime or about the defendant's background or character that would mitigate against the death penalty...If there are such mitigating factors, whether or not specifically argued by defense counsel, which are established by the greater weight of the evidence, you are free to consider them in your deliberations.
>
> On the Special Findings Form you will be asked to identify ay mitigating factors that any one of you finds has been proved by the greater weight of the evidence.

(Final Selection Phase Instructions, No. 3) (emphasis added).  Defendant opines that this

instruction in contrary to established Supreme Court and Eighth Circuit precedent as found in

Jones v. United States, 527 U.S. 373 (1999) and United States v. Paul, 217 F.3d 989 (8th Cir.

2000).  In Jones, the Supreme Court held that "a jury may consider a mitigating factor in its

weighing process so long as one juror finds that the defendant established its existence by a

preponderance of the evidence." 527 U.S. at 377 (internal citations omitted).  In Paul, the Eighth

Circuit noted that a sentencing phase jury instruction regarding mitigating factors was

ambiguous because it did not state that "Juror A may consider a mitigating factor found by Juror

B even if not found by Juror A."  217 F.3d at 999.

The Court's instruction, as interpreted by the Defendant, requires a "two-part test" in that a factor must be first proven before it can be weighed.  Thus, the Court's instruction would only have effect if Juror A initially found Factor X to exist, but did not find it to be mitigating, but that Juror B found Factor X to exist and be mitigating.

The Court cannot subscribe to Defendant's tortured reading of this instruction.  The jurors are explicitly told that they may consider a mitigating factor found by any other juror, even if they themselves did not find it to be mitigating.  This has the effect of expanding the number of mitigating factors that a juror could consider.  In Paul, the instruction at issue specifically stated that the a juror is to weigh a factor that they themselves individually found to exist and be mitigating.  Id.  That instruction would essentially foreclose the possibility of Juror A weighing a factor that only Juror B found to be mitigating, because Juror A is called upon to both find the factor to exist and determine if it is mitigating.  Here, a juror needs only to find the factor to exist, and may freely consider any factor that any other juror finds to be mitigating. The Court's instruction was thus faithful to the requirements of both Jones and Paul.  As the Court noted during the instructions conferences, it seems a logical impossibility, for a juror to assign weight to a factor it believes is non-existent, a non-entity by definition has no weight.

Further, the instruction, even if imprecise, is not violative of the FDPA or the Constitution, in light of the context of the other instructions.  Id. (citing Jones, 527 U.S. at 391 ("instructions that may be ambiguous in the abstract are cured when read in conjunctions with other instructions")).  The Court therefore did not err in giving Final Instruction No. 3.

**DEFENDANT'S ISSUE XXVIII: THE COURT ERRED IN PROHIBITING DEFENSE COUNSEL FROM ARGUING THAT A DEATH VERDICT IS NEVER REQUIRED UNDER THE FDPA.**

The defendant argues the Court should have allowed defense counsel to argue that a death verdict is never required under the Federal Death Penalty Act.

Under the FDPA, a jury is required to consider whether the aggravating factors it found to exist sufficiently outweigh all the mitigating factors to justify a sentence of death. 18 U.S.C. § 3593(e).  If no jurors find the existence of any mitigating factors, then the jury must consider whether the aggravating factors alone are sufficient to justify a sentence of death.  Id.  In either case, if the jurors unanimously agree that the aggravating factors sufficiently outweigh the mitigating factors or the aggravating factors alone are sufficient, then the jury must recommend a sentence of death.  Id.  The FDPA does not contain a "second, substantive determination regarding a sentence of death once it decides that a sentence of death is indeed justified."  United States v. Allen, 247 F.3d 741, 781 (8th Cir. 2001).  The FDPA does not allow jurors to arbitrarily disregard its "unanimous determination that a sentence of death is justified."  Id.

The Court ruled on this issue in its September 9, 2006, Order (doc. #589).  The Court's Order was in line with established Eighth Circuit precedent, and the Court is convinced its original ruling was correct.  The jury retained sole discretion to determine the weight of each mitigating and aggravating factor, and whether the sum of one outweighed the other.  Certainly, a sentence of death was never required.  Considerations of mercy alone could have outweighed any and all aggravating factors.  However, once the jury determined the aggravating factors outweighed the mitigating factors, a death sentence was required under the FDPA.  Allowing the defense to argue otherwise would have constituted a misstatement of the law.

**DEFENDANT'S ISSUE XXIX: THE COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT A DEATH SENTENCE IS NEVER REQUIRED UNDER THE FDPA.**

The defense argues the Court erred in refusing to instruct the jury that a sentence of death is never required.  As discussed in Issue 28 and the Court's previous Order (doc. #589), that instruction would have constituted a misstatement of the law.  The jury was instructed properly and in accordance with binding precedent.


**DEFENDANT'S ISSUE XXX: THE DISTRICT COURT ERRED IN ALLOWING VICTIM IMPACT TESTIMONY TO GO BEYOND THE PARAMETERS SET BY THE COURT.**

The defense argues some of the victim impact testimony violated the Court's Order on Motion to Exclude Victim Impact Testimony (doc. #601), which stated:

> Finally, the Court has concerns about the potential prejudicial impact of this kind of testimony if the witnesses make statements of affection for Ms. Sjodin or they make statements that she had affection for them.  Emotional appeals to the jury have the potential for overcoming the jurors' rational decision-making process. The witnesses can adequately convey these emotions through factual statements about the kind of person she was, and the interaction they had with her.  Therefore the Court will not allow statements of love and affection during the victim impact testimony.

The defense argues statements such as Mr. Walker's testimony that the victim "loved everyone and everyone loved her," among others, exceeded the boundaries set forth by the Court's Order. The prosecution acknowledged this breach but argued that every attempt was made to keep the testimony within the Order.

"Statements of love and affection" were clearly excluded by the Court's Order. Nevertheless, the defendant has not directed the Court to any case in which a few isolated

110

statements regarding love for the victim amount to reversible error. Any reasonable juror would have inferred that Dru Sjodin's family loved her. The victim impact testimony included no highly emotional, passionate statements likely to "overcome the jurors' rational decision-making process," and therefore no error occurred.

## CONCLUSION

The Court has reviewed all of the issues raised by the Defendant. The Court finds no error that would warrant a new trial. Defendant's Motion for a New Trial is therefore **DENIED**.

**IT IS SO ORDERED**.

Dated this <u>12th</u> day of February, 2007.

   /s/  Ralph R. Erickson         
Ralph R. Erickson, District Judge
United States District Court
