IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:04-cr-055 |
| Plaintiff/Respondent, | |
| v. | **UNITED STATES' POST-HEARING RESPONSE BRIEF ON ATKINS AND MITIGATION CLAIMS** |
| ALFONSO RODRIGUEZ, JR., | |
| Defendant/Petitioner. | |

The United States of America, by Drew H. Wrigley, United States Attorney for the

District of North Dakota, and Melissa Burkland, Assistant United States Attorney, hereby

submit the United States' Post-Hearing Response Brief on Petitioner Alfonso

Rodriguez's ("Rodriguez") <u>Atkins</u> and Mitigation Claims.

## INTRODUCTION

The United States' position is set forth in the United States' Answer in Opposition

to Motion under 28 U.S.C. § 2255 For Collateral Relief to Vacate, Set Aside, Or Correct

Sentence, and For a New Trial (DKT 879), filed November 13, 2013.  This Brief

responds to information received in connection with the evidentiary hearing held January

28-February 7, 2019,[1] and Petitioner's Post-Hearing Brief on Intellectual Disability

---

[1] Citation form throughout the United States' Post-Hearing Response are, generally, in conformity with traditional legal citations and the *Blue Book*. However, throughout this Response the following abbreviations and citation conventions are employed:

Citations to Rodriguez's Motion for Collateral Relief, To Vacate, Set Aside, or Correct Sentence and for a New Trial will be referenced by shortened pleading reference:  e.g., Mot. at 21.

Claims. This Brief supplements the United States' Answer in Opposition to Motion under

28 U.S.C. § 2255 For Collateral Relief to Vacate, Set Aside, Or Correct Sentence, and for

a New Trial.

The United States maintains that Rodriguez's intellectual disability and related

Sixth Amendment claims should fail, as he has failed to establish the requisite legal and

factual standards that would afford him relief.

## PROCEDURAL HISTORY

On May 11, 2004, a federal grand jury for the District of North Dakota returned a

one-count Indictment that charged Alfonso Rodriguez, Jr. with kidnapping Dru Sjodin

and transporting her from North Dakota to Minnesota for the purpose of sexual assault,

---

Citation to exhibits filed with the United States' Answer to Petition include a description
of the exhibit and exhibit number:  e.g., Report of Dr. Michael Welner, U.S. Exhibit 5.

Citations to exhibits received at the Intellectual Disability Evidentiary Hearing on
January 28-February 7, 2019, will be referenced by party ("D" for Petitioner and "G" for
United States) followed by a number: e.g., Ex. D-1 or Ex. G-500.

Citations to all three phases of the trial transcripts are formatted "Tr." followed by the
transcript volume and page number: e.g., Tr., vol. 29, 6533.

Citations to the Intellectual Disability Evidentiary Hearing on January 28-February 7,
2019, are formatted "Hrg." followed by a page number: e.g., Hrg. 1.

Citation to Atkins evidentiary hearing exhibits are referenced as "Post hearing Ex.__."

Citations to trial exhibits are referenced as they were at the appellate level: e.g., Gov't.
Ex. 22-2.

Citations to pleadings filed with the Court are referenced by a shortened pleading title
followed by the docket number: e.g., Jury Verdict – Phase II (Eligibility Phase), DKT
585.

and otherwise, resulting in the death of Dru Sjodin, in violation of 18 U.S.C.

§ 1201(a)(1).  (Indictment, DKT 1.)  As required by the Federal Death Penalty Act, 18

U.S.C. §§ 3591-98 ("FDPA"), to justify a death sentence, the Indictment alleged that

Rodriguez was eighteen years of age or older at the time of the offense, had acted with

the mental states described in 18 U.S.C. § 3591(a)(2), and that four statutory aggravators

applied:  (1) Rodriguez caused Sjodin's death during the commission of another crime,

namely, a kidnapping (18 U.S.C. § 3592(c)(1)); (2) Rodriguez had previously been

convicted of two or more violent felonies (18 U.S.C. § 3592(c)(4)); (3) Rodriguez killed

Dru Sjodin in an especially heinous, cruel, and depraved manner (18 U.S.C.

§ 3592(c)(6)); and (4) Rodriguez killed Dru Sjodin after substantial planning and

premeditation (18 U.S.C. § 3592(c)(9)).  (Indictment, DKT 1.)  On October 28, 2004, the

United States filed a Notice of Intent to seek a Sentence of Death, re-alleging the grand

jury's FDPA findings and adding non-statutory aggravators, including victim impact.

(Notice of Intent to Seek Sentence of Death, DKT 34.)

Jury selection began on July 7, 2006, and a panel was sworn on August 14, 2006.

On August 30, 2006, the jury found Rodriguez guilty as charged in the Indictment. On

September 7, 2006, the jury found "eligible" for consideration of the death penalty and

found true all but one FDPA allegation, rejecting only the assertion that Rodriguez

substantially planned and premeditated the murder.  (Jury Verdict – Phase II (Eligibility

Phase), DKT 585.)  On September 22, 2006, the jury returned Special Findings, including

a unanimous determination finding the non-statutory victim impact aggravator applicable.

(Special Findings Form (Jury Verdict) Phase III, DKT 626.)

Additionally, the jury, or individual jurors, found twenty-five alleged mitigators true; the jury unanimously rejected five other mitigators.  (Id.)  The jury unanimously found that the aggravators sufficiently outweighed the mitigators to justify the imposition of a death sentence.  (Id.)  On February 8, 2007, following the denial of Rodriguez's motion for a new trial, United States v. Rodriguez, No. 2:04-CR-55, 2007 WL 466752 (D.N.D. Feb. 12, 2007), aff'd, 581 F.3d 775 (8th Cir. 2009), the District Court formally sentenced Rodriguez to death.  (Judgment, DKT 652.)

Rodriguez appealed the Judgment to the Eighth Circuit Court of Appeals raising 20 claims of error including a claim that the trial court improperly admitted expert opinions from the pathologist; a claim Rodriguez raises again in this Motion under 28 U.S.C. § 2255 for Collateral Relief to Vacate, Set Aside, Or Correct Sentence, and for a New Trial and Post Hearing Brief on Forensic Claims.

The Eighth Circuit affirmed the conviction and sentence.  United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009), reh'g and reh'g en banc denied, (Feb. 11, 2010).  The United States Supreme Court denied Rodriguez's Petition for a Writ of Certiorari. Rodriguez v. United States, 131 S. Ct. 413 (2010).

## TRIAL PROCEDURE

The Court "trifurcated" the trial proceedings in this case, granting Rodriguez's request.  The Court viewed the trial as a three-phase procedure: a "merits" (guilt) phase, "eligibility" phase, and "selection" phase.  See, e.g., United States v. Johnson, 362 F. Supp. 2d 1043, 1111 (N.D. Iowa 2005); United States v. Jordan, 357 F. Supp. 2d 889,

903–04 (E.D. Va. 2005); United States v. Davis, 912 F. Supp. 938, 949 (E.D. La. 1996). (Order granting Motion to Trifurcate Trial, DKT 200.)

## I.   Merits Phase Evidence.

A.  Disappearance of Dru Sjodin.

On November 22, 2003, Dru Sjodin was a 22-year-old college student at the University of North Dakota.  She also worked at Victoria's Secret in the Columbia Mall, Grand Forks, North Dakota. (Tr., vol. 24, 5589-5594.)

That day Ms. Sjodin worked at Victoria's Secret from approximately noon to 4:00 p.m. (Tr., vol. 24, 5591-94), then shopped in the Columbia Mall.  Ms. Sjodin was at Marshall Fields in the mall, at approximately 5:00 p.m., where she bought a purse. (Tr., vol. 24, 5606.)

As she was leaving Marshall Fields, Ms. Sjodin called her boyfriend, Chris Lang (Tr., vol. 24, 5615), on her cell phone. (Id. at 5619.) The conversation between Ms. Sjodin and Mr. Lang lasted about four minutes, at which time Mr. Lang heard Ms. Sjodin say, "Okay, okay."  (Tr., vol. 24, 5621.) The call ended abruptly at approximately 5:04 p.m.  (Tr., vol. 24, 5621-22; Tr., vol. 25, 5758-59.)

Mr. Lang tried to call Ms. Sjodin several times within the two to three hours after their call was interrupted.  (Tr., vol. 24, 5622-23.)  She never answered. (Id.)

At 7:42 p.m., Mr. Lang's cell phone rang. (Tr., vol. 24, 5623.) He heard no voices; nobody spoke. (Tr., vol. 24, 5623.) This call came from Ms. Sjodin's cell phone, number (218) 330-4000.  Sprint later informed law enforcement that Ms. Sjodin's cell was

"bouncing" off a cell tower near Crookston, Minnesota. (Tr., vol. 24, 5635-37; Tr., vol. 25, 5746-54.)

At approximately 11:00 p.m., Ms. Sjodin's car was found at the Columbia Mall parking lot. (Tr., vol. 24, 5642-44, 5653.) A search of her car revealed a Marshall Fields bag containing the purse she had purchased. (Id. at 5644-45.) A knife sheath, bearing the logo "Tool Shop," was found next to her car. (Id. at 5646.) Ms. Sjodin was nowhere to be found.

On November 25, 2003, one of Ms. Sjodin's shoes was found underneath the bridge on Highway 75, near Crookston, Minnesota. (Tr., vol. 24, 5712-17; vol. 25, 5794-95.) Ms. Sjodin was still not found.

B. Investigation of Alfonso Rodriguez, Jr.

Law enforcement began conducting the investigation into Ms. Sjodin's disappearance. (Tr., vol. 25, 5822-26.) Rodriguez, among others, became a person of interest because he was a Level III sex offender who had been released from prison in May 2003. (Id. at 5823-24.) Rodriguez was living in Crookston, Minnesota, at the time of Ms. Sjodin's disappearance. (Id. at 5822.)

On November 26, 2003, Minnesota Bureau of Criminal Apprehension Special Agent Dan Ahlquist went to a job site where Rodriguez was employed by Jose Hernandez as a sheetrock worker. (Tr., vol. 25, 5824-25; Tr., vol. 27, 6175-78.) Rodriguez told Ahlquist that on November 22, 2003, he had gone to Grand Forks, North Dakota, from his Crookston, Minnesota, home. (Tr., vol. 25, 5825-27.) Rodriguez reported going to a number of stores in Grand Forks, including Sam's Club, Wal-Mart,

6

Target, the Columbia Mall, and then to a movie.  (Id.)  Rodriguez claimed that after the movie he went to the McDonald's restaurant in East Grand Forks, Minnesota. (Id. at 5828-29.)  Rodriguez said he went to J.C. Penney's, Sears, and Marshall Fields while at the Columbia Mall. Rodriguez said he did not buy anything at the mall.  He said he was wearing blue jeans, a black shirt, a baseball-style cap, and a black leather jacket. (Gov't. Ex. 21, 21-1 (at Bates Nos. 11, 191-95).)

Rodriguez recalled the name of the movie was "Once Upon a Time in Mexico," starring Antonio Banderas, a movie he said was about shooting and drugs.  He could not elaborate about the details of the movie.  (Tr., vol. 25, 5827.)  Rodriguez reported he left the movie and went to McDonald's at approximately 8:00 p.m., and then drove straight home to Crookston.  (Id. at 5828-29.)

Rodriguez consented to a search of his car.  (Tr., vol. 25, 5829-30.)  In the trunk of Rodriguez's car, Ahlquist observed a knife in a small pan lying in a liquid solution. (Id. at 5830-31.)  Ahlquist did not take the knife at that time.  (Id. at 5831.)  Rodriguez told his employer, Mr. Hernandez, that law enforcement were searching for drugs in his car.  (Tr., vol. 27, 6178-79.)

 Ahlquist learned the "Tool Shop" knife sheath, recovered from the Columbia Mall parking lot near Ms. Sjodin's car, was sold with a knife matching the knife observed in the trunk of Rodriguez's car.  (Tr., vol. 25, 5855-56.)

The movie, "Once Upon A Time In Mexico," was not showing at any theater in Grand Forks on November 22, 2003.  (Tr., vol. 25, 5854-55.)  However, Alfonso Rodriguez, Jr., was in Grand Forks, North Dakota on November 22, 2003.  (Tr., vol. 25,

7

5826; Gov't. Ex. 21-1 (at Bates No. 11,187)).  He was observed at the Target store near the Columbia Mall at approximately 4:00 p.m. that afternoon.  (Tr., vol. 25, 5798-5804.) The video tape from the McDonald's restaurant did not show Rodriguez at the establishment on the evening of November 22, 2003. (Id. at 5853-54, 5883-86.)

Ahlquist asked Rodriguez to come to the Crookston Police Department to straighten out the discrepancies.  (Tr., vol. 25, 5856-58.)  Rodriguez went to the Police Department and provided additional claims about his trip to the Columbia Mall on November 22, 2003.  (Id. at 5857-58.)

Previously, Rodriguez had emphatically told law enforcement that he had parked near the Marshall Fields area of the Columbia Mall parking lot on November 22, 2003. Now Rodriguez said he parked near the Royal Fork Restaurant, which was located on the opposite side of the mall from Marshall Fields.  (Gov't. Ex. 22-2, 22-3 (at Bates No. 11,213-14).)  Rodriguez said he walked through the Marshall Fields store mistakenly, as he thought he parked on that side of the mall.  (Gov't. Ex. 22-2, 22-3 (at Bates Nos. 11,219, 11,234-36).)  Rodriguez said he wasn't sure what time he entered the Columbia Mall, but he did say that he was at the mall for approximately one hour.  (Tr., vol. 25, 5838; Gov't Ex. 22-2, 22-3 (at Bates No. 11,221)).

When Rodriguez was questioned about the knife in his car, he said he had bought it approximately four months earlier.  (Gov't. Ex. 22-2, 22-3 (at Bates No. 11,258).) Rodriguez told Ahlquist that he had thrown the knife's sheath away.  (Gov't. Ex. 22-2, 22-3 (at Bates Nos. 11,251, 11,258)).  Rodriguez also stated that this particular knife was used for work. (Id.)

Mr. Hernandez, Rodriguez's employer, later told law enforcement that Rodriguez did not have a knife or use a knife when he worked for Mr. Hernandez.  Hernandez stated that Rodriguez was not a sheetrock cutter.  (Tr., vol. 27, 6182.)  In fact, if Rodriguez had used a knife at work, it wouldn't be the type of knife which was seized from Rodriguez's car.  He explained that a "sheetrock" knife would be needed to do the type of cutting involved in sheetrock work.  The knife seized from Rodriguez's trunk was not a sheetrock knife. (Id.)

Ahlquist obtained a search warrant to search and seize Rodriguez's vehicle.  (Tr. 5866.)  Ahlquist seized the knife in the trunk. (Tr., vol. 25, 5861.)  BCA located small spots of blood on the interior of the rear window, the back-rear seat cushion, sections of seat belts removed from the back seat, rear passenger-side window and adjacent door area, and the seat frame of the passenger seat.  (Tr., vol. 27, 6088-90, 6099-6109, 6126-46.)

Another search warrant was obtained for Rodriguez's house.  (Tr., vol. 25, 5866.) Items were seized from his residence, including boots, gloves, and a blanket. (Id.)

Mr. Hernandez also explained that prior to November 22, 2003, he picked up Rodriguez on his way to the job site each day.  (Tr., vol. 27, 6181.)  The Monday after November 22, 2003, Rodriguez told Mr. Hernandez that he would drive himself and did so for the next three days. (Id.)

C. Recovering the Body of Dru Sjodin.

Law enforcement, friends and family, and hundreds of people from the surrounding communities participated in the search for Ms. Sjodin. They went the winter without finding her. Their efforts were futile until April 17, 2004.

After four-and-one-half months of searching, Dru Sjodin's body was found by a ravine on the north side of Polk County No. 61 just northwest of Crookston, Minnesota. (Tr., vol. 27, 6221-41.)

Ms. Sjodin's body lay face down (Tr., vol. 27, 6233) with her hands and wrists bound behind her back with white woven cord. (Tr., vol. 28, 6326.) She was partially covered with grass that had been pulled and placed over her. (Tr., vol. 27, 6237-6238.) Ms. Sjodin was naked from the waist down but for one sock on her left foot, and a ligature of cord or rope tied around her neck with what appeared to be some plastic remnants underneath the rope. (Id. at 6236.) She was wearing a dark coat, a pink blouse or sweater, pink tank top, and pink bra. The coat and blouse were pulled down off her shoulders with her arms still in them. The blouse was ripped. (Tr., vol. 27, 6236; Tr., vol. 29, 6686, 6691.)

Ms. Sjodin's body was found approximately 30 miles from the Columbia Mall, where she had last been seen. (Tr., vol. 27, 6263-64.) Her body was approximately two miles from the cell tower that her phone had "bounced" off. Her body was approximately 2.1 miles from where her shoe had been found underneath the Highway 75 Bridge, only 4.2 miles from Rodriguez's house. (Id. at 6260-62.) Ms. Sjodin's cell phone was found a

few feet away from her body.  Her second shoe was also found nearby.  (Tr., vol. 28, 6326-34.)

Ms. Sjodin's pants were found approximately two weeks later just south of Crookston, approximately two miles south of Rodriguez's residence and approximately six miles from where her body was found.  (Tr., vol. 27, 6275-79; 6283-89.)

D.  Evidence Testing.

Testing of samples seized in the investigation was done by the Minnesota BCA, North Dakota BCI, and FBI Laboratories.  The blood observed in Rodriguez's car on the back window, back seat, and back seat belt was Dru Sjodin's.  (Tr., vol. 27, 6146-51; Tr., vol. 28, 6442-45.)

A hair found on Ms. Sjodin's coat, which she still had on when her body was found, was tested by the FBI Laboratory.  (Tr., vol. 28, 6341-43.) It was compared to the saliva sample obtained from Rodriguez.  (Id. at 6441, 6453.)  The mitochondrial DNA profile obtained from this particular hair matched Rodriguez's mitochondrial DNA profile obtained from his saliva sample. (Id. at 6452-53.)

Minnesota BCA analyzed the numerous fibers obtained from several items during the investigation.  (Tr., vol. 28, 6374-6415.) The pink cotton blouse which Ms. Sjodin had been wearing the day she disappeared contained cotton fibers matching fibers found in Rodriguez's vehicle, on Rodriguez's boots, and on a pair of his gloves seized from his residence.  (Id. at 6405.)

11

Ms. Sjodin's black-and-blue pea coat contained certain wool fibers that were matching in type and color to fibers found in Rodriguez's vehicle.  (Tr., vol. 28, 6408-10.)

A blanket seized from Rodriguez's bed in his residence was the source of red and fuchsia acrylic fibers.  (Tr., vol. 28, 6371-72.)  Matching red acrylic fibers were found on the knife sheath located outside of Ms. Sjodin's vehicle, and were also found inside Rodriguez's vehicle, on Rodriguez's boots, on Ms. Sjodin's coat, on Rodriguez's gloves, as well as on Ms. Sjodin's black pants.  (Tr., vol. 27, 6253-55; Tr., vol. 28, 6390-99.)

Ms. Sjodin's body was transported for an autopsy (Tr., vol. 27, 6253-55), which was performed by Dr. Michael McGee, M.D., the day after Ms. Sjodin's body was found.  (Tr., vol. 29, 6683-85.)

The autopsy revealed that Ms. Sjodin's hands were bound behind her back, as noted above.  (Tr. 6686.)  Ms. Sjodin was nude from the waist down, and a ligature was observed around her neck with remnants of a K-Mart plastic bag.  (Tr., vol. 29, 6686, 6701; Gov't Ex. 78-11 (Bates No. P-0812), 78-39 (Bates No. P-0834a)).

Dr. McGee observed that Ms. Sjodin had a bruise or contusion to her upper right arm.  (Tr., vol. 29, 6689.)  She had a bruise or contusion on the back of her right forearm.  (Id. at 6689.) Ms. Sjodin also had a bruise or contusion beneath her right eye, and a bruise or contusion to her lower right cheek. (Id. at 6688.)

A large gaping and notched slash wound was observed to the front of Ms. Sjodin's neck.  There were actually two slash wounds to the front of her neck that were caused by a knife drawn across the neck through the tissue in a fashion to cause notching.  (Tr., vol.

12

29, 6688-89, 6694-95.) Dr. McGee also determined that there was a defect to Ms. Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound.  (Id. at 6689, 6692, 6706.)

A sexual assault examination and laboratory testing revealed an elevated level of prostatic acid phosphatase, an enzyme, in the vaginal and cervical areas.  This enzyme is produced in high levels in the male prostate.  The elevated levels were considered a presumptive positive for seminal deposit.  (Tr., vol. 29, 6716-23.)

Dr. McGee concluded that Ms. Sjodin died due to homicidal violence (Tr., vol. 29, 6726, 6728); that the probable cause of Ms. Sjodin's death was asphyxiation or suffocation, strangulation from the cord around her neck, (Id. at 6727, 6728), death from the slash wound injury to the front of her neck (Id. at 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November day in the manner she was found, bound and half-naked.  (Id.)  It was his opinion that the slash wounds to Ms. Sjodin's neck took place where her body was found. (Id. at 6729-33.)

At the conclusion of the evidence, the jury delivered a guilty verdict on August 30, 2006, on the sole count of the Indictment, Kidnapping Resulting in Death.  (Tr., vol. 31, 6946.)

## II.    Eligibility Phase Evidence.

In the "eligibility" phase the jury determined whether the defendant was 18 years of age or older when the offense occurred, whether he committed any intentional act listed in 18 U.S.C. § 3591(a)(2), and whether an aggravating factor under 18 U.S.C.

§ 3592(c) exists. 18 U.S.C. § 3593(e)(2).  (Jury Verdict – Phase II (Eligibility Phase), DKT 585; Appendix 276.)

The United States called three witnesses during the eligibility phase.  (Tr., vol. 33, 7117-94.)  Elizabeth Knudson-Volker and Shirley Seddon Iverson each testified regarding prior attacks by Rodriguez upon them.  Rodriguez had been convicted of aggravated rape of Elizabeth Knudson in Polk County, Minnesota.  (Tr., vol. 27, 6209-10, 6217.)  Elizabeth Knudson-Volker testified the rape attack caused her to suffer serious bodily injury.  After the rape, she felt there was no meaning to her life.  She stopped eating, and thought about killing herself.  She continued to suffer with depression, insomnia, eating problems, and issues of self-worth.  (Tr., vol. 33, 7147-70.)

Rodriguez was also convicted of the attempted aggravated rape of Shirley Seddon, in Polk County, Minnesota.  (Tr., vol. 27, 6199.)  Shirley Seddon Iverson testified the rape attack caused her to suffer serious bodily injury.  She testified that she re-experiences the rape through bad dreams or nightmares of the assault; suffers recurring flashbacks of the rape; and experiences physical sensations during these flashbacks.  She continues to experience medical and emotional problems.  (Tr., vol. 33, 7117-43.)  Ms. Seddon Iverson and Ms. Knudson-Volker sought, and continue to seek counseling, treatment or other assistance for the psychological trauma they experience as a result of the attacks by Rodriguez.  (Id.)

The United States and Rodriguez entered into a stipulation regarding a third prior conviction that read:

On June 24, 1980, the defendant, Alfonso Rodriguez, Jr, was convicted of the offense of Attempted Kidnapping and Assault in the 1st Degree, in violation of Sections 609.25 and 609.17 and 609.221 of the Minnesota Statutes in a case entitled State of Minnesota v. Alfonso Rodriguez, Jr. in the 9th Judicial District Court, Polk County, Minnesota, case number 6192. During this incident, the victim was confronted by the defendant and directed into his car, an altercation ensued during which the victim was stabbed once in the left elbow and once in the abdominal area on her right side. These injuries required medical attention including stitches to close the wounds.

