**CRIMINAL CASE No. 2:04-cr-55**

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION**

_____

UNITED STATES OF AMERICA,
Plaintiff-Respondent,

v.

ALFONSO RODRIGUEZ, JR.,
Defendant-Petitioner.

_____

**PETITIONER'S POST-HEARING REPLY BRIEF
CONCERNING *ATKINS* AND MITIGATION CLAIMS**

_____

Respectfully submitted,


JOSEPH W. LUBY
ERIC J. MONTROY
JAHAAN SHAHEED
ANNIE FISHER
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut St., Suite 545W
Philadelphia, Pennsylvania 19106
(215) 928-0520

Dated: January 7, 2021

## TABLE OF CONTENTS

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Petitioner is intellectually disabled under the established diagnostic
      standards, from which the Government repeatedly departs. . . . . . . . . . . . . . 4

      A.    The Government's attacks on Dr. Weinstein are misguided. . . . . . . . 6

      B.    The evidence establishes Petitioner's significantly sub-average
            intellectual functioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            1.    A diagnosis of intellectual disability requires only a
                  single qualifying IQ score, which includes the scores
                  obtained by Dr. Weinstein on the CTONI-2 and the
                  WAIS-IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.    The hearing evidence supports the correction of IQ
                  scores to account for the Flynn effect. . . . . . . . . . . . . . . . . . 17
            3.    The Government's remaining attacks on Dr. Weinstein's
                  WAIS-IV testing are unavailing. . . . . . . . . . . . . . . . . . . . . . . 19
                  a.    Dr. Weinstein's administration of the Spanish-
                        language WAIS-IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
                  b.    Dr. Weinstein's use of American testing norms. . . . . . 22

      C.    Petitioner has qualifying adaptive deficits. . . . . . . . . . . . . . . . . . . . . 27
            1.    Petitioner need only demonstrate adaptive deficits
                  corresponding to mild intellectual disability, not those
                  associated with severe or moderate disability. . . . . . . . . . . . 27
            2.    The Court should accord little, if any, weight to
                  Petitioner's perceived adaptive functioning in prison. . . . . . . 31
            3.    Petitioner's high school-level coursework as an adult
                  does not detract from his showing of intellectual
                  disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
            4.    The Government relies on numerous inaccurate
                  stereotypes about intellectually disabled persons. . . . . . . . . . 35
            5.    Dr. Weinstein soundly administered the ABAS. . . . . . . . . . . 37
            6.    Petitioner manifests conceptual, social, and practical
                  adaptive deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

      D.    Petitioner's limitations originated before the age of 18. . . . . . . . . . . 42

II.    Trial counsel rendered ineffective assistance by failing to investigate
       and present evidence of Petitioner's intellectual disability and lifelong
       exposure to toxins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       A.    The Government misstates the legal standards governing
             Petitioner's ineffective-assistance claims. . . . . . . . . . . . . . . . . . . . . . . 44
             1.   Counsel's presentation of other mitigating evidence
                  at the penalty phase does not cure counsel's failure to
                  investigate and present evidence of intellectual disability
                  and exposure to toxins. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
             2.   The Government misstates and misapplies the
                  prejudice requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

       B.    Trial counsel performed ineffectively by failing to investigate
             and present evidence of Petitioner's intellectual disability. . . . . . . . . 48

       C.    Trial counsel rendered ineffective assistance by failing to
             adequately investigate and present evidence of Petitioner's
             lifelong exposure to toxins and the effects of that exposure. . . . . . . 50
             1.   Petitioner's claim rests on specific evidence of the
                  toxins to which he was exposed in childhood as well
                  as while working in the prison print shop, and such
                  evidence was lacking at trial. . . . . . . . . . . . . . . . . . . . . . . . . 51
             2.   Trial counsel's ill-investigated and legally erroneous
                  strategy was unreasonable and prejudiced the defense. . . . . . 54

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF AUTHORITIES

**Cases**

*Andrus v. Texas*, 140 S. Ct. 1875 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 47

*Atkins v. Commonwealth*, 534 S.E.2d 312 (Va. 2000). . . . . . . . . . . . . . . . . . 30, 39

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . 6, 7, 21, 22

*Brumfield v. Cain*, 576 U.S. 305 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Brumfield v. Cain*, 808 F.3d 1041 (5th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . 7, 15

*Butler v. Quarterman*, 576 F. Supp. 2d 805 (S.D. Tex. 2008). . . . . . . . . . . . . . . . 22

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 53, 57

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . 57

*Clemons v. Ala. Dep't of Corr.*, 967 F.3d 1231 (11th Cir. 2020). . . . . . . . . . . 13, 14

*Commonwealth v. Cox*, 240 A.3d 509 (Pa. 2002). . . . . . . . . . . . . . . . . . . . . . . . 38

*Cullen v. Pinholster*, 563 U.S. 170 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 46, 54

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). . . . . . . . . . . . . . 21

*Ex Parte Maldonado*, No. 721568-B (Dist. Ct. Harris County, Tex,
Dec. 13, 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ex Parte Maldonado*, No. WR-51612-02, 2013 WL 2368771
(Tex. Crim. App. May 22, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ex Parte Sosa*, No. AP-76,674, 2017 WL 2131776
(Tex. Crim. App. May 3, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Forsyth v. Ault*, 537 F.3d 887 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Hall v. Florida*, 572 U.S. 701 (2014). . . . . . . . . . . . . . . . . . . . . 10, 12, 14, 33, 49

*Harrington v. Richter*, 562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hinton v. Alabama*, 571 U.S. 263 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Howell v. State*, 151 S.W.3d 450 (Tenn. 2004). . . . . . . . . . . . . . . . . . . . . . 15, 16

*In re Hawthorne*, 105 P.3d 552 (Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Jackson v. Kelley*, 898 F.3d 859 (8th Cir. 2018).. . . . . . . . . . . . . . . . . . . . . . . 31

*Keen v. State*, 398 S.W.3d 594 (Tenn. 2012). . . . . . . . . . . . . . . . . . . . . . . . . 22

*LeCroy v. United States*, 739 F.3d 1297 (11th Cir. 2014). . . . . . . . . . . . . . . 55, 56

*Link v. Luebbers*, 469 F.3d 1197 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . 56

*Maldonado v. Thaler*, 625 F.3d 229 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . 8, 9

*Moore v. Texas*, 137 S. Ct. 1039 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Moore v. Texas*, 139 S. Ct. 666 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Newman v. State*, 2014 WL 197789, 2014 Ark. 7 (2014).. . . . . . . . . . . . . . . . 7, 8

*Ortiz v. United States*, No. 04-8001-CV-W-GAF, 2007 WL 7686126
    (W.D. Mo. Dec. 14, 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Pizzuto v. Blades*, No. 1:05-cv-516-BLW, 2012 WL 73236
    (D. Id. Jan. 10, 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013).. . . . . . . . . . . . . . . . . . 54

*Rodriguez v. Sec'y Fla. Dept. of Corr.*, 818 F. App'x 945
    (11th Cir. 2020).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 24, 25

*Rodriguez v. State*, 219 So. 3d 751 (Fla. 2017). . . . . . . . . . . . . . . . . . . . . . . 23

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . 44, 45

*Shinn v. Kayer*, — S. Ct. —, No. 19-1302, 2020 WL 7327827
(U.S. Dec. 14, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sidebottom v. Delo*, 46 F.3d 744 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 56, 57

*Sinisterra v. United States*, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . . 56

*State v. Davis*, 394 P.3d 817 (Kan. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*State v. Gumm*, 864 N.E.2d 133 (Ohio Ct. App. 2006). . . . . . . . . . . . . . . . . . . . 49

*State v. Lott*, 779 N.E.2d 1011 (Ohio 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 49

*State v. White*, No. 22591, 2005 WL 3556634 (Ohio App. Dec. 30, 2005). . . . . . 22

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . 46, 47, 48

*Taylor v. State*, 262 S.W.3d 231 (Mo. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 4, 47

*United States v. Jones*, No. 6:10-CR-03090-DGK, 2017 WL 4231511
(W.D. Mo. Sept. 22, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . 47

*United States v. Montgomery*, No. 2:11-cr-20044-JPM-1,
2014 WL 1516147 (W.D. Tenn. Jan. 28, 2014). . . . . . . . . . . . . . . . . . 21, 31

*United States v. Roland,* 281 F. Supp. 3d 470 (D.N.J. 2017). . . . . . . . . . . . . . 13, 19

*United States v. Wilson*, 170 F. Supp. 3d 347 (E.D.N.Y. 2016). . . . . . . . . 13, 14, 21

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . 3, 4, 46, 47, 53

*Wong v. Belmontes*, 558 U.S. 15 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . . 47

*Wright v. Sec'y, Dep't of Corr.*, No. 8:17-CV-974-T-02TGW,
2020 WL 4816333 (M.D. Fla. Aug. 19, 2020). . . . . . . . . . . . . . . . . . . 13, 14

v

**Statutes and court rules**

18 U.S.C. § 3596(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

28 U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2254(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 2254(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2254(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 57

Fed. R. Crim. P. 12.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 54, 55, 56

**Other authorities**

American Association on Intellectual and Developmental Disabilities,
   *Intellectual Disability: Definition, Classification, and Systems
   of Support* (11th ed. 2010) ("AAIDD-2010") . . . . . . . . . . . . . . . . . . . . *passim*

American Association on Intellectual and Developmental Disabilities,
   *User's Guide to Accompany the 11th Edition of Intellectual
   Disability: Definition, Classification, and Systems of Support*
   (2012) ("AAIDD-2012") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

American Association on Intellectual and Developmental Disabilities,
   *The Death Penalty and Intellectual Disability* (2015)
   ("AAIDD-2015") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30, 38, 43

American Association on Mental Retardation, *Mental Retardation:
   Definition, Classification, and Systems of Supports*
   (10th ed. 2002) ("AAMR-2002") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

American Psychiatric Association, *Diagnostic and Statistical
   Manual of Mental Disorders-5th Edition* (2013) ("DSM-5") . . . . . . . *passim*

Laura Shifter, *High School Graduation of Students With Disabilities: How Long Does It Take?*, 77 Exceptional Children 409 (2011). . . . . . . . . 35

Christopher B. Swanson, *Special Education in America: The State of Students with Disabilities in the Nation's High Schools* (2008). . . . . . . . . 35

Michael Welner, *Forensic Psychiatry and Forensic Psychology: Mental Handicap and Learning Disability*, from *Encyclopedia of Forensic and Legal Medicine*, Vol. 2 (2016).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

## **INTRODUCTION**

Petitioner Alfonso Rodriguez has made a conclusive showing of intellectual disability based on established diagnostic standards. Those standards are provided by the American Association on Intellectual and Developmental Disabilities and the American Psychiatric Association, whose "current manuals" offer "the best available description of how mental disorders are expressed and can be recognized by trained clinicians[.]" *Moore v. Texas*, 137 S. Ct. 1039, 1053 (2017); *see also* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 31 (11th ed. 2010) ("AAIDD-2010"); AAIDD, *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* (2012) ("AAIDD-2012"); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-5th Edition* (2013) ("DSM-5"). The Government's neuropsychological expert, Dr. James Seward, recognized those same manuals as authoritative. Hrg. 1061, 1286-87. The Government even argues that the Federal Death Penalty Act incorporates the AAIDD's standards in determining which prisoners are ineligible for execution. Govt. Br. 89.

In its response, the Government repeatedly departs from what it admits are the established diagnostic standards. It adopts a wide variety of contra-diagnostic stereotypes, for example: Petitioner can carry on a friendly conversation, was not labeled or perceived as "retarded" during his childhood, held various jobs when not

1

incarcerated, and maintained his driver's license. *Id.* at 38, 48-49, 80-81, 89; *Moore*, 137 S. Ct. at 1046 n.6 (listing the disapproved *Briseño* factors, including whether those who knew the defendant "during the developmental stage" regarded him as "mentally retarded at the time"); AAIDD-2012 at 26 (listing disapproved stereotypes). The Government also relies on Petitioner's perceived abilities in the highly-structured environment of prison, while ignoring the all-encompassing supports in prison that allow Petitioner to function there. Govt. Br. at 84-87; *see also* AAIDD-2010 at 1 ("With appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve.").

