IN THE
338TH CRIMINAL DISTRICT COURT
OF HARRIS COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE | § | CCA Writ No. 51,612-02 |
| | § | |
| VIRGILIO MALDONADO, | § | CAUSE NO. 721568-B |
| | § | |
| Applicant. | § | |

**COURT'S PARTIALLY ADOPTED FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW**

On April 25, 2012, the Texas Court of Criminal Appeals ("CCA") exercised its authority to reconsider this case on its own initiative, and remanded this cause to this Court "to allow it the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement." *Ex parte Maldonado*, No. WR-51,612-02, (Tex. Crim. App. April 25, 2012). These proceedings arise from Mr. Maldonado's assertion that he is a person with mental retardation[1] and thus ineligible for execution under *Atkins v. Virginia*.

On October 25 and 26, 2012, this Court received evidence and testimony from the parties. After reviewing the evidence and testimony presented, the trial record, the transcripts of the state habeas proceedings, and the materials submitted by Applicant to the CCA in support of his motion requesting reconsideration, the Court hereby withdraws the findings of fact, conclusions of law, and recommendations entered on January 31, 2007, and enters these findings and conclusions.

---

[1] The term mental retardation is replaced by the term intellectual disability in the American Association on Intellectual and Developmental Disability Manual, Intellectual Disability: Definitions, Classification, and Systems of Support (11th ed. 2010) ("AAIDD Manual"). For ease of reference, however, the term mental retardation will be used.

1

**Exhibit 1**

## FINDINGS OF FACT

### I.    Procedural History

1. The Court finds that Mr. Maldonado was convicted of capital murder and sentenced to death on October 6, 1997, in Harris County, Texas. His conviction and sentence were affirmed on direct appeal. *Maldonado v. State*, 998 S.W.2d 239 (Tex. Crim. App. 1999). Appointed counsel filed in the state trial court an Application for Post-Conviction Writ of Habeas Corpus by a Person Sentenced to Death on February 4, 2000. The Court of Criminal Appeals adopted the trial court's recommendations and denied relief on March 6, 2002.

2. The Court finds that on June 7, 2001, Judge Nancy Atlas appointed the undersigned counsel to represent Mr. Maldonado in his federal habeas proceedings. On June 20, 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), holding that individuals with mental retardation are constitutionally ineligible for the death penalty under the Eighth Amendment. Mr. Maldonado raised an unexhausted "*Atkins* claim" in his federal petition, and then returned to the state courts to exhaust that claim, filing a second Petition for a Writ of Habeas Corpus on June 17, 2003, in which he raised a claim asserting that his execution was barred because he was a person with mental retardation. On July 2, 2003, the CCA found that Mr. Maldonado's *Atkins* claim had met the requirements of Article 11.071 s.5, and remanded it to this Court for consideration.

3. The Court finds that on September 11, 13-15, and November 16, 17, and 27, 2006, the Honorable Brock Thomas conducted an evidentiary hearing (the "2006 Hearing") to determine whether Mr. Maldonado is a person with mental retardation.

2

**Exhibit 1**

4. The Court finds that during the aforementioned hearing, Dr. Denkowski was the State's sole expert witness and the only expert to testify that Mr. Maldonado is not a person with mental retardation.

5. The Court finds that on January 31, 2007, the Honorable Brock Thomas adopted the State's proposed findings and conclusions, and recommended denying relief, and on September 12, 2007, the Court of Criminal Appeals adopted that recommendation and denied relief on Mr. Maldonado's *Atkins* claim.

6. The Court finds that following the 2006 Hearing, the State Board instituted proceedings against Dr. Denkowski based on the flawed methodologies he employed in evaluating whether death row inmates are persons with mental retardation.

7. The Court finds that in December 2007, the State Board filed a complaint with the State Office of Administrative Hearings (SOAH), asserting that Dr. Denkowski's methods were unscientific, unethical, and in violation of numerous Board rules.

8. The Court finds that Mr. Maldonado also filed a complaint with the State Board in November 2009, and that the original complaint was amended to include Mr. Maldonado's case and the methods employed by Dr. Denkowski in his examination. [DX[2] 44R, First Amended Complaint With the State Office of Administrative Hearings].

9. The Court finds that on April 14, 2011, Dr. Denkowski entered into a Settlement Agreement with the State Board which contained a "Finding" that Dr. Denkowski did not admit to a violation of any law or specific board rule, and which contained a "Conclusion of Law" that

---

[2] "DX" refers to exhibits admitted by the Applicant at the evidentiary hearings. Exhibit numbers followed by an "R" indicate that the exhibits were entered at the Reconsideration Hearing. "SX" refers to the exhibits admitted by the State at the evidentiary hearing. "2006 H.T." refers to the transcript taken at the 2006 Hearing. "2012 H.T." refers to the transcript taken at the Reconsideration Hearing.

3

**Exhibit 1**

Dr. Denkowski violated Board Rule 465.18(a)(4) -- a "catchall" rule. [DX 45R, Settlement Agreement Between Texas State Board of Examiners of Psychologists and George Denkowski, Ph.D. (April 14, 2011)].

10. The Court finds that Board Rule 465.18(a)(4) provides the following: "A licensee who provides forensic services must comply with all other applicable Board rules and state and federal law relating to the underlying areas of psychology relating to those services." 22 Tex. Admin Code § 465.18(a)(4) (Tex. Bd. of Examiners of Psychologists).

11. The Court finds that under the terms of the Settlement Agreement, Dr. Denkowski agreed to receive a "Reprimand" of his professional license; that Dr. Denkowski agreed to desist from performing forensic psychological services in the evaluation of individuals for mental retardation or an intellectual disability in criminal proceedings; that Dr. Denkowski agreed to pay an administrative penalty; that the State Board's first amended complaint with SOAH would be dismissed with prejudice; and, that the Board would close and not prosecute Dr. Denkowski for any pending complaints. [DX 45R].

12. The Court finds that as aforementioned, on April 25, 2012, the Texas Court of Criminal Appeals ("CCA") exercised its authority to reconsider this case on its own initiative, and remanded this cause to this Court "to allow it the opportunity to re-evaluate its initial findings, conclusions, and recommendation in light of the Denkowski Settlement Agreement.

13. The Court finds that in its order, the CCA gave this Court discretion to "hold a live hearing" and "and make new or additional findings and conclusions and a new recommendation to this Court."

4

**Exhibit 1**

## II.    Reconsideration Hearing

14. The Court finds that after the case was remanded, Mr. Maldonado set the matter for an evidentiary hearing, which took place on October 25 and 26, 2012 (the "Reconsideration Hearing") at which time, Mr. Maldonado waived his appearance.

15. The Court finds that prior to the Reconsideration Hearing, the State did not designate experts and, in fact, did not present any testimony during the Reconsideration Hearing.

16. The Court finds that, specifically, during the Reconsideration Hearing, the State did not call an expert witness to testify and render an opinion as to whether Mr. Maldonado is mentally retarded and or intellectually and developmentally disabled.

17. The Court finds that the State and Mr. Maldonado requested that the Court incorporate for all purposes testimony and evidence considered in the 2006 Hearing, **except** for testimony and other evidence from Dr. Denkowski.

18. The Court finds that during the Reconsideration Hearing Mr. Maldonado presented live testimony from the following experts:

 a. Jack M. Fletcher, Ph.D., an expert clinical neuropsychologist who testified in the 2006 Hearing and also was one of the psychologists who filed a complaint with the State Board against Dr. Denkowski;

 b. Kevin McGrew, Ph.D., an expert psychologist and creator of the Woodcock-Johnson battery of intelligence tests;

 c. Ricardo Weinstein, Ph.D., an expert bi-lingual neuropsychologist, familiar with Hispanic culture, with specific expertise in classification and measurement issues pertaining to the diagnosis of people with disabilities who provided a declaration for the 2006 Hearing;

 d. Antonio Puente, Ph.D., an expert bi-lingual neuropsychologist with training in diagnosing people with disabilities who testified at the 2006 Hearing.

19. The Court finds that during the Reconsideration Hearing each of the foregoing expert's testimony was credible and reliable.

5

**Exhibit 1**

20. The Court finds that the State represented prior to the Reconsideration Hearing that it would not rely on the testing performed by Dr. Denkowski or his testimony offered in the previous 2006 hearing.

