No. 14-7506

_____

_____

IN THE SUPREME COURT OF THE UNITED STATES

_____

ABELARDO ARBOLEDA ORTIZ, PETITIONER

v.

UNITED STATES OF AMERICA

(CAPITAL CASE)

_____

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

BRIEF FOR THE UNITED STATES

_____

IAN HEATH GERSHENGORN
  Acting Solicitor General
    Counsel of Record

DAVID BITKOWER
  Acting Assistant Attorney General

DAVID M. LIEBERMAN
  Attorney

  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____

_____

**Exhibit 2**

CAPITAL CASE

QUESTION PRESENTED

Whether a certificate of appealability should issue on petitioner's claim that he is intellectually disabled under <u>Atkins</u> v. <u>Virginia</u>, 536 U.S. 304 (2002), and is therefore constitutionally ineligible for a death sentence.

(I)

**Exhibit 2**

IN THE SUPREME COURT OF THE UNITED STATES

————————————

No. 14-7506

ABELARDO ARBOLEDA ORTIZ, PETITIONER

v.

UNITED STATES OF AMERICA

(CAPITAL CASE)

————————————

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

————————————

BRIEF FOR THE UNITED STATES

————————————

OPINIONS BELOW

The order of the court of appeals (Pet. App. A2) is un-reported. The orders of the district court (Pet. App. A47, A48-A52) are unreported. Prior opinions of the court of appeals (Pet. App. A3-A25, A26-A46) are reported at 664 F.3d 1151 and 315 F.3d 873. Prior orders of the district court (Pet. App. A53, A54, A55-A83) are unreported, but one order is available at 2007 WL 7686126.

JURISDICTION

The judgment of the court of appeals was entered on March 13, 2014. A petition for rehearing was denied on July 22, 2014 (Pet.

**Exhibit 2**

2

App. A1).  On September 26, 2014, Justice Alito extended the time within which to file a petition for a writ of certiorari to and including December 4, 2014, and the petition was filed on that date.  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

STATEMENT

Following a jury trial in the United States District Court for the Western District of Missouri, petitioner was convicted of conspiracy to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. 841(a)(1) and (b)(1)(A) and 846 (Count 1); the intentional, premeditated murder of Julian Colon while using a firearm during and in relation to a drug-trafficking offense, in violation of 18 U.S.C. 924(c)(1) and (j)(1) and 2 (Count 2); and knowingly traveling in interstate commerce with intent that a murder for hire be committed, resulting in Colon's death, in violation of 18 U.S.C. 1958 and 2 (Count 3).  The district court imposed a capital sentence on Counts 2 and 3.  Pet. App. A8.  The court of appeals affirmed, id. at A26-A46, and this Court denied certiorari, 540 U.S. 1073 (2003) (No. 02-11188).

The district court denied petitioner's subsequent motion for collateral relief under 28 U.S.C. 2255.  Pet. App. A55-A83.  The court of appeals affirmed in part, vacated in part, and remanded, Id. at A3-A25, and this Court denied certiorari.  133 S. Ct. 2763 (2013) (No. 12-5437).  On remand, the district court again denied Section 2255 relief, Pet. App. A48-A52, and denied a certificate

**Exhibit 2**

3

of appealability (COA), id. at A47.  The court of appeals denied a COA and dismissed the appeal.  Id. at A2.

1.    Petitioner is a Colombian national who, in 1991, illegally entered the United States and went to Houston, Texas.  Pet. App. A7.  Petitioner was associated with a Colombian drug cartel known as "La Oficina."  Ibid.  In 1998, petitioner participated in an attempted double murder in retribution for the theft of approximately $240,000 in drug proceeds from Edwin Hinestroza, who ran a drug-distribution ring with cocaine from La Oficina.  Id. at A7-A8.  Colon was murdered, but the other victim -- Héberth Andres Borja-Molina (Borja) -- survived and later testified against petitioner and his co-defendants.  Ibid.

