**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff/Respondent,** | : | |
| | : **Criminal Case No. 2:04-cr-55** | |
| **vs.** | : **Civil Case No. 2:11-cv-88** | |
| | : | |
| **ALFONSO RODRIGUEZ, JR.,** | : | |
| | : | |
| **Defendant/Petitioner.** | : | |

**PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT
PURSUANT TO FED. R. CIV. P. 59(e)**

Petitioner Alfonso Rodriguez respectfully requests that the Court reconsider

its denial of post-conviction relief on his claim of intellectual disability under

*Atkins v. Virginia*, 536 U.S. 304 (2002), and 18 U.S.C. § 3596(c). A material

mistake of law or fact allows a district court to alter or amend its judgment under

Rule 59(e). *See, e.g.*, *Deutsch v. Burlington Northern Ry. Co.*, 983 F .2d 741, 744

(7th Cir. 1992); *Bannister v. Armontrout*, 807 F. Supp. 516, 556 (W.D. Mo. 1991).

As relevant here, a district court may modify its judgment if it failed to notice or

consider material arguments or authorities, or in order to accommodate an

intervening change in the law or facts. *See Hicks v. Town of Hudson*, 390 F.2d 84,

87-88 (10th Cir. 1967); *Knish v. Stine*, 347 F. Supp. 2d 682, 686 (D. Minn. 2004).

These settled grounds justify Rule 59(e) relief for the reasons explained below.

1

## The Court's Ruling

The Court analyzed Petitioner's *Atkins* claim under the three-factor test that requires a showing of deficits in intellectual functioning (prong one), deficits in adaptive behavior (prong two), and onset before the age of eighteen (prong three). Doc. #1149, p. 135-36. It found that Petitioner satisfied the first two of these requirements but not the third one:

> The Court finds that while Rodriguez is capable of learning, socializing, and making decisions, he has significant cognitive and adaptive deficits that would tend to favor a finding of intellectual disability when one considers the experts' findings and clinical interviews that were conducted for this proceeding. But, there is a lack of evidence showing Rodriguez was intellectually disabled prior to age 18.

*Id.* at 141; *see also id.* at 157 ("If the Court only had to decide overall whether Rodriguez satisfies the criteria for intellectual disability, it would have little difficulty finding he has shown significant cognitive and adaptive functioning deficits.").[1]

The Court found the evidence to be "in equipoise" on the question of whether Petitioner manifested his intellectual and adaptive deficits before the age

---

[1] In what appears to be a clerical error, the Court listed the IQ score obtained Dr. Weinstein on the WAIS-IV as 89. *Id.* at 149. In fact, Petitioner scored a 74 on that particular test. Hrg. Tr. 426; Pet. Ex. 44 at 11. Elsewhere the Court accurately reported the Weinstein-obtained score as 74, which "falls within the diagnostic criteria of prong one for someone who is intellectually disabled." Doc. #1149, p. 147.

of eighteen. *Id.* at 162. The Court reasoned that it cannot "rule out other factors that may be contributing" to Petitioner's intellectual and adaptive deficits, including brain trauma, toxin exposure, a history of alcoholism and chemical dependency, a family history of dementia, and symptoms of obsessive-compulsive disorder. *Id.* at 7, 141, 162. The Court remarked that these factors "may have arisen" after Petitioner turned eighteen. *Id.* at 141.

## Argument

The Court should amend its ruling for three inter-related reasons, all of them involving the Court's obligation to assess Petitioner's disability through established clinical standards. *See Moore v. Texas*, 137 S. Ct. 1039, 1049 (2017) ("*Moore-I*"); *Moore v. Texas*, 139 S. Ct. 666, 668-71 (2019) ("*Moore-II*"); *Jackson v. Kelley*, 898 F.3d 859, 865 (8th Cir. 2018).

**A.    The Court wrongly assessed Petitioner's various mental health issues as evidence that he is not intellectually disabled.**

The Court's reliance on Petitioner's additional mental illnesses and impairments contradicts binding authority and clinical standards. "As mental-health professionals recognize, . . . many intellectually disabled people also have other mental or physical impairments." *Moore I*, 137 S. Ct. at 1051. Indeed, "[c]o-morbidities in the population of people with ID are the standard, rather than the exception." Am. Ass'n on Intellectual and Developmental Disabilities, *The Death Penalty and Intellectual Disability* 287 (2015). Intellectual disability is a

3

"functional disability" that does not require an etiology. *Id.* at 80. Consequently, "the existence of a personality disorder or mental-health issue . . . is not evidence that a person does not also have intellectual disability." *Moore-I*, 137 S. Ct. at 1051 (quotation omitted). "[T]he diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder." Am. Psychiatric Ass'n, *DSM IV-TR* 47 (2000).

In contrast to the Court's approach, the medical community views additional mental health issues as "'risk factors,' causing clinicians to further explore the possibility of intellectual disability rather than 'counter[ing] the case for a disability determination.'" *Jackson*, 898 F.3d at 865 (quoting *Moore-I*, 137 S. Ct. at 1051). Moreover, "'a defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability." *Id.* at 868 (quotation omitted). It is not proper for a Court to "break down each deficit and determine what portion of each is attributable to a learning disability, emotional disturbance, ADHD, or a conduct disorder." *Id.* at 869. Such an approach creates "the unacceptable risk that persons with intellectual disability will be executed in violation of the Eighth Amendment." *Id.* (quoting *United States v. Wilson*, 170 F. Supp. 3d 347, 372 (E.D.N.Y. 2016) (itself quoting *Hall v. Florida*, 572 U.S. 701, 704 (2014)).

The Court's search for alternative explanations of Petitioner's deficits

contradicts the clinical understanding of the disability: the deficits themselves define intellectual disability regardless of their cause, so long as they were manifest during the developmental period. *See* APA, DSM-V at 39 ("The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met."). On the issue of toxins, for example, there is abundant trial and post-conviction evidence that Petitioner was exposed to neurotoxic pesticides prior to birth and during his childhood – and that the exposure impaired his intellectual and adaptive functioning by causing brain damage. Trial Tr. 7636-40, 7730-54, 7791-92, 7822-26, 7907-09; Hrg. Tr. 38, 474-76, 790-804, 820; Pet. Ex. 3 at 2; Pet. Ex. 8 at 1; Pet. Ex. 23 at 2-3; Pet. Ex. 24 at 4, 8; Pet. Ex. 26 at 2-3, 27-28; Pet. Ex. 55 at 4. Far from detracting from Petitioner's diagnosis, the evidence substantiates it. "[I]f you're killing cells in the brain and the brain doesn't have the ability to connect the different avenues of the brain because they don't have enough cells, that's going to produce deficits," Dr. Weinstein explained. Hrg. Tr. 476.

Evidence of substance abuse illustrates the same point. Petitioner started using alcohol and drugs at the age of seven and became a regular abuser by the age of either eleven or thirteen. Pet. Ex. 26 at 32; Hrg. Tr. 45-46 (noting, among other things, that Petitioner was "drinking to intoxication every weekend" at age thirteen). Aside from the damage to his developing brain, Petitioner's substance abuse reflects a poor adaptive response to his difficulties, as Petitioner "resorted to

self-medicating with alcohol and mind-altering substances in order to function."
Pet. Ex. 44 at 12; Hrg. Tr. 478; Pet. Ex. 26 at 32. That familiar pattern is consistent
with intellectual disability. Hrg. Tr. 478 (per Dr. Weinstein).

Similarly, to whatever degree Petitioner's obsessive-compulsive tendencies
diminish his social and practical functioning – *see* Doc. #1149, p. 162 – they
contribute to his intellectual disability rather than disproving it. Petitioner is not
required to "rule out" other contributing causes of his deficits. *Jackson*, 898 F.3d at
868.

**B.**     **The Court wrongly required proof that Petitioner's academic struggles stem from his innate or biological limitations, as opposed to social disadvantages that are recognized risk factors for intellectual disability.**

The Court's review of Petitioner's academic struggles similarly contradicts
diagnostic standards. The Court acknowledged the extensive evidence
documenting Petitioner's academic struggles and low scores on standardized tests
and group-administered IQ tests. Doc. #1149, p. 142-46. But the Court was
uncertain how to explain these struggles. It described three inferences that could be
drawn from the records:

> (1) no one motivated or encouraged Rodriguez to be successful
> academically so a lack of effort contributed to his academic failure;
>
> (2) Rodriguez was capable of doing better but he did not receive the
> supports he needed to be more successful in school; and
>
> (3) Rodriguez did as well as he could and he would not have done
> better, even with support, because he is intellectually disabled.

*Id.* at 146, 158. The Court reasoned that only the third explanation would qualify Petitioner for *Atkins* relief. *Id.* at 158.

Contrary to the Court's ruling, diagnostic standards treat all three possibilities as consistent with intellectual disability. For one thing, an adaptive "deficit" is defined as one that requires "ongoing support" in order for the person "to perform adequately in one or more life settings at school, at work, at home, or in the community." DSM-V at 38. The possibility that Petitioner would have performed better in school "but did not receive the supports he needed" (Doc. #1149, p. 146) – including encouragement from educators and parents – means that Petitioner was deficient in his conceptual adaptive skills, which include "language; reading and writing; and money, time, and number concepts." AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 44 (11th ed. 2010).

Otherwise stated, Petitioner needed ongoing support in order to perform adequately in the conceptual domain. DSM-V at 38. That fact is unaffected by the Court's doubts about whether Petitioner was *socially* impaired as a child. *See* Doc. #1149, p. 134 (stating that "Rodriguez was not as withdrawn and socially isolated as a child as his counsel suggest"). Conceptual deficits alone satisfy prong 2. *See* DSM-V at 38 ("Criterion B is met when at least one domain of adaptive functioning – conceptual, social, or practical – is sufficiently impaired…").

Petitioner's impoverished socialization and poor decisionmaking might have

7

contributed to his academic impairments, but they are not extrinsic factors that explain away those impairments. *See* AAIDD-2010 at 59 (distinguishing "ID of biological origin" from "ID of cultural-familial origin," in which "social, behavioral, or educational risk factors predominate"). Clinicians recognize that a person's behavior, motivation, habits, and personality features may play a causal role in the manifestation of intellectual disability. *See* AAIDD-2010 at 17 ("personal characteristics" including "motivation, lifestyle, habits … [and] character style"); DSM-V at 39 (listing "self-management of behavior" and "motivation in school or work environments" as "associated features supporting diagnosis").[2]

Moreover, the lack of appropriate educational services is itself a risk factor for intellectual disability. Among the AAIDD's recognized risk factors are "inadequate special education services," "inadequate early intervention services," "impaired parenting," and "inadequate family support." AAIDD-2010 at 60. The very purpose of such educational supports is to "promote intellectual development and the development of adaptive skills." AAIDD, *User's Guide to Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of*

---

[2] Even accepting the Court's contra-diagnostic premise that a lack of academic motivation in childhood may tend to disprove intellectual disability, Petitioner's jurors rejected that factual possibility. Nine out of the twelve jurors found that Petitioner "had learning problems in school because he was developmentally delayed as a child." Hrg. Tr. 58.

8

*Supports* 4 (2012). The lack of such supports is "a major risk factor because early intervention will help the brain develop adequately," Dr. Weinstein explained. Hrg. Tr. 478. Petitioner, then, lacked the supports that would have promoted his intellectual and adaptive capacities. That deprivation may explain his deficits, but it in no way disproves them.

Clinicians rely on risk factors "to explore the prospect of intellectual disability further, not to counter the case for a disability determination." *Moore-I*, 137 S. Ct. at 1051. As with toxin exposure and mental illness, educational risk factors do not detract from Petitioner's showing of intellectual disability. *See Moore II*, 139 S. Ct. at 671 (observing that the state court "departed from clinical practice when it required Moore to prove that his problems in kindergarten stemmed from intellectual disability, rather than 'emotional problems'").

**C.     The alternative explanations relied on by the Court were manifest during the developmental period of Petitioner's life – which is now recognized as extending through the age of twenty-one – and there is no evidence that Petitioner's intellectual and adaptive capacities have declined since that time.**

Two threshold observations are relevant to assessing the Court's prong 3 finding. First, subsequent to the completion of post-hearing briefing on Petitioner's *Atkins* claim, the AAIDD changed the diagnostic criteria by extending the age of onset from eighteen to twenty-one:

> This disability originates during the developmental period, which is defined operationally as before the individual attains age 22.

AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 1 (12th ed. 2021) (attached as Exhibit A); *see also* "AAIDD Announces the Publication of the 12th Edition of its Manual," Jan. 15, 2021 (attached as Exhibit B).[3] The APA, for its part, does not specify an age limit, instead providing that "onset is during the developmental period" defined as "during childhood or adolescence." DSM-V at 37-38; *cf.* DSM-IV-Tr at 41(as of the year 2000, providing that "The onset must occur before age 18 years"). The evidence from this case is that the AAIDD is the pre-eminent organization in defining intellectual disability and that the APA generally follows the AAIDD's guidance. Hrg. Tr. 404, 407-08 (per Dr. Weinstein); AAIDD-2021 at 17. The changed age of onset is significant in the case of Petitioner, who was been incarcerated almost continuously since the age of twenty-one. Hrg. Tr. 1653.

A second threshold consideration is the relatively limited purpose of prong 3. Barring some discrete event or specific trauma during adulthood that caused a

---

[3] Although counsel for Petitioner did not file a supplemental brief to advise the Court of the AAIDD's announcement, the arguments raised by the government did not turn on whether the age of onset is eighteen as opposed to twenty-one. Neither did the government argue against a prong 3 finding based on the mental health issues relied upon by the Court. A party may raise an otherwise new argument in a Rule 59(e) motion when, as here, a court's ruling departs from the arguments advanced by either party. *See*, *e.g.*, *Luig v. North Bay Enters., Inc.*, 817 F.3d 901, 906-07 (5th Cir. 2016); *McDermott v. Marcus, Errico, Emmer & Brooks, P.C.*, 969 F. Supp. 2d 74, 84-85 (D. Mass. 2013).

person's disability, the age-of-onset criterion is not intended to require a rigorous assessment of the point at which an otherwise qualifying individual became disabled. "The key thing here is … whether there were clear signs that the person's post-18 impairment did not emerge suddenly (perhaps because of an illness or injury) in adulthood and without earlier signs of, and related concerns about, a failure to develop in an age-expected manner." AAIDD-2015, at 79.

Such "concerns" about Petitioner's development are abundant in the record, and the Court itself observed that:

> Rodriguez was slow to achieve developmental milestones. Even as an adult, he never lived independently.

Doc. #1149, p. 3. That circumstance stands in contrast to a case like *United States v. Coonce*, 932 F.3d 623 (8th Cir. 2019), in which the defendant's disability was caused by a high-speed automobile accident when Coonce was twenty years old. The Eighth Circuit rejected Coonce's *Atkins* claim because he could not show onset by the age of eighteen. *Id.* at 634. Subsequent to the opinion's issuance, however, Coonce and the government have both asked the Supreme Court to vacate the Eighth Circuit's ruling and remand the case in light of the AAIDD's intervening change to the age of onset. *See United States v. Coonce*, U.S. Case No. 19-7862, "Brief for the United States" (July 21, 2021) (attached as Exhibit C), at 12-15, 28.

Bearing in mind the two threshold considerations described above, the

alternative explanations listed by the Court falter because they were manifest before Petitioner's twenty-second birthday:

●*Substance abuse* – Petitioner regularly abused drugs and alcohol from the age of either eleven or thirteen. Pet. Ex. 26 at 32; Hrg. Tr. 45-46. He was incarcerated at the age of twenty-one, at which point alcohol and drugs were considerably less available. Hrg. Tr. 498, 1518. The government's trial expert found that Petitioner had a "a *remote* history of alcohol abuse and perhaps illicit drug abuse." Report of Steven E. Pitt, D.O., Aug. 24, 2006, at 8-9 (attached as Exhibit D) (emphasis added). To whatever extent substance abuse may have contributed to Petitioner's intellectual and adaptive deficits, that effect took place before he turned twenty-two.

●*Toxin exposure* – As explained above, the bulk of Petitioner's exposure came from the neurotoxic pesticides to which he was exposed *in utero* and until the age of six. *See* Argument A, *supra*; Pet. Ex. 24 at 8 (per Dr. Froming). Another possible exposure took place when Petitioner worked in the American Crystal Sugar Plant and came into contact with pesticides on unprocessed sugar beets. Hrg. Tr. 102-03, 791; Pet. Ex. 29 at 2. Petitioner worked at the plant from September 1972 until March 1973, or from the age of nineteen to twenty. Hrg. Tr. 1145, 1551. Still another toxic exposure was from the family's use of cooking utensils and dinnerware made from lead-glazed pottery. Hrg. Tr. 807-12; Pet. Ex. 68 at 12 (per

Dr. Lugo). Petitioner was exposed to lead "from the time when [he] was conceived and throughout his childhood." Pet. Ex. 68 at 12. To be sure, Petitioner was also exposed to toxins during his adult-stage employment at a print shop in a Minnesota prison. Hrg. Tr. 814-17. But the considerable majority of the most hazardous exposures occurred before the age of twenty-two.

●*Symptoms of obsessive-compulsive disorder* – Testimony at the hearing described Petitioner's obsessive need to maintain the order and cleanliness of his cell and his person. Hrg. Tr. 608, 1692-93. But those symptoms date back to Petitioner's childhood. Hrg. Tr. 608, 1538, 1693. According to Petitioner's sister:

> As a kid, Tito would clean his possessions over and over again. If he had finished playing with a toy, he would clean it and put it back in its place. He had a little case that had a cleaning solution and a cleaning cloth inside of it. That's what he used to clean his things, especially his shoes. When he finished cleaning one of his possessions, he would fold up the little cloth and put it neatly back in its case. Tito would clean his shoes every day when he came home from school, as he was taking them off.

Govt. Ex. 660; Hrg. Tr. 1538. There is no evidence that Petitioner's obsessive tendencies have materially worsened in adulthood.

●*Brain trauma* – The Court speaks of Petitioner's "history of brain trauma," but the documented injuries occurred during childhood. At the age of seven or eight, Petitioner was knocked out when his younger brother hit him over the head with a toy rifle. *See* Excerpt of Petitioner's Interview with Dr. Pitt, Aug. 4, 2006 (attached as Exhibit E), at 43-44; Trial Tr. 8555-56; Pet. Ex. 74 at 22 (per Dr.

13

Silva); Pet. Ex. 53 at 12 (per Rosa Rodriguez). Although Petitioner was unconscious for some 30 minutes, he was not hospitalized. Ex. E at 44-45; Pet. Ex. 74 at 22. On another occasion, Petitioner was hit in the head during a fight as a teenager but did not lose consciousness. Ex. E at 45; Pet. Ex. 74 at 22. When Petitioner was sixteen years old, his mother reported that he had experienced "intense headaches" as well as swelling to the back of the head. Pet. Ex. 26 at 7, 33. In 1971 – when Petitioner was seventeen or eighteen years old and working on a farm – Petitioner hit the top of his head against the roof of a harvesting machine. Ex. E at 45-46; Pet. Ex. 74 at 22. Petitioner visited the emergency room but did not lose consciousness. Ex. 5 at 46; Pet. Ex. 74 at 22.

The evidence describes only a single post-developmental head injury, when a sheet of drywall fell onto Petitioner shortly before his arrest in 2003. Ex. E at 46-47; Pet. Ex. 74 at 22. But no records describe the injury as severe or otherwise, and Petitioner did not visit the hospital. Ex. E at 47. At trial, Dr. Froming agreed with the prosecutor's statement that "no one has suggested that Mr. Rodriguez has traumatic brain injury." Trial Tr. 7869. There is simply no evidence of brain trauma beyond the age of onset.

●*Family history of dementia* – As with the other causal factors analyzed by the Court, a family history of dementia and other mental illness is a risk factor for intellectual disability rather than a disproof of it. Hrg. Tr. 224-25. More

14

importantly, though, there is no evidence that Petitioner himself has experienced dementia. No such symptoms were described by any of the mental health experts who testified at trial and on post-conviction: Drs. Pitt, Seward, and Welner for the government, and Drs. Hutchinson, Froming, Weinstein, and Silva for Petitioner. Nor has any expert opined that Petitioner's intellectual and adaptive impairments have materially worsened with over the years. To the contrary, the government's neuropsychologist believes that "Rodriguez's reading comprehension has improved over time based on all the reading Rodriguez has done during his lengthy periods of incarceration." Doc. #1149, p. 161. Dr. Weinstein agrees, at least insofar as prison life tends to improve the functioning of intellectually disabled persons "most of the time." Hrg. Tr. 498.

*********************************

In short, the Court's analysis departs from the established clinical standards that govern Petitioner's disability, including the AAIDD's recent adjustment to the age of onset. Because intellectual disability is a functional diagnosis, Petitioner is intellectually disabled by virtue of his qualifying intellectual and adaptive deficits. It makes no difference whether those deficits stem in part or in whole from toxin exposure, alcoholism, obsessive-compulsive personality characteristics, head injuries, or the failure of Petitioner's educators and family to support and encourage him during childhood. Moreover, there is no evidence that Petitioner's

deficits manifested after the developmental period, which is now defined as ending on his twenty-second birthday. The Court should amend its ruling, sustain Petitioner's *Atkins* claim, and re-sentence him to life imprisonment.

WHEREFORE, Petitioner respectfully requests that the Court modify its order and judgment of September 3, 2021, sustain Petitioner's claim of intellectual disability, and re-sentence Petitioner to a term of life imprisonment.

Respectfully submitted,

/s/ JOSEPH W. LUBY
JOSEPH W. LUBY
ERIC J. MONTROY
ANNIE FISHER
JAHAAN SHAHEED
FEDERAL COMMUNITY DEFENDER
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
joseph_luby@fd.org
eric_montry@fd.org
annie_fisher@fd.org
jahaan_shaheed@fd.org

Dated:      October 1, 2021
            Philadelphia, PA

16

**CERTIFICATE OF SERVICE**

I hereby certify that on October 1, 2021, the foregoing document was filed

electronically with the Clerk of Court through ECF, and that ECF will send a

Notice of Electronic Filing (NEF) to the following:

Melissa H. Burkland
melissa.burkland@usdoj.gov

/s/ Joseph W. Luby
*Counsel for Defendant-Petitioner*