No. 19-7862

_____
_____


IN THE SUPREME COURT OF THE UNITED STATES

_____


WESLEY PAUL COONCE, JR., PETITIONER

v.

UNITED STATES OF AMERICA

(CAPITAL CASE)

_____


ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____


BRIEF FOR THE UNITED STATES

_____


ELIZABETH B. PRELOGAR
  Acting Solicitor General
    Counsel of Record

KENNETH A. POLITE, JR.
  Assistant Attorney General

FRANCESCO VALENTINI
  Attorney

  Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217

_____
_____


Exhibit C

CAPITAL CASE

QUESTIONS PRESENTED

1.    Whether the court of appeals correctly concluded that petitioner is not intellectually disabled under Atkins v. Virginia, 536 U.S. 304 (2002), because his alleged deficits did not manifest before age 18.

2.    Whether the Sixth Amendment's Confrontation Clause applies to the sentence-selection phase of a federal capital sentencing proceeding, which occurs after the jury has unanimously found beyond a reasonable doubt that the defendant is statutorily eligible for a death sentence.

(I)

Exhibit C

ADDITIONAL RELATED PROCEEDINGS

United States District Court (W.D. Mo.):

    United States v. Coonce, No. 10-cr-3029 (July 18, 2014)

United States Court of Appeals (8th Cir.):

    United States v. Coonce, No. 14-2800 (July 25, 2019)

    United States v. Hall, No. 14-2742 (Dec. 19, 2019)

United States Supreme Court:

    Hall v. United States, No. 20-5375 (Mar. 22, 2021)

(II)

Exhibit C

IN THE SUPREME COURT OF THE UNITED STATES

_____

No. 19-7862

WESLEY PAUL COONCE, JR., PETITIONER

v.

UNITED STATES OF AMERICA

(CAPITAL CASE)

_____

ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

BRIEF FOR THE UNITED STATES

_____

OPINION BELOW

The opinion of the court of appeals (Pet. App. 2-25) is reported at 932 F.3d 623.

JURISDICTION

The judgment of the court of appeals was entered on July 25, 2019. A petition for rehearing was denied on October 4, 2019 (Pet. App. 31). On December 6, 2019, Justice Gorsuch extended the time within which to file a petition for a writ of certiorari to and including March 2, 2020, and the petition was filed on February 28, 2020. The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1).

Exhibit C

2

STATEMENT

Following a jury trial in the United States District Court for the Western District of Missouri, petitioner was convicted of first-degree murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. 1111, and murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. 1118. Judgment 1. The jury unanimously recommended a capital sentence, and the district court imposed such a sentence. Pet. App. 11. The court of appeals affirmed. Id. at 2-25.

1. On January 26, 2010, petitioner and his co-defendant, Charles Hall, murdered Victor Castro-Rodriguez while all three were inmates in a mental-health ward at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. Pet. App. 9. Petitioner and Hall followed Castro-Rodriguez into his cell, where his hands were then bound with tape and his feet with petitioner's shoelaces. Ibid.; Tr. 1053 (petitioner's confession). Petitioner repeatedly kicked him, and petitioner and Hall stood on his throat until he stopped breathing. Pet. App. 9; Trial Tr. (Tr.) 1052-1053; Tr. 1480 (Hall's confession). Surveillance video shows that petitioner exited Castro-Rodriguez's cell and "made a throat-slashing sign to another inmate." Pet. App. 9.

Petitioner immediately and repeatedly admitted killing Castro-Rodriguez. With the unit still in lockdown, petitioner informed a correctional officer that he "did it." Tr. 842; see Tr. 836; Pet. App. 9. Petitioner repeated his admission to the lieutenant

Exhibit C

3

on duty.  Tr. 854 ("I killed him.  You can see it on camera.");
see Tr. 842-843.  When the lieutenant summoned the captain in
charge of the institution's correctional staff, petitioner simi-
larly told the captain, "Yes, I did it"; explained that he had
tied Castro-Rodriguez up and "stomped" on his throat; and stated
that he had killed Castro-Rodriguez because "[h]e was a f---ing
snitch."  Tr. 883-884; see Tr. 854-855; Pet. App. 9.

Later that night, petitioner waived his <u>Miranda</u> rights and
agreed to speak to an investigating FBI agent, who reduced peti-
tioner's ensuing confession to writing.  Pet. App. 9; Tr. 1050-
1051; see Tr. 1052-1054 (confession).  Among other things, peti-
tioner confessed that, in advance of the murder, he had "discussed
[with Hall] how to do it, when to do it, and how to avoid being
seen by officers."  Tr. 1054; see Pet. App. 9.  Petitioner there-
after continued to admit that he committed the murder.  During an
interview with a Bureau of Prisons (BOP) psychologist, he admitted
"kill[ing]" Castro-Rodriguez "by * * * choice."  Tr. 1079, 1081;
Pet. App. 9.  And he repeatedly bragged about the murder to other
inmates, friends, and family.  Pet. App. 10.

Consistent with petitioner's admission to standing on Castro-
Rodriguez's throat, an autopsy showed that Castro-Rodriguez died
of asphyxiation from a compressed larynx, Pet. App. 9; the govern-
ment's expert pathologist testified that the strangulation result-
ed from a "larger object" -- "consistent" with "a foot or shoe" --
compressing the neck, Tr. 1337; and Castro-Rodriguez's DNA was
recovered from petitioner's boot, Tr. 1595-1597.  See Pet. App. 9.

Exhibit C

4

Surveillance video footage placed petitioner and Hall in Castro-Rodriguez's cell at the time of the murder. Ibid.; Tr. 1498-1512. And tennis shoes seized from petitioner's cell were missing their shoelaces, consistent with petitioner and Hall using them to bind Castro-Rodriguez's ankles. Pet. App. 9; Tr. 1016-1018.

2. A federal grand jury indicted petitioner on one count of first-degree murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. 1111 and 2, and one count of murder by a federal prisoner serving a life sentence, in violation of 18 U.S.C. 1118. Pet. App. 10. The government provided notice that it would seek the death penalty. D. Ct. Doc. 62 (July 22, 2011).

a. The Eighth Amendment prohibits application of the death penalty against an offender who suffers from "mental[] retard[ation]," Atkins v. Virginia, 536 U.S. 304, 321 (2002), which is now more commonly referred to as "intellectual disability," Hall v. Florida, 572 U.S. 701, 704 (2014) (discussing this "change in terminology" and noting both terms "describe the identical phenomenon"). In addition, Congress has provided that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. 3596(c) (enacted 1994).

The government moved the district court to allow pretrial discovery of petitioner's mental-health evidence "related to any claim of [intellectual disability]" and for a pretrial Atkins hearing to adjudicate any "potential claim of [mental disability]" that petitioner might assert. D. Ct. Doc. 408, at 1-2, 13-14 (Nov.

Exhibit C

5

19, 2013); see Pet. App. 10. Petitioner acknowledged that the government had "requested notice whether the defendants are going to file the type of mental health claims that will require an Atkins hearing" and, in response, petitioner provided written "notice that [petitioner] shall not assert that he is [intellectually disabled]." D. Ct. Doc. 429, at 1 (Dec. 16, 2013). Petitioner accordingly represented that "[b]ecause the defense will not be asserting [petitioner] is [intellectually disabled], no Atkins hearing is necessary." Id. at 2; see Pet. App. 10. The district court denied the government's motion "[i]n light of [petitioner's] response that he does not intend to assert a claim of [intellectual disability]." 2/13/2014 Order. After an eight-day trial, the jury found petitioner guilty on both murder counts. Pet. App. 10; Tr. 1731-1732 (verdict).

On May 28, 2014, two days before the end of the subsequent penalty-phase hearing, petitioner moved for an order "precluding the government from seeking the death penalty on the ground that the Eighth Amendment bars the execution of an individual with * * * intellectual disability." D. Ct. Doc. 795, at 1 (May 28, 2014); cf. Tr. 1736-5380 (penalty phase from May 7 to May 30, 2014). Petitioner based that motion on this Court's then-recent decision in Hall v. Florida, supra (decided May 27, 2014). See D. Ct. Doc. 795, at 2. Petitioner described Hall as rejecting Florida's rigid requirement that a defendant establish an IQ score of 70 or less, based on the Court's determinations that "experts in the field [of intellectual disability] would consider other evidence" beyond a

Exhibit C

6

threshold score of 70 and that an IQ score is, in any event, "imprecise" because IQ testing generally embodies a measurement error of plus or minus five points. Id. at 2-3 (quoting Hall, 572 U.S. at 712). Petitioner recognized that one of the "three criteria" for intellectual disability is the "onset of [intellectual] deficits during the developmental period," id. at 2 (citing Atkins, 536 U.S. at 308 n.3), and he acknowledged that he did "not me[e]t" that criterion because his alleged deficits manifested after the age of 18, id. at 4. But petitioner argued that Hall reflected a new, more "fluid" approach that "should encompass an [alleged] intellectual deficiency such as [petitioner's]," which he asserted was the result of brain injuries "suffered after age 18 instead of during his developmental period." Ibid.

The government orally opposed petitioner's motion the next day, disputing Hall's applicability and offering to "prepare a written response." Tr. 4983. The district court did not request a written response and instead orally denied petitioner's motion without explanation. Tr. 4984.

b. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const., Amend. VI. In Williams v. New York, 337 U.S. 241 (1949), this Court concluded that, in a state capital murder case, the Fourteenth Amendment's Due Process Clause also required that a state court afford the defendant the "opportunity to examine adverse witnesses" when "passing on the guilt of a defendant," id.

Exhibit C

7

at 245-246, but rejected the defendant's challenge to his capital sentence, which rested in part on "information supplied by witnesses" that the accused was not allowed to "confront[]" and for which he "had no opportunity for cross-examination." Id. at 243 (citation omitted); see id. at 245. In light of the longstanding "historical basis for different evidentiary rules governing trial and sentencing procedures" and the "sound practical reasons for the distinction," Williams determined that -- where the accused is eligible for the imposition of a capital sentence "within limits fixed by law" -- the sentencing tribunal has "wide discretion in the sources and types of evidence used to assist [it] in determining the kind and extent of punishment to be imposed." Id. at 246.

Under the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. 3591 et seq., after a jury finds the defendant guilty of an offense for which the government seeks the death penalty, the district court must hold a separate penalty proceeding before the same jury. 18 U.S.C. 3593(b)(1). That proceeding consists of two parts. First, the jury must decide whether the defendant is eligible for a capital sentence within the limits fixed by federal law, which requires that the government prove beyond a reasonable doubt the existence of at least one of the mental states in 18 U.S.C. 3591(a)(2), and at least one of the corresponding statutory aggravating factors in 18 U.S.C. 3592. See 18 U.S.C. 3593(d) and (e). Second, if the jury has unanimously found the defendant statutorily eligible for a capital sentence, the jury proceeds to the sentence "selection" phase. At the sentence-selection phase, the jury

Exhibit C

8

determines "whether the defendant should be sentenced to death" by deciding "whether all the [statutory or non-statutory] aggravating factor or factors [that it has unanimously] found to exist [beyond a reasonable doubt] sufficiently outweigh all the mitigating factor or factors [that any one or more jurors has] found to exist to justify a sentence of death."  18 U.S.C. 3593(e); see 18 U.S.C. 3593(a) and (d).  The jury's capital recommendation is then binding on the district court, which must impose the recommended sentence. 18 U.S.C. 3594.

In this case, the jury unanimously found petitioner statutorily eligible for a capital sentence, finding beyond a reasonable doubt the requisite mental state and the existence of each of the four statutory aggravating factors advanced by the government: (1) petitioner caused death during the commission of another crime; (2) he had previously been convicted of two or more violent felonies; (3) he committed the murder in an especially heinous, cruel, or depraved manner; and (4) he committed the murder after substantial planning and premeditation.  Pet. App. 10-11; see 18 U.S.C. 3592(c)(1), (4), (6), and (9); cf., e.g., Tr. 1868-1934 (testimony showing that petitioner had kidnapped and carjacked a 20-year-old girl at knife point, repeatedly raped her, and threatened to kill her, which resulted in petitioner's prior federal life sentence). At the sentence-selection phase, the jury unanimously found beyond a reasonable doubt four nonstatutory aggravating factors:  (1) petitioner poses a continuing future threat to the lives and safety of others; (2) his conduct reflected a grave indifference to human

Exhibit C

life; (3) he showed lack of remorse; and (4) petitioner had obstructed justice by retaliating against Castro-Rodriguez for assisting prison officials. Pet. App. 10-11.

Some of the evidentiary information supporting the first non-statutory aggravator, found at the sentence-selection phase, included testimonial hearsay for which petitioner did not cross-examine the declarant. In addition to direct testimony about petitioner's disciplinary record, which included 60 violations while he was incarcerated since 2002, e.g., Tr. 2112-2114, 2431-2436, the district court admitted BOP records documenting that record. Petitioner did not object to the admission of several BOP incident reports, see, e.g., Tr. 2116-2134 (violations for, inter alia, assaults on other inmates and prison staff), but he objected to the admission of others on Confrontation Clause grounds, e.g., Tr. 2134-2136. The court overruled that objection. Tr. 2137. Cf. 4/14/2014 Tr. 13 (deferring Confrontation Clause rulings until the proffer of specific information in the penalty phase).

After weighing all of "the aggravating factors against the mitigating factors [found to exist]," the jury unanimously "agreed the death penalty was appropriate." Pet. App. 11. The district court sentenced petitioner accordingly. Ibid.

3.    The court of appeals affirmed. Pet. App. 2-25.

a.    As relevant here, the court of appeals rejected petition-er's contention that he is ineligible for a capital sentence because he is intellectually disabled. Pet. App. 11-13. Although the government argued that petitioner had both waived his intellectual-

Exhibit C

10

disability contentions and failed to show reversible plain error, Gov't C.A. Br. 51-52, 64-87, the court "assume[d], without deciding, [that petitioner had] preserved his argument," Pet. App. 12. The court then rejected "as a matter of statutory construction" petitioner's contention that the FDPA itself prohibited the application of a capital sentence.  Ibid.; see id. at 12-13.

The court of appeals also rejected petitioner's alternative "Eighth Amendment challenge" based on intellectual disability. Pet. App. 13.  Quoting Atkins, the court observed that the "[c]linical definitions of [intellectual disability]" that inform the scope of such a claim require that, inter alia, the requisite deficits "'bec[o]me manifest before age 18.'"  Id. at 11 (quoting Atkins, 536 U.S. at 318).  The court noted that petitioner "conceded" that "his intellectual deficits were onset at age twenty" and "relie[d] on changing the prevailing understanding" of intellectual disability to include "onset after eighteen."  Ibid.  The court took note of petitioner's arguments that the American Psychiatric Association (APA) had "recently changed its definition for the age of onset" from "before eighteen" to "'during the developmental period'" and thereby "le[ft] open the question of whether the APA still believes the developmental period is before eighteen," and that although the American Association on Intellectual and Developmental Disabilities (AAIDD) "still define[d] the age of onset as before eighteen," "literature suggest[ed]" that the AAIDD "will eventually shift to a more vague standard."  Id. at 13.  But the court observed that petitioner's arguments were simply "pre-

Exhibit C

11

dictions that medical experts will agree with [petitioner's] view in the future" and that such predictions were insufficient to show "any current Eighth Amendment limitation" on a capital sentence here. Ibid. The court accordingly reasoned that an Atkins claim was unavailing, "regardless of whether [petitioner] waived his [Atkins] arguments." Ibid.

In a footnote, the court of appeals found "no merit" to petitioner's related assertion that applying a disability-onset cutoff at age 18 would violate the equal-protection component of the Fifth Amendment's Due Process Clause. Pet. App. 13 n.8; cf. Pet. C.A. Br. 92-93 (making this "assert[ion]").

b.    The court of appeals separately rejected petitioner's Confrontation Clause challenge to the admission of testimonial hearsay during the sentence-selection phase of his penalty hearing. Pet. App. 19-20. The court observed that this Court's decision in Williams had "address[ed] the scope of the Confrontation Clause in capital sentencing proceedings." Id. at 20. And the court of appeals explained that, in light of Williams, "the Confrontation Clause does not apply in capital sentencing proceedings" like those here. Ibid. The court also noted that its determination was consistent with decisions of "[n]umerous" other courts of appeals. Ibid.

4.    In 2021, after the court of appeals rendered its decision, the AAIDD revised its definition of intellectual disability by eliminating the requirement that the disability onset before age 18. Under the revised definition, intellectual disability

Exhibit C

12

must "originate[] during the developmental period," which the AAIDD "define[s] operationally as before the individual attains age 22." AAIDD, Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports 26 (12th ed. 2021). As a result, neither the AAIDD nor the APA now retain the express onset-before-age-18 criterion for intellectual disability that this Court originally identified in Atkins based on the (now superseded) clinical definitions previously used by the AAIDD (then named the American Association on Mental Retardation (AAMR)) and the APA. See Atkins, 536 U.S. 308 n.3 (earlier definitions by the AAMR and the APA); see also AAIDD, About Us, https://www.aaidd.org/about-aaidd (last visited July 6, 2021).

ARGUMENT

Petitioner contends (Supp. Br. 1, 5-8) that this Court should grant certiorari, vacate the judgment of the court of appeals, and remand (GVR) in light of the AAIDD's revision to its clinical definition of intellectual disability, which occurred after the court of appeals rendered its decision rejecting petitioner's Eighth Amendment intellectual-disability claim. The government agrees that a GVR would be appropriate in light of a significant intervening factual change that affects a central predicate of the court of appeals' Eighth Amendment analysis. This Court's plenary review of the questions presented, however, is unwarranted.

1. This Court should GVR because the AAIDD's intervening definitional revision affects a central factual predicate for the court of appeals' Eighth Amendment analysis. The court of appeals

Exhibit C

13

reasoned that, "regardless of whether [petitioner] waived his [Eighth Amendment] arguments" based on alleged intellectual disability, those arguments would lack merit because petitioner contends that his intellectual disability manifested at age 20 and the requisite "age of onset is eighteen." Pet. App. 13. Although the court acknowledged that the APA had "recently changed its definition for the age of onset" from "before eighteen" to "'during the developmental period,'" the court cited the fact that the AAIDD "still define[d] the age of onset as before eighteen" in concluding that petitioner could only "predict[] that medical experts will agree with [his] view in the future" about an older-than-18 age of onset. Ibid. That fact subsequently changed when the AAIDD revised its definition of intellectual disability to now specifically contemplate that the age of onset for intellectual disability can, at least in some contexts, occur as late as age 21. See AAIDD, Intellectual Disability: Definition, Diagnosis, Classification, and Systems of Supports 26 (12th ed. 2021) (onset "before the individual attains age 22").

This Court has "GVR'd in light of a wide range of developments, including," as relevant here, "changed factual circumstances." Lawrence v. Chater, 516 U.S. 163, 166-167 (1996) (per curiam). The Court has determined that such an order can be appropriate "[w]here intervening developments * * * reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination

Exhibit C

14

may determine the ultimate outcome of the litigation." Lords Landing Vill. Condo. Council of Unit Owners v. Continental Ins. Co., 520 U.S. 893, 896 (1997) (per curiam) (quoting Lawrence, 516 U.S. at 167). This case satisfies both criteria.

This Court has stated that the proper understanding of intellectual disability under the Eighth Amendment is "informed by the views of medical experts" and "the medical community's diagnostic framework," Hall v. Florida, 572 U.S. 701, 721 (2014), and relied on "the most recent (and still current) versions of the leading diagnostic manuals" published by the APA and AAIDD when analyzing the criteria for intellectual disability under the Eighth Amendment, Moore v. Texas, 137 S. Ct. 1039, 1048 (2017) (discussing Hall). The Court has also determined that a State's method of determining intellectual disability based, inter alia, on "superseded medical standards," id. at 1048, rather than "current manuals [which] offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians,'" violated the Eighth Amendment. Id. at 1053 (citation omitted). And in the proceedings below, the government invoked the AAIDD's and APA's "leading publications" on intellectual disability to argue that the proper Eighth Amendment standard for intellectual disability requires that such disability "originate before age 18" and that petitioner himself conceded that he could not meet that criterion. See Gov't C.A. Br. 61-62, 68-69, 71-73. The court of appeals likewise relied on the AAIDD and APA standards when it rejected petitioner's Atkins claim, Pet. App. 13, while "assum-

Exhibit C

15

[ing], without deciding," that petitioner had "preserved" it, id. at 12.

A GVR order is particularly warranted given the stakes in this capital context.  Such an order would allow the court of appeals, if it finds petitioner's Eighth Amendment claim to be adequately preserved, to properly analyze petitioner's contentions in light of the current clinical definitions for intellectual disability and to consider based on that analysis whether an Atkins hearing would be warranted to resolve any relevant factual disputes about petitioner's alleged intellectual disability before the death sentence in this case becomes final.  Petitioner's claim is not, however, appropriate for plenary review, as this is "a court of review, not of first view."  Cutter v. Wilkinson, 544 U.S. 709, 718 n.7 (2005).  And in any event, petitioner does not contend that the court of appeals' Eighth or Fifth Amendment rulings con-flict with any decision of this Court or any other court of appeals.[1]

2.    Petitioner separately asks this Court (Pet. 19-32), in the alternative (Supp. Br. 9), to review the court of appeals' determination that the Sixth Amendment's Confrontation Clause does not apply to information pertinent to the sentence-selection phase

_____

[1] Although petitioner twice cites (Pet. i, 33) the statutory prohibition against the execution of "mentally retarded" defen-dants, 18 U.S.C. 3596(c), his citations appear designed merely to support his constitutional contentions.  Petitioner's relevant question presented seeks review only of the court of appeals' decision under "Eighth and Fifth Amendments," Pet. i, and peti-tioner has not advanced in this Court any independent statutory argument based on Section 3596(c).

Exhibit C

16

of a federal death-penalty case.  The decision of the court of appeals is correct and does not implicate any division of authority.  This Court has repeatedly denied review in cases presenting similar questions under the FDPA or state law.  See Umana v. United States, 576 U.S. 1035 (2015) (No. 14-602); Fields v. United States, 552 U.S. 1144 (2008) (No. 07-6395); see also, e.g., Dunlap v. Idaho, 574 U.S. 932 (2014) (No. 13-1315).  If the Court does not GVR, the Court should follow the same course here.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."  U.S. Const. Amend. VI.  This Court has stated that the right of confrontation "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."  Crawford v. Washington, 541 U.S. 36, 54 (2004).  And the Sixth Amendment's confrontation right, like its common-law antecedent, applies only at trial, not at sentencing.

a.    The common-law confrontation right protected against the use of "testimonial" out-of-court statements at trial unless the witness was unavailable to testify and the defendant has had a prior opportunity for cross-examination, Crawford, 541 U.S. at 68, but imposed no limit on the information that could be considered at sentencing, Williams v. New York, 337 U.S. 241, 246 (1949).  "[B]oth before and since the American colonies became a nation," the sentencing judge has been permitted "wide discretion in the sources and types of evidence used to assist him in determining

Exhibit C

17

the kind and extent of punishment to be imposed within limits fixed by law." Ibid. Courts have accordingly "treated the rules of evidence applicable to the trial procedure and the sentencing process differently," with "[o]ut-of-court affidavits * * * used frequently" at sentencing. Id. at 246 & n.4. And this Court in Williams rejected a state capital defendant's confrontation-based challenge to a sentence based on "information supplied by witnesses" that the accused was not allowed to "confront[]" and for which he "had no opportunity for cross-examination." Id. at 243-244 (citation omitted). Williams recognized that a confrontation right at capital sentencing under the Due Process Clause would exceed traditional confrontation protections, id. at 246-247; would "abandon the[] age-old practice of seeking information from out-of-court sources to guide [a court's] judgment toward a more enlightened and just sentence"; and would contradict nationwide sentencing practices, id. at 250-251; see Williams v. Oklahoma, 358 U.S. 576, 584 (1959); cf. Nichols v. United States, 511 U.S. 738, 747 (1994) ("As a general proposition, a sentencing judge 'may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'") (quoting United States v. Tucker, 404 U.S. 443, 446 (1972)).

The courts below correctly recognized that the Confrontation Clause did not bar consideration of petitioner's BOP records in this case. As petitioner acknowledges (Pet. 10, 31-32), those records pertained only to non-statutory aggravating factors --

Exhibit C

18

factors that played no role at the eligibility phase of petitioner's sentencing proceeding, where the jury determined whether petitioner was guilty of a distinct (capital) offense for which federal law authorizes a sentence of death.  See 18 U.S.C. 3593(d); see pp. 7-9, supra.  The BOP records became relevant only at the sentence-selection phase, where the jury, having unanimously found that petitioner was guilty of that capital offense and thus eligible for a capital sentence, exercised its discretion to decide on the appropriate sentence within the limits fixed by the FDPA.  See 18 U.S.C. 3593(e).  Williams forecloses petitioner's proposed extension of the Sixth Amendment's Confrontation Clause to that traditional sentencing phase of the proceedings.

    b.    Petitioner's contrary contentions (Pet. 25-32) lack merit.  Petitioner attempts (Pet. 27) to distinguish Williams on the ground that it addressed a confrontation claim under the Fourteenth Amendment's Due Process Clause, rather than under the Sixth Amendment's Confrontation Clause, which (at the time) had yet to be incorporated against the States through the Fourteenth Amendment, see Pointer v. Texas, 380 U.S. 400, 406 (1965).  But petitioner overlooks that Williams rejected the defendant's confrontation claim on the ground that the right he asserted exceeded the right of confrontation at common law, which (under Crawford v. Washington, supra) informs the contexts in which the Confrontation Clause applies.  This Court has thus continued to treat Williams as announcing the proper Sixth Amendment rule long after its 1965

Exhibit C

19

decision incorporating the Confrontation Clause against the States. See Alleyne v. United States, 570 U.S. 99, 113 n.2 (2013).

Petitioner also errs in suggesting that Williams was wrongly decided. Petitioner contends (Pet. 26-27) that the Confrontation Clause must bar admission of testimonial out-of-court statements at sentencing because the Clause applies "[i]n all criminal prosecutions," U.S. Const. Amend. VI, and "sentencing is part of a 'criminal prosecution,'" Pet. 27 (citation omitted). But the Sixth Amendment's prefatory phrase "in all criminal prosecutions" applies to all rights in that Amendment, not simply the right of confrontation. And while the Confrontation Clause undisputedly applies in every prosecution, the scope of its protection is informed by the "right of confrontation at common law," see Crawford, 541 U.S. at 54, which, as explained, applied only to the use of testimonial evidence at trial, not at sentencing.

This Court's recent jurisprudence on the jury-trial right explicitly supports Williams's continued vitality. This Court has held that a statutory "aggravating factor[]" that makes a defendant eligible for the death penalty is "the functional equivalent of an element of a greater offense," i.e., a separate capital offense for which the governing statute authorizes a death sentence, for which the Fifth and Sixth Amendments require proof to a jury beyond a reasonable doubt. Ring v. Arizona, 536 U.S. 584, 609 (2002) (quoting Apprendi v. New Jersey, 530 U.S. 466, 494 n.19 (2000)). An "aggravating or mitigating" circumstance considered by a sentencing tribunal in exercising its discretion to select "a

Exhibit C

20

specific sentence within the range authorized" by law for that offense, in contrast, is not subject to such a requirement. Apprendi, 530 U.S. at 494 n.19. Relying on Williams, the Court has explained that "the Sixth Amendment does not govern" "factfinding used to guide judicial discretion in selecting a punishment 'within limits fixed by law.'" Alleyne, 570 U.S. at 113 n.2 (quoting Williams, 337 U.S. at 246); see id. at 116-117 & n.6.

The plurality opinion in United States v. Haymond, 139 S. Ct. 2369 (2019), is consistent with that understanding. That opinion observed that "a 'criminal prosecution' continues and the defendant remains an 'accused' with all the rights provided by the Sixth Amendment, until a final sentence is imposed," id. at 2379, but it did not purport to expand the scope of the jury-trial right at issue there beyond factfinding that produces an "increase in a defendant's [statutorily] authorized punishment," ibid. (quoting Ring, 536 U.S. at 602). See id. at 2378 (explaining that "the facts the judge found here [impermissibly] increased 'the legally prescribed range of allowable sentences'") (citation omitted). The plurality's analysis thus has no application to the non-statutory sentencing factor to which the disputed evidence here pertains.[2]

---

    [2] In any event, Justice Breyer's opinion concurring in the judgment, 139 S. Ct. at 2385-2386, not the plurality opinion, reflects the Court's Sixth Amendment holding in Haymond. See Marks v. United States, 430 U.S. 188, 193 (1977).

Exhibit C

21

Petitioner's observation (Pet. 25) that "a guilty verdict mandated a death sentence" "for many [founding-era] felonies" suggests no error in Williams's rationale. Williams itself observed that for certain offenses judges historically had no discretion and were required to impose "identical punishment[s]," Williams, 337 U.S. at 247, but that says little about the permissible evidentiary framework in cases in which a judge or jury does possess sentencing discretion within the range of punishments authorized by law.

Petitioner is also incorrect in arguing (Pet. 28-30) that Williams no longer reflects the scope of the Confrontation Clause because, "[a]s an Eighth Amendment matter," "unfettered sentencing discretion" in capital cases has given way to a system where statutory criteria must channel that discretion.  The Court's Eighth Amendment decisions do not alter the scope of the Sixth Amendment's distinct confrontation right, and "it is not the role of the Eighth Amendment to establish a special 'federal code of evidence' governing 'the admissibility of evidence at capital sentencing proceedings.'"  Kansas v. Carr, 577 U.S. 108, 123 (2016) (quoting Romano v. Oklahoma, 512 U.S. 1, 12 (1994)).  The decisions cited by petitioner address the procedures for considering whether to impose the death penalty, but they do not suggest that less information should be considered when deciding on a sentence within the authorized range.

Petitioner argues (Pet. 31) that the non-statutory aggravating factor of his future dangerousness was "a key part of the

Exhibit C

22

government's case" for a capital sentence.  But even if the jury had deemed that factor decisive when weighing the aggravating and mitigating factors to determine an appropriate sentence, petitioner's future dangerousness would nevertheless remain a pure sentencing factor to which the Confrontation Clause has never applied.  Cf. McKinney v. Arizona, 140 S. Ct. 702, 707 (2020) ("[I]n a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range.").[3]

c.    Petitioner errs in contending (Pet. 19-25) that review is necessary to resolve a division of authority on the confrontation question in this case.  Every federal court of appeals to have addressed the application of the Confrontation Clause to capital sentencing proceedings under the FDPA has, like the court of appeals here, recognized that the right of confrontation does

---

[3] Petitioner states (Pet. 32) that the jury is "statutorily required to determine whether [any non-statutory factors] ha[ve] been proven before it [can] consider what sentence to impose." The FDPA, however, provides that "[i]f" a "[statutory] aggravating factor * * * is found to exist," then the jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death."  18 U.S.C. 3593(e).  The FDPA accordingly requires that the jury first find at least one statutory aggravator before proceeding to consider the appropriate "sentence" by weighing all aggravating and mitigating factors. Under the FDPA, therefore, the jury makes findings with respect to non-statutory aggravators only in the context of determining which sentence to impose within the range of punishments authorized by statute.

Exhibit C

23

not extend to "the sentence selection phase" of FDPA proceedings, where the jury "exercise[s] its discretion to select the appropriate sentence." United States v. Umana, 750 F.3d 320, 347-348 (4th Cir. 2014), cert. denied, 576 U.S. 1035 (2015); accord United States v. Fields, 483 F.3d 313, 325, 335, 338 (5th Cir. 2007) (rejecting contention that Confrontation Clause applies to "testimony relevant only to penalty selection in a capital case"), cert. denied, 552 U.S. 1144 (2008).[4]  Petitioner cites (Pet. 20-21) several state-court decisions which have applied the Confrontation Clause in capital cases.  But none of those decisions addresses how the Confrontation Clause should apply in FDPA proceedings, and none reflects a division of authority that might warrant this Court's review.

Several of those decisions, unlike the decision in this case, involved challenges to evidence about the defendant's statutory eligibility for a capital sentence under state law, not merely the selection of such a sentence within the applicable statutory range.

---

[4] Petitioner appears to suggest (Pet. 23-24) that the court of appeals' decision could be read to reject the application of the Confrontation Clause not only to the FDPA's sentence-selection phase but also to the "eligibility" phase.  That is incorrect. The court specifically identified Umana and Fields as in accord with its decision here, Pet. App. 20, and both of those cases address only the FDPA's sentence-selection phase.  And because petitioner's Confrontation Clause challenge concerns information pertinent only to a non-statutory aggravator considered at the sentence-selection phase, the court's opinion is properly read to resolve only that question.  In any event, the facts of this case do not present the question whether the Confrontation Clause applies to the eligibility phase of FDPA proceedings, and the case would thus be an unsuitable vehicle for addressing any disagreement on that issue.

Exhibit C

24

In Russeau v. State, 171 S.W.3d 871 (Tex. Crim. App. 2005), cert. denied, 548 U.S. 926, and 548 U.S. 927 (2006), the challenged evidence concerned the defendant's "repeated disciplinary offenses" while incarcerated, id. at 880, which was relevant to whether he was eligible for a capital sentence on the ground that "a probability [existed] that [he] would commit criminal acts of violence that would constitute a continuing threat to society," Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) and (g) (West 2006 & Supp. 2014). See Def. Br., Russeau v. State, No. 74,466, 2003 WL 23320300, at *158 (Tex. Crim. App. Nov. 21, 2003) (explaining that the evidence supported that eligibility requirement). The decision in State v. Bell, 603 S.E.2d 93 (N.C. 2004), cert. denied, 544 U.S. 1052 (2005), similarly concerned an aggravating circumstance under state law that was relevant to the defendant's eligibility for a capital sentence. Id. at 115-116 ("prior crime of violence"); see N.C. Gen. Stat. § 15A-2000(b)(1) and (e)(3) (2003) (requiring that jury find a statutory aggravator, including prior crime of violence, for death eligibility). And the two Florida decisions that petitioner invokes likewise addressed evidence relevant to statutory aggravators under the State's (former) advisory-jury system, which required the court to find a statutory aggravator to make the defendant statutorily eligible for a capital sentence. See Rodgers v. State, 948 So. 2d 655, 663 (Fla. 2006) (per curiam) (hearsay supporting statutory "prior violent felony aggravator"), cert. denied, 552 U.S. 833 (2007); Rodriguez v. State, 753 So. 2d 29, 35, 43 (Fla. 2000) (hearsay about defendant's

Exhibit C

25

state of mind, which was relevant to whether "the murder was cold, calculated, and premeditated"), cert. denied. 531 U.S. 859 (2000); see also Fla. Stat. § 921.141(3)(a), (5)(b) and (i) (2005).[5]

Other decisions on which petitioner relies are also inapposite. Ball v. State, 699 A.2d 1170 (Md.), cert. denied, 522 U.S. 1082 (1997), arose under Maryland's since-repealed capital sentencing statute, predated Crawford, and found no violation of the defendant's confrontation rights. Id. at 1191 (finding it sufficient that the defendant could have subpoenaed the hearsay declarants and "had the opportunity to present evidence in rebuttal to any information contained in the victim impact statements").[6] The decision in State v. Carr, 331 P.3d 544, 723-724 (Kan. 2014) (per curiam), was reversed by this Court on other grounds, 577 U.S. 108 (2016), and, in any event, it "merely 'caution[ed]'" against admitting testimonial hearsay at future resentencing proceedings without "mak[ing] the admission of [contested out-of-court] statements a basis for its" judgment. Carr, 577 U.S. at 126 (quoting Carr, 331 P.3d at 724) (first set of brackets in original).

---

[5] This Court subsequently invalidated Florida's advisory-jury system under Apprendi and Ring. See Hurst v. Florida, 577 U.S. 92, 97-99 (2016). Given the atypical nature of that former sentencing framework, prior decisions by Florida courts do not speak to how the Confrontation Clause might apply in the FDPA context.

[6] Because Maryland repealed the death penalty in 2013, Bellard v. State, 157 A.3d 272, 274-275 (Md. 2017), and commuted all pending Maryland death sentences to life imprisonment, Md. Exec. Order Nos. 01.01.2015.03 to .06 (Jan. 20, 2015), https://go.usa.gov/x6tBs, prior Maryland state-court decisions on confrontation questions in the capital sentencing context have no prospective importance relevant here.

Exhibit C

26

Finally, the Pennsylvania and Mississippi state decisions cited by petitioner (Pet. 20-21) likewise provide no sound basis for review.  The Supreme Court of Pennsylvania based its resolution of the hearsay challenge in Commonwealth v. Green, 581 A.2d 544, 564 (1990), in part on state law and in part on the Sixth Amendment, citing the Eleventh Circuit's Confrontation Clause decision in Proffitt v. Wainwright, 685 F.2d 1227 (1982), cert. denied, 464 U.S. 1002, and 464 U.S. 1003 (1983).  But in the ensuing three decades, Crawford determined that the Sixth Amendment's confrontation right is informed by the right recognized at common law and Alleyne v. United States, supra, confirmed the continuing application of Williams's confrontation analysis to capital sentence-selection proceedings.  The Eleventh Circuit has now also applied Williams to the capital sentencing context; cited the Fifth Circuit's sentence-"selection" decision in United States v. Fields, supra, as "consistent" with its decision; and explained that its prior decision in Proffitt (at most) extends only to psychiatric reports.  Muhammad v. Secretary, Fla. Dep't of Corrs., 733 F.3d 1065, 1073-1076 (11th Cir. 2013), cert. denied, 571 U.S. 1117 (2014).  And since deciding Green, the Supreme Court of Pennsylvania has never cited Green's confrontation analysis, making it far from clear how it would decide a current Confrontation Clause challenge in capital sentencing proceedings.

The Supreme Court of Mississippi similarly based its resolution of a hearsay challenge to capital sentencing testimony in Lanier v. State, 533 So. 2d 473 (1988) (en banc), in part on state

Exhibit C

27

law and in part on the Sixth Amendment by applying the Court's Confrontation Clause framework in Ohio v. Roberts, 448 U.S. 56 (1980), abrogated by Crawford, supra. See Lanier, 533 So. 2d at 488-489. The court, however, did not analyze whether the Confrontation Clause applies at sentencing and apparently assumed that it does. See ibid. In a more recent decision, after Crawford overruled Roberts, the court has stated that Lanier did decide that issue, but observed that "[t]he United States Supreme Court ha[d] not yet ruled on whether Crawford extends to the sentencing phase of a trial" and acknowledged that federal courts of appeals had determined that "the Sixth Amendment does not apply at sentencing proceedings." Pitchford v. State, 45 So. 3d 216, 251-252 & n.100 (Miss. 2010) (en banc), cert. denied, 563 U.S. 939 (2011). The court further found the admission of the hearsay evidence in that case "harmless," id. at 252, and it did not reconsider the assumption on which Lanier was based. Given the absence of any pertinent Confrontation Clause analysis in those decisions and this Court's subsequent reaffirmation that, under Williams, "the Sixth Amendment does not govern" "factfinding used to guide judicial discretion in selecting a punishment 'within limits fixed by law,'" Alleyne, 570 U.S. at 113 n.2 (citation omitted), the current state of Mississippi's Confrontation Clause jurisprudence is unclear. Petitioner has thus failed to identify any decision reflecting a developed disagreement concerning the possible application of the Confrontation Clause to sentence-selection factfinding under the FDPA.

Exhibit C

28

CONCLUSION

The petition for a writ of certiorari should be granted, the judgment of the court of appeals vacated, and the case remanded for further proceedings in light of the change in factual circumstances discussed in this brief.  In the alternative, the petition for a writ of certiorari should be denied.

Respectfully submitted.

ELIZABETH B. PRELOGAR
  Acting Solicitor General

KENNETH A. POLITE, JR.
  Assistant Attorney General

FRANCESCO VALENTINI
  Attorney

JULY 2021

Exhibit C