IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>v.<br><br>ALFONSO RODRIGUEZ, JR.,<br><br>Defendant/Petitioner. | Case No. 2:04-cr-55<br><br>**UNITED STATES' RESPONSE TO PETITIONER'S MOTION UNDER RULE 59(E) OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

The United States of America, by Nicholas W. Chase, Acting United States

Attorney for the District of North Dakota, and Melissa Helen Burkland, Assistant United

States Attorney, submits this response to Petitioner's Motion to Alter or Amend

Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Doc. 1151.

## INTRODUCTION

On September 3, 2021, this Court granted in part Petitioner's claims for relief

under 28 U.S.C. § 2255, vacated Petitioner's death sentence, and ordered a new

sentencing proceeding. Doc. 1149. Relevant to the instant motion, this Court determined

that Petitioner failed to meet his burden to prove he met the three necessary criteria for

relief under Atkins v. Virginia, 536 U.S. 304 (2002) and the Eighth Amendment ("Claim

5"). Id. at 162.

On October 1, 2021, Petitioner timely filed a motion under Rule 59(e) of the

Federal Rules of Civil Procedure, arguing this Court misapplied the facts and law with

respect to Claim 5 and seeks an alteration or amendment of the judgment accordingly.

Petitioner argues for an amendment of the ruling for three reasons: (1) Petitioner argues

1

this Court wrongly assessed his mental health issues as evidence that he is not intellectually disabled; (2) Petitioner argues this Court incorrectly required proof that his academic struggles stem from innate or biological limitations as opposed to social disadvantages that are recognized risk factors for an intellectual disability; and (3) Petitioner argues a change in diagnostic criteria, which now states that an intellectual disability must manifest by age twenty-two, rather than age eighteen, saves his intellectual disability claim.

For the reasons set forth below, Petitioner cannot satisfy the very stringent standard to warrant alteration or amendment of this Court's order. As explained below, all three of Petitioner's arguments flatly fail to establish the existence of a manifest error or newly discovered evidence.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59(e), a district court may alter or amend a judgment. But this Rule is not a mechanism to relitigate issues or raise arguments available prior to the entry of judgment. C. Wright & A. Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed. 2019). The Eighth Circuit has explained that Rule 59(e) "was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment." Innovative Home Health Care, Inc. v. P.T.-O.T. Assoc. of the Black Hills, 141 F.3d 1284, 1286 (8th Cir.1998) (citing Norman v. Arkansas Dep't of Educ., 79 F.3d 748, 750 (8th Cir.1996)). "Rule 59(e) does not afford an opportunity to rehash or re-frame issues upon which the Court has already ruled." Indiana Lumbermens Ins. Co. v. PrimeWood, Inc., No. A3-97-03, 1999 WL 33283337 at

*1 (D.N.D. Apr. 9, 1999). "[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." C. Wright & A. Miller, 11 Fed. Prac. & Proc. Civ. § 2810.1 (3d ed. 2019).

"Motions under Rule 59(e) 'serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence' and 'cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment.'" Ryan v. Ryan, 889 F.3d 499, 507 (8th Cir. 2018) (quoting United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006)). Courts have recognized "[a] 'manifest error' occurs when the district court commits a 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" Burritt v. Ditlefsen, 807 F.3d 239, 252-53 (7th Cir. 2015) (quoting Oto v. Metro Life Ins. Co., 224 F.3d 601, 606 (7th Cir. 2000)); see Olga Despotis Tr. v. Cincinnati Ins., Co., No. 4:12CV2369, 2016 WL 11050668, at *1 (E.D. Mo. Apr. 18, 2016) ("A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent.") (cleaned up). Similarly, a manifest error of fact or law may occur when the district court is alleged to have misunderstood or misapprehended the facts or the party's contentions. See, e.g., Castanon v. Cathey, 976 F.3d 1136, 1141 (10th Cir. 2020) (finding a Rule 59(e) motion appropriate only if the court has "'misapprehended the facts, a party's position, or the controlling law'" (citation omitted)); Caribbean Management Group, Inc. v. Erikon LLC, 966 F.3d 35, 45 (1st Cir. 2020) (finding a Rule 59(e) that revisits issues already presented will "rarely" succeed unless it argues the court

"misapprehended some material fact or point of law"). Mere disagreement with how the district court weighed the facts or interpreted the case law does not constitute a manifest error justifying Rule 59(e) relief. See Ivan v. County of Middlesex, 612 F. Supp. 2d 546, 551 (D.N.J. 2009) ("'A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" (citation omitted)); Horizon Lines, LLC v. United States, 429 F. Supp. 2d 92, 97 (D.D.C. 2006) (finding mere disagreement with how the district court weighed the facts and interpreted the case law provides no basis for reconsideration under Rule 59(e)).

## ARGUMENT

Petitioner has not met the demanding burden required to warrant relief under Rule 59(e). His arguments restate the same arguments and facts fully explored by the Court in rendering its original decision. Such a relitigation of the same points is not a basis for Rule 59(e) relief.

First, the only individually administered test Petitioner took as an adult that placed him near two standard deviations below the norm was administered by psychologist Dr. Ricardo Weinstein. Dr. Weinstein's administration and testing of the WAIS-IV exam was flawed, which likely accounts for the outlier score (74) Dr. Weinstein obtained. Second, the look-back manufacturing of adaptive deficits is also unreliable and does not meet the burden of showing Petitioner had adaptive deficits. The lack of evidence of an intellectual disability appropriately led the Court to conclude that other factors may have

contributed to his low academic performance. Finally, the extension of the age of manifestation to before twenty-two should not change the Court's conclusion that Petitioner failed to show that he was intellectually disabled prior to adulthood because Petitioner did not meet his burden to show evidence of an intellectual disability during the development period. Petitioner has no additional evidence from age eighteen to twenty-two that would modify this finding.

Dr. Weinstein testified for Petitioner at the mental health evidentiary hearing. Dr. Weinstein conducted a mental health status examination and administered tests evaluating Petitioner for the purposes of determining whether Petitioner was intellectually disabled. Relevant to the pending Motion, Dr. Weinstein administered the WAIS-IV intellectual quotation ("IQ") test and the third edition of the Adaptive Behavior Assessment System ("ABAS-3"). Notably, Dr. Weinstein gave Petitioner the Mexican version of the WAIS-IV exam, which is in the Spanish language and included questions related to Mexican history. Dr. Weinstein self-translated this exam, as Petitioner's preferred language is English. Dr. Weinstein testified that he administered this version of the exam to Petitioner because he did not have the United States English exam manual when he traveled to Terre Haute United States Penitentiary.

Dr. Weinstein arrived at a WAIS-IV full scale score of 74, which he adjusted to a range of 65-75 using the Flynn Effect. However, Dr. Weinstein unconventionally normed Petitioner's Mexican test results to the United States' norms, despite the fact Petitioner was administered the Mexican version of the WAIS-IV.

Dr. Weinstein gave two of Petitioner's family members, Sylvia D'Angelo and Rosa Rodriguez, the ABAS-3 questionnaire. This test is generally only given to individuals who have had frequent, recent, and prolonged contact with the subject. Dr. Weinstein acknowledged this but testified he used it because no other test exists for a retrospective adaptive functioning assessment. Dr. Weinstein further admitted there is a particular worry in capital cases about bias because family members are reporting assessments on their loved ones. Dr. Weinstein's ABAS-3 assessments yielded alleged adaptive deficits in all three domains—practical, conceptual, and social—for Petitioner.

Neuropsychologist Dr. James D. Seward testified Petitioner did not display any of the three prongs of intellectual disability. Dr. Seward reviewed Petitioner's previously administered testing, examined Petitioner, and, relying on the Neuropsychological Symptom Checklist, administered a number of tests on Petitioner. Doc. 1144 at 34–37. Dr. Seward testified Petitioner's WAIS-IV test results—a full-scale IQ score of 86—showed no evidence of any marked difficulties with his executive or cognitive functioning. Doc. 1144 at 37. The language functioning tests showed Petitioner had no difficulty with language, despite being born into a Spanish speaking home and learning English at an early age, and his learning and memory test results were average.  Doc. 1144 at 37.

Dr. Seward had lengthy conversations with Petitioner during which they discussed current events, religion, daily life both in and out of prison, Petitioner's travel as a child, Petitioner's management of his diabetes, and Petitioner's employment history. According to Dr. Seward, Petitioner demonstrated abstract thinking, cognitive ability to

follow stories, socialization, ability to navigate practical day-to-day life activities, communication skills, and logical thinking. Doc. 1144 at 37–39. Petitioner also discussed the day he kidnapped Ms. Sjodin.  Dr. Seward testified Petitioner's responses reflected Petitioner's thought process and problem-solving ability. Doc. 1144 at 39.

Dr. Seward also criticized Dr. Weinstein's approach. Dr. Weinstein failed to administer psychological or emotional functioning tests and had administered only one-and-a-half malingering tests instead of the recommended six. Dr. Seward pointed out that one of Dr. Weinstein's administered tests is not an IQ test and is not recommended for the assessment of intellectual disability.  Further, the tests and tools used by Dr. Weinstein were designed for individuals who live with or see the examinee on a frequent basis, which was not applicable to Petitioner's situation. Doc. 1144 at 39–40.

Dr. Seward explained it is clinical practice to norm the version of the WAIS-IV with the country of origin. Nothing in the English version of the WAIS-IV allowed Dr. Weinstein to ask the questions in a different language, and nothing in the Mexican version of the WAIS-IV allows use of United States norms to score it. Further, Dr. Seward identified discrepancies in Dr. Weinstein's raw data, such as the lack of recorded completion times, improper test administration with unreliable Spanish to English translation, and questionable scoring methods. Doc. 1144 at 39–41.

Board-certified psychiatrist Dr. Michael Welner also testified on behalf of the United States and opined that Petitioner did not have an intellectual disability. After spending three days interviewing, testing, and observing Petitioner in 2013, Dr. Welner prepared a lengthy report detailing his opinions. Dr. Welner examined and reviewed 143

7

sources of data in order to provide a convergent data set to evaluate Petitioner's mental health and his adaptive functioning.

Dr. Welner reviewed the data in relation to the three domains of adaptive functioning—conceptual, practical, and social—and analyzed how Petitioner functions in each of these domains. For example, Dr. Welner noted that Petitioner has functional academic skills like reading, exhibits problem solving abilities, can think abstractly, and is able to plan. Dr. Welner opined Petitioner has practical skills, such as self-care, money management, and task organization. Finally, Dr. Welner noted Petitioner exhibits social skills such as peer friendships, age-appropriate girlfriends, and the ability to properly communicate with others.

Additionally, Petitioner called psychiatrist Dr. Jose Arturo Silva and medical toxicologist Dr. Andres M. Lugo. Dr. Silva opined generally to Petitioner's mental health, and concluded he exhibited adaptive functioning deficits, and diagnosed him with mood disorder, anxiety, and post-traumatic stress disorder. Dr. Lugo opined Petitioner had a lifetime of toxin exposure, including toxin exposure at the print shop where Petitioner worked serving his Minnesota state sentence. Dr. Lugo admitted he is not qualified to make any medical diagnosis, such as psychiatric conditions or brain damage, and he did not consult with any experts who could make such determinations in preparing his opinions for this case.

**I.      The Court Properly Assessed Petitioner's Mental Health Issues in Determining the Evidence was Equipoise and Concluded that Petitioner had not Met His Evidentiary Burden.**

Petitioner argues the Court failed to properly assess his mental health history—which included substance use issues, toxin exposure, and obsessive-compulsive tendencies—when evaluating Petitioner's intellectual and adaptive functioning. See Doc. 1151 at 3-4. But in its extensive analysis, the Court reviewed the competing evidence submitted by Petitioner and the United States. The Court noted the evidence "encompasses a broad spectrum of abilities and gives rise to competing interpretations about his ability to handle the demands of life." Doc. 1149 at 162. The Court, as it was tasked to do, considered and weighed the evidence, applied Petitioner's evidentiary burden of proving an intellectual disability, and determined the record did not support such a finding. See id.

The Court wholly appreciated the role of other mental health issues in reaching its conclusion. Indeed, the Court questioned experts at the mental health evidentiary hearing, presumably to ensure it had a firm grasp on how comorbidities would affect an analysis of adaptive functioning:

> THE COURT: And my question is: When you testified about that – those – like his neatness and his orderly behavior showing the ability to kind of function as adaptive behaviors, right, my issue is that – what about the sort of obsessive-compulsive component that may be in that? Is that anything that the Court ought to consider?

(Hr. Vol. 8, pp. 1668-69). Dr. Welner's response, that such issues can occur independent of or alongside of an intellectual disability, is incorporated into the Court's analysis. Doc. 1149 at 162.

The Court's Order is far afield from <u>Jackson v. Kelley</u>, 898 F.3d 859 (8th Cir. 2018), on which Petitioner relies. In <u>Jackson</u>, the Eighth Circuit emphasized that the district court's order did not have the benefit of <u>Moore v. Texas</u>, 137 S. Ct. 1039, 1051 (2017) ("Moore I"). The district court was guided only by <u>Atkins</u>, and it therefore improperly weighed adaptive strengths against adaptive deficits. <u>See</u> <u>Jackson</u>, 898 F.3d at 867. In the instant case, however, the Court did not weigh adaptive strengths against adaptive deficits; the Court merely noted that the experts in Petitioner's case each brought their own clinical judgment and reached vastly different results.

For example, Dr. Seward's administration of the WAIS-IV yielded a full-scale IQ score of 86, below average but generally not considered diagnostic of an intellectual disability. <u>See</u> Doc. 1149 at 149. In evaluating Petitioner's adaptive functioning, Dr. Seward noted his relatively stronger sentence comprehension scores, as well as all of the traits he observed during his clinical visit with Petitioner.

Rather than weigh one expert against another, this Court properly acknowledged the evidentiary burden Petitioner has and concluded that:

> In the end, while the criteria for diagnosing intellectual disability is plain, its application to the evidence in this case is difficult. The experts are divided; they have expressed varying degrees of criticism as to the other experts' test selections, interpretations, and conclusions that differed from their own. Despite these differences, the Court cannot say there was an expert that stands out as completely lacking in competence, qualifications, or credibility. They each made their own judgment call.

<u>Id.</u> at 157. The Court did not improperly assess Petitioner's mental health history. Rather, it properly noted the issue before it was complicated and found that, on the record

before it, Petitioner did not demonstrate by the preponderance of evidence he was intellectually disabled.

The Supreme Court of Pennsylvania recently affirmed a similar denial of a habeas petition when the petitioner failed to demonstrate the required Atkins factors for proving his intellectual disability. Commonwealth v. Flor, No. 771 CAP, 2021 WL 4303484, at *21 (Pa. Sept. 22, 2021). In Flor, the petitioner presented evidence that he suffered from fetal alcohol syndrome, which should be assessed as a risk factor for an intellectual disability. Id. at *18. The Supreme Court of Pennsylvania, in affirming the denial, noted that the petitioner's testimony of fetal alcohol syndrome was just one factor considered in the entirety of the record of evaluating test scores and expert opinions. See id.

Here, the Court similarly considered the entirety of Petitioner's mental health records when evaluating whether or not he met the Atkins criteria for an intellectual disability. The Court did not require that any mental health condition or other factor be "ruled out" for Petitioner to prove he was intellectually disabled; rather, each issue was considered within the record as a whole.

Petitioner cannot show a manifest error of law or any newly discovered evidence of a mental health issue not considered that would warrant Rule 59(e) relief. See Olga, 2016 WL11050668 at *1. The Court did not misunderstand Petitioner's arguments or misapprehend the record. The Court did not commit a wholesale disregard or misapplication of, or fail to recognize, controlling precedent. Rather, the Court's Order reflects it understood the Petitioner's evidence and arguments but reached a conclusion

different to the one Petitioner would like. This "mere disagreement" with the Court's

conclusion is not a viable basis for Rule 59(e) relief.

## II.    The Court did not Improperly Impose any Evidentiary Burden on Petitioner.

Petitioner next argues the Court's assessment of his academic risk factors was

improper and subjected Petitioner to an inappropriate evidentiary burden. See Doc. 1151,

at 6-9. Petitioner accurately notes the Court surmised three possibilities after reviewing

the record evidence regarding Petitioner's academic history:

> (1) No one motivated or encouraged Rodriguez to be successful
> academically so a lack of effort contributed to his academic failure; (2)
> Rodriguez was capable of doing better but he did not receive the supports
> he needed to be more successful in school; and (3) Rodriguez did as well as
> he could and he would not have done better, even with support, because he
> is intellectually disabled.

Doc. 1149 at 146. Contrary to Petitioner's argument that the Court's conclusion

contradicts diagnostic standards, the Court then went on to perform a lengthy and

comprehensive analysis of the record evidence related to Petitioner's academic and

adaptive functioning. See Doc. 1149 at 146-158.

The Court analyzed every single one of Petitioner's IQ score tests, including the

test administered by Dr. Weinstein, which the United States continues to submit was

improperly administered and scored. Doc. 1144 at 56-69. Notably, Dr. Weinstein's

defective testing method resulted in the lowest score Petitioner has ever received on a

diagnostic and individually administered IQ test. Id. at 69. Nevertheless, when the Court

considered each one of these tests, it determined "Rodriguez's IQ scores are of such a

nature that he is on the bubble, necessitating a close consideration of the second prong-his adaptive functioning." Doc. 1149 at 152.

The Court then reviewed the record evidence relating to Petitioner's adaptive functioning, noting Petitioner's expert, Dr. Weinstein, found adaptive deficits in all domains, whereas the United States' experts, Drs. Seward and Welner, did not observe adaptive deficits. See id. at 152-57. Dr. Weinstein's adaptive deficit findings are fraught with error because a retrospective "look-back" use of the Adaptive Behavior Assessment System ("ABAS") is unreliable and likely to produce erroneous results. See United States v. Bourgeois, No. C.A.C-07-223, 2011 WL 1930684, at *34 (S.D. Tex. May 19, 2011). Dr. Weinstein's approach was also contrary to the ABAS instructions that the forms be completed by people who have had frequent, recent, and prolonged contact with the subject, and that respondents not be answering the forms decades after the subject's developmental ages. Additionally, Dr. Weinstein drew conclusions that were not supported by the record. His statements that Petitioner was a "loner" and did not have many friends is contradicted by many other clinicians and friends. See Doc. 1144 at 82.

This underscores the fact that, as this Court noted, "the evidence is inconsistent." Doc. 1149 at 159. Demonstrating an intellectual disability is Petitioner's burden. The Court correctly concluded he has not met it by a preponderance of the evidence and appropriately denied relief. See United States v. Umana, 750 F.3d 320, 358 (4th Cir. 2014).

Moreover, finding that Petitioner has not met his burden with inconsistent evidence is not a "manifest error[] of law" Rule 59(e) was designed to correct. See Ryan,

13

889 F.3d at 507. The Court should reject Petitioner's rehashing of already presented arguments because he opposes the Court's conclusion. This opposition does not meet the demanding standard for Rule 59(e) relief because Petitioner can show no misapplication of law or failure to recognize controlling precedent that would warrant an alteration or amendment of judgment. See Oto, 224 F.3d at 606.

**III.    The Expanded Age of Onset to Twenty-Two Should Not Impact the Court's Analysis.**

The American Association on Intellectual and Developmental Disabilities ("AAIDD") defines intellectual disability as "characterized by significant limitations in both intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills." Doc. 1140-5. An intellectual disability must manifest during the developmental period. Id. When the parties briefed the Atkins issue following the evidentiary hearings, the AAIDD instructed the age of onset for an intellectual disability was before age eighteen; early this year, the AAIDD amended that to before the age of twenty-two. See Doc. 1151-A.

The change from eighteen to twenty-two has no effect on the Court's analysis. Significantly, there is nothing in the record to suggest Petitioner's intellectual capacity diminished from eighteen to twenty-two, and Petitioner presented no new evidence in his Rule 59(e) motion. Thus, the AAIDD's amendment does not change the Court's analysis. See, e.g., Bourgeois v. Watson, 977 F.3d 620, 636 (7th Cir.), cert. denied, 141 S. Ct. 507, 208 L. Ed. 2d 488 (2020) (denying petitioner's claim and noting a petitioner cannot seek

14

renewed relief "where intellectual disability is at issue, every time the medical community updates its diagnostic standards.").

A review of the Order confirms the AAIDD's amendment makes no difference here, where the Court viewed the evidence as inconsistent such that Petitioner failed to sustain his burden to show intellectual disability. Atkins defined, consistent with the AAIDD and DSM-V, diagnosis of an intellectual disability "requires not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before [22]." 536 U.S. at 318. As this Court properly noted, it is Petitioner's burden to prove each one of these requirements. Doc. 1149 at 162; see also Umana, 750 F.3d at 358. The Court reviewed all presented evidence regarding Petitioner's developmental history and appropriately determined that it was "equipoise." Despite the Court's analysis in the Order of an onset by eighteen, the now-extended onset age of twenty-two does not change the Court's conclusion.

To begin, the Court noted again "the evidence is inconsistent" when analyzing if Petitioner met the burden of showing an intellectual disability that manifested during the developmental years. To summarize:

> Having spent nearly 70 percent of his life in an artificial environment combined with the inconsistent recollections and scant documentation of Rodriguez's ability as a child, the Court is tasked with making a retrospective decision on Rodriguez's adaptive functioning as it existed 50 to 60 years ago. On this issue, the Court finds the record, as a whole, is equivocal and inconclusive.

Id. at 162. Broadening the timeframe by four years would not assist Petitioner in overcoming the "equivocal" and "inconclusive" record before the Court. The Court grounded its analysis of Petitioner's alleged onset age with the record evidence. See Doc. 1149 at 158-162. As the United States has previously argued, this endeavor requires a review of witness testimony and evidence that are over fifty to sixty years old. Petitioner himself points out that he was incarcerated at age twenty-one. The record would likely not change much in this regard if the Court were to consider evidence from an additional four years.

Petitioner's arguments that the Court should reweigh other health issues such as substance abuse, toxin exposure, obsessive-compulsive disorder, and brain trauma, fail for the same reasons the United States discussed above at Section I; the Court fully appreciated how other risk factors can occur independently of or alongside of an intellectual disability. See Doc. 1149 at 162. This Court properly analyzed these health matters and how they functioned alongside Petitioner's showing of adaptive strengths and alleged deficits, and this Court found Petitioner had not carried his burden. Id. Petitioner's mere disagreement with the conclusion the Court reached does not warrant relief under Rule 59(e). See Ivan, 612 F. Supp. 2d at 551; Horizon Lines, 429 F. Supp. 2d at 97.

Petitioner's case is quite different from United States v. Coonce, 932 F.3d 623 (8th Cir. 2019). In Coonce, the Eighth Circuit rejected the petitioner's intellectual disability claim because he could not show an onset prior to eighteen. Id. at 624. In briefing before the Supreme Court, the United States agreed the Court should grant, vacate, and remand

16

Coonce's petition for further consideration because Coonce suffered a traumatic brain injury that affected his cognitive functioning prior to the age of twenty-two, which is now within the developmental period in the amended AAIDD manual. Coonce v. United States, No. 19-7862 (U.S. July 21, 2021) (Brief of Respondent United States). In this case, nothing in the record or in Petitioner's Rule 59(e) motion points to any events between eighteen to twenty-two that would change the Court's analysis.

Finally, Petitioner has not satisfied any of the required showings to prevail on a Rule 59(e) motion presenting new evidence. Namely, the moving party must show: (1) the evidence was discovered after judgment was entered; (2) the movant exercised due diligence to discover the evidence before the judgment was entered; (3) the evidence is material, not cumulative or impeaching; and (4) consideration of the evidence would probably produce a different result. See United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 933 (8th Cir. 2006).

The AAIDD announced publication of the 12th edition of Intellectual Disability:  Definition, Diagnosis, Classification, and Systems of Supports on January 15, 2021, in which it revised its position and extended the developmental period to before the age of twenty-two. See Doc. 1151 at 10, Exh. B. This publication occurred just over one week after Petitioner filed his post-hearing reply brief on January 7, 2021, and eight-and-a-half months before the Court issued its Order on September 3, 2021. Docs. 1146, 1149.

In an attempt to excuse his neglect in not alerting the Court of this development until after the entry of judgment, Petitioner contends Rule 59(e) permits a new argument because the Court allegedly departed from the parties' arguments. But Petitioner

17

grounded his <u>Atkins</u> argument on the onset before age eighteen of Petitioner's alleged intellectual disability. Docs. 1137 at 37, 1146 at 42. Petitioner's new argument based on the AAIDD's change in position goes to the core of his previous argument, was available before the entry of judgment, and is thus an improper argument to raise in a Rule 59(e) motion. Regardless, the AAIDD's change in position makes no difference as to Petitioner's claim of intellectual disability, as discussed above.

## CONCLUSION

For the foregoing reasons, this Court's finding that Petitioner failed to establish an intellectual disability was correct. The United States requests that this Court deny Plaintiff's Motion under Rule 59(e) of the Federal Rules of Civil Procedure.

Dated:   October 29, 2021.

NICHOLAS W. CHASE
Acting United States Attorney

By:   */s/ Melissa H. Burkland*
MELISSA HELEN BURKLAND
Assistant United States Attorney
WI Bar ID 1071443
655 First Avenue North, Suite 250
Fargo, ND  58102-4932
(701) 297-7400
melissa.burkland@usdoj.gov
Attorneys for United States