(Tr., vol. 33, 7194-95.)  Dr. McGee testified as to his findings on the injuries suffered by Dru Sjodin during the attack by Rodriguez.  (Id. at 7170-93.)

The jury determined the United States proved beyond a reasonable doubt each of the four-threshold eligibility factors of mental state alleged in the Notice of Special Findings, specifically, that Rodriguez intentionally killed or committed acts resulting in the death of Dru Sjodin.  (Jury Verdict – Phase II (Eligibility Phase), DKT 585.)  The jury further determined that the United States proved beyond a reasonable doubt three statutory aggravating factors:  (1) Rodriguez caused the death of Dru Sjodin during the commission of a violation of 18 U.S.C. § 1201 (kidnapping) (18 U.S.C. § 3592(c)(1)); (2) Rodriguez has previously been convicted of two or more federal or state offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, and attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. § 3592(c)(4)); (3) Rodriguez killed Dru Sjodin in an especially heinous, cruel, and depraved manner, in that it involved torture to Dru Sjodin (18 U.S.C. § 3592(c)(6)); however, the jury determined that the United States did not prove beyond a reasonable doubt that Rodriguez killed Dru Sjodin after substantial

15

planning and premeditation to cause the death of Dru Sjodin.  18 U.S.C. § 3592(c)(9); (Jury Verdict – Phase II (Eligibility Phase), DKT 585.)

## III.    Selection Phase

The United States called six victim impact witnesses:  Dru Sjodin's father, mother, stepfather, college roommate, one of her college sorority sisters, and Dru's boyfriend to explain what the loss of Dru meant and how it impacted the family.  (Tr. 7484-7588.) Rodriguez called a total of 24 mitigation witnesses, including testimony from his mother, two sisters, an aunt, a niece, a nephew, and two family friends regarding his love and kindness towards them and the emotional pain they would suffer if he were executed. Rodriguez called numerous witnesses employed by the Minnesota Department of Corrections regarding his conduct during his previous imprisonment.  He called four expert witnesses, doctors, who testified concerning his alleged exposure to toxins as a child, his addiction to drugs and alcohol as a child, his alleged mental disorders, and his concerns about being released from prison.  (Tr. 7621-8454.)  In rebuttal, the United States called one expert witness, Dr. Steven Pitt, a Forensic Psychiatrist, to rebut Rodriguez's claims of diminished mental capacity and brain damage.  (Tr. 8472-8564.) Dr. Pitt testified that he diagnosed Rodriguez to have personality disorder with anti-social features, anxiety disorder and paraphilia nos, a sexual disorder.  (Tr. 8488-89, 8521-25.) He testified that he had not seen any evidence of post-traumatic stress disorder as a result of child sexual abuse. (Tr. 8512.)  He testified that Rodriguez suffered from no mental disease or defect, as he had shown the capacity to make choices, to engage in behaviors

16

both lawful and unlawful, and he suffered from nothing that would impact his ability to understand the nature of his acts. (Tr. 8516, 8525.)

The United States submitted one non-statutory aggravating factor, that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family. Rodriguez requested, and the court submitted, 30 mitigating factors for consideration by the jury during its deliberations. The jury unanimously found that the United States had proved beyond a reasonable doubt that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family. Various jurors found that 25 of the 30 mitigating factors submitted had been proved by the greater weight of the evidence. Of those, the jury was unanimous on 19 of the mitigating factors. By unanimous vote, the jury determined that a sentence of death should be imposed. (Special Findings Form (Jury Verdict) Phase III, DKT 626; Tr. 8770-78.)

**THE POST-CONVICTION RECORD AND <u>ATKINS</u> CLAIMS**

Rodrigeuz asserts he is intellectually disabled and not eligible for the death penalty pursuant to <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002) and 18 U.S.C. § 3596.  To support his claim, Rodriguez relies upon the testimony of Ingrid Christiansen Kretzmann, the testimony of Dr. Ricardo Weinstein, the testimony of Dr. Andres M. Lugo, Ph.D., the testimony of Dr. Jose Arturo Silva, as well as testimony of Rodriguez's trial counsel, Attorneys Richard Ney and Robert Hoy.  To rebut the claim of intellectual disability, the United States relies upon the report and testimony of Dr. James Seward, the report and testimony of Dr. Michael Welner, as well as significant documentary evidence consisting of correspondence, school records, Minnesota Department of Corrections reports, medical notes/progress reports, and other documentation concerning Rodriguez's allegations.

The Court should deny the defendant's <u>Atkins</u> claim for several reasons.  First, Rodriguez is not intellectually disabled. Rodriguez's intellectual functioning as demonstrated by his achieving a GED, as well as his reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and ability to read, rebuts any claim of intellectual disability as that condition is defined by the DSM-5 and AAIDD manuals. Rodriguez does not have deficits in adaptive functioning that result in a failure to meet developmental and sociocultural standards for personal independence and social responsibility as defined by the DSM-5 and AAIDD manuals as demonstrated by his conduct and interactions both in and out of prison. Rodriguez does not have deficits in adaptive functioning as defined by the DSM-5 and AAIDD during the developmental

18

period. Second, Rodriguez has not met his burden of proving an intellectual disability by the preponderance of the evidence. Rodriguez's expert, Dr. Ricardo Weinstein, a licensed psychologist, unconventionally administered the Mexican version of the WAIS-IV (Hrg. 433-34) to Rodriguez and normed his test with United States norms (Hrg. 646) resulting in a score of 74 (Hrg. 433-34), which Rodriguez asserts presents a range of 70 to 80 with the application of the Flynn Effect. (Hrg. 432-33.) Rodriguez's reliance on Dr. Andres Lugo's, toxicology consultant, testimony that Rodriguez suffered side effects of toxin and lead exposure resulting in developmental and cognitive problems (Hrg. 802-03; 807; 814-15) and Dr. Arturo Silva's, forensic psychiatrist, testimony that Rodriguez's developmental and cognitive delays contributed to deficits in his developmental and sociocultural functioning (Hrg. 852-53) and being subject to physical and emotional abuse contributed to Rodriguez's diagnosed mood disorder, anxiety, depression and post-traumatic stress disorder (PTSD). (Hrg. 877-880.)

## I.    Statement of Facts

The intellectual disability hearing in this case commenced on January 28, 2019. Rodriguez presented the testimony of trial counsel, attorneys Richard Ney and Robert Hoy, Ingrid Christiansen Kretzmann, Dr. Ricardo Weinstein, Dr. Andres M. Lugo, Dr. Jose Arturo Silva, and Latoya Hampton. The United States presented the testimony of Dr. James Seward and Dr. Michael Welner. The United States presented 176 pieces of documentary evidence without objection.

## II.   Defense Evidence

### A.  Dr. Ricardo Weinstein

Dr. Weinstein conducted a mental status examination and administered tests evaluating Rodriguez's neurocognitive function to determine whether Rodriguez fulfills the diagnostic criteria of intellectual developmental disability.  (Hrg. 383, 390, 559.)  Dr. Weinstein's evaluation included a clinical interview, neuropsychological testing and interviewing multiple other sources.  (Hrg. 390-91.)  Dr. Weinstein did not videotape or audiotape his examination or interview of Rodriguez.  (Hrg. 558.)

Dr. Weinstein testified he conducted Rodriguez's interview in Spanish and English even though Rodriguez's preferred language is English.  (Hrg. 560, 671.) According to Dr. Weinstein, Rodriguez was able to communicate adequately, openly and no significant receptive or expressive language deficits were identified.  (Hrg. 561.)  Dr. Weinstein administered the following tests during Rodriguez's evaluation: Dot Counting Test (DOT) (non-IQ, effort and malingering test); Rey 15 Item test (non-IQ, effort and malingering test); Rey Complex Figure (drawing test); Wide Range Achievement – 4th ed. (WRAT-4) (achievement test); Delis Kaplan Executive Functions Systems (D-KEFS); Neuropsychological Assessment Battery (NAB); Test of General Reasoning Ability (TOGRA) (IQ test); Wechsler Adult Intelligence Scale – 4th ed. (WAIS-IV) (IQ test); and Comprehensive Test of Nonverbal Intelligence – 2d ed. (CTONI-2) (IQ test).  (Hrg. 417.) Dr. Weinstein testified Rodriguez completed all of the administered tests (Hrg. 566) and did well on effort testing (Hrg. 397-98) and showed no signs of malingering.  (Id.)

The Rey Complex test required Rodriguez to replicate a picture of a drawing that was momentarily presented to him. Rodriguez copied the drawing demonstrating immediate recall and then later demonstrated delayed recall or memory.  (Hrg. 625.)  Dr. Weinstein did not use a scoring system for the Rey Complex Figure drawing nor did he compare his results with Dr. James Seward's Rey Complex Figure drawing results.  (Id.)

Dr. Weinstein testified he usually administers only two effort tests when testing patients.  (Hrg. 631.)  In Rodriguez's case, he administered the Rey 15-Item test to determine and measure effort and malingering.  (Hrg. 625.)  Rodriguez scored 15 out 15 indicating good effort and no malingering.  Dr. Weinstein also administered a timed effort test, Dot Counting Test (Hrg. 629), which involved showing Rodriguez stimuli of dots and asking him to count the dots.  (Hrg. 630.)  The test results indicate Rodriguez made no mistakes counting presented stimuli.  (Id.)

The Wide Range Achievement Test (WRAT) was also administered to Rodriguez. This test measures academic skills with a standardized score.  (Hrg.729.)  According to Dr. Weinstein, Rodriguez scored a sixth grade or lower level in reading and arithmetic with the exception of reading comprehension. Dr. Weinstein acknowledged Rodriguez scored a 10.9 grade level on the very same test administered by Dr. Seward.  (Hrg. 740.)

Rodriguez also took the timed TOGRA IQ test, English version, requiring him to read questions to determine reasoning ability.  (Hrg. 419, 643.)  Interestingly, the TOGRA is not recommended for use in the diagnosis of clinical disorders such as intellectual disability, specific learning disabilities, or related phenomena.  (Hrg. 644.) However, Dr. Weinstein administered the TOGRA on Rodriguez and obtained an

21

equivalent score of 70, after applying the Flynn Effect. (Hrg. 441.)  Dr. Weinstein admits the TOGRA test "is not a test that's used a lot outside of the school system."  (Hrg. 398-99.)

Rodriguez was also administered the CTONI-2, a nonverbal IQ, "cultural free" test. The CTONI-2 is recognized as the only nonverbal test of intelligence contained in the AAIDD for people who, according to Dr. Weinstein, have "problems with language." (Hrg.420-21.) The CTONI-2 requires nonverbal participation by the use of pictures, geometric figures and abstract reasoning.  (Hrg. 442.)  Dr. Weinstein testified he chose the CTONI-2 because he "wanted to have several different scores from several different tests" when evaluating Rodriguez.  (Hrg. 642.)  He stated he gave the test, "because I gave [Rodriguez] a test in English, I gave it in Spanish and I gave him a nonverbal test because he's bilingual."  Rodriguez received a full-scale CTONI-2 score of 64, with the application of the Flynn Effect his CTONI-2 score was 54 to 64.  (Hrg. 442.)

The third IQ test administered to Rodriguez was the WAIS-IV.  According to Dr. Weinstein, the WAIS-IV is the "gold standard" and most widely used test in the field of psychology in terms of measuring intellectual quotient (IQ).  (Hrg. 418.)  The WAIS-IV has been translated in numerous languages including Spanish. Dr. Weinstein administered the Mexican version of the WAIS-IV because Rodriguez was a "Spanish speaker" in his early years of life and the doctor wanted to know "if language would make a difference for him."  (Hrg. 418-19.)  When further questioned why he administered the Mexican WAIS-IV test on Rodriguez, Dr. Weinstein responded,

"Because to be blunt I didn't bring the . . . . I didn't have the manual in English. I had it in Spanish. I brought the test in Spanish. I didn't bring it in English."  (Hrg. 678-79.)

Despite knowing Rodriguez's primary, and preferred, language is English, Dr. Weinstein testified he administered the Mexican version of the WAIS-IV. As a result:

> Because of his - - [Rodriguez] asked me to interpret or translate some of the instructions into English, which I did. And even though I was asking him questions in Spanish sometimes he would answer them in English and I would record them as his answers were in English so he would understand it.

(Hrg. 434.)  Dr. Weinstein stated Rodriguez "chose to respond to many of the questions in English."  (Hrg. 421, 673.)

Dr. Weinstein arrived at a WAIS-IV full scale IQ of score 74.  (Hrg. 426-27), with an adjusted score of 65 to 75 based on the Flynn Effect (Hrg. 428-29; 432-33) which, according to Dr. Weinstein, satisfies prong one of the diagnostic criteria for someone who's intellectual disabled.  (Id.)

However, Dr. Weinstein unconventionally used United States' norms when scoring Rodriguez's Mexican WAIS-IV test. (Hrg. 435.)  Dr. Weinstein testified he applied the U.S. norms, opposed to Mexican norms, because:

> Mr. Rodriguez was not born in Mexico. Mr. Rodriguez's primary language is not Spanish. Mr. Rodriguez never lived in Mexico. Why would I compare him to a Mexican population? That's half of it. The other half is Mr. Rodriguez - - the purpose of the evaluation is contextual. In other words we want to evaluate him to determine whether he fulfills the definition of 'intellectual developmental disability' in the United States because he is being judge according - - he committed a crime for which he is being punished and judged in the United States, not in Mexico. So there's no reason to compare him to the Mexican population.

(Hrg. 438-39.)

23

Dr. Weinstein reviewed Rodriguez's school records and academic history and testified his academic history is consistent with someone who is intellectually disabled. Dr. Weinstein based this conclusion on Rodriguez failing multiple grades while in school. (Hrg. 454.)  However, Dr. Weinstein indicated that Rodriguez told him that he obtained his GED while in prison. (Hrg. 599.) Rodriguez further indicated he quit high school "because he wasn't working at it and thought most of the students were aware of his sexual behavior and talking about him."  (Hrg. 592; Ex. G-576.)

Dr. Weinstein also administered the ABAS-3, an adaptive behavior assessment systems test, and had two people in Rodriguez's family, Sylvia D'Angelo and Rosa Rodriguez, complete the ABAS-3 questionnaire. (Hrg. 663; See Post-Hearing Exs. C-D.) This test, generally, is given to individuals who have frequent, recent, and prolonged contact with the individual however in Rodriguez's case, Ms. D'Angelo and Ms. Rodriguez had no recent contact with Rodriguez in years.  (Hrg. 663-65.)  That said, administration and scoring of the ABAS-3 (Ex. G-588) directs:

> All respondents should have frequent, recent, prolonged contact with the individual over the last few months. These contacts must have offered the respondent an opportunity to observe the various adaptive skill areas measured by the ABAS-3.

(Hrg. 664.)  Dr. Weinstein acknowledged the ABAS-3's design but admittedly used it because no other test exists for retrospective evaluation. (Hrg. 664; Ex. G-589.)  Dr. Weinstein further admitted there is a particular worry in capital cases about bias

24

introduced by family members in reporting on the adaptive behavior of their loved one. (Hrg. 668; Ex. G-590.)

Dr. Weinstein is not a member of the American Psychological Association testifying, "I do follow [American Psychological Association] ethical principles I think but, I mean, most of them, if not all of them, but I'm not a member." (Hrg. 611.) He also testified to his familiarity with the Professional Considerations for Improving the Neuropsychological Evaluation of Hispanics and acknowledged the need for clinical neuropsychologists to determine the best language to use for the evaluation of specific examinees. (Hrg. 671; Ex. G-591.) That said, Dr. Weinstein administered the Mexican version of the WAIS-IV on Rodriguez despite the professional considerations for improving neuropsychological evaluations, fully knowing Rodriguez never lived in Mexico and his preferred language is English. (Hrg. 672-73.)

Dr. Weinstein's testimony and raw data demonstrate the variations of application between the Spanish and English versions as well as Dr. Weinstein's irregular methods of scoring Rodriguez's WAIS-IV test. (Hrg. 672-96.) The data indicates Dr. Weinstein asked portions of the test in Spanish and portions in English and Rodriguez predominantly answering in English and in some instances Spanish. (Hrg. 673-77.)

Dr. Weinstein testified he normed the WAIS-IV to United States' norms because "in order for you to face the death penalty in the United States, regardless whether you're Mexican or not, you have to have broken the law in the United States, not in Mexico." (Hrg. 699.) Dr. Weinstein's raw data indicated a scaled score using the United States norm and the scaled score using the Mexican norm. (Hrg. 700-04.) Dr. Weinstein's

25

calculated WAIS-IV score was 74 using the United States norms and 89 using the Mexican norms.  (Hrg. 704.)

Dr. Weinstein endorses the use of the Flynn Effect when scoring IQ tests and asserts it's not a highly controversial subject despite literature indicating otherwise.  (Hrg. 706-07; Ex. G-592.)  When questioned about the Flynn Effect being controversial, Dr. Weinstein testified, "I'm aware that there's some courts that have not admitted it in the past in Atkins cases."  (Hrg. 768-69.)  Furthermore, it's apparent a lot of psychological professionals will not apply the Flynn Effect when scoring an IQ test. (Id.) That said, the record reflects Dr. Weinstein's unorthodox testing methods have been rejected in other judicial districts in the United States.  (Hrg. 713-19.)

Dr. Weinstein concluded he will not work a death penalty case for the prosecution. (Hrg. 711.)  He states, "[I]f my findings were not consistent with the needs of the defense but there were needs of the prosecution, I would not work for the prosecution because I wouldn't assist in the death penalty."  (Id.)  Dr. Weinstein testified in those instances when he assesses a defendant for intellectual disability, he finds 80 to 85 percent of those individuals intellectually disabled. (Hrg. 712-13.)  Dr. Weinstein agreed that any person facing the death penalty in the United States that takes the WAIS-IV, no matter where they're from, should be normed in the United States.  (Hrg. 776.)

In summary, Dr. Weinstein agreed that nowhere in Dr. Froming's or Dr. Hutchinson's trial testimony was there any mention that Rodriguez is "mentally retarded."  (Hrg. 719-20.)

26

B.  Dr. Andres M. Lugo, Ph.D.

Dr. Andres M. Lugo, medical toxicologist, assessed Rodriguez for neurotoxin exposure.  (Hrg. 783.)  Dr. Lugo's credentials reveal experience in neurolinguistics, however he has no medical training in neurology, psychiatry or radiology nor is he licensed to practice medicine in the United States.  (Hrg. 821-22; Ex. D-67.)

In his assessment of Rodriguez, Dr. Lugo reviewed documents including Rodriguez's school records, medical-mental health records, Minnesota Security Hospital, neuropsychological reports and testing scores from Dr. Karen Froming, the transcript of psychiatric evaluations on Rodriguez by Drs. Martell and Pitt, supplemental psychiatric evaluations by St. Peter, and neuropsychological evaluations by Dr. Martell.  (Hrg. 785.) He also interviewed Rodriguez and relatives who live in Laredo, Texas and Crookston, Minnesota to assess their perception and conduct onsite investigations of exposure sites. (Hrg. 786-87.)

Dr. Lugo asserts Rodriguez was exposed to toxic substances intrauterine and during childhood and adult life which caused developmental and cognitive problems. (Hrg. 791, 802.)  Dr. Lugo also claims Rodriguez was also exposed to lead toxins during his childhood.  (Hrg. 807.)  Dr. Lugo opines Rodriguez was exposed to solvents while working at the prison print shop which contributed to his cognitive problems.  (Hrg. 814.)

Dr. Lugo states that since 2006 there have been advances in toxin testing regarding pesticides and their effect on children.  (Hrg. 810.)  Dr. Lugo testified new information reveals neurocognitive damage is caused by exposure of neurotoxic substances. He asserts that toxin exposure as a child can affect a person as an adult.  (Id.)  That said, Dr.

27

Lugo asserts Rodriguez's headaches are likely a result toxin exposure. (Hrg. 811.) He claims Rodriguez's developmental changes – having a large head – was a result of neurological changes of the endocrine system due to toxin exposure. (Hrg. 812.)

Dr. Lugo testified that blood tests are available to determine pesticide levels in people. (Hrg. 812.) However, this type of testing is unreliable as pesticides do not stay in the body indefinitely. (Hrg. 812.) Furthermore, a person can be tested for lead but such testing does not give reliable results because of body growth, changes in chemical distribution and nutrition. (Hrg. 813.) Furthermore, Dr. Lugo testified it's not practical to test bone or nerves for lead. He asserts a historical analysis and looking at developmental changes is the better assessment for toxin and lead exposure. (Id.)

Dr. Lugo opines an additive effect in Rodriguez's case is his exposure to multiple neurotoxic pesticides, lead and solvents. (Hrg. 819-20.) He concludes Rodriguez's various neurotoxic exposure altered his development of cognitive functions which affected him from doing "normal things." (Hrg. 820.)

Dr. Lugo admitted he would not be able to diagnose anybody with brain damage or any psychiatric condition. (Hrg. 822.) He further testified he interviewed Rodriguez's aunt and longtime friends in Laredo, and Rodriguez's mother and sisters in Crookston but failed to record these interviews. Dr. Lugo admits taking interview notes but failing to provide them to Rodriguez's counsel or the United States. (Hrg. 823-24.)

Dr. Lugo testified he did not consult with neurologists or neuropsychiatrists nor did he consult with such professionals when concluding Rodriguez's neurologic and cognitive problems were "caused by chronic exposure to highly neurotoxic pesticides."

28

(Hrg. 824; Ex. D-68.)  Dr. Lugo admits there is no way to test Rodriguez today for lead exposure as a child.  (Hrg. 825.)  Dr. Lugo acknowledges the Red River Valley is a heavy agricultural area wherein thousands of other people have, likely, been exposed to chemicals during their lifetime.  (Hrg. 826.)  He further admits that he has no direct literature, articles, or evidence, which link a specific higher incidence of brain damage to people in the Crookston, Minnesota area.  (Hrg. 825-27.)  Dr. Lugo could not provide evidence linking a higher incidence of homicide or sexual assault rates to pesticide use.  (Hrg. 827.)  In conclusion, Dr. Lugo testified his capital punishment work has been strictly on behalf of capital defendants.  (Hrg. 829.)

       C.  Dr. Jose Arturo Silva

Dr. Jose Arturo Silva is a psychiatrist retained by the original 2255 counsel, Joseph Marguilies.  (Hrg. 845)  Dr. Silva evaluated and conducted two interviews on Rodriguez on September 13 and 14, 2011.  (Hrg. 848.)

Dr. Silva is familiar with the criteria for a diagnosis of intellectual disability including the need to meet developmental and sociocultural demands for personal independence and social responsibility.  (Hrg. 893.)  According to Dr. Silva, to meet the diagnostic criteria of intellectual disability, you have to prove one adaptive deficit in one of the three domains: conceptual, social, and practical.

The conceptual domain includes executive functioning, such as judgment, planning, impulse control, abstract thinking, problem solving, memory, language, functional academic skills and self-direction.  (Hrg. 894.)

According to Dr. Silva the social domain includes social judgment and competence, interpersonal responsibility, self-esteem, gullibility, naiveté, following and obeying laws, avoiding victimization and emotional regulation. (Hrg. 893-94.)

The practical domain includes activities of daily living and learning and self-management across life settings, occupational skills, use of money, health and safety and other self-care. (Hrg. 894.)

Despite Dr. Silva's assertion that Rodriguez exhibited deficits in social functioning and was characterized as a "loner" (Hrg. 914), he acknowledged Rodriguez's large circle of male, female, younger, and older friends that he frequently "hung out with." (Hrg. 917-20.) Rodriguez was reported to always be well-groomed, pleasantly mannered and cooperative in and outside of prison. (Hrg. 920-23.) Rodriguez also liked football and hunting and was known for his tidiness. (Hrg. 925.)

During Rodriguez's first few grades of school he was a Spanish-speaking individual who was learning to speak English within the school system along with his siblings. (Hrg. 927.) He continued to attend school until his high school years when he decided to quit school. (Id.) Evidenced by Minnesota Security Hospital records and the Department of Public Welfare – Special Review Board, and Rodriguez himself, shows Rodriguez obtained a GED while in prison. (Hrg. 928-29, 929-30.)

Dr. Silva was aware Rodriguez enjoys reading what Rodriguez calls a "genre" of books. (Hrg. 932-34.) Rodriguez reads book series on history and war and likes to indulge in the Harry Potter series. (Id.) Dr. Silva agreed that Rodriguez has read numerous books and understands the themes of those books. (Hrg. 940-41.) Dr. Silva

stated "[Rodriguez] certainly improved in terms of developing an interest in books, especially when you arrive to jail to spend that many years." (Hrg. 940.)

Dr. Silva suggested Rodriguez suffered an Arnold Chiari malformation. (Hrg. 945.) As a result Rodriguez underwent an MRI to determine whether he has a Chiari malformation. (Hrg. 947-48.) The MRI results found no Chiari malformation nor did it indicate hydrocephalus. (Hrg. 947-48.) Despite the MRI results, Dr. Silva disagreed with the MRI's conclusions. (Hrg. 948.)

Rodriguez's Psychosexual History was examined by Dr. Silva. (Hrg. 950.) Dr. Silva stated Rodriguez's older sister remembered Rodriguez was abused when he was four years old. (Id.) However, Rodriguez has no recollection of this incident. (Id.) Dr. Silva testified Rodriguez recalls a second sexual abuse incident by a young female college student in 1959. (Hrg. 950-52.) Dr. Silva testified that Rodriguez has a visual recollection of this incident. (Hrg. 952.) However, Dr. Silva's report states, "Mr. Rodriguez denied any visual recollections of his past sexual abuse." (Hrg. 953; D-44, p. 33.)

Dr. Silva was aware Rodriguez made a number of obscene phone calls as a teenager in high school and while incarcerated at the Minnesota Security Hospital. (Hrg. 953-54.) Dr. Silva testified he was not surprised Rodriguez made such calls. (Id.)

Dr. Silva was aware of Rodriguez's past criminal history of sexual attacks on women. (Hrg. 956.) Dr. Silva also addressed the capital offense wherein Rodriguez describes the day when Dru Sjodin died. (Hrg. 955.) Dr. Silva's report indicates,

"[Rodriguez] found himself walking in a mall.  He had no interest in meeting anyone and no desire to abduct or rape anyone."  (Hrg. 955; D-44, p. 37.)

Rodriguez discussed and provided different explanations regarding his prior sexual offenses.  (Hrg. 956.)  He informed Dr. Silva he raped his first victim, Shirley Seddon, because she was disrespectful and he became angry with her.  (Hrg. 957.) Rodriguez stated he wasn't going to ask Ms. Seddon to have sex, rather, he "was going to take it."  (Hrg. 958-59.)  He simply states, "I was going to rape her. That's it."  (Hrg. 960.)

When confronted about the day Dru Sjodin died, Rodriguez stated to Dr. Silva had no interest in meeting anyone and no desire to abduct or rape anyone.  (Hrg. 961.)  He further provided that he "never intended to have sexual intercourse with [Dru Sjodin]." (Id.)  However, Rodriguez later told Dr. Michael Welner that he was going to rape Ms. Sjodin and went into lengthy detail of the assault.  (Hrg. 962.)

Dr. Silva and Dr. Hutchinson both found Rodriguez suffered with Post-Traumatic Stress Disorder (PTSD).  (Hrg. 963.)  Dr. Silva acknowledged Dr. Hutchinson did not find Rodriguez intellectually disabled at the time of his trial.  (Hrg. 964-65.)  Dr. Silva was aware of Dr. Hutchinson's findings that Rodriguez had a long-standing preoccupation of sexual thought and long-standing habit of sexual fantasy regarding tall, blonde women that he would see in public.  (Hrg. 972-73.)  However, Rodriguez told Dr. Silva he does not have a history of engaging in sexual fantasies in which he derives pleasure as a result of sexually attacking women or otherwise sexually coercing women. (Hrg. 972.)

Dr. Silva reported that although Rodriguez denied these fantasies, there is evidence in his records which mentions Rodriguez suffers from rape fantasies. (Hrg. 971.) Dr. Hutchinson's Y-BOCS Symptom Checklist (Ex. G-602) indicated Rodriguez experiences "Current and Past, Forbidden or perverse sexual thoughts, images or impulses." (Hrg. 975.) Dr. Hutchinson's "Comprehensive Report for Alfonso Rodriguez" (Ex. G-603) also indicated Rodriguez "acknowledges fantasizing about . . . sexually deviant behaviors with females" including "having anal intercourse with female, controlling a female, female is controlling him, forcing a female to have sex with him, a female is forcing him to have sex with her." (Hrg. 977.) Dr. Silva testified he asked a lot of Dr. Hutchinson's same questions of Rodriguez including a long list of questions regarding different paraphilia, however admittedly did not put that information in his report. (Hrg. 977.) Dr. Silva also testified Rodriguez talked to him about watching and enjoying pornographic movies. (Hrg. 979.)

Dr. Silva testified Rodriguez was interested in women's underwear when he was young and that progressed to obscene phone calls. (Hrg. 980.) It was after the obscene calls that he attacked his first victim, Shirley Seddon. (Id.) Dr. Silva testified Rodriguez "engaged in procuring female underwear and at the same time . . . he also engaged in telephone scatophilia and it appeared . . . he was doing that at the same time." (Hrg. 981.) In summary, Dr. Silva diagnosed Rodriguez with mood disorder, anxiety, depression and post-traumatic stress disorder (PTSD). (Hrg. 879-80.) Dr. Silva testified Rodriguez does not qualify for Antisocial Personality Disorder as he fails to meet the criterion however likely suffers conduct disorder. (Hrg. 982.)

Dr. Silva concluded it appears Rodriguez likely obtained his GED from the Minnesota Security Hospital as there is indication he took World History, American Government, Biology, Sociology, Social Studies, and Algebra, and records otherwise indicate he completed his GED diploma.  (Hrg. 1001; Exs. D-75, G-606.)

## III.   United States' Evidence

### A.  Dr. James D. Seward

Dr. James D. Seward is a neuropsychologist who examined Rodriguez on July 10-12, 2013.  (Hrg. 1057; Ex. G-615.)  Dr. Seward audio and video taped the interview (Hrg. 1059) and produced a report as a result of his examination.  (Hrg. 1057-58.)  Dr. Seward's collective testing data along with pertinent collateral history of Rodriguez was used to opine whether Rodriguez is intellectually deficient.  (Hrg. 1059-60.)

Dr. Seward testified there are three prongs to intellectual disability.  (Hrg. 1060.) The first prong requires having a significantly sub-average intellectual functioning as measured by IQ testing.  There must also be deficits in adaptive functioning that interfere with life and at the onset of the developmental period which is usually defined prior to age 18.  (Id.)

Dr. Seward reviewed Rodriguez's previously administered testing data including: the Kuhlmann-Anderson Test (measures academic potential by assessing cognitive skills related to the learning process) in elementary school (Hrg. 1063); the Shipley IQ test administered at the Minnesota Security Hospital indicating an "Academic IQ Estimate" of 85 (Hrg. 1065; Ex. G-616); the California Psychological Inventory (CPI) (measures cognitive ability) test which Rodriguez tested within normal limits (Hrg. 1066; Ex. G-

34

617); a psychological report which included the Shipley test indicating verbal score 21, abstraction score 20, estimated academic aptitude-average range.  (Hrg. 1067; Ex. G-618.)

Results of the CPI tests were similar to profiles in November 1976 and December 1977 indicating Rodriguez's characteristics of rebelliousness, rigidity, and moodiness. (Hrg. 1068.)

Dr. Seward was aware of Dr. Eggert's, Minnesota Security Hospital, report indicating "[Rodriguez's] intelligence is within the average range, but was compromised by language difficulties and difficulty with social acceptance. He shows a good general and personal knowledge. He shows a fair amount of insight and good judgement."  (Hrg. 1069.)  Dr. Seward was also aware of Dr. Karen Froming's prior testing at the time of trial.  (Hrg. 1070; D-24.)

Dr. Seward testified the AAIDD recommends the Wechsler Adult Intelligence Scale (WAIS) test and the Stanford-Binet test for individual IQ testing.  (Hrg. 1071.)  In Rodriguez's case, Dr. Froming reported Rodriguez's WAIS-III full-scale IQ was 87 (Hrg. 1074), the verbal IQ was 86 and the performance IQ was 89.  (Hrg. 1071.)

Dr. Seward testified Rodriguez spoke fluent English and was engaged during his examination and psychological and neuropsychological testing.  (Hrg. 1078-79.)  Dr. Seward relied on the Neuropsychological Symptom Checklist and administered the following tests on Rodriguez: Minnesota Multi-phasic Personality Inventory (MMPI) (Hrg. 1080); Victoria Symptom Validity Test (malingering test) (Hrg. 1082-83); Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) (Hrg. 1083); Structured

35

Interview of Malingered Symptomology (malingering test) (Id.); Booklet Category Test (nonverbal problem solving test) (Hrg. 1083); Wechsler Memory Scale (Hrg. 1083); Dot Counting Test (malingering test) (Hrg. 1084); Wide Range Achievement Test (WRAT4) (Hrg. 1084); Trauma Symptom Inventory-2 (Hrg. 1084); Word Memory Test (malingering test) (Hrg. 1084); Wisconsin Card Sorting Test (nonverbal problem solving test) (Hrg. 1084); WAIS-IV Letter-Numbering Sequencing (Hrg. 1084); Rey Complex Figure Test (recall test) (Hrg. 1084-85); Stroop Color and Word Test (mental flexibility test) (Hrg. 1086); California Verbal Learning Test (list learning test) (Hrg. 1087); Trail Making Test (Hrg. 1088); 15-Item Test with Recognition (malingering test) (Hrg. 1088); Boston Naming Test (picture identification test) (Hrg. 1089); Verbal Fluency and Category Fluency Test (Hrg. 1089); Test of Memory and Malingering (malingering test) (Hrg. 1089); WRAT4 Spelling test (Hrg. 1089); Finger Tapping Test (measures fine motor speed) (Hrg. 1089); Thurston Word Fluency Test (Hrg. 1089); and Personality Assessment Inventory.  (Hrg. 1090.)

Dr. Seward administered the English version of the WAIS-IV on Rodriguez. (Hrg. 1097, 1150.)  Dr. Seward testified the WAIS-IV test is comprised of four indices and a general ability index. (Hrg. 1095-96.) The WAIS-IV indices include the Verbal Comprehension Index (VCI) (Hrg. 1097); Perceptual Reasoning and Visuospatial Skills (Hrg. 1097-98); Working Memory (Hrg. 1099); and Processing Speed (Hrg. 1096).  A full-scale IQ is acquired by taking the scaled scores of the four indices converting them into IQ scores and index scores.  (Hrg. 1100-01).  Rodriguez was administered each of the indices which produced a raw score.  Rodriguez's raw scores were inputted into a

computer program which converted the scaled IQ scores and index scores into a full-scale

IQ.  (Hrg. 1101).  Rodriguez's full-scale WAIS-IV IQ is 86.  (Hrg. 1101).

Dr. Seward testified Rodriguez's WAIS-IV test results showed no evidence of any

marked difficulties with Rodriguez's executive or cognitive functioning.  (Hrg. 1102; Ex.

G-615, p. 38.)  Rodriguez's language functioning tests revealed no evidence he had

difficulty with language despite him being born into a Spanish speaking home and

learning English at an early age.  (Hrg. 1104.)  Rodriguez's learning and memory test

results were average.  (Hrg. 1111.)

Dr. Seward testified Rodriguez's sentence comprehension grade level reflects all

of the reading he has done while incarcerated.  (Hrg. 1109.)  Rodriguez indicated to Dr.

Seward that he "hated" going to school "because there was always a fight between me

and the kids."  (Id.)  Rodriguez also provided that he likely flunked every class from

fourth grade to tenth grade because he wasn't doing anything because "I didn't care after

a while . . . Got to a point where I didn't care."  (Hrg. 1113; Ex. G-624.)  Rodriguez' lack

of effort in regard to his academic work was also evidenced in a state parole and

probation agent's report.  (Id.; Ex. G-625.)  Rodriguez admittedly told Dr. Seward, "Well,

it isn't that I was doing poorly.  If I had pushed myself I could've done it but I didn't

care."  (Hrg. 1116.)

Despite no transcript or diploma available, records indicate Rodriguez graduated

from St. Peter's High School as evidenced by Minnesota Security Hospital records.  (Hrg.

1116.)  In fact, records show that Rodriguez did well in school. He was motivated and

requested extra work.  Documentation is that he was close to receiving his high school

diploma as of March 29, 1979.  (Hrg. 1118.)  Furthermore, Dr. Hutchinson also testified Rodriguez completed high school and received his high school diploma while he was at St. Peter.  (Hrg. 1118; Ex. G-627.)

Rodriguez had a lengthy conversation with Dr. Seward during the examination regarding national and world events. Rodriguez spoke about the Trayvon Martin case and George Zimmerman, Fox News, politics, and Edward Snowden demonstrating his abstract thinking, cognitive ability to follow stories, and socialization.  (Hrg. 1122; Ex. G-628A.)

Rodriguez spoke about spirituality while discussing religion during the examination.  (Hrg.1123-26.)  He went into great detail about the origins and books of the Bible. Rodriguez also discussed his thoughts on Christian beliefs and spoke abstractly about biblical stories. Dr. Seward testified the issues he raised were sophisticated and theological.  (Hrg. 1126.)

The examination also discussed Rodriguez's ability to drive a vehicle.  (Hrg. 1126; Ex. G-630.)  Rodriguez informed Dr. Seward that when he was released from prison he purchased a new car, read the manual to learn how to properly use it and figure out the various items and accessories within the car.  (Hrg. 1126-28.)  Rodriguez explained he had a driver's license when he went to prison and over the years of incarceration he would renew the license by mail every four years.  (Hrg. 1130.)

Dr. Seward discussed with Rodriguez the trips he took with his family when he was released from prison in 2003 including a trip to Laredo, Texas.  (Hrg. 1131; Ex. G-632A, Ex. G-632B.)  During this discussion, Rodriguez demonstrated his ability to read

an atlas or map and showed Dr. Seward his route to Laredo. (Hrg. 1131-32.) He also talked about the number of locations he visited, lived or driven to those places. (Id.) Dr. Seward testified Rodriguez demonstrates a practical understanding of day-to-day life activities, communication skills, socialization, and logical thinking. (Hrg. 1133.)

Rodriguez also discussed the day he kidnapped Ms. Sjodin. (Hrg. 1133-35; Ex. G-633.) Dr. Seward testified during this conversation Rodriguez showed his ability to transport, his thought process to use gravel roads to avoid traffic, and where he could place Ms. Sjodin in an effort to hide her body. (Hrg. 1135.) As a result of Rodriguez's problem solving, Ms. Sjodn's body wasn't found for approximately seven months. (Hrg. 1136.)

Rodriguez further demonstrated he is well-versed in his problem with diabetes and what he needs to do to manage it including his blood sugar and sugar intake. (Hrg. 1140-1143.) Rodriguez is also well aware of his prescribed medication and what he needs to do to treat his diabetes. (Id.; Ex. G-636.)

When questioned about employment, Rodriguez explained he worked in the prison print shop for over 20 years and indicated he was skilled in the profession. (Hrg. 1144; Ex. G-637.) The record also shows Rodriguez worked a variety of jobs prior to incarceration including custodian at Crookston Public Schools, maintenance worker, farm laborer, American Crystal Sugar Co., Red River Alfalfa Co. (Hrg. 1145-1146; Ex. G-625.)

Furthermore, prior to the capital offense, after he was released from prison in 2003, Rodriguez managed his own affairs by providing for himself, his mother,

39

helping his nieces and nephews, renewing his relationship with family members and making plans, and obtaining employment.  (Hrg. 1147.)

In reviewing Dr. Weinstein's report, Dr. Seward testified Dr. Weinstein did not administer psychological or emotional functioning tests on Rodriguez.  (Hrg. 1147.)  Dr. Weinstein only administered one and a half malingering tests instead of the recommended six malingering tests.  (Hrg. 1148.)  Dr. Seward also found that one of Dr. Weinstein's administered tests, the TOGRA, is not an IQ test nor is it recommended for the assessment of intellectual disability (Hrg. 1149) despite Dr. Weinstein referring to it as an IQ test in which Rodriguez scored a 70.  (Id.; D-44.)  In fact, Dr. Weinstein administered tests or measurement tools on Rodriguez that were designed for individuals who either live with or see the examinee on a frequent daily basis.  (Hrg. 1149-50.)  None of which are applicable to Rodriguez's situation.

Dr. Seward further testified he is aware of the various cultural and language adaptations of the WAIS-IV, including the Mexican and Spanish versions.  (Hrg. 1150-51.)  He explained its clinical practice to norm the version of WAIS-IV test with the country of origin.  (Id.)  Dr. Seward further explains there is nothing in the English version of the WAIS-IV that allows him to ask WAIS-IV questions in another language.  (Hrg. 1152.)  Nor is there anything in the manual that suggests parts of the Mexican version of the WAIS-IV should be translated and administered in English.  (Id.)

Furthermore, it is evident Dr. Weinstein's raw data contained discrepancies (Hrg. 1152-53) including the lack of recorded completion times (Hrg. 1153); improper test administration with unreliable Spanish to English translation during

40

testing (Hrg. 1154-55, 1169); and questionable scoring methods.  (Hrg. 1156-62.)

Dr. Seward testified there is nowhere in the manual which allows the examiner to

give the Mexican version of the WAIS-IV and use United States norms to score it.

(Hrg. 1169.)

The following are Rodriguez's full-scale IQ scores: Dr. Weinstein's WAIS-IV

(Mexican version) 89; Dr. Seward's WAIS-IV (United States version) 86; and Dr. Karen

Froming's WAIS-IV (United States version) 86.  (Hrg. 1169.)

B.  Dr. Michael Welner

United States' expert, Dr. Michael Welner is a board certified psychiatrist and

forensic psychiatrist (Hrg. 1394; see Ex. G-642) and chairman of The Forensic Panel, a

peer-review, multi-specialty consultation practice that is based in New York specializing

in psychiatry, psychology, pathology, toxicology, and several areas of medicine. (Hrg.

1396.)  Dr. Welner has consulted on death penalty cases for the purpose of intellectual

disability on approximately 10 to 12 prior occasions.  In all of these instances, Dr. Welner

used the current edition DSM criteria as the authoritative reference.  (Hrg. 1412.)

In Rodriguez's case, Dr. Welner reviewed thousands of pages of discovery,

interviewed Rodriguez and others and produced a lengthy report.  (Hrg. 1418-20; Ex. G-

643.)  Rodriguez's interview was conducted on June 26-28, 2013 at the FCC in Terre

Haute, Indiana.  (Hrg. 1428.)  The interview was video and audiotaped.  (Id.)  Dr. Welner

testified Rodriguez participated and cooperated throughout his interview.  (Hrg. 1430.)

Dr. Welner provided, "There were times that [Rodriguez] was – maneuvered or

manipulated the discussion, which is a testament to him cognitively."  (Hrg. 1430-31.)

41

Dr. Welner examined Rodriguez and reviewed 143 sources of data in order to provide a convergent data set in his assessment of whether Rodriguez was intellectually deficient. (Hrg. 1435.) Specifically, Dr. Welner's impressions about Rodriguez's ability to reason were based on a variety of "different slices of life" from homemaking to caretaking (Hrg. 1435-36) and because he had a  as well as his prison life. (Id.; see Ex. G-644.) The record reflects evidence of Rodriguez's active reasoning process. (Hrg. 1436-1441; Exs. G-644, G-645.)

Planning

Dr. Welner's report indicates Rodriguez's ability to plan. (Hrg. 1445-46; Ex. G-643, p. 97.) Notably, as he anticipated his release from prison in 2003, he sought out help to renew his driver's license, and he explored the possibility of moving out of the country with an eye toward moving to a location where he wouldn't have to worry about being a registered sex offender. (Hrg. 1446.) Rodriguez also expressed an interest and explored employment possibilities in New York and Georgia as he had experience working in the prison print shop and as a result acquired advanced training in printing. (Hrg. 1446.) Rodriguez also indicated that it was his preference to live in Grand Forks because he wanted to go about his business without necessarily feeling everyone was aware he was a Level III sex offender. (Hrg. 1447.) Dr. Welner found no evidence indicating Rodriguez needed support in his day-to-day responsibilities. (Hrg. 1450.) Evidence indicates Rodriguez was anticipating life in the community, and looking for ways to support himself. (Id.) Dr. Welner found no evidence showing Rodriguez needs support in order to plan day-to-day responsibilities. (Hrg. 1450.)

At the time of his arrest, Rodriguez was working 8 to 10 hour days, laying drywall, caring for his mother and caretaking the home. He did what needed to be done around the house as a homemaker and homeowner. (Hrg. 1450.) He also drove his niece and nephew to activities. (Id.) According to Dr. Welner, Rodriguez fit his activities into a schedule, got to work on time, all which required planning. (Hrg. 1451.) Dr. Welner testified, "[B]y all accounts he carried off these sundry personal and vocational responsibilities in an orderly way as one would expect of a person who doesn't need assistance planning." (Id.)

Abstract Thinking

Rodriguez demonstrated abstract thinking when discussing skepticism for 24-hour news. (Hrg. 1454.) Rodriguez's use of the news stations sensationalizing the George Zimmerman trial demonstrates his ability of abstract thinking and "well-developed adult intelligence." (Hrg. 1455.) According, to Dr. Welner, Rodriguez is thinking geopolitically on an abstract level when he discusses issues regarding Edward Snowden. (Hrg. 1456-57.)

Problem Solving

Rodriguez's recorded jail calls, for said case, indicate his different areas of cognition and his ability to relate to other people. (Hrg. 1442-43.) Dr. Welner explained there were several instances that demonstrate Rodriguez's ability to problem-solve and reason. (Hrg. 1444.)

Dr. Welner provides Rodriguez's problem solving is demonstrated in a variety of ways including troubleshooting issues in diverse areas. (Hrg. 1465-66.) From tax advice

43

to advice on selling the family farm, Rodriguez was a problem solver and a source of information.  (Hrg.1466-67.)  Dr. Welner testified Rodriguez's ability goes beyond his problem solving skills, he is demonstrably clever.  (Hrg. 1467.)  In one case, after a rape in the Mankato, Minnesota area for which Rodriguez was later charged, Rodriguez provided some semblance to an alibi that he could not have committed the offense because he was "checked in" at the Minnesota Security Hospital.  (Hrg. 1467-69.)

Practical Understanding

Rodriguez further demonstrates his practical understanding of aspects of life that reflect his general knowledge.  (Hrg. 1480-81.)  This includes homemaking, home care responsibilities, discussions with his family, driving, getting acquainted with electronics and other areas of general knowledge that he could parlay into either advice or his actual doing.  (Hrg. 1481-82; Ex. G-648.)  Dr. Welner testified Rodriguez was not limited in anything he wants to learn. According to Dr. Welner, "He's self-directed when it comes to learning."  (Hrg. 1483-84.)

Functional academic skills

Rodriguez's functional academic skills reflect a young child who grew up strictly speaking Spanish to learning English while attending school in Crookston, Minnesota.  (Hrg. 1509; G-643, p. 112.)  As Rodriguez became more acculturated, he became better schooled and his grades improved until the time he began taking drugs and alcohol.  (Hrg.  1510.)  Rodriguez admits his grades weren't good because he didn't try and was more interested in his social life.  (Id.)  He got back to academics when he entered the Minnesota Security Hospital.  (Hrg. 1511.)  Records reflect when put to task Rodriguez

was capable of accomplishing academic achievements. Dr. Welner testified, "Over time [records] reflected that he not only learned English but his reading improved significantly, that he participated in a higher education program that was offered for adults . . . that involved heavy reading, that involved math, that he was able to succeed." (Hrg. 1511.)  Records further indicate not only does Rodriguez learn but he learns quickly when he is particularly motived.  (Id.)

Short term memory

Rodriguez's short term memory is reflected in Dr. Seward's and Dr. Froming's testing prior to trial.  (Hrg. 1513; Ex. G-643, p. 115.)  Dr. Welner testifies Rodriguez's ability to retain shows adequate short term memory and he needs no supports in this adaptive domain.  (Id.)

Understanding of risk in social settings

Early in his youth Rodriguez demonstrates avoiding getting involved in activity that could potentially put him in jail.  (Hrg. 1516; Ex. G-643, p. 115.)  He recognized before something might get "out of hand" and would not participate in the activity with others and expose himself to risk.  (Id.)

In his teens, Rodriguez got involved in criminal activity.  (Id.)  However, his involvement was under conditions that would minimize risk.  Rodriguez describes his illegal activity as something he did either privately or very selectively whether it be burglaries or selling drugs.  (Hrg. 1517.)  However, Rodriguez did not continue his criminal activity in prison (i.e. selling drugs) as he did not want to expose himself to having any debt to another prisoner.  (Id.; Ex. G-654.)

45

Maturity of Social Judgement

Dr. Welner provides Rodriguez's friendships were age-appropriate with people who were not themselves intellectually disabled but essentially peers either from school or the community. (Hrg. 1521; Ex. G-643, p. 117.) Rodriguez's social group was large with smaller groups of people that he was closer to. (Id.) He also had age-appropriate girlfriends. (Id.; Ex. G-655.) None of Rodriguez's girlfriends indicated that he was anything but polite and didn't force them into any sexual situations. (Id.) Furthermore, his mother and sister were comfortable with Rodriguez taking care of Deloris Rodriguez when he was released from prison. (Id.)

In all of Rodriguez's employment records, he might have had a couple of infractions. (Hrg. 1522.) He got in trouble at the prison print shop for printing a picture of LeAnn Rhimes but never had an issue with interpersonal, or social relationships with co-workers. (Id.) Moreover, Illeanna Noyes, his sister, had a comfort level to allow Rodriguez unsupervised time with her children even though Rodriguez was a convicted rapist. (Id.)

Social Maturity and Perceiving Social Cues

According to Dr. Welner, Rodriguez had different friends for different reasons. He recognized the need to have different friends for different purposes which demonstrates his maturity. (Hrg. 1533; Ex. G-643, p. 126.)

Furthermore, Rodriguez is consistently described as being well-groomed and attending to his hygiene. He maintains his diet, fitness and the care for himself and others both in and outside of incarceration. (Hrg. 1535-39; Ex. G-643, p. 128, Exs. G-

46

658, G-659, G-660.)  Documentation shows Rodriguez's ability to make proper healthcare decisions and no health professional has ever contested or questions his capacity to refuse treatment or accept treatment.  (Hrg. 1539-40.)

Rodriguez controls and recognizes his diabetes.  (Hrg. 1540.)  He utilizes biofeedback for his hypoglycemia and headaches and doesn't require any additional support for making healthcare decisions or managing his personal healthcare needs.  (Hrg. 1540-43; Ex. G-661.)

Transportation

Dr. Welner testified Rodriguez doesn't need additional sources of support in order to adequately attend to transportation needs as he is comfortable in driving at night, as his comfort of driving on back roads, recognizing and attending to safety.  (Hrg. 1546; Ex. G-643, p. 133.)  Rodriguez demonstrates his skills as a driver as well as the implicit trust in driving and navigating himself and his family on a trip to Laredo, Texas during the summer of 2003.  (Id.)

Banking/Money Management

Although there is no record of Rodriguez having a bank account upon release in May 2003, Dr. Welner testified Rodriguez developed a budget before he was released from prison and had access to a credit card.  (Hrg. 1547; Ex. G-662.)  Dr. Welner asserts Rodriguez's capacity to maintain a budget by use of a credit card account demonstrates responsible financial decision-making.  (Id.)

Vocational Training and Learning

Rodriguez's vocational training and learning are evidenced as early as his teenage years. Rodriguez performed a variety of tasks and jobs detailed in Dr. Welner's report (Hrg. 1549-50; Ex. G-643, p. 135.)  Rodriguez demonstrated the ability to use what he was trained in, whether in it be the print shop, custodial responsibilities, and carpentry skills, engraving or putting up drywall.  (Hrg. 1550-51.)

The DSM-5 presents three criteria for intellectual disability: Criteria A Intellectual Functioning; Criteria B Adaptive Functioning; and Criteria C Occurrence prior to age 18. (Hrg. 1554-55.)  In five years of documentation by psychiatrists, psychologists, social workers, and other professionals no one diagnosed Rodriguez with being intellectually disabled.  (Hrg. 1555.)  No one referenced him as being intellectually disabled.  (Id.)  Dr. Welner testified Rodriguez does not meet intellectual disability criteria A, B, or C.  (Id.) Dr. Welner provides there was not one domain that he found which needed support, let alone ongoing support.  (Id.)  Dr. Welner states, "[Rodriguez] was capable to manage as any other average individual might be expected of his peer group and his sociocultural and developmental level."  (Id.)

In summary, Dr. Welner diagnosed Rodriguez with Other Specified Paraphilic Disorder, Paraphilia, and Antisocial Personality Disorder.  (Hrg. 1567-70; Ex. G-643.)

**ARGUMENT**

Rodriguez contends that intellectual disability bars his capital sentence under
Atkins.  No mental health professional identified Rodriguez as intellectually disabled
until after he received a death sentence.  Prior to that, Rodriguez lived a life which,
although was defined by lengthy periods of confinement, did not reveal gross intellectual
deficiencies.  When Rodriguez was not incarcerated, he lived a very normal life: he
socialized with family and friends, steadily worked jobs, helped his aging mother,
voraciously read books, and took long road trips to visit relatives.  Trial counsels' and
defense experts' extensive interactions with him did not hint that he was intellectually
disabled.

Rodriguez now claims that notwithstanding all of this, he has an intellect
psychiatric manuals describe as afflicting approximately one percent of the population.
(Ex. D-62 p. 38.)  According to Rodriguez, he owed the normalcy of his life when he was
not incarcerated to significant support and assistance from others.  However, no one ever
tested Rodriguez for intellectual disability until the United States charged him with a
capital offense.  This left Rodriguez's § 2255 attorneys with the charge of attempting to
establish his intellectual disability through retroactive assessments – something the
psychological profession did not intend its tests to do.

Rodriguez has collected lay accounts and expert opinions to support his claim that
he has an intellectual disability.  The United States responded with significant evidence
showing that while Rodriguez's intellectual functioning may be below average, he is not

49

intellectually disabled.  Although the psychological profession generally agrees on the standards governing a diagnosis of intellectual disability, the experts in this case dramatically differed in their application of these standards.  A full review of the evidence and applicable law demonstrates that Rodriguez's <u>Atkins</u> claim is without merit.

## I.    Rodriquez's intellectual disability claim fails as a matter of law.

The Federal Death Penalty Act ("FDPA") and the Eighth Amendment prohibit the execution of persons with an intellectual disability (previously termed "mental retardation").[2]  The FDPA provides, "A sentence of death shall not be carried out upon a person who is mentally retarded."  18 U.S.C. § 3596(c).  The FDPA did not specifically define the phrase "intellectually disabled."  <u>See id.</u>  The Supreme Court has directed that the statutory definition of intellectual disability "generally conforms to the clinical definitions" reflected in two prominent publications:  the American Association on Mental Retardation ("AAMR")[3]'s <u>Mental Retardation, Definitions, Classifications, and Systems of Support</u>, and the American Psychiatric Association's ("APA") <u>Diagnostic and Statistical Manual of Mental Disorders</u> (hereinafter DSM-5).  <u>See</u> <u>Atkins</u> at 317, fn. 22.  According to the DSM-5:

---

[2] In somewhat recent years, Congress, the federal judiciary, and the medical community have used the term "intellectual disability" to describe the same condition previously referred to as "mental retardation."  <u>See</u> Rosa's Law, 124 Sta. 2643 (describing the change of certain entries in the U.S. Code from "mental retardation" to "intellectual disabilities"); American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013) (DSM-5).  The FDPA has not been amended to use "intellectual disability."  The United States uses "intellectual disability" unless clarity demands otherwise.

[3] In 2007, the AAMR changed its name to American Association on Intellectual and Developmental Disabilities ("AAIDD").

> The essential features of intellectual disability (intellectual development disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age, gender, and socio-culturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardize testing of intellectual and adaptive functions.

American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders 37 (5th ed., 2013). (Ex. D-62.)

The AAIDD defines intellectual disability as "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." ( Ex. D-47.) Atkins defined, consistent with these clinical manuals, diagnosis of an intellectual disability "require[s] not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." 536 U.S. at 318.

The Eighth Circuit has adopted essentially the same definition under the FDPA. In Ortiz v. United States, 664 F.3d 1151, 1158 (8th Cir. 2011), the Eighth Circuit noted that the AAIDD and APA, whose prior definitions of [intellectual disability] were footnoted in Atkins, define [intellectual disability] in similar ways." Id. at 1158 (referencing AAMR, Mental Retardation: Definition, Classification, and Systems of Supports (10th ed. 2002) (hereinafter, AAMR-2002) and DSM-IV-TR)). The Court noted that an intellectual disability diagnosis necessitates "significantly limited intellectual functioning (intellectual function prong) and adaptive functioning (adaptive function prong) originating before the age of 18 (age prong)." Id.

51

In Moore v. Texas, the United States Supreme Court held evaluating a defendant's intellectual disability using the nonclinical Briseno factors rather than applying current medical standards "creat[ed] an unacceptable risk that a person with intellectual disabilities will be executed" in violation of the Eighth Amendment. Moore v. Texas, 137 S. Ct. 1039, 1051 (2017) ("Moore I"). This case came before the Supreme Court a second time in Moore v. Texas, 139 S. Ct. 666 (2019) ("Moore II"), after the Court granted certiorari to review the Texas Court of Criminal Appeals finding that Moore was not intellectually disabled. Id. at 667.

In Moore I, the Texas Court of Criminal Appeals rejected the petitioner's Atkins claim. Id. at 1044. In so ruling, the Texas court relied on the evidentiary factors set forth in Ex parte Briseno, 135 S.W.3d 1 (Tex. Crim. App. 2004), discounted the lower end of the standard error of measurement, and found that he failed to prove that he suffered from significantly sub-average intellectual functioning. Id. at 1047. The Supreme Court held that the Texas appellate court's adherence to superseded medical standards and its reliance on the Briseno factors[4] did not comport with the Eighth

---

[4] The Briseno factors the Court criticized are: Whether those who knew the person best during developmental years thought he was intellectually disabled at the time and acted in accordance with that determination; Whether the person formulated plans and carried them through or had impulsive conduct; Whether the person showed leadership or if he is led around by others; Whether his conduct in response to external stimuli is rational and appropriate, regardless of whether it's socially acceptable; Whether the person responds coherently, rationally, and on point to oral or written questions or if his responses wander from subject to subject; Can the person hide facts or lie effectively in his own or others' self-interest?; and Putting aside the heinousness of the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose? Moore I at 1046.

Amendment.  Id. at 1053.  The Court faulted the Texas court for "overemphasiz[ing]" Moore's adaptive strengths when the medical community focuses the adaptive-functioning inquiry on adaptive deficits.  Id. at 1050.  The Court also faulted the Texas court for "stress [ing]" his "improved behavior in prison."  Id.  The Court further condemned the Briseno factors, which "are an outlier, in comparison both to other States' handling of intellectual-disability pleas and to Texas' own practices in other contexts," because those factors "creat[e] an unacceptable risk that persons with intellectual disability will be executed."  Id. at 1051-52.

In Moore II, the Supreme Court granted certiorari after the Texas Court of Criminal Appeals, on remand, again found that Moore was not intellectually disabled. In reversing the lower court's judgment and finding that Moore is intellectually disabled, the Court faulted the Texas court for, among other things, overemphasizing his adaptive strengths and for relying "heavily upon adaptive improvements" that he made in prison. Id. at 670-71.

Both Moore I and Moore II simply emphasize using medical guidelines and experts in making a determination of intellectual disability, and formally repudiate reliance on "stereotypical" Briseno factors in making such a determination.  See Moore I at 1051-52.  This Court received evidence from the United States' medical experts who relied upon medical standards for evaluation of intellectual disability just as Moore I and Moore II require.

The Supreme Court decided Hall v. Florida, 572 U.S. 701 (2014), striking down a Florida law that automatically cut off Atkins claims for defendants with a full-scale IQ of 70 or higher. Id. at 704. That holding did not change the legal landscape under the FDPA because federal law has never used a rigid IQ cutoff. In fact, the Hall Court recognized "[e]very state legislature, save one, to have considered the issue after Atkins – save Virginia's – and whose law has been interpreted by its courts has taken a position contrary to that of Florida." Id. at 718.

Rodriguez's assertion that Hall requires this Court to consider Dr. Weinstein's reported IQ scores fails to account for the fact, which is discussed infra, to conform the legal definition of intellectual disability to the view of the scientific community is contrary to the express language of Hall itself. There, the Supreme Court expressly stated that the work of the medical community "do[es] not dictate the Court's decision," and that the "legal determination of intellectual disability is distinct from a medical diagnosis." Hall, 134 S. Ct. at 2000. Instead, the Court stated that it was appropriate for legal authorities to "consult" and be "informed" by the views of the medical community. Id. at 1993. Thus, Rodriguez's assertion that Hall required Florida to adopt the AAIDD definition of intellectual disability and interpret the definition so adopted in conformance with that organization's views is simply false. The holding of Hall was limited to a determination that it was unconstitutional for Florida to refuse to allow defendants to present evidence of their alleged deficits in adaptive behavior when their IQ scores were above 70 but within the standard error of measure of 70. Hall, 134 S. Ct. at 2001. In Moore I, the Court clarified that "Hall indicated that being informed by the medical

54

community does not demand adherence to everything stated in the latest medical guide." Moore I, 137 S. Ct. at 1049. Even if Hall could apply to his case—which it cannot—it would not advance his cause.

> A. The scientific standard of care for forensic psychology and Federal Rule of Evidence 702 establish the professional and legal standards guiding the process of diagnosing intellectual disability.

Although the FDPA does not specify the governing standard of proof, federal courts have consistently found that defendants carry the burden of proving intellectual disability by a preponderance of the evidence. See, e.g., United States v. Umana, 750 F.3d 320, 358 (4th Cir. 2014); United States v. Sablan, 461 F. Supp. 2d 1239, 1243 (D. Colo. 2006); United States v. Davis, 611 F. Supp. 2d 472, 474 (D. Md. 2009).

The American Psychological Association ("APA")'s Ethical Principles and Code of Conduct, 2002 revision, with 2010 and 2016 amendments, ("APA Code"), is a binding code of ethics that all APA members must adhere to in their professional practice. (Post-Hearing Brief Ex. A.) Forensic psychologists are guided by the Specialty Guidelines for Forensic Psychologists. (Ex. G-581.) Both of these documents provide guidance to forensic psychologists in the testing of patients and the presentation of expert opinions. Both require forensic psychologists to faithfully and fully present information to help the public and develop informed judgments. Such a presentation requires forensic psychologists to examine "the issue or problem at hand from all reasonable perspectives and seek information that will differentially test plausible rival hypotheses." (Id. p. 15.) It further requires experts to "present their conclusions, evidence, opinions, or others professional products in a fair manner," meaning they must not, "participate in partisan

55

attempts to avoid, deny, or subvert the presentation of evidence contrary to their own position." (Id. p. 16.)  Forensic psychologists are required to abide by current scientific standards in their field of expertise, which mandate the use of scientific methods where possible in the diagnosis of intellectual disability.

Rule 702 of the Federal Rules of Evidence clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify.  "If scientific, technical, or other specialized knowledge will assist the trier of fact in issue, "an expert may testify thereto."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-90 (1993).  The adjective "scientific" implies a grounding in the methods and procedures of science.  See id. at 593.  ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.")  "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. Id. at 592–93.

Any review of expert testimony should be considered in light of Rule 702, the APA Code, and the Guidelines.  Failure to adhere to these standards results in the diminished credibility and reliability of an expert opinion.  Because Rodriguez's expert Dr. Weinstein failed to adhere to the accepted methods of testing, his opinion is unreliable and cannot be used to assert that Rodriguez is intellectually disabled.

B. Rodriguez is unable to establish deficits in intellectual functioning.

1. Dr. Weinstein's administration of the WAIS-IV is scientifically invalid.

56

Dr. Weinstein's approach to the task at hand, determining whether Rodriguez is intellectually disabled, is fatally flawed. Dr. Weinstein's analysis permits the emotionally charged issue of the death penalty to shape, mold, and guide his opinion on whether Rodriguez is intellectually disabled, thereby rendering his methods unscientific and unreliable. He fails to comprehend, or if he does he flatly rejects, his obligation to perform an objective determination as to whether or not Rodriguez is intellectually disabled. Dr. Weinstein chooses to abandon scientific objectivity to manufacture an outcome he desires, that Rodriguez is intellectually disabled, but his outcome is wrought from improperly administered IQ tests, dishonest norming of the IQ tests, and unacceptable data.

Dr. Weinstein can simply not step away from his own biases. He testified that:

A: I wouldn't work on a death penalty case with the prosecution because I don't believe that the state should be killing people. I'm sorry about that.
Q: Well, that's fine. Honest answer. So the cases you've worked on have been for the defense then?
A: Yes.
Q: Okay.
A: Well, I've been appointed by the Court in a few cases. But, you know, like, for instance, let's say specifically about mental retardation. If my findings are that the person is not mentally retarded, I wouldn't provide testimony or work for the prosecution in those cases.

(Post-Hearing Br. Ex. B, p.13.)

As an expert witness in Atkins hearings, Dr. Weinstein has a dubious track record, and other courts have discredited or been suspicious of his techniques. The Fifth Circuit was "troubled" with Dr. Weinstein's inability to explain his irregular methodology, including his failure to "report partial conclusions" that contradicted the findings he

submitted to the court.  Maldonado v. Thaler, 625 F.3d 229, 239 (5th Cir. 2010) (internal

citations omitted).  In the Ortiz case, the district court found Dr. Weinstein's expert

testimony "unreliable" and said that he "appears more concerned with legal culpability

than with an objective assessment of intellectual capability."  Ortiz v. United States, 2007

WL 7686126 at *2-7 (W.D. Mo. Dec. 14, 2007).  Another district court stated that Dr.

Weinstein's findings, at best, were "ambiguous" and that it found it could not "credit" his

comprehensive IQ scores.  Pizzuto v. Blades, 2012 WL 73236 at *14 (D. Id. Jan. 10,

2012).  These past rulings only underscore Dr. Weinstein's bias and unreliability.

Dr. Weinstein administered a number tests to Rodriguez, but only one, the WAIS-

IV, is generally accepted as a diagnostic IQ test, and therefore the United States will

focus nearly exclusively on this test.  Mr. Rodriguez obtained the following scores on the

WAIS-IV Dr. Weinstein administered:

| SCALE | STANDARD SCORE | 95% CONFIDENCE INTERVAL |
|---|---|---|
| VERBAL COMPREHENSION | 78 | 73 – 85 |
| PERCEPTUAL REASONING | 82 | 77 – 89 |
| WORKING MEMORY | 68 | 61 – 75 |
| PROCESSING SPEED | 84 | 77 – 94 |
| FULL SCALE IQ SCORE | 74 | 70 – 79 |

Dr. Weinstein explained that an IQ test is appropriately expressed as a range of

numbers with a confidence interval, so even though Rodriguez's standard score is 74, Dr.

Weinstein believes it is more appropriately expressed as range of 70-79 with a 95% confidence interval.  (Hrg. 426-27.)

i.  The Spanish language test

The WAIS-IV IQ test comes with an instruction manual that directs practitioners how to properly administer the test.  There is nothing in the manual that would permit a test administrator to personally translate test questions from one language to another in order for the test taker to understand.  (Hrg. 1152.)  In fact, the American Psychological Association's Specialty Guidelines for Forensic Psychology directs a method that would obviate this ever having to happen in the first place: "Forensic practitioners use assessment methods that are appropriate to an examinee's language preference and competence, unless the use of an alternative language is relevant to the assessment issues."  (Ex. G-581 p. 15.)

Intellectual Quotient tests must be administered in a uniform, reliable manner; if they are not, the results are unreliable and non-diagnostic.  One obviously key requirement of an IQ test is that they be administered in the test-taker's preferred language.  (Ex. G-581 p. 15.)

Here, Dr. Weinstein failed to perform the first and fundamental step of properly administering the WAIS-IV to Rodriguez in his preferred language.  This resulted in a non-uniform, unreliable, and therefore non-diagnostic administration of this exam.  Dr. Weinstein self-translated portions of the test Rodriguez informed him he didn't understand.  He also changed entire questions and words during the administration of the

59

test.  Dr. Weinstein had an obligation to administer the WAIS-IV in English, but he failed

to carry out this important duty.  He knew Rodriguez's preferred language was English:

> Q: But as you indicated, he prefers English?
> A: He prefers English, particularly testing,
> because -- and it's not unusual. If you go to school
> and you're taught in English, you're likely going to
> request being tested in English.
>
> Q: Okay. So let's go back to -- I guess I'm
> wondering what -- since his preferred language is
> English, why did you decide to give him this WAIS-IV
> test in Spanish?
> A: Because he has been given the WAIS-IV in
> English before and because it was one of the tests that
> I was going to use.

 (Post Hearing Br. Ex. B p. 37, 48.)  In fact, Dr. Weinstein supplied the actual reason he

tested Rodriguez in Spanish at the evidentiary hearing:

> A: Because to be blunt I didn't bring the – after I asked him, I didn't have
> the manual in English.  I had it in Spanish.  I brought the test in Spanish. I
> didn't bring it in English.

(Hrg. 679.)  He thwarted his duty to adhere to the ethical guidelines for administering the

WAIS-IV in the appropriate language and simply used an unsuitable test in its place.  He

knew, or if he did not he should have known during the testing that this was inappropriate

to do because Rodriguez was clearly less comfortable with Spanish than English:

> Q: Okay.  So you administered one IQ test in Spanish because Mr.
> Rodriguez, during his early years, spoke Spanish and knows Spanish; is
> that accurate?
> A: Let me state that I attempted to do it in Spanish but he chose to respond
> to many of the questions in English.

Dr. Weinstein's "cure" for administering the test in the wrong language was to swap out questions and words. (Hrg. 1370.) Dr. Seward testified that even if there was an identical, parallel translation from English to Spanish, the ordering of the questions is significant because "[o]n many of the subtests they are ranked from easiest to hardest. They're ranked in order of difficulty." (Hrg. 1369.) The reason for this is because "any items can be discontinued after three wrong items to avoid frustrating the examinee." (Id.) The ordering differences between the Mexican and English WAIS, Dr. Seward surmised, was likely "the different cultures that for whatever reason that rank order would be different." (Id.) Dr. Weinstein's approach, however, took away the necessary uniformity and standardization of the exam. For example, in the Mexican version of the WAIS-IV, there is a question where the correct answer is Emiliano Zapata, a leading figure in the Mexican Revolution that Mexican test-takers may be familiar with. (Hrg. 1370.) Dr. Weinstein did not ask Rodriguez this question; he supplied an Americanized question where Abraham Lincoln would be the correct answer. (Hrg. 1159-60.) This is problematic in and of itself, but even more so because this was "not only changing the test but the order of that question." (Hrg. 1370.)

Notably, Dr. Weinstein conducted other tests, in Rodriguez's preferred language of English, presumably because he had actual copies of the appropriate language, but these tests in no way corroborate Dr. Weinstein's flawed WAIS-IV results. The Test of General Reasoning ("TOGRA") is just that – a general reasoning test – and this exam is not recommended for an IQ test or to test for an intellectual disability. (Hrg. 1149; Ex. G-587.) This exam is recommended for screening purpose and things like academic

61

placement and employee selection, and TOGRA information specifically states, "the TOGRA is not recommended for use in the diagnosis of clinical disorders such as intellectual disability, specific learning disabilities, ore related phenomena; instead, it will have applications in broad, rapid screening." (Ex. G-587 p. 2.)  The CTONI is also not generally used as a diagnostic IQ exam, and is more appropriately given when a test taker is unable to take a traditional ability test.  (Ex. G-586.)  Rodriguez does not fit this category.

>ii.  Dr. Weinstein improperly normed Rodriguez's WAIS-IV test results.

Dr. Weinstein testified that he administered the Mexican version of the WAIS-IV but employed the norms for the version of the WAIS used in the United States. (Hrg. 435.)  As discussed above, it was inappropriate to even administer the WAIS-IV to Rodriguez in Spanish.  However, norming his results to the United States norms was not an appropriate cure and in fact made his test results further unreliable.  Dr. Seward testified that this was not sanctioned in the WAIS testing manual and was not aware of any instance where it was appropriate to use a Mexican version of the WAIS-IV but use the U.S. norms for obtaining the score.  (Hrg. 1169.)

Other courts have rejected Dr. Weinstein's test results where he was found to have improperly administered and normed a test result.  For example, in Rodriguez v. Sec'y, Fla. Dep't of Corr., 818 F. App'x 945, 961 (11th Cir. 2020), the Eleventh Circuit affirmed the circuit court finding that Dr. Weinstein improperly administered a Mexican version (rather than a Cuban version) of the WAIS exam when the defendant should have been given the Cuban version of the test.  Id. at 961.  Dr. Weinstein's results were more

unreliable when he failed to use what other experts believed to be more appropriate and reliable norms. Id. (noting "Dr. Weinstein's method of norming the Mexican WAIS-III to United States IQ levels was likely to underestimate the IQ of a subject without a high school education.")

While a test administrator must always adhere to appropriate test taking procedures and use the correct test and norms when administering a WAIS, there was a particular issue with the WAIS-IV exam that makes Dr. Weinstein's methods even more suspect and problematic. As Dr. Seward explained, obtaining the full scale IQ score on a WAIS exam is actually a three step process. (Hrg. 1372-73.) First, the test administrator tallies and obtains the examinee's raw score. (Hrg. 1372.) Next, this raw score is transformed into a scaled score based upon the test taker's age. (Hrg. 1373.) Finally, the scaled score obtained in the second step is used to produce the full-scale IQ score and the various indices. (Hrg. 1373.)

With the use of a demonstrative, Dr. Seward explained why Dr. Weinstein's methods were unacceptable. (Hrg. 1374, Ex. G-639.) For the third version of the WAIS exam, the WAIS-III, an alternative computation at step two was permitted, thereby allowing a test administrator to transform the raw scores to scaled scores using Mexican Norm tables. (Id.) From this step two, a test administrator could then obtain the full-scaled IQ score using either the Mexican or United States norms. (Id.)

The WAIS-IV exam, however, does not permit the same method. (Id.) The WAIS-IV came out in 2008 and the scoring method set forth in figure 2 of Exhibit G-639 that Dr. Seward explained is not mentioned as a score computation method for the

63

WAIS-IV. (Id.) However, Dr. Weinstein inappropriately used the WAIS-III scoring method for his computation of Rodriguez's WAIS-IV score. As Dr. Seward explained, the reason the WAIS-III process is not allowed for the WAIS-IV exam is that "it totally separates it from the normative sample." (Id. at 1379.) Dr. Weinstein's norming of Rodriguez's raw score at step two with United States norms is not allowed for the WAIS-IV, even though this method was permitted for the WAIS-III. (Id.)

Dr. Seward calculated Rodriguez's score using a method that is permitted for the WAIS-IV Mexican version. This process utilized Mexican norms at step two (see Ex. G-639), and Dr. Seward obtained a score of 89 from Dr. Weinstein's raw score for Rodriguez. (Id. at 1380.) The full-scale score resulted again in 89. (Id.)

iii.   Dr. Weinstein's testing errors and irregularities.

Setting aside the fact that Dr. Weinstein improperly gave Rodriguez a Spanish language WAIS-IV and improperly normed Rodriguez's test results, Dr. Weinstein's administration of the test was also flawed and unreliable.

First, Dr. Weinstein failed to follow the WAIS-IV protocols in administering the test, such as recording the completion times for each item. (Hrg. 1153.) Second, Dr. Weinstein failed to "query" Rodriguez for ambiguous responses or responses that did not earn him full credit. (Hrg. 1155.) This is significant because not only did it rob Rodriguez of a scoring opportunity in the present question, the test is designed to become gradually more difficult and test administrators are instructed to terminate the test after three wrong answer. (Hrg. 1156-57.) This prevents test takers from becoming frustrated, but in an instance like this, it could also deprive a test taker of scoring opportunities.

Rodriguez's counsel's questioning of Dr. Seward further demonstrates the problem with the question order for several of the questions on the WAIS-IV:

> Q:    So all the items are the same except for numbers 9 through 13 have the order shuffled a little bit between the Spanish version and the English version, correct?
>
> A:    Correct.
>
> Q:    And No. 17 and 18 are just inverted, right?
>
> A:    Correct.
>
> Q:    The items themselves though are all the same.
>
> A:    But the item order is meaningful.

(Hrg. 1198.)  Here, what the testimony actually demonstrates is that for at least <u>seven</u> questions on the exam, the order is significantly and substantially different between the two tests, and simply translating the questions to the test-taker's preferred language does not cure the irregularities.  (<u>See id.</u>)  In an exam where just a few correct answers can make a consequential difference on a full-scale score report, this is a far-reaching error in test administration that produced an unreliable score result for Rodriguez.

Dr. Weinstein also gave Rodriguez zero points in instances where Dr. Seward testified he would have awarded Rodriguez a full credit two point score.  It appears there were also instances where Rodriguez did supply the correct answer, but received no credit.  (Hrg. 1161-62.)  Dr. Seward testified that he believed answers such as "equator" and "Olympics," were correct responses to test questions but Rodriguez received no credit.  (<u>Id.</u>)  There were also instances in Dr. Weinstein's raw data where Rodriguez's responses should have been written down, per the testing manual, verbatim, but Dr. Weinstein wrote nothing down.  (Hrg. 1157-58.)

Each of these errors alone would render Dr. Weinstein's test results questionable, but taken together, the aggregate of the errors is fatal to any reliability Dr. Weinstein's reported test scores or reports would have.

### iv.   The Flynn Effect

Predictably, Dr. Weinstein applied the "Flynn Effect" to adjust Rodriguez's IQ scores.  (Hrg. 429-32.)  The Flynn effect refers to the assertion that the scores of IQ test-takers improve gradually over time and, as such, you must apply a downward-adjustment to the IQ score to accurately reflect the test-taker's true abilities.  This practice is not universally accepted and is in fact inconsistent with established practice guidelines the psychology profession follows.[5]  See Hagan, Drogin and Guilmette, IQ Scores Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases, Journal of Psychoeducational Assessment, Vol. 28, No. 5, 474-476 (2010) (Ex. G-640); see also Hagan, Drogin, and Guilmette, Adjusting IQ Scores for the Flynn Effect:  Consistent With the Standard of Practice?, Journal of Professional Psychology:  Research and Practice, vol. 39, No. 6, 619-625 (2008) (Ex. G-592).

Significantly, the Flynn Effect is only applied in the context of an Atkins hearing by psychologists who testify on behalf of capital defendants.  This is perhaps why "[t]he Flynn Effect remains highly controversial and many courts have declined to accept its

---

[5] Rodriguez submits that "Dr. Seward acknowledged that the AAIDD states an IQ score adjustment of three points per decade of the age of the test's norms" (DKT 1137, p. 62), but a lawyer simply reading the User Guide's passage to the witness and asking the witness if she read it correctly can hardly be grounds for asserting Dr. Seward endorses the practice of Flynn Effect adjustments.  (See Hrg. 1286-87.)

application." United States v. Jimenez-Bencevi, 934 F. Supp. 2d 360, 369 (D.P.R. 2013). The Jimenez-Bencevi district court further found that "the Flynn Effect is sufficiently controversial as to be unreliable. Under such circumstances, the Flynn Effect has no relevance to our inquiry and we agree with the government's experts that it should not apply here." Id. (citing Hooks v. Workman, 689 F.3d 1148, 1170 (10th Cir. 2012) (concluding that neither Atkins nor any other U.S. Supreme Court decision mandates the application of the controversial Flynn Effect).

Here, Dr. Weinstein applied the Flynn Effect to his WAIS-IV score for Rodriguez, and calculated his score as a 70, with a working range of 65-75. (Hrg. 433.) For the reasons articulated in the Hagan, Drogin, and Guilmette article, in addition to other courts refusing to adopt a Flynn-adjusted score, the United States respectfully urges this Court to disregard Dr. Weinstein's attempt to further non-scientifically lower Rodriguez's IQ score. The more appropriate reading of Dr. Weinstein's scores is to consider Dr. Seward's and even Dr. Froming's adjusted WAIS-III score, interpreting the scores as a range, and using these scores as a more true, scientific, and reliable interpretation of Rodriguez's actual IQ.

v.    Controlling for the outlier nature of Dr. Weinstein's score.

The United States does not request that the Court reject Dr. Weinstein's full scale IQ score of 74 and make a determination based solely on the IQ scores that Rodriguez does not meet the definition of intellectual disability based solely on his failure to prove sub-average intellectual functioning under the first prong in the DSM-5. Hall cautions that courts should "understand that an IQ test score represents a range rather than a fixed

67

number" and "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Hall, 572 U.S. at 711, 723.  Taking the standard error of measurement into account, ranges in the 70 to 75 level still require consideration of adaptive functioning, and even a defendant with a 75 IQ could prove intellectual disability by showing substantial adaptive deficits.  Hall, 572 U.S. at 722 (quoting Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002).  Accordingly, the United States requests that the Court find that, given the full range of Rodriguez's IQ tests scores and the problems with Dr. Weinstein's IQ's testing, Rodriguez has failed to meet his burden under prong A of establishing sufficient deficits "in intellectual functions" and the United States requests that the Court consider, and reject on the merits, Rodriguez's adaptive deficits evidence.

Even taking in account Dr. Weinstein's IQ score for Rodriguez of 74, considering the standard error of measurement, the score reports as a range from between 69 and 79 (Hrg. 427-28); see also DSM-5, pg. 37 (Prong A diagnostic features "On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 ($70 \pm 5$)").  Even considering the standard error of measurement, Dr. Weinstein's low-range adjusted 69 barely falls within the range identified by the DSM-5 for Prong A diagnostic criteria for intellectual disability.

Courts have disregarded, or held invalid, outlier IQ scores in making a determination of whether a defendant meets the significant sub-average intellectual functioning prong for intellectual disability under the DSM.  This Court can discount, or

reject, the testimony of Dr. Weinstein as it relates to his IQ testing of Rodriguez.  See

Clemons v. Ala. DOC, 967 F.3d 1231. 1246-47 (11th Cir. 2020) (court properly

discounted IQ scores in assessing intellectual functioning with range of IQ scores 51, 58

adjusted to 66, 67 adjusted to 60, 73, 77, 84); Wright v. Sec'y, Dep't of Corr., No. 8:17-

CV-974-T-02TGW, 2020 WL 4816333, at *12 (M.D. Fla. Aug. 19, 2020) ("Petitioner

has taken a total of nine IQ tests, all of them reported full-scale scores of 75 or above. His

highest was a full-scale score of 82.")  Considering the standard error of measurement on

the WAIS tests (even without discounting or rejecting Dr. Weinstein's testing),

Rodriguez's IQ range is from 69 to 91.

> vi.  Every properly administered IQ test resulted in WAIS scores in the 80s.

Prior to trial, Dr. Karen Froming, a neuropsychologist, administered a complete

neuropsychological test battery on Rodriguez.  Her testing included specialized tests of

visual system functioning, malingering tasks, and the then most up-to-date WAIS test, the

WAIS-III. (DKT 775-6, p. 1.)  From the results of the WAIS-III, Dr. Froming reported

Rodriguez obtained a verbal comprehension score of 86, a perceptual organization score

of 89, and a full-scale IQ score of 87.  (Id.)  In her report, Dr. Froming states "Mr.

Rodriguez intellectual level is in the average to low average range. His only deficient

performance is on the working memory subscale of the test."  (Id.)  At trial, Dr. Froming

testified consistent with her findings and report with regard to her testing of Rodriguez:

> Q. Now this is a guy with an 87 IQ, right --
> A. Correct.
> \*\*\*
> Q. And what did you find in relation to Mr. Rodriguez's IQ?

> A. His IQ scores – first of all, I should say again average is 100. Any departure from 100 by 15 points is above or below average, and then you can be 30 points above or below and then you get into superior performance or mentally retarded performance.
> He is in the low-average range on verbal IQ with a score of 86. He has a performance IQ, which differs from verbal IQ in terms of it mostly being – dealing with shapes and perception of shapes and motor ability, and he has a score of 89, again in the average range. There are four neuropsychological variables that are also part of the IQ test and these variables are verbal comprehension so generally speaking more focused on one's verbal skills and abilities. He has a 96, which is pretty spot on average.

(Tr., vol. 37, 7866, 7793-94.)  Far from testifying that Rodriguez suffered from an intellectual disability, Dr. Froming, his own expert, opined that his test results did not yield such a diagnosis and indeed reported that he was "low average."  (See id.)

In 2011, Dr. Froming amended her 2006 score to correct what she termed a scoring error, and reported her new score as a full-scale IQ score of 84, expressed as a score range of 80-88 (DKT 763-5 p. 6.)  As will be discussed below, Dr. Froming's full-scale IQ score, even when adjusted to correct for her 2006 scoring errors, is far closer to Dr. Seward's results and a full ten points out of range with Dr. Weinstein's results.  This only underscores the outlier nature of Dr. Weinstein's testing and further confirms its unreliability.

The most recent properly administered IQ test Rodriguez has undergone was in 2013, conducted by Dr. James Seward, Ph.D., ABPP.  Dr. Seward is a Neuropsychologist and Forensic Psychologist.  (Ex. G-614.)  He is a Neuropsychologist at Banner Alzheimer's Institute in Phoenix, Arizona and an Adjunct Professor at A.T. Still University in Mesa, Arizona.  (Id.)  He is also a member of The Forensic Panel, New

York, New York. He received his Masters in Forensic Psychology at John Jay College of Criminal Justice in New York.  He received his Ph.D. in Counseling Psychology at Temple University in Philadelphia, Pennsylvania.  (Id.)  He was a Postdoctoral Fellow in Neuropsychology at Bryn Mawr Rehabilitation Hospital in Malvern, Pennsylvania and also a Fellow in Forensic Psychiatry at the University of Pennsylvania, Philadelphia, Pennsylvania.  (Id.)  He is a Diplomate and Board Certified in Clinical Neuropsychology and a Fellow of the National Academy of Neuropsychology.  (Id.)

Dr. Seward interviewed, examined, and performed a number of tests on Rodriguez on July 10, 11, and 12, 2013.  The interviews were audio and video recorded. As noted above, Dr. Seward spent three days with Rodriguez in Indiana, performing a battery of tests on him.  Dr. Seward extensively reviewed documents prior to and in the course of rendering his report, and made several observations of Rodriguez.

Dr. Seward, as did Dr. Froming, administered "a variety of psychological and neuropsychological tests" to Rodriguez. Dr. Seward explained that "[t]hese tests were chosen in order to provide a comprehensive assessment of his neuropsychological status, replicate the findings of previous evaluators, and assess his level of motivation and involvement in this evaluation." (Ex. G-615 p. 34.)  Dr. Seward administered the WAIS-IV to Rodriguez, and the following chart represents his scores on this IQ exam:

| SCALE | STANDARD SCORE | 95% CONFIDENCE INTERVAL |
|---|---|---|
| VERBAL COMPREHENSION | 95 | 90-101 |
| PERCEPTUAL REASONING | 88 | 82-95 |
| WORKING MEMORY | 80 | 74-88 |
| PROCESSING SPEED | 89 | 82-98 |
| FULL SCALE IQ SCORE | 86 | 82-90 |

Dr. Seward noted prior testing data for Rodriguez and explained while he was attending grade school, Rodriguez's IQ was assessed with the Kuhlmann-Anderson Intelligence Test, a group administered tests, and Rodriguez received the following scores:

| Grade | Score |
|---|---|
| 1 | 77 |
| 2 | 80 |
| 3 | 79 |
| 5 | 74 |

Dr. Seward was careful to note that the Kuhlmann-Anderson is not to be used as an IQ measurement device because it is a group-administered device. (Hrg. 1063-64.) The reason is not surprising; group tests bring with them a host of distractions, such noise from other students, distractions, and an inability to concentrate that a one-on-one test could more easily control for. (Hrg. 1063-64.)

Therefore, Dr. Seward noted that the most reliable IQ tests administered to Rodriguez as an adult, namely his and Dr. Froming's, produced results with a standard error of measurement of 80-90. The United States urges the Court to use this range as a

starting point for its inquiry into whether Rodriguez is intellectually disabled or not.  Of course, Atkins jurisprudence would encourage a review into Rodriguez's adaptive functioning, discussed infra, but such a review should be viewed through a lens that Rodriguez does not meet the first prong of any intellectual disability assessment because no reliably administered IQ test resulted in a score that demonstrates severe intellectual functioning deficits.

C.  Rodriguez has no evidence of adaptive deficits.

Adaptive functioning is the ability to function independently in life.  Adaptive behavior scales or assessment instruments look at an individual's abilities in various domains of life such as conceptual skills, social skills, and practical skills.  The AAIDD defines deficits in adaptive skill areas as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and social responsibility that are expected for his age level and cultural group." Maldonado v. Thaler, 625 F.3d 229, 241 (5th Cir.2010) (emphasis added).

The AAIDD and APA definitions for intellectual disability both categorize adaptive limitations into subcategories of deficiencies.  The AAIDD evaluates "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills."  (Ex. D-47 p.1.)  The APA in the DSM-5's definitions capture the same range of functional aptitude for a diagnosis of intellectual disability.  (Ex. D-62 p. 33.)  Because a finding of intellectual disability requires significant limitations in intellectual and adaptive functioning, it is necessary to refer to the DSM-5's chart for its explanations of what severe adaptive functioning deficits actually look like:

| Conceptual domain | Social domain | Practical domain |
|---|---|---|
| Attainment of conceptual skills is limited.  The individual generally has little understanding of written language or concepts involving quantity, time, and money.  Caretakers provide extensive support for problem solving throughout life. | Spoken language is quite limited in terms of vocabulary and grammar.  Speech may be single words or phrases and may be supplemented through augmentative means.  Language is used for social communication more than for explication.  Individuals understand simple and gestural communication.  Relationships with family members and familiar others are a source of pleasure and help. | The individual requires support for all activities of daily living, including meals, dressing, bathing, and elimination.  The individual cannot make responsible decisions regarding well-being of self or others.  In adulthood, participation in tasks at home, recreation, and work requires ongoing support and assistance.  Skill acquisition in all domains involves long-term teaching and ongoing support.  Maladaptive behavior, including self-injury, is present in a significant minority. |

(Ex. D-62 p. 36 (emphasis added).)  Rodriguez is nowhere near demonstrating severe

adaptive deficits in anything of the relevant domains.  Even the DSM-5's description of

moderate intellectual disability does not fit Rodriguez's functioning.  There is no

evidence that demonstrates Rodriguez would need "ongoing assistance on a daily basis . .

. to complete conceptual tasks of day-to-day life, and others may take over these

responsibilities fully for the individual."  (Id. p. 34.)  Nor is there evidence to suggest

Rodriguez has "marked differences between peers in social and communicative

behavior."  (Id.)  Finally, Rodriguez does not show practical deficits such that he required

"an extended period of teaching" for acts of daily living, nor is there any evidence that

jobs he held would require "considerable support from co-workers, supervisors, and

others" in order to "manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management." (Id.)

To the contrary, during the times in which Rodriguez was living in the community, there is no evidence that he was in need of any particular support and his living situation was dictated by legal considerations rather than any adaptive functioning deficits. Prior to the instant offense, Rodriguez and others describe him as not only managing his own affairs, but also providing support for his mother, taking responsibility for his young nieces and nephews, maintaining close, mutually beneficial relationships with his family members, making plans and proactively following up on them, and seeking and maintaining employment.

Drs. Seward, Welner, and Weinstein evaluated Rodriguez's adaptive functioning, albeit with different methods. Drs. Seward and Welner viewed Rodriguez through a clinical lens, and observed him during their respective interviews, in addition to a comprehensive review of Rodriguez's life prior to his incarceration at Terre Haute. Both Drs. Seward and Welner recognized the limitations of using an ABAS-3 test because these tests were not designed to be used with a retrospective look back, and in fact must only be administered to individuals who have had frequent, recent and ongoing contact with the subject. (Ex. 588.) Indeed, there are tremendous problems assessing adaptive functioning in capital cases with Dr. Weinstein's methods because a (likely biased) person is being asked to evaluate the subject's conduct based on what they could do decades before.

Dr. Weinstein's retrospective developmental years adaptive behavior analysis was flawed and inappropriate.  The retrospective use of the Adaptive Behavior Assessment System in capital litigation is controversial and should be discounted.  See United States v. Candelario-Santana, 916 F. Supp. 2d 191 (D. P.R. 2013).  "Caution attends undue reliance on those backward-glancing assessments. The retrospective review assumes that those reporting on an inmate's past adaptive abilities can provide competent, honest, and objective observations of his abilities."  United States v. Bourgeois, No. C.A. C-07-223, 2011 WL 1930684, at *34 (S.D. Tex. May 19, 2011).  Thus, the AAIDD 11th Edition warns to use respondents who are "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times."  Id.  Also, the responder should be one with sufficient age, maturity, and understanding during the time period they observed the inmate to provide a reliable assessment of their behavior.  To that end, the AAIDD 11th instructs "clinicians to assess the reliability of any respondent providing adaptive behavior information."  Id.

Dr. Weinstein relied upon two family members (Rodriguez's sisters) to retrospectively test Rodriguez's claimed adaptive behavior deficits.   (Post-Hearing Br. Exs. C-D.)  Dr. Weinstein had Rosa Rodriguez complete the ABAS-3 form, and was asked to assess her brother, who she had barely any regular contact with in recent years, as an adult.  (Id. Ex. C.)  The ABAS-3 guides specifically directs that "all respondents should have frequent, recent, prolonged contact with the individual (e.g., most days, over the last few months, for several hours each day).  (Ex. G-588.)  The administration and

76

scoring guide further directs that, "[these contacts must have offered the respondent an opportunity to observe the various adaptive skills areas measured by the ABAS-3." (Id.)

Dr. Weinstein also had Sylvia D'Angelo complete an assessment, and she was asked to recall events from 1961 when she was only ten years old. (Post-Hrg. Br. Ex. D; D-44, p. 2.) Significantly, Dr. Weinstein characterizes Ms. D'Angelo as a caretaker despite the fact that she was a child. This retrospective interview took place approximately sixty years after the events transpired. Moreover, Dr. Weinstein's administration of the ABAS-3 violated the guidelines for administering the test. The test manual itself does not provide for children to be used as "caregiver" responders. (Ex. G-588).

According to Sylvia's 57-year-old memory, Rodriguez was unable to name 20 familiar objects, could not use sentences with a noun and a verb, could not speak clearly, and never or almost never said "hello" or "good-bye" to others. (Post-Hrg. Br. Ex. D.) Rodriguez was unable to use anything in the community, including an ATM which likely did not exist in Crookston in 1961. (Id.) Sylvia also claimed Rodriguez had no friends, was unable to show care towards others, nor could he listen to friends or family members discuss problems. (Id.) This is contrary to well-established record evidence and only underscores the problems with using the ABAS-3 retrospectively.

Aside from the likely memory erosion these family members no doubt faced, there is an equally troubling unreliability of their responses due to bias. Experts have written articles noting the problems with using family member responses in capital cases. Dr. Marc Tasse noted:

77

In the capital cases there is a particular worry regarding the bias introduced by family members in reporting on the adaptive behavior of their loved ones.  This might be interpreted as a form of malingering by proxy, where a parent might want to under-report adaptive skills to intentionally lower their loved one's adaptive behavior performance, in order to increase the likelihood of a diagnosis of [intellectual disability] and a result in a reprieved of the death penalty.

(Hrg. 668-69, Ex. G-590.)  Dr. Weinstein agreed with this concern.  (See id.)

Both Rosa and Silvia's ABAS-3 forms stand at stark odds with the record in this case, which clearly demonstrates that Rodriguez did not suffer any adaptive deficits during his formative years.  Dr. Weinstein's assessment of Rodriguez's adaptive behaviors, using the ABAS-3, is not persuasive.

1.  Rodriguez has no conceptual deficits.

Conceptual deficits refer to such skills like receptive and expressive language abilities, reading and writing, money concepts, and self-direction, the ability to plan, and maintaining employment once it is secured.

Because conceptual deficits capture reading, writing, and number abilities, test scores on the Wide Range Achievement Test ("WRAT") can be informative to detect deficits.  Dr. Seward administered the 4th edition of the WRAT to Rodriguez and reported the following scores:

| Subtest | Standard Score (95% CI) | Grade Equivalent |
|---|---|---|
| Word Reading | 78 (71-87) | 6.0 |
| Sentence Comprehension | 90 (83-98) | 10.9 |
| Spelling | 69 (62-79) | 3.5 |
| Math Computation | 93 (84-103 | 6.9 |
| Reading Composite | 82 (76-88) | N/A |

(Ex. G-615 p. 36.)  These scores reflect an overall academic functioning in the low-average range to average range, with "a pronounced weakness in spelling."  (Id.)  Dr. Seward reported that these WRAT scores are similar to the WRAT scores Dr. Froming reported in pre-trial administration of this exam.  (Id.)  They do not indicated severe conceptual deficits.

Dr. Welner also testified that this domain also would include things like academic achievement.  (See Hrg. 1509.)  Rodriguez's academic history is marked by underperformance and poor grades, rather than showing deficits, Dr. Welner testified that this performance only reflected Rodriguez's chaotic upbringing and personal choices. (Id. 1510.)  For example, many of Rodriguez's grade school years were marked by annual moves between Texas and Minnesota, and he grew up in an environment where his father was illiterate and the family did not prioritize schooling.  (Id. 1512-13)  Lack of interest, rather than lack of ability, is reflected in Rodriguez's academic record.  (Id.)  Dr. Welner opined that early onset drug and alcohol use also contributed to Rodriguez's lack of interest, which in turn may have caused him to quit school.  (Id.)  Record evidence suggests that Rodriguez eventually obtained a GED, which should further preclude a finding that he lacks academic functioning.  See United States v. Jones, No. 6:10-CR-03090-DGK, 2017 WL 4231511, at *10 (W.D. Mo. Sept. 22, 2017) (noting "[c]ourts have uniformly declined to find a defendant who received a GED to be intellectually disabled.")

Dr. Welner testified to Rodriguez's many telephone conversations with family members where he was able to discuss a range of topics and verbally interact with family, reflecting receptive and expressive language and communication abilities.  (Hrg. 1443.)

Dr. Welner's report elaborated upon Rodriguez's adaptive functioning in the conceptual domain:

> Mr. Rodriguez's exchanges in several recorded telephone calls to relatives in late 2005 and early 2006 displayed his mature, sage reasoning. He offered advice on how his mother could rid the home of squirrels that attacked bird feeders, and he counseled another relative that she could file a joint tax return to the IRS even though she was cohabitating but not married. He directed his mother in January to call the insurance company to pay for home improvements and to remedy a gas bill that was unacceptably high. The examinee also advised his mother on another occasion that the family should sell a farm before losing access to water on the property, which would diminish its value.

(Ex. G-643 p. 97.)  As these examples over decades demonstrate, Rodriguez has the ability to reason capably and instinctively, and without need for assistance.

Rodriguez also demonstrated an ability to plan, without the need for any support, much less ongoing support, both prior to his Minnesota incarceration and following his release.  He immediately began developing employment options for himself after dropping out of school at age 18 by securing employment at the school from which he dropped out. Establishing a stream of legal income—even, as he notes, he was able to meet his otherwise simple financial needs—reflects a maturity in his planning from the period of his youth.

> Anticipating his release from custody in 2003, the defendant sought residency in New York, Georgia, or Mexico in the hope that he could find work and support himself. He aimed to be away from his family so that his notoriety would not create problems for them. He prioritized his

employment search to engage areas that held promise for a career, rather than mere employment. For example, the examinee sought out those who would welcome his experience in the print shop that he had long worked at in prison, such as the local newspaper.

(Ex. G-643 p. 97.)

> Mr. Rodriguez, preparing for his early 2003 release, sought renewal of his driver's license; it was he who informed his caseworker that all he needed was to pass an eye exam.
> When he returned to his mothers' home and acted as a caretaker to her, he started and planted a vegetable garden and flower beds and cared for the trees, according to his mother Dolores. They even reportedly baked together, and according to his mother, canned vegetables and fruits. His sister Ileanna testified about his gardening and homemaking as well.

(Ex. G-643 p. 107.)  These exemplars establish that Rodriguez has the ability to develop plans to meet objectives.

Rodriguez's own experts testified to his reading abilities, and his long interest in reading, another component of conceptual functioning.  Dr. Silvia stated, "[h]e enjoyed books that have to do with war, with history.  He also mentioned that he – that there were books that come in a series.  Sometimes – and, you know, he definitely said that he enjoyed following one book after another and he mentioned that."  (Hrg. 937.)  This testimony is consistent with other record evidence demonstrating that Rodriguez enjoys and reads many books, and further consistent with comprehension being reported as his highest WRAT subtest score. (Ex. G-615 p. 36.)

2.  Rodriguez has no evidence of social deficits.

Social deficits refer to skills such as interpersonal, social responsibility, self-esteem, gullibility, naiveté, social problem solving, the ability to follow rules and obey laws, and the ability to avoid being victimized.

The record is rife with examples of Rodriguez's robust, age-appropriate, and long-lasting circle of friendships.  Rodriguez had many friends throughout his early teenage years, and even when he joined in some of the maladaptive behaviors such as drug and alcohol use, he was not so naïve or gullible as to join in some of the other reckless behavior his peers engaged in, such as burglarizing homes, particularly when it would be more risky and imprudent to do so.

Rodriguez developed friendships in his life after the Minnesota State Hospital and before the instant offense.  A neighbor, Clifford Hegg, was a source of friendship with him that he spoke with frequently about a variety of topics, and naturally, as friends would.  (Hr. 304; Ex. G-559).  Rodriguez also had age-appropriate girlfriends prior to his incarceration.  His girlfriends spoke of their relationships, which were normal and unremarkable.

Both Drs. Welner and Seward noted how Rodriguez had the ability to hold conversations with them on a number of different topics, even though he knew why they were there and what the purpose of their visits were.  Rodriguez also demonstrated a keen self-awareness that would require functioning social adaptation skills:  Drs. Seward and Welner reported that their conversations with him showed social reasoning skills through Rodriguez's life, flexible thinking and acting, the ability to learn from experiences, and, according to Dr. Welner, the absence of any gullibility or naïvete,

82

3.  Rodriguez has no evidence of practical deficits

Practical skills are activities of daily living such as personal care, occupational skills, healthcare, travel and transportation, following schedules and routines, safety, the use of money, and the use of the telephone.  The record has extensive examples establishing Rodriguez does not demonstrate any practical deficits.  During his times outside of incarceration, Rodriguez demonstrates such skills as map reading, planning, goal reaching (Hrg. 1133)

When Rodriguez was not incarcerated, there is no evidence of any inability to attend to his own personal care.  Ms. Christianson's pretrial reports also extracted information regarding Rodriguez's abilities to cook, prepare food and coffee, and tend to his own and others' needs.  (Ex. G-557 p. 2.)

Not only did Rodriguez take care of himself when he was not incarcerated, he took on the role as caretaker for his mother.  At trial, Mr. Clifford Hegg, a neighbor of Rodriguez's mother, testified that when Rodriguez came home, he managed all of the work Mr. Hegg had been doing for Delores:  household chores, taking out the garbage, getting her around town, shopping for her, and taking care of the yard. (Hrg. 1138, Ex. G-635)

There is voluminous testimony of Rodriguez's persistent desire to keep himself and his living areas tidy and clean.  Indeed, even as a small child Rodriguez kept himself clean in a way that belied his age; he would care for his shoes and clothing in a way most young children simply did not.  Pictures of Rodriguez's living space prior to his arrest for

the kidnap and murder of Ms. Sjodin further demonstrate that he had no practical adaptative deficits and did not need any supports in the aspects of daily living.

4.      Post- Moore, courts have relied on or even gave weight to adaptive functioning in an institutional setting

Rodriguez insists that this Court disregard all evidence of his adaptive functioning in an institutional setting, but this is inconsistent with cases that evaluate adaptive function after Moore I and Moore II.  Courts have considered prison adjustment, post Moore, in analyzing adaptive behavior deficits for determinations of intellectual disability claims under Atkins.   The United States seeks, not to overemphasize, but to identify well-documented adaptive behavior adjustments and conduct throughout the course of Rodriguez's incarceration for the simple fact that he has spent the vast majority of his life behind bars.  To the extent the Supreme Court cautions against relying on behavior while in prison and cites the DSM-5, Moore I, 137 S. Ct. at 1050, the DSM-5 does not prohibit reliance on behavior in a controlled setting, like prison.  (See Ex. D-62 p. 38 (emphasis added.))  Although the AAIDD counsels against the consideration of behavior while in prison, the DSM-5 recommends "if possible" a court should consider "corroborative information reflecting functioning outside of those settings."  (Id.); State ex rel. Montgomery v. Kemp in & for Cty. of Maricopa, 249 Ariz. 320, 469 P.3d 457, 463, n.3 (2020) (noting "[t]o the extent the Supreme Court cautions against relying on behavior while in prison and cites the DSM-5, Moore I, 137 S. Ct. at 1050, we do not read the DSM-5 as prohibiting reliance on behavior in a controlled setting, like prison."); Wright v. Sec'y, Dep't of Corr., No. 8:17-CV-974-T-02TGW, 2020 WL 4816333, at *12

(M.D. Fla. Aug. 19, 2020) (finding state court reasonably held petitioner was not intellectually disabled and noting "[f]amily relatives testified that Petitioner reads the Bible often in prison, writes letters and cards, and asked for a college-level dictionary.")

It is prudent here, where Rodriguez has spent such substantial amounts of his adult life incarcerated, to at least consider as corroborative his adaptive functioning in these settings. (See Hr. Ex. P-62 p. 38.) Thus, the United States respectfully requests that this Court consider adaptive functioning abilities Rodriguez demonstrated in each of the relevant domains. First, the Court ought to consider Rodriguez's academic abilities and GED achievement while he was in the Minnesota Security Hospital. (Hrg. 116.) Second, Rodriguez's extensive communications, both with family while he was incarcerated, and with Drs. Seward and Welner when he spent three days with him amply demonstrate an individual who can discuss and respond to many different concrete and conceptual topics. Finally, Rodriguez has consistently shown – throughout his entire life – that he can ably attend to the practical needs of daily living.

Courts have uniformly accepted this tripartite formulation for deciding whether an inmate qualifies for Atkins protection. Yet courts have also struggled to guarantee that convicted capital murderers who claim to be intellectually disabled are evaluated in a non-arbitrary manner. An examination for intellectual disability, and particularly the adaptive-skills component of that inquiry, involves the subjective evaluation of skills, aptitudes, and life experiences. Transposing the psychological community's understanding of intellectual disability unto the legal context amplifies the subjectivity of this analysis. See Bourgeois, No. C-02-CR-216, 2011 WL 1930684, at *23-24.

Here, as in most Atkins cases, experts have examined Rodriguez and his life and reached drastically different professional opinions about his intellectual functioning. See Wiley v. Epps, 625 F.3d 199, 215 (5th Cir. 2010) (noting that most Atkins cases involve "essentially a battle of the experts, who gave competing opinions as to [an inmate's] IQ and intellectual functioning.") As was discussed above, Rodriguez's expert concludes that he is intellectually disabled. The law, however, has not completely turned the question of eligibility for execution over to the psychological community. See Clark v. Quarterman, 457 F.3d 444, 445 (5th Cir. 2006) (recognizing that the Supreme Court in Atkins did not hold that courts "must track the approach of the [AAIDD] or the APA exactly"). The law observes that "[p]sychiatry is not ... an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior, [and] on cure and treatment[.]" Ake v. Oklahoma, 470 U.S. 68, 81 (1985); see also Jones v. United States, 463 U.S. 354, 365 (1983) ("The only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment."); Bourgeois, No. C-02-CR-216, 2011 WL 1930684, at *23-24. The Atkins decision did not delegate to psychologists the determination of whether an inmate should not face execution, but left the contours of the constitutional protection to the courts. Thus, psychology informs, but does not determinatively decide, whether an inmate is exempt from execution. See Hall v. Quarterman, 534 F.3d 365,395 (5th Cir. 2008) (observing that federal courts cannot "commit the ultimate decision of mental retardation to the experts" alone).

Other courts have declined "to follow rigidly the AAIDD User's Guide's admonition that "[t]he diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.'" United States v. Montgomery, No. 2:11-CR-20044-JPM-1, 2014 WL 1516147, at *50 (W.D. Tenn. Jan. 28, 2014). In Montgomery, the district court did rely upon Dr. Welner's extensive evidence, noting:

> [P]ost-incarceration adaptive functioning must be assessed in light of its potentially limited probative value, but the Court will not completely disregard Defendant's criminal and post-incarceration behavior that may lend support one way or another to Defendant's adaptive functioning profile. Especially where standardized adaptive behavior scales cannot be employed (see infra Part IV.B .2), the Court is hesitant to disregard potentially relevant information completely.

Id.

D. Rodriguez cannot establish an intellectual disability, much less one that originated before he was 18

The AAIDD manual defines intellectual disability as "characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before 18." AAIDD-11 at 5 (emphasis added). The AAIDD-11 explains that, "[n]eurologically, the primary time of brain development and change is the prenatal, infancy, and childhood years." Id. at 28. Thus, although age 18 does not necessarily mark the end of all neurological development, id. at 93, "from a neurological perspective, 18 is generous for manifestation." Id. at 28. After giving the matter considered attention, the authors of the

AAIDD-11 adhered to their position that "18 is still the best upper limit." Id. at 28

(providing reasons and rejecting proposal to raise age of onset to 21).

The APA's standards are in accord.  Until 2013, the DSM-IV-TR - cited in Atkins

- expressly provided that "[t]he onset is before age 18 years." DSM-4 at 49. In its latest

DSM-5 manual, the APA reworded this standard to require "[o]nset of intellectual and

adaptive deficits during the developmental period." DSM-5 at 33.  That rewording has

not materially altered the age-of-onset standard, however, as it still requires the

intellectual and adaptive deficits to be "present during childhood or adolescence."  DSM-

5 at 38.  Adolescence, in its accepted definition, does not extend beyond the teenage

years.  See Webster's Third International Dictionary 29 (2002) ("adolescence": "1: the

state or process of growing up; the period of life from puberty to maturity terminating

legally at the age of majority").

The legislative history of the FDPA's intellectual disability provision,

18 U.S.C. § 3596(c), confirms that Congress intended to set the age of onset at 18. In

enacting § 3596(c), Congress borrowed the language it had enacted six years earlier in

the capital-sentencing provisions of the Anti-Drug Abuse Act (ADAA): "A sentence of

death shall not be carried out upon a person who is mentally retarded."  See Pub. L. 100-

690, § 7001(a)(2), 102 Stat 4181, 4390 (codified at 21 U.S.C. 848(l) (repealed 2006)).

That language was proposed in an amendment introduced by Rep. Levin, which was

adopted without modification.  See 134 Cong. Rec. 22993 (Sept. 8, 1988).  In proposing

the amendment, Rep. Levin explained that "[t]here is a well-established definition of

mental retardation." Ibid.  Rep. Levin then identified the AAIDD (then the AAMR) as the source of the operative definition and read it into the record:

> The definition of "mental retardation" promulgated by the American Association on Mental Retardation [now, American Association on Intellectual and Developmental Disabilities (AAIDD)] and universally accepted in the courts states as follows: * * * a person shall be considered mentally retarded when they have "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period."  That is in the early period of their lives.

At the time, in turn, the association's manual expressly defined "developmental period" as "the period of time between conception and the 18th birthday."  AAMD, Classification in Mental Retardation 1 (Grossman ed. 1983) (AAMD-1983).  It is therefore clear that, in the ADAA (and, by extension, in the FDPA), Congress intended to link the phrase "mentally retarded" to the AAIDD definition, which, in turn, has always required onset of the intellectual and adaptive deficits before age 18.

The extraordinary attention devoted to the definition of intellectual disability and the key lawmakers' careful endorsement of the AAIDD's formulation - which adopted an age-18 standard - shows that Congress intended to tie its definition to the AAIDD's, "not to expand it," 134 Cong. Rec. at 22993 (Rep. Levin); See Public Employees Ret. Sys. of Ohio v. Betts, 492 U.S. 158, 190 (1989) (views of a bill's sponsors are weighty).

One of the insurmountable hurdles Rodriguez faces is that no one – not a single teacher, doctor, family member, friend, case worker, or social worker – ever hinted or even suggested that Rodriguez was intellectual disabled until he was charged with a capital crime.  Thus, there is no evidence that he had any intellectual deficits or adaptive

deficits prior to the onset age of 18, which the statute and case law insists this Court use as a determining prong. Equally important, assessments performed on Rodriguez as an adult also fail to reveal the deficits that must be present for a finding of intellectual disability. Because Rodriguez cannot show any one prong of the required test, much less all three that must be proven, his Atkins claim fails as a matter of law.

## II.     Rodriguez's Sixth Amendment claims fail as a matter of law.

Rodriguez alleges that hand-selected trial counsel were insufficiently vigorous in the preparation and presentation of his mitigation defense, and were constitutionally ineffective. Rodriguez seeks a new penalty trial. (DKT 1137, p. 4.) This, despite a defense team led by a deeply experienced defense attorney learned in death penalty law, Richard Ney, and one of North Dakota's pre-eminent defense attorneys, Robert G. Hoy. The tandem built a mitigation team that included highly respected and experienced psychologists and mitigation team members, all overseen by an acclaimed mitigation expert. The scope of their investigation was broad and thorough. The team eventually recognized that an Atkins defense was not available to Rodriguez. Nevertheless, they expertly prepared and presented a well-crafted mitigation case on Rodriguez's behalf, gaining a degree of support with jurors though the weight of the aggravating factors proved overwhelmingly decisive.

A. Rodriguez's experienced trial counsel and expert mitigation team gathered evidence and assessed Rodriguez's mental health and mitigation.

Prior to his work on United States v. Rodriguez, learned death penalty counsel, Mr. Ney, had prepared, tried, or been involved in approximately a dozen capital cases, including two capital cases with mental health explored as a possible defense. (Hrg. 18-20). Indeed, following his work on Rodriguez's trial, Mr. Ney earned appointment as federal death penalty resource counsel. Ney has handled multiple capital and non-capital cases involving claims of mental retardation. (Hrg. 19.)

Mr. Hoy has been a criminal defense attorney since 1991. Before that, he served as an Assistant States Attorney in Cass County, North Dakota from 1978 to 1981, and was the Cass County States Attorney from 1981 until 1990. Hoy has handled some of North Dakota's most challenging high profile criminal defense cases in the past twenty years, and also maintains an active civil trial practice in a highly respected law firm.

Mr. Ney and Mr. Hoy recruited and assembled a deeply experienced mitigation team and began to prepare their mitigation presentation well before trial commenced on August 14, 2006. Cf. Williams v. Taylor, 529 U.S. 362, 395 (2000) (noting counsel began to prepare for the sentencing phase a week prior to trial). Both of Rodriguez's trial counsel had regular contact with the mitigation specialist and the entire team of professionals who skillfully investigated, compiled, prepared and presented Rodriguez's mitigation evidence. (Hrg. 18; 354-358 and 1006.) The team worked in concert across many months during which they gathered every variety of potentially mitigating information.

91

Counsel retained Mitigation Specialist Ingrid Christiansen on November 22, 2004, just weeks after the United States filed its Notice of Intention to Seek Death (DKT 34). Christiansen has decades of mitigation experience in capital cases, and testified to a methodical, rigorous, and collaborative approach to professionally investigating and organizing all possible defense mitigation evidence. (Hrg. 201-207; 246-248) (Christiansen CV, Ex. D-35.) Ms. Christiansen first met with Rodriguez on November 18, 2004. (Hrg. 340) As assessed by Mr. Richard Burr, defense resource counsel from the Federal Death Penalty Project, who testified at an ex parte hearing held by this Court on July 6, 2005: "Ms. Christiansen is regarded as one of the best mitigation specialists in the upper Midwest." (Ex. G-501, p. 19.)

During that same July 6, 2005 hearing, Mr. Burr informed this Court that clinical psychologist Dr. Marilyn Hutchinson is "as good as any expert I've seen in the country[] "at developing a deep capital mitigation investigation. (Ex. G-501, p.23-24) (Post- Hrg. Br. Ex. E.)

This Court also approved the hiring of a neuropsychologist, Dr. Karen Froming, to conduct testing and to assess any brain damage or dysfunction on the part of Rodriguez. (Post hearing Ex. F.)[6] Dr. Froming had administered and scored neuropsychological tests and provided neuropsychology services to over 300 patients. As of 2005, she had

---

[6] Curiously, the CV attached to the Melton (See CV of Dr. Froming, Melton v. Vasquez, 2:89-cv-04182-RMT (C.D. CA, Sep. 27, 2006)) habeas ineffective assistance of counsel claim in which Dr. Froming was an expert witness is much more detailed about her capital mitigation credentials than the CV attached to Rodriguez pleading. CV of Dr. Froming, attached to Defendant's 12.2 disclosure filed June 27, 2006, attached as Post hearing Ex. F.

evaluated or supervised the evaluation of over 2,000 patients.  When asked about Dr.

Froming's qualifications, during this court's July 6, 2006 ex parte hearing, Mr. Burr

responded: "She is very highly qualified.  Among neuropsychologists who practice in

death penalty cases around the country, she is in the top two."  (Ex. G-501, p. 34) (Hrg.

141.)  Mr. Burr also noted Dr. Froming's working familiarity with the effects of

neurotoxins on the human brain, a topic on which she later testified at trial.  (Ex. G-501,

p. 34-35.)  Dr. Froming conducted IQ testing on Rodriguez in 2005, reporting a full-scale

IQ of 87, detailed infra.

Dr. Donald Ecobichon, PhD, had substantial capital experience and provided

substantial testimony on Rodriguez's behalf.  At the time of Rodriguez's trial, Dr. Donald

Ecobichon had "forty years' experience in academic fields of pharmacology and

toxicology."  (Tr., vol. 37, 7701.)  He had studied and written extensively on topics

relevant to the chemical exposure and impact testimony offered by him and other trial

witnesses.  (Post hearing Ex. G.)  He also had extensive capital litigation experience.

The defense team consulted with additional experts who explored the full range of

mitigation arguably impacting Rodriguez's life, searching for other possible information

that could impact a penalty phase determination.  By way of example, this Court

approved the hiring of Dr. Mark Cunningham to refute the United States' evidence of

future dangerousness, and Sister Margretta Dwyer, concerning sex offender treatment of

Rodriguez.  The Court approved an expert toxicologist, Dr. Stallones, who explored

whether pesticide exposure had somehow injured Rodriguez's brain.  This Court also

approved the hiring of Dr. Rossby for serotonin testing of Rodriguez.  Dr. Rossby

investigated whether possible DDT exposure may have induced a low serotonin level that, in turn, could arguably increase Rodriguez's propensity for violence.

Ms. Christiansen detailed her methodical investigative process during the January 2019 hearing.  (Hrg. 201-209; 246-248.)  She met often with Mr. Ney and Mr. Hoy and conducted multiple face-to-face interviews with Rodriguez, his immediate family, and a widening circle of others that the initial interviews identified, all under the guidance of the American Bar Association guidelines for this mitigation work.  (Hrg. 203.) Additionally, the mitigation team interviewed Rodriguez's teachers, clergy, childhood friends, and extended family.  All information was cross-checked.  (Hrg. 204.)  Ms. Christiansen gathered birth records, death certificates, school records, "[a]ny record that has his name on it[,] I want, I get lots of records."  (Hrg. 205.)  She worked with both Mr. Ney and Mr. Hoy on the mitigation case, and remained in close contact with each of them. (Hrg. 209.)  Afterward, Ms. Christiansen prepared a full report, which she shared with the defense attorneys.  (Hrg. 209-210).  She also created, then continuously revised, a mitigation theme document, themes which she routinely discussed with counsel (id.).

Ms. Christiansen testified that certain themes became apparent in Rodriguez's life, including potential learning limitations.  (Hrg. 211.)  She eventually turned to the expertise of the psychologists and asked them to explore any possible intellectual disability (Hrg. 213) and "mental health issues."  (Hrg. 268.)  Themes of mental illness, brain damage, and learning disabilities were all explored.  (Hrg. 1007.)

Dr. Hutchinson met with Rodriguez for seven hours on October 20, 2005, and five hours on October 21, 2005.  She examined Rodriguez again for over six hours on March

94

2, 2006.  The final evaluation took place on May 12, 2006, and lasted six hours.  Dr. Hutchinson conducted wide-ranging psychological testing, interviewing Rodriguez about his life history and administrating additional tests.  (Tr., vol. 38, 7947-48, 7954.)  Dr. Hutchinson issued a detailed report, with no findings to indicate a meritorious intellectual disability defense for Rodriguez.  (Rpt. of Mitigation, August 6, 2003 - Dr. Marilyn Hutchinson.  (Pet. 2255 Exhibit D-90.)

Dr. Froming met with Rodriguez as early as November 11, 2005, and conducted three days of testing.  Dr. Froming later prepared a nine page mitigation report she provided to counsel.  (Pet. 2255 Exhibit D-107)  Dr. Froming's test of Rodriguez showed he had an IQ of 87, which made an Atkins claim untenable when combined with the results of the full mitigation investigation.  Even so, the team's mitigation investigation moved actively forward.

The mitigation team made contact with a long list of corrections professionals who had contact with Rodriguez or who might have other helpful mitigation information in relation to Rodriguez's various periods of incarceration.  By way of example, on April 3, 2006, trial counsel issued subpoenas to take depositions of Kevin Goodno, Commissioner of the Minnesota Department of Human Services, and Joan Fabian, Commissioner of the Minnesota Department of Corrections, together with subpoenas duces tecum to provide the names of individuals who had worked or dealt with Rodriguez during his stays in the Minnesota prison system.  The subpoenas sought the addresses of an array of current or former Minnesota State Security Hospital employees Anne Amundson, Sister Peggy Anderson, Bruce Hawkinson, Greg McDunn, Charles Sheppard, and Maureen Walker.

They also sought the addresses of current or former Minnesota Department of

Corrections employees Mark Brooks, Connie Bush, Dwight Close, Don Engledinger,

Steve Ergen, Christopher Esty, David Hall, Diana Lind, Jose Lopez, Ted Mickelson, Jill

Rhoda, and Rita St. George.

Thereafter, trial counsel conducted numerous depositions aimed at gathering

mitigation evidence on behalf of Rodriguez.  Those individuals included Jill Tigner, May

17, 2006 (Pet. 2255 Exhibit D-116); Steve Ergen, May 17, 2006 (Pet. 2255 Exhibit D-

117); Donald Engledinger, May 17, 2006 (Pet. 2255 Exhibit D-118); Mark Brooks, May

10, 2006 (Pet. 2255 Exhibit D-119); Connie Cushing, May 18, 2006 (Pet. 2255 Exhibit

D-20); Diana Magaard, May 10, 2006 (Pet. 2255 Exhibit D-121); Ted Mickelson, May

10, 2006 (Pet. 2255 Exhibit D-122); Rita Saint George, May 10, 2006 (Pet. 2255 Exhibit

D-123); and Dwight Close, May 17, 2006 (Pet. 2255 Exhibit D-124).   They also deposed

Bruce Hawkinson on May 18, 2006. (U.S. 2255 Exhibit 4)  Trial counsel also took the

deposition of Dolores Rodriguez on December 13, 2005.  (Pet. 2255 Exhibit D-115.)

Mr. Ney and the entire team's exhaustive efforts thoroughly explored the

possibility of an intellectual disability/Atkins defense in this case, but determined such a

defense was not a viable option.  When asked by Rodriguez's counsel:

Q:  "[W]hy it was that you elected not to present a defense of mental
retardation in this matter[?]"

Mr. Ney replied:
A:  "[ ] obviously an Atkins claim is a critical issue in capital cases…we
looked at it in this case after looking at Mr. Rodriguez's school history,
prior IQ scores, as certainly something we wanted to closely investigate and
think about.  We hired experts to test Mr. Rodriguez, both a
neuropsychologist and a clinical psychologist.  Eventually to get to the

short answer here, based on their information we concluded it was not a viable Atkins claim […] [We reviewed] the IQ testing that was done along with the other psychological information they gave us. I talked with both experts at some length about this issue, and at the conclusion of those consultations we felt it was not a claim we could not make." (Hrg. 20-21)

Rodriguez's arguably most impactful brain function finding was diagnosed by his mitigation neuropsychologist, Dr. Froming. She met with Mr. Ney and Mr. Hoy on November 21, 2005, and told them she believed Rodriguez has frontal brain lobe damage "consistent with neurotoxin exposure." However, according to Mr. Hoy, Dr. Froming raised no indication of intellectual disability. (Hrg. 1015-1016.) Similarly Mr. Ney testified that neither Dr. Froming nor Dr. Hutchinson diagnosed Rodriguez as being intellectually disabled. (Hrg. 167-168.) That conclusion was also consistent with Dr. Froming's testimony at trial where she gave no indication that Rodriguez was even arguably intellectually disabled. (Hrg. 1017.)

A review of the complete record reveals a thorough investigation by legal, psychological and other experts. These dedicated professionals evaluated the options, and not one of them urged that the defense pursue an Atkins intellectual disability defense. During the January 2019 hearing before this court, Mr. Hoy had the following exchange with the United States:

Q: Ok, Do you recall any discussion in any of your meetings with Mr. Hoy (sic) or Miss Christiansen or Dr.Froming or Dr. Hutchinson where there was a discussion regarding any presentation of any evidence of the fact that Mr. Rodriguez was mentally retarded?
A: My recollection is that the defense team did not have any information at that time that led us to believe that he was mentally retarded.
Q: And in all the discovery that you received or investigation that your team did, you didn't find any indication from historical records or

97

declarations, statements that were made by any other individuals, that Mr. Rodriguez was mentally retarded, correct?

A:  I'm aware of no information that we received from anyone else that believed that Mr. Rodriguez was mentally retarded.

(Hrg.1018.)

That candid exchange puts to rest the question of whether any possible intellectual disability defense was either identified or discarded over the objections of any team member.[7]  This life-audit of Rodriguez was conducted to identify mitigation themes that could possibly bear on the jury's ultimate determination.  Undeterred by the practical legal unavailability of a complete Atkins defense, Rodriguez's trial counsel and mitigation team strategically mounted what the United States now recognizes was an expertly-crafted "cloaked" mental health mitigation case on behalf of Rodriguez. Whereas Rodriguez's motion and brief allege ineffective assistance of counsel, any fair consideration of this complete record establishes that this defense team and mitigation effort smacks of excellence.

B.  Legal Standard for Ineffective Assist of Counsel

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const., amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson,

---

[7] Notably, this exchange perhaps sheds light on why Rodriguez's habeas counsel tries to divert close scrutiny of counsel Hoy's participation in the relevant decision-making, and his hearing testimony regarding the issue of the investigated, considered, and ultimately unavailable intellectual disability defense or bar to execution. (DKT 1137, p. 40.)

397 U.S. 759, 771 n.14 (1970)).  A defendant "faces a heavy burden" to establish

ineffective assistance of counsel under 28 U.S.C. § 2255.  DeRoo v. United States, 223

F.3d 919, 925 (8th Cir. 2000).  A defendant must meet the two-part test established in

Strickland to substantiate a claim of ineffective assistance of counsel.

First, "[t]o establish deficient performance, a petitioner must demonstrate that

counsel's representation fell below an objective standard of reasonableness."  Wiggins v.

Smith, 539 U.S. 510, 521 (2003), quoting Strickland, 466 U.S. at 688.  Counsel is

strongly presumed to have rendered constitutionally sufficient assistance and to have

made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690.  Defendants have a heavy burden in overcoming the "strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance."  Strickland, 466 U.S. at 689; Lawrence v. Lockhart, 767 F.2d 449, 450 (8th

Cir. 1985).

Second, if a petitioner meets their burden to establish counsel's objectively

deficient performance, then he must also show that he suffered prejudice, and must do so

by demonstrating that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."

Strickland, 466 U.S. at 694; see, e.g., United States v. Ledezma-Rodriguez, 423 F.3d 830,

836 (8th Cir. 2005) (holding that a defendant cannot establish ineffective assistance of

counsel unless defendant shows that his counsel's deficient performance prejudiced his

defense).  When the allegation of ineffective assistance of counsel pertains to conduct of

counsel in the penalty phase of a capital trial, a defendant must demonstrate that, absent

99

counsel's deficient performance, at least one juror would have voted for life.  Wiggins, 539 U.S. at 536.

> 1. Learned counsel was guided by established practice and Supreme Court precedent.

Reduced to its essence, Rodriguez's ineffective assistance of counsel claim alleges that counsel performed deficiently for having forgone an Atkins defense once informed that Rodriguez had scored an 87 on his latest IQ test.  In addition to the fact that the record in this case makes abundantly clear that counsel and experts fully evaluated Rodriguez's mental health, the recognition that Rodriguez's IQ score of 87 helped foreclose an Atkins defense was fully within the objectively reasonable advocacy standard.

Rodriguez's § 2255 counsel offers that "[a]t the evidentiary hearing, counsel acknowledged that his understanding of intellectual disability changed after Rodriguez's trial." (DKT 1137, pg. 86.)  Section 2255 counsel couches this in terms that would leave an unknowing observer to think Mr. Ney had withdrawn his head from a mound of sand, only to discover the "real law" on intellectual disability.

What Rodriguez fails to make clear, and what is firmly established by Supreme Court precedent, is that it was not until Hall v. Florida that Rodriguez's previous IQ scores would not, as a practical matter, serve as a bar to Rodriguez making a successful Atkins claim.  Though on this record, there is not an arguable path to a meritorious likelihood of success.  That legal assessment alone supports trial counsel opting for a legally sound strategy aimed at fully developing mental health and other evidence the

100

defense hoped would sufficiently mitigate the defendant's moral culpability in the eyes of even just one juror.  "Strickland is concerned with prevailing professional norms at the time of trial, not with subsequent developments of the law."  LeCroy v. United States, 739 F.3d 1297, 1324 (11th Cir. 2014).

Despite the practical unavailability of an Atkins defense, Rodriguez benefitted by trial counsel's recognition that the vigorous mitigation investigation had revealed the opportunity for the defense to lodge a "cloaked" mental health mitigation case despite the non-existent, or patently weak, claim that Rodriguez is appreciatively burdened by some variety of adaptive deficits.

The evolving nature of the standard for determining intellectual disability after Rodriguez's trial establishes that Rodriguez cannot show ineffective assistant of counsel, nor can he, as a matter of law, show that he was prejudiced by counsel's tactical decision to proceed on a fulsome mitigation case that combined a variety of mitigation options. See State v. Thurber, 420 P.3d 389, 402 (2018) ("Our problem on appeal is identifying the law to apply to resolve these questions because that law changed after Thurber's trial. The United States Supreme Court twice expanded Eighth Amendment requirements for making intellectual disability determinations in death penalty cases") (citing Moore v. Texas, 137 S. Ct. 1039 (2017) and Hall v. Florida, 572 U.S. 701 (2014)); Ortiz v. United States, No. 04-8001-CV-W-GAF, 2007 WL 7686126 at *2-3 (W.D. Mo. Dec. 14, 2007) (post-conviction Atkins claim based upon Weinstein testimony rejected, in part, upon formulation of ID from DSM-IV "significantly sub-average intellectual functioning (an IQ of approximately 70 or below)").

As this record firmly establishes, trial counsel directed and participated in a constitutionally sound effort to develop mitigation evidence. They hired capable and experienced mitigation specialists and experts well in advance of trial, worked collaboratively, and vigorously assembled arguable mitigation evidence in anticipation of a sentencing hearing. As such, trial counsel well exceeded the threshold required for constitutional effectiveness.

    2. Rodriguez's defense team presented a strategic mitigation case.

Rodriguez alleges that counsel failed to properly consider Rodriguez's adaptive deficits and risk factors. (DKT 1137, p.85.) He specifies an assortment of possible "risk factors" for evaluation but ignores the record that establishes the fact that those are the very same categories of evidence that the trial counsel and mitigation team excavated, investigated, and presented at trial. Rodriguez's alleged malnutrition as a baby, pesticide exposure in utero and during his childhood, episodic poverty, sexual abuse, uneven educational performance, and more were all investigated, examined, then presented through a variety of witnesses during the penalty phase of Rodriguez's trial.

Rodriguez's mitigation presentation spanned four days of testimony during the penalty phase of his trial. Trial counsel called a total of twenty-four mitigation witnesses, including his psychologist, his neuropsychologist, a toxicologist, Rodriguez's mother, his two sisters, an aunt, a niece, a nephew, and two family friends. Family and friends testified as to Rodriguez's love and kindness towards them and the emotional pain they would suffer if he were executed. They further testified about Rodriguez's life experiences, including what they described as his troubled childhood. Trial counsel also

called a religious counselor who had often visited Rodriguez in jail, and had developed a relationship with him.

The defense also called numerous witnesses employed by the Minnesota Department of Corrections regarding Rodriguez's conduct during his previous imprisonment. They called employees of the Cass County jail regarding his stay in the jail while awaiting his capital trial.

      i.   Toxicology evidence presented by Dr. Ecobichon.

Dr. Ecobichon testified that toxic chemicals, such as DDT and toxaphene, were used extensively on sugar beet crops in the Red River Valley during the time Dolores Rodriguez and her family were working in the fields and living nearby. (Tr., vol. 37, 7715 16.) He testified that toxaphene quickly evaporates when sprayed and can be easily absorbed through inhalation, dermal exposure and ingestion. (Tr., vol. 37, 7723-26.) He testified exposure to these chemicals can lead to persistent tremors, muscle weakness, poor learning skills, phobias, anxiety, depression, and aggressive behavior. (Tr., vol. 37, 7749-51.) Dr. Ecobichon's testimony dovetailed with testimony that Rodriguez suffered from hand tremors (Tr., vol. 37, 7642), though this malady may have been inherited from his father, according to Delores Rodriguez. (Tr., vol. 37, 7642.) Dr. Ecobichon's testimony also seemed to interface with other testimony relating to Rodriguez's learning problems and failures in school. (Tr., vol. 37, 7988-89.)

Defense counsel strategically elected to not have Dr. Ecobichon personally examine Rodriguez. (Tr., vol. 37, 7774.) Nevertheless, Dr. Ecobichon's trial preparation also included a review of the mitigation team's relevant records as well as Dr. Froming's

full report.  (DKT 1137, p.43.)  Dr. Ecobichon was permitted to testify in great detail about a wide variety of dangerous toxins he believed Rodriguez had been exposed to, as well as to the negative effects that the relevant neurotoxins and farm chemicals can have on components of the central and peripheral nervous systems.  (Hrg. 7730-7731.)

### ii.  Neurological evidence presented by Dr. Froming.

Dr. Ecobichon's testimony was then effectively harmonized with the testimony of Dr. Karen Froming, who testified that Rodriguez suffers from subcortical brain damage, the center of impulse control within the brain.  (Tr., vol. 37, 7822-23.)  Dr. Froming had extensively tested Rodriguez, obtained a complete family medical history prior to her testing, and claimed the test results confirmed that the origin of Rodriguez's brain damage was likely neurotoxin exposure.  (Tr., vol. 37, 7822.)  Dr. Froming testified that "there are some mild symptoms of depression there as you would expect but not of the significant degree that you would expect to see these what are called frontal subcortical signs . . . Depression is implicated in these same regions but the presence of the motor problems, the impact of the motor problems on various tasks, the working memory deficit and then his acquired color vision loss, his absence of smell function, really all say to me that he has frontal subcortical brain damage and the etiology of that may be neurotoxin exposure."  (Tr., vol. 37, 7822.)

### iii.  Psychological evidence presented by Dr. Hutchinson.

The defense also offered testimony of Dr. Marilyn Hutchinson, a clinical psychologist, who testified that Rodriguez was malnourished for most of the first year of life, and that this had a biological importance because of the growth of the brain in one's

first year.  She was told that, as a teen, Rodriguez experienced terrible headaches.  (Tr., vol. 38, 7988-89.)  She testified he had a sexual preoccupation, often seen in victims of sexual abuse.  (Tr., vol. 38, 8011-12.)  She testified that she was aware of the prior sexual abuse that had been reported and testified to by Sylvia.  Dr. Hutchinson testified that Rodriguez confirmed his memory of the sexual abuse at the school.  (Tr., vol. 38, 7960, 7965, 8046–49.)  Dr. Hutchinson diagnosed Rodriguez with dysthymia, a long term depression, also coinciding with Dr. Ecobichon's testimony.  Depression is one of the symptoms alleged to arise from exposure to the toxic chemicals used during Rodriguez' early life in the sugar beet fields.  Dr. Hutchinson testified Rodriguez's memory, mood, academic, and impulse control problems were related to toxic exposure.  (Tr., vol. 38, 8031-32.)  She also diagnosed him with substance abuse in remission, a general anxiety disorder and post-traumatic stress disorder due to the prior sexual abuse.  (Tr., vol. 38, 8029-31.)  She did not find that he suffered from dissociative disorder.  (Tr., vol. 38, 8007.)

Dr. Hutchinson testified extensively about what she claimed were the seven factors that negatively influenced Rodriguez's life and his psychological makeup: childhood deprivation, poverty and malnutrition; sexual abuse; racism; failure in school; substance abuse; exposure to toxic chemicals; and the multiple mental health and neurological conditions.  (Tr., vol. 38, 7944-8038.)

           iv.  The interface of expert testimony presented a strong mitigation case.

The testimony of Dr. Ecobichon, Dr. Froming, and Dr. Hutchinson was effectively presented, in part, to link Rodriguez's alleged toxin exposure and negative life

experiences to his alleged mental and functional manifestations. The testimony of the three doctor experts formed the foundation of the cloaked mental health mitigation case, which was then carefully augmented by the testimony of several family members and associates who developed the themes of negative life experiences, positive family relations, teenage substance abuse, childhood illness, personal habits and interests, and toxin exposure.

Counsel also called several witnesses from the Minnesota correctional system, each of whom knew Rodriguez from his time in state prison. These witnesses etched a positive image of Rodriguez as a compliant, respectful, discipline-free inmate who gained privileges and placement in Honor Unit housing. Sister Yvonne Nelson testified at trial that she visited Rodriguez on numerous occasions, during the pendency of the trial in this matter, speaking with him on a variety of topics, including their shared interest in reading, and her belief that Rodriguez had the capacity to grow spiritually. (Tr., vol. 40, 8399–8406.)

While the cloaked mental health mitigation strategy selected by counsel was clearly the strongest avenue on which to proceed, it warrants mentioning that Strickland and its progeny give wide latitude to such determinations by defense counsel. Decisions about what to do with the results of an investigation are strategic decisions that are virtually immune to second-guessing by habeas courts. Marcrum v. Luebbers, 509 F.3d 489, 506 (8th Cir. 2007) (citing Wiggins, 539 U.S. at 522–23, 527–28 (2003)). Indeed, in most cases, a counsel's decision not to pursue a particular approach at sentencing reflects a sound strategic choice. Lovit v. True, 403 F.3d 171, 179 (4th Cir. 2005). "In judging

the defense's investigation, as in applying <u>Strickland</u> generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . and by giving a 'heavy measure of deference to counsel's judgments . . . .'" <u>Rompilla v. Beard</u>, 545 U.S. 374, 381 (2005). Unsurprisingly, when courts are examining the performance of an experienced trial counsel, as in this instance, the presumption that their conduct was reasonable is even stronger. <u>See</u> <u>Chandler v. United States</u>, 218 F.3d 1305, 1316 (11th Cir. 2000) (citing <u>Burger v. Kemp</u>, 483 U.S. 776, 780 (1987)) (reciting counsel's impressive credentials in opinion finding that counsel rendered effective assistance).

At the close of the penalty phase of the trial, Rodriguez requested, and this Court submitted, thirty mitigating factors for jury consideration. On September 20, 2006, the jury heard this Court's final instructions of law and closing arguments by the United States and defense counsel, and began deliberations. (Tr., vol. 42, 8650–8753.) On September 22, 2006, the jury returned with a verdict of death, though the verdict form showed that the defense mitigation evidence had arguably resonated with jurors impacted by the defense mitigation strategy.

Some number of jurors found 25 of the 30 proposed mitigation factors. Jurors were unanimous on 19 of these factors; a majority found 4 additional mitigators, and a plurality found 2 more. Defense counsel's effort effectively humanized Rodriguez's family connections, and some number of jurors found mitigation trending to show that Rodriguez had suffered the emotional and intellectually weakening forces of sexual abuse, prejudice, and chemical exposure manifesting as brain damage.

107

In addition to their mitigation findings, the jury unanimously found that the one non-statutory aggravating factor proposed by the United States had been proven: that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family.

The mitigation factors proposed by the defense with the number of jurors who voted in favor of each respective factor in parenthesis:

1. If he is not put to death, Alfonso Rodriguez will live every day of the rest of his life incarcerated in a federal prison. (12)
2. Alfonso Rodriguez was sexually abused as a child. (7)
3. Alfonso Rodriguez suffers from his exposure to toxins. (0)
4. Alfonso Rodriguez suffers from brain damage. (3)
5. Alfonso Rodriguez suffers from a mental disorder or impairment. (12)
6. Alfonso Rodriguez has neurological or psychological problems, which have impaired his ability to make good decisions. (0)
7. Alfonso Rodriguez was introduced to addictive drugs and alcohol at a young age and has suffered from alcoholism and drug addiction during his life. (12)
8. Alfonso Rodriguez had learning problems in school because he grew up in a migrant family that moved from place to place during the school year. (6)
9. Alfonso Rodriguez had learning problems in school because he was developmentally delayed as a child. (9)
10. Alfonso Rodriguez has experienced racial prejudice during his lifetime. (12)
11. Alfonso Rodriguez has shown love and kindness towards his mother Dolores. (12)
12. Alfonso Rodriguez is loved by his mother, Dolores, and Dolores will suffer emotional pain if Alfonso is executed. (12)
13. Alfonso Rodriguez has shown love and kindness towards his sister, Sylvia D 'Angelo. (12)
14. Alfonso Rodriguez is loved by his sister, Sylvia D'Angelo, and Sylvia will suffer emotional pain if Alfonso is executed. (12)
15. Alfonso Rodriguez has shown love and kindness towards his sister, Rosa Rodriguez. (12)
16. Alfonso Rodriguez is loved by his sister, Rosa Rodriguez, and Rosa will suffer emotional pain if Alfonso is executed. (12)

17.  Alfonso Rodriguez has shown love and kindness towards his sister, Illeana Noyes. (12)

18.  Alfonso Rodriguez is loved by his sister, Illeana Noyes, and Illeana will suffer emotional pain if Alfonso is executed. (12)

19.  Alfonso Rodriguez has shown love and kindness towards his nephew, Joshua Noyes. (12)

20.  Alfonso Rodriguez is loved by his nephew, Joshua Noyes, and Joshua will suffer emotional pain if Alfonso is executed. (12)

21.  Alfonso Rodriguez has shown love and kindness towards his niece, Alina Noyes. (12)

22.  Alfonso Rodriguez is loved by his niece, Alina Noyes, and Alina will suffer emotional pain if Alfonso is executed. (12)

23. The existence of other factors in Alfonso Rodriguez's childhood, background, or character. (0)

24. Alfonso Rodriguez offered to plead guilty to causing Dru Sjodin's death, thereby accepting responsibility for his actions in this matter. (0)

25.  Alfonso Rodriguez has responded well to structured environments and would likely make a good adaptation to prison if he were sentenced to life imprisonment. (12)

26.  Since his arrest on this charge, Alfonso Rodriguez has been a well behaved inmate. (12)

27.  Alfonso Rodriguez raised concerns to prison officials about being released from prison in 2003. (12)

28. Minnesota Department of Corrections personnel failed to act on statements of concern from Alfonso Rodriguez and his family about Alfonso Rodriguez's release from prison in 2003. (0)

29.  Alfonso Rodriguez has the potential to grow spiritually. (10)

30.  Considerations of mercy support a sentence of life imprisonment without the possibility of parole.(8)

(Penalty Phase Special Findings Form; DKT 626, pp. 1-5.)

C.  Rodriguez's trial team had a well-developed and strategic toxin exposure case.

Mr. Ney, Mr. Hoy, Ms. Christiansen, Dr. Froming, Dr. Hutchinson, Dr. Ecohichon, and others worked assiduously to demonstrate a nexus between what they

claimed were prolonged toxin exposures and a variety of mental and physical

manifestations of that exposure.

Rodriguez's defense and mitigation teams developed and presented a thorough and

consistent chemical toxin mitigation argument.  Still, Rodriguez's § 2255 counsel attacks

learned counsel Ney's decision not to have Dr. Ecobichon personally evaluate Rodriguez

as part of a toxic exposure defense.  However, that was a strategic choice supporting a

cleverly constructed toxic exposure mitigation presentation.  Mr.Ney testified in the

evidentiary hearing as follows:

> A: Well, it was my belief at that time that Dr. Froming had done the sort of
> evaluation that we needed to show the deficits that Alfonso had based on
> the exposure to neurotoxins. So, I mean, I just didn't consider a second
> examination necessary.  That's one reason.  The second reason is if Dr.
> Ecobichon had examined Alfonso and was going to testify to his findings
> about Alfonso's physical or mental state, that we would have had to
> disclose that examination, file a report, go through 12.2 protocol.
> Q: And so by not having Dr. Ecobichon evaluate your client, you avoided
> having to disclose his report beforehand under Rule 12.2?
> A: Yes.

(Hrg. 108-9.)

Dr. Ecobichon was certainly in accord with defense counsel's surreptitious

approach, as was made clear in his letter to the defense counsel dated January 3, 2006.

(Ex. D-28)  The letter provides, in part:

> An important point that has to be considered is that both Karen Froming
> and I hold doctoral (Ph.D.) degrees but not medical degrees (Claudia Miller
> does!). The "other side" will throw up a physician (MD), a neurologist,
> psychiatrist or whatever, his/her testimony outweighing ours, even if he/she
> knows zilch about pesticide poisonings. I have even run into testimony by a
> coroner who was a chiropractor in "real life".  I would suggest that you
> contact David Freedman and ask him about the neurologist used in the

110

> Caro[8] case.  That man understood what pesticide exposure could do in the long term, his testing/interview results were crucial to the outcome of the Caro appeal in that we were in agreement, but we never met or discussed the case.

(Def. Exhibit 28.)[9]

It is settled law that, "[s]trategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable."  Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (internal quotation omitted); United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (same).  Ney's tactical decision to pursue the "toxic exposure" mitigation in a fashion that avoided 12.2 notice to the government is precisely the type of tactical decision triggering Strickland deference.  LeCroy, 739 F. 3d at 1312.  This is especially true where, as here, counsel had directly relevant experience, hired a psychologist, a neuropsychologist, and other experts with whom he consulted, investigated the possible avenues of all mental health defenses, and selected the path of least resistance.  Counsel's strategy avoided having to provide expert witness reports to

---

[8] Caro refers to Caro v. Woodford, 280 F. 3d 1247 (9th Cir. 2002), a death penalty ineffective assistance of counsel case in which Dr. Ecobichon testified concerning the toxic exposure claims, and in which the court found ineffective assistance of counsel.

[9] In addition to urging the Rule 12.2 avoidance strategy by defense counsel, Dr. Echobichon's letter can be read to reveal the potential "set-up" of a downstream ineffective assistance of counsel claim.  As many courts have recognized, it is not uncommon for capital case defense counsel to concede in a post-conviction proceeding that their trial performance was deficient.  Gentry v. Sinclair, 576 F. Supp. 2d 1130, n. 38 (W.D. WA 2008), see also Graham, Tactical Ineffective Assistance in Capital Trials, 57 Am. U.L. Rev. 1645 (2008).   In fact, Sixth Circuit Chief Judge Boggs has noted the oddity of perhaps the intentional appearance of a lacking "fully-investigated and competent penalty phase defense."  Poindexter v. Mitchell, 454 F.3d 564, 586 (6th Cir. 2006), Boggs concurring.

the government, subject the defense expert to a well-prepared cross examination, and provide the United States with the opportunity to rebut the witnesses.

The Eleventh Circuit was asked to rule on a similar situation in LeCroy.  In that case, the defendant was charged with a federal death penalty offense, was convicted after a trial, then sentenced to death.  On collateral appeal, LeCroy argued that his trial counsel was ineffective in not presenting a more vigorous mental health defense, including expert testimony.  LeCroy, 739 F. 3d at 1311.  A habeas evidentiary hearing was held, during which trial counsel testified that they had obtained a mental health evaluation by a retained expert, but did not want to pursue that line of defense further because of the disclosure requirements of Fed. R. Crim. Proc. 12.2.  Id., at 1305.  In affirming the rejection of the ineffective assistance of counsel claim, the Eleventh Circuit held:

> As LeCroy's defense team considered their options in light of Doctor Hilton's report, they were operating in the shadow of Rule 12.2(b) of the Federal Rules of Criminal Procedure, which requires a defendant to notify the Government in advance of trial if the defendant plans to introduce expert testimony on mental health issues at either the guilt or penalty phase of trial.  Rule 12.2 further provides that if a defendant elects to introduce expert evidence bearing on a mental health issue, the defendant must make the results and reports of the defendant's expert available to the Government, and the defendant himself may be required to submit to an evaluation by a Government expert.  See Fed. R. Crim. P. 12.2(c).

Id.

Similar to how counsel in LaCroy had proceeded, Mr. Ney called Dr. Ecobichon in the penalty phase as a "teaching witness," to highlight the prevalence and dangers of toxins and chemicals which Rodriguez arguably had been exposed to during his lifetime. Trial counsel later called their psychologists to underscore those dangers and testify to

Rodriguez's alleged mental health and physiological impairments. Counsel called family and friends who bolstered and bridged the exposure and negative manifestations testimony, all of which was tidily argued by learned counsel Ney in the penalty phase closing. (Tr. vol. 42, pp. 8722-8726)

Unlike LaCroy where the expert in question never testified, Rodriguez's expert in question testified, and in a fashion that shielded him from well-prepared cross-examination, and witness rebuttal. The jury eventually heard the entire claim detailing the dangers of toxins, the likelihood that Rodriguez was exposed to them, and the alleged damage that resulted. This strategic plan produced an arguably favorable toxin exposure narrative, and warrants Strickland deference. More to the point, beyond meriting Strickland deference, trial counsel's efforts warrant acclaim.

Rodriguez was able to retain multiple experts, and present the evidence of toxic exposure despite its dubious admissibility. Far from being ineffective, the trial team ably navigated the tactical, evidentiary, and procedural hurdles to present the marginally relevant evidence in the most impactful manner, all without having to disclose his strategy to the United States as required by the rules of procedure. While Rodriguez alleges that trial counsels' duty to disclose was nevertheless apparent, what's most informative is that notice was never provided; Rodriguez's trial counsel followed their own understanding of Rule 12.2 and never provided notice with regard to Dr. Ecobichon's testimony. This defense tactic became a matter of significant contention before this court during the penalty phase, but it was too late for the defense to provide

113

timely Rule 12.2 notice.  On this point, Mr. Ney had been playing chess while the United States was playing checkers.  (Tr., vol. 37, p. 7754-64.)

In the January 2019 hearing before this court, Rodriguez offered the testimony of Dr. Andres Lugo, Ph.D., and now suggests that it would have provided powerful mitigation, had he testified regarding his examination of Rodriguez and the "specific facts" of that examination.  (DKT 1137, p. 92.)  Upon close inspection, however, Rodriguez's argument fails for two reasons, each individually sufficient to defeat it. First, it suggests that Rodriguez would now like to have a "do-over" trial where he opts to have the chemical toxin expert conduct a personal examination and assessment of him. This is precisely the second-guessing disallowed under Strickland and its progeny. Second, Rodriguez's claim regarding the strength of Dr. Lugo's testimony ignores the testimonial record developed during the January 2019 hearing, during which Dr. Lugo testified quite similarly to Dr. Ecobichon's trial testimony with barely appreciable differences, and faced withering cross-examination by the United States.

Dr. Lugo testified that he assessed Rodriguez for neurotoxin exposure. (Hrg. 783) While Dr. Lugo's credentials include experience in neurolinguistics, he acknowledged that he has no medical training in neurology, psychiatry or radiology, nor is he licensed to practice medicine in the United States. (Hrg. 821-22; Ex. D-67.)  His assessment of Rodriguez largely followed the same course as that of Dr. Ecobichon.  Dr. Lugo reviewed documents including Rodriguez's school records, medical-mental health records, Minnesota Security Hospital records, neuropsychological reports and testing scores from Dr. Karen Froming, the transcript of psychiatric evaluations on Rodriguez by Drs.

114

Martell and Pitt, supplemental psychiatric evaluations by St. Peter, and neuropsychological evaluations by Dr. Martell. (Hrg. 785.) Dr. Lugo also interviewed Rodriguez and relatives who live in Laredo, Texas and Crookston, Minnesota. (Hrg. 786-87.)

As did Dr. Ecobichon, Dr. Lugo asserts Rodriguez was exposed to toxic substances in utero and during childhood and adult life which, he speculates, caused developmental and cognitive problems. (Hrg. 791, 802.) Dr. Lugo claims Rodriguez was also exposed to lead toxins during his childhood. (Hrg. 807.) Dr. Lugo opines Rodriguez was exposed to solvents while working at the prison print shop which contributed to his cognitive problems. (Hrg. 814.)

Dr. Lugo testified that exposure to neurotoxic substances cause neurocognitive damage, and suggested a link between Rodriguez's headaches and toxin exposure. (Hrg. 811.) He made similar claims regarding what he termed Rodriguez's "large head". (Hrg. 812.) Unmistakably, this testimony nearly mirrored that of the compendium of expert and lay witnesses who in fact testified in the penalty phase of Rodriguez's trial.

Dr. Lugo opined that there arose an additive effect between a variety of exposures to neurotoxic pesticides, lead and solvents (Hrg. 819-20), concluding that this combination altered Rodriguez's development of the cognitive functions which affect the ability to doing "normal things." (Hrg. 820.) That testimony was followed by cross examination where Dr. Lugo admitted he would not be able to diagnose anybody with brain damage or any psychiatric condition. (Hrg. 822.)

115

Unlike Dr. Ecobichon's collaborative work with Drs. Froming and Hutchinson, Dr. Lugo testified he did not consult with neurologists or neuropsychiatrists nor did he consult with such professionals when concluding Rodriguez's neurologic and cognitive problems were "caused by chronic exposure to highly neurotoxic pesticides." (Hrg. 824; Ex. D-68.) Similar to Dr. Ecobichon's trial testimony, Dr. Lugo acknowledges the Red River Valley is a heavy agricultural area wherein thousands of other people have, likely, been exposed to chemicals during their lifetime. (Hrg. 826.) He further admits that he has no direct literature, articles, or evidence, which link a specific higher incidence of brain damage to people in the Crookston, Minnesota area. (Hrg. 825-27.) Dr. Lugo could not provide evidence linking a higher incidence of homicide or sexual assault rates to pesticide use. (Hrg. 827.)

Even considered in the most favorable light possible, such testimony as that given by Dr. Lugo would do nothing more than provide an alternate strategy route, and, in all fairness, it would be only a marginally altered path. As such, Dr. Lugo's testimony cannot legally form the foundation of a successful ineffective assistance of counsel attack Strickland v. Washington 466 U.S. 668, 686 (1984). What is also established is that Dr. Lugo proved vulnerable to the very same cross examination that Rodriguez acknowledges so effectively undermined Dr. Ecobichon at trial. (Hrg. 45.) As such, Dr. Lugo's testimony provides no legal basis for Rodriguez's request to set aside the jury's penalty decision.

Trial counsel conducted a thorough investigation into Rodriguez's mental health and hired experts for that purpose, and counsels' performance cannot be deemed so

116

deficient that it amounts to ineffective assistance of counsel.  In Cole v. Roper, 623 F.3d 1183, 1189–90 (8th Cir. 2011), the Eighth Circuit rejected an ineffective assistance of counsel claim where habeas counsel hired a new expert who would allegedly have testified the defendant was suffering from "extreme emotional distress" at the time of the offense. The Court noted that trial counsel had hired experts who evaluated the defendant and that "was enough of an investigation to clear Strickland's performance prong."  Id.

Rodriguez's ineffective assistance claim would fail even if his experts had offered a more interesting variety of opinions, or fared better on cross-examination.  In Link v. Luebbers, 469 F.3d 1197, 1203–05 (8th Cir. 2006), habeas counsel hired new experts who purported to show the defendant suffered from mental health illnesses not presented by trial counsel.  Accordingly, that Rodriguez's § 2255 counsel has since found additional experts who would give a new diagnosis is not the test for ineffective assistance of counsel.  See, e.g., Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008) (holding the Sixth Amendment does not require trial counsel to shop for favorable experts, and finding no ineffective assistance of counsel where trial counsel hired a mental health expert and chose to cut off the investigation without hiring additional experts or seeking further opinions); Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995) (holding that mere fact trial counsel did not shop around for experts with more favorable opinion does not mean trial counsel was ineffective).

D.  Rodriguez is unable to establish prejudice under the Strickland standard.

Rodriguez fails to allege facts that would overcome Strickland's obstacles to successfully asserting an ineffective assistance of counsel claim.  Nor can Rodriguez

117

allege that he was prejudiced by any alleged deficiencies.  The most Rodriguez's § 2255 counsel manages to do is make conclusory allegations that there is a reasonable probability that the result would have been different if there had been an amorphous "further investigation," in support of which, trial counsel presented additional cumulative mental health mitigation testimony. (Mot. at 208.)  See Purkey v. United States, 729 F.3d 860, 865 (8th Cir. 2013) (noting "proffered evidence does nothing to establish prejudice required by Strickland because it is entirely cumulative"); Cullen v. Pinholster, 131 S. Ct. 1388, 1409 (2011) (finding no prejudice where "new" evidence largely duplicated the mitigation evidence presented at trial); Wong v. Belmontes, 558 U.S. 15, 22-23 (2009) (concluding that additional evidence of the defendant's humanizing features would not have affected the sentencing jury's decision).

Finally, § 2255 counsel fails to consider the weight of the aggravating evidence. Even assuming for the purposes of argument that Rodriguez did present new material evidence of some weight, this court must assess prejudice by "'reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence' to determine whether 'the result of the proceeding would have been different.'"  Purkey, 729 F.3d at 866 (quoting Wiggins, 539 U.S. at 534 (citation omitted)).  In assessing prejudice, this Court must take into account the aggravating evidence presented at trial, and that evidence was overwhelming in this case.

The jury found that the United States proved three statutory aggravating factors beyond a reasonable doubt:

1. The defendant, Alfonso Rodriguez, Jr., caused Dru Katrina Sjodin's death during the commission of the offense of kidnapping by the defendant.
2. The defendant, Alfonso Rodriguez, Jr., has previously been convicted of two or more federal or state offenses, each of which is punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

Pursuant to their determination in the second statutory aggravating factor, the jury found the following convictions involved the infliction of, or attempted infliction of, serious bodily injury:

A. Attempted Aggravated Rape in Polk County Case No. 5438 (Shirley Seddon Iverson);
B. Aggravated Rape in Polk County Case No. 5447 (Elizabeth Knudson);
C. Attempted Kidnapping and Assault in the 1st Degree in Polk County Case No. 6192 (Ardyce Whalen).

3. The defendant, Alfonso Rodriguez, Jr., killed Dru Sjodin in an especially heinous, cruel, or depraved manner in that:

A. It involved the torture of Dru Sjodin.

In addition to the three statutory aggravating factors, the jury found the United States proved the following non-statutory aggravating factor beyond a reasonable doubt:

1. That the defendant, Alfonso Rodriguez, Jr. caused loss, injury, and harm to Dru Sjodin and Dru Sjodin's family.

The United States presented a substantial body of evidence in support of the jury's "merits phase," "eligibility phase," and "penalty phase" determinations. In addition to the horrifying and factually determinative details of Dru Sjodin's kidnapping, rape, and murder, the United States presented evidence of Rodriguez's prior rape and assault

119

convictions, and Dru Sjodin's family and friends shared the poignant impact of her death. This trial record definitively establishes that the statutory and non-statutory aggravating factors were proven on overwhelming evidence and beyond a reasonable doubt.

On this record Rodriguez does not successfully argue that there exists a reasonable likelihood that the additional cumulative evidence Rodriguez now claims his trial attorneys could have presented would have altered the outcome of the penalty phase of the trial. The allegedly new testimony largely mirrors that which the trial jury heard and applied in their mitigation determinations. As such, "[i]t is not substantially likely that the jury would have returned a different sentence had [Rodriguez's] proffered evidence been presented to it." Purkey, 729 F.3d at 868; see Cullen, 131 S. Ct. at 1403 (requiring a habeas Rodriguez to show a "'substantial,' not just 'conceivable,' likelihood of a different result" to establish prejudice (quoting Harrington v. Richter, 131 S. Ct. 770, 792 (2011)).

The aggravating evidence is too overwhelming and Rodriguez's "new" mitigating testimony simply rehashes evidence the jury did not find convincing at trial. Rodriguez falls well short of his burden to persuade this court to conclude that even one juror would have struck a different balance." See Wiggins, 539 U.S. at 537.

## CONCLUSION

For all the foregoing reasons, the United States respectfully requests that the Court

deny Rodriguez's 28 U.S.C. § 2255 Petition.

Dated: December 4, 2020

DREW H. WRIGLEY
United States Attorney


By:    */s/ Drew H. Wrigley*
DREW H. WRIGLEY
United States Attorney
ND Bar ID 05156
655 First Avenue North, Suite 250
Fargo, ND 58102-4932
(701) 297-7400
Drew.Wrigley@usdoj.gov
Attorney for United States


By:    */s/ Melissa Helen Burkland*
MELISSA HELEN BURKLAND
Assistant United States Attorney
WI Bar ID 1071443
655 First Avenue North, Suite 250
Fargo, ND 58102-4932
(701) 297-7400
Melissa.Burkland@usdoj.gov
Attorney for United States