More generally, the Government cherry-picks from the evidence in order to exaggerate Petitioner's functioning, such as his purported role as his mother's "caretaker" – a term that appears to describe household chores, Govt. Br. 83 – even though Petitioner lived rent-free in his mother's basement, where he mostly isolated himself as he had when living with his family before he was incarcerated. Hrg. 499-500, 608-09. The Government similarly argues that Petitioner completed high school in prison or earned a GED. Govt. Br. Govt. Br. 18, 30, 34, 79, 85. But it presents no documentation that Petitioner took and passed the national GED examination because there is no such evidence. And it ignores the circumstances of Petitioner's high school education in prison – a process that took five years even with individualized instruction, and after which Petitioner tested out at a 6.7 grade level in reading and a

2

4.3 grade level in mathematics on the Wide Range Achievement Test. Hrg. 1317-19.

The Government's attacks on Petitioner's ineffective-assistance claims are similarly without merit. Trial counsel performed deficiently, and prejudiced their client, by failing to investigate and develop evidence of his intellectual disability and lifelong toxin exposure. The Government chiefly contends that the claims are all but precluded as a matter of law: first, because the sheer volume of mitigating evidence at trial automatically establishes counsel's effectiveness regardless of whatever other evidence they failed to investigate, discover, and present; and second, because the instant offense was so aggravated that no additional mitigation could have made any difference to even a single juror.

Both arguments are wrong. There is no specified amount of mitigation that establishes counsel's effectiveness, and instead, the relevant question is whether counsel based their defense on an adequate investigation of "all reasonably available mitigating evidence" and in accordance with the governing law. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Counsel in this case performed deficiently because they had ample notice of evidence that Petitioner is intellectually disabled under the standards that were known to counsel, under which Petitioner's IQ score alone did not foreclose the use of intellectual disability to either establish his categorical ineligibility for the death penalty or mitigate the offense. Counsel likewise failed to investigate and discover evidence of the specific toxins to which Petitioner was exposed while living on a farm in

3

childhood and working for two decades at a print shop in prison, as well as the effects of those toxins on Petitioner's neuropsychological functioning.

Neither of these failures to investigate can qualify as a "reasonable" strategic decision. Both errors involve counsel's decision to truncate the investigation even though "the known evidence would have led a reasonable attorney to investigate further." *Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) (quoting *Wiggins*, 539 U.S. at 527). Both errors involve counsel's misapprehension of the law: the legal and diagnostic standards governing intellectual disability, as well as the standards governing disclosure of expert opinions under Fed. R. Crim. P. 12.2, which led counsel to limit the expert's role. Both errors involve evidence that would have altered fundamentally the trial mitigation presentation, which expressly denied that Petitioner was "mentally retarded," and which never explained or demonstrated which toxins Petitioner was exposed to or what effect they had. Both types of evidence would have substantially mitigated Petitioner's crime despite its utmost seriousness. Indeed, "There is no crime that, by virtue of its aggravated nature standing alone, automatically warrants a punishment of death." *Taylor v. State*, 262 S.W.3d 231, 252 (Mo. 2008) (prejudice established despite rape and murder committed while defendant was already incarcerated for an earlier rape and murder). Counsel's errors left Petitioner to be sentenced by a materially uninformed jury.

4

## I.    PETITIONER IS INTELLECTUALLY DISABLED UNDER THE ESTABLISHED DIAGNOSTIC STANDARDS, FROM WHICH THE GOVERNMENT REPEATEDLY DEPARTS

The Government offers a contra-diagnostic case that Petitioner is death-eligible. It rejects the legally governing principle that Petitioner needs only a single qualifying IQ score, and even then, it resists application of the clinically-accepted Flynn effect, overlooks the sufficiency of Petitioner's qualifying score on the AAIDD-endorsed Comprehensive Test of Nonverbal Intelligence (CTONI-2), and nit-picks its way through Dr. Weinstein's administration of the WAIS-IV without even trying to show how any defects in Dr. Weinstein's testing affected Petitioner's score.

Similar errors infect the Government's analysis of Petitioner's adaptive functioning. The Government endorses a slew of stereotypes that diagnostic authorities and the Supreme Court have rejected. Equally troubling, it asks the Court to rely on Petitioner's perceived skills from within the highly structured environment of prison – where Petitioner has spent all but seven months of his life since the age of 21 – in order to show that Petitioner had no adaptive deficits when he committed a crime on the outside. Similarly off-base is the Government's attack on Dr. Weinstein's credibility. Dr. Weinstein has participated as an expert in some 130 to 150 *Atkins* cases, and it is unremarkable that the Government cites three cases in which courts have rejected his testimony.

In short, the Government's arguments are insubstantial. The Court should

5

sustain Petitioner's claim that he is intellectually disabled under *Atkins v. Virginia*, 536 U.S. 304 (2002), and the FDPA, 18 U.S.C. § 3596(c).

### A.   The Government's attacks on Dr. Weinstein are misguided

Dr. Weinstein candidly admits that he would not testify for the prosecution in an *Atkins* case. Hrg. 711. From that premise – that Dr. Weinstein would not assist the prosecution in the case of a defendant whom he finds not to be intellectually disabled – the Government contends that Dr. Weinstein has actively "manufactured" the desired findings in Petitioner's case by abandoning "scientific objectivity." Govt. Br. 57.[1]

The Government's suggestion is unwarranted. Its own experts have never testified for the defense in an *Atkins* case. Hrg. 1173-75, 1417. And far from practicing "scientific objectivity" under accepted clinical criteria, Dr. Welner expressly rejects the AAIDD's standards for assessing adaptive behavior – a rejection that the Government follows by urging the Court to measure Petitioner's adaptive capacities according to his crimes in the outside world and his support-aided life in prison. *See* Pet. Br. 34-37 and sources cited; Govt. Br. 39, 85-87. Dr. Seward's conclusions are contra-diagnostic as well, even as he acknowledges that the

---

[1] The Government quotes a lengthy excerpt from Dr. Weinstein's deposition. *See* Govt. Br. 57. The deposition was not admitted into evidence at the hearing, and the same is true of the other six exhibits attached to the Government's brief. At no point does the Government explain why or how its new exhibits are properly before the Court. Petitioner objects to all seven exhibits and urges the Court to ignore them.

AAIDD's manual and user's guide are authoritative in the field. *See* Pet. Br. 32-34; Hrg. 1286-87.

Neither has the Government shown that Dr. Weinstein's supposed bias influenced his findings. The Government offers no persuasive reason why Dr. Weinstein should use Mexican test norms to measure the intelligence of a man who has never lived in Mexico, and it presented no evidence that Dr. Weinstein's use of the Spanish-language WAIS-IV made any difference in Petitioner's score. Tellingly, Dr. Seward reached the same full-scale IQ score of 74 (using American testing norms) when he re-ran Dr. Weinstein's test data to correct for his perceived scoring errors and changes in the sequencing of test questions. Hrg. 1271-78.

Still more strained is the Government's attack on Dr. Weinstein's "dubious track record." Govt. Br. 57-58. The Government cites three cases in which courts have rejected or criticized Dr. Weinstein's findings. But *Atkins* hearings are generally contested adversarial proceedings, and it is not surprising that a few courts have reached such conclusions. On the other hand, courts have repeatedly credited Dr. Weinstein's testimony. *See*, *e.g.*, *Brumfield v. Cain*, 808 F.3d 1041, 1054-55, 1059, 1061 (5th Cir. 2015) (affirmance of grant of habeas relief on *Atkins* claim, including Dr. Weinstein's IQ testing and testimony on adaptive functioning); *Ex Parte Sosa*, No. AP-76,674, 2017 WL 2131776 (Tex. Crim. App. May 3, 2017) (relief granted on claim of intellectual disability, affirming lower court's findings based on Dr. Weinstein's testimony); *Newman v. State*, 2014 WL 197789, 2014 Ark. 7, 17 (2014)

(granting claim of incompetence to stand trial, and crediting Dr. Weinstein's testimony that Newman scored 67 on the WAIS-III). From among the many cases in which Dr. Weinstein has testified in multiple courts, Hrg. 378-79, 556-57, it is unremarkable that some courts in some cases would credit the prosecution's experts over Dr. Weinstein.

In any event, a closer examination of the three cited cases strongly supports Dr. Weinstein's "track record." The first such case is *Maldonado v. Thaler*, 625 F.3d 229 (5th Cir. 2010). The Government points out that the Fifth Circuit was "troubled" by the fact that Dr. Weinstein's report did not include the results from the verbal portion of the WAIS-Español, which reflected a score of 83 and appeared to conflict with the full-scale IQ score of 61 that Dr. Weinstein obtained with the Woodcock-Muñoz Batería-R. *Id.* at 239-40.

Subsequent events vindicated Dr. Weinstein, who had not testified in the *Maldonado* proceedings and was unable to explain himself. *See id.* at 233. Maldonado's case was reopened after the state's expert was professionally reprimanded and agreed to stop working on *Atkins* cases. The Texas Court of Criminal Appeals ultimately found Maldonado to be intellectually disabled and reduced his sentence to life imprisonment. *See Ex Parte Maldonado*, No. WR-51612-02, 2013 WL 2368771 (Tex. Crim. App. May 22, 2013). It did so by adopting the trial court's findings from six months earlier. *Id.* at *1. Those findings, in turn, explained that (a) Dr. Weinstein had used the WAIS-Español verbal portion only as a

8

screening device in order to "determine how well Mr. Maldonado responded to instructions and whether he would be able to answer questions"; (b) the WAIS-Español's outdated and defective norms tend to overestimate the subject's IQ by 20 points; (c) the partial verbal score should be adjusted downward to 63; (d) so adjusted, the verbal score of 63 was consistent with the score of 61 that Dr. Weinstein credibly obtained on the Batería-R as well as with another expert's scores of 70 on the Beta-III and 62 on the CTONI; and (e) Dr. Weinstein's full-scale IQ score of 61 on the Batería-R was "credible and reliable, and as such, the test was scored correctly." *See Ex Parte Maldonado*, "Court's Partially Adopted Findings of Fact and Conclusions of Law" (Cause No. 721568-B, Dist. Ct. of Harris County, Texas, Dec. 13, 2002) (Attached as Exhibit 1), ¶¶ , 18-19, 55-56, 90-100. Far from discrediting Dr. Weinstein, the *Maldonado* case shows that a court relied on his credible findings.

To similar effect is the second case cited by the Government: *Ortiz v. United States*, No. 04-8001-CV-W-GAF, 2007 WL 7686126 (W.D. Mo. Dec. 14, 2007). The district court in *Ortiz* criticized Dr. Weinstein for using American norms to reach an IQ score on the WAIS-III for a Colombian national who had been living in the United States for several years. The court remarked that no Colombian norms had been developed for the test, that the American norms failed to account for Ortiz's illiteracy in both Spanish and English as well as his lifelong cultural impoverishment, and that the Dr. Weinstein's administration of the WAIS-III was therefore unreliable. *Id.* at *3-*4; *but see Moore*, 137 S. Ct. at 1051 (observing that experts in the field

9

treat risk factors for intellectual disability as explanations for the disability and "not to counter the case for a disability determination"). The court also criticized Dr. Weinstein's sole focus on Ortiz's adaptive deficits, as well as his refusal to credit perceived adaptive strengths such as Ortiz's participation in a large-scale narcotics conspiracy, his ability to travel by airplane from Houston to Kansas City in order to commit a murder, his earlier service in the Colombian military, and his ability to drive a car and support his children. *Ortiz*, 2007 WL 7686126 at *4-*6; *but see Moore*, 137 S. Ct. at 1050 (rejecting the state court's reliance on Moore's adaptive strengths because "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*") (emphasis in original); *id.* at 1052 ("[T]he medical profession has endeavored to counter lay stereotypes of the intellectually disabled.").

Once again, later events vindicated Dr. Weinstein. Leaving aside the fact that Judge Fenner lacked the benefit of *Moore* as well as *Hall v. Florida*, 572 U.S. 701 (2014), when he rejected Ortiz's claim in 2007, the Government reexamined Ortiz's intellectual disability in 2016 in order to determine the appropriateness of executing him. *See* Brief for the United States (U.S. Case No. 14-7506, filed Jan. 17, 2017 on petition for writ of certiorari) (attached as Exhibit 2), at 11-12. The Government retained neuropsychologist Daniel A. Martell, who had served as the state's expert in *Atkins*. *Id.* at 11. Dr. Martell observed that the Government's expert in *Ortiz* had herself used improper testing norms, that Dr. Weinstein's score of 54 on the WAIS-III "provides the best overall indication of [Ortiz's] intellectual functioning," that the

10

Government's expert and the district court had wrongly "weigh[ed] things [Ortiz] could do against things he could not," and that Ortiz is intellectually disabled. *Id.* at 11-14. On January 13, 2017, Attorney General Loretta E. Lynch authorized Department of Justice personnel to consent to the entry of judgment in Ortiz's favor. *Id.* at 14-15. Four days later, President Obama commuted Ortiz's death sentence to life imprisonment. *See* Executive Grant of Clemency (attached as Ex. 3).

The Government's third case is *Pizzuto v. Blades*, No. 1:05-cv-516-BLW, 2012 WL 73236 (D. Id. Jan. 10, 2012). As the Government points out, the district court in *Pizzuto* declined to credit the WAIS-IV results from Dr. Weinstein. *Id.* at *13-*14. Although the court described some of Dr. Weinstein's test results as "ambiguous," the main issue in the case was how to reconcile conflicting IQ scores: Dr. Weinstein obtained an IQ score of 60 in 2009, in comparison to competing scores of 92 from 1996 and 72 from 1985. Dr. Weinstein acknowledged that the earlier scores might be more accurate and that Pizzuto's advancing age and heart disease could depress his score and contribute to "an overall decline in his mental acuity." *Id.* at *14. The court, then, accorded little weight to Dr. Weinstein's score because of weaknesses that Dr. Weinstein himself acknowledged. *Id.* That ruling does not support the Government's narrative of Dr. Weinstein's systematic "bias and unreliability." Govt. Br. 58.

To summarize: the "dubious track record" described by the Government consists of two cases in which the prisoner was ultimately re-sentenced to life on the strength of Dr. Weinstein's findings, as well as a third case in which a court

11

discounted an IQ score obtained by Dr. Weinstein in light of methodological

weaknesses described by Dr. Weinstein himself. That is a laudable track record and

not a "dubious" one.

> **B.    The evidence establishes Petitioner's significantly sub-average intellectual functioning**

The Government asks the Court to accept Dr. Seward's test results over Dr.

Weinstein's, but it misapprehends the clinical standards that govern how to measure

intellectual functioning. And despite criticizing Dr. Weinstein's WAIS testing at

length, the Government does not even argue that the claimed defects in Dr.

Weinstein's testing made any difference in Petitioner's scores – as Dr. Seward

conceded that they did not. Hrg. 1271-78. Petitioner readily satisfies prong one of

*Atkins*: significantly sub-average intellectual functioning as reflected in a full-scale

IQ score of 75 or below. *See Hall*, 572 U.S. at 712, 723-24; *Moore*, 137 S. Ct. at

1049-50; *Brumfield v. Cain*, 576 U.S. 305, 315 (2015).

> **1.    A diagnosis of intellectual disability requires only a single qualifying IQ score, which includes the scores obtained by Dr. Weinstein on the CTONI-2 and the WAIS-IV**

The Government urges the Court to discount Dr. Weinstein's WAIS-IV result

of 74 – to which the Government separately resists a Flynn correction to 70 – as an

"outlier" in comparison to the results obtained from Dr. Seward in these proceedings

and Dr. Karen Froming before trial. Govt. Br. 67-73. This argument fails for four

separate reasons.

*First*, the Government does not even discuss Petitioner's authorities, which

hold that an individual satisfies the requirement of significantly sub-average intellectual functioning when the confidence interval surrounding any single valid IQ score falls into the range of 70 or below – as do Petitioner's scores of 64 on the CTONI-2 and 70 on the Flynn-corrected WAIS-IV. *See United States v. Wilson*, 170 F. Supp. 3d 347, 366, 372 (E.D.N.Y. 2016); *United States v. Roland*, 281 F. Supp. 3d 470, 503 (D.N.J. 2017); Pet. Ex. 44 at 11. *Wilson* and *Roland* both involve federally-sentenced prisoners and are governed by the same standards that apply in Petitioner's case.

*Second*, the cases on which the Government relies for its outlier-discounting theory are readily distinguishable. In *Clemons v. Ala. Dep't of Corr.*, 967 F.3d 1231 (11th Cir. 2020), the state courts discounted all three of Clemons's below-75 scores because the trial court credited evidence that he was malingering. *Id.* at 1247-48. To similar effect is *Wright v. Sec'y, Dep't of Corr.*, No. 8:17-CV-974-T-02TGW, 2020 WL 4816333 at *13 (M.D. Fla. Aug. 19, 2020), which held that the Florida Supreme Court had reasonably considered "the likelihood of malingering when reviewing this record," in which Wright's only qualifying score from among nine tests was 75. In this case, by contrast, there is no evidence that Petitioner was malingering on any of his IQ tests. Hrg. 396-98, 1091. The Government does not even advance such an argument.

Beyond factual differences, *Clemons* and *Wright* involve a materially different legal posture from the one in this case. In these § 2255 proceedings the Court must

consider Petitioner's *Atkins* and FDPA claims *de novo* rather than through the deferential lens of AEDPA. *See* 28 U.S.C. §§ 2254(d)-(e). The question is whether Petitioner is intellectually disabled under current legal and diagnostic standards, *see* 18 U.S.C. § 3596(c), not whether a state court's adverse ruling was, under the law governing at the time of the decision, "so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, — S. Ct. —, No. 19-1302, 2020 WL 7327827 at *3 (U.S. Dec. 14, 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *see also Clemons*, 967 F.3d at 1249 (holding that the Alabama courts reasonably employed a strict IQ score cut-off of 70 prior to *Hall*); *Wright*, 2020 WL 4816333 at *12 (Florida rulings were "reasonable" under *Hall* and *Moore*).

*Third*, the Government gives short shrift to Petitioner's score of 64 on the CTONI-2. That valid score satisfies the intellectual deficit requirement regardless of the strength of the Government's many (unwarranted) attacks on Dr. Weinstein's WAIS-IV results. *See Wilson*, 170 F. Supp. 3d at 366, 372-75 (relying on one of nine IQ scores to determine that Wilson satisfied Prong One). The Government does not dispute that Petitioner scored a 64 on the CTONI-2. It does not dispute that Dr. Weinstein correctly administered and scored the test. It does not dispute that the CTONI-2 is an "intelligence test" as described by Dr. Seward, or that Dr. Welner specifically endorses its use. *See* Michael Welner, *Forensic Psychiatry and Forensic Psychology: Mental Handicap and Learning Disability* (from Encyclopedia of

14

Forensic and Legal Medicine) Vol. 2 (2016), at 641, 643 (Pet. Ex. 80); Hrg. 1258-59, 1268-69. And it does not dispute that the AAIDD has endorsed the CTONI-2 as an IQ test to diagnose intellectual disability when the subject's language skills are in question. *See* Govt. Br. 22; Hrg. 420-21; *see also* Govt. Ex. 643 (Welner report) at 95 ("Intellectual testing in Al Rodriguez confronts the challenge that English is his second language."); Hrg. 642 (per Dr. Weinstein, "I gave him a nonverbal test because he is bilingual.").

The Government now argues that that the CTONI-2 is not "generally used" as a diagnostic IQ instrument, and that the test is "more appropriately given" when the subject "is unable to take a traditional ability test." Govt. Br. 62 (citing Govt. Ex. 586 (excerpt from CTONI-2 testing manual)). But that argument does not invalidate Petitioner's CTONI-2 score. Even Dr. Seward testified that the CTONI-2 is not exclusively intended "for people who can't speak or only use sign language or anything like that." Hrg. 1259. Case authorities also recognize the appropriateness of the CTONI as a general intelligence test. *See*, *e.g.*, *Brumfield*, 808 F.3d at 1047 (5th Cir. 2015) ("Weinstein administered two IQ tests to Brumfield in 2007 . . . Brumfield scored a 72 (95% confidence interval of 69-77) on the Stanford-Binet V and a 70 (95% confidence interval of 65–75) on the C-TONI. Both of these scores fall within the intellectually disabled range and thus meet the first prong of the intellectual disability test."); *Howell v. State*, 151 S.W.3d 450, 459 (Tenn. 2004) (although the WAIS-III has been called the "standard instrument" for assessing intellectual

15

functioning, "there is nothing in the record to indicate that . . . the Stanford-Binet Intelligence Test-Fourth Edition or the CTONI are not also accurate I.Q. tests").

The testing manual on which the Government relies states that the CTONI-2's "principal" uses include testing people who "come from cultural, linguistic, educational, or socioeconomic backgrounds that *might* negatively influence their performance on ability tests." Govt. Ex. 586 (emphasis added). Multiple experts have endorsed that very possibility in this case. *See* Govt. Ex. 643 (Welner report) at 95-96 (stating that cultural factors "could potentially depress his performance on intelligence testing"); Govt. Ex. 615 (Seward report) at 43-44 (noting that Petitioner's group-administered IQ scores from childhood were "near the range of Mental Retardation/Intellectual Disability," but explaining that Petitioner "had an impoverished upbringing, and did not learn English until he was about 8 years old"); Trial Tr. 7981-82 (similar, per Dr. Hutchinson). Dr. Weinstein, then, administered the CTONI-2 in accordance with the AAIDD's guidance as well as the test's manual. The score of 64 stands.

*Fourth*, the Government begs the question of which IQ score is the "outlier." Petitioner's individually-administered IQ scores are as follows:

●64 on the CTONI-2, with Dr. Weinstein in 2018

●70 on the WAIS-IV, with Dr. Weinstein in 2018, reflecting a correction from the obtained score of 74 in light of the Flynn effect. *See* Pet. Ex. 44 at 11.

●79 on the WAIS-III, with Dr. Froming in 2005, reflecting corrections from

16

the obtained score of 87 in light of the Flynn effect, a scoring error, and the WAIS-

III's defective testing norms. *See* Pet. Br. 16-17, 68 and sources cited.

●84 on the WAIS-IV, with Dr. Seward in 2013, reflecting a correction from

the obtained score of 86 in light of the Flynn effect. Hrg. 1289, 1382.

Dr. Weinstein's score of 70 on the WAIS-IV is not the "outlier" that the

Government urges it to be. That distinction belongs to Dr. Seward's score, which

exceeds by 10 points the average (74) of the four individually-administered IQ test

scores. Moreover, Petitioner obtained group-administered IQ scores of 77 in the first

grade, 80 in second grade, 79 in third grade, and 74 in fifth grade on the Kuhlman-

Anderson test. Hrg. 443-44; Govt. Ex. 615 (Seward report) at 29. Those scores

provide further evidence that Dr. Weinstein's WAIS-IV result is not an aberration.

The Government argues that group-administered tests cannot ensure the subject's

effort or eliminate classroom distractions. Govt. Br at 72. Nonetheless, the Kuhlman-

Anderson scores reflect four separate administrations of the same test with similar

results each time. Even if the Court were to require more than a single qualifying test

score, the totality of Petitioner's scores is "approximately two standard deviations

below the mean, considering the standard error of measurement for the specific

instruments used and the instruments' strengths and limitations." AAIDD-2010 at 31.

2.    **The hearing evidence supports the correction of IQ scores to account for the Flynn effect**

The Government argues against the Flynn effect, Govt. Br. at 66-67, yet it did

not elicit any expert testimony against applying it. Dr. Seward described the Flynn

17

effect as "controversial" but never testified against its use. Hrg. 1380-82. The two journal articles that the Government now cites were not endorsed by Dr. Seward at the hearing. Hrg. 1381-82. They do not disprove Dr. Weinstein's testimony that the overwhelming majority of scholarly articles on the subject accept the idea of correcting an individual's IQ score for the Flynn effect. Hrg. 707-08, 765-66. That idea makes sense: an IQ score measures the subject's intelligence against the relevant population. Hrg. 425, 429-30. Because the American population's intelligence increased by one-third of a point per year during the twelve years that elapsed between the time that the WAIS-IV's testing norms were established (2006) and the time that Petitioner took the test (2018), Petitioner's score should be adjusted so that it compares his intelligence in 2018 to that of the population of 2018 instead of the population of 2006. Pet. Ex. 44 at 11; Pet. Ex. 2 at 173; Hrg. 429-32.

Notwithstanding the two articles on which the Government relies, the AAIDD states that "best practices" require a Flynn adjustment to correct for aging test norms. AAIDD-2010 at 37; AAIDD-2012 at 23. Dr. Seward's testimony and the Government's brief both state the AAIDD's guidance is authoritative in establishing the standards for determining intellectual disability. Hrg. 1236, 1286-87; Govt. Br. 89. The Supreme Court describes that same guidance as "the best available description of how mental disorders are expressed and can be recognized by trained clinicians[.]" *Moore*, 137 S. Ct. at 1053. It does not help the Government to cite two pre-*Moore* cases in which courts declined to apply the Flynn effect. Govt. Br. 66-67.

18

Those authorities do not justify a departure from the "best practices" described by the non-conflicting expert testimony at the hearing in *this* case. *See*, *e.g.*, *Roland*, 281 F. Supp. 3d at 503 (choosing to apply the Flynn effect "in light of the AAIDD's mandate, the evidence presented by both parties, and other federal courts' practices").

3.    **The Government's remaining attacks on Dr. Weinstein's WAIS-IV testing are unavailing**

The Government fares no better criticizing Dr. Weinstein's administration of the WAIS-IV. It attacks Dr. Weinstein's use of the Spanish-language test, quibbles with Dr. Weinstein's documentation of Petitioner's responses, and argues that Dr. Weinstein cannot measure Petitioner's IQ from the Mexican-published test by using American norms. Govt. Br. 55-56, 59-65. These objections are largely addressed in Petitioner's opening brief, *see* Pet. Br. 10-16, 18-23, 58-65, but Petitioner offers a few responsive arguments here.

a.    *Dr. Weinstein's administration of the Spanish-language WAIS-IV*

Chief among the Government's objections is Dr. Weinstein's use of the Spanish-language test that he brought with him to the prison, and his decision to then translate the test into English and use American-based cultural questions when Petitioner told him of his preferred language. Hrg. 1728 ("[English] was his choice. I had to respect that."). Dr. Weinstein has administered the WAIS in both languages "hundreds of times." Hrg. 1729. The two tests are identical except for "very minor differences" for which Dr. Weinstein adjusted Petitioner's test. Hrg. 436-37, 693-94, 1160, 1731. Dr. Weinstein explained that his use of the Spanish-language test did not

19

lower Petitioner's score. Hrg. 1732. The Government offered no testimony to the contrary, and it cites none in its brief. Dr. Seward even acknowledged that the scoring errors he imputed to Dr. Weinstein's test – including the alleged failure to "query" Petitioner's responses, to credit responses in accordance with how Dr. Seward would credit them, and the sequencing of questions on the Spanish-language test – did not depress Petitioner's score. Hrg. 1271-78.

Neither does it matter that Dr. Weinstein did not universally "record[] the completion times for each item." Govt. Br. 64 (citing Hrg. 1153). On the "block design" test at issue, Dr. Weinstein gave full credit to Petitioner for any drawing completed within the time limit of 30 or 60 seconds but without recording the time elapsed. Govt. Ex. 580 at 103; Hrg. 679-80. Dr. Weinstein wrote down the completion times only when they would affect the score, such as the 32 seconds for the ninth cube design (worth four points when the range is 31 to 60 seconds) or the full 60 and 120 seconds for the tenth and eleventh designs (zero points, because they were not completed within the allotted time). Hrg. 679-80; Govt. Ex. 580 at 103. Dr. Seward criticized Dr. Weinstein, because the test manual instructs the administrator to record the completion time for each and every item. Hrg. 1153. But there is no reason why Dr. Weinstein's failure to do so would affect Petitioner's score, let alone inflate it. *See* Hrg. 1271 (Dr. Seward agreeing that "Dr. Weinstein did give Petitioner full credit on all four of those questions where he didn't write down the time."). The Government is straining at gnats.

20

More generally, the Government cites no authority for its apparent view that an IQ test must be methodologically pristine in order to satisfy the *Atkins* requirement of substantially sub-average intellectual functioning, or even to be admissible under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).[2] No such requirement exists. *See*, *e.g.*, *Wilson*, 170 F. Supp. 3d at 373-74 ("[A]lthough the court finds that Wilson has satisfied the requirements of prong one, the court has several concerns about the reliability of these [two] results."); *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1516147 at *37, *44 (W.D. Tenn. Jan. 28, 2014) (prong one satisfied based on two WAIS-IV tests, even though defendant passed only a "majority" of effort tests instead of all of them).

At any rate, a wide variety of test scores and other data validate Dr. Weinstein's WAIS-IV score of 74 (Flynn-corrected to 70), whether or not any additional test satisfies prong one by itself. Petitioner achieved a score of 70 on the Test of General Reasoning Ability (TOGRA); a score of 64 on the CTONI-2; scores

---

[2] The Government raises a *Daubert* objection almost two years after the evidentiary hearing, despite knowing weeks beforehand that Dr. Weinstein had used the Mexican-published WAIS-IV. Govt. Br. 56. Had the Government lodged a proper objection, Petitioner could have sought to remedy the alleged defect by arranging for Dr. Weinstein to retest Petitioner with the American-published WAIS-IV or another instrument before the hearing. Nevertheless, the Government appears to recede from its objection several pages later. *Id.* at 67 ("The United States does not request that the Court reject Dr. Weinstein's full scale IQ score of 74 and make a determination based solely on the IQ scores that Rodriguez does not meet the definition of intellectual disability based solely on his failure to prove sub-average intellectual functioning under the first prong in the DSM-5.").

21

of 74, 77, 79, and 80 on group-administered IQ tests during his childhood; and multiple WRAT scores showing academic skills at the sixth grade level or below even after Petitioner's alleged graduation from high school. Pet. Ex. 44 at 11; Pet. Ex. 48. Courts routinely use such measures to validate disputed IQ scores. *See*, *e.g.*, *Keen v. State*, 398 S.W.3d 594, 599 n.5 (Tenn. 2012) (expert explained that standardized academic tests "do not meet the 'gold standard' required in an *Atkins* . . . hearing" but nevertheless corroborate Keen's IQ scores on the WISC, WAIS-III, and WAIS-IV); *State v. White*, No. 22591, 2005 WL 3556634 at *4 (Ohio App. Dec. 30, 2005) ("Both experts were satisfied that the IQ score of 52, as established by the WAIS-III, was authentic and corroborated by the WRAT-III and also by the surrounding circumstances."); *Butler v. Quarterman*, 576 F. Supp. 2d 805, 811-12 (S.D. Tex. 2008) (childhood IQ score of 80 was corroborated by Butler's score on the Short Form Test of Academic Aptitude).

 **b.**   *Dr. Weinstein's use of American testing norms*

  Neither is there merit to the Government's complaints about American testing norms. *See* Govt. Br. 62-64; Pet. Br. 60-61. The Government incorrectly cites *(Juan) Rodriguez v. Sec'y Fla. Dept. of Corr.*, 818 F. App'x 945 (11th Cir. 2020), for the proposition that Dr. Weinstein "improperly administered a Mexican version (rather than a Cuban version) of the WAIS exam when the defendant should have been given

the Cuban version of the test." Govt. Br. 62.[3]  In fact, no Cuban version of the WAIS-III exists. The only Spanish-language versions of the WAIS-III were published in Mexico, Puerto Rico, and Spain. Hrg. 439, 761. The state's expert in *Juan Rodriguez* opined that Spain's version of the WAIS-III would be more appropriate than Mexico's for testing a Cuban immigrant, "because Cuban culture more closely aligns with Spanish culture." *(Juan) Rodriguez v. State*, 219 So. 3d 751, 756 (Fla. 2017).

The *Juan Rodriguez* case involved a difference of expert opinion as between the Mexican test and the Spanish test. There was no finding that Dr. Weinstein "improperly" administered the wrong test, much less that he manipulated the evidence by avoiding the "Cuban version" when testing a Cuban defendant. Neither did the Eleventh Circuit reach such a holding. It merely affirmed the denial of habeas corpus relief, and in doing so, it held that the Florida courts did not "unreasonably" determine the facts by crediting the state's expert views over Dr. Weinstein's. *Juan Rodriguez*, 818 F. App'x at 961-62; 28 U.S.C. §§ 2254(d)(2), (e)(1).

More importantly, the norming question in *Juan Rodriguez* materially differs from the one at issue here. The defendant in *Juan Rodriguez* had lived in Cuba through his teenage years before immigrating to the United States – quite unlike Petitioner, who was born in the United States and has lived in the United States his

---

[3]  We refer to the defendant-petitioner in the Eleventh Circuit case as "Juan Rodriguez" in order to avoid confusion with the present case, in light of the fact that both cases involve Dr. Weinstein and the two defendants have the same surname.

entire life, and for whom there is no plausible justification to apply any other country's testing norms. Dr. Weinstein administered the Mexican-published version of the WAIS-III in *Juan Rodriguez*, which was "questionable" because the defendant had never lived in Mexico, and the "cultural differences" between Cuba and Mexico diminished the reliability of the Mexican-published test. *Juan Rodriguez*, 818 F. App'x. at 961. In this case, by contrast, Dr. Weinstein substituted American questions for Mexico-specific ones – such as the question about Abraham Lincoln in place of the question about Emiliano Zapata. Hrg. 436-38, 693-94, 1160. There are no "cultural differences" for which Dr. Weinstein failed to account.

For that matter, Dr. Weinstein employed American norms to gauge Juan Rodriguez's answers to the *Mexican* test questions. The state's expert believed that norming the Mexican test to American standards would "underestimate the IQ of a subject without a high school education." *Juan Rodriguez*, 818 F. App'x at 961. That testimony does not diminish the reliability of Dr. Weinstein's testing in this case, which involved the use of American norms for answers to the *American* test questions – even though the sequencing of the questions differed slightly from the American-published version of the test. Hrg. 436-38, 693-94, 1157, 1160, 1195-98. In addition, there is no record evidence in this case that using American norms on Petitioner's test (the WAIS-IV) tends to depress IQ scores for less educated test-takers, as the state's expert testified in *Juan Rodriguez* with respect to the WAIS-III. And there is no dispute that Petitioner has "a high school education" and took courses

24

for at least five years, whether or not he earned a degree. Hrg. 1317-18. Petitioner therefore falls outside of the population for whom the WAIS-III's American norms would "underestimate the IQ." Finally, *Juan Rodriguez* does not hold that Dr. Weinstein acted improperly by applying American norms to the Mexico-published WAIS-III, as the Government implies. Drs. Weinstein and Seward agree that the Mexican norms for the WAIS-III were defective, and that the test's publisher authorized the use of American norms in their place. Hrg. 1238-40, 1733-34.

The Government next argues that Dr. Weinstein additionally erred in his norming of the WAIS-IV by employing the same process that was authorized by the publishers of the WAIS-III. Govt. Br. at 63-64. That process involves two separate population-specific adjustments to a subject's score. First, the examiner adjusts the person's raw score to account for the distribution and effects of age in the relevant population, whether American, Mexican, or otherwise. Hrg. 1372-73, 1737-38. The Government refers to the age-adjustment task as "step two." Govt. Br. 63. Second, the examiner arrives at the age-modified score according to the norms established in the relevant population, and specifically, that population's level of education, social welfare, and other relevant characteristics as reflected by the test performance of a sample of that population. Hrg. 772-74, 1373-74, 1738-39. That second modification yields the subject's IQ score relative to that of the population to which the subject being compared. Hrg. 772-74, 1373-74.

25

The Government's complaint appears to be that it was illegitimate for Dr. Weinstein to use American age-equivalency numbers at "step two" *in addition* to using American norms at the last step, because the WAIS-IV manual does not expressly authorize that process when the subject has taken the Mexican-published test. That complaint is misguided. For one thing, it rests on the mistaken premise that Petitioner took the Mexican-published test, when in fact Dr. Weinstein administered the questions for the American test – differing only slightly in the sequencing of some of the questions, but without any effect on Petitioner's score. Hrg. 436-38, 693-94, 1157, 1160, 1195-98, 1271-78.

Moreover, as long as it was permissible for Dr. Weinstein to use American norms in order to measure the IQ of an American citizen who has lived in the United States his entire life, there was no *additional* or separate error committed by using the American age-equivalency conversion – which, the Government concedes, is the process that the WAIS-III authorized when the examiner uses American norms. Govt. Br. 63-64; Hrg. 1738-39. Dr. Weinstein explained that it is unsound to use the Mexican population as the comparison-group at one stage and the American population at the next. Hrg. 1739. "If you're using the American norms [you] use the American norms the whole way through." Hrg. 1739.

In substance, the Government's contention about "step two" amounts to nothing beyond its more general argument against using American norms in the first place. It is unsurprising that Dr. Weinstein and Dr. Seward arrived at the same IQ

26

score of 89 with the use of Mexican norms as applied to Dr. Weinstein's testing data. Hrg. 704, 1167-69, 1278-79, 1380. But that does not mean the Court should compare Petitioner to the population of the Mexico when assessing his intellectual deficits, let alone that it should mix-and-match distinct norming samples in the process.

### C.    Petitioner has qualifying adaptive deficits

The Government departs even further from the accepted diagnostic standards when evaluating Petitioner's adaptive deficits. It urges that Petitioner should have to demonstrate deficits corresponding with a "severe" or "moderate" level of intellectual disability, Govt. Br. 73-75, as opposed to the "mild" level that defines some 89 percent of the intellectually disabled population. *See* AAIDD, *The Death Penalty and Intellectual Disability* 21 (2015) ("AAIDD-2015") (Pet. Ex. 85). It argues that the Court should reject standards adopted by the AAIDD and prescribed by the Supreme Court in *Moore*, by crediting Petitioner's adaptive functioning in the highly-structured environment of prison. And it embraces numerous outdated stereotypes about intellectual disability that the AAIDD and *Moore* have rejected. The Court should give little weight to these arguments, which radically depart from "the best available description" of appropriate diagnostic standards. *Moore*, 137 S. Ct. at 1053.

### 1.    Petitioner need only demonstrate adaptive deficits corresponding to mild intellectual disability, not those associated with severe or moderate disability

Without support from legal or diagnostic authorities, the Government contends that Petitioner should have to demonstrate adaptive deficits consistent with a severe

27

or moderate level of intellectual disability. Govt. Br. at 73-75. It then recreates a table from the DSM-5 – from which it is difficult for the reader to discern that the table describes the adaptive traits of *severely* disabled persons – and argues that Petitioner does not embody those traits. *Id.* at 74-75. In essence, the Government argues that Petitioner does not have "significant" limitations in adaptive functioning under the AAIDD and DSM-5 because he does not have "severe" limitations.

The Government is mistaken in numerous respects. At the outset, its table is misleading because it omits mention of the "severe" category that it describes. Petitioner therefore reproduces, below, the DSM-5's tables for all four levels of intellectual disability: mild, moderate, severe, and profound. *See* DSM-5 at 34-36.

**TABLE 1    Severity levels for intellectual disability (intellectual developmental disorder)**

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Mild | For preschool children, there may be no obvious conceptual differences. For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations. In adults, abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired. There is a somewhat concrete approach to problems and solutions compared with age-mates. | Compared with typically developing age-mates, the individual is immature in social interactions. For example, there may be difficulty in accurately perceiving peers' social cues. Communication, conversation, and language are more concrete or immature than expected for age. There may be difficulties regulating emotion and behavior in age-appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for age, and the person is at risk of being manipulated by others (gullibility). | The individual may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child-care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age-mates, although judgment related to well-being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make health care decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family. |

28

TABLE 1  Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Moderate | All through development, the individual's conceptual skills lag markedly behind those of peers. For preschoolers, language and pre-academic skills develop slowly. For school-age children, progress in reading, writing, mathematics, and understanding of time and money occurs slowly across the school years and is markedly limited compared with that of peers. For adults, academic skill development is typically at an elementary level, and support is required for all use of academic skills in work and personal life. Ongoing assistance on a daily basis is needed to complete conceptual tasks of day-to-day life, and others may take over these responsibilities fully for the individual. | The individual shows marked differences from peers in social and communicative behavior across development. Spoken language is typically a primary tool for social communication but is much less complex than that of peers. Capacity for relationships is evident in ties to family and friends, and the individual may have successful friendships across life and sometimes romantic relations in adulthood. However, individuals may not perceive or interpret social cues accurately. Social judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions. Friendships with typically developing peers are often affected by communication or social limitations. Significant social and communicative support is needed in work settings for success. | The individual can care for personal needs involving eating, dressing, elimination, and hygiene as an adult, although an extended period of teaching and time is needed for the individual to become independent in these areas, and reminders may be needed. Similarly, participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing supports will typically occur for adult-level performance. Independent employment in jobs that require limited conceptual and communication skills can be achieved, but considerable support from co-workers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management. A variety of recreational skills can be developed. These typically require additional supports and learning opportunities over an extended period of time. Maladaptive behavior is present in a significant minority and causes social problems. |

TABLE 1  Severity levels for intellectual disability (intellectual developmental disorder) *(continued)*

| Severity level | Conceptual domain | Social domain | Practical domain |
|---|---|---|---|
| Severe | Attainment of conceptual skills is limited. The individual generally has little understanding of written language or of concepts involving numbers, quantity, time, and money. Caretakers provide extensive supports for problem solving throughout life. | Spoken language is quite limited in terms of vocabulary and grammar. Speech may be single words or phrases and may be supplemented through augmentative means. Speech and communication are focused on the here and now within everyday events. Language is used for social communication more than for explication. Individuals understand simple speech and gestural communication. Relationships with family members and familiar others are a source of pleasure and help. | The individual requires support for all activities of daily living, including meals, dressing, bathing, and elimination. The individual requires supervision at all times. The individual cannot make responsible decisions regarding well-being of self or others. In adulthood, participation in tasks at home, recreation, and work requires ongoing support and assistance. Skill acquisition in all domains involves long-term teaching and ongoing support. Maladaptive behavior, including self-injury, is present in a significant minority. |
| Profound | Conceptual skills generally involve the physical world rather than symbolic processes. The individual may use objects in goal-directed fashion for self-care, work, and recreation. Certain visuospatial skills, such as matching and sorting based on physical characteristics, may be acquired. However, co-occurring motor and sensory impairments may prevent functional use of objects. | The individual has very limited understanding of symbolic communication in speech or gesture. He or she may understand some simple instructions or gestures. The individual expresses his or her own desires and emotions largely through nonverbal, nonsymbolic communication. The individual enjoys relationships with well-known family members, caretakers, and familiar others, and initiates and responds to social interactions through gestural and emotional cues. Co-occurring sensory and physical impairments may prevent many social activities. | The individual is dependent on others for all aspects of daily physical care, health, and safety, although he or she may be able to participate in some of these activities as well. Individuals without severe physical impairments may assist with some daily work tasks at home, like carrying dishes to the table. Simple actions with objects may be the basis of participation in some vocational activities with high levels of ongoing support. Recreational activities may involve, for example, enjoyment in listening to music, watching movies, going out for walks, or participating in water activities, all with the support of others. Co-occurring physical and sensory impairments are frequent barriers to participation (beyond watching) in home, recreational, and vocational activities. Maladaptive behavior is present in a significant minority. |

29

The Government does not justify its proposed measuring stick of severe or even moderate disability, which are traditionally associated with IQ ranges of 20-34 (severe) and 35-49 (moderate). *See Atkins v. Commonwealth*, 534 S.E.2d 312, 323 (Va. 2000) (Hassell, J., concurring in part and dissenting in part). Use of the Government's method would remove 89 percent of the intellectually disabled population from the protections of *Atkins* and the FDPA, even as the mildly disabled are "the most difficult to diagnose and the least immediately recognizable as having ID." AAIDD-2015 at 21 (Pet. Ex. 85). Among the mildly disabled is Bobby Moore himself, whose sole qualifying IQ score was 74. *See Moore*, 137 S. Ct. at 1049. The Supreme Court nevertheless employed the established clinical standards for "mild" deficits in adaptive behavior, as opposed to the ones that describe "moderate" or "severe" disability. *Id.* at 1049-53. This Court must do the same. *See id.* at 1051 ("Mild levels of intellectual disability, although they may fall outside Texas citizens' consensus, nevertheless remain intellectual disabilities[.]").

To be sure, a diagnosis of intellectual disability requires "significant" limitations in adaptive functioning. Govt. Br. 73; AAIDD-2010 at 5. But the limitations described in the DSM-5's for mild intellectual disability are themselves significant, in the sense that the individual "is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-5 at 38. Cases of "mild" intellectual disability are "mild" only in comparison with more severe cases.

30

Nevertheless, the sovereign "may not execute anyone in the *entire category* of intellectually disabled offenders[.]" *Moore*, 137 S. Ct. at 1051 (emphasis in original).

The Government seems to advocate a sliding-scale approach to adaptive behavior. Because Petitioner does not satisfy prong one under any tests that the Government considers to be valid and reliable, the Government suggests that Petitioner should have to meet a heightened standard on prong 2 to compensate for his alleged failure on prong 1. *See* Govt. Br. 73. This argument, too, is unavailing. First and most obviously, the IQ scores obtained from Dr. Weinstein on the WAIS-IV (74, Flynn-corrected to 70) and the CTONI-2 (64) *are* valid and reliable for the reasons already explained above and in Petitioner's initial brief. *See* Section I.B, *supra*; Pet. Br. 2, 18-19, 56-67. Second, a determination of adaptive deficits should be made independently of deficits in intellectual functioning. *See Montgomery*, 2014 WL 1516147 at *44 (crediting testimony that "[Y]ou want to establish whether the person is presenting significant deficits in both intellectual functioning and adaptive behavior, and those are assessed separately and independently and in different manners.").

### 2. The Court should accord little, if any, weight to Petitioner's perceived adaptive functioning in prison

The AAIDD, the Supreme Court, and the Eighth Circuit all caution against relying on prison behavior in *Atkins* cases. *See* AAIDD-2012 at 20; *Moore*, 137 S. Ct. at 1050; *Jackson v. Kelley*, 898 F.3d 859, 865 (8th Cir. 2018). The Government nevertheless argues that the Court has little choice in this case, because Petitioner has

31

spent the overwhelming majority of his life behind bars (leaving aside the maladaptive behaviors that landed him there). Govt. Br. 84-86. The Government therefore insists that the Court must at least "consider" relevant prison evidence rather than ignoring it altogether, and that the DSM-5 does not absolutely prohibit such evidence from being consulted. Govt. Br. 84-87.

The Government's argument is flawed for two separate reasons. First, it is contrary to the record, which does not support elevation of the DSM-5 over the AAIDD's manuals. Dr. Seward and the Government's brief both characterize the AAIDD's guidance as authoritative on the question of how to measure intellectual disability. Hrg. 1286-87; Govt. Br. 89. Dr. Weinstein agrees. Hrg. 404-06. The DSM tends to "always follow" the AAIDD, and thus, "the controlling definition is probably more so contained in the AAIDD manuals" than in the DSM. Hrg. 408. The record in this case does not justify adopting the DSM-5's approach over the AAIDD's, which provides that "The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.'" AAIDD-2012 at 20.

Second and more generally, Petitioner's prison behavior has little probative value – even if the Court were to consider it. An adaptive deficit is one that requires supports in order for the person to function in society day-to-day. Hrg. 467, 1753; DSM-5 at 38. Prison life is itself an elaborate and all-encompassing set of supports. "[S]omebody else is controlling his behavior," explains Dr. Weinstein. Hrg. 500. Prison "hides any deficits that he may have because he doesn't have to make any

decisions," which is why prison activities tell us little about Petitioner's real-world adaptive skills. Hrg. 1679-81, 1701. The Court should therefore accord little weight to Dr. Welner's and Seward's opinions that various prison activities evidence Petitioner's adaptive functioning, such as: Petitioner's "impression management" and cultivation of peers, his avoidance of disciplinary problems, his steady employment at a print shop, his ability to manage his diabetes medications, and his cleanliness. Hrg. 1141-43, 1436-37, 1514-15, 1535-42. The same is true of Petitioner's crimes, as opposed to the typical and day-to-day activities that inform his adaptive functioning under diagnostic standards. *See* Hrg. 1685-87; AAIDD-2010 at 45; AAIDD-2012 at 2 ("Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned and are performed by people in their everyday lives.").

The Government nevertheless insists that *Hall* and *Moore* do not constitutionalize "everything stated in the latest medical guide." Govt. Br. 54-55 (quoting *Moore*, 137 S. Ct. at 1049). True enough, but the Court is *at least* bound by those particular clinical standards that the Supreme Court has adopted and prescribed. Those include the very standards at issue in this case: the diminished relevance of adaptive behavior in prison, the diminished relevance of a defendant's crimes, the diminished relevance of adaptive strengths to cancel out adaptive deficits, and the inappropriateness of relying on outmoded and contra-diagnostic stereotypes. *See Moore*, 137 S. Ct. at 1050-53; *Moore v. Texas*, 139 S. Ct. 666, 668-69 (2019). Those standards apply here even if the Government and its experts disagree with them.

33

**3.    Petitioner's pursuit of a high school education as an adult does not detract from his showing of intellectual disability.**

The Government argues that Petitioner cannot be intellectually disabled because he earned a GED. Govt. Br. 18, 30, 34, 79, 85. The Government presents no certificate proving that Petitioner earned a GED, in contrast to the case that it cites, in which the court relied on the fact that the defendant scored just below the 50th percentile on the national GED exam – and in comparison to high school seniors. *See United States v. Jones*, No. 6:10-CR-03090-DGK, 2017 WL 4231511 at *10 (W.D. Mo. Sept. 22, 2017). In this case, by contrast, there is no GED certificate or diploma within Petitioner's correctional records, those of the high school he claimed to attend from a Minnesota prison, or those of the Minnesota Department of Education. *See* Hrg. 165, 599, 929, 987-88, 1039-42, 1117; Pet. Ex. 79. The Government relies solely on Petitioner's self-reports, most of which state that he earned a *high school diploma* as opposed to a GED, and none of which state that he took or passed the GED exam.[4] The distinction is significant, because 37 percent of intellectually

---

[4] *See* Hrg. 165 (per Mr. Ney, "[I]t doesn't say GED. It says graduated from high school, high school grad."); Hrg. 737 (Dr. Seward: "Was that a GED program?" Mr. Rodriguez: "To tell you the truth I got a diploma." Dr. Seward: "Oh a regular diploma?" Mr. Rodriguez: "Yeah."); Hrg. 929 (same); Pet. Ex. 14 (Minnesota DOC classification summary, stating "High School Grad, St. Peter MN"); Pet. Ex. 75 at 20 (same, per Dr. Seward); Govt. Br. 37 ("Despite no transcript or diploma available, records indicate Rodriguez graduated from St. Peter's High School as evidenced by Minnesota Security Hospital records."); Trial Tr. 8060 (per Dr. Hutchinson, Petitioner "receive[d] a high school diploma" at St. Peter); *but see* Govt. Ex. 606 (self-report of a "GED diploma"); Hrg. 598-99 (per Dr. Weinstein, Petitioner "says he did" finish high school, but no record of high school graduation or GED); Hrg.

34

disabled students graduate with a regular high school diploma.[5]

More importantly, the Government does not acknowledge the circumstances of Petitioner's adult schooling. It does not contest that Petitioner was allowed five years to finish high school courses, that he benefited from extensive one-on-one instruction, and that, one year after his claimed graduation in 1979, Petitioner tested at a 6.7 grade level in reading and a 4.3 grade level in mathematics on the Wide Range Achievement Test. Hrg. 1317-19. Petitioner's WRAT scores from 1980, 2006, 2013, and 2018 show that he operates at or below the sixth grade level in reading and mathematics. Hrg. 450-53; Pet. Ex. 48. Petitioner's undocumented GED, then, does not remotely "suggest[] that he was capable of high-school level academic achievement." *Jones*, 2017 WL 4231511 at *10.

### 4.    The Government relies on numerous inaccurate stereotypes about intellectually disabled persons

The Government concedes that the Supreme Court rejected the non-clinical *Briseño* factors as improper stereotypes, and that use of the *Briseño* factors in place

---

931-32 ("completion of his GED" from 1977 parole recommendation, although 1979 records suggest Petitioner was still "close to receiving his high school diploma as of March 29, 1979" – per Govt. Br. 37-38).

[5] See Laura Shifter, *High School Graduation of Students With Disabilities: How Long Does It Take*?, 77 Exceptional Children 409, 411 (2011), *available at* https://scholar.harvard.edu/files/schifter/files/63017926.pdf; Christopher B. Swanson, *Special Education in America: The State of Students with Disabilities in the Nation's High Schools* 20 (2008) (citing data from U.S. Dept. of Education), *available at* https://epe.brightspotcdn.com/e5/cc/b0f08b5f4f4c8e1f38dd82c88596/ eperc-specialeducationinamerica.pdf.

of "current medical standards" creates "'an unacceptable risk that a person with intellectual disabilities will be executed' in violation of the Eighth Amendment." Govt. Br. 52 (quoting *Moore*, 137 S. Ct. at 1051); *Moore*, 137 S. Ct. at 1046 n.6 (listing the *Briseño* factors). The Government does not dispute the inappropriateness of relying on the stereotypes disapproved by the AAIDD, *see* AAIDD-2012 at 26, even though the Government embraces numerous such stereotypes in its brief. Petitioner's opening brief explains why such stereotypes cannot bear on a claim of intellectual disability. *See* Pet. Br. 3-4, 34, 54-56, 67, 74, 76. Rather than repeat those arguments, Petitioner identifies below the stereotypes embraced by the Government and matches them with those that the AAIDD and *Moore* have disapproved.

| **Government's Argument** | **Govt. Br.** | **AAIDD-disapproved Stereotype** | ***Briseño* Factor Disapproved in *Moore*** |
|---|---|---|---|
| Petitioner can discuss current events and other "topics," converse with his mother's neighbor, and communicate and socialize with friends and relatives | Pp. 38, 43, 44, 49, 80, 82, 85 | "Persons with ID look and talk differently from persons from the general population" | "Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?" |
| Petitioner was not perceived or diagnosed as "retarded" during childhood and was not even evaluated for the disability until he was capitally prosecuted | Pp. 48, 49, 89 | "Persons with ID look and talk differently from persons from the general population" | "Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?" |
| Petitioner maintains his personal cleanliness and wears clean and appropriate clothing | Pp. 46, 83 | "Persons with ID look and talk differently from persons from the general population" | -- |
| Petitioner had "normal" relationships with girlfriends | Pp. 46, 82 | "Persons with ID cannot romantically love or be romantically loved" | -- |

36

| Government's Argument | Govt. Br. | AAIDD-disapproved Stereotype | *Briseño* Factor Disapproved in *Moore* |
|---|---|---|---|
| Petitioner has worked as a janitor, a farm worker, at a sugar plant, on a drywall crew, and in a prison print shop. | Pp. 39, 40, 43, 48, 49, 75, 80 | "Persons with ID cannot acquire vocational and social skills necessary for independent living"<br><br>"Persons with ID do not (and cannot) support their families" | -- |
| Petitioner performed household chores and gardening tasks to support his mother | Pp. 43, 44, 49, 75, 81, 83 | "Persons with ID are completely incompetent and dangerous"<br><br>"Persons with ID do not (and cannot) support their families"<br><br>"Persons with ID are characterized only by limitations and do not have strengths that occur concomitantly with the limitations" | -- |
| Petitioner obtained and kept a driver's license, ran errands, and can navigate from Minnesota to Texas | Pp. 38-39, 43, 47, 49, 81 | "Persons with ID cannot get driver's licenses, buy cars, or drive cars"<br><br>"Persons with ID cannot do complex tasks" | -- |
| Petitioner, prior to his 2003 release, engaged in long-term planning for his post-prison life and employment | Pp 42, 80 | "Persons with ID cannot do complex tasks" | "Has the person formulated plans and carried them through or is his conduct impulsive?" |
| Petitioner avoids or delays prosecution; drove on gravel roads to avoid detection; hid the victim's body; declined to engage in "risky" burglaries; and once manufactured "some semblance of an alibi" | Pp. 39, 44, 45, 82 | -- | "Can the person hide facts or lie effectively in his own or others' interests?"<br><br>"Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?" |

## 5.    Dr. Weinstein soundly administered the ABAS

The Government complains that the ABAS is not designed for retrospective

administration and that family respondents might not provide reliable information so

many years after the fact. Govt. Br. 75-78. But Dr. Weinstein acknowledged both of those shortcomings in his testimony. Hrg. 664, 668. The fact remains that the AAIDD expressly authorizes the retrospective use of adaptive behavior instruments in *Atkins* cases. *See* AAIDD-2015 at 193 (Pet. Ex. 85); Hrg. 665; AAIDD-2010 at 46. Dr. Weinstein placed an appropriate "caveat" on the ABAS scores and explained that he would not rely on the scores alone to find adaptive deficits. Hrg. 539-40. Adaptive behavior instruments are not required for a diagnosis of intellectual disability in any event. *Commonwealth v. Cox*, 240 A.3d 509, 534-35 (Pa. 2020); Hrg 538-39. Far from administering an "inappropriate" test, Gov. Br. 76, Dr. Weinstein ran a widely used test under clinically appropriate circumstances, then acknowledged the factors that could affect the test's probative value. *See* Pet. Ex. 44 (report) at 13 ("Although the scores are based on recollections and are affected by culture and living conditions, they do reflect a consistent pattern of adaptive behavior deficits that buttress the information obtained from interviews and declarations.").

Next the Government argues that Dr. Weinstein did not query Petitioner's sisters in accordance with the ABAS instructions. Govt. Br. 76-78. It points out that the two sisters have not had ongoing contact with Petitioner as an adult in recent years, but the test assesses Petitioner's adaptive functioning during the *developmental* period of decades ago. Hrg. 665 ("Plus you're asking somebody to report on the developmental years when you're really talking about a 65-year-old man."). Given that Dr. Weinstein was applying the test retrospectively, the sisters' lack of ongoing

38

recent contact is immaterial.

Neither was it improper for Dr. Weinstein to rely on Sylvia Rodriguez as a "caregiver," since it was she who primarily took care of Petitioner while his parents worked in the fields and elsewhere. Hrg. 539, 663-64. The Government argues that the ABAS instructions do not authorize the use of children as "caregiver" respondents. Govt. Br. 77. But the Government cites the instructions out of context. The instructions are discussing contemporaneous assessments of adaptive behavior instead of retrospective analysis decades later, by which time a sibling-caregiver will have grown into adulthood. Govt. Ex. 588. At any rate, the instructions do not specifically exclude the use of non-adult siblings as caregiver respondents. *Id.*

**6.      Petitioner manifests conceptual, social, and practical adaptive deficits**

*Conceptual deficits* – According to the Government, the record "clearly demonstrates that Rodriguez did not suffer any adaptive deficits during his formative years." Govt. Br. 78. That description of the record is inaccurate. In the conceptual area alone, Petitioner failed multiple grade levels, scored near the level of mental retardation on school-administered IQ tests, and has consistently scored at or below the sixth grade level on academic achievement tests – even in adulthood, and even after taking high school courses for five years. *See* Pet. Br. 71 and sources cited. Objective test scores disprove the Government's argument that Petitioner's academic struggles resulted from a lack of effort or that his struggles diminished after Petitioner's family settled in Crookston and he learned English. *Id.*; *see also* Pet. Ex.

39

48 (WRAT scores); Govt. Ex. 615 at 29 (IQ scores on Kuhlman-Anderson test).

The Government argues that Petitioner lacks any *severe* conceptual deficits, Govt. Br. 79, but he need only establish the *substantial* deficits typical of *mild* intellectual disability. *See* DSM-5 at 34 ("For school-age children and adults, there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations."). As for the Government's suggestion that "Rodriguez eventually obtained a GED," Govt. Br. 79, the Government has no proof that Petitioner passed the GED exam, rather than completing five years of individualized high school courses – after which he tested at the sixth-grade level in reading and a fourth-grade level in math. *See* Section I.C.3, *supra*.

It makes no difference that Petitioner likes to read books. Govt. Br. 81. Dr. Weinstein explained that Petitioner's self-report of reading hundreds or thousands of books reflects an intention to "pretend to be very high functioning." Hrg. 492, 1688; *see also* Hrg. 872 (per Dr. Silva: "I think he had some understanding of some of the books that he was reading but it was clearly exaggerated and it was clearly the case that he also had to re-read some of those books in order to be able to understand what was actually going on."). Most of the books Petitioner claimed to have read are written for a young-adult audience or are mass-marketed paperbacks. They are "generally very relatively straightforward books for people that may have some difficulties reading," Dr. Silva explained. Hrg. 873; *accord* Hrg. 1329 (Dr. Seward

40

equating the reading level of young adult books and mass-marketed paperbacks); Pet. Ex. 53 at 7 (according to sister, Petitioner was unable to understand *Harry Potter* books). Petitioner's performance on the WRAT is a more reliable measure of his reading skills than are his self-described reading practices. Hrg. 995, 1694-95 (per Dr. Weinstein: "[W]e know from not only my [WRAT] testing but Dr. Seward's testing and Dr. Froming's testing that he can read at a sixth grade level. So [the book-reading in prison] would not negate that.").

The remainder of the Government's arguments on conceptual deficits are based on impermissible stereotypes or are adequately addressed in Petitioner's opening brief. *See supra* pp. 36-37 (table); Pet. Br. 70-72.

*Social deficits* – Here as elsewhere the Government relies on contra-diagnostic stereotypes, such as Petitioner's ability to discuss various "topics" in a conversation and his history of "normal" relationships with girlfriends. *See* Govt. Br. 82; *supra* pp. 36-37 (table). Beyond that, the Government overlooks Petitioner's lifelong history of social isolation. Other than a one-month period in 1980 and a six-month period in 2003, Petitioner has spent the entirety of his life in confinement since the age of 21. Hrg. 1653. He seemingly prefers prison over freedom because it is "safe" and "somebody else is controlling his behavior." Hrg. 500. Numerous relatives and friends state that Petitioner tended to isolate himself and refrain from social interactions, even within his own family and even after his release from prison in 2003. Pet. Br. 27-29, 72-73, and sources cited.

The Government cites Petitioner's "robust" and "age-appropriate" friendships, but without direct evidence describing those friendships. Govt. Br. 82. In fact, Petitioner's childhood friends were generally younger than he was by two years or more. Hrg. 533-34, 859-60. Even then, his socialization was stunted. *See*, *e.g.*, Pet. Ex. 58 at 2 (per Gloria Gonzalez, "When he was outside with us, he would usually sit quietly by himself and watch us play.").

*Practical deficits* – Once again the Government relies on stereotypes: Petitioner can cook food, make coffee, read maps, set goals, maintain the cleanliness of his person and his living area, run errands, and perform chores for his mother. Govt. Br. 83-84; *but see supra* pp. 36-37 (table). Petitioner need not show that he lacks *all* practical capabilities. It suffices that Petitioner has never been able to live independently despite the ability to perform satisfactory work in menial jobs. Hrg. 238, 608-10.

**D.     Petitioner's limitations originated before the age of 18**

The diagnostic authorities require only that Petitioner's intellectual and adaptive deficits originated before he reached adulthood. AAIDD-2010 at 5; DSM-5 at 33. The Government seeks to impose an additional requirement: that the individual must be diagnosed or recognized as intellectually disabled before the age of 18. *See* Govt. Br. 89-90 ("One of the insurmountable hurdles Rodriguez faces is that no one – not a single teacher, doctor, family member, friend, case worker, or social worker – ever hinted or even suggested that Rodriguez was intellectual[ly] disabled until he

42

was charged with a capital crime. Thus, there is no evidence that he had any intellectual deficits or adaptive deficits prior to the onset age of 18[.]").

Once again the Government departs from the diagnostic standards. Neither the AAIDD nor the DSM requires a formal diagnosis or a lay assessment of intellectual disability before the age of 18. To the contrary, the diagnostic authorities recognize that mildly intellectually disabled persons "are the most difficult to diagnose and the least immediately recognizable as having ID." AAIDD-2015 at 21 (Pet. Ex 85). That is why the Supreme Court disapproved the *Briseño* factors, including the first one: "Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?" *Moore*, 137 S. Ct. at 1046 n.6. Enforcement of that factor "create[s] an unacceptable risk that persons with intellectual disability will be executed." *Id.* at 1051. The Court must avoid that risk in the same way that *Moore* did.

Petitioner is intellectually disabled under the established diagnostic standards. He is therefore categorically exempt from execution under the Eighth Amendment and the FDPA, and the Court should modify his sentence to life imprisonment.

## II.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF PETITIONER'S INTELLECTUAL DISABILITY AND LIFELONG EXPOSURE TO TOXINS

The Government misapprehends both the law and the facts in its response to Petitioner's claim that trial counsel were ineffective in failing to develop and present

43

evidence of Petitioner's intellectual disability and toxin exposure. Both claims reflect

counsel's incomplete investigation, their legally erroneous trial strategies, and the

resulting prejudice to Petitioner

### A.      The Government misstates the legal standards governing Petitioner's ineffective-assistance claims

The claims at issue here involve counsels' failures to investigate and develop

two types of mitigating evidence of which counsel had ample notice, and to know the

applicable law when crafting strategic decisions. Those failures were unreasonable

under prevailing norms and prejudiced the defense, regardless of what other evidence

counsel presented at sentencing.

### 1.      Counsel's presentation of other mitigating evidence at the penalty phase does not cure counsel's failure to investigate and present evidence of intellectual disability and exposure to toxins

The Government erroneously contends that because the mitigation team was

experienced in capital litigation and presented a large number of witnesses at the

penalty phase, counsel could not be ineffective for failing to present a claim that

Petitioner was intellectually disabled and had been exposed to toxins. Gov. Br. 93-94,

96-97, 102-09.

Counsel were not "effective" simply because they are experienced, consulted

several experts, and presented 24 mitigation witnesses. Although experience,

thoroughness, and conscientiousness are helpful attributes, they do not ensure

effective performance in a death penalty trial. *See*, *e.g.*, *Rompilla v. Beard*, 545 U.S.

374, 381 (2005). Counsel in *Rompilla* were ineffective for a particularized failure in

44

their investigation and despite their substantial overall efforts. "This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence," the Supreme Court remarked. *Id.* Counsel's efforts included consulting their unhelpful and "uninterested" client, interviewing his relatives, and employing "a cadre of three mental health witnesses who were asked to look into Rompilla's mental state as of the time of the offense and his competency to stand trial." *Id.* at 381-82. Despite otherwise thorough preparations, counsel in *Rompilla* were ineffective for their specific failure to obtain and review the court file on one of the defendant's prior convictions, which would have led to a wealth of mitigating evidence about his troubled background and impaired mental state as described in a prison file. *Id.* at 383-93.

The failures of counsel at issue here are analogous to defense counsel's failure in *Rompilla*. Although Mr. Ney and Mr. Hoy consulted experts and were concerned that Petitioner was intellectually disabled, their decision not to pursue a claim of intellectual disability was based on their misunderstanding that they needed an IQ score below a fixed cutoff – a belief at odds with the diagnostic criteria for intellectual disability/mental retardation at the time. Hrg. 27; Pet. Ex. 1 at 58. Counsels' general efforts to develop other mitigation do not offset their failure to pursue a viable intellectual disability claim. Likewise, counsel's failure to investigate, discover, and present evidence of the particular toxins to which Petitioner was exposed as a child, a young adult, and in the prison print-shop is not cured by an

45

otherwise sizeable mitigation defense.

There is no single *amount* of mitigation that trial counsel must produce, and above which the defendant cannot seek redress. *See Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) ("Beyond the general requirement of reasonableness, 'specific guidelines are not appropriate.'") (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). Rather, counsel must undertake a reasonable investigation before deciding which evidence to present and in what amount. *See Wiggins*, 539 U.S. at 523 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*.") (emphasis in original). Petitioner has already described counsel's failure to investigate the particulars of Petitioner's toxin exposure and to develop an intellectual disability defense. *See* Pet. Br. 81-87, 90-97. The fact that the trial mitigation "spanned four days of testimony" and involved "a total of twenty-four mitigation witnesses," Govt. Br. 102, is beside the point.

### 2. The Government misstates and misapplies the prejudice requirement

The Government also urges an erroneous, and unduly stringent, legal standard in arguing that Petitioner was not prejudiced by counsel's deficient performance. Citing *Wiggins*, the Government argues that in order to demonstrate prejudice, Petitioner must show that "at least one juror would have voted for life" but for counsel's deficient performance. Gov. Br. 99-100, 120. That is not the standard set forth in *Wiggins* or any other Supreme Court case. Rather, the appropriate standard is

whether there is a "*reasonable probability* that at least one juror would have struck a different balance." *Andrus v. Texas*, 140 S.Ct. 1875, 1887 (2020) (emphasis added) (quoting *Wiggins* 539 U.S. at 537). A "reasonable" probability is one that undermines a court's confidence in the trial's outcome. *Strickland*, 466 U.S. at 693. Contrary to the Government's arguments, the defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.*

Equally wrong is the Government's contention that the trial aggravating evidence was so weighty as to defeat any showing of prejudice. Gov. Br. 119-20. As a matter of law, no such super-aggravated case exists; the Eighth Amendment *always* requires "the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). As a result, "There is no crime that, by virtue of its aggravated nature standing alone, automatically warrants a punishment of death." *Taylor v. State*, 262 S.W.3d 231, 252 (Mo. 2008) (prejudice despite defendant's commission of a rape and murder while already incarcerated for an earlier rape and murder); *see also*, *e.g.*, *United States v. Kehoe*, 310 F.3d 579, 584 (8th Cir. 2002) (life sentence despite robbery and murder of a man, woman, and her eight-year-old daughter by placing plastic bags over their heads, weighing them down with rocks, and throwing them into a bayou); *State v. Davis*, 394 P.3d 817, 822-25 (Kan. 2017) (life sentence despite home invasion in which eight-year-old girl was kidnapped, raped repeatedly, choked, and stuffed in a

47

clothes dryer where she died). Petitioner's crime was of the utmost seriousness, but that is why counsel were obliged to mitigate it with the available evidence.

In arguing that the facts of the underlying crime are simply too aggravated to overcome, the Government places significant weight on the jury's consideration of the "horrifying and factually determinative details of Dru Sjodin's kidnapping, rape, and murder." Gov. Br. 119. However, the Government fails to acknowledge that crucial elements of its trial narrative have been undermined in these post-conviction proceedings, based on Petitioner's claims of prosecutorial misconduct and ineffective assistance. *See* Post-Hearing Brief on Forensic Claims (ECF Doc. 1083), at 47-98. At the evidentiary hearing before this Court on forensic claims, Petitioner presented substantial evidence that, contrary to the Government's evidence and arguments at trial, Ms. Sjodin was not raped, marched naked through a field with a bag over her head, laid on the ground, or slashed across the neck. *Id.* at 1-3, 17-46. Instead, the evidence shows, and fully-informed counsel would have argued, that Ms. Sjodin most likely died of asphyxiation after a brief struggle and attempted rape in Petitioner's car. *See* Forensics Hrg. Tr. 841-46, 869-72, 928-31. Just as no aggravation case precludes a showing of *Strickland* prejudice, neither does an artificially aggravated case that rests on the prosecution's knowing or reckless presentation of false evidence. *See* Pet. Forensics Br. (ECF Doc. 1083) at 47-73.

### B.    Trial counsel performed ineffectively by failing to investigate and present evidence of Petitioner's intellectual disability

The Government erroneously contends that counsel was prohibited from

48

presenting an intellectual disability claim because Petitioner scored 87 on an IQ test. Gov. Br. 100-101. The Government argues that it was "not until *Hall v. Florida* that Rodriguez's previous IQ scores would not, as a practical matter, serve as a bar to Rodriguez making a successful *Atkins* claim." *Id.* 100. The Government seems to suggest that, because the courts were not constitutionally *required* to credit IQ scores above 70 prior to *Hall*, this Court would have been *forbidden* from crediting such a score and finding Petitioner to be intellectually disabled. But the Government cites no pre-*Hall* law to that effect.

To the contrary, counsel in death penalty cases, appropriately relying on the standards set forth in the prevailing diagnostic criteria, were raising claims of intellectual disability in cases with IQ scores above the so-called "cut off" for some time before the Supreme Court decided *Hall*. *See*, *e.g.*, *State v. Gumm*, 864 N.E.2d 133, 139-40 (Ohio Ct. App. 2006) (despite having multiple IQ test scores over 70, Gumm rebutted the presumption that he was not intellectually disabled by demonstrating "significant[] subaverage intellectual functioning and significant limitations in social, self-direction, and functional-academics adaptive skills"); *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002) (stating that IQ tests are a factor to be considered but not sufficient alone to make a final determination on the issue); *In re Hawthorne*, 105 P.3d 552, 557 (Cal. 2005) ("[A] fixed cutoff is inconsistent with established clinical definitions and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing.").

49

At the time of Petitioner's trial, the diagnostic criteria for intellectual disability were set forth in the 10th edition of the American Association of Mental Retardation's manual, published in 2002 (Hrg. 23-24; Pet. Ex 1), which, along with the then-prevailing DSM-IV-TR, expressly advised against using a fixed cutoff IQ score in assessing intellectual disability. Hrg. 27. Counsel was required to know these criteria, which were reflected in counsel's own files and materials, along with the tools to challenge the accuracy of Dr. Froming's pretrial IQ score of 87. Hrg. 32-33, 455-69; Pet. Ex. 2 (article describing norming errors involving the WAIS-III, as well as the Flynn effect). The Government wrongly argues that counsel need not have forecast the still-"evolving" law at the time of trial. Govt. Br. 101. Petitioner demands only that counsel apply the criteria that were already known to them, in accordance with the efforts of successful defense counsel elsewhere. Even if counsel had failed to convince the Court and the jury that Petitioner met the standard for intellectual disability, the evidence of that disability would have measurably enhanced the mitigation case presented at trial. *See* Pet. Br. 85-86, 88-90.

C. **Trial counsel rendered ineffective assistance by failing to adequately investigate and present evidence of Petitioner's lifelong exposure to toxins and the effects of that exposure**

At trial, the prosecution disparaged the testimony of the defense's expert toxicologist, Dr. Donald Ecobichon. In closing, the prosecutor pointed out that Dr. Ecobichon "admitted *no knowledge to what chemicals*, if any, this defendant was exposed to in significant doses or what effects the defendant may have had. No

50

knowledge." Trial Tr. 8675. The prosecutor then told the jury that the defense's case "fell utterly apart on any importance and what they call toxins" because "[n]o causal connection was established." Trial Tr. 8676. Astoundingly, the Government now claims that trial counsel worked "assiduously to demonstrate a nexus between what they claimed were prolonged toxin exposures and a variety of mental and physical manifestations of that exposure." Govt. Br. 109-10. The Government had it right the first time.

**1.     Petitioner's claim rests on specific evidence of the toxins to which he was exposed in childhood as well as while working in the prison print shop, and such evidence was lacking at trial**

The Government suggests that the mere introduction of any evidence about toxins rendered counsel's representation effective. Govt. Br. 104. But the jury was never provided a fact-based understanding of Petitioner's lifelong exposure to dangerous chemicals and the effect that those chemicals had on his behavior. Counsel failed to investigate Petitioner's exposure to neurotoxins in prison even though the records were in his possession. Hrg. 103, Pet. Ex. 28 at 1. He failed to investigate the specific toxins used on farms where Petitioner was raised so that he could provide the jury with a causal link between Petitioner's behavior and his exposure. And counsel performed deficiently by needlessly limiting his investigation because he misunderstood the law concerning disclosure of expert opinions. *See* Pet. Br. 94-95.

The record belies the Government's argument that the differences between the testimony of Dr. Andres Lugo, the toxicologist who testified at the evidentiary

51

hearing, and that of Dr. Ecobichon were "barely appreciable." Govt. Br. 114. Dr. Ecobichon could not specify the chemicals that Petitioner was exposed to as a child. Trial Tr. 7774. On cross-examination, he agreed that he was "not familiar at all . . . whether [Petitioner] was exposed to A, B, C or D chemical." Trial Tr. 7774, 8675. Dr. Ecobichon equivocated and could only "say there's a pretty good chance he was exposed." Trial Tr. 7774. The prosecutor easily exploited the fact that Dr. Ecobichon failed to distinguish Petitioner from the "tens of thousands of people in the area [who] have been exposed to these exact same chemicals." Trial Tr. 7774-75. Dr. Ecobichon could not testify about any causal link between toxins and Petitioner's impairments, including brain dysfunction. Trial Tr. 7780-81. In stark contrast, Dr. Lugo presented specific evidence that the pesticides Paris Green and parathion were used on a farm where Petitioner's family worked and lived. Hrg. Tr. 797-800; Pet. Ex. 69 at 2-3. Dr. Lugo disagreed with Dr. Ecobichon's conclusion that Petitioner was not "exposed seasonally to many organophosphorus or carbamate insecticides." Hrg. 804-05; Pet. Ex. 70.

The Government barely mentions Petitioner's toxin exposure in the prison print shop, and it dismisses this evidence as "only a marginally altered path" from the trial. Govt. Br. 116. The Government misunderstands the significance of this evidence. Trial counsel, who possessed Petitioner's prison records, performed deficiently because he did not investigate those records and did not provide the records to the expert even though Dr. Ecobichon specifically requested Petitioner's

work history. Hrg. 103, Pet. Ex. 28 at 1; *Wiggins*, 539 U.S. at 523; *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) ("[C]ounsel must present those experts with information relevant to the conclusion of the expert").

The jury never heard that Petitioner worked in the prison print shop for nearly twenty years, touching and inhaling heavy metals and solvents without personal protective equipment. Hrg. 814-15; Pet. Ex 68 at 13; Pet. Ex. 72. As Dr. Lugo explained, Petitioner's work in the print shop was "linked to his earlier exposures" in childhood and adolescence, making him more vulnerable to the damaging neurological effects of the dangerous chemicals. Hrg. 819-20.

Although the Government attempts to dismiss this evidence as insignificant, its omission was particularly prejudicial where the Government argued that Petitioner was exposed to farm chemicals in the same manner as numerous other people in the Red River Valley. Trial Tr. 7775 (cross-examination of Dr. Ecobichon). By providing information specific to Petitioner, Dr. Lugo would not have been "vulnerable to the very same cross examination that Rodriguez acknowledges so effective undermined Dr. Ecobichon at trial." Govt. Br. 116.

The Government's attempt to label Dr. Lugo's testimony as "cumulative" of the trial evidence is not compelling. Govt. Br. 120. The unpresented and uninvestigated evidence of toxin exposure was of a markedly different quality than the evidence heard by the jury. The prosecutor argued that the jury should disregard the testimony about toxic chemicals because it had no nexus to Petitioner or his

53

actions. That argument was consistent with the trial record, which was void of specific evidence of Petitioner's childhood *and* adulthood exposure to toxins or the connection between the toxins and Petitioner's impairments. It is unsurprising that no jurors found the toxin evidence mitigating. *See* Verdict Form, ECF Doc. 626, at 2.

The cases cited by the Government do not advance its argument that the evidence was cumulative. *See* Govt. Br. 118 (citing *Purkey v. United States*, 729 F.3d 860, 865 (8th Cir. 2013); *Pinholster*, 563 U.S. at 200; *Wong v. Belmontes*, 558 U.S. 15, 22-23 (2009)). In *Purkey*, for example, trial counsel presented multiple witnesses to prove that the defendant suffered abuse throughout his childhood. 729 F.3d at 865-66. In post-conviction, Purkey argued that his attorneys were ineffective for failing to call additional witnesses to testify about his abusive childhood. *Id.* The Court held that the non-testifying witnesses "add[ed] nothing of substance" because their evidence was "entirely cumulative." *Id.* at 866.

In this case, unlike *Purkey* and the other cases cited by the Government, the evidence is not duplicative because it was never presented to the jury. Dr. Lugo's testimony proved what had not been established *at all* at trial by Dr. Ecobichon: Petitioner was exposed to specific insecticides, he was further exposed to chemicals in the print shop, and these repeated exposures can be linked to Petitioner's lower intelligence and impaired judgment. Hrg. 811, Def. Ex. 68 at 5.

### 2.    Trial counsel's ill-investigated and legally erroneous strategy was unreasonable and prejudiced the defense

The Government makes much of Mr. Ney's decision to avoid Rule 12.2

54

disclosure, even going as far as to say that Mr. Ney was "playing chess while the government played checkers." Govt. Br. 114. But the name of the game hardly matters when counsel played without adequate preparation and failed to score at all. Not a single juror found that "Alfonso Rodriguez suffers from the effects of his exposure to toxins." Trial Tr. 8772-73; Special Findings Form, ECF Doc. 626, at 2.

The Government similarly contends that Mr. Ney made a "strategic choice supporting a cleverly constructed toxic exposure mitigation presentation." Govt. Br. 110. To support its argument, the Government recites the facts of *LeCroy v. United States*, 739 F.3d 1297 (11th Cir. 2014), in which the Eleventh Circuit held that trial counsel reasonably decided to retain a "teaching expert" and ultimately decided not to present the expert at trial. Govt. Br. 112-13. LeCroy's attorneys hired an expert to evaluate him as a "test run" in order to "see what a psychiatric evaluation . . . would reveal before making any final strategic judgments." *LeCroy*, 739 F.3d at 1303. Counsel, aware of the aggravating contents within the doctor's report, decided not to present this expert at trial. In an unsuccessful attempt to avoid the reciprocity requirements of Rule 12.2, the *LeCroy* defense hired a "teaching expert" who did not evaluate the defendant. *Id.* at 1307. The attorneys ultimately chose not to present the "teaching expert" in order to avoid a "battle of the experts" with the prosecution. *Id.* at 1312.

The circumstances are entirely different here. LeCroy's attorneys made a decision that was consistent with Rule 12.2 and supported by a reasonable

55

investigation. The attorneys in *LeCroy* had their client evaluated by the expert in question, and they were fully informed prior to making the strategic decision about what evidence to present at trial. In comparison, Petitioner's counsel made a decision that was inconsistent with the law. Dr. Ecobichon was not a "teaching expert," and he was not hired to prevent the disclosure of aggravating facts. There was no basis in the law to limit his testimony about Petitioner's specific exposure to toxins and its resulting neurological impact. Moreover, because Rule 12.2 applies to experts who review records and is not limited to experts who have examined a defendant, counsel's decision to forego Dr. Ecobichon's evaluation of Petitioner was pointless. *See* Pet. Br. 94-95.

More fundamentally, trial counsel's decision to prevent Dr. Ecobichon from testifying about Petitioner's specific exposure was unreasonable because it was made without a "thorough background investigation." *Sinisterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). Although the "strategy" may have resulted in successful evasion of the disclosure requirement, it does not justify or explain trial counsel's failure to provide the prison print shop records to Dr. Ecobichon or investigate the specific toxins used on the farm where Petitioner lived.

Equally misplaced is the Government's argument that trial counsel were not obligated to "shop" for a more favorable expert than the ones they had. Govt. Br. 117-18 (citing *Link v. Luebbers*, 469 F.3d 1197, 1203-05 (8th Cir. 2006); *Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008); *Sidebottom v. Delo*, 46 F.3d 744, 753 (8th

Cir. 1995)). Petitioner has never argued that counsel's *choice* of expert was problematic. As noted in Petitioner's brief, in *Caro*, Dr. Ecobichon testified that the defendant suffered "chronic exposure to neurotoxicants," which caused "psychological reactions" such as "temper outbursts." Pet. Br. 98 (citing *Caro v. Woodford*, 280 F.3d 1247, 1253 n.5 (9th Cir. 2002)). Dr. Ecobichon was clearly capable of presenting comprehensive evidence of Petitioner's exposure and its effect on his brain. But that did not happen because of counsel's deficient investigation and misuse of the expert.

Petitioner was prejudiced, as already explained. *See* Pet. Br. 97-100. By failing to investigate the specifics of Petitioner's exposure to toxins, and to share those specifics with the expert, counsel all but ensured that the jury would not find the evidence mitigating. But for counsel's errors, the defense could have directly linked Petitioner's lifelong toxin exposure to his brain dysfunction, impaired judgment, and intellectual disability. There is a reasonable probability that, had the defense made that connection for the jury, at least one juror would have voted to spare Petitioner's life. Petitioner is entitled to a new and fair sentencing trial.

## CONCLUSION

For the reasons set forth above, this Court should grant Petitioner's motion under 28 U.S.C. § 2255, vacate his death sentence, resentence Petitioner to a term of life imprisonment on his claim of intellectual disability, grant Petitioner a new and fair sentencing trial on the ineffective-assistance claims described herein, grant

57

appropriate relief on Petitioner's claims relating to jury misconduct and forensic issues as previously briefed, and grant such other and further relief as law and justice require.

Respectfully submitted,

*s/ Joseph W. Luby*
JOSEPH W. LUBY
ERIC J. MONTROY
JAHAAN SHAHEED
ANNIE FISHER
Federal Community Defender Office,
Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Dated: January 7, 2021

58

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2021, the foregoing document was filed

electronically with the Clerk of Court through ECF, and that ECF will send a

Notice of Electronic Filing (NEF) to the following:

Drew H. Wrigley
drew.wrigley@usdoj.gov

Melissa H. Burkland
melissa.burkland@usdoj.gov

*/s/ Joseph W. Luby*
*Counsel for Petitioner*