21. The Court finds that Denkowski's testimony during the 2006 Hearing, as well as the evidence offered by the State through Dr. Denkowski, to be unreliable and not credible in light of the Settlement Agreement.

22. The Court finds that the State admitted it would not rely on the testimony of Dr. Denkowski or any testing by Dr. Denkowski for this proceeding.

23. The Court therefore withdraws its previous findings of fact and conclusions of law, and substitutes them with the findings and conclusions stated herein. As such, the Court gives no weight to any of Dr. Denkowski's testimony or to any of the evidence sponsored by Dr. Denkowski.

24. The Court finds that Dr. Weinstein was born in Mexico and is a psychologist licensed to practice in the State of California where he specializes in the practice of neuro-psychology and neuro-psychological assessment. [DX 12, at 1, ¶ 1]. He has been in the psychology practice for thirty-seven years. [2012 H.T. Vol. 1, p. 162]. He has a forty-year-old son with Down Syndrome, and with a group of parents he started a school, developed a curriculum, and began work in the field of mental retardation. [Id.]. Over the course of his professional practice in diagnosing mental retardation, he has evaluated over 3,000 individuals. [Id.] He received his undergraduate degree from the Universidad Nacional Autonoma de Mexico (UNAM), located in Mexico City, Mexico. [DX 12 at 1, ¶ 2]. He has a master's degree from Merril Palmer Institute, Wayne State University, a doctoral degree from International College, and postdoctoral training certification in neuropsychology from the Fielding Institute. [2012 H.T. Vol. 1, p. 167]. He has

6

Exhibit 1

served as an adjunct professor at San Diego State University and has published articles on topics in neuro-psychology in peer-reviewed journals.  [DX 12 at 1, ¶ 4].  He has testified as an expert witness in federal court and in state courts in California, Washington, and Florida, and has conducted court-appointed neuro-psychological evaluations in California, Washington, Oregon, Arizona, New Mexico, and Florida.  [*Id.*].

25. The Court finds that Dr. Weinstein is well qualified to testify as an expert in the field of psychology.

### A.  Batería-R Test Administered by Dr. Weinstein in 2003

26. The Court finds that Dr. Ricardo Weinstein administered the Batería Woodcock-Munoz: Pruebas de habilidad cognitive-Revisada ("Batería-R") to Mr. Maldonado on February 5-6, 2003.

27. The Court finds that the Bateria-R test is an accepted test in the field of psychology used specifically for Spanish speaking subjects.

28. The Court finds that at the time Mr. Maldonado was tested, the Batería-R was an appropriate and valid measure of intellectual functioning in a Hispanic individual like Mr. Maldonado.

### 1.    Batería-R Confirmed Appropriate & Reliable by Other Expert Testimony

29. The Court finds that Dr. Kevin McGrew, Director of the Institute for Applied Psychometrics, testified as to the validity of the test.  [2012 H.T. Vol. 1, p. 125].

30. The court finds that Dr. McGrew received a bachelor's degree in psychology from Moorhead State University in 1974, a master's degree in school psychology from Moorhead State University in 1975, and a Ph.D. in educational psychology from the University of

7

Exhibit 1

Minneapolis in 1989, after he served the field as a school psychologist for twelve years. [*Id.* at 132].

31. The Court finds that Dr. McGrew was the co-creator of the Woodcock-Johnson III ("WJ-III") and Batería-III and also worked extensively on, but did not create, the Woodcock-Johnson-Revised ("WJ-R") and Batería-R. [*Id.*].

32. The Court finds that Dr. McGrew has published over thirty peer-reviewed journal articles and book chapters on the Woodcock-Johnson tests as well as two full books. [*Id.* at 129].

33. The Court finds that Dr. McGrew also co-authored a desk reference for intelligence testing, named the *Intelligence Test Desk Reference*. [*Id.* at 131]. The reference guide examines all major childhood and adult intelligence tests available since 1998, evaluating them from a common set of criteria and presenting best practice approaches. [*Id.*].

34. The Court finds that Dr. McGrew is an expert on intelligence tests, not just the Woodcock-Johnson batteries. [*Id.*].

35. The Court finds that Dr. McGrew is well qualified to testify as an expert in the field of psychology.

36. The Court finds that Dr. McGrew testified that the Batería-R is the Spanish equivalent of the Woodcock-Johnson test, which he co-authored and created. [2012 H.T. Vol. 1, p. 129].

37. The Court finds The Batería-R is a translation adaptation of the English Woodcock-Johnson Revised, which has been in the field since 1989. [*Id.*].

38. The Court finds that the Batería-R is based on the Cattell-Horn-Carroll theory of intelligence and measures seven of the major abilities [*Id.* at 135], and that other leading experts in intelligence testing, including Alan Kaufman, Ph.D. at Yale University, find that the Batería-R is incredibly comprehensive with excellent psychometric characteristics. [*Id.* at 142].

**Exhibit 1**

39. The Court finds that the Batería-R is normed for ages 2 to 95 plus. [*Id.* at 143].

40. The Court finds that the Batería-R was translated by Spanish-speaking people from different countries. [*Id.* at 144]. Once translated, the test items were administered to 3,911 Spanish-speaking people in and outside of the United States. [*Id.* at 145]. In particular, over 1,500 of the subjects were from Costa Rica, Mexico, Peru, Puerto Rico, and Spain. [*Id.*]. Although the original Woodcock-Johnson, published in 1977, was often used by school age and adult populations, the WJ-R, which is the English version of the Batería-R, caught the attention of clinical and neuropsychologists, and its use has been advocated in criminal settings. [*Id.* at 148-149].

41. The Court finds that, based on Dr. McGrew's expert opinion, the Batería-R is a "comprehensive, culturally specific and sensitive language appropriate measure of general intellectual functioning, and it was an appropriate measure used by Dr. Weinstein to estimate Mr. Maldonado's general intelligence." [*Id.* at 134].

42. The Court finds that Dr. Weinstein also testified that the Batería-R was a very appropriate test to administer [*Id.* at 169] because, he explained, that at the time he tested Mr. Maldonado there was no translation of the Wechsler test that was published in 2003. [*Id.* at 170]. Dr. Fletcher also concurred. [*Id.* at 62].

> **2.    Support by the Literature of the Validity of the Batería-R as a Measure of Intelligence**

43. The Court finds the following sources of literature advocate and support use of the Batería-R as a valid measure of intelligence testing because of its comprehensive measures:

- Psychology in Intellectual and Developmental Disabilities, Official Publication of Division 33, American Psychological Association, "Message from President," Vol. 36(2) (Fall 2010) ("Most non-English speaking defendants in *Atkins* cases have been Spanish speaking, and there are several IQ tests in Spanish...Kevin McGrew,

**Exhibit 1**

mentioned earlier, is one of the authors of a more appropriate test, the Batería III Woodcock-Munoz.") [DX 52R].

- James E. Ysseldyke, "Goodness of Fit of the Woodcock-Johnson Psycho-Educational Battery-Revised to the Horn-Cattell Gf-Gc Theory," *Journal of Psychoeducational Assessment*, Vol. 8: 268-275 (1990) (stating that the WJ-R is the most comprehensive measure of human cognitive abilities available) [DX 58R]

- Richard Woodcock and Ana Munoz-Sandoval, "The Batería-R in Neuropsychological Assessment," in *Neuropsychology and The Hispanic Patient: A Clinical Handbook*, pp. 143-168 (2001) [DX 59R]

- Excerpts from John Salvia and James Ysseldyke, *Assessment*, Fifth Edition (1991) ("The WJ-R provides a comprehensive assessment of cognitive and academic ability throughout the life span.") [DX 60R]

44. The Court finds, based on the evidence, that the Batería-R is a valid and appropriate measure of intellectual functioning and was a proper test for Dr. Weinstein to administer to Mr. Maldonado.

45. The Court finds that in 2003, Dr. Weinstein was asked to pre-screen Mr. Maldonado for mental retardation as a defense to his appeal. [2012 H.T Vol. 1, p. 174].

46. The Court finds that Dr. Weinstein administered the Batería-R, in Spanish, to Mr. Maldonado in the Polunsky Unit in 2003.

47. The Court finds that Dr. Weinstein administered the Batería-R in Spanish and by the accepted manner of his field by using the test manual. [*Id.* at 171].

48. The Court finds that Dr. Weinstein testified that the manual is very specific, and it is his goal to keep administration of tests as standardized as possible to get the most accurate score. [*Id.*].

49. The Court finds that Dr. Weinstein was qualified to administer the Batería-R to Mr. Maldonado.

10

**Exhibit 1**

50. The Court finds that during the administration of the Batería-R, Mr. Maldonado exerted his best effort and was cooperative. [*Id.* at 172].

51. The Court finds that Dr. Weinstein administered both the cognitive and achievement batteries of the Batería-R and concluded on the basis of Mr. Maldonado's scores on both batteries that his score of 61 shows that he functions at the level of a child aged seven years and ten months, a result that "is below the 1st percentile rank" and more than two standard deviations below the mean. [DX 12, at 9, ¶22].

52. The Court finds that Dr. Weinstein also reviewed results from sub-categories and determined there were no results that were statistically different or significant. [2012 H.T. Vol. 1, p. 177].

53. The Court finds that Dr. Weinstein's findings from his review of Mr. Maldonado's history, social and cultural influences, and the results of testing him for intelligence and achievement were that Mr. Maldonado functions in the mentally retarded range [DX 12, ¶ 22].

54. The Court finds that Dr. Weinstein calculated Mr. Maldonado's scaled score on the Batería-R to be a 61. [DX 12, at 9, ¶22].

55. The Court finds Dr. Weinstein's testimony of the calculation of 61 to be credible and reliable, and as such, the test was scored correctly.

56. The Court finds that Mr. Maldonado's score of 61 falls within the range established in the field of psychology for a diagnosis of mental retardation.

57. The Court finds that a consensus exists among mental health professionals and the AAIDD that the requirement of significantly subaverage general intellectual functioning is satisfied by "an IQ score that is approximately two standard deviations below the mean,

11

**Exhibit 1**

considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations."[3]  [DX 53R, AAIDD Manual at 27].  T

58. The Court finds that the AAIDD Manual also states that "[a]n IQ score should be reported with confidence intervals rather than a single score.  [DX 53R, AAIDD Manual at 40].

59. The Court finds that Dr. Puente administered two intelligence tests to Mr. Maldonado.

60. The Court finds that Dr. Puente is a native speaker of Spanish, who was born in Havana, Cuba, and who immigrated to the United States when he was nine years old.  [2006 H.T. Vol. 2, p. 61], and that he has been assessing mental retardation in Hispanic individuals since 1979.  [*Id.* at 66].

61. The Court finds that Dr. Puente obtained his bachelors' degree in psychology from the University of Florida in 1973 and his Ph.D. in psychology from the University of Georgia in 1978.  From 1978 to 1981, he was a clinical psychologist at a large teaching psychiatric hospital run by the University of Florida.  [*Id.* at 61-62; DX 8, at 3]  In 1981, he joined the faculty at the University of North Carolina at Wilmington, where he presently holds a position as Professor of Psychology.  [*Id.* at 60; DX 8, at 3], and that in 1982, he was the recipient of a Fulbright Scholarship for study in Argentina.  [DX 8, at 3].

---

[3] The AAIDD does not intend for a fixed cutoff point to be established for diagnosing a person with mental retardation.  [DX 53R, AAIDD Manual].  The diagnosis is "intended to reflect a clinical judgment rather than an actuarial determination."  *Id.*  The AAIDD Manual explains that "it is important to use a range as reflected in the test's standard error of measurement" because of variations in test performance, examiner's behavior, or other undetermined factors.  [DX 53R, AAIDD Manual].  Accordingly, a "standard error of measurement" must be taken into account in interpreting the IQ score obtained on any test.  *Id.*  The standard error of measurement is the range of IQ score of plus or minus five points within which there is a high level of confidence that a person's "true" IQ resides.  *Id.*

**Exhibit 1**

62. The Court finds that Dr. Puente has held teaching appointments at the Universities of Madrid and Granada, in Spain, [*Id.* at 3] and he has lectured in Mexico, Puerto Rico, the Dominican Republic, Colombia, Cuba, and Spain. [2006 H.T. Vol. 2, pp. 62-63].

63. The Court finds that Dr. Puente has a private practice in psychology (with a specialty in neuropsychology) in Wilmington, North Carolina, where he offers services in both English and Spanish. [DX 8, at 3].

64. The Court finds that Dr. Puente has authored six books and more than 150 scientific and professional articles, most in English, but some in Spanish and Russian. [2006 H.T. Vol. 2, pp. 64-65; DX 8, at 3]. He is co-author of such books as *Neuropsychological Evaluation of the Spanish Speaker* and is the editor of Spanish language books on intelligence testing such as *Examen de Inteligencia Wechsler Para Niños-III Edición.* [DX 7, at 40]. His articles relevant to this case have included such titles as "Neuropsychological Evaluation of Ethnic Minorities," "Neuropsychological Assessments of Spanish Speaking Children and Youth" [2006 H.T. Vol. 2, p. 65; DX 7, at 42], and "Neuropsychological Assessment of Hispanics." [DX 7, at 43]. He is the Associate Editor of the scientific journal, *Neuropsychology Review.* [*Id.* at 36].

65. The Court finds that he is a member of the American Psychological Association, where he was past-President of the Division of Neuropsychology and is currently on the Committee for Psychological Tests and Assessments. [2006 H.T. Vol. 2, p. 64].

66. The Court finds that during the time when he has been a member of this Committee, he sponsored a symposium on assessment of culturally dissimilar individuals such as African-Americans and Hispanics. [2006 H.T. Vol. 2, p. 64]. He was also on a committee that spent ten years in preparing a translation into Spanish of the Wechsler Intelligence Scale for Children (WISC). [2006 H.T. Vol. 2, pp. 88-89].

13

**Exhibit 1**

67. The Court finds that Dr. Puente's primary focus area deals with assessment of neuropsychological functions in Spanish speakers. [2012 H.T. Vol. 1, p. 11].

## B. Beta III and C-TONI Tests Administered by Dr. Puente in 2006

68. The Court finds that Dr. Antonio Puente administered, in Spanish, the Beta III and the Comprehensive Test of Non-Verbal Intelligence ("C-TONI") to Mr. Maldonado on June 27-28, 2006.

69. The Court finds that Dr. Puente was qualified to administer the Beta III and C-TONI.

70. The Court finds that Dr. Puente scored Maldonado received scores of 70 and 62, respectively, with a composite score of 66.

71. The Court finds Dr. Puente's testimony of the score of 70 and 62 with a composite score of 66 to be credible and reliable, and as such, Dr. Puente correctly scored each test.

72. The Court finds that on the two intelligence tests Dr. Puente administered to Mr. Maldonado, Mr. Maldonado scored a seventy on the Beta III, [DX 8, at 16], a number that, given a 95% confidence interval of eight points, qualifies as showing significant subaverage intellectual functioning under the *Atkins* and *Briseno* requirements for mental retardation.

73. The Court finds that he also scored a sixty-two on the CTONI, which, like the Beta III, is – as its name implies – a non-verbal test of intelligence. [DX 8, at 16].

74. The Court finds that Dr. Puente did not administer the Batería-R, which he testified was an appropriate measure, because Dr. Weinstein had already administered it and he wanted to avoid potential practice effects. [2012 H.T. Vol. 2, p. 21].

14

**Exhibit 1**

1.    **Validity of the Tests as Measures of Intelligence**

(i)    **Beta III**

75. The Court finds that the Beta III was developed during World War One to assess non-verbal intelligence in illiterate persons who did not read English. [2006 H.T. Vol. 2, p. 84].

76. The Court finds that the Beta III has instructions in Spanish, is supported by a great deal of research, and over-samples the Hispanic population because it uses as its "formative sample" a population that contains more Hispanics than are in the population at large. [*Id.* at 85].

77. The Court finds that the Beta III is a reliable and valid measure of intelligence.

(ii)    **C-TONI**

78. The Court finds that the Comprehensive Test of Non-Verbal Intelligence (C-TONI) is a more recent test than the Beta III and is primarily used when assessing mental retardation in an individual whose native language is not English. [2006 H.T. Vol. 2, p. 86; 2012 H.T. Vol. 2, p. 14].

79.    The Court finds that it has instructions that can be given in pantomime so it is well-suited for persons who do not understand English. [*Id.*].

80. The Court finds that, according to Dr. Puente, it is "well-normed," oversamples the Hispanic population, and yields a valid I.Q. score. [*Id.*] and [2012 H.T. Vol. 2, p. 14].

81. The Court finds that manuals that govern diagnosis of mental retardation recognize the C-TONI as a valid instrument "to be used to assess intellectual ability of individuals for whom most other intelligence tests are inappropriate or possibly biased." [DX 54R at 65].

82. The Court finds that the C-TONI is a reliable and valid measure of intelligence.

15

**Exhibit 1**

## C. Evidence of IQ Test Administered by the TDCJ is Not Reliable

83. The Court finds that the Texas Department of Criminal Justice ("TDCJ") has scores pertaining to Mr. Maldonado's intelligence, and that an official report in the TDCJ's inmate file records his I.Q. as "below 73" and his "Educational Average" as "below 5.0." [Service Investigation Worksheet dated 2005/07/07, in SX-24 (unpaginated); 2006 H.T. Vol. 5, pp. 53 54].

84. The Court finds that scores such as these are normally obtained during the intake diagnostic process when, according to TDCJ guard Major Nelson, *"they do an interview with the offender and find out what education level he has or how far he's gone in school."* [*Id.* at 46].

85. The Court finds that the scores on the report, however, both have zeros written next to them, which Major Nelson testified, *"tells us that we don't actually have an I.Q. test on him."* [*Id.* at 47].

86. The Court finds that Major Nelson did admit that she could neither confirm nor deny whether the I.Q. notation reflected an actual test [*Id.*].

87. The Court finds that Major Nelson agreed that "official reports at Polunsky show an score IQ [anywhere] below 73" [*Id.* at 54]; and she could not explain how the 73 was selected to appear in the official record. [*Id.* at 60-61].

88. The Court finds that the TDCJ official record also notes that Mr. Maldonado's "literacy is questionable" and that he "has difficulty understanding English." [Service Investigation Worksheet dated 2005/07/07, in SX 24 (unpaginated)].

89. The Court finds that the TDCJ records finding that Mr. Maldonado has an I.Q. score anywhere below 73 and an EA score below 5 do not contradict the intelligence scores Mr. Maldonado received on tests administered by Drs. Weinstein.

16

**Exhibit 1**

**D. Administration of WAIS-Espanol as a Screening Device**

90. The Court finds that Dr. Weinstein administered the verbal portion of the WAIS-Espanol, a Spanish-language test of intellectual functioning known in full as the *Escala de Inteligencia Wechsler para Adultos* ("EIWA"), to Mr. Maldonado as a *screening* device and did not use nor intend to use the result in his report, although the data from the EIWA was included in his test protocols that were provided to the prosecution. [2006 H.T. Vol. 3, p. 109; 2012 H.T. Vol. 1, p. 174].

91. The Court finds that he used this test to determine how well Mr. Maldonado responded to instructions and whether he would be able to answer questions. [2012 H.T. Vol. 1, p. 175].

92. The Court finds that Dr. Weinstein administered only the verbal portion of the test, which is not a full test nor a test he would use to determine an accurate I.Q. score. [*Id.*].

93. The Court finds that the score obtained by Dr. Weinstein was not reported in his findings because he submitted a *"declaration"* and not a full report. [*Id.* at 192].

94. The Court finds that a full report would have included the partial score but because he did not rely on the EIWA score for his conclusion, he did not include that finding in his declaration to the Court. [*Id.*].

95. The Court finds that on the verbal portion of the EIWA Mr. Maldonado received an adjusted score of 63 based on a score of 83 after allowing for the age of the test.

96. The Court finds that the EIWA was first published in 1968. [DX 32, at 270]. It was derived from the 1955 version of the *Wechsler Adult Intelligence Scale* (WAIS), which was itself based on a 1939 test known as the Wechsler Bellevue Intelligence Scale. [*Id.*].

17

**Exhibit 1**

97. The Court finds that the WAIS was standardized on a population sample based on the 1950 United States census. [*Id.*]. It has been updated and re-normed *twice* since its publication in 1955--in 1981 as the WAIS-R and in 1997 as the WAIS-III. [DX 32, at 264; *see* SX 10].

98. The Court finds that the EIWA has not been updated or re-normed like the WAIS.

99. When the differences between the two tests (WAIS and EIWA) are taken into account, the result is that, "[i]n the lower ranges, the Full Scale IQs are ... overestimated by about 20 points." [DX 43, at 389].

100. The Court finds that Mr. Maldonado's adjusted score of 63 (*i.e.*, 83 minus the estimated twenty point inflation) on the EIWA places him exactly in the middle between Dr. Weinstein's finding of a sixty-one on the Batería-R and Dr. Puente's finding of a sixty-six composite score on the Beta III and C-TONI.

101. The Court finds that Mr. Maldonado's partial score on the WAIS-Espanol, administered by Dr. Weinstein, is irrelevant to its determination of whether Mr. Maldonado meets the requirements for mental retardation.

### E. Application of the Flynn Effect

102. The Court finds that underlying any analysis or calculation of scores on intelligence tests is application of the phenomenon known as the Flynn Effect.

103. The Court finds that Dr. Fletcher testified that there are, in fact, times when a psychologist should adjust a test subject's scores when assessing him or her for the existence of mental retardation:

18

**Exhibit 1**

104.    The Court finds that test scores are affected by the dating of standardization samples" [See 2006 H.T. Vol. 16, pp. 22-23][4] a phenomenon known as the "Flynn Effect," which was first described a couple of decades ago by Professor James R. Flynn, who discovered that the scores on general intelligence tests standardized on U.S. populations (such as the WAIS, the Stanford-Binet, and the WISC) were rising approximately 0.3 points per year, compared to their original standardization samples. *See* James R. Flynn, "Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect," 12(2) *Psychology, Public Policy, and Law* 170, 173 (2006) [DX 41].    According to Dr. Fletcher, the "Flynn Effect" is "widely accepted" by the psychological profession, including being called "robust and reliable" by Prof. Alan S. Kaufman, co-author (with Elizabeth O. Lichtenberger) of *Essentials of WAIS-III Assessment* (1999), a text on which Dr. Denkowski relied in his report concerning Maldonado's mental functioning. [2006 H.T. Vol. 16, pp. 23-24; SX-4, at 42].[5]

105.    The Court finds that when the "Flynn Effect" is applied to Mr. Maldonado's score of eighty-three on the WAIS Español (EIWA) results in a score of 71 or 72.

106.    The Court finds that  Dr. Fletcher testified, the standardization sample on the EIWA dates from 1965 and the test was administered to Mr. Maldonado in 2003, thirty-eight years later. [2006 H.T. Vol. 16, p. 27].  Multiply thirty-eight times 0.3 to get approximately twelve and subtract that from eighty-three and you arrive at seventy-one or seventy-two, which are also within the confidence interval for mental retardation. [*Id.*].

---

[4] Dr. Fletcher wrote a very recent article on the Flynn Effect. [DX 49R]. He, along with others, conducted a meta-analysis, which is a statistical approach to determining the amount of the Flynn Effect. [2012 H.T. Vol. 1, p. 60].  The weighted mean across the fourteen studies was 2.8 points, and the measurement error associated with the estimate of the Flynn Effect was less than one point per decade, or 0.1 per year. [*Id.*]

[5] The Flynn Effect "has demonstrated that norms in the United States become outdated at the rate of 3 points per decade[.]" [DX 39, at 21].

19

**Exhibit 1**

107.    Court finds, based on uncontradicted testimony, the Flynn Effect is valid, and that its application to the intelligence scores Mr. Maldonado received is appropriate.

## F.  Prong Two: Maldonado's Significant Limitations in Adaptive Behavior

108.    The Court finds that adaptive behavior is a person's ability to typically or habitually perform everyday acts of living.  [2012 H.T. Vol. 1, p. 64]

109.    The Court finds that adaptive behavior is discussed in terms of three domains:  the *conceptual domain*, which is language and communication; the *social domain*, which is social skills; and the *practical domain*, which are things like self-care, level of independence, the person's ability to take care of themselves independently on a daily basis. *Id.*

110.    The Court finds that according to the AAIDD Manual, *"limitations in adaptive behavior* are operationally defined as performance that is appropriately two standard deviations below the population average on **one** of the three adaptive skill domains of conceptual, social, or practical." [DX 53R, AAIDD Manual at 47].

111.    The Court finds, moreover, the AAIDD Manual recognizes deficits in adaptive behavior as "performance on a standardized measure of adaptive behavior that is normed on the general population including people with and without [intellectual disability] that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, and practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills." [DX 53R, AAIDD Manual at 43].

112.    The Court finds that adaptive behavior measures what a person actually does on a habitual everyday basis and not what they are capable of doing.

20

**Exhibit 1**

113.    The Court finds the focus of an adaptive behavior assessment, therefore, is on documenting the individual's deficits, not his strengths.

114.    The Court finds, based on Dr. Weinstein's testimony, that people with mental retardation are capable of performing well in many areas. [2012 H.T. Vol. 1, p. 186]. He stated, *"[m]ental retardation is a disability of thinking. It is not a disability of learning."* [*Id.*]. A recent longitudinal study by the Department of Education reports that 79% of individuals with mild mental retardation have jobs or are in school; 49% have driver's licenses; 35% live independently; 62% are registered to vote; 10% are married; and 25% have children. [*Id.* at 197].

115.    The Court finds the fact that Mr. Maldonado, at one point, was married and even had a driver's license is therefore not inconsistent with a potential finding that he is a person with mental retardation.

116.    The Court finds that Dr. Fletcher is a Distinguished University Professor of Psychology at the University of Houston. [2006 H.T. Vol. 16, p. 7]. He received his Ph.D. in Clinical Psychology from the University of Florida in 1978. [DX 34, at 1, ¶ 2].

117.    The Court finds that Dr. Fletcher is licensed by the State of Texas as a psychologist and is board-certified in Clinical Neuropsychology by the American Board of Professional Psychology. [2006 H.T. Vol. 16, p. 6]. For the past twenty-five years, in addition to teaching courses on the topics of intelligence, adaptive behavior, and neuropsychological assessments, he has completed research on children and adults with developmental disabilities, with a focus on the development of reading, language, and other cognitive skills. [*Id.* at pp. 8-11; DX 33].

21

**Exhibit 1**

118.    The Court finds that, among many other posts, he is a past member and Chair of the Mental Retardation Research Committee of the National Institute of Child Health and Human Development, a committee that reviews research proposals on behalf of the National Institute of Health that involve mental retardation developmental disabilities. [2006 H.T. Vol. 16, p. 9]. He has also been a member of the President's Commission on Excellence in Special Education, a group that advised the Bush Administration on whether to include mental retardation in the reauthorization of the Individuals with Disabilities Education Act. [*Id.* at pp. 9-10].

119.    The Court finds that he has been an Associate Editor of the *Journal of Clinical and Experimental Neuropsychology* and he has published over two hundred articles in peer-reviewed journals. [DX- 4, Exh. 1, at 7; 2006 H.T. Vol. 16, pp. 8-9].

120.    The Court finds that Dr. Fletcher has created core courses at the University of Houston that are used to train entering graduate students in the methods of administering intelligence tests and behavior assessments. [2006 H.T. Vol. 16, p. 10].

121.    The Court finds that Dr. Fletcher has extensive experience in making assessments of mental retardation in adults and children. [*Id.* at p. 11]

122.    The Court finds that, within adaptive behavior, Dr. Fletcher described the three major domains: *conceptual, social, and practical.* [2012 H.T. Vol. 1, p. 64].

123.    The Court finds that a person meets the definition of mental retardation for the adaptive behavior prong if there is a deficiency in one of these areas or if the composite score across the three areas is deficient. *Id.*

124.    The Court finds that the AAIDD Manual advises that an administrator should obtain information regarding the individual's adaptive behavior "from a person or persons who know the individual well. Generally, individuals who act as respondents should be very familiar

22

**Exhibit 1**

with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times. Very often, these respondents are parents, older siblings, other family members, teachers, employers, and friends." [DX 53R, AAIDD Manual at 47].

125. The Court finds, based on Dr. Fletcher's testimony, that maladaptive behavior is not relevant to analysis of adaptive behavior because this type of behavior does not represent behavior that is typically or habitually performed. [2012 H.T. Vol. 1, p. 66].

126. The Court finds, based on Dr. Fletcher's testimony, that maladaptive behavior includes criminal behavior, and that such behavior should not be considered in determining whether a person has mental retardation because such maladaptive behavior is not behavior that a person typically and habitually performs. [*Id.*].

G.   **Dr. Puente's Adaptive Behavior Assessment**

127. The Court finds that Dr. Puente assessed Mr. Maldonado's adaptive behavior by relying on his own interviews, prior testing of Mr. Maldonado, his own tests and observations, and the testimony from Mr. Maldonado's father, his elementary school teacher, and his school classmate.

128. Court finds that, based on Dr. Puente's testimony, Mr. Maldonado has adaptive deficits in "numerous" areas. [2006 H.T. Vol. 2, p. 91].

129. The Court finds the most "glaring" deficit area, according to Dr. Puente, is in functional academics, where Mr. Maldonado had the equivalent of one year of education prior to the age of 18, while today "with all the years of continued effort on his part, he's got to about fifth grade." [*Id.*].

23

**Exhibit 1**

130.    The Court finds that, based on Dr. Puente's testimony, Mr. Maldonado had adaptive deficits in his inability to establish or use a bank account [*Id.* at 93]; his inability both before and after the age of eighteen to use public transportation without help from others [*Id.*]; his lack of any leisure activities such as listening to music, watching movies, or enjoying sports such as soccer [*Id.*]; and his unsuccessful social relationships both before and after the age of 18 [*Id.* at 93-94].

131.    The Court finds, based on Dr. Puente's testimony, Mr. Maldonado has "impaired functioning" in six neurological tests [*Id.* at 120], which are useful in helping to "understand the origins of some functional limitations." [*Id.* at 117].

132.    The Court finds, Dr. Puente's, uncontradicted, testimony credible and reliable including his clinical judgments and the evidence he relied upon to make those judgments.

133.    The Court finds, based on Dr. Puente's testimony, Mr. Maldonado has significant deficits in adaptive functioning in the conceptual, social, and practical domains that place him approximately two standard deviations below the mean in adaptive functioning.

**H.    Administration of the Vineland[6]**

134.    The Court finds that Dr. Puente used the Vineland Adaptive Behavior Scales-II ("Vineland") test procedure to analyze adaptive behavior.

135.    The Court finds that, based on Dr. Puente's testimony, that the Vineland is a standardized procedure, and he used a form of the Vineland that represents a semi-structured interview.

---

[6] The Court sustained the State's objection to admission of Dr. Puente's results on the Vineland exam. The other testimony concerning the Vineland exam was not objected to by the State and was admitted as evidence.

24

**Exhibit 1**

136.    The Court finds that the Vineland is an appropriate assessment identified in the AAIDD Manual and also recognized and accepted by courts[7] in this jurisdiction.

137.    The Court finds that before administering the Vineland, he consulted with Dr. Fletcher, who was a colleague to Dr. Sarah Sparrow, the developer of the second version of the Vineland who is now deceased. [2012 H.T. Vol. 2, p. 32].

138.    The Court finds that about two months before the evidentiary hearing, Dr. Puente confirmed that he could conduct the Vineland telephonically, retrospectively, and in an interview format. [*Id.*].

139.    The Court finds that in 2006, although the Vineland was available, Dr. Puente was not confident he could administer the test properly and declined to administer it.

140.    The Court finds that after discussing proper methodology with Dr. Fletcher, Dr. Puente administered the test. [*Id.* at 36]. Dr. Puente did not administer the Adaptive Behavior Assessment System ("ABAS") test to Mr. Maldonado in 2006 because, as he testified, it is not available in Spanish, it is not normed for Hispanic individuals, and it is supposed to be given to "high functioning individuals." [2006 H.T. Vol. 2, pp. 94-95].

141.    The Court finds, based on Dr. Puente's testimony, Dr. Puente contacted fourteen witnesses and interviewed ten people in Spanish. [*Id.* at 33]. Dr. Puente focused on his interview with the teacher, who was most sophisticated. [*Id.*]. He contacted the teacher, Ms. Dilea Garcia, once in 2006 and twice in 2012. [*Id.*]. Dr. Puente emphasized that Mr.

---

[7] *See, e.g., Wiley v. Epps*, 625 F.3d 199, 217 (5th Cir. 2010) (recognizing that "the authors of the Vineland test expressly state that retrospective interviews to obtain information about a subject's behavior at an earlier stage is permissible in certain circumstances, including when the subject is in a restricted environment, *such as a prison, and there is a question about the subject's adaptive functioning before coming to that environment*"); *Chester v. Quarterman*, No. 5:05-cv-29, 2008 U.S. Dist. LEXIS 34936, at *5 (E. D. Tex. Apr. 28, 2008) (stating the Vineland test is "an accepted instrument for measuring limitations in adaptive behavior").

25

**Exhibit 1**

Maldonado's school teacher was an important witness because not only was she his teacher for the few years he attended school but she was also his neighbor who saw him for fifteen years on a consistent basis. [*Id.* at 24].

142.    The Court finds that Dr. Puente generated scores on the test based on his interview and testified that these scores were consistent with his findings in 2006. [*Id.* at 34].

## I.    Deficiencies in the Conceptual, Practical, and Social Skill Areas

### 1.    Deficits in Maldonado's Conceptual Skill Area

143.    The Court finds that Mr. Maldonado has the following deficits in the conceptual skill area:

> **Money, time, and number concepts**. Mr. Maldonado's uncle, Severiano Maldonado, testified that Mr. Maldonado had problems counting money. [2006 H.T. Vol. 15, pp. 8-9].

> **Reading and writing**. Several witnesses testified to Mr. Maldonado's performance in school. Dilea Garcia, Mr. Maldonado's neighbor and school teacher of five years, described him as "a slow learner" in comparison with the other students; noted that he had to seek help from the other students "because maybe he couldn't understand," and reported that he did not reach a very high grade level. [2006 H.T. Vol. 2, p. 159]. Mr. Maldonado dropped out of school for good when he was nine or ten years old. [*Id.* at Vol. 3, p. 8]. The daughter of Dilea Garcia, Patricia Garcia, who was a schoolmate of Mr. Maldonado's and approximately his same age, did not consider him to be a good student and agreed that he

26

**Exhibit 1**

was "noticeably slow." [*Id.* at 7]. She was unsuccessful in helping him with his homework because "he did not understand much." [*Id.* at 8]. His neighbor Socorro Nava Villegas, described him as "not good in the head." [DX 5, ¶ 9]. His uncle, Severiano Maldonado, testified that Mr. Maldonado "was never able to learn" and "could not follow simple instructions." [DX 4, ¶ 14].

### 2.    Deficits in Maldonado's Social Skill Area

144.    The Court finds, based on uncontradicted testimony, Mr. Maldonado has the following deficits in the social skill area.

**Interpersonal relations**. Mr. Maldonado did not socialize well with other children. His uncle stated in an affidavit that *"Virgilio was not like the other children. He did not play much with the other children."* [DX 4 at ¶ 14]. One of Mr. Maldonado's neighbors also remarked that *"I always thought of Virgilio as an orphan because he wandered about aimlessly ("vagando") from the time he was old enough to walk. Virgilio would always walk around alone."* [DX 5 at ¶ 6]. One of Mr. Maldonado's classmates also remarked that Mr. Maldonado *"isolated himself from the children."* [2006 H.T. Vol. 3 at p. 8]. Dr. Puente testified that children would not engage in activities with Mr. Maldonado, like games and playing marbles, because of his oddities and behavior. [2012 H.T. Vol. 2, p. 45].

**Gullibility and naiveté.** People with mild intellectual disabilities are easily led and coaxed into behavior that reflects poor judgment. [2012 H.T. Vol. 1, p. 71]. Based upon the facts of the crime, Mr. Maldonado is a follower, which is

27

**Exhibit 1**

consistent with his mental retardation. [*Id.*]. Even the capital offense for which Mr. Maldonado was found guilty did not demonstrate forethought, planning, or complex execution of purpose on his part. [2012 H.T. Vol. 1, p. 71]. To the contrary, the Court finds that these facts indicate and provide further evidence of Mr. Maldonado's deficits and gullibility.

### 3.    Deficits in Maldonado's Practical Skills Area

145.    Based on uncontradicted testimony, the Court finds that Mr. Maldonado has the following deficits in the practical skills area:

**Activities of daily living**.

Mr. Maldonado had adaptive deficits in his inability to establish or use a bank account [2006 H.T. Vol. 2 at p. 93]; his inability both before and after the age of eighteen to use public transportation without help from others. *Id.*

**Occupational skills**. Mr. Maldonado held certain jobs, but even his work was consistent with mental retardation. For example, his uncle, Severiano Maldonado, worked with Mr. Maldonado at Greenspoint Dodge for a few years, where he, too, supervised Mr. Maldonado's work, which consisted of washing cars. [2006 H.T. Vol. 15, pp. 9-10]. His uncle recalled that Mr. Maldonado "would forget to put cleaner on the cars," "would hurry up too much," and "would wash a line of cars where he was not supposed to wash." [*Id.* at 10].

Mr. Maldonado also did security work at the apartment complex in which he stayed, which awarded him a free apartment and a salary of $500 per

28

**Exhibit 1**

month. [Pet. Exh. 4, p. 8, ¶ 47]. At each job, Maldonado's relatives assisted and supervised him so that he could do his work and remain employed. [2006 H.T. Vol. 3, p. 18]. Mr. Maldonado worked at a taqueria for approximately three or four months. [2006 H.T. Vol. 3, pp. 35, 36]. Mr. Amaro, Mr. Maldonado's cousin, testified that he attempted to put Mr. Maldonado in charge of the cash register, but that he was not capable of handling the task "completely" because he was "limited" [*Id.* at 35-36] and did not "have the skill," [*Id.* at 41]; so, Mr. Amaro would either assign Mr. Maldonado to other tasks or do the work himself [*Id.* at 41]. He described Mr. Maldonado as "a good employee but limited," who could not "completely" do his job, and who was not reliable because he would sometimes not show up for his shift. [*Id.* at. 36]. He stated that Mr. Maldonado was not the manager of his taqueria and, in fact, could never have earned the title of manager. [*Id.* 35, 36-37].

## J.    Testimony and Records from the TDCJ Should Not Be Used In Evaluating Adaptive Behavior

146.    The Court finds, based on uncontradicted testimony, that the environment in which the correctional officers and officials observed Mr. Maldonado is not indicative of typical community functioning and disregards the evidence presented by the State during the 2006 Hearing where the State called several Texas Department of Criminal Justice ("TDCJ") correctional officers and officials and admitted records in an attempt to establish Mr. Maldonado did not have any deficits in adaptive behavior.

**Exhibit 1**

147.    The Court finds, based on Dr. Fletcher's testimony, practitioners generally do not, and should not, consider a person's behavior in prison for purposes of an adaptive behavior assessment. [2012 H.T. Vol. 1, p. 109]. He described incarceration as a highly structured and very atypical social situation where there is no independent living. [*Id.*]. For the same reasons, prison officials and guards, or those who supervise the inmates, are not valid respondents. [*Id.* at p. 113]. For purposes of an intellectual disability assessment, people who observed the inmate during the developmental period are far more reliable informants. [*Id.*].

The Court finds, based on Dr. Fletcher's testimony, other experts agree that prison environments should not be used to determine adaptive behavior; Marc Tasse, Ph.D., an expert on the assessment of adaptive behavior, in an article titled "Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases," published in the peer-reviewed journal *Applied Neuropsychology*, also recommends that correctional officers not be interviewed as respondents for adaptive behavior assessment:  Correctional officers and other prison personnel should probably never be sought as respondents to provide information regarding the adaptive behavior of an individual that they've observed in a prison setting.   The only extreme circumstance when one might consider interviewing a member of the prison personnel regarding an inmate's adaptive behavior would be if there is absolutely no one alive who can provide any information regarding the individual's functioning prior to incarceration.  [DX 50R, Marc J. Tasse., "Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases," 16 *Applied Neuropsychology* 114 (Mar. 2009)] (emphasis added).

148.    The Court Finds that the people who knew Mr. Maldonado during the developmental period thought he was "slow" and acted accordingly.  Dr. Puente testified that no person identified Mr. Maldonado as mentally retarded because that term does not appear in the

30

**Exhibit 1**

lexicon of Acuyo (Mr. Maldonado's home village). [2012 H.T. Vol. 2, p. 25]. Instead, several family members and friends described Mr. Maldonado as "retrasado" or "lento," both meaning slow. [*Id.* at 26]. People treated Mr. Maldonado as slow, for example, in leisure activities. [*Id.*]. Mr. Maldonado never figured out games, like marbles, and therefore was not included. [*Id.*]. Mr. Maldonado was treated differently in school, in the playground, and in the community. [*Id.* at 27].

149.    The Court finds there is no evidence that Mr. Maldonado formulated plans and carried them through.   Rather, as Dr. Fletcher testified, the evidence demonstrates that Mr. Maldonado is a follower.

150.    The Court finds there is no evidence that Mr. Maldonado lead anyone in anything.

151.    The Court finds that there is no evidence that Mr. Maldonado could hide facts or lie effectively in his own other's interests

152.    The Court finds that there is no evidence that Mr. Maldonado's conduct, in response to external stimuli, was or was not rational and appropriate.

153.    The Court finds that the crime Mr. Maldonado committed did not show life-sophistication. [2012 H.T. Vol. 1, p. 71].

### K. Maldonado's Intellectual Disabilities Before the Age of Eighteen

154.    The Court finds, based on Dr. Fletcher's testimony, that intellectual disabilities begin very early in development and persist. [2012 H.T. Vol. 1, p. 68], and that sometimes they are due to genetic defects like Down Syndrome, environmental factors, or risk factors. For instance, somebody may have a brain injury in the developmental period, but it's something that basically arrest or disrupts development. [*Id.*]

31

**Exhibit 1**

155. The Court finds that to establish an intellectual disability, factors have to exist that interfere with the development of the person which is before the age of 18 and not after they are fully developed. *Id.*

156. The Court finds, based on Dr. Fletcher's testimony, that to analyze whether a person has mental retardation before age eighteen, there must be a careful review of the person's developmental history, school performance, prenatal history, postnatal history, and the occurrence of an event in adulthood, such as brain injury, that would explain why a person has mental difficulties. [*Id.* at 68-69].

157. The Court finds that Mr. Maldonado had problems with his development that began at a very early age that interfered with his school performance, and that persisted. [*Id.* at 69].

158. The Court finds, based on Dr. Weinstein's testimony that there were several risk factors in Mr. Maldonado's upbringing that lead him to the conclusion that onset of Mr. Maldonado's intellectual disability occurred before the age of 18. [*Id.*].

159. The Court finds, based on Dr. Weinstein's testimony, that Mr. Maldonado's mother abused alcohol during pregnancy; that Mr. Maldonado, as a child, would drink alcohol; also that he suffered from malnutrition; and that he was exposed to toxic substances, including pesticides, herbicides, and alcohol. [*Id.* at 179-80]. In addition, there was no intervening factor after the age of eighteen that would have lead Mr. Maldonado to lose cognitive abilities. [*Id.* at 180].

160. The Court finds that Dr. Weinstein agreed with Dr. Fletcher and testified that the onset of Mr. Maldonado's intellectual disability was most certainly before age eighteen. [*Id.* at 179].

32

**Exhibit 1**

161. The Court finds, based on Dr. Puente's testimony, people who knew Mr. Maldonado as a child established that he had intellectual disabilities prior to the age of eighteen. [*Id.* at Vol. 2, p. 30].

## L. Mr. Maldonado's Risk Factor for Mental Retardation

162. The Court finds that AAIDD Manual sets forth risk factors commonly associated with mental retardation. The four categories of risk factors are: (1) biomedical: factors that relate to biologic processes; (2) social: factors that relate to social and family interaction; (3) behavioral: factors that relate to potentially causal behaviors; and (4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills. [DX 53R, AAIDD Manual at 60].

### 1) Behavioral Risk Factors

163. The Court finds that behavioral factors "relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse." AAMR, *Mental Retardation* at 126 (2002); AAIDD Manual at 60.

164. The Court finds, Dr. Weinstein administered a neurological examination and review of Mr. Maldonado's history of being exposed to large amounts of alcohol in the womb and determined that Mr. Maldonado was at risk of suffering from Fetal Alcohol Syndrome ("FAS") -- there is "a great possibility" that Mr. Maldonado suffers from Fetal Alcohol Syndrome ("FAS"), which "is one of the leading known causes of mental retardation." [DX12, at 9, ¶ 23].

33

**Exhibit 1**

165.    The Court finds, based on Dr. Tara Wass, Ph.D.[8], an expert on FAS and its effect on child development, [DX2, at ¶ 2], that Mr. Maldonado's mother's heavy alcohol consumption during her pregnancy is consistent with behavior that leads to FAS and is highly probable caused Mr. Maldonado to suffer intellectual disabilities. [2006 H.T. Vol. 2, p. 22; DX 2, at [12]].

166.    The Court finds that Dr. Wass reached her conclusion based in large part on information from Mr. Maldonado's father [2006 H.T. Vol. 2, pp. 15, 48] and on information in Dr. Puente's and Dr. Weinstein's reports, plus corroborating information from his grade-school teacher about the mother's drinking habits from both the teacher's affidavit and a personal interview with her. [Id. at Vol. 2, p. 30].

167.    The Court finds, based on Dr. Wass's testimony, in the typical case of a diagnosis of FAS, the mother will have consumed 60 drinks per month, a level that Mr. Maldonado's mother reached in three days. [Id. at Vol. 2, p. 20].

168.    The Court finds, based on Dr. Wass's testimony, approximately 25% of individuals whose mothers drank as heavily during pregnancy as did Mr. Maldonado's would be mentally retarded. [Id. at Vol. 2, p. 21].

---

[8] Dr. Wass is a child development psychologist who specializes in the impact of prenatal ingestion of alcohol on the fetus. [2006 H.T. Vol. 2, p. 11]. She received a Ph.D. from the University of Denver in Developmental Psychology with a specialization in Developmental Cognitive Neuroscience. [DX 2, at ¶ 4, at [1]]. She has completed a two-year post-doctoral fellowship in "behavioral tetrology" which is "the study of agents that can cause birth defects (teratogens) with an emphasis on neurobehavioral effects (e.g., intelligence, attention, motor, etc.)". [DX 2, ¶ 4, at [2]]. She has delivered reports at numerous professional conferences and published research articles in peer-reviewed journals. [Id.]. Among her relevant publications, she has an article in press titled "The neuroanatomical and neurobehavioral effect of heavy prenatal alcohol exposure" which will appear in J. Brick, ed., Handbook of the Medical Consequences of Alcohol and Drug Abuse (2d ed.). She has previously been certified as an expert in Fetal Alcohol Syndrome by a trial court in Memphis, Tennessee. Keen v. State, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258 (Tenn. Crim. App. June 5, 2006, application for permission to appeal denied, Oct. 30, 2006).

34

Exhibit 1

169. The Court finds, based on Dr. Wass's testimony, that "cognitive deficits disorders" caused by FASD would appear before the age of eighteen, because they stem from brain damage caused by "prenatal alcohol exposure." [*Id.* at Vol. 2, p 23-24].

170. The Court finds that Mr. Maldonado was exposed to toxic substances contained in pesticides and insecticides during his childhood and adolescence. [DX 12, ¶¶ 29-31]. At the age of thirteen, he began to work as an agricultural worker in the fields fumigating crops. [*Id.* at ¶ 27]. As part of his duties, Mr. Maldonado was required to carry a tank filled with chemicals, such as Tamaron, Tiodan and cyanine, used in the fumigation process, on his back. [*Id.*]. These chemicals often leaked out of the tank, into the clothes that he was wearing, and eventually into his skin. [*Id.*].

171. The Court finds that exposure to such toxic substances can impair frontal lobe activity. [*Id.* at ¶ 31].

**2) Educational Risk Factors**

172. The Court finds that educational factors "relate to the availability of educational supports that promote mental development and the development of adaptive skills." AAMR, *Mental Retardation* at 126 (2002); AAIDD Manual at 60. The Court finds that impaired parenting is also relevant to this risk factor. The Court finds that Mr. Maldonado's uncle testified in his affidavit that Mr. Maldonado's mother (Transito) was a "local prostitute" and "would bring men (customers) home. Transito drank all the time. She was an alcoholic, a drunk." [DX 4 at 7]. Another neighbor testified that "Transito was a prostitute ("rabo verde"). She was known in Acuyo as 'La Guzga' (devourer of men). She drank a lot, especially at town dances." [DX 5 at 5].

35

**Exhibit 1**

173.    The Court finds that the same neighbor also described that *"As long as I can remember, Transito paid no attention to [Mr. Maldonado] and left him alone. He walked around the village barefoot and in rags that were falling off him."* [*Id.* at 6].

### 3)    Social Risk Factors

174.    The Court finds that social factors "relate to social and family interaction, such as stimulation and adult responsiveness." AAMR, *Mental Retardation* at 126 (2002); AAIDD Manual at 60.

175.    The Court finds that Mr. Maldonado had a turbulent and harsh childhood marked by neglect, deprivation, and abuse, and that his uncle, Severiano Maldonado, who lived in Acuyo both prior to the mother's pregnancy and during the time when Mr. Maldonado was growing up, [*Id.* at Vol. 15, pp. 6, 11, 19], testified that Mr. Maldonado was treated "badly" and that he had seen his mother hit him. [*Id.* at 8].

176.    The Court finds that Mr. Maldonado's mother was violent with Mr. Maldonado and, when drunk, would beat him daily, sometimes hitting him in the head with rocks [DX 4, ¶11], and, at other times, hitting him with a whip on his hands, his arms, his head, and on his legs until they were bloody. [*Id.* at ¶15].

177.    The Court finds that, as a child, Mr. Maldonado was very thin and frequently sick. [DX 6, ¶ 12; DX 5, ¶ 9]. When he was not sick, he was described as "very hyper" and running "back and forth like a rat." [DX 4, ¶ 18].

36

**Exhibit 1**

## CONCLUSIONS OF LAW

**Standard for Determining Mental Retardation**

1.    In the criminal courts of the State of Texas, Mental Retardation is defined pursuant to the American Association on Mental Retardation, now the American Association on Intellectual and Developmental Disabilities ("AAIDD") and/or Section 591.003(13) of the Texas Health and Safety Code.  Both of which have very similar definitions for "mental retardation".

2.    As such, mental retardation is defined by the following criterion:

> **a.** significantly **subaverage general intellectual functioning**;
>
> **b.** concurrent with related **deficits in adaptive functioning**, *that is, impairment in adaptive behavior defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales;*
>
> **c. the onset of which occurs prior to the age of 18.** *Thus, the limitations in adaptive functioning are apparent before the age of eighteen concurrent with significant subaverage intellectual functioning.*

See *Ex Parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004) stating, *"Until the Texas Legislature provides an alternate statutory definition of "mental retardation" for use in capital sentencing, we will follow the AAMR or section 591.003(13) criteria in addressing Atkins mental retardation claims."*

37

**Exhibit 1**

3.    **Significantly subaverage general intellectual functioning** is defined as an IQ score of approximately 70 or below (approximately 2 standard deviations below the mean)." *Id. citing* DSM-IV at 39; see also American Association on Mental Deficiency (AAMD), Classification in Mental Retardation 1 (Grossman ed.1983).

4.    Establishing evidence of deficits in adaptive behavior is "exceedingly subjective", and it's likely that experts will view the same evidence and offer opposing opinions as to whether the evidence establishes deficits in adaptive behavior or not.  See, *Ex Parte Briseno*, 135 S.W. 3d 1, 8 (Tex. Crim. App. 2004).

5.    When experts offer opposing opinions as to whether evidence establishes deficits in adaptive behavior or not, the fact-finder in the criminal court *may* consider the following factors in weighing the evidence as indicative of retardation or of a personality disorder:

- Did those who knew the person best during the developmental stage –his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and if so, act in accordance with the determination?

- Has the person formulated plans and carried them through or is his conduct impulsive?

- Does his conduct show leadership or does it show that he is led around by others?

- Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

38

**Exhibit 1**

- Does he respond coherently, rationally, and on point to oral or written questions or does his responses wander from subject to subject?

- Can the person hide facts or lie effectively in his own or others' interests?

- Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose? *Id.*

6. "Although experts may offer insightful opinions on the question of whether a particular person meets the psychological diagnostic criteria for mental retardation, the ultimate issue of whether the person is, in fact, mentally retarded for purposes of the Eighth Amendment ban on excessive punishment is for the finder of fact, based upon all of the evidence and determinations of credibility." *Id.*

7. The Court finds by a preponderance of the evidence that Mr. Maldonado has significantly subaverage general intellectual functioning based on uncontradicted testimony that Mr. Maldonado has a full scale score of 61 on the Batería-R, administered by Dr. Weinstein, and scores of 70 on the Beta III and 62 on the C-TONI, administered by Dr. Puente; all of which demonstrate that his intellect is firmly in the range of mild mental retardation, as recognized by the AAIDD Manual; and as such, meets prong one of the definition of mental retardation under the law.

8. The Court finds by a preponderance of the evidence that Mr. Maldonado's significantly subaverage general intellectual functioning developed prior to the age of 18.

39

**Exhibit 1**

9.      The Court finds by a preponderance of the evidence that Mr. Maldonado has significant deficits in adaptive functioning in the conceptual, social, and practical domains that place him approximately two standard deviations below the mean in adaptive functioning meeting the second prong of mental retardation under the applicable law

10.     The Court finds by a preponderance of the evidence that Mr. Maldonado's deficits in adaptive functioning in the conceptual, social, and practical domains occurred prior to the age of 18 and concurrent with his significantly subaverage intellectual functioning.

11.     The Court finds when there are "battling experts" with opposing opinions formed after reviewing the same evidence, the *Briseno* factors may be considered in weighing evidence as indicative of mental retardation or of a personality disorder.  *See Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004).

12.     The Court finds by a preponderance of the evidence that there were no dueling experts with opposing opinions as to whether Mr. Maldonado had deficits in adaptive behavior or not.

13.     The Court finds there was no evidence presented by the State where an expert testified to his opinion that Mr. Maldonado did not demonstrate deficits in adaptive behavior or that he had a personality disorder.

14.     Although the Court *may* focus on the *Briseno* factors in determining whether Mr. Maldonado had limitations in his adaptive behavior related to his significantly subaverage intellectual functioning, the Court did not proceed to weigh the *Briseno* factors to determine whether they were indicative of Mr. Maldonado being mentally retarded or having a personality disorder because there was no contradictory expert opinion stating that Mr. Maldonado did not have a deficit in adaptive behavior but a personality disorder.

40

**Exhibit 1**

15.     As such, the Court finds reliable and credible the well qualified expert opinions of the psychologists establishing by a preponderance of the evidence that Mr. Maldonado had limitations in his adaptive behavior related to his significantly subaverage intellectual functioning prior to the age of 18.

16.     Therefore, the Court finds by a preponderance of the evidence that Mr. Maldonado is mentally retarded for purposes of the Eighth Amendment's ban on excessive punishment as established by all of the evidence and this Court's determinations of credibility.

17.     Accordingly, under the holdings of *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), Mr. Maldonado cannot be put to death. His death sentence must be modified to a sentence of life imprisonment.

18.     Any findings of fact determined to be conclusions of law shall be such, and any conclusion of law determined to be a finding of fact shall be so.

41

**Exhibit 1**

## ORDER

The Court hereby adopts and incorporates herein the attached findings of fact and conclusions of law in this cause.

The Clerk is hereby ORDERED to prepare a transcript of all papers in cause number 721568-B and transmit same to the Court of Criminal Appeals as ordered by the Court of Criminal Appeals.

The Clerk is further ORDERED to send a copy of this Court's findings of fact and conclusions of law, including this Order, to Applicant's counsel and to counsel for the State.

SIGNED this 12th day of December, 2012

Hon. Hazel B. Jones
Presiding Judge of the
338th Criminal District Court,
Harris County, Texas

42

**Exhibit 1**



STATE OF TEXAS
COUNTY OF HARRIS

I, Chris Daniel, District Clerk of Harris County, Texas, certify that
this is a true and correct copy of the original record filed and or recorded
in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this

12-14-12

CHRIS DANIEL, DISTRICT CLERK
HARRIS COUNTY, TEXAS

_____ Deputy

**Exhibit 1**