Hinestroza suspected that two of his associates -- Colon and Borja -- had stolen the $240,000 from his apartment.  Pet. App. A7.  In November 1998, Hinestroza lured both men to a meeting at a motel in Kansas City, Missouri, with Hinestroza and three other cartel associates:  German Sinisterra, Plutarco Tello, and petitioner.  Ibid.  The group took Colon and Borja to a house where they bound them with duct tape, beat them, and demanded the return of the stolen money.  Ibid.  Colon was moved to a bathroom and Borja was dragged down to the basement.  08-1749 Gov't C.A. Br. 14.  Hinestroza then ordered Sinisterra, Tello, and petitioner to kill the men.  Ibid.  Sinisterra shot Colon in the head, killing him.  Pet. App. A7.

**Exhibit 2**

4

It is not entirely clear whether petitioner or Tello shot at Borja in the basement, but whoever took the shot, it missed the mark, even though Borja was bound and lying on the floor.  Pet. App. A7 & n.1; see 08-1749 Gov't C.A. Br. 14; see also Pet. App. A42 (petitioner and Tello each claimed the other took the shot).[1] A quick-thinking Borja survived by feigning death.  Pet. App. A7-A8.  Borja was placed into the trunk of a vehicle with Colon's body, and after the vehicle was abandoned, Borja escaped and reported the crime to the police.  Id. at A8.

Petitioner was arrested soon thereafter.  Pet. App. A8.  Petitioner admitted to the police that he came to Kansas City "to do a job" for which he was paid $1000.  Ibid.  Petitioner also admitted that he had bound and beaten Borja but denied any role in the actual shootings.  Id. at A29.

2.    The government pursued the death sentence against Sinisterra, Tello, and petitioner, who were tried together as co-defendants.  Pet. App. A8.  The jury found all three guilty on all counts, and separate penalty phases were held for each defendant. Ibid.  Sinisterra (who actually murdered Colon) was sentenced to death.  Ibid.  Petitioner also received a death sentence for aiding

---

[1] The shooter's efforts were sufficiently inept that petitioner's attorney later pressed a "'deliberate-miss' defense," arguing that petitioner and Tello chose to spare Borja's life by intentionally "sho[oting] into the basement floor."  Pet. App. A74.

**Exhibit 2**

5

and abetting that murder (Count 2) and traveling interstate to engage in murder for hire (Count 3), but Tello was sentenced to life imprisonment.  Id. at A8 & n.3.[2]

On direct review, the court of appeals affirmed petitioner's convictions and sentence, Pet. App. A26-A46, and this Court denied certiorari, 540 U.S. 1073 (2003).

3.  a.  In 2004, petitioner moved to vacate his sentence under 28 U.S.C. 2255.  Pet. App. A9.  Petitioner argued, as relevant here, that he is intellectually disabled[3] and is thus constitutionally ineligible for the death penalty under the Court's then-recent decision in Atkins v. Virginia, 536 U.S. 304 (2002). Pet. App. A9.  A government and a defense expert in psychology each interviewed petitioner and conducted tests to assess his cognitive ability.  Id. at A10.  Each also testified at an evidentiary hearing about whether petitioner satisfied the prevailing definition of intellectual disability, which required (1) "significantly subaverage intellectual functioning (an IQ of approximately 70 or below)"; (2) "concurrent deficits or impairments in present adaptive functioning * * * in at least two [specified]

---

[2] Hinestroza was tried separately and was sentenced to life imprisonment.  Pet. App. A8 n.2.

[3] The Court previously described "intellectual disability" as "mental retardation," but it has since adopted the former term. See Hall v. Florida, 134 S. Ct. 1986, 1990 (2014).  This brief uses the Court's current terminology.

**Exhibit 2**

6

areas"; and (3) "onset before age 18." Ibid. (citation omitted); see id. at A10-A12.

The government's expert, Dr. Carmen Vasquez, opined that petitioner was not intellectually disabled. Pet. App. A10. Dr. Vasquez determined that petitioner achieved an I.Q. score of 70 on the Spanish version of the Woodcock-Johnson III Tests of Cognitive Abilities (Bateria III) and scores of 47 and 51 on different parts of the Comprehensive Test of Non-Verbal Intelligence (C-TONI). Ibid. Dr. Vasquez acknowledged that those scores themselves "indicate borderline mental functioning," but she opined that the low scores likely reflected that "[petitioner] attempted to malinger on the exams" and that, in addition to "poor cooperation," other factors such as his almost complete lack of schooling and his depressed and anxious mood likely accounted for the results. Id. at A11; see id. at A64. Dr. Vasquez also collected data on petitioner's "adaptive functioning" using the Adaptive Behavior Assessment System, Second Edition (ABAS-II), which similarly reflected "'extremely low' scores" in multiple areas. Id. at A11. Dr. Vasquez "discounted" those scores and relied on her personal observations and other information to conclude that petitioner had a "demonstrated ability to function" in other areas, including his purported ability to "pass[] the test to acquire a Texas driver's license," that indicated that he was "functioning appropriately" when compared to other Columbian immigrants. Id. at A11, A64.

**Exhibit 2**

7

Petitioner's expert, Dr. Ricardo Weinstein, by contrast, opined that petitioner was intellectually disabled based on a low I.Q. and adaptive deficits that manifested before the age of 18. Pet. App. A10-A11.  Dr. Weinstein determined that petitioner achieved an I.Q. score of 54 on the Spanish version of the Wechsler Adult Intelligent Scales III (WAIS-III) and an estimated score between 44 and 50 on the Bateria Woodcock-Munoz-Revisada (Bateria W-M-R).  Id. at A10.  Dr. Weinstein opined that it was unlikely that petitioner could purposely achieve such convergently low scores by malingering.  Id. at A11.  Dr. Weinstein likewise con-cluded that petitioner had "significant deficiencies in three adaptive skill sets (conceptual, social, and practical)" based on a social history report about petitioner that described his "inability to achieve success in school, poor interpersonal skills, inability to accomplish simple tasks as a child, dependence upon others to take care of his personal hygiene and health, inability to learn simple unskilled labor tasks, inability to manage his own finances, and general dependence upon others to function in society."  Ibid.

The district court rejected petitioner's Atkins and other Section 2255 claims.  Pet. App. A55-A83.  The court concluded that Dr. Weinstein's methodology was suspect, did not adequately account for cultural differences, and ultimately did not meet the Daubert standard for expert testimony.  Id. at A56 (citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)); see id. at A59-

**Exhibit 2**

8

A63, A65.   In any event, the court concluded that Dr. Vasquez's opinion was more reliable because she "properly accounted for cultural differences," id. at A63, and "adequately considered [petitioner's] adaptive capabilities [rather than just deficits] as demonstrated by the other evidence of record," id. at A65-A66, including his ability to understand English and have relationships with English-speaking women, to carry out extensive criminal conduct despite being illiterate, to travel through airports, and to "pass[] the test to acquire a Texas driver's license," id. at A63-A64.

b.   The court of appeals affirmed in part on grounds not relevant here, vacated the district court's judgment on petitioner's Atkins claim, and remanded for reconsideration of that claim.   Pet. App. A3-A25.

First, the court of appeals granted petitioner's request to supplement the record with materials not previously offered in district court, which indicated that a government witness had incorrectly testified that petitioner obtained a Texas driver's license.   Pet. App. A16-A19.   The court explained that although a reviewing court generally "cannot consider evidence that was not contained in the record below," it concluded that it "may order the record of a case enlarged" in "extraordinary circumstances" "[w]hen the interests of justice demand it."   Id. at A17 (citations omitted).   In light of the government's concession that a government witness had testified incorrectly about the driver's license,

**Exhibit 2**

id. at A13, and because the incorrect information "left the district court with an inaccurate view of [petitioner]," the court of appeals concluded that the "[j]ustice demand[ed]" supplementation of the record.  Id. at A17.  The erroneous testimony, the court added, not only gave the district court an incorrect view of petitioner's abilities, it "may have reinforced the perception [petitioner] was intentionally performing poorly, or malingering, on the psychological tests."  Id. at A18.  Because the court of appeals concluded that it "cannot be fairly certain the erro[neous testimony] was harmless," it remanded the case for reconsideration of petitioner's Atkins claim.  Id. at A19, A25.

The court of appeals observed that petitioner also relied "heavily upon the extra-record declarations of other purported experts in the field of mental retardation" to support petitioner's argument on appeal that "established science discredit[ed] Dr. Vasquez's approach."  Pet. App. A20.  The court, however, declined to supplement the record "for purposes of this appeal" with the newly proffered evidence and, instead, concluded that "the district court may consider this other untimely evidence at its considerable discretion" on remand.  Id. at A17.

In light of that remand, the court of appeals "reserve[d] judgment" on the question whether Dr. Weinstein's opinions reflected the mainstream of psychological expertise, Pet. App. A19, and "express[ed] no opinion whether the evidence shows [petitioner] is mentally retarded or not," id. at A21.  The court,

**Exhibit 2**

10

moreover, concluded that a remand was necessary because, on "the record before [it]," the court could not say that the district court committed clear error in finding "Dr. Vasquez more reliable and credible than Dr. Weinstein" and in rejecting petitioner's claim of intellectual disability.  Id. at A20-A21.[4]

c.    On remand, the district court again denied Section 2255 relief.  Pet. App. A48-A52.  The court declined "to consider the additional untimely evidence" proffered by petitioner on appeal, id. at A50, including evidence from "purported experts in the field if I.Q. testing" and from petitioner's family in Columbia, id. at A49.  The court also clarified that erroneous government testimony that petitioner had obtained a driver's license or passed a driver's exam "was not a significant factor" in its decision.  Id. at A50.  The court stated that it remained "firmly convinced that [petitioner] is not mentally retarded," explaining that the government's expert testimony was "clearly more reliable" than petitioner's and that the record included evidence of petitioner's abilities in various contexts, which supported the court's conclusion that petitioner was not intellectually disabled.  Id. at A50-A52.

---

[4] The court of appeals rejected an ineffective-assistance claim not relevant here, Pet. App. A21-A24, and this Court denied certiorari on that claim.  133 S. Ct. 2763 (2013).

**Exhibit 2**

11

In a separate order, the district court denied petitioner's request for a COA on his Atkins claim and related issues.  Pet. App. A47.

d.    The court of appeals subsequently dismissed petitioner's appeal in a short, three-sentence judgment.  Pet. App. A2.  The court stated that it had denied petitioner's application for a COA after "carefully review[ing] the original file of the district court."  Ibid.

4.    After petitioner filed his certiorari petition based on intellectual disability, the Department of Justice undertook an internal review of petitioner's case to more fully assess the appropriateness of applying the death penalty to petitioner.

a.    As part of that review, the government retained Dr. Daniel Martell to render an opinion on whether petitioner is intellectually disabled based on the totality of the available evidence, including the evidentiary and other materials in this case and relevant extra-judicial records concerning petitioner. Report by Dr. Daniel A. Martell re Abelardo Arboleta Ortiz v. United States (Gov't Expert Report) 1 (Nov. 28, 2016); see id. at 2-4.  Dr. Martell is a board-certified forensic psychologist with 25 years of experience in capital litigation who has consulted on scores of Atkins cases, including as a state government expert in Atkins itself.  Id. at 1.  In late November 2016, Dr. Martell submitted his report to the government in which he concluded that, "to a reasonable degree of neuropsychological certainty," peti-

**Exhibit 2**

12

tioner is intellectually disabled and merits an exemption from the death penalty under <u>Atkins</u>.  Gov't Expert Report 2, 28.[5]

Dr. Martell identified two material and significant errors in Dr. Vasquez's testing of petitioner.  First, Dr. Martell concluded that Dr. Vasquez had failed to use "the most updated set of norms for the [Bateria III] test that were available at that time" to determine petitioner's I.Q. score.  Gov't Expert Report 11 & n.9. When scored with the proper norms, he explained, petitioner's Bateria III I.Q. score was 60 rather than 70.  <u>Ibid.</u>  Relatedly, Dr. Martell concluded that although petitioner's I.Q. scores of 51 and 47 on the C-TONI might "slightly underestimate his actual ability" due to "situational factors" and although he concluded that the I.Q score of 54 from the WAIS-III administered by Dr. Weinstein "provides the best overall indication of [petitioner's] intellectual functioning," petitioner's I.Q. scores were "strikingly consistent with those from each of the other tests" administered by Drs. Vasquez and Weinstein.  <u>Id.</u> at 11-12.  Given the "remarkable similarity" in the range of scores obtained using different tests, Dr. Martell concluded that the results reflect "substantial 'convergent validity'" and demonstrate petitioner's "significantly sub-average intellectual functioning."  <u>Id.</u> at 12. In short, he concluded, each of the mutually reinforcing "tests

---

[5] The government furnished a copy of Dr. Martell's report to counsel for petitioner in December 2016.

**Exhibit 2**

13

returned results that are clearly in the range of Intellectual Disability." Id. at 10.

Second, Dr. Martell identified error in Dr. Vasquez's decision to use the Validity Indicator Profile (VIP) to measure petitioner's testing effort and in her conclusion that "lack of engagement" accounted for his invalid results. Gov't Expert Report 9. The VIP test manual, Dr. Martell explained, "states that the test should not be used with mentally retarded populations, as 95% of persons with intellectual disability falsely 'fail' the test." Ibid. Based on his assessment of petitioner's other testing data, Dr. Martell concluded that petitioner's "[i]nconsistent" score on the VIP was "most likely the result of true cognitive impairments, rather than lack of effort or malingering." Id. at 10. Dr. Martell similarly concluded that "[a]ll three measures" of effort in Dr. Weinstein's testing, including results from the Test of Memory Malingering, produced valid results, "indicating that [petitioner] was putting forth a good effort during Dr. Weinstein's testing in general, and on the IQ test in particular." Id. at 9.

Dr. Martell also concluded that petitioner "exhibits significant deficits or impairments in all three domains of adaptive functioning (Conceptual, Social and Practical)" based on "a significant amount of evidence * * * from divergent sources." Gov't Expert Report 12, 27; see id. at 12-27 (detailed findings). Dr. Martell concluded, moreover, that both Dr. Vasquez and the district court had erred in "applying what was essentially a

**Exhibit 2**

14

balancing test: weighing things [petitioner] could do against things he could not." Id. at 27.  Rather than balancing strengths against weaknesses, Dr. Martell explained, "the diagnosis must be made on the basis of identifying areas of deficit or impairment that place [petitioner's] functional ability outside the norm and require systems of support for daily living."  Id. at 27-28.

Finally, Dr. Martell opined based on the materials concerning petitioner's history that petitioner's "intellectual and adaptive deficits find their origin in the bacterial meningitis he suffered at 8 months of age," well before his 18th birthday.  Gov't Expert Report 28.

b.   Once the Attorney General has authorized a capital prosecution, her determination establishes the litigating position of the Department of Justice until the Attorney General determines otherwise.  Cf. Department of Justice, United States Attorneys' Manual § 9-10.160 (2017) (providing that a United States Attorney may not withdraw the government's notice of intention to seek the death penalty "unless directed by the Attorney General").  On January 13, 2017, the Attorney General "authorized and directed" Department of Justice personnel "to consent to entry of judicial relief setting aside [petitioner's] existing death sentence."

**Exhibit 2**

15

Letter from Attorney General Loretta E. Lynch to United States Attorney Tammy Dickinson (Jan. 13, 2017).[6]

DISCUSSION

Petitioner seeks this Court's review to (1) clarify that district courts must follow the scientific consensus concerning diagnosis of intellectual disability when reviewing claims under <u>Atkins</u> v. <u>Virginia</u>, 536 U.S. 304 (2002), see Pet. 18-25; (2) ensure that foreign-born defendants raising <u>Atkins</u> claims are held to the same evidentiary burdens as defendants born in the United States, Pet. 25-30; and (3) announce more specific standards for <u>Atkins</u> determinations, Pet. 30-32.  Petitioner ultimately contends that, under consensus standards applied by the medical community, he is intellectually disabled.  Pet. 18.

Although petitioner's broader challenge to the method of evaluating intellectual disability would not warrant this Court's plenary review in light of, <u>inter alia</u>, deficiencies in the current record and the court of appeals' denial of a COA, significant developments post-dating the decision of the court of appeals warrant granting certiorari, vacating the judgment below, and remanding for further proceedings.  The government's own expert (Dr. Martell) has identified significant errors in the analysis of

[6] The Attorney General's letter and Dr. Martell's report are not yet contained within the record in this case.  At the Court's request, the government will lodge copies of both with the Clerk of this Court.

**Exhibit 2**

16

the government expert who originally testified in this case.  And when this case is viewed in light of those errors, there is a substantial showing of the deprivation of the Eighth Amendment right recognized by <u>Atkins</u> that warrants granting a COA to allow the court of appeals to address the question in the first instance. Indeed, after conducting a fresh review of this case in light of the available evidence, the position of the United States is that petitioner is entitled to relief to set aside the death sentence in this case.  In these extraordinary circumstances, the appropriate course is to grant, vacate, and remand for further proceedings.

1.    A federal prisoner must obtain a COA before he can appeal from a district court's denial of Section 2255 relief.  28 U.S.C. 2253(c)(1)(B).  To obtain a COA, the prisoner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. 2253(c)(2).  Where, as here, a district court denies Section 2255 relief on the merits, that standard requires the prisoner to establish "that jurists of reason would find it debatable whether [he] states a valid claim of the denial of a constitutional right." <u>Gonzalez</u> v. <u>Thaler</u>, 132 S. Ct. 641, 648 (2012) (quoting <u>Slack</u> v. <u>McDaniel</u>, 529 U.S. 473, 484 (2000)).

The court of appeals denied a COA after review of the district court record, including the district court's conclusion that testimony from the government's expert, Dr. Vasquez, was more credible than that of Dr. Weinstein.  The government, however, has become

**Exhibit 2**

17

aware of significant errors in Dr. Vasquez's analysis that are material to the proper disposition of this case. See pp. 12-14, supra. Those errors warrant supplementing the record on appeal to correct the misimpression left by the erroneous evidence submitted by the government concerning petitioner's intellectual disability. If this case were remanded, the government would therefore advocate supplementing the record in the interest of justice in order to correct the record.

The court of appeals previously took that exact course earlier in this case when the government admitted that a government witness had incorrectly testified that petitioner had obtained a driver's license. See pp. 8-9, supra (discussing Pet. App. A13, A16-A19). Supplementation of the record in such truly "extraordinary cir-cumstances" was required in "the interest[] of justice" because the erroneous evidence "left the district court with an inaccurate view of [petitioner]" that could have affected both the court's views about petitioner's abilities and its views about whether petitioner was malingering on I.Q. tests. Pet. App. A17-A18 (cita-tion omitted). The errors that Dr. Martell has identified in the original government expert's testimony are much more significant: They undermine the expert's conclusions about petitioner's I.Q. scores, her views on possible malingering (informed by an error in her testing for such malingering), and her methodology that focused on abilities rather than adaptive deficits. See pp. 12-14, supra. In the context of a capital case such as this, justice demands

**Exhibit 2**

18

that such materially significant errors in the government's submission be corrected for consideration by the courts.

2.   Moreover, once those errors have been corrected with supplementary evidence, petitioner will be able to make a substantial showing of a constitutional violation that would warrant an appeal.  Petitioner's remarkably consistent I.Q. test scores, the highest of which is 60, are well below the threshold for intellectual disability, even after one considers the measurement error inherent in such testing.  Cf. Hall v. Florida, 134 S. Ct. 1986, 1995 (2014) (noting general measurement error of +/- 5 points).   The opinion of the government's original expert on malingering, moreover, was erroneously influenced by the results of testing that could not properly be applied in this context to measure such effort.  And the analysis of the government's expert who identified these errors (Dr. Martell) has determined "to a reasonable degree of neuropsychological certainty" based on the information available that petitioner is, in fact, intellectually disabled.  Gov't Expert Report 2, 28; see pp. 12-14, supra.  In this context, "jurists of reason would [at least] find it debatable whether [petitioner] states a valid claim of the denial of a constitutional right," Gonzalez, 132 S. Ct. at 648 (citation omitted), so as to warrant a COA that would allow the court of appeals to consider petitioner's Atkins claim.  Indeed, after considering the question in light of the currently available information, the government itself concludes that petitioner is entitled to relief

**Exhibit 2**

19

from the death sentence under Atkins.  The Attorney General has directed that the government "consent to entry of judicial relief setting aside [petitioner's] existing death sentence."  See pp. 14-15, supra.  In its place, petitioner should receive a sentence of life imprisonment, which is fully warranted on the facts of this case.

### CONCLUSION

The petition for a writ of certiorari should be granted, the judgment of the court of appeals vacated, and the case remanded for further proceedings in light of the extraordinary circumstances discussed in this brief.

Respectfully submitted.

IAN HEATH GERSHENGORN
    Acting Solicitor General

DAVID BITKOWER
    Acting Assistant Attorney General

DAVID M. LIEBERMAN
    Attorney

JANUARY 2017

**Exhibit 2**