IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff/Respondent,<br><br>vs.<br><br>Alfonso Rodriguez, Jr.,<br><br>   Defendant/Petitioner. | Criminal No. 2:04-cr-55<br>Civil No. 2:11-cv-88<br><br>**AMENDED\* MEMORANDUM OPINION AND ORDER GRANTING IN PART & DENYING IN PART MOTION UNDER 28 U.S.C. § 2255; VACATING DEATH SENTENCE; AND ORDERING NEW SENTENCING HEARING** |

\*This Amended Opinion corrects a typographical error on page 149. The Court's original opinion incorrectly listed the IQ score obtained by Dr. Weinstein as 89, when it should have been stated as 74. The score was accurately stated elsewhere in the opinion. The misstatement did not impact or have an effect on the Court's analysis of the Atkins issue.

## INTRODUCTION

Dru Katrina Sjodin made people feel comfortable. She brought people together and joined them in laughter. At a street dance, Dru accepted the hand of a male in a wheelchair and then danced with him. She played volleyball and basketball. She was a skilled golfer. As a child, Dru was spontaneous and kind—always creating cards and artwork for someone else. She loved photography. She was a talented artist who enjoyed painting and drawing. Her childhood nickname was "Doodles."

One of the many activities Dru did as a volunteer was taking underprivileged children bowling. She raised money for organizations like the American Diabetes Association. She helped kindergartners and first graders learn to read. While in college, Dru participated in events that raised awareness for violence against women and children.

Dru was close to her older brother; the siblings had friends in common. On the first day of 9th grade, when the teacher directed that the students chose a partner, Dru

immediately selected the girl who recently transferred to the school and knew no one. Dru took the new girl under her wing. They became lifelong friends.

In her senior year of high school, Dru was elected homecoming queen. Dru's friends describe her as genuine, a down-to-earth person who was fun, confident, and outgoing. Teachers and students liked Dru. She loved to travel and meet people. In 2000, Dru graduated from Pequot Lakes High School (Minnesota).

After high school, Dru attended the University of North Dakota in Grand Forks, North Dakota. She joined a sorority. While in school, Dru held a job and continued volunteering. She started dating Chris. Chris was drawn to her smile. Dru made Chris feel wonderful about himself. Chris told Dru he loved her. Dru told her friends that she may have met the guy she wanted to marry. Dru had recently introduced Chris to her parents.

The person Dru was in high school was the person she was in college and who she would have been her entire life. On Saturday, November 22, 2003, around 4:00 p.m.,Dru finished her shift at the Victoria's Secret store located in the Columbia Mall in Grand Forks, North Dakota. After shopping for and purchasing a new purse from Marshall Field's, Dru left the mall around 5:00 p.m. and began walking to her car. As she was walking, Dru was talking to Chris on her cell phone. Chris heard Dru say, "Okay, okay," and then the call abruptly ended. Dru had been abducted. Her body was found on April 17, 2004. Dru never had the chance to graduate from college. She missed her class's upcoming trip to Australia. She never had the chance to develop her relationship with Chris and determine if Chris was the person she was going to marry. She never had the opportunity to have her own children. Although Dru was only 22 years old when she died, the loss to her friends, to her family, and to society is immense—in fact, incalculable.

Born in February 1953, Alfonso Rodriguez, Jr. (his family nicknamed him "Tito") was the second of five children.  His dad, Alfonso, Sr., attained a third grade education and spoke Spanish. Alfonso, Sr. never learned to read. Alfonso, Jr.'s mother, Dolores, attended school through the fourth grade.  She taught herself how to read and learned English.  As a baby, Rodriguez was small, fussy, and sickly.  When Rodriguez was unable to tolerate breast milk, the doctor recommended Dolores feed him rice water (leftover water after boiling rice).  When he was four months old, Rodriguez was on the verge of starvation and his condition so poor that his doctor diagnosed him with failure to thrive.  Rodriguez was slow to achieve developmental milestones.  Even as an adult, he never lived independently.

Rodriguez's family history shows a family that was hard-working and industrious but plagued by poverty, mental and neurological impairments, as well as physical and mental illnesses, including Alzheimer's disease, learning disorders, depression, diabetes, alcoholism, cancer, and hand tremors.  Rodriguez himself has been diagnosed with depression, diabetes, hand tremors, and chemical dependency.  Dolores describes her son as different, a slow learner, quiet, withdrawn, sad, and "out of step with the other children."

When Rodriguez was born, his parents were migrant workers and lived in Texas from November to April and then in Minnesota from April to November.  They worked long hours in the field.  When Rodriguez was an infant and his older sister, Sylvia, was a toddler, Dolores brought them to the field with her.  During her 12-hour day in the field, the children would play in the ditch and Dolores would move them from row to row as she worked the fields.

At age four or five, Rodriguez was sent away with Sylvia to stay at a camp for migrant children while his parents worked in the fields.  Rodriguez was small for his age and

vulnerable.  It was here that Rodriguez was sexually abused by a female for the first time. Sylvia witnessed the abuse.  Later, during potato harvest in North Dakota around this same time frame, a male forced Rodriguez and Sylvia into an outhouse and coerced the children to fondle him and perform sex acts on him.  Rodriguez was sexually abused another time by a college-age female when he was six years old at a church camp.  While in Laredo, when he was seven years old, Rodriguez was molested by a teenage boy.

When Rodriguez was nine years old, the family moved to Crookston, Minnesota. Dolores got a job in the kitchen of a restaurant.  During the school year, there was little time to develop a parent-child relationship.  Dolores' shift at the restaurant started at 4:00 p.m. The children got out of school at 3:30 p.m.  Dolores, on her way to work, and the children on their way home from school would come together down a street and meet on a certain corner where they would all hug and she would say: "The house is clean.  I've cooked dinner.  You must go home, do your homework and eat your dinner and take a bath and go to bed."  Their father got home from work around 8:00 p.m., after the children had gone to bed.  He was physically abusive, beating the children—the boys more so—with a belt.  He would call Rodriguez "stupid" and "cabezón" (bighead).

As the oldest child, Sylvia helped her younger siblings with their schoolwork and aided the family as they adjusted to their new community.  Despite her efforts, life was still difficult, as they were impoverished and few Mexican families lived in Crookston.  Life was particularly difficult for Rodriguez.  His brother "Paco," although two years younger than Rodriguez, passed Rodriguez in school.  Paco was handsome, athletic, and embarrassed of his older brother, Alfonso.  Rodriguez was short in stature, had a big head, had darker skin than the other Rodriguez children, walked with a limp because one of his legs was shorter

than the other, and his hands shook from tremors.  Being slow and different from most children, Rodriguez was an easy and irresistible target for bullies.  Rodriguez would often sit quietly and watch other children play.  He was an outsider.

Rodriguez failed in school, both in Texas and in Minnesota.  He repeated the 1st and 9th grades and was socially promoted on other occasions.  Rodriguez dropped out of school during his second year in the 9th grade. He was 18 years old and unable to successfully complete basic 9th grade coursework.  At age 21, Rodriguez committed his first sexual assault.  And he committed additional offenses against women.  Since age 18, Rodriguez has been incarcerated for all but approximately three and a half years of his life.

There is no genuine dispute that Rodriguez kidnapped and killed Dru Sjodin six months after he was released from custody.  Prior to his release into the Crookston area community, Rodriguez expressed fears and anxiety during a visit with a psychologist, saying he wanted to be "locked up but not locked up."  His family called the Minnesota Department of Corrections and expressed concerns about Rodriguez's upcoming release and the likely lack of supervision and guidance.  The Minnesota Department of Corrections could have, and should have, sought to have Rodriguez—an untreated level 3 sex offender with a history of harming women who was expressing anxiety and grave fears about living in society—civilly committed.  Despite its failures, the Minnesota Department of Corrections did not commit the offense against Dru Sjodin; it did, however, provided Rodriguez with the opportunity to do so.

On May 11, 2004, Rodriguez was charged federally with kidnapping and killing Dru Sjodin.  Jury selection began on July 7, 2006, and took place over the course of 21 days.  On September 22, 2006, the jury decided that a sentence of death was warranted for the

abduction and murder of Dru Sjodin.  On appeal, the Eighth Circuit Court of Appeals upheld the conviction and sentence.  United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009).

On October 17, 2011, Rodriguez timely filed the instant motion under 28 U.S.C. § 2255. (Doc. #752).  Due to the quantity and nature of the issues raised by Rodriguez, the government was granted an extension of time to conduct its own evaluations of Rodriguez and to respond to the issues raised in the motion.  The government responded to the motion on November 11, 2013. (Doc. #879). Certain issues could be decided on the existing record and law while other issues required further development of the record.  The Court, after clustering the issues into three groups for the purpose of conducting evidentiary hearings, held hearings on: September 8-9, 2015 (jury misconduct issues); June 20-23, 2017 & September 11, 2017 (forensics issues); and January 28-February 7, 2019 (mental health issues).  The last post-hearing brief was filed on January 25, 2021.

At the outset, the Court wishes to make plain that its findings in this Memorandum Opinion and Order are not meant to undermine the competent and herculean efforts put into this case by Rodriguez's trial team.  Indeed, both sides were represented by capable, experienced, well-respected trial lawyers.  But, as with every trial involving competent and zealous advocacy, there were struggles along the way.  The Court was asked at times to make difficult decisions and did so based on the evidence before it and within the typical time constraints that exist shortly before and during trial.

In this proceeding, the Court is not second-guessing those decisions it made at trial, nor the jury's verdicts.  Likewise, although the briefing has been voluminous, the Court has not been swayed by either parties' arguments.  The decisions the Court has made in this

6

proceeding are based on careful consideration of all of the evidence in the record, including the trial record, testimony from the evidentiary hearings held in this case, and voluminous expert testimony made part of the record in this proceeding.  While it is beyond question that Rodriguez abducted and murdered Sjodin, the evidence now in the record has led the Court to conclude that errors were made that violate the United States Constitution such that due process demands a new penalty phase trial be held.

## SUMMARY OF DECISION

It is undeniable that Rodriguez is of low intellectual functioning and demonstrates significant adaptive deficits.  But, there is insufficient evidence in the record demonstrating Rodriguez was intellectually disabled, as set forth in the guidance for diagnostic criteria for intellectual disabilities, prior to age 18.  The Court makes this finding recognizing that intellectual disability is a lifetime condition and does not usually develop over time.  But, on this record, evidence of Rodriguez intellectual and adaptive deficits prior to age 18 is equivocal.  The Court cannot rule out other factors that may be contributing to Rodriguez's below average cognitive functioning that is evident today, to name a few: Rodriguez's history of alcoholism; his family history of dementia; and his brain trauma.  As a result, Rodriguez's Eighth Amendment challenge to his sentence is unavailing.

With regard to the presentation of evidence and arguments advanced at Rodriguez's trial, a trial is a search for truth and justice.  The rules are meant to facilitate that search, not impede it.  Few trials are perfect.  Admittedly, even fewer trials are riddled with error because expert testimony is later proven to be so unreliable that had all the circumstances been known it would have been inadmissible.  But, these post-conviction relief proceedings have uncovered credible evidence demonstrating that in the trial of this case, the truth was

obscured.  The impediments to the exposition of the truth during Rodriguez's trial are two-fold:

(1)     Ramsey County Medical Examiner Michael McGee ("McGee") presented unsupported, misleading, and inaccurate testimony regarding the cause of Sjodin's death. The circumstances surrounding Sjodin's death were instrumental in advancing the government's arguments for why this case is unlike other murders such that a death sentence was the only just and appropriate punishment.  When the government failed to produce a single witness to support McGee's trial opinions during the course of these post-conviction proceedings, and not even McGee himself attempted to support his trial opinions, there can be only one reasonable conclusion—the jury did not hear the truth.

(2)     Rodriguez's trial counsel directed their own mental health experts to not discuss the circumstances of the crime with Rodriguez.  This limitation led to a deficient investigation into Rodriguez's mental health conditions, both in general and at the time of the commission of the crime.  An adequate investigation would have exposed a possible insanity defense, and, at a minimum, information indicating that Rodriguez suffers from post-traumatic stress disorder ("PTSD") so severe that he sometimes has dissociative experiences.  Because this evidence was not developed for trial, during the trial the government was able to discount and dismiss any possibility that Rodriguez suffers from PTSD.  The government told the jury repeatedly that this case was about Rodriguez's intentional and deliberate choices.  A choice to search for a female on November 22, 2003; a choice to sexually assault that female; and a choice to kill that female.  That may not be the truth.  If the jury heard evidence about the severity of Rodriguez's mental health condition, there is a reasonable probability that at least one juror would have struck a

8

different balance and voted to impose a life sentence, rather than a death sentence.

When a death sentence "resulted from a breakdown in the adversary process that renders the result unreliable," the defendant is entitled to a new sentencing hearing.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  The Court hereby **ORDERS** as follows:

(1)    Rodriguez's § 2255 motion (Doc. #752) is **GRANTED, IN PART, AND DENIED, IN PART**;

(2)    Rodriguez's death sentence is **VACATED**;

(3)    A new penalty phase trial be held as soon as practicable.

## DISCUSSION

The first section in Rodriguez's motion is an introduction. The following sections identify the claims upon which relief is being sought.  Since there was no claim in section 1 of the briefing, the Court's analysis begins with Claim 2.

### CLAIM 2A: RODRIGUEZ'S TRIAL COUNSEL WERE DEFICIENT FOR FAILING TO ADEQUATELY INVESTIGATE AND CHALLENGE THE GOVERNMENT'S SCIENTIFIC EVIDENCE OF SEXUAL ASSAULT; HOWEVER, RODRIGUEZ CANNOT SHOW PREJUDICE.

Trial counsel believed that evidence about whether or not Sjodin had been raped was a significant trial issue for two reasons:

(1)    Counsel believed jurors would view a kidnapping as less heinous than a kidnapping and a rape (Doc. #1071, p. 501), and

(2)    McGee's opinion that a rape occurred would have, and did have, a "ripple down effect into the sentencing phase.  (Id., at  p. 388; see also Doc. #1073, p. 790).

Trial counsel believed it would be "a major victory" if, in part, the defense could keep the government from proving Sjodin had been sexually assaulted. (Id. at p. 490; see also Doc. #1073, p. 790).

Habeas counsel assert that trial counsel were ineffective for failing to mount a proper challenge to McGee's testimony that Sjodin had been raped and that the rape occurred 24 to 36 hours before she was killed. Habeas counsel's arguments on this claim can be summarized as follows: (1) there is no reliable scientific evidence that Rodriguez sexually assaulted Sjodin (and, in fact, the lab testing demonstrates there was no rape); (2) trial counsel were ineffective in failing to discover this fact; and (3) the entire trial was infected by McGee's unreliable opinions, which deprived Rodriguez of a fair trial. The Court agrees with habeas counsel on the first two claims, but not on the third. Because of the length of the analysis on this claim, the Court has prepared a summary.

### 1.     Summary of Decision on this Claim

Based on the unrefuted evidence made part of the record through these post-conviction proceedings, there is no scientific evidence to support McGee's interpretation that the evidence showed the presence of semen. The government's theory that Rodriguez raped Sjodin because semen was detected in lab testing was based on nothing more than rank speculation. Speculative expert opinions are inadmissible. At most, the evidence would allow the government (and the jury) to draw an inference based on non-scientific evidence, such as the remote location where Sjodin's body was found, missing and disheveled or torn clothing, and bound hands.

Trial counsel were unknowingly in possession of evidence that was so significant that it would have called into question the validity and factual basis for McGee's opinion

regarding the presence of semen.  This additional evidence if it had been disclosed to the Court at trial would have changed the Court's ruling on admissibility of McGee's opinion under Fed. R. Evid. 702.  This is a more significant conclusion than one that merely calls into question the weight to be assigned to McGee's opinion.  Rather, the opinion was so unmoored from a scientific basis that it should not have been received at all.  Trial counsel did not realize the significance of the evidence buried in 20,000 pages of discovery at the time of trial.  Trial counsel's failure to recognize and present evidence regarding, for example, the results of p30 antigen testing was neither strategic nor tactical but an inadvertent oversight.

But, even if trial counsel's performance was deficient in failing to locate and apprehend the significance of the evidence in its possession, the error does not give rise to a reasonable probability that the outcome would have been different.  It is indisputable that circumstances about Sjodin's body—that she was found with her top pulled down from her shoulders and naked from the waist down with her hands bound behind her back in a remote area—combined with Rodriguez's criminal history is evidence from which a reasonable juror could infer that her attacker's motivation was sex-related.  Despite the absence of scientific evidence to establish the presence of seminal deposition, there was sufficient evidence for reasonable jurors to find (1) there was an abduction; (2) Rodriguez attempted to sexually assault or perhaps did sexually assault Sjodin in a manner that might not have involved ejaculation; and (3) Rodriguez tragically killed Sjodin.

The particular manner of the sexual assault or whether certain sexual contact is less aggravating to a reasonable juror is a question the Court cannot and need not resolve in this proceeding.  In light of the circumstantial evidence regarding sexual assault, Rodriguez

cannot show prejudice and his ineffective assistance of counsel claim on the failure to mount a proper challenge to the scientific evidence of sexual assault fails.

### 2.   Analysis

#### a.   *The Government's Untimely Expert Disclosure and Rule 702 Hearing*

Trial counsel faced a few unexpected hurdles at the last minute before trial started. One of those hurdles was the government's late disclosures related to Ramsey County Medical Examiner Michael McGee's opinions.  No where in McGee's provisional autopsy report is there anything indicating the presence of semen found on or inside Sjodin's body. (Doc. # 1071, p. 393).  In the final autopsy report, McGee listed three different swab areas that were tested.  The corresponding lab reports indicate each area tested negative for sperm and also listed the acid phosphatase level for each of the three specimens.  Id.  Based on this information, trial counsel believed they were in a position to rebut the government's allegation that Rodriguez had raped Sjodin.  As far as Rodriguez's trial team was aware, the following was accurate: (1) the government had no evidence indicating sperm or male DNA was found on or inside Sjodin's body; (2) the government's evidence showed Rodriguez was not aspermic because three areas of Rodriguez's pants had been lab tested and sperm cells were detected (Doc. #1069, p. 38); and (3) the lab results from the acid phosphatase testing were of limited value since this testing is considered a screening tool used to detect the possible presence of semen.

Then the landscape abruptly changed.  With just over two months left to finish trial preparations, trial counsel learned for the first time that the government intended to offer opinions from McGee at trial that were not contained in his autopsy reports.  Those opinions comprised two aspects of McGee's interpretation of the evidence: (1) there was

seminal deposition found during the autopsy, and (2) the deposit had occurred within 24 to 36 hours of Sjodin's death. The government informed trial counsel of these new opinions in a disclosure dated April 28, 2006. (Doc. #1071, pp. 402, 502). Absent from the disclosure, however, was the bases for these opinions. Trial counsel's ability to mount an adequate last-minute defense was hampered by the difficulty in obtaining the bases for McGee's newly-disclosed opinions.

The Court was made aware of this issue when trial counsel filed an expedited motion for sanctions. (Doc. #337). In the motion, trial counsel, among other things, objected to the government's untimely disclosure of McGee's opinions. Following a hearing, the Court found the government's late expert disclosures violated its discovery order and prejudiced trial counsel. (Doc. #343). One of the sanctions imposed by the Court required the government to make McGee available for a deposition. Id.

Trial counsel took McGee's deposition on May 31, 2006. The results of Regions Hospital's acid phosphatase testing formed the scientific basis for McGee's opinion about the presence of semen, indicating that a rape had occurred. McGee bolstered his opinion by asserting he saw a globule or mucoid-like substance during the autopsy, which he believed was consistent with a seminal deposit, although this finding was neither documented nor photographed for his reports.

Trial counsel bought a motion challenging the scientific basis for McGee's opinion related to the acid phosphatase test results under Fed. R. Evid. 702. Trial counsel believed the literature they were studying and the expert they were consulting did not substantiate McGee's opinion regarding a seminal deposit based on the results of the acid phosphatase testing. (Doc. #1071, pp. 403–04; Doc. #1073, p. 790). Trial counsel was also concerned

13

in another regard:

> the information that was provided in the autopsy protocols it was very
> general in nature and you could not determine what [McGee's] actual
> opinions might be. And as we got closer to trial I became concerned that he
> was going to attempt to offer opinions that were not contained in his report,
> and that was one of the reasons I wanted to press the government to identify
> their experts and comply with the rules and tell us what their testimony was
> expected to be.

(Doc. #1071, p. 507). Rodriguez's trial team believed it was crucial to seek the exclusion of
McGee's opinions about the presence of semen because this was a new development and
trial counsel had no expert evidence to contradict these opinions from McGee. Id. at p. 528.

The Court held a hearing to determined the admissibility of McGee's opinions during
trial on August 28, 2006. Trial counsel presented the testimony and opinions of Dr. George
Sensabaugh, a well-known academic professor of forensic science. Dr. Sensabaugh agreed
that forensic labs across the country use acid phosphatase levels as a presumptive indicator
for the presence of semen. The Court noted trial counsel was not at that time challenging
the validity of the test used to obtain the acid phosphatase levels (Doc. #596, p. 2); instead,
the parties' dispute centered around two issues:

(1)     the uncertainty in the scientific community about what acid phosphatase
        levels would be for a corpse, as opposed to a living being; and

(2)     the cutoff level utilized by McGee to find "elevated" phosphatase levels
        indicative of the presence of semen.

Based on the evidence in front of it at the time, the Court wrote in its Order that it
believed McGee "was not guessing to reach his conclusion" and that his opinions have a
sufficient degree of certainty to be admissible. (Doc. #596). The Court concluded that
although there may be competing scientific views on the reliability of McGee's opinions, any

doubts go to the weight, not reliability, of the opinions.  Id.  More specifically, the Court

explained orally its findings and conclusions:

> And so what I see here is really pretty fascinating. It's kind of almost textbook
> law school kind of Daubert stuff.  What you have are two experts that
> testifying from very interrelated fields but are scientifically different
> communities and that there are different opinions held between those two
> communities.  And so that there's a question that arises as to which school of
> thought -- because this is really a school of thought question at this point. It
> becomes which school of thought is more probable, more probative, more
> reasonable, more reliable.
>
> And so you have a school of thought that is experiential and that would
> be -- the forensic pathologists seem to be basing their opinions based on their
> observations of what they find in conjunction with the testing and what it all
> means. And then you have the more scientific -- rigorously scientific
> community which is much more interested in what does the data tell us? And
> it was interesting that as you looked at it the forensic pathologist kept coming
> back: We view totality of the circumstances.  We look at this as a piece of the
> puzzle. It's indicative. And on the other side you have somebody saying: No
> really you look at the scientific data. And the data doesn't lie and you've got
> to be very careful that you're not mislead.
>
> Ultimately this is precisely the kind of question that we have juries for.
> The juries make a determination as to which explanation seems plausible
> assuming that both are scientifically valid and reliable.  And it strikes me that
> this is -- that we don't see here sort of the classic junk science on either side.
> What we see are two distinct schools of scientific thought and that as such it's
> a question for the jury. The questions really that are raised are weight and
> credibility determinations. Admissibility seems not to be, to the court
> anyhow, the primary issue here. It seems that to me the primary issue is in
> fact which opinion has the greatest weight and which opinion does the jury
> tend to believe.

(Doc. #712, pp. 160–61).

While the Eighth Circuit Court of Appeals affirmed the Court's admissibility ruling

under an abuse of discretion standard,  Rodriguez, 581 F.3d at 793–95, if the Court knew

then what it now knows about (a) the totality of the lab testing that was done in this case,

(b) the results of that testing, and (c) that the dispute went beyond merely "two schools of

expert thought," it would have ruled differently.   The evidence now in the record demonstrates that McGee was, in fact, "guessing" and his opinions are not scientifically supported by the literature or any other expert who was called to testify in this proceeding.

> b.   *McGee's Trial Testimony and The Government's Arguments Regarding Sexual Assault*

At trial, McGee testified about the contents of his reports—his provisional and final autopsy report—and about his interpretation of the evidence that was not contained within either of his reports.  Although not photographed or documented in his final autopsy report (Doc. #712, p. 232), McGee described to the jury that during his autopsy examination he saw "a large deposit of mucoid-like material that I think looks like seminal fluid surrounding the uterus." (Doc. #712, pp. 212–13).  In his experience and training, McGee "thought it was a seminal fluid deposition." Id. at p. 213.  McGee explained to the jury that he collected the material and sent it for laboratory testing.  Id.

McGee acknowledged that the lab testing did not detect the presence of sperm cells or male DNA, id. at pp. 213, 245–46, so he proceeded to review the lab results for the enzyme prostatic acid phosphatase.  Id. at pp. 213–14.  Although there was no finding in McGee's final autopsy report that the acid phosphatase testing indicated elevated levels, (Doc. #712, pp. 231–32), McGee testified that the level of acid phosphatase detected in the vaginal and cervical specimens were "considered positive for seminal [fluid]." Id. at p. 215. McGee, extracting from the acid phosphatase levels, opined for the jury as to when the seminal deposit likely occurred:

> for an elevated level like this is it's above what we consider cutoff level and it suggests that deposition has occurred in a time period 24 to 36 hours prior to the subject's death. Some authorities will go back longer in a deceased individual but that's generally the information we've given to the police as they have to consider deposition in that 24 to 36-hour time frame prior to the subject's death.

Id. at p. 215.

McGee's conclusion about the presence of seminal fluid was based entirely on the results of the acid phosphatase testing.  Id. at pp. 247–48.

McGee offered the following explanation as to how it was possible that the enzyme prostate acid phosphatase was elevated months after Sjodin's death:

> Enzymes degrade faster than sperm do. Sperm will hang around longer. Generally speaking enzymes, as I've said before, will degrade in a living person within the first 24 to 36 hours.  Some people will move it out farther so you can find that farther in the literature.  But generally speaking it degrades within hours of deposition. That's the enzyme.  Sperm --
>
> Q.    Go ahead.
>
> A.    Sperm when they're deposited will be motile for the first few hours. Then they will die but you can still see them. But that is again within a matter of hours. However, sperm intact and heads can be seen sometimes for days afterwards so generally enzyme degrades more rapidly than the sperm do.
>
> Q.    In this case how would you explain that the enzyme remains elevated some several months later?
>
> A.    Only explanation I can give is the conditions that the subject's body was in at the time she died and at the time she was kept -- remained in that area. It was extremely cold.  The temperatures were low.  She's had a temperature that was lower than we normally freeze our bodies in our office.  Investigators tell us she's under multiple inches or layers of snow, and I think the cold environment has to be taken into account regarding the preservation of the specimens we found at the sexual assault exam.

Id. at pp. 228–29.  McGee's explanation was neither supported with scientific literature nor did it explain how the cold preserved the enzyme but no sperm cells in the purported globule of semen, particularly when lab testing of Rodriguez's pants detected sperm cells.

Nonetheless, the government's closing arguments at the guilt phase were

17

appropriately focused on the elements of the offense of kidnapping resulting in death. The government minimized trial counsel's anticipated defense that there was no federal crime because there was insufficient evidence to prove where Sjodin was killed in order to meet the interstate transportation requirement. Specifically as to the purported sexual assault, the government argued that the Court's instructions and the law required them to agree only that the kidnapping was for "some purpose, whether it was sexual assault or otherwise" and did not require the jurors to agree on what the purpose was. (Doc. #713, p. 74). The government relied on a number of pieces of evidence to argue Sjodin had been sexually assaulted:

> When you consider that Dru Sjodin was found stripped nude from the waist down with her sweater torn down the front to expose her undergarments, her hands bound tightly behind her back, she's laying face down in the ditch with her throat sliced open, you probably didn't need to be told that this crime involved sexual assault. Sexual assault is a sexual act or a sexual touching. Sometimes people just think of it as sexual penetration but it can be many things, touching of a sexual nature to obtain gratification of some kind.

> You probably didn't need to be told that it was a sexual assault. But because the facts in this case so obviously indicate sexual assault in addition to the kidnapping, the law allows the United States to present evidence, and we did that in this case, of certain other sexual assaults that were committed by Alfonso Rodriguez, Jr.

Id. at pp. 87–88.

> During rebuttal, the government argued:

> The reason he abducted Dru Sjodin was to sexually assault her. And how do you know that? You know it two different ways. You know it from the defendant's past and you know it from the facts in this case. The defendant's past criminal history shows that he has prior convictions for attempted aggravated rape and aggravated rape.

> Now those convictions weren't offered as Mr. Wrigley pointed out to show anything other than a propensity or disposition on the part of the defendant to sexually assault women. It wasn't offered to show that he's a

18

bad person, therefore, you should conclude that he did what he did in this case.  It's offered to show that he has a disposition or a propensity to violently attack and then sexually assault women. That's the reason for it.

* * *

But that's not the only thing we have.  We also have the facts in this case, and the facts as Mr. Wrigley pointed out in his original opening - - closing argument was that Dru was found naked from the waist down.  Now what does that tell you?  That tells you that he sexually assaulted her.  We don't have to prove that he raped her.  We don't have to prove how he sexually assaulted her.  Only that -- and we don't have to prove that he sexually assaulted her for that matter.  That's not one of the elements here.

But again understanding why he did what he did helps you answer some of the other questions in this case.  He sexually assaulted her.  She's nude from the waist down.  Dru Sjodin didn't take her own pants off.  She didn't take her own underwear off.  She had her hands tied behind her back.  She was helpless.  The defendant could do whatever he wanted to do to her.  And we know that the defendant forced Shirley Seddon to have sex with him, to perform oral sex on him, and we know that the defendant forced Elizabeth Knudson at knifepoint to have sex with him.  So you think if he's got Dru Sjodin helpless with her hands tied behind her back that he's not going do something like that with her?

He sexually assaulted Dru Sjodin when she was completely helpless and nothing she could do about it.  But again keep in mind that we don't need to prove any of that.  The kidnapping can be for any purpose.  The judge has already told you that.  It doesn't have to be for sexual assault.  It can be for any purpose that benefits the defendant.

So don't think that -- I know [defense counsel] was up here talking earlier about what the acid phosphatase actually shows.  Who cares what it shows?  It doesn't make that big a difference.  He may not have sexually assaulted her at all.  Assume that and it doesn't make any difference.  He still kidnapped her for some purpose or some reason of his own and he transported her across state lines and that's enough.

(Doc. #713, pp. 137–39).  Of note, the Court could find no reference to McGee's

interpretation of the evidence regarding sexual assault at this phase in the trial.

The government did not allege a statutory aggravating factor related to sexual

assault.  At the eligibility phase of the penalty portion of the trial, the government argued

it was "pretty apparent" that Sjodin was sexually assaulted.  (Doc. #717, p. 62).  The prosecutor described in general for the jury what he thought the evidence showed Sjodin endured: "bleeding, beaten, raped, threatened, terrorized, and fearing for her life."  Id. at p. 63.  The government did not place any specific emphasis on McGee's interpretation of the scientific evidence supporting his conclusion that Sjodin had been sexually assaulted.

Similarly, at the selection phase of the penalty portion of the trial, the government discusses the sexual assault in general terms while focusing mostly on the terror Rodriguez inflicted on Sjodin:

> To reach a just punishment for this defendant, Ladies and gentlemen, you must do so.  Terror and acute mental anguish.  The raw fear of what would be her fate as the defendant drove her into the night, stopped to strip off her clothes, battled her in the back seat of his car where the blood is found, sexually assaulted her, and drove her to a ravine and directed her to the ground on which her body would lie. . . .

(Doc. #725, p. 23).  The prosecutor argued that, in his view, the mitigation evidence was insufficient to overcome Rodriguez's heinous and depraved actions: "But what could it have to do with a 22-year-old girl the defendant spotted in a mall, lusted after, kidnapped, assaulted and raped, and finally killed on November 22nd, 2003?"  Id. at p. 45.  The prosecutor further argued: "He chose not to care, and he chose to live out his rape fantasy on Dru Sjodin.  She suffered for his pleasure.  She died for his convenience.  All at his choice."  Id. at p. 52.  The prosecutor reiterated: "He chose to kidnap, bind, strip, rape and cut the throat of Dru Sjodin."  Id. at p. 53.

The prosecutor subsequently mentioned the sexual assault again but did not specifically highlight it as a basis for the jury to impose the death penalty:

> Ladies and gentlemen, Dru Sjodin walked - - she was forced to walk down that embankment.  She was not dragged down there off of that road where

only a car could go and dragged down through there over the point, over the hump and in there.  She walked with her hands bound behind her back, naked from the waist down.  She had already been sexually assaulted, physically assaulted. . . .

Id. at p. 64.  At the penalty phase of the trial, while sexual assault was mentioned, the government did not highlight McGee's testimony regarding his interpretation of the evidence supporting a sexual assault occurred.

<em>c.   Post-Trial Investigation Regarding Sexual Assault Evidence</em>

Pretrial discovery in this case approximated 20,000 pages. (Doc. #1071, p. 499). Trial counsel read each page.  Id. at p. 409.  Trial counsel, through independent research and study as well as expert consultation, were aware of the existence of a test more definitive for the presence of semen than the acid phosphatase testing done in this case by Regions Hospital.  That test assesses p30, a prostate-specific antigen.

At the hearing to determine admissibility under Rule 702, the only people in the courtroom that might have been aware that p30 testing had been done in this case was the prosecution team.  There is a note in the record dated June 30, 2004, after the p30 testing had been completed, in which the Minnesota Bureau of Criminal Apprehension ("BCA") documented a phone call from the North Dakota United States Attorney's Office.  The note says: "I spoke with [ ] of the US Attorney's office about the semen search results of the vaginal, cervical and rectal swabs.  They requested that DNA testing be performed on the vaginal and cervical swabs even though no semen was detected on them." (Doc. #1072, p. 760).  The record, however, is silent as to what the North Dakota United States Attorney's Office knew about the BCA's p30 testing and when they found out about it.  Although it has been established that the lab analyst prepared bench notes dated April 23, 2004, which

were disclosed to trial counsel on May 8, 2006, the record is silent as to when the North Dakota United States Attorney's Office received the bench notes.

Trial counsel, although aware of the significance of p30 testing, did not see any lab reports in the discovery indicating the results of p30 testing in this case. When trial counsel asked McGee during his deposition whether p30 testing was done in this case, McGee responded, "No." (Doc. #1071, pp. 430–31; Doc. #880-1, p. 60). That deposition answer was inaccurate. There is potentially conflicting evidence on whether McGee knowingly gave a false answer during his deposition or entirely lacked competence in this area.

As part of his sexual assault examination, McGee collected duplicates of each of the three swab areas. A set of specimens was sent to Regions Hospital for testing, which McGee relied on exclusively to form his opinion regarding the presence of semen. A set was also sent to the Minnesota BCA lab. It is plain that McGee was aware of the results of, at least, some of the BCA lab testing. When asked at trial by the prosecution about the DNA results from the BCA testing of the specimens McGee collected from Sjodin's body, McGee acknowledged that he knew about the results:

> And are you also aware that the other swabs that you gave to the Minnesota Crime Bureau people that they took to their lab, and I think they've been talked about here during this case earlier as BCA items No. 86A, 86B and 86C, which are the samples from the three areas of her body, that they DNA tested those and found no male DNA present. Are you aware of that?
>
> A. That's my understanding.

(Doc. #712, p. 6754). In his trial testimony, McGee directly relied on BCA test results to form his conclusion that Sjodin's neck had been slashed at the scene where her body was located: "Well, because the clothing -- the BCA tells me that the lab tells me that there are no large deposits of blood found inside the car that we have seen when people have had

neck injuries or head injuries in our office." Id. at p. 6732.

Evidence that tends to suggest perhaps that McGee was, at least at the time of trial, entirely incompetent in the areas of available testing for the presence of semen can be found in his deposition. When McGee was asked whether he had heard of the p30 antigen, McGee responded: "If I remember correctly, P30 antigen is also observed in seminal fluid and can be tested for the presence or to confirm the presence of deposited material, deposited seminal material." (Doc #880-1). According to McGee, a p30 test was not done because he was "not aware if that testing is available in the laboratory we use." Id. The following additional colloquy ensued:

> Q.   Let me ask you this. As a professional expected to be asked to go into a courtroom and give testimony on a case like this and offer an opinion about whether or not this young woman was or was not sexually assaulted prior to her death, wouldn't you like to know that?
>
> A.   You would if the lab would offer it.
>
> Q.   Is there any lab in the state of Minnesota that does that testing?
>
> A.   I don't know.
>
> Q.   Have you tried to find out?
>
> A.   No.
>
> Q.   Why not?
>
> A.   Because I think a [acid phosphatase] level of 130 is enough to indicate that.

(Doc. #880-1, pp. 60–61). When asked by trial counsel for a reference or citation to any learned text that supported McGee's opinion that the acid phosphatase levels were elevated, McGee could not provide any. Id.

McGee's anticipated expert testimony in terms of meeting the Rule 702 admissibility

standard was an issue highlighted by the Court at the pretrial conference held on July 5,

2006.  The Court noted its concerns:

> I look at this - - these sort of acid phosphatase tests as being completely separate.  And the question is, "Is it junk science or not?"  I mean, in it's kind of harshest terms that's the - - And if the test itself isn't junk science is the interpretation that this particular witness is offering, is it junk science, because if you get right down to it, the Supreme Court wanted us in Kumho Tire and in Daubert to keep junk science out but not to stifle the development of scientific evidence and its admissibility.
>
> And so the question is - - I mean, it's theoretically possible that I'm the only scientist in the world that knows something and that it's held with such a degree of certainty that a judge might look at it and say, You know, this guy is Mr. Cutting Edge and I think that there's a reason, and you might be able to write an opinion where it ought to come in.  But as a practical matter what it usually means is this: If you're the only guy in the world saying X is true because we saw Y, you're going to have a hard time getting that to satisfy Daubert, particularly if it's not something that can be reproduced in a laboratory.

(Doc. #682, pp. 59–60).  In response, the prosecution argued that McGee's opinions should

not even be subject to a Rule 702 analysis because it is "not controversial science" in any

way and the cutoff utilized by McGee goes to the weight of the evidence, which is not an

admissibility issue.  Id. at pp. 63–64.  The Court reiterated its concerns:

> The problem could be is if you are so far afield from the standard that is ordinarily applied within the community of experts, and I can't answer that question.  And I've read those briefs carefully, and that's really the question.  The question is they've got a numerical number of X and you've got a statement by Dr. McGee that in their lab they always treat that - - numerical number Y as the cutoff point, this is above that cutoff point.  And then when he's asked what do other labs do? He says, Well, it's a flexible standard.  I don't know what other labs do.
>
> And the question that really becomes is, is what this lab is doing within the sort of bell curve, you know.  Because I mean if it's whacked out on either end on that bell curve - - Well, if their standard is strange on the high end, it doesn't matter because they're over whatever standard they set.  But if they've set the standard way low compared to what ordinarily folks would do who are in this business, and if there's no literature out there that supports setting it

24

there, then that might be a cause of concern under Daubert.

Id. at pp. 64–65.  Despite the prosecution's pleas to resolve the dispute without an evidentiary hearing, the Court advised the prosecutor: "I want to see the evidence, hear the evidence, and then I'll make the call. . . . You're building your wall, they're trying to tear your wall down.  If at the end of the day it looks more like a wall, the evidence comes in.  If it looks more like a pile of bricks, the evidence stays out." (Doc. #682, p. 67).

Trial counsel were unable to turn the government's wall into bricks because although they recognized that p30 test results could have a significant impact on the case in terms of the government's evidence that Rodriguez sexually assaulted Sjodin, the evidentiary hearing proceeded without any evidence of p30 testing.  Trial proceeded without any evidence of p30 testing.

Early on during the exchange of discovery, trial counsel saw a lab report produced by the government from the Minnesota BCA indicating its testing failed to detect the presence of semen.  The testing was done on April 23, 2004, within a week of the discovery of Sjodin's body.  When habeas counsel reviewed trial counsel's file, they discovered a significant piece of evidence: on May 8, 2006, which was more than two years after Sjodin's death but was within two months of the commencement of trial and in the midst of the government's disclosure of new and untimely expert opinions, the government produced additional discovery along with a cover letter indicating the bates numbers of the documents being disclosed.  The discovery produced by the government at this time included 2,586 pages of materials—bates numbered 17661 through 20241. (Doc. #1073, p. 802).  Some of the discovery had been previously disclosed.  Id. at p. 804.  Among the many pages of discovery produced to trial counsel at this time was the same Minnesota BCA lab

report.  But, this time the BCA lab report was accompanied by the scientist's bench notes. (Doc. #1071, pp. 406, 411).  The bench notes were important because they contained the p30 testing results and additional testing results of the three swab specimens sent to the BCA.

Trial counsel testified at the evidentiary hearing as to why this information did not draw their attention at the time of the government's disclosure:

> I had received Minnesota BCA Lab Report No. 10 early on in the case and I was aware of the findings there regarding the swabs that we're talking about, Item 86 swabs, that they had not detected the presence of semen on those swabs.  I later got, in probably April or May of -- on May 8th of 2006 or thereabouts, I received a copy of BCA Report No. 10 with the attached lab report -- excuse me, with the attached bench notes I should say.  So I had it, as I indicated, but I was not aware of the p30 testing that had been done by the BCA lab, which was contained only in the bench notes and was not reported in their main body of their report.  So I was not aware of that at the time that I took Dr. McGee's deposition on May 31st of 2006, nor was I aware that it had been done when I was working with Dr. Sensabaugh.

(Doc. #1071, pp. 573–74).  Co-counsel testified similarly:

> My strong belief is that I did not see this.  And not that I did not have it but for whatever reason as being a duplicative or whatever I did not read this carefully and I did not see this document, as it would have been fairly significant.
>
> Q.    But you had it.
>
> A.    That is my belief, yes, that I had all the discovery.

(Doc.# 1073, pp. 804–805).

In short, since the testing failed to detect the presence of semen, which was not hurtful (but in fact helpful) to Rodriguez's defense, trial counsel assumed the bench notes would verify or corroborate the no semen finding and they would not add anything to the defense.  (Doc. #1071, p. 410).  In other words, "we just assumed wrongly, obviously very

wrongly, that it was just microscopic review when he said no semen, which clearly the bench

notes tells us it was something much more than that." (Doc. #1073, p. 811).

In addition to the p30 test results, the bench notes indicate that two of the swabs had a heavy or very heavy presence of nucleated epithelial cells, which would have made it more likely that sperm cells would have been observed if semen was present and would have also affected the DNA report. Id. at pp. 811–12. Trial counsel did not have a strategic or tactical reason for not providing this information or the p30 test results to their experts, or at the Rule 702 hearing or at trial. Id. at pp. 813–815, 817–18, 859–61. It was "a mistake" because trial counsel did not carefully read or examine the bench notes. Id. Trial counsel are convinced that this information would not only have undermined McGee's testimony regarding the presence of a seminal deposit, but "completely refute[d]" it. Id. at p. 815.

Steven Fischer, forensic scientist in the DNA section of the Minnesota BCA, confirmed trial counsel's testimony regarding the contents of the lab report and his bench notes. Fischer performed the testing in this case and testified it was the BCA's practice to state the conclusions in the report but not include the bases for the conclusions. (Doc. #1072, pp. 745, 749). The bases for the conclusions are separate from the lab report and documented within the bench notes. Id. at p. 749. Fischer testified that p30 testing was performed on the samples the Minnesota BCA received because "[i]t's considered to be more confirmatory than acid phosphatase." Id. at p. 751.

Trial counsel knows today, and did so at the time of trial, that not finding the p30 antigen in the specimens tested, as noted in the bench notes, would have been important at the hearing under Rule 702 to determined the admissibility of McGee's opinions and for

trial.  As trial counsel explained at the evidentiary hearing in this proceeding,

> A p30 test would have been much more definitive than the presumptive acid phosphatase that Dr. McGee was relying upon.  And so, as we talked about earlier, that would have been very important had I been able to present that at the Daubert hearing or at trial.

(Doc. #1071, pp. 410–11).  The earlier testimony referenced by trial counsel was the significance of the p30 test results:

> Had I known that that test existed, I think that that would certainly have been a centerpiece of the Daubert hearing evidence that I would have put on because Dr. McGee's opinions were based solely on the acid phosphatase levels, which seemed to be presumptive rather than definitive.  And even he agreed that a p30 test would have been more definitive and if we had known or I had realized at the time that the p30 test had been done, was available, was negative, we would have certainly put that on during the Daubert hearing, which hopefully would have helped the judge keep that evidence away from the jury; that is, his opinions based on the acid phosphatase out of the trial.  Completely barring that we would have certainly put it on in front of the jury even if his opinions had come in.

Id. at pp. 388–90.  Another consequence of failing to discover that p30 testing had been performed was that trial counsel did not cross-examine BCA scientist Fischer about the impact of p30 testing in terms of the purported discovery of seminal fluid deposition, which, given it is a more definitive test for semen, would have cast doubt on McGee's opinions regarding the presence of a semen deposit.  Id. at p. 500.  While Fischer did testify on cross-examination that the specimens tested negative for sperm cells, he was not questioned in any meaningful way that would have called into question McGee's conclusion that semen was present.  (Doc. #1072, pp. 764–65).

At a trial, one of the Court's duties is to keep from the jury the presentation of unqualified evidence.  The Court, at the time of the evidentiary hearing on the admissibility of the scientific sexual assault evidence, lacked a factual or scientific basis to exclude

McGee's opinions regarding the presence of semen.  Today, however, it is indisputable that neither Rodriguez's trial counsel nor the Court knew at the time of its ruling that there was, in fact, a more definitive test performed in this case to detect semen and this more definitive test would have resulted in a determination by the Court that McGee's opinion about the presence of semen was scientifically unsustainable and factually unreliable.  And the Court would have excluded the evidence as unreliable and not probative.  The Court's reasoning for exclusion is based on unrefuted evidence.

Although experts who testified at the evidentiary hearing in this proceeding confirmed the Court's understanding and Rule 702 decision that acid phosphatase testing is recognized within the scientific community as a presumptive test (Doc. #1069, p. 49), experts detailed the reasons it is outdated for semen detection—because acid phosphatase is not an enzyme unique to the prostate and more definitive testing is available.  More importantly, though, no expert, not even McGee himself, offered evidence in support his interpretation that any one, or even combination of, the acid phosphatase levels detected in this case was indicative of the presence of semen.

In particular, forensic pathologist Jonathan Arden described acid phosphatase testing as "a very good first step screening test which would then cause you, if it were positive, to look further for something more specific to confirm" the presence of semen. (Doc. #1070, p. 244).  However, Arden has not utilized acid phosphatase testing in many years because "it has largely been superseded by other better tests."  Id. at p. 245.

Similarly, former Hennepin County Medical Examiner Garry Peterson, testified about the usefulness of acid phosphatase testing:

Acid phosphatase is often helpful.  It's present in semen.  Semen is made up

29

of the male sperm cells but the fluid in which they're suspended has a number of constituents, among which is acid phosphatase. And so that's often used as a marker to identify seminal stains.

Q.   And when you say it's identified 'as a marker,' is that a presumptive or definitive marker?

A.   Generally it's presumptive. In very, very high levels it's pretty definitive.

(Doc. #1072, p. 684).

Alan Keel, Forensic Biology/DNA Analysis Unit Supervisor and DNA Technical Lead Analyst for Forensic Analytical Sciences, Inc. (Doc. #1032-4), explained the meaning of a positive acid phosphatase test result while also acknowledging the validity of acid phosphatase testing:

* * *

A positive result is a presumptive indication, not proof of the presence of semen.

Q.   And is that also true when the sample is taken from a deceased body as opposed to a living one?

A.   Of course. Except one would need to be more cautious because there's likely to be a more elevated level of acid phosphatase from a deceased individual because of the proliferation of bacteria and because as one dies the body begins to basically dump acid phosphatases to try to generate more energy to keep the cell alive.

(Doc. #1069, p. 20). Peterson echoed Keel's testimony regarding the reliability of acid phosphatase testing in this case, which, according to Peterson, was developed at Regions Hospital as a hospital test to guide physicians treating patients. (Doc. #1072, p. 689). Peterson elaborated that "[i]n postmortem specimens [acid phosphatase] levels go up and so the test becomes unreliable and does not permit you to make [McGee's presence of semen] conclusion." Id. at p. 688.

30

Keel was hired by Rodriguez's trial counsel in 2005 to assist in examining the government's lab testing and assess the government's expert opinions.  Keel, however, withdrew in June 2006 (about a month before trial was to start) when he and his team felt they were not getting the samples or the materials they felt they needed to adequately and competently assist counsel.  (Doc. #1069, pp.  23–25).  Keel, having now had the opportunity to review the Minnesota BCA testing and the results of the three specimens that tested negative for sperm and negative for p30, testified there is no evidence of the presence of semen in any of these specimens.  Id. at p. 30.  Arden agreed with that conclusion, opining the p30 test results indicate "no semen present because this is another very specific and conclusive piece of evidence that supports that conclusion."  (Doc. #1070, p. 265).  Arden further elaborated:

> negative p30 in each of the swabs to me is highly dispositive of the question of whether there is or is not semen present.  So if I consider that absent the other evidence that we have to bear on this question, negative p30 by itself indeed I think can be conclusive of the absence of semen.

Id. at p. 267.  Consistent with the other experts who testified at the evidentiary hearing, Peterson testified about the impact of the p30 test results on McGee's conclusion and McGee's incorrect interpretation of the acid phosphatase test results:

> Q.    Okay. Doctor, how do the p30 results or the negative p30 results impact your opinion regarding the allegation that semen was detected on any of these swabs?

> A.    Again they provide the information. P30 is a more specific test that has better stability and so again they support the negativity.

> Q.    And given, Doctor, the negative sperm search, the negative male DNA testing and the negative p30 results which are now known to you, is there any basis in your opinion upon which a forensic pathologist could conclude that there was semen on any of the tested swabs?

A.    No, I don't think so.

Q.    And is that so despite the acid phosphatase levels that were detected
in this case?

A.    Yes.

(Doc. #1072, pp. 690–91).

Keel testified that "the only logical explanation for the acid phosphatase activity is simply an elevated endogenous level or a microbial acid phosphatase. There's certainly no evidence of semen." (Doc. #1069, at p. 23).

The unrefuted evidence in the record establishes that the p30 testing, which "clearly has a much greater degree of specificity for semen" (Doc. #1070, p. 319), produced negative results. Taken together, the absence of sperm, the absence of male DNA, and a negative p30 test result renders McGee's "elevated" acid phosphatase levels as indicative for semen scientifically unsupportable. Id. at p. 347. This determination is significant because it highlights what the jury was not told about the lab results of the specimens tested and goes directly to the credibility and reliability of McGee's opinions and bases for his opinions. According to Keel:

Well, they tell us that p30 testing was done, which in the line of testing is again more specific and more sensitive than the acid phosphatase test which was negative, which indicates there was no semen present. And then the fact that there are numerous nucleated epithelial cells present also tells us that sperm would not have preferentially degraded through the same environmental insults and simply been absent for that reason.

So given the presence of nucleated epithelial cells if there were sperm cells there would be sperm cells present as well if there were semen here.

(Doc. #1069, p. 31). Keel rejected McGee's theory as scientifically flawed that somehow the cold weather preserved semen but not sperm or male DNA. Id. at p. 68.

Keel identified a very specific problem with presentation of an incomplete picture of the lab results: "[T]here was never any association between the presumptive presence of semen and then the fact that there were all of these other tests that were done that did not affirm the presence of any semen whatsoever." (Doc. #1069, pp. 76–77). Arden identified yet another problem with McGee's interpretation of the acid phosphatase test results:

> Q.   Do you have an opinion regarding Dr. McGee's testimony that the acid phosphatase levels above 25 units per liter indicate the presence of semen?
>
> A.   I have such an opinion.
>
> Q.   What is that opinion?
>
> A.   My opinion is that that is not supported by any literature and it is not scientifically valid. Using a level of 25 and above to be determinative, to use your term, of presence of semen I believe is incorrect and inappropriate.

(Doc. #1070, p. 246). Similarly, Peterson disagreed with McGee's assessment that the levels of acid phosphatase indicated the presence of semen. Peterson testified that a "very high" level would be:

> Hundreds or thousands of units. I don't remember the specific numerical values anymore, but you would get to certain values that were so high that the testing would no longer be linear and so at those levels it would be a reasonable assumption that it was male secretion.

(Doc. #1072, p. 684).

Arden also disagreed with McGee's testimony that the acid phosphatase test results indicated the presence of semen deposited within 24 to 36 hours of Sjodin's death:

> A.   I strongly disagree with his opinion that those AP levels indicated the presence of semen, both for the general reasons as I've summarized here already that those levels alone, that finding alone is not sufficient and specifically because the opinion was offered in the presence of negative male DNA and negative sperm search. So I believe that that

opinion is incorrect.

(Doc. #1070, p. 251).

Consistent with the other expert testimony presented at the evidentiary in this proceeding, Peterson testified that the absence of sperm and male DNA on the specimens that were tested was an important consideration:

> Q.    Are the findings, Doctor, that the sperm search was negative and that the search for any male DNA on either the vaginal, cervical or anal swabs, are those factors significant to you as a forensic pathologist in determining the presence or absence of semen?
>
> A.    Yes.
>
> Q.    Can you explain that, please.
>
> A.    The negativity of the male DNA would indicate that male sperm cells were not there.
>
> Q.    Could it also indicate the absence of male epithelial cells?
>
> A.    It could, yes.

(Doc. #1072, pp. 686−87).  Even without the p30 test results, Peterson disagreed with McGee's interpretation regarding the acid phosphatase results:

> [Based on] what was known in 2004-2005 that there was a negative sperm search and a negative male DNA search, what's your opinion on whether a forensic pathologist could conclude with a reasonable degree of medical certainty that semen was present on the tested swabs under those circumstances?
>
> A.    I would disagree that you could make that conclusion.

Id. at p. 687.

The experts reviewing the evidence in this case opined that McGee's credibility was further undermined by his purported observation of a globule, consistent with a deposit of semen, at the time of autopsy.  Keel rejected as scientifically unsound McGee's testimony

34

regarding the presence of a semen globule that McGee claimed to have visually observed five months postmortem at the time of autopsy. (Doc. #1069, pp. 39–40). If such a semen deposit existed, according to Keel, "it would have had an abundance of p30 and an abundance of sperm." Id. at p. 68.   Arden also discredited McGee's testimony about a globule of semen being present at autopsy:

> So the finding of the globule raises great question in my mind, first, because it wasn't documented, second, because it's a description of something that does not sound realistic to me. I would not expect it to still be there in that location and with that appearance and that viscosity five months later when the rest of the body has severely decomposed. So that in and of itself raises great question in my mind.

(Doc. #1070, p. 254).   Likewise, Peterson deemed McGee's testimony about the purported semen globule unreliable:

> Q.   What's your opinion, Dr. Peterson, regarding whether a globule of semen, as described by Dr. McGee, would maintain its viscosity five months after being ejaculated and deposited in a vaginal cavity?
>
> A.   I'm confident it wouldn't remain in globular form. It would just liquify and disappear.
>
> Q.   Can you explain that?
>
> A.   What?
>
> Q.   Can you explain that?
>
> A.   Semen very quickly liquifies. In fact, I believe it's related to this prostate-specific antigen that allows that to liquify and helps in the process of conception.

(Doc. #1072, p. 691).

Despite the significant questions raised about McGee's opinions and the bases for them, the government has not presented any evidence to support McGee's interpretation of the evidence—not from McGee himself or any other expert.   The unexplained gap

between the evidence relied on by McGee and McGee's conclusion as to the presence of semen renders his opinions on sexual assault excessively speculative and unsupported. The only and overwhelming evidence now in this record is that the lab results (a negative sperm search, no male DNA, and negative p30 results) provide no basis for a forensic pathologist to conclude to a reasonable degree of medical certainty that semen was in Sjodin's body.

This is not a matter of evolving science or technology. (Doc. #1070, p. 270). It is a matter of an expert witness, unbeknownst to the Court, providing a flawed and scientifically unsupportable interpretation of the evidence. As Arden explained, McGee's belief that he found semen is not supported by the evidence because "[t]he negative [test] results took care of that as an issue." (Doc. #1070, p. 348).

The Court was mislead by the misleading and incomplete evidence offered at the evidentiary hearing held to determine admissibility under Rule 702. As it turns out, McGee's opinions were not, as the prosecutor argued at the pretrial conference, a matter of "not controversial science" such that the only dispute pertained to arguments over the appropriate cutoff number. As it turns out, McGee's opinions do not fall into the category of option A that the Court described during the pretrial conference as Mr. Cutting Edge who is the only scientist who knows this information but it is held with a degree of certainty that it is admissible under Fed. R. Evid. 702. Instead, McGee is option B that the Court expressed concern about in terms of Rule 702 admissibility—that is, Dr. McGee is "the only guy in the world saying X is true because [h]e saw Y." It was simple ipse dixit.

Having carefully considered the trial record and the evidence presented in this proceeding, the Court finds, and would have found at the time of the Rule 702 hearing had all the pertinent evidence been presented, that McGee's opinions regarding the presence

36

of semen were unreliable and lacked a scientific basis.  These findings render McGee's opinions inadmissible.  See Onyiah v. St. Cloud State Univ., 684 F.3d 711, 720 (8th Cir. 2012) (quoting Barrett v. Rhodia, Inc., 606 F.3 975, 981 (8th Cir. 2010) ("Expert testimony is inadmissible where, as here, is excessively speculative or unsupported by sufficient facts.")).

### d.    Ineffective Assistance of Counsel Claim

Trial counsel's oversight of the p30 testing as well as the other contemporaneous testing conducted by the Minnesota BCA was neither strategic nor tactical.  The disclosure was made by the government within weeks of the commencement of trial along with other discovery during a time in which all sorts of issues were going on with the government's late disclosures of expert opinions.  The disclosure was not in the form of a lab report, but instead part of bench notes.  Although it is understandable as to how and why the oversight occurred, the undisputed evidence is that it occurred.  And it was an oversight that would have changed the Court's admissibility ruling, which in turn would have changed the nature of the government's evidence and its theory that Rodriguez definitively raped Sjodin and then killed her.

Regardless of whether counsel performed deficiently, in order to obtain relief for ineffective assistance of counsel, Strickland requires that Rodriguez show prejudice.  As the Supreme Court has explained: "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  Rodriguez must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Harrington v. Richter, 562 U.S. 86, 104–05 (2011) (quoting Strickland, 466 U.S. at 694).  This means "a probability sufficient to undermine confidence

in the outcome," which is more than "errors had some conceivable effect on the outcome of the proceeding."  Id.  The errors "must be so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable."  Id.

The jury did not have to resolve, or unanimously agree, whether Rodriguez raped Sjodin in order to find him guilty of the charged offense—kidnapping resulting in death. The government was required to prove that the kidnapping was for some purpose, sexual or otherwise.  A reasonable jury could rely on circumstantial evidence, including the location where Sjodin's body was found (a remote ravine), the condition of her body (hands bound, naked from the waist down, top pulled down from shoulders), as well as Rodriguez's criminal history of sexual assault/attempted sexual assault to find that the purpose of the kidnapping was sexual in nature.  Because of the additional circumstantial evidence, the Court finds Rodriguez has not shown a reasonable probability that the jury's verdict at the guilt phase of the trial would have been different had McGee's opinions about sexual assault been excluded.

With regard to the penalty phase, the purported sexual assault was a piece of evidence that the government generally relied on when advancing its position as to why Rodriguez was eligible for the death penalty and the death penalty should be imposed. However, after carefully studying the closing arguments, it was only one piece of evidence and McGee's particular opinions about sexual assault were not emphasized or highlighted by the prosecutor.  The government primarily focused the jury's attention on Rodriguez's history of victimizing women, the cause of death, and the terror Sjodin endured.  When the government mentioned rape or sexual assault, it was in combination with other evidence—being beaten, stabbed, killed, etc.  In light of the other circumstantial evidence

38

and the government's lack of focus on the scientific evidence to support sexual assault, the Court is not convinced that McGee's inadmissible testimony regarding the presence of semen provided the jurors a reason to reach the verdicts it did during the penalty phases.

### 3.    Decision

Having heard the evidence and carefully reviewed the parties' arguments as presented to the jury at trial, the Court is not convinced that McGee's flawed interpretation of the evidence of sexual assault, while certainly regrettable and unfortunate, deprived Rodriguez of a fair trial.  Long ago, the United States Supreme Court announced that a "[d]efendant is entitled to a fair trial not a perfect one." Lutwak v. United States, 344 U.S. 604, 619 (1953).  This principle has been repeated by the Supreme Court at least twice since it decided Lutwak.  See Brown v. United States, 411 U.S. 223 (1973); Bruton v. United States, 391 U.S. 123 (1968).

Few trials are perfect.  Admittedly, even fewer trials are riddled with error because expert testimony is later proven to be so unreliable that it would have been inadmissible. But, the Court is bound to follow the law, and Strickland requires a showing of an error that goes beyond the possibility of simply having "some conceivable effect on the outcome." Because on this record there is circumstantial evidence, entirely unrelated to the lab testing, from which a reasonable jury could find Sjodin was sexually assaulted and because the presence of semen is not dispositive of the question of whether Sjodin was sexually assaulted, Rodriguez has not shown prejudice—that is, a reasonable probability that the jurors would have reached a different verdict at any stage of the proceedings.  Rodriguez's ineffective assistance of counsel claim with regard to the government's unreliable scientific

39

evidence[1] of sexual assault fails.

**CLAIM 2B: RODRIGUEZ'S TRIAL COUNSEL WERE DEFICIENT FOR FAILING TO ADEQUATELY INVESTIGATE AND CHALLENGE THE GOVERNMENT'S EVIDENCE OF THE CAUSE OF SJODIN'S DEATH AND RODRIGUEZ HAS DEMONSTRATED PREJUDICE.**

There is no dispute as to one aspect of this case—the manner of Sjodin's death was homicidal violence. There were, however, a number of possibilities raised at trial as to the cause of death. The possibilities included: (1) asphyxiation due to ligature strangulation; (2) asphyxiation due to a plastic bag placed over the head; (3) exposure to the elements, particularly frigid temperatures; or (4) slash wounds to the neck. At trial, the government offered testimony from Ramsey County Medical Examiner Michael McGee that the cause of death was two slash wounds to the neck, one of which extended from ear to ear.

When trial counsel discovered they had no expert or basis to challenge the government's evidence as to the cause of Sjodin's death, counsel informed the Court that they would not contest the cause of death and on that basis argued that the number of autopsy photographs presented to the jury ought to be limited. (Doc. #1073, pp. 842–45). While trial counsel prevailed in its attempt to limit the number of autopsy photographs shown to the jury, counsel failed to conduct an adequate investigation of cause of death, which would have informed them that McGee's opinions were unsupported by the evidence and excessively speculative. Because the Court's analysis on this issue is lengthy, it has

---

[1] In his motion, Rodriguez has raised a number of reasons as to why McGee's opinions related to the evidence of sexual assault are unreliable, unsupported, and inadmissible. Because the Court agrees with trial counsel that the expert testimony provided at the evidentiary hearing overwhelmingly and irrefutably establishes McGee's opinions lack a factual or scientific basis rendering them inadmissible at trial, it need not address each specific other challenge raised by Rodriguez.

prepared a summary.

### 1.    Summary of Decision on this Claim

The evidence in the record demonstrates that McGee did much more than merely follow where the evidence and science led him.  Instead, he chose to play the role of a super sleuth, something akin to Sherlock Holmes.  McGee provided the government with a theory worthy of capital punishment.  But more importantly, a theory that was neither contained within McGee's autopsy reports nor disclosed to trial counsel until long after the deadline for expert disclosures had passed.  Worse yet, it was a theory unsupportable by competent evidence.  Trial counsel discovered McGee's theory only two months prior to trial.  Based on the evidence in the record, McGee's opinion that the cause of death was most likely slash wounds to the neck is so speculative that it simply could not have been held to a degree of medical or scientific certainty.  And, given the evidence that has been introduced as part of these proceedings, McGee's position to the contrary was likely knowingly false.

Based on the unrefuted evidence in the record, trial counsel's investigation into Sjodin's cause of death was deficient.  One of the statutory aggravating factors that the jury was asked to consider, and the one that turned out to be the government's focal point in its arguments, was the heinousness, cruelty, and depravity of the offense.  Because trial counsel's deficient performance resulted in prejudice to Rodriguez during the penalty phases of the trial, the law and the Constitution demand that this Court vacate Rodriguez's sentence and order a new penalty phase trial.

### 2.    Analysis

####   a.    *Trial Testimony on Cause of Death*

Michael McGee, the medical examiner for Ramsey and Washington Counties of Minnesota, received a telephone call on April 17, 2004, around 6:00 p.m. from a BCA field agent indicating that law enforcement had found a body within the area McGee serves and that the agents would be shipping the body to Ramsey County once the field investigation was completed.  (Doc. #712, pp. 175–76).  Sjodin's body arrived at the Ramsey County Medical Examiner's Office several hours later, shortly before midnight.  Id. at p. 176.

McGee performed an autopsy the following day.  He prepared two reports—a provisional report and a subsequent final report.  The final report lists the cause of death as simply "homicidal violence."  (Doc. #1071, pp. 506–07).  At trial, McGee testified about the condition of the body, noting the presence of decomposition on parts of it.  He indicated the area with the most tissue loss was from the left scalp to the upper neck region.  (Doc. #712, pp. 179–80).  More specifically, decomposition resulted in the complete loss of soft tissue, vessels, arteries, and veins in the neck area.  Id. at pp. 233, 242.

McGee testified he found the following injuries on Sjodin's body during the autopsy:

- a bruise on the right cheek region about an inch in diameter and a smaller similar injury just below that area (Id. at p. 180);

- a 1-by-2 inch bruise on the back of Sjodin's right forearm (Id. at p. 181);

- a 1.5-by-5 centimeter oval to elliptical shaped perforation on the right lateral flank region (Id.);

- a penetrating wound about 8 centimeters deep in the right internal abdominal region that extended from the elliptical shaped injury on the right flank area that did not touch any internal organs and would not be fatal (Id.

at pp. 184, 240–41); and

- "A large gaping wound to her neck area caused by a sharp-edged instrument that extend[ed] across her entire anterior neck region measuring 13.5 centimeters in length. That is about five and a half, five and a quarter inches in length. A second possible incision wound was observed to the left neck region measuring eight centimeters in length, about three inches in length." (Id. at pp. 180–81; 185–86).

When asked by the prosecutor to "describe" the injury to the neck area, McGee testified as follows:

A.    It's a sharp-force injury; that is, you classify injuries on bodies due to sharp-force instruments as a sharp-force injury, in this case a cut or a slash. It has a sharp well-formed edge that is notched and has a scalloping to it.

Q.    What you mean by the term 'notched' or 'scalloping'?

A.    If you look at the edge of the wound, it will – instead of going across the subject's neck in a uniform straight pattern, it will go and then stop and slightly scallop and then begin again and then slightly scallop and again begin again. So it almost looks like gentle waves on the edge of the wound.

Q.    In your experience what does that signify?

A.    The weapon that was causing the slash of the neck was being plunged into her neck.

Q.    Describe that process for us that would create marks like that.

A.    I believe the waves or the notching, whatever term you wish to use, is consistent with repositioning the knife so as the knife is plunged inside

43

the neck it's going to cut to that depth and being drawn across it will cause one in which as it's repositioned and you're moving across the neck it will get that notched or that hesitation-like mark instead of making a uniform draw all the way across a body.

Q.   What would cause that?  Why would you be repositioning bringing it across?

A.   Because I think the knife is probably striking the internal neck organs and is coming to rest and withdrawing it and plunging it again.

* * *

Q.   Now the margins of the cut that you've described as the three and a half, three and an eighth inch; is that correct?

A.   Right.

Q.   Cut on the bottom there, could you tell us whether there's any of that notching on there that is visible to you?

A.   There is some but it is less distinct on the side marks. So on the side mark, this mark, I believe on the autopsy protocol I call that a possible incision-type wound because it does not have the distinct marking that was present on the more superior wound.

Q.   And why is that?  Why does your examination of that lead you to this conclusion?

A.   Well, because it has a different appearance and because there is the decomposition process present and, you know, you want to make sure you don't overstate your findings so that's why I said that. I said that this is a slice or incision-type wound. And this I think is – to the best of my ability I think that is one, too.  It's just it didn't have those marks. I gave it that terminology.

Q.   Is it your opinion or not then that this bottom one, it's still a sharp-force incision on Miss Sjodin's neck?

A.   I believe it is a sharp-force injury, yes.

44

Id. at pp. 186–89.

McGee further testified that he did not find any injuries on Sjodin's body that would indicate her body had been dragged, although he acknowledged that those types of injuries would not be found if the victim was clothed. Id. at p. 240. While McGee told the jury that decomposition of the body prevented him from opining to a degree of medical certainty whether Sjodin was killed at the location where her body was found or some other location (Id. at pp. 217–18, 243, 252–53); he nevertheless testified that he believed Sjodin's neck was slashed where her body was found based on the absence of significant blood inside Rodriguez's vehicle or on Sjodin's clothing. Id. at p. 224. Finally, McGee testified that he believed the neck wounds and flank stab wound were consistent with the type of blade similar to the 4-inch lock-blade found in Rodriguez's vehicle. Id. at pp. 226–27, 229.

As to the cause of Sjodin's death, McGee identified a total of four possibilities, although he essentially ruled out two of them: asphyxiation caused by a plastic bag placed over Sjodin's head; strangulation from the cord found around her neck (not likely because of the lack of petechiae); slash wounds to her neck; and exposure to the cold if the neck wounds were not fatal (not likely given the nature of the slash wounds). Id. at pp. 219–20, 236–37, 249–51. McGee opined that the most likely cause of death was the slash wound to the neck. Id. at p. 223.

### b.   *The Government's Arguments to the Jury Regarding Cause of Death*

McGee's testimony had a profound impact on the government's guilt phase closing argument. Based on McGee's testimony, the government argued to the jury that Sjodin's

throat had been "slashed at least two times, with one of the cuts extending 13 and a half centimeters in length across from one side of her throat to the other, and the other cut running parallel to the first cut extending eight centimeters in length." (Doc. #713, p. 95). The prosecutor further argued "[d]eath still took long minutes . . . from an injury like that" and "it most likely occurred out in that ditch." Id. The government told the jurors that they did not need a medical examiner to tell them that "two gashing wounds such as Dru sustained to her neck did not create the blood pattern that was left in [Rodriguez's] car." Id. at p. 97. According to the government, the evidence "strongly supports the doctor's other opinion that the neck wounds and certain death were inflicted at the death scene where Dru's body was found." Id.

While summing up the evidence for the jury, the government discounted the possibility that Sjodin's death could have been caused by the cord around her neck, arguing:

> Now a layperson might assume that Dru had been strangled and it would be reasonable when you look at it in addition to all of her other injuries. But the forensic investigation, according to Dr. McGee, showed that it did not appear that she was strangled, at least not strangled to death, at least not enough to burst the blood vessels.

Id. at p. 96.

In the defense closing argument, trial counsel argued that Sjodin could have died in the mall parking lot—an argument ridiculed by the prosecution, which claimed the defense theory "makes no sense" because it could not and did not explain why Rodriguez cut Sjodin's throat. Id. at p. 142. The government flat-out rejected any possibility that Sjodin's throat had not been slashed, arguing:

> Now [defense counsel] also suggested that Dru could already be dead

46

in the parking lot.  He didn't explain though if she's already dead then why the defendant would have cut her throat. If she's already dead from suffocating in the car, then why does he cut her throat?  There's no reason to at that point, absolutely none.  And why take her pants off if she's already dead at that point unless he's suggesting that he raped her in the parking lot and then she died and then he took her out to where he left her body and cut her throat. Makes no sense.  There's no reason for it. If she's already dead it doesn't do anything to cut her throat. That's not how it happened.  And you know he didn't cut her throat in his car. Mr. Wrigley already talked about that.  There would have been way too much blood.  It did not happen that way. The evidence doesn't support that one bit.

Id. at pp. 141–42.

The government also disparaged defense counsel's theory that the cause of death could have been asphyxiation due to strangulation caused by the plastic bag over her head and the ligature, calling that possibility "just a red herring . . . something [counsel's] thrown out there as a mere possibility to distract you from what the real issues in this case are and what the evidence in this case is." Id. at p. 147.

After the jury found Rodriguez guilty of kidnapping resulting in death, McGee was recalled to testify during the eligibility phase of the penalty portion of the trial.  The government again discussed the injuries McGee found during the autopsy, including the location, nature, and length of the knife wounds on Sjodin's neck. (Doc. #716, pp. 143–45). The purported knife wounds became paramount to two issues before the jury at the eligibility stage: the threshold intent factor and the statutory aggravating factor of whether the murder was especially heinous, cruel, and depraved.  Specifically, the government argued Rodriguez made his intentions "most clear" by the neck wounds.  According to the prosecutor, Rodriguez ensured he would "face no witness" and "was not going to have another living, breathing witness around to send him off to prison, this time for good." The

prosecutor continued:

> A 13 ½ centimeter cut, ear to ear, notched from the knife, positioning and repositioning.  An 8 centimeter cut for good measure and more notching. Certainly certainty that his murderous intent was successful.  Dru Sjodin would not breathe a word of this to anyone, not one single breath.  That was his intent.

(Doc. #717, p. 56).

The government also argued the facts were established to support the third aggravating factor in that Rodriguez killed Sjodin in an especially heinous, cruel, or depraved manner.  The prosecutor referred the jury to the facts "touched on" earlier and directed the jury to consider what Sjodin endured, which included the cause of death as described by McGee:

> Pause and think - - because you're asked to assess, pause and think of what Dru endured.  Respectfully the United States asks you to think of what she endured.  Don't allow the sterility of the courtroom to impose simplistic labels on things and then brush by them. Kidnapped? Check. Sexual assault? Pretty apparent. Check. Resulted in death? Yep, she's dead. Check.
>
> When a young woman is forcibly abducted, punched, slapped, rendered bloody, bound and bagged, stripped of her clothing revealing her nude body to her attacker, further assaulted, hauled around in her attacker's vehicle for hours as was the case here, then snuffed out with two vicious knife cuts to her neck, this is set apart from other killings.
>
> In this aggravating factor, as this aggravating factor requires, the defendant's acts were shockingly evil.   They were extremely wicked. Remember how he treated his other victims? Threats and demands that they do as he ordered or he'd kill them.  Think of the hours that Dru endured. Bleeding, beaten, raped, threatened, terrorized, and fearing for her life. That is what she endured.  And that is what Alfonso Rodriguez inflicted on her.
>
> Alfonso Rodriguez was indifferent to any pleas that she was able to make, any begging for mercy that she could muster.  Alfonso Rodriguez was

utterly indifferent as he escalated his assault to be punctuated by his ultimate murderous infliction of homicidal violence.  The defendant murdered Dru Sjodin and in an especially heinous, cruel or depraved manner, just as this statute sets out.

The third aggravating factor, ladies and gentlemen, is proven beyond a reasonable doubt.

(Doc. #717, pp. 62–63).   The jury agreed with the government's arguments and interpretation of the evidence.

Having found Rodriguez eligible for the death penalty based on its findings that intent was proven as well as three of the four statutory aggravating factors alleged by the government had been proven, the Court proceeded to the final phase in which the jury was asked to determine the appropriate punishment.  The government's arguments supporting imposition of the death penalty were premised on its claims that Rodriguez:

(1)     had great self-control;

(2)     hatched a plan, which included murder from the very beginning, so there would be no witness to his evil deeds;

(3)     kidnapped Sjodin at knifepoint, beat her, and hauled her around in his car while looking for a spot to rape her;

(4)     eventually stopped his car to rape Sjodin and then drove her to a remote place only he was familiar with; and

(5)     marched Sjodin naked from the waist down (while bound with hands behind her back, gagged, a plastic bag over her head with a rope around her neck) to the ravine where he then slashed her throat, and left her to bleed out, alone,

scared, and incapacitated in the freezing cold.

The government's final plea to the jury to impose the death penalty rested largely on McGee's testimony and focused the jury's attention, multiple times, on the neck wounds and the horrific nature of Sjodin being marched to the site of her heartless summary execution. The government's impassioned closing argument sought to emphatically discredit any possible defense theory while emphasizing and highlighting McGee's testimony:

> When Dr. McGee testified, you may or may not recall me asking, but I did, when you did your complete body autopsy, Dr. McGee, and assessed each of the defects - - everything is so clinical, isn't it, when we talk about these things - - did you see a single drag wound of any kind or injury to Dru Sjodin at all consistent with dragging of any kind?  None.

> Ladies and gentlemen, Dru Sjodin walked  - -  she was forced to walk down that embankment.  She was not dragged down there off of that road where only a car could go and dragged down through there over the point, over the hump and in there.  She walked with her hands bound behind her back, naked from the waist down.  She had already been sexually assaulted, physically assaulted.  She had a bag over her head.  You saw the little cord on that by the way, little cord, not tied, not secured in any way, just over holding the bag in place.  She had the knife wound to her side.  Dr. McGee told you that didn't happen in that car.  There was no blood pattern to be consistent with that, and that makes sense.  You know that.  You saw the blood.  You don't need a medical examiner to tell you that.

> Dru Sjodin was marched, she was shivering, she was cold, she was scared, and everything else that goes along with the torture that you found.  She was marched down that embankment into the night, into the freezing night and over to the point where her death occurred.

> We've all come to agree, I think, she didn't freeze to death out there. . . . Nobody believes that's what happened in this case.  It's obvious.  You also don't slit the throat in the fashion twice that Dr. McGee described to a dead body as some have postulated somewhere along the line in this case.  That's how Dru Sjodin died.  The grave ear-to-ear knife wounds.  Dr. McGee

described them for you. I'm not going to do it again. You know enough about this case, you've seen enough, there's already too much. It's not going to be erased, as I said earlier.

You need, when you're weighing, to think about that act. A hand had to draw that knife across her throat. The defendant's. And somebody with a knife being drawn across their throat in the fashion described by Dr. McGee is not going to be standing still. You know that, too. And so the defendant secured her somehow and he prepared to do what he had to do to ensure that he would not be caught after living out his rape fantasies. Somehow he held her and he plunged the knife into her neck and he drew it across her neck, and it got stopped, as Dr. McGee said, by tissue and had to be repositioned again and again and again. Ear to ear. And then again 8 more centimeters. Left to die bleeding for how long? A minute? Two minutes or three.

Ladies and gentlemen, I told you in my first closing argument, my first closing comments, that Dru Sjodin is right here with us in all that the evidence represents about this case and everything that happened to her and everything that he did to her, everything that he intentionally inflicted on her. Well, Dru Sjodin is here, but I must speak for her.

And only you, joined together to speak as one, can bring justice. That's what this case is about. In this case, this is the right case, in this case justice is a penalty of death.

(Doc. #725, pp. 63–66). The jury selected the death penalty as the appropriate punishment.

        c.    *Post-Trial State Court Finding's Regarding McGee's Lack of Credibility*

The Court begins its analysis with the public and troubling fact that longtime Ramsey County Medical Examiner Michael McGee has a well-documented history of providing false or inaccurate testimony in court. McGee's testimony has been proven to not be supportable by science. For example, in July 2011, Douglas County Judge Peter Irvine found that McGee gave false testimony in the case of State of Minnesota v. Michael Ray Hansen.

Hansen was charged with murdering his infant daughter in 2004.  (Doc. #755).  McGee testified baby Hansen died of a skull fracture caused by blunt force trauma while in her father's care.  In the post-conviction relief proceeding, none of the five physicians who reviewed the case agreed with McGee on the cause and manner of death.  They determined the skull fracture showed signs of healing and could have been caused by an accident six days before the baby died.  The reviewing physicians found it more likely that the baby accidentally suffocated to death while sleeping on a futon with Hansen and her three-year-old sister.  Following the order for a new trial because of McGee's unreliable and false testimony, the State dismissed the charges against Hansen.  (Doc. #755-6).

In another case, the Wisconsin Court of Appeals found defense counsel was ineffective for not investigating and challenging McGee's conclusions on cause of death. State of Wisconsin v. Evan Zimmerman, 669 N.W.2d 762 (Wis. Ct. App. Aug. 12, 2003). McGee performed the autopsy and testified the victim died on February 26, 2000, due to asphyxia caused by ligature strangulation.  McGee also opined that a telephone cord found in the defendant's van might have been the object used.  Id. at 768.  McGee further testified that the victim's nasal secretions had dried in such a way to suggest she had been sitting upright, possibly in the passenger seat of the defendant's van, and not lying down when the secretions drained and dried.  McGee also said it was possible the victim was strangled inside the van, but the crime did not appear sex-related.  Id.

During the hearing to determine the defendant's claims for post-conviction relief, Milwaukee medical examiner Jeffrey Jentzen testified on the defendant's behalf, challenging most of McGee's conclusions.  Id. at 772.  Jentzen concluded the telephone cord

was not the murder weapon based on the marks left on the victim's neck; the nasal secretion pattern was consistent with forming while the body was lying down, not sitting upright as McGee testified; the victim's wounds were inconsistent with strangulation inside the van by someone in the driver's seat; and the crime appeared to be sex-related. Id.

Based on Jentzen's testimony, the Court of Appeals reversed the conviction and ordered a new trial. The prosecutor eventually dropped the murder charges because he lacked sufficient evidence to prove the defendant killed his former girlfriend. (Doc. #755-11).

In yet another case in Minnesota, McGee's trial opinions formed the basis for a murder conviction as well as the state's theory that the defendant killed his wife by causing her to fall overboard and then running over her with the boat. McGee, testifying as the state's forensic pathologist, provided critical evidence to show the jury that the death was intentional, not accidental. The Minnesota Supreme Court summarized the significance of McGee's testimony when analyzing the issues raised on post-conviction relief:

> Some of the most critical evidence supporting the state's theory was testimony from medical experts indicating that Jane's death was not accidental. The first medical expert who examined Jane's body was Dr. Lyle Munneke, a Kandiyohi County medical examiner. Upon examination, Dr. Munneke noted that bruising covered Jane's forehead and nose, left and right sides of her face, and the underside of her hairline to the top of her head. Dr. Munneke also observed a cut on the right side of her mouth.
>
> In addition to the injuries Dr. Munneke observed, Dr. Michael McGee, the forensic pathologist who performed the autopsy, found hemorrhaging beneath the facial injuries. Dr. McGee believed that these injuries occurred while Jane was alive, and used a life-sized clay model of Jane's head to demonstrate that 'a single blow' probably did not cause the damage to both sides of Jane's face. Dr. McGee answered in the affirmative when asked whether multiple strikes from a boat hull-possibly the appellant's could have caused the injuries.

Dr. McGee also testified about Jane's other injuries. He stated that the laceration on the side of her mouth was premortem and could have occurred when a boat hit her mouth and stretched it to the point of tearing. Furthermore, he explained that postmortem abrasions on the backs of her hands and forehead may have been caused by her body sinking and scraping the bottom of the lake while floating face down.

Dr. McGee's testimony undercut appellant's theory that the drowning was accidental. Specifically, Dr. McGee noted paired injuries to the upper forearms that he classified as defensive wounds and soft tissue hemorrhages inside the neck region that did not have corresponding external marks. When asked about the neck trauma, Dr. McGee testified:

Q. Could that have been done by the hull of a boat?

A. I think not.

Q. Could that have been done with a hand, in particular a hand used thus in the V position?

A. I believe that is possible, yes.

Taken as a whole, Dr. McGee's testimony reinforced the state's theory that appellant forced his wife overboard. His testimony was also consistent with Chandler's testimony that because Jane's body resurfaced nine-tenths of a mile from the last-seen point, she probably sank to the lake bottom after drowning at a location different than appellant identified.

State v. Rhodes, 627 N.W.2d 74, 79–80 (Minn. 2001).

In light of the affidavits presented by habeas counsel calling into question McGee's opinions indicating that the case of Jane's death was intentional and not accidental, the Minnesota Supreme Court concluded that the trial court erred by not holding an evidentiary hearing on the defendant's claim of ineffective assistance of counsel for failing to thoroughly challenge the state's expert, McGee, or to provide thorough countering medical testimony. State v. Rhodes, 627 N.W.2d 74, 88 (Minn. 2001). In particular, defendant's habeas counsel presented an expert opinion, supported by several law and medicine journal articles, concluding:

> The injuries to Jane Rhodes' neck musculature may also be attributed to one or more of the following causes: hypostatic change, post-mortem leakage of venous blood, post-mortem traumatization and breaking of the cadaveric rigidity during recovery or transport of the corpse, extravasation of blood into the tissue spaces as a result of the handling of organs and the incision of vessels during routine post-mortem examinations.

State v. Rhodes, 657 N.W.2d 823, 833 (Minn. 2003).  The expert further concluded that "the injuries to Jane's forearms, characterized by Dr. McGee as 'defensive wounds,' and to Jane's face, caused by 'multiple blows' according to Dr. McGee, were consistent with her body scraping the bottom of the lake.  Id.

The trial court held an evidentiary hearing on the defendant's claims for post-conviction relief.  During the hearing, the defendant called three medical experts, who, upon their review, found that the injuries to Jane's body, with the exception of the hemorrhage in the scalp which could have been caused by the hull of the boat, were typical in drowning victims and there was no scientific basis from the microscopic slides to conclude when the injuries occurred.  Id. at 885.  The Minnesota Supreme Court subsequently affirmed the trial court's denial of relief, determining Rhodes' habeas claims were not cognizable because they were based on strategic decisions of counsel and there was sufficient evidence in the record to support the jury's verdict.

The common thread in these cases is that McGee interpreted the evidence from his autopsy examination in a manner that was subsequently determined by other physicians and forensic pathologists (as well as the court in two instances) to be unsupportable. McGee's testimony was so critical in two of the cases that after his opinions were cast into doubt, a new trial was ordered.  Eventually, the prosecutors dropped the charges because,

without McGee's interpretation of the evidence, they lacked proof beyond a reasonable doubt to prove the offense.

### d.    McGee's Speculative and Unsupported Opinions in This Case

Regrettably, the same pattern of speculation that was found in other cases involving McGee's interpretation of the evidence is present in this case.  What the Court has learned through evidence presented in these post-conviction proceedings is that the government's theory as to what happened on November 22, 2003, to Dru Sjodin is entirely speculative and not supported by any other forensic pathologist who has reviewed the evidence.

McGee, the only witness who testified at trial as to the cause of Sjodin's death, provided the evidence that allowed the government to portray the death of Sjodin as something other than the typical sexual assault that ended in murder, which while tragic, unfortunately happens in our society.   Instead, the McGee testimony allowed the government to argue that the crime involved horrific and tortuous offense conduct committed over the course of hours ending in a harrowing march of Sjodin at knifepoint to a remote area, where she was slaughtered like an animal, her throat slit and her life slowly bleeding out on the cold frozen ground.  If McGee's conclusions were actually supported by the evidence, Rodriguez's ineffective assistance of counsel claims and constitutional claims could be resolved with little difficulty.  But, the record now makes plain that McGee's conclusions are unsupported and unsustainable as to the cause of death and that trial counsel failed to adequately investigate McGee's conclusions, which would have shown them to be scientifically invalid.

Even though trial counsel raised the "possibility" at trial that McGee could be

mistaken during cross-examination, the lack of investigation left the bases and evidentiary support for McGee's opinions unchallenged. Having carefully studied the trial record and the evidence presented at the evidentiary hearing held on this issue on June 20–23, and September 11, 2017, for the reasons outlined in the following pages, it is evident that McGee's interpretation of the evidence and conclusions regarding the cause of Sjodin's death are inconsistent with the evidence documented at the crime scene and upon examination at autopsy, rendering them excessively speculative and inadmissible. Had trial counsel performed adequately, counsel would have been able to develop evidence to exclude or refute McGee's testimony on the cause of death and the jury would have heard a different case—one in which there is a reasonable probability that but for counsel's errors the outcome of the penalty phases would have been different.

i.   *Dr. Mark Flomenbaum*

Dr. Mark Flomenbaum reviewed the evidence in this case, prepared a report, and testified at the evidentiary hearing. Flomenbaum, who at the time of the hearing was the Chief Medical Examiner for the State of Maine, did not question the protocols McGee followed during the autopsy. (Doc. #1069, pp. 79, 188). In fact, Flomenbaum testified that McGee presented his materials in a "very standard" manner, including detailed descriptions and documentation of his findings. Id. at p. 188. Flomenbaum, however, testified as to why McGee's interpretation of the evidence was demonstrably inconsistent with forensic science such that McGee's ultimate conclusion on the cause of Sjodin's death was not scientifically sustainable.

The government did not question Flomenbaum's qualifications as an expert, as he

was an experienced forensic pathologist who had conducted in excess of 2,000 autopsies; determined the cause of death in over 8,000 cases; and had been qualified as an expert in forensic pathology in well over 200 trials in at least a dozen different jurisdictions. Id. at pp. 84, 87. Flomenbaum offered convincing and credible testimony demonstrating that every single one of the "defects" relating to a stab or slash wound identified by McGee can be "easily explained by the postmortem changes of decomposition." Id. at p. 103.

Although McGee noted the presence of decomposition during his trial testimony, he gave no appreciable weight to the notion that the condition of the neck area and the flank area (the two areas McGee identified as sustaining knife wounds) could be the result of post-mortem changes due to decomposition and/or animal predation.   In contrast, Flomenbaum, without reservation, testified there was no evidence that Sjodin's neck had been slashed with a knife or that she had been stabbed in the side with a knife. Id. at p. 114, 146.  Flomenbaum "disagreed totally" with McGee's knife wound interpretation of the evidence on Sjodin's side based on the nature and location of the defect. Id. at p. 148. Flomenbaum explained to the Court the defect identified by McGee:

> [T]his represents part of the decompositional process where the skin splits. There is really no evidence of anything sharp having caused it. But much more importantly the orientation of this split, as well as the orientation of the splits in the body, are following very closely the anatomical lines of skin.  There are elastic properties to skin which are well-known and well-documented, and if the skin splits from nonviolent reasons it's going to follow a certain path. It's going to follow the graininess of the skin and this is doing exactly that.
>
> We can see in this photograph that above and below the long defect lines it's absolutely parallel to the minuscule folds in the skin, and this is how we expect the skin to split when it's done so by decomposition. Had it been oriented perpendicularly as the knife cut through those lines, it would have been gaping obviously in the other direction and would have looked very

different than this. This is very parallel to the lines in the body where we
expect postmortem changes to occur, as is the case in many of the other ones
[McGee] described.

Id. at pp. 148–49.  On cross-examination, Flomenbaum acknowledged that nothing is

"impossible" as to the cause of this defect, and provided further reasoning for his opinion

as to why the defect was not the result of a knife wound:

> Nothing is impossible but if you look at where this is located on the
> body I grant you fully it's not in a place that's normally moist but it's right on
> the border between where the body was on the ground and where it might
> have been somewhat off. You could actually even see where the postmortem
> blood was pooling marking that dark green line right nearby. No, it's not a
> moist part of the body but it's in a perfect location to give all these other
> postmortem artifacts an excellent opportunity to respond.

> Yes, she could have had a knife wound there which started it. Yes, she
> could have been dragged and scraped. Yes, she could have had a pimple that
> she itched. Why that spot and not a spot an inch above it, they're all possible.
> But there is right on the border between where animals can get to. You can
> see the imprint of the hay around it and then nothing above it.  And to me
> way more important is that the split is directly on those cleavage lines of the
> skin, which is the exact lines the body is going to take if it's going to split
> rather than be injured.

Id. at pp. 178–79.

McGee's testimony that this defect on Sjodin's side was a stab wound perpetrated by

Rodriguez was challenged only through limited cross-examination at trial.  The jury heard

no competent evidence to the contrary.  Although it was undisputed that this wound was

not fatal, the government emphasized its significance to the jury at the eligibility phase of

the penalty portion of the trial.  Specifically, the government argued that Rodriguez

"stabbed Dru in the side, but not through her clothing.  That was a coercive wound. A

control wound.  Make no mistake, though, it was torturous and it was serious." (Doc. #717,

p. 56).  According to the government, this "stab wound" (which to a degree of medical certainty is likely nothing more than a post-mortem artifact) was significant and relevant to the statutory aggravating factor pertaining to whether the offense was especially heinous, cruel, and depraved.

Flomenbaum's testimony also raises significant questions about McGee's interpretation of the evidence regarding Sjodin's neck.  He testified that McGee's conclusion that Sjodin's neck was slashed is inconsistent with the evidence for three reasons: (1) there is no indication there was any bleeding from the neck area to support McGee's slashing theory, and certainly not the quantity that would be present at the scene or on her clothing; (2) several photographs of Sjodin's neck area plainly depict "notching" in the form of "classic rodent activity;" and (3) a slash wound from a knife would have "a very sharp line" and if there was some sort of hesitation or resistance, it would show as "sharp Vs," not casual "scalloping" or very shallow semicircles similar to the letter C, which are depicted in the autopsy photographs.  Id. at pp. 114, 116, 138, 144.  As detailed by Flomenbaum:

> Notching does not occur as hesitation or broken injuries. You do get things to look at but not this.  Notching almost never - - real notching is - - the notching that looks like rodent teeth, that type of notching will not occur in cut wounds. It just doesn't.

> Hesitation marks are different and repositioning the knife is a possibility. If it's a stab wound you go in one direction, twist the knife, come out another, yes, you will get funny sorts of patterns but not notching and not this. And I hear what [McGee] says.  I just totally disagree with his [McGee's] interpretation.

Id. at pp. 134–35.  While almost all of the tissue and internal structures of the neck were gone, a remaining strip of skin contributed to McGee's conclusion that Sjodin's throat had

been slashed.  The presence and significance of that strip of skin was explained by Flomenbaum:

> The plastic bag and rope essentially caused the skin to be tightly adherent to the underside of the plastic bag and the pressure from the rope is what kept it tight and squeezed, kept the skin squeezed. And it protected that strip of skin that was tightly adherent just there, protected that skin from the rodent activity that completely removed all the soft tissue from the rest of her neck.

Id. at pp. 120-21.  Notably, some of the plastic bag that remained contained "the same gnawing-type teeth activity."  Id. at p. 122.  With regard to the rope, according to Flomenbaum, it was not "just a rope around Sjodin's neck" like the government argued (see for example, Doc. #725, p. 64, government selection phase closing argument: "you saw the little cord on that by the way, little cord, not tied, not secured in any way, just over holding the bag in place. . ."); rather, the rope was "really tight," approximately 11 inches in circumference, maybe smaller, but enough to constrict the neck considering an adult neck collar size is typically between 12–14 inches.  Id. at pp. 105–06.  Flomenbaum also opined that the strip of skin was "furrowed," an additional indication that the rope was tight around Sjodin's neck.  Id. at p. 105.

Flomenbaum acknowledged there was one aspect of this case that the evidence does not disclose and science cannot determine—that is, whether the rope was placed on Sjodin's neck before or after she was killed.  When Flomenbaum initially assessed the evidence, he believed it was likely Rodriguez strangled Sjodin with the rope, causing her death.  Id. at p. 171.  To him, it seemed counterintuitive for a perpetrator to place a tight ligature around a victim's neck after she had been killed.  But, when additional evidence was presented to Flomenbaum, including a narrative from Rodriguez in which he stated that during the

struggle to control Sjodin he accidentally killed her by putting too much pressure on her neck, Flomenbaum could not rule out the possibility that the rope was placed around Sjodin's neck after she was killed in order to hold in place a plastic bag around Sjodin's head to contain bleeding.

This new information did not alter Flomenbaum's opinion that the evidence showed the cause of death was asphyxiation. Only Rodriguez knows whether he caused Sjodin's death by manual strangulation or blunt force trauma to the neck. This detail is, however, insignificant to the Court's analysis of the particular claims before it. What is significant is Flomenbaum's convincing and credible testimony that there is insufficient evidence to sustain McGee's testimony that Rodriguez slashed Sjodin's throat, causing her death. Flomenbaum's expert opinion as to McGee's interpretation of the evidence regarding the cause of Sjodin's death can be summed up with this excerpt from Flomenbaum's testimony:

> I don't see any evidence of a slash wound let alone causing her death. . . . We don't see the blood. We don't see any indication that there was ever any bleeding. It's just not there. All those injuries to the neck are postmortem, and none of them had anything to do with a knife or any sharp object.

Id. at pp. 141, 144.

### ii.    Dr. Jonathan L. Arden

In addition to Flomenbaum, another forensic pathologist, Jonathan L. Arden, also reviewed the evidence, prepared a report, and testified at the evidentiary hearing. Arden is an independent consultant, part-time medical examiner in West Virginia, and a member of the National Association of Medical Examiners. (Doc. #1070, pp. 199–201). Having performed some 3,000 forensic autopsies, id. at 204–05; been qualified as an expert in

25–30 state court jurisdictions and 6 federal courts, id. at 207; and testifying in court over 900 times, id. at 275, the government did not challenge Arden's expert qualifications.  Like Flomenbaum, Arden opined that the defects in Sjodin's neck were the result of "a combination of postmortem decomposition, the breakdown of the tissues that occurs after death by multiple mechanisms, and it also includes additional tissue loss caused by the actions of animals eating the tissues. . . . animal depredation." (Doc. #1070, p. 215).  Arden could find "no evidence whatsoever" to support a conclusion to a degree of reasonable medical certainty that Sjodin sustained a sharp force injury to her neck.  Id. at pp. 215–16.

Contrary to McGee's conclusions, Arden explained that because of the substantial alteration and destruction of the neck tissues by the postmortem processes, there is no evidence that is "indicative or suggestive of a sharp or sharp force injury." Id. at p. 216.  On cross-examination, Arden acknowledged that almost anything is "possible" and there could be some "possibility in the universe" that Sjodin sustained a slash wound, but there was absolutely no evidence to either support that conclusion or to make that conclusion.  Id. at p. 285.

Arden was able to see several features that he testified are conclusive to the post-mortem processes.  Those include: discolored tissue, superficial layers of tissue that have "slipped away;" areas where the tissue is gone; and remaining tissue margins have "notching" or "scalloping," which is indicative of the tissue breaking down and animal feeding.  Id. at pp. 217–18.  These features led Arden to conclude an "outright diagnostic of postmortem decomposition with animal depredation." Id. at p. 218.

Arden discredited McGee's conclusion that the remaining strip of tissue on Sjodin's

neck (which in Arden's opinion the rope preserved, or at least prevented animals from

getting to that tissue) showed signs of a knife being repositioned, explaining:

> I would expect to see some really jagged cut marks going in different directions with some intersections to fulfill the opinion that you've just described from Dr. McGee concerning repositioning.

> We don't have any of those jagged intersecting angulated marks here. We have kind of a gentle undulation of the lower margin of that strip of tissue[.]
>
> * * *
>
> So this strip of tissue not only doesn't have the features that are indicative of a sharp edge or repositioning of a sharp edge but its junction with the lower corner, which is just slightly to the right, our right of the center of the photograph, itself has features that are typical of postmortem processes.

Id. at pp. 219–20, 226.  Like Flomenbaum, Arden described the marks that would be

indicative of a knife being plunged and repositioned as "intersecting sharp wounds and

margins like V shapes and Y shapes."  Id. at p. 221.  Arden saw "none of that" in the

evidence in the record.  Id. at p. 222.

Arden also casts doubt on McGee's conclusion that Rodriguez had stabbed Sjodin

on the right side.  Upon his review of the evidence, Arden informed the Court that "there

is not sufficient evidence on which to base an opinion with reasonable medical certainty

that the sharp or sharp force injury occurred in this location."  Id. at pp. 229–29.  Arden

noted McGee's lack of documentation to support his conclusion, which he testified "would

have been a critically important piece of that autopsy, and there was no photographic

documentation of those purported findings."  Id. at p. 233.  According to Arden, the proper

procedure to document a knife wound requires two components: (1) a detailed description

set out from other parts of the report, and (2) both external and internal photographs of the areas. Id. at pp. 233–34.

Arden also viewed McGee's conclusion about the right flank defect as inconsistent with the evidence because there were other areas on Sjodin's body, such as her knee, that were similar in appearance to the flank defect, but McGee interpreted that defect differently and did not characterize the knee defect as a stab wound. Id. at p. 231.

Arden also inserted doubt about McGee's trial testimony connecting the knife wounds he opined were on Sjodin's body with the knife recovered in Rodriguez's car:

> Ordinarily and very commonly it is possible to opine as to whether a given knife is consistent with a given injury or inconsistent. And in actual practice most knives are consistent with most stab wounds, and almost any sharp implement is consistent with virtually every cutting wound. So it is almost never feasible or reasonable to associate a given knife with a given wound to any degree of medical certainty, other than the broad term of consistency.

Id. at p. 235. Given the evidence in the record in this case, Arden, as did Flomenbaum, called into question the conclusion made by McGee regarding the purported knife wounds and Sjodin's cause of death:

> Q.   In your opinion, Doctor, given the amount of postmortem decomposition and animal depredation in the neck and flank defects, were there sufficient evidence from which a forensic pathologist could conclude with a reasonable degree of medical certainty that the knife recovered from Mr. Rodriguez's car or its duplicate was consistent with the neck wound or flank wound in Ms. Sjodin's body?

> A.   Well, I have to preface my answer with -- first of all, I hope it's clear that in my opinion those are not wounds, the neck and the flank. They are not wounds. They are not knife wounds. There are absolutely no features whatsoever to permit such a conclusion to a reasonable medical certainty.

65

> If I assume for the sake of your question that those are or at least could be knife wounds, first of all, there are no features of the neck wound which would be a cut or a slash that can allow you to associate it with any particular knife or sharp implement. And we've already gone over why that is the case so I won't belabor that point.
>
> Even if I turn my attention to the flank defect and again for the question assume it is a stab wound, it does not have any of the features at the time of autopsy that allow you to associate it with a particular knife or a particular type of knife. It is probably fair and the best I can do is say 'probably fair' to say that the knife recovered or the duplicate of the knife recovered could possibly have caused that if it were indeed a stab wound. However, the size and configuration of the skin defect no longer allow you to diagnose it as a stab wound much less associate it with a knife of a particular size.

Id. at pp. 236–37.

Arden's comprehensive review of the evidence led him to opine that the most likely cause of Sjodin's death was asphyxiation by ligature strangulation.  Id. at p. 238.  Having reasonably excluded other causes of death (blunt force trauma; stabbing; cutting; and gunshot wounds) and having considered the circumstances in which Sjodin was found (bound; naked from the waist down; body dumped; and a ligature around her neck), Arden concluded asphyxia, most likely by ligature strangulation, was the likely mechanism of Sjodin's death.  Id. at pp. 239–40.  Inexplicably, McGee did not measure the rope found around Sjodin's neck.  Arden, like Flomenbaum, attempted different methods to measure the circumference of the ligature around Sjodin's death.  Arden's measurements led him to conclude the circumference was 9 or 10 inches. Id. at pp. 241, 310–11. As did Flomenbaum, Arden concluded the circumference was tight enough to apply pressure and cause asphyxiation.  Id. at p. 242.

Both Flomenbaum and Arden agree the most likely cause of Sjodin's death was

asphyxiation.  They, however, gave different considerations to the narrative provided by Rodriguez.  Flomenbaum opined that Sjodin was more likely asphyxiated when Rodriguez placed pressure on Sjodin's neck while trying to maintain control over her, and Arden placed more consideration on the ligature found around Sjodin's neck and opined Sjodin was likely asphyxiated by ligature strangulation.  Neither expert, however, found any evidence to indicate Sjodin's throat was slashed.

### iii.   Dr. Ljubisa L. Dragovic

A third expert, Dr. Ljubisa Dragovic, a forensic pathologist and a neuropathologist, reviewed the evidence in this case, also prepared a report, and also testified at the evidentiary hearing.  At the time of the hearing, Dragovic was employed as the chief forensic pathologist and chief medical examiner for Oakland County in Michigan and had been so for 27 years.  (Doc. #1070, p. 327).  Having been employed as a pathologist for 39 years, Dragovic has performed thousands of autopsies.  Id. at p. 328.  A majority of the time, Dragovic conducts investigations and testifies on behalf of the prosecution.  Id. at p. 332. The government did not challenge Dragovic's qualifications as an expert.  Id.

Dragovic is a member of The Forensic Panel.  It was the government that solicited the forensic services of the Panel in this case.  Id. at p. 334.  Dragovic signed a report that he prepared, which was also critiqued, reviewed, and signed by two additional members of the Panel.  Id. at p. 335.  In total three experienced forensic pathologists who were members of the Panel reviewed the evidence in this case, discussed it, and reached conclusions based on their review.  Id. at p. 336.  If one of the reviewers had disagreed with some or any of the other reviewers' conclusions, the dissent would have been noted in the report.  Id. at pp.

336–37.  Dragovic explained the advantages of using the Panel's services:

> Well, it is a tremendous value because people look at different issues that are under consideration from different vantage points and different levels of experience and understanding of the problem. So it is - - it is a more in depth analysis with certainly far more - - many more details than presented at the original process of adjudication at the original trial. So, yes, it has some special advantages along those lines.

Id. at p. 337.

In response to the questions the government posed to the Forensics Panel regarding whether the method of injury for the wounds on Sjodin's neck and flank can be determined, Dragovic opined:

> The loss of integrity of the skin and soft tissue on the victim's neck represents a post mortem artifact, resulting from combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains. The very same mechanism of destruction is the most logical explanation for the damage/loss of integrity of the right flank.

Id. at p. 349.  Dragovic opined there was no indication that the defect on Sjodin's neck was caused by a slash or a stab wound.  Id. at pp. 349–50.  Dragovic also opined that there was no evidence to support the opinion that the flank defect was caused by a sharp force injury. Id. at p. 351.   As did Flomenbaum and Arden, Dragovic disagreed with McGee's interpretation of the defects identified on Sjodin's body, specifically opining there was "no evidence of sharp force injury anywhere on the remains" in any of the photographs or other material.  Id. at p. 350.  Dragovic concluded, after his comprehensive review of all the evidence including evidence obtained after trial, that the cause of death was most likely asphyxiation due to the application of force to the front part of Sjodin's neck.  Id. at pp. 351, 361, 366–67.

68

To a reasonable degree of medical and scientific certainty, Dragovic could find no evidence of trauma to the body, other than decomposition and animal depredation.  Id. at pp. 351, 353.

In short, based on the evidence, Dragovic concluded that asphyxiation was "the only reasonable bloodless process." Id. at p. 361.  Dragovic testified that McGee's theory about Sjodin's neck being slashed and no blood on her clothing is not "a particularly logical concept." Id. at p. 362.  When pressed further during the government's cross-examination, Dragovic remained unconvinced by McGee's erroneous interpretation of the evidence, stating: "The proposed theory that the victim was slashed outside at the place of disposal of the body does not hold water," id. at p. 365, because regardless of whether the slash wound is deep or superficial, "eventually it has to be a lot of blood to effectuate death." Id. at p. 377.

### iv.    Dr. Michael J. Ferenc

Michael J. Ferenc began working as a forensic pathologist in 1986.  At the time of the hearing in this case, Ferenc was the chief forensic pathologist at the Alameda County (California) Coroner's Bureau.  Ferenc also reviewed the evidence in this case, prepared a report, and testified at the evidentiary hearing.  (Doc. #1071, pp. 442–43).  As with the other expert witnesses who testified at the hearing, the government did not contest Ferenc's qualifications to testify as an expert in the field of forensic pathology.  Id. at p. 445.

Ferenc opined that based on his knowledge, training, and own direct observations of decomposed remains with postmortem depredation, including specifically "areas in urban jurisdictions, the woods of Maine, the Arizonan desert, and the agricultural regions

of central/northern California," that to a reasonable degree of medical certainty, the findings of Sjodin's "neck and right flank are not characteristic of sharp force injuries. Neither are any of the other autopsy findings." Id. at p. 448.

Ferenc testified that most of the defect on Sjodin's neck is "decomposition effects" including "postmortem depredation by animals and to much lesser extent insects because of the time of year." Id. at p. 451. He further explained:

> What triggered it may involve the rope, may just involve an easy location for animals to get to. And there is the theoretical possibility a knife could be involved there but there's just nothing to raise it beyond speculation in my opinion.

Id. In other words, according to Ferenc, there was nothing that told him the defect started out as a sharp force injury. Id. at p. 452.

With regard to the pieces of the plastic bag that remained, Ferenc observed they were "consistent with what you see when animals such as rodents or other things are chewing away at the plastic bag to get to the tissues." Id. at pp. 452–53. As to the scalloping that McGee attributed to a knife being plunged and repositioned, Ferenc (as did the other testifying expert forensic pathologists) called that interpretation of the evidence into question:

> If you look along the edges of the wound, you see scalloping like little -- basically they usually represent little tooth marks along the edges of a lot of the wounds.
>
> Q.   And is that type of scalloping that you're describing consistent with animal depredation?
>
> A.   Yes, sir. You have to worry yourself about things like serrated knives but the overall - - you know, that would be in a different kind of

70

> wound, a much more pristine wound.  All of the features around here, again the scalloping and the irregularities of the wound edges, all strongly suggest, indicate animal activity.

Id. at p. 454.

Additionally, unlike McGee, Ferenc did not interpret the isolated strip of skin as a positive indication that Sjodin sustained a slash wound to the neck.  In Ferenc's opinion, McGee's interpretation that animals may have eaten all around the area but left that strip alone "doesn't even make sense."  Id. at p. 456.  He agreed with the other experts that concluded the rope and plastic bag protected that strip of skin otherwise it should have been chewed away like everything else.  Id.  So Ferenc saw "a reason why it's there.  I don't see any reason why it has to be sharp force."  Id.  Ferenc observed from the evidence that for the rope to not have been notched or affected in any way by the purported slashing would be "rather amazing serendipity."  Id.

In yet another aspect of the evidence that called into question McGee's slash wound interpretation was the lack of blood found on Sjodin's clothing or at the scene.  Id. at p. 457.  McGee's interpretation of the evidence was inconsistent with the evidence found at the location of her body and her clothing.  Ferenc was "absolutely not" able to conclude to a reasonable degree of scientific or medical certainty that the defect to Sjodin's neck was caused by a sharp force injury.  Id. at p. 458.

Ferenc's opinions about the flank defect were also similar to the other experts' opinions and rendered McGee's opinions and testimony about this defect dubious.  Ferenc provided the following testimony:

> I saw nothing that suggested it had to be sharp force injury. The pictures I

71

> saw clearly showed features of postmortem depredation with scalloping or
> gnawing type marks along the side. I saw nothing that made me think there
> was significant hemorrhage in the tissues, at least in the photographs that I
> could see. I saw nothing. It's just another area just like she has over several
> parts of her body where it looks like it's just postmortem depredation.

Id. Again, Ferenc found no evidence to indicate the flank wound was a stab wound beyond mere speculation. Id. at p. 460.

While Ferenc could not completely rule out the possibility the defect was caused by a stab would, according to Ferenc, it would not be a reasonable interpretation of the evidence, as he has seen defects, like the ones found on Sjodin's body, that were caused completely by postmortem depredation. Id. at pp. 460–61. Contrary to McGee's interpretation of the evidence, Ferenc's interpretation of the evidence led him to classify Sjodin's cause of death as "homicidal violence consistent with complications of asphyxia." Id. at p. 461.

### v.    Dr. Garry F. Peterson

Garry Peterson, a retired former Chief Medical Examiner for Hennepin County who served between 1984 to 2004, was called to testify at the evidentiary hearing and was qualified as an expert in forensic pathology. (Doc. #1072, pp. 648, 654). Trial counsel consulted with Peterson in 2004 and 2005, but, during that time frame, Peterson did not prepare a written report and was not called to testify at trial. Trial counsel testified at the evidentiary hearing that what counsel learned from consulting with Peterson pretrial was that Peterson "was very clear that he was unclear. He could not make a determination" about the defects identified by McGee on Sjodin's body. (Doc. #1073, pp. 828–29).

While habeas counsel located notes from meetings and discussions between trial

counsel and Peterson in trial counsel's file, Peterson has no notes or independent recollection of his meetings or discussions with trial counsel. Trial counsel's notes indicate that Peterson, with the information he was given before trial, did not express disagreement with McGee's opinions regarding the possibility that Sjodin's neck had been cut or that she had been stabbed in the side. Id. at pp. 727, 731. Trial counsel recalled that Peterson talked about "possibilities" and did not offer an opinion to a degree of medical certainty about any of the issues they consulted with Peterson about prior to trial. (Doc. #1073, pp. 829, 833).

Peterson was contacted again about this case in 2011 by habeas counsel. (Doc. #1072, p. 676). To habeas counsel, Peterson described his involvement with trial counsel as "limited" in so far as he reviewed photographs and other materials and talked to trial counsel. Id. at p. 674. Habeas counsel provided Peterson with photographs, autopsy reports, trial evidence, and expert reports to review. Id. at p. 675. To the extent that trial counsel's notes of discussions with Peterson differ from his hearing testimony, Peterson testified that he has changed his mind. Id. at p. 731.

Having worked as the longtime medical examiner in Hennepin County alongside McGee who worked for decades as the medical examiner in neighboring Ramsey County, Peterson was familiar with McGee. One of Peterson's perceptions of McGee is that McGee views himself as a knife wound expert, but McGee "may not be as good as he thinks." Id. at p. 706. After reviewing all the materials provided by habeas counsel, Peterson prepared a report and opined that the defects identified on Sjodin's body by McGee as knife wounds were caused by "postmortem deterioration and animal activity." Id. at p. 676. Peterson also agreed with the other experts who testified at the evidentiary hearing that the most

likely cause of death was asphyxiation by neck ligature.  Id.

Peterson testified that his review of the other expert reports was helpful for a couple of reasons: "Well, they're eminent people and looking at their opinions and their way of working through it I think was very helpful.  And I think the reports were more extensive and involved more time than I was able to spend initially."  Id. at p. 677.  Peterson explained that it was a normal part of his practice as medical examiner to confer with colleagues in formulating opinions, especially on difficult cases when they would hold a special conference to confer and discuss.  Id. at pp. 677–78.  Like other experts, Peterson could not absolutely exclude the existence of sharp force injuries on Sjodin's body, testifying:

> I do not believe that sharp force or other injuries at these sites can be completely excluded, but postmortem depredation and extensive tissue loss would make the existence of any such injuries no more than speculation.

> \* \* \*

> Q.    Doctor, why is it that you could not completely exclude the possibility of sharp force injuries according to this letter?

> A.    There's a great deal of tissue loss there. There are structures that are not present. There are areas that just cannot be evaluated because they're not there or they've been altered by the various processes.

Id. at pp. 678–79.

After habeas counsel provided Peterson supplemental materials, including a narrative from Rodriguez, Peterson testified that his opinions did not change:

> I continued and always believed it to be a homicide. And I said that the asphyxiation by ligature remained a possible cause of death and I could not

74

> rule out Dr. Dragovic's conclusion that there was asphyxia brought on by direct pressure and that I - - I don't think I could also rule out the possibility of sharp force injury. I'm not sure it's stated there specifically but I've never totally rejected that.

Id. at p. 681.  It is unclear from the record whether some of the issues associated with trial counsel's attempts to obtain opinions from Peterson were due to budgetary constraints, if for some reason Peterson lacked interest in providing his expertise, or if Peterson simply was unable to formulate opinions based on the evidence he was given pretrial and counsel should have pursued the assistance of a different forensic pathologist.  None of these reasons excuse counsel from its duty to provide adequate representation.

### 3.   Decision

While there may be "countless ways to provide effective assistance in any given case," Harrington, 562 U.S. at 106 (quoting Strickland, 466 U.S. at 689), and counsel is undoubtedly afforded wide latitude when making strategic and tactical decisions, the Court finds that little to no investigation on the government's theory as to the cause of death in a capital case where one of the aggravating factors relates directly to that issue does not constitute adequate representation.  This is one of those case that the Supreme Court identified "where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." Richter, 562 U.S. at 106.

Here, there was no meaningful investigation or consultation with a competent expert on the issue of cause of death.  The result is the government's evidence as to cause of death, although developed from entirely flawed analyses, was not challenged in any meaningful

or persuasive manner at trial.  The only forensic pathologist trial counsel contacted about the cause of death was "very clear that he was unclear" and could not make a determination about the government's theory on cause of death.  Given the significance, and perhaps dispositive nature, of an issue that directly pertained to a statutory aggravating factor, counsel had an obligation to consult with an expert that was willing and able to investigate the government's evidence and offer advice.[2]

This is not a case where science or technology has evolved over the intervening years in a way that changes what was known or what could have been discovered.  The opposite is true.  Had, for example, Arden or Dragovic or Ferenc been called as a witness in 2006 at the evidentiary hearing on the admissibility of McGee's opinions or at trial, they stated that the science has not changed on analyzing body defects and they would have provided the very same opinions they expressed at the evidentiary hearing in this proceeding.  (Doc # 1070, pp. 270, 352; Doc. #1071, p. 479−80; Doc. #1072, p. 708).  As explained by Dragovic:

> I mean, how could I come up with another conclusion? You see, I have to explain this. Forensic pathology is not a democratic process. It's a situation with findings. Facts and findings dictate the diagnosis, and that's how it works. That's the scientific approach. There is no democracy in science. Majority votes this way, minority votes this way. No. It's conceptually the method that has established itself through centuries and this is what we have. And in the end it's not a hundred percent exact science because not all the facts are known at any given time.

(Doc. #1070, pp. 352−53).

---

[2] Indicative of the lack of adequate consultation is the evidence in the record demonstrating that trial counsel unequivocally determined Peterson was ambivalent and not very helpful when they asked for pretrial advice on McGee's opinions, but now, inexplicably, in this habeas proceeding, Peterson has changed his mind and is able to arrive at definitive conclusions.

After considering all of the evidence in the record, the Court is left with a definite and firm conviction that the reliability and veracity of McGee's opinions could have been successfully challenged, not merely through cross-examination with the goal of hoping to create reasonable doubt or raise "possibilities," but independent, compelling expert testimony that would have convinced the Court to exclude McGee's opinions as unreliable and excessively speculative. Or if that approach was not successful, could have convinced a jury that McGee's opinions were unsound, inaccurate, and so unreliable that the death penalty was not warranted.

As detailed earlier, the core of the government's argument as to why this murder is distinguishable from other murders and warranted capital punishment was the repeat image the government planted in the jury's mind: Rodriguez marched a half-naked Sjodin to the ravine where, after he raped her, he slashed her throat and left her to bleed out and die alone in the freezing cold. That image was created from McGee's testimony. That image has now been shown to be based entirely on speculation. Without question, that speculative image contributed to the jury's decision to impose the most severe penalty.

Precisely the same grave concern is present in this case as was in the Dakota County, Minnesota case where the court found McGee provided false testimony and ordered a new trial. In that case, Dr. Lindsay Thomas, the medical examiner for Dakota County and seven other counties, was among those who disagreed with McGee's findings and spoke publicly. She said McGee created a story about what happened to the defendant's infant daughter, instead of sticking to the facts. Thomas elaborated:

> It's not like Sherlock Holmes. It's not like we do an autopsy and we find something and then we invent a story to explain it. That's not our job. Our job

is to do the autopsy, to find what we find, and then say to everyone who was involved, 'What's the story?'

https://www.mprnews.org/story/2011/09/05/ramsey-county-medical-examiner-faces-investigation

Likewise, in this case, Dragovic testified that "the most dangerous approach that one can take in a medical/legal investigation of death" is to have an agenda or an advanced theory. (Doc. #1070, p. 353). Dragovic echoed Thomas' comment as to the appropriate approach: "At first you put the facts together and then you start considering theories." Id.

The evidence does not reflect how it came to be that McGee interpreted the evidence in a manner that is entirely unsupportable by widely accepted medical or scientific principles. But, he did.

The unrefuted evidence is plain: the only conclusion that can be made to a reasonable degree of medical or scientific certainty is that the cause of Sjodin's death was asphyxiation by some form of neck compression. Two of the forensic pathologists (Flomenbaum and Dragovic) were willing to give more consideration to Rodriguez's narrative so they opined the manner of death was likely asphyxiation caused by blunt force. A third expert (Arden) held firm to his opinion that the manner of death was most likely ligature strangulation because that interpretation was most supported by the evidence. Not a single expert who was called to testify at the evidentiary hearing supported McGee's conclusion that there was evidence indicating Sjodin's neck was slashed. Although the government notes that other "possibilities" about the cause of death were mentioned at trial by McGee as well as defense counsel, this evidence does not remove the prejudice resulting from the evidentiary error that occurred in allowing speculative expert testimony.

Had trial counsel not performed deficiently and adequately investigated the

78

government's evidence on cause of death, a different case (not an entirely different one because the inadmissible expert testimony does not cast doubt on Rodriguez's guilt) would have been presented to the jury.  Unlike the evidence of sexual assault where there was evidence outside of McGee's unreliable expert opinions that was admitted at trial from which jurors could find Rodriguez sexually assaulted Sjodin, there was no other evidence admitted at trial besides that proffered by McGee that would have allowed the government to argue to the jury that an essential reason Rodriguez is deserving of the death penalty is because he marched Sjodin to a remote location, slashed her neck, and left her to bleed out and die.

Because there is a reasonably probability that the penalty phase would have turned out differently had counsel not performed deficiently, Rodriguez has shown prejudice caused by trial counsel's deficient performance.  Although surmounting Strickland's high bar is no easy task, when the government's most compelling arguments as to why the jury should select the most severe punishment were based on nothing more than expert speculation, the Constitution, the law, and justice demand a new penalty phase trial.

### CLAIM 2C: TRIAL COUNSEL NEITHER PERFORMED DEFICIENTLY DURING JURY SELECTION, NOR HAS RODRIGUEZ SHOWN PREJUDICE FROM ANY ALLEGEDLY DEFICIENT PERFORMANCE.

Habeas counsel also assert that trial counsel's performance during jury selection was objectively unreasonable in a number of particulars, including failing to: (1) identify jurors who would automatically vote for death; (2) identify jurors who could not or would not consider mitigating evidence; (3) correct repeated misstatements of the law of mitigation; (4) challenge or match the "staking out" done by the prosecution; (5) challenge or correct the "processing effect;" (6) insure proper instruction was given about the elements of the

offense; and (7) object or seek the removal of jurors who had not been admonished to avoid outside influence.

### 1.     Identifying Jurors with Pre-Determined Views or Partiality

Habeas counsel discuss at length the Court's refusal to change venue and contend that if trial counsel "made competent use of the opportunity" the Court could have, or would have, moved the trial.  That contention is belied by the record.

Trial counsel moved unsuccessfully pretrial to change venue (Docs. #320, 355), and renewed the request again at trial (Docs. #476, 498).  On appeal, counsel sought review of the denial of their request to change venue, citing pretrial publicity as well as presumed and actual juror prejudice.  The Eighth Circuit Court of Appeals concluded the Court did not abuse its discretion in refusing to change venue and did not err in finding there was insufficient evidence to demonstrate prejudice by jurors who had knowledge of Rodriguez's prior convictions, who had alleged opinions of Rodriguez's guilt, or who had discussed the case with others and received opinions about Rodriguez's guilt.  Rodriguez, 581 F.3d at 784–88.

Contrary to habeas counsel's arguments in this proceeding, the jury selection process was thorough.  After the Court issued its jury selection order, counsel filed a motion to address jury selection issues (Doc. #237), a request for clarification (Doc. #284), and a renewed motion on jury selection issues (Doc. #507).  Rodriguez's trial counsel zealously advocated on his behalf throughout the entire jury selection process.

The process included a screening questionnaire, an additional form containing 121 questions, and individual *voir dire* in the courtroom.  This process elicited information about the prospective jurors' knowledge of the case, general views about the death penalty,

specific views on the death penalty as they might apply in this case, the importance of both aggravating and mitigating evidence, and the ability of jurors to consider and weigh all of the evidence presented in the case.

In support of his claim here, Rodriguez isolates responses given by several jurors and asserts trial counsel's performance was deficient for not probing further or seeking to strike the juror. Rodriguez's claim ignores the rest of the record and sworn responses given by the jurors affirming their ability to follow the Court's instructions and fully and fairly consider all of the evidence.

After the government presented its case-in-chief, there was no real colorable defense as to Rodriguez's guilt. The penalty phases were different. There was competing evidence that the jury needed to consider, analyze, and weigh as well as compelling arguments from both sides. Notably, in Claim 3, habeas counsel consider the jury's ten hours of deliberations during the eligibility portion of the penalty phase as excessively long and grounds for a mistrial. There were a number of questions the jury was required to answer. In addition, part of the length could reasonably be attributed to the fact that trial counsel convinced at least one juror to question whether the government had proven the alleged statutory aggravating factors beyond a reasonable doubt and we know at least one juror arrived at the conclusion that the government had not proven beyond a reasonable doubt the statutory aggravating factor related to premeditation. The length of the jurors' deliberations runs counter to Rodriguez's claim of a partial jury with predetermined views.

Despite Rodriguez's criticism of the jury selection process and the opinions of David D. Wymore (described by Rodriguez as "the nation's preeminent authority on jury selection in capital cases"), the record demonstrates trial counsel and the Court worked diligently

and collaboratively to select an impartial jury.  While habeas counsel and Wymore are critical of a number of the jurors' written responses to the questionnaire or answers given during *voir dire*, this claim fails for two reasons.

First, "scrutiny of counsel's performance must be 'highly deferential,' and we must make every effort 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'"  Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 689).  Given the deference customarily owed to counsel's tactical decisions during jury selection, Rodriguez cannot succeed on his ineffective assistance of counsel claim  because the jurors who sat during the trial were accepted only after lengthy and probing questioning and trial counsel's confidence in the ability of the jurors to act impartially was well-founded, supported by the record, and objectively reasonable based on the jurors' sworn responses during the jury selection process.  Sharp v. Johnson, 107 F.3d 282, 286–87 (5th Cir. 1997).  The record demonstrates that counsel's performance falls within the wide range of reasonable professional assistance.

In addition, Rodriguez's claim isolates a few responses that he then takes out of context or in disregard of other responses that reflect the juror's views or attitude.  On this record, there is inadequate evidence from which the Court can find that an empaneled juror was not impartial or failed to fully and fairly consider the evidence presented in this case.

Second, habeas counsel is barred from relitigating the denial of a change of venue due to juror prejudice.  United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001) ("Issues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255").  As on direct appeal, Rodriguez contends that *voir*

*dire* revealed juror prejudice. Although Rodriguez has brought forth additional evidence to support his claim, Wymore's opinions cannot avoid the procedural bar precluding claim relitigation.

### 2. Alleged Misstatements of the Law

Habeas counsel contend that during *voir dire*, the Court sometimes got the law right on mitigation and sometimes got it wrong, and trial counsel's failure to object when the Court got it wrong was ineffective assistance. According to Rodriguez, the Court got the law wrong twice when it advised prospective jurors, without objection, that mitigation evidence tends to explain—not excuse—a defendant's behavior and conduct. Rodriguez also takes issue with the Court's use of the word "consider" when used in conjunction with mitigating evidence. Rodriguez contends "consider" informed the jury that they only had to pay attention and remain open to the sentences available rather than to "give effect" to the evidence.

Rodriguez's interpretation of the term "consider" and the manner in which prospective jurors understood or interpreted the term is based on nothing more than speculation and the opinion of Wymore. It was clear during *voir dire* and in the Court's instructions that the jury was required to weigh—that is, give effect to both the aggravating and mitigating factors. That weighing process necessarily involved more than listening and keeping an open mind. Rodriguez's challenge to the term "consider" is unfounded and speculative.

While it came as no surprise to counsel involved in the trial that the Court's *voir dire* colloquy was, at times, chatty and perhaps less formal than other judges might conduct, its goal during jury selection is to try to make prospective jurors as comfortable as possible so

83

they understood the different phases of the trial and, hopefully, became more willing to open up and answer the questions posed to them truthfully.  Those purposes would not excuse misstatements of the law that may have influenced the prospective jurors.  But, that is not what happened in this case.

At issue are comments the Court made on day seven of jury selection.  The group of prospective jurors called in on this day were introduced to counsel and the Court, were provided an overview of what would happen at trial, and then were asked individual questions.  Given the nature of the entire explanations and remarks by the Court during the introductory session, the prospective jurors were not told or left with the impression that the Court was instructing them on any law at that moment, let alone the law of mitigation during *voir dire*.  After describing the phases of the trial, the Court provided a general overview of aggravating and mitigating factors should the case proceed to a selection phase. With regard to mitigation, the Court explained:

> Mitigating factors include such things as the background of the defendant, his past. They may include things like childhood trauma, could include abuse, could include mental health, could include physical health. There's really no limit on what it might include, but those are the sorts of things you'll be asked to consider. Now it's important to note that mitigating factors are not offered as excuses for the fact that the crime was committed. They're offered for explanations as to the defendant's behavior and conduct if you get to that point, okay?

(Doc. #690, p. 33).

Rodriguez ignores that before this explanation, the Court made plain that its job was to give the jurors instructions on the law, that it had provided some instructions, and that it would provide additional instructions at trial.  Id.  No reasonable interpretation of the Court's comments and overview of the process would lead counsel or prospective jurors to

84

conclude the Court was "instructing" them on the law.

Similarly, trial counsel had no reason to object to comments made in the course of individual questioning (day 16 of jury selection) of a member of the venire. Rodriguez contends the follow explanatory comments constitute a misstatement of the law:

> Now, there are also mitigating circumstances or facts, and those are the things that tend to point towards the application of a life sentence. Those factors would include or might include such things as the background of the defendant; again, you know, his - - whether he suffers from a mental illness, his physical health, his other mental health issues, whether he's suffered from some experience of childhood trauma or abuse that somehow explains what happened, right? Not excused but just explains. Okay?

(Doc. #699, p. 151). Again, the nature of the Court's comments make plain that this discussion was not to advise the prospective juror on the law or provide a legal definition of mitigation evidence. The Court was outlining what could be a phase in the trial to assess the prospective juror's attitude and ability to serve as an impartial juror.

Even assuming that during the jury selection process the Court inadvertently provided an incomplete or imprecise definition of mitigation, any possible confusion or impact was remedied by the Court's other *voir dire* remarks and when the Court instructed the jury on the law. Although on direct appeal, Rodriguez asserted the government misled the jury about the relevance of mitigating factors during its closing argument, Rodriguez did not assert any challenge to the Court's jury instructions. Rodriguez, 581 F.3d at 798. This information would have been known to him at the time of appeal. This is because the jury was properly instructed and the jurors are presumed to have followed the law as set forth in the instructions.

Even assuming the Court was imprecise in its summary discussions at these two times during jury selection, Rodriguez has shown no juror was confused, lacking in

impartiality, or otherwise impacted as a result of the comments.

### 3.    Refusal to Engage in Reciprocal "Staking Out"

Rodriguez asserts trial counsel was ineffective during *voir dire* because, although prohibited by the Court, counsel should have asked "stakeout" questions because the government did.  During the 21 days of jury selection, Rodriguez points to two questions that he believes constitute stakeout questions.  The government disputes they were stakeout questions.  The Court is unpersuaded by Rodriguez's claim that these question crossed the line and were impermissible stakeout questions.  Even if they were improper stakeout questions, Rodriguez's claim fails for several reasons.

First, Rodriguez has pointed to no authority in which a court has found counsel performed deficiently for failing to engage in improper conduct.  Second, quite simply, trial counsel's refusal to respond to allegedly improper questioning by the government with its own improper questioning, in direct violation of the Court's order, is not objectively unreasonable.  And, finally, Rodriguez has not pointed to any prejudice that resulted from these two passing questions, even if they crossed over the line of probing a juror's attitudes or views to amount to "stakeout" questions.

Rodriguez has not shown trial counsel was ineffective for failing to object to, or engaging in, stakeout questioning during jury selection.

### 4.    The "Processing Effect"

Rodriguez contends trial counsel should have objected to instructions and questions during *voir dire* about the death penalty that allegedly implied his guilt, thereby depriving him of a fair trial. He premises his claim on a social science study that concluded the process of death qualification has a psychological processing effect that biases the jury.

Rodriguez's claim is foreclosed by United States Supreme Court precedent.  See Lockhart v. McCree, 476 U.S. 162, 170 n.7 (1986) (addressing and rejecting "processing effect" claim based on the same social science study).  Rodriguez's claim is undeveloped and lacks a factual or legal basis.

### 5.      Jury Instruction About the Elements of the Offense

Rodriguez asserts the Court's introductory instructions to the jury omitted the elements of the offense and, according to his expert (Wymore), this was in error.  Rodriguez contends the Court was obligated to inform the prospective jurors up front during jury selection that an intent to kill was a prerequisite for a sentence of death.

Rodriguez has failed to develop his argument in any meaningful way.  His entire argument consists of four sentences and only cites to the opinions of Wymore. Moreover, an intent to kill is not an element required for the offense of kidnapping resulting in death. Instead, whether the kidnapping proximately caused the death is an element of the charged offense.  As to eligibility for the death penalty, the jury was properly instructed on the threshold intent factors during the eligibility phase.  Trial counsel did not perform deficiently by failing to request an inapplicable and erroneous instruction during jury selection.

### 6.      Jurors Who Had Not Been Admonished to Avoid Outside Influence

Rodriguez argues that trial counsel, apparently regardless of a showing of partiality or prejudice, should have moved to strike any member of the venire that did not heed or receive an admonishment not to speak to anyone or read about the case before they were summoned for individual *voir dire*.  Rodriguez again relies on Wymore to support his

claim.  He identifies two jurors that told the Court and counsel during individual *voir dire* that they had people express an unsolicited opinion to them about Rodriguez's guilt or innocence.  Both, however, confirmed during *voir dire* that they would fully and fairly decide the case regardless of others' opinions and had no predetermined view about the case or the appropriate penalty.  Counsel and/or the Court specifically probed the prospective jurors to ensure they were not impacted by others' views about the case.

Rodriguez has presented no explanation as to why the two identified jurors were unable to serve as an impartial juror capable of fully and fairly deciding the case based on the evidence presented in court and the Court's instructions.  Further, he has presented no explanation as to how the Court can review his broad claim that trial counsel performed deficiently overall because they did not move to strike any and all prospective jurors that heard about the case outside of the courtroom or talked about the case outside the courtroom.  He apparently is asking the Court to presume prejudice.  <u>Strickland</u>, however, requires a showing of actual prejudice.  Rodriguez has not demonstrated deficient performance, let alone prejudice.

### 7.   Trial Counsel's Purported Abandonment

Rodriguez's final claim in Claim 2C is that trial counsel "threw up their hands" and abandoned him.  His claim is belied by the record.  Jury selection in this case was thorough. Trial counsel vigorously participated in the entire process.  Although it is apparent that trial counsel's desire, both pretrial and during jury selection, was to convince the Court that venue should be moved, it does not follow that trial counsel gave up on working tirelessly to probe the jurors' views about the case and their views on the death penalty in order to select the jurors they thought would be most favorable to the defense.  Counsel made for-

cause challenges and diligently exercised their allotted peremptory challenges when deciding on the jurors who would ultimately be selected to sit on the case.

Rodriguez has failed to meet his burden of showing that due to trial counsel's conduct, any one of the empaled jurors was biased against him or had predetermined views to find him guilty and impose the death penalty. The record belies Rodriguez's claim that trial counsel's performance was deficient during jury selection or that but-for their deficient performance the result would have been different.

In summary, Rodriguez has failed to present a sufficient factual or legal basis to support his claim that trial counsel provided ineffective assistance of counsel during jury selection. Instead, Rodriguez's claim is subject to dismissal because he is barred from relitigating claims decided on appeal, he has failed to develop in any meaningful way his claim, or the claim is belied by the evidence in the record.

**CLAIM 2D: TRIAL COUNSEL EFFECTIVELY PRESENTED ALL EVIDENCE AND ARGUMENTS THAT ITS PRETRIAL INVESTIGATION UNCOVERED AT THE CULPABILITY PHASE, BUT AN INADEQUATE INVESTIGATION MAY HAVE LEFT OUT A POTENTIAL AFFIRMATIVE DEFENSE AND LEFT OUT SIGNIFICANT MENTAL HEALTH EVIDENCE.**

Habeas counsel contend trial counsel was ineffective because they presented what should have been left out, left out what should have been presented, and failed to develop a coherent theory of the case to be used through all phases of the trial. Habeas counsel's claim, which is deeply grounded in hindsight and second-guessing, ignores the indisputable evidence establishing beyond a reasonable doubt that Rodriguez kidnapped and killed Sjodin. This case did not rest on circumstantial evidence. The evidence included video surveillance, blood analysis, a knife sheath located at the scene of the abduction that was sold with the style of knife found in Rodriguez's car, and interstate transportation of

Sjodin.

The government presented overwhelming evidence on each element of the charged offense. With no witnesses or evidence to refute the government's case-in-chief, trial counsel's only available options were to try to convince the jury that this case was being prosecuted in the wrong court and to attempt to create doubt in the jury's mind about the credibility of the government's evidence and its witnesses through cross-examination. Counsel did so thoroughly, but it was not enough to convince the jury that the government had failed to meet its burden of proof.

Habeas counsel go to great lengths to explain what they believe should have been argued and presented at trial, ignoring that under Strickland the "proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Strickland, 466 U.S. at 688). Rodriguez second-guesses trial counsel's strategy and tactics, contending that the only reasonably available defense was one of insanity. He now contends that trial counsel performed deficiently by failing to offer an insanity defense.

While this Court is skeptical about the viability of habeas counsel's proposed insanity defense, the United States Supreme Court, in the context of ineffective assistance of counsel claims, has made one thing clear: It has "never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." Knowles, 556 U.S. at 123. The Court is required to assess trial counsel's performance on the facts as they appeared to them at the time of trial, not on habeas counsel's opinions or on whether trial counsel, in retrospect, thinks a particular course of action would have been advantageous. Marcrum v. Luebbers, 509 F.3d 489, 507 (8th Cir. 2007) (citing

Kimmelman v. Morrison, 477 U.S. 365, 386−87 (1986)).

The jury heard about Rodriguez's mental health and brain damage that was known to trial counsel. Specifically, during the penalty phase, trial counsel called two experts, a psychologist and a neuropsychiatrist, who testified about their findings related to the damage to Rodriguez's frontal lobe of his brain, which posed difficulty with impulse control, as well as depression, and conduct consistent with past sexual abuse and PTSD.

One of the experts, Dr. Karen Froming, told the jury about Rodriguez's frontal lobe impairments and how they inhibit and effect his responses, emotions, and impulses. (Doc. #720, p. 207). Another expert, Dr. Marilyn Hutchinson, testified that her evaluation revealed Rodriguez suffered from long-term depression, substance abuse in remission, general anxiety disorder, and PTSD due to prior sexual abuse. (Doc. #721, pp. 146−48). Dr. Hutchinson identified and explained seven different factors that negatively influenced Rodriguez's life and his psychological makeup. Those factors included: childhood deprivation, poverty, lack of cultural stimulation, and malnutrition; sexual abuse; experiences with racism; failure in school; substance abuse; exposure to toxic chemicals; and the vast array of mental health and neurological diagnoses. Id. at pp. 152−55. By way of mitigating evidence, the jury heard substantial testimony about Rodriguez's background, history, mental impairments, and other diagnoses that impacted his life and decision-making abilities.

Despite the ample evidence presented by trial counsel, for the reasons more fully explained in Claim 4, even after applying a heavy measure of deference to counsel's judgments, the failure to discover a potential affirmative defense because of an inadequate

investigation is not a reasonable strategic decision that falls within the bell curve of professional competency, nor can the Court say on this record that pursing such a defense would have been certainly meritless or futile.  See Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008) (quoting Link v. Luebbers, 469 F.3d 1197, 1204 (8th Cir. 2006) ("Trial counsel's strategic decisions are 'virtually unchallengeable unless they are based on deficient investigation, in which case the 'presumption of sound trial strategy. . . founders on the rocks of ignorance.'")).

Notably, the lack of an adequate investigation into Rodriguez's mental health led Dr. Hutchinson to testify that she did not see evidence that Rodriguez suffered from dissociative experiences. (Doc. #721, p. 124).  It is plain from reviewing the record that trial counsel pursued every avenue of defense that they knew about, even renewing earlier requests, seeking reconsideration, and asking for further clarification.  Trial counsel were successful in keeping some of the government's evidence away from the jury.  Nevertheless, were it not for trial counsel's inadequate investigation into Rodriguez's mental health due to the limits they placed on the experts' investigation, trial counsel would have discovered what habeas counsel describe as the only colorable defense.

While an unsuccessful strategy does not make counsel ineffective, competent performance requires counsel to thoroughly investigate a capital defendant's mental health. Insanity is an affirmative defense to a federal charge.  18 U.S.C. § 17.  In order to establish an insanity defense, a defendant must prove: (1) he was suffering from a severe mental disease or defect at the time of the charged offense, and (2) the disease or defect rendered him unable to appreciate the nature and quality of the wrongfulness of his acts.  United

States v. Long Crow, 37 F.3d 1319, 1323 (8th Cir. 1994) (quoting United States v. Hiebert, 30 F.3d 1005, 1007 (8th Cir. 1994)).  The defendant bears the burden of proving the defense by clear and convincing evidence, and the "statutorily imposed higher burden of proof calls for a correlating higher standard for determining the quantum of evidence necessary to entitle a defendant to such an instruction."  Id.  In order to be entitled to an insanity instruction, Rodriguez must convince the Court that the "evidence would allow a reasonable jury to find that insanity had been shown with convincing clarity."  Id.  (quoting United States v. Owens, 854 F.2d 423, 435–36 (11th Cir. 1988)).

Rodriguez has presented in this proceeding opinions from an expert indicating that Rodriguez's PTSD is so severe that it could meet the requirements for an insanity defense. The government undoubtedly would have challenged this expert evidence and sought its own evaluation.  The Court is unable to resolve whether Rodriguez's newly proposed insanity defense would have been successful at trial because the record has not been fully developed on that issue due to trial counsel's inadequate investigation.

But, regardless of whether Rodriguez is able to pursue an insanity defense, once the expert's evaluation of Rodriguez's mental health was unburdened, the evaluation uncovered evidence that would rebut the government's extensive arguments about Rodriguez's intentional, deliberate, and premeditated efforts to locate a female to sexually assault on the evening of November 22, 2003.  Evidence of insanity or severe PTSD is consistent with the jury's finding that the government failed to prove beyond a reasonable doubt premeditation.

**CLAIM 2E:   RODRIGUEZ'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM FOR FAILING**

## TO MOUNT A PROPER CHALLENGE TO EVIDENCE ADMITTED UNDER FED. R. EVID. 413 HAS BEEN PREVIOUSLY DECIDED AND IS WITHOUT MERIT.

Trial counsel challenged the government's Rule 413 evidence. The government sought to admit evidence of four prior sexual assaults. The Court allowed evidence of two prior convictions under Fed. R. Evid. 413. The Eighth Circuit Court of Appeals affirmed this ruling, determining Rule 413 is not unconstitutional and the Court did not abuse its discretion by admitting the evidence. Rodriguez, 581 F.3d at 795–96.

Habeas counsel now contend that trial counsel failed to mount the proper challenge and should have argued no evidence was admissible under Rule 413 as a matter of law because (1) the charged offense, kidnapping resulting in death, does not require sexual assault as an element of the offense, and (2) there was insufficient evidence of sexual assault presented at trial. Habeas counsel incorrectly assert these arguments were not raised by trial counsel. Trial counsel did in fact raise these arguments in the motion for a new trial. The Court rejected them, explaining:

> Rule 413, however, merely requires that the Defendant be *accused* of a sexual assault. Rule 413 has two additional requirements, that the prior offenses being offered against the defendant must also be 'offenses of sexual assault,' Fed. R. Evid. 413(a), and the prior offenses must be relevant. United States v. Guardia, 135 F.3d 1326, 1328 (10th Cir. 1998) (citing Fed. R. Evid. 402). Prior offenses of sexual assault are relevant if they are similar to the current charge. United States v. Crawford, 413 F.3d 873, 876 (8th Cir. 2005).

> The first element is satisfied in that the indictment states, in pertinent part, that Defendant kidnapped Ms. Sjodin 'for the purpose of sexually assaulting her.' The second element is met in that convictions 5438 and 5447 both involved instances of sexual assault. The Court, after weighing the various similarities of the facts of the present assault, and the facts of those previous, found that 5438 and 5447 were sufficiently similar to be admitted as propensity evidence under Rule 413.

> Defendant also argues that the government was inconsistent in arguing that the Defendant committed a sexual assault in order to have 5447 and 5438

admitted under Rule 413, but later argued to the jury that the sexual assault need not be proven. However, there is nothing inconsistent about the United States arguing that the kidnapping could have been for any purpose, and arguing to the Court that a reasonable jury could find that a sexual assault occurred. The Court did not err in admitting Defendant's prior convictions 5438 and 5447 under Rule 413.

United States v. Rodriguez, No. 2:04 CR 55, 2007 WL 466752, at *34–35 (D.N.D. Feb. 12, 2007), aff'd, 581 F.3d 775 (8th Cir. 2009). Nothing habeas counsel has asserted in its motion in this proceedings persuades the Court that its earlier decision was erroneous. In addition, Rodriguez has cited no authority that would allow him to relitigate these claims that were decided on direct appeal.

In addition, Rodriguez's prior convictions would have been admissible in the penalty phase proceedings under 18 U.S.C. § 3593(c). As explained by the Eighth Circuit Court of Appeals, "[t]he Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings. Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence 'as to any matter relevant to the sentence.'" United States v. Lee, 274 F.3d 485, 494 (8th Cir. 2001) (quoting 18 U.S.C. § 3593(c)). Even "the admission of evidence of unadjudicated prior offenses at a capital sentencing hearing is constitutionally permissible and not inherently prejudicial." Id.

Section 3593(c) further provides that information is admissible "regardless of the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Id. Rodriguez's history of sufficiently similar

conduct is relevant for a number of sentencing reasons: it goes to the alleged statutory aggravating factors; it is rebuttal to some of the mitigating factors presented by Rodriguez; and it is a factor to be considered in determining whether the aggravating factors sufficiently outweigh all the mitigating factors to justify a sentence of death.

Rodriguez's claim that counsel was ineffective in its handling of the Rule 413 evidence lacks merits. Not only have his claims been rejected by this Court in post-trial motions, which were affirmed by the Eighth Circuit, but he has failed to show prejudice. Regardless of his claims that the convictions were inadmissible at the guilt phase, the evidence was unquestionably admissible for purposes relevant and material to the sentencing issues the jury was tasked with deciding.

**CLAIM 2F:    TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO RAISE A CONFRONTATION CLAUSE OBJECTION WHEN DR. MICHAEL MCGEE TESTIFIED ABOUT THE RESULTS OF REGIONS HOSPITAL'S ACID PHOSPHATASE TESTING, WHICH FORMED, IN PART, THE BASIS FOR HIS EXPERT OPINIONS.**

Habeas counsel contend that it was a violation of the Confrontation Clause for trial counsel to allow McGee to testify about the results of acid phosphatase testing that he neither performed, nor witnessed. Rodriguez asserts that trial counsel's failure to object constitutes ineffective assistance of counsel.

The offense charged by the government was kidnapping resulting in death. The indictment charged that Rodriguez held Sjodin for "the purpose of sexually assaulting her and otherwise." As the Court instructed, the government was not required to prove sexual assault as an element of the offense. The government offered evidence of the (alleged) sexual assault as part of intent—the state of mind that had to be proven. But, the government also argued to the jury that it could meet the intent element by establishing

sexual assault or "otherwise," which could have included reasons like revenge or thrill-seeking.

The government did not introduce the acid phosphatase test results from Regions Hospital as an exhibit at trial.  Nor did it argue to the jury that evidence of sexual assault derived from the lab results.  See the Court's analysis in Claim 2A regarding sexual assault evidence.  Instead, the government, while it did offer McGee's opinions and laid the foundation for them, focused the jury's attention on other factors, including: (a) the manner in which Sjodin was found (naked from the waist down, hands bound, etc.); (b) Rodriguez's prior history and Rule 413 evidence; and (c) the jury's common sense.

It is significant in the Court's analysis that the acid phosphatase test results were (1) not the only evidence of sexual assault; (2) offered in a context that did not leave the jury with the impression that the lab results were being offered for the truth of the matter asserted; and (3) not argued by the government as proof a sexual assault occurred.  While McGee testified that he considered the lab results when forming the bases for his expert opinion, had trial counsel objected for the reasons it states in this proceeding (because McGee was not present for the testing and the lab analyst was not called to testify), the Court would have engaged in its normal practice of giving the jury a cautionary instruction rather than excluded the evidence.  Exclusion was not required under Crawford and its progeny.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend VI.  The Supreme Court in Crawford overruled prior precedent interpreting the Confrontation Clause to allow the admission of absent

witnesses' testimonial statements based on a judicial determination of reliability. Crawford, 541 U.S. at 61–62.

Since Crawford, the Supreme Court has considered under what circumstances the Confrontation Clause requires a lab analyst to testify in person.  In so doing, the Supreme Court determined that documents containing lab results (whether denominated as affidavits, certificates, declarations, or otherwise), generated for the purpose of establishing or proving some fact, are testimonial in nature, rendering the analyst a "witness" for purposes of the Sixth Amendment. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310–11 (2009) (determining that certificates, which were plainly in the nature of affidavits, containing lab results were prima facie evidence of the composition, quality, and the net weight of the analyzed substance such that they constituted testimonial statements and, absent a qualifying exception, the defendant had the right to be "confronted with" the analysts at trial).  Similarly, in another case, the Supreme Court decided that the Confrontation Clause does not permit the prosecution to introduce a forensic laboratory report—done for the purpose of proving a particular fact—through the testimony of an analyst who did not certify the lab results, perform, or observe the test. Bullcoming v. New Mexico, 564 U.S. 647, 652 (2011).

 "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront the witness." Bullcoming, 564 U.S. at 657.  Key to implication of the Confrontation Clause depends on whether the statement seeks to establish the truth of the matter asserted.  As noted by the Supreme Court in Williams v. Illinois, the Crawford Court "took pains to reaffirm the

proposition that the Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 567 U.S. 50, 70 (2012) (cleaned up).

Under Fed. R. Evid. 703, "basis evidence" that is not admissible for its truth may be disclosed in a jury trial when, for example, it may assist the jury in evaluating the expert's opinions, such as understanding the expert's thought process and determining the weight to give to the expert opinion. Id. at 78 (quoting Fed R. Evid. 703). "The purpose of disclosing the facts on which the expert relied is to allay these fears—to show that the expert's reasoning was not illogical, and that the weight of the expert's opinion does not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts. Id.

In Melendez-Diaz and Bullcoming, the forensic reports were introduced for the purpose of proving the truth of what they asserted: in Bullcoming it was as evidence that the defendant's blood alcohol level exceeded the legal limit and in Melendez-Diaz it was as evidence that the substance in question contained cocaine. Nothing comparable happened here.

Sexual assault was not an element of the charged offense. The purpose for which the acid phosphatase lab results were introduced was limited; they served as "basis evidence" to allow the jury to evaluate McGee's opinion on whether Sjodin had been sexually assaulted. While, as indicted, the government had to prove Rodriguez held Sjodin for the purpose of sexually assaulting her or otherwise, the jury was not required to unanimously find a sexual assault occurred in order to find Rodriguez guilty and need not have relied on the acid phosphatase test results to find a sexual assault. Under these circumstances, the

Court finds no violation of the Confrontation Clause.  See Williams, 567 U.S. at 78.

While these Supreme Court cases were decided after the trial in this case, there is nothing in Crawford that would have caused trial counsel to suspect or assert a Confrontation Clause problem arising from the disclosure of the lab results in the context of the bases for McGee's expert opinion, particularly in light of Rule 703.  Since Crawford was decided, a Confrontation Clause issue arises only when a statement is testimonial and offered for the truth of the matter asserted.  And these post-trial Supreme Court cases simply make this requirement more plain.

Rodriguez's Sixth Amendment confrontation right was not violated when McGee disclosed the acid phosphatase test results as one of the bases for his opinion.  Counsel's performance in failing to object was not objectively unreasonable.  "Ineffective assistance should not be found under Strickland when counsel fails to perform those acts which clearly appear to be futile or fruitless at the time the decision must be made."  Garrett v. United States, 78 F.3d 1296, 1303 n.11 (8th Cir. 1996).  Even if trial court performed deficiently in this regard, Rodriguez cannot show prejudice because of the ample other evidence presented to the jury establishing that Rodriguez abducted Sjodin for the purpose of sexually assaulting her.

**CLAIM 3A. TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO SEEK A MISTRIAL WHEN THE JURY DELIBERATED FOR TEN HOURS; AND**

**B. COUNSEL CONTESTED THE PURPORTED "INVALID" STATUTORY AGGRAVATING FACTOR MULTIPLE TIMES BUT IT WAS NOT UNTIL THE EVIDENCE WAS PRESENTED IN THESE PROCEEDINGS THAT THE INVALIDITY OF THE ESPECIALLY HEINOUS, CRUEL, AND DEPRAVED AGGRAVATING FACTOR WAS SHOWN.**

*A.    10-Hour Jury Deliberations*

During the eligibility portion of the penalty phase, the government recalled three witnesses: two of Rodriguez's prior victims and McGee, who reiterated his conclusions about Sjodin's injuries. Defense counsel did not call any witnesses. While the supplemental testimony presented was brief, taking less than two hours to present, the jury deliberated for almost ten hours over the course of two days before reaching a decision that Rodriguez was eligible for the death penalty.

Rodriguez asserts that when the length of the jury's deliberations far exceeded the length of the presentation of the evidence on the eligibility phase, trial counsel should have moved for a mistrial. Rodriguez claims "these circumstances unambiguously called for a mistrial" and the failure to move for one constitutes ineffective assistance of counsel. (Doc. #752, p. 92).

Rodriguez points to no case in which counsel has been found to be ineffective for failing to move for a mistrial based solely on the length of deliberations when the jury has given no indication that it was deadlocked. And this Court has found none. Rodriguez's claim is without merit, as there was no constitutional or reasonable basis grounded in fact or law for counsel to have requested a mistrial. See Garrett, 78 F.3d at 1303 n. 11.

While a deadlocked jury can certainly be grounds for a mistrial, Nelson v. Dist. Ct. of Iowa in & for Scott Cty., 543 F.2d 631, 632 (8th Cir. 1976) (explaining that when a jury has reported it is deadlocked, a court determining the propriety of declaring a mistrial considers the length of trial, the length of deliberations, and the complexity of the issues involved), at no point in this portion of the jury deliberations was there an indication that the jury was deadlocked or struggling to reach a consensus. While Rodriguez makes much of the limited testimony presented during this phase of the trial, it is important to

remember that the jury was asked questions that required the jurors to consider all of the evidence presented to them up until that point in the trial—that means they were to consider both the evidence related to the guilt phase and the eligibility phase.

In light of the numerous questions the jury was tasked with answering along with consideration of the evidence that framed the inquiries, there was no reason for the Court or trial counsel to believe the jurors were doing anything other than what they were instructed to do—that is, to consult with one another, to decide the questions for themselves, to be open to re-examining their views, to change their opinion if they were convinced they were wrong, and "to deliberate with a view to reaching agreement if [they] can do so without violence to [their] individual judgment." (Doc. #584, Inst. 10).

Notably, the eligibility verdict form included four sections—two with substantive questions, one entailing application of previous answers, and a final "certification" section requiring each juror to confirm he/she made an individual decision and did not consider an inappropriate factor. (Doc. #585). Specifically, section one of the verdict form required the jury to answer "yes" or "no" to four distinct intent factors. Answering these questions necessarily required the jurors to contemplate not only the supplemental evidence presented during this phase of the proceedings, but also all of the evidence regarding the underlying crime that had been developed during the previous two weeks of the guilt phase.

Similarly, section two contained four statutory aggravating factors, some of which contained subparts, each of which also required a "yes" or "no" response. Evidence regarding the facts and circumstances surrounding Sjodin's homicide informed three of the alleged statutory aggravating factors, including: (1) whether the death was caused during the commission of the offense of kidnapping; (2) whether Sjodin was killed in an especially

heinous, cruel, or depraved manner; and (3) whether Rodriguez killed Sjodin after substantial planning and premeditation. The fourth factor, whether Rodriguez had previously been convicted of two or more offenses that involved the infliction of, or attempted infliction of, serious bodily injury upon another person, also required consideration of evidence presented during the guilt phase in the form of Rule 413, Fed. R. Evid. In total, these two sections required the jurors to respond to 12 questions. Ten hours to answer 12 significant questions that required jurors to consider evidence far more expansive than Rodriguez suggests was neither unreasonable nor unexpected.

After the jurors had answered these 12 questions, they had to examine their previous answers to decide the ultimate question of whether Rodriguez was eligible or not eligible for the death penalty. The jurors unanimously determined he was eligible. While Rodriguez suggests trial counsel's failure to recognize or respond to the jury's inability to reach a verdict was deficient performance that prejudiced him, the Eighth Circuit of Appeals has explained the proper inquiry:

> We have been asked how we can gauge whether counsel's failure to object was deficient or not if he did not know the law. This is the wrong question. We need only determine whether the law required that an objection be made in this case to prevent trial counsel's representation from falling below an objective standard of reasonableness.

Escobedo v. Lund, 760 F.3d 863, 870 (8th Cir. 2014) (cleaned up). Here, there was no factual, statutory, or constitutional basis to seek a mistrial. Such a request would have been based on nothing more than the time the jury was taking to deliberate on the numerous significant issues in the case, which, on its face, was not unreasonable. Because counsel has no obligation to raise meritless issues, the first part of Rodriguez's ineffective assistance of counsel claim is denied. Garrett, 78 F.3d at 1303 n.11.

B.    *Failing to Contest an "Invalid" Statutory Aggravating Factor*

Rodriguez contends counsel was ineffective for failing to adequately investigate and contest McGee's testimony, which would have then allowed a cognizable challenge to the propriety of one of the alleged statutory aggravating factors—that is, whether Rodriguez killed Sjodin in an especially heinous, cruel, or depraved manner.

Under the Federal Death Penalty Act, before the jury may consider non-statutory factors, the jury must first find a statutory aggravating factor.  18 U.S.C. § 3592.  For a jury to return a sentence of death, the jury must find at least one statutory aggravating factor beyond a reasonable doubt.  18 U.S.C. § 3593(d).  Here, the government alleged four statutory aggravating factors and the jury found three were proven beyond a reasonable doubt.  Rodriguez has raised the validity of one of the factors.

The Supreme Court, in <u>Zant v. Stephens</u>, 462 U.S. 862, 878 (1983), articulated the constitutional significance of statutory aggravating factors.  They "circumscribe the class of persons eligible for the death penalty."  <u>Id.</u>  Although narrowing the class eligible for the death penalty is a "constitutionally necessary function" at the legislative stage, "the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death."  <u>Id.</u>  At the selection stage, what is important is that there be "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.  <u>Id.</u> at 879 (emphasis in original).  Accordingly, the Supreme Court has determined that invalidation of one aggravating factor does not necessarily require that a death sentence be set aside.  <u>Id.</u>; <u>see</u> <u>Pizzuto v. Arave</u>, 280 F.3d 949, 958 (9th Cir. 2002), <u>opn.</u>

amended in part and superseded in part, 385 F.3d 1247 (9th Cir. 2004) (to establish prejudice petitioner must show that but for his counsel's deficient performance the trial court would not have found any one of the statutory aggravating circumstances). Notwithstanding the Zant decision, the existence of a valid aggravating factor does not necessarily excuse a constitutional error pertaining to the admission or exclusion of inaccurate evidence.  Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (citing Johnson v. Mississippi, 486 U.S. 578 (1988)).

When the death penalty is imposed under a weighing scheme and a question arises about the constitutionality or validity of an aggravating factor, reviewing courts must conduct a constitutional error analysis or require re-weighing.  Hoffman v. Arave, 236 F.3d 523, 541 (9th Cir. 2001); see Wright v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1256, 1284 (11th Cir. 2014) (citing Sochor v. Fla., 504 U.S. 527, 532 (1992) (denying habeas relief and not vacating sentence when state appellate court reversed findings of aggravating circumstances because any error was harmless)).  The Supreme Court has recognized two issues: (1) variations and complexities have arisen in courts' analyses when the validity of a sentencing factor is at issue, and (2) the peculiar distinctions among weighing and non-weighing capital punishment schemes.  In order to reduce that variation and complexity the Supreme Court has simplified the analysis with the following rule:

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

Brown v. Sanders, 546 U.S. 212, 220 (2006) (emphasis in original).  The focus of this test

is not solely on the admissibility of the underlying evidence, but instead on whether "an invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it." Id. at 220–21. In such a case, due process mandates reversal.

The test for a constitutional violation attributable to evidence improperly admitted at a capital sentencing proceeding is whether the evidence "so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." Kansas v. Carr, 577 U.S. 108, 123–24 (2016) (quoting Romano v. Oklahoma, 512 U.S. 1, 12 (1994)). For the reasons stated in Claim 2B of this opinion, the Court finds McGee's false and inadmissible testimony regarding the purported knife wounds he found on Sjodin's body rise to the level of a constitutional violation warranting new penalty phase proceedings. Without his testimony, it is debatable whether the government presented sufficient evidence to raise a jury question on the especially heinous, cruel, and depraved statutory aggravating factor. Without his testimony, the government's arguments to convince the jury this factor was proven beyond a reasonable doubt would necessarily have been different.

While it is true that the Supreme Court's has said the sentencer is to consider the circumstances of the crime when deciding whether to impose the death penalty, Tuilaepa v. California, 512 U.S. 967, 976 (1994), the knife wounds that McGee falsely testified about became the focal points of the government's arguments in support of the especially heinous, cruel, and depraved aggravating factor. The images the government portrayed to the jury, based on McGee's inadmissible speculative testimony, necessarily impacted the jury's

106

penalty phase verdicts because it was the evidence that the government relied on to set this murder apart from other killings:

- An image that Sjodin was marched to the ravine after being sexually assaulted whereupon her neck was slashed ear-to-ear.

- An image of a knife being plunged into her neck, slashing, repositioning, and more slashing.

- An image of Sjodin, half-naked, being left in the freezing cold to bleed out and die.

The prosecutor argued that death took "long minutes." The prosecutor minimized the possibility raised by the defense that Sjodin's death could have been much less horrifying and caused by strangulation shortly after the abduction occurred. The prosecutor told the jury that the defense's theory would be inconsistent with McGee's "forensic investigation," made "no sense," and was "a red herring."

Both before and after trial, trial counsel moved to strike the especially heinous, cruel, and depraved aggravating factor. (Docs. #185 & #635). The Court denied the pretrial motion premised on the sufficiency of the evidence, concluding it was premature since the Court had not yet heard the evidence. (Doc. #259). At trial, Rodriguez's counsel moved for a jury instruction that constitutionally limited the especially heinous, cruel, and depraved aggravating factor. (Doc. #551). The Court granted, in part, and denied, in part, the motion through the jury instructions it approved. Also, after the evidence had been presented, the Court denied trial counsel's motion to dismiss based on the alleged statutory aggravating factors, finding:

> It does appear to me that on each of these issues there is a quantum of evidence that has been produced, and like all cases, the quantum of evidence varies from factor to factor, but it does appear to the Court that each is sufficiently supported to give rise to a question for the jury.

(Doc. #717, p. 8).  Similarly, the Court denied the renewed motion raised in Rodriguez's motion for a new trial on the ground that it was satisfied the evidence was sufficient to sustain the aggravating factor. (Doc. #656).

It was not until evidence was presented in this proceeding that the Court discovered McGee's interpretation of the evidence would fail to find support from any other expert, not even the government's own experts.  While the government argues that the evidence in this proceeding demonstrates, at most, competing interpretations of the evidence, the Court disagrees.  When the issue is raised and no evidence is presented by the government, not even from McGee himself, to support the scientific bases utilized by McGee indicating there was evidence of sexual assault or evidence indicative of knife wounds inflicted on Sjodin's body, the expert testimony is excessively speculative and fails to meet the admissibility standard under Rule 702.

McGee's inadmissible testimony regarding the purported knife wounds that Sjodin suffered so infected the sentencing proceeding with unfairness that Rodriguez was denied due process.  Without the false and inaccurate knife wound testimony, the jury would have heard a different case.  The remaining physical evidence, which included some bruising, a plastic bag over Sjodin's head, and asphyxia caused by the neck ligature and/or the plastic bag or manual strangulation, might not set this case apart from other killings such that the evidence satisfies the relevant definitions necessary to sustain the statutory aggravating factor.  Satisfying this factor to create a jury question is a high burden, as the Court

108

instructed the jury:

> 'Heinous' means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of torture or serious physical abuse of the victim as to set it apart from other killings. 'Cruel' means that the defendant intended to inflict a high degree of pain by torturing the victim in addition to killing the victim. 'Depraved' means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

> 'Torture' includes severe mental as well as physical abuse of the victim. In either case, the victim must have been conscious of the abuse at the time it was inflicted, and the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, in addition to the killing of the victim. Severe mental pain or suffering means prolonged mental harm caused by or resulting from intentionally inflicting or threatening to inflict severe physical pain or suffering or from the threat of imminent death.

> 'Serious physical abuse' means a significant or considerable amount of injury or damage to the victim's body. To constitute 'serious physical abuse,' the defendant must have specifically intended the abuse in addition to the killing.

> Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include the infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing and the helplessness of the victim.

> The word 'especially' means highly or unusually great, distinctive, peculiar, particular, or significant, when compared to other killings.

(Doc. #717, pp. 46–48).

Neither the Court nor the parties can assess exactly how much weight the jurors gave to McGee's inadmissible evidence that directly relates to this particular aggravating factor when reaching their decision to select death as the appropriate punishment.

Trial counsel's failure to investigate and fully develop the record in a meaningful way to challenge McGee's testimony constitutes ineffective assistance of counsel. The record demonstrates that McGee's false and inaccurate testimony opened the door to the

government's inflammatory arguments, unsupportable by the evidence, regarding the circumstances and cause of death, which so infected the penalty phases that Rodriguez was both deprived due process and has shown prejudice. Whether the government might have sufficient admissible evidence to support this aggravating factor cannot be resolved in this proceeding. As the Court indicated in its pretrial rulings, a decision on whether a particular aggravating factor is supported by sufficient evidence to raise a jury question must be resolved at the close of the evidence.

In contrast to McGee's knife wound opinions, McGee's testimony that there was scientific evidence indicative of sexual assault, while also now proven to be inadmissible, did not infect the sentencing proceeding to support a constitutional violation in light of the other circumstantial evidence from which the jury could have found Rodriguez sexually assaulted Sjodin.

For the foregoing reasons, the Court grants a new penalty phase trial due to the false and inadmissible knife wound evidence that the jury heard and weighed in its sentencing decision. The Court denies the remainder of the claim.

**CLAIM 4:** TRIAL COUNSEL'S DECISION TO LIMIT THE INFORMATION THEIR EXPERTS COULD OBTAIN TO ASSESS RODRIGUEZ'S MENTAL DISORDERS RESULTED IN AN INADEQUATE MITIGATION INVESTIGATION AND THE FAILURE TO DISCOVER A POTENTIAL INSANITY DEFENSE AS WELL AS OMISSION OF SIGNIFICANT AND COMPELLING MENTAL HEALTH EVIDENCE IS SUCH THAT THERE IS A REASONABLE PROBABILITY THAT AT LEAST ONE JUROR WOULD HAVE WEIGHED THE AGGRAVATING AND MITIGATING FACTORS DIFFERENTLY.

Habeas counsel contend that trial counsel were ineffective when they failed to uncover and present readily available mitigating evidence, in violation of his right to effective assistance of counsel and the Fifth, Sixth, and Eighth Amendments to the United

States Constitution.  Rodriguez contends trial counsel performed deficiently in a number of particulars, including: (1) failing to investigate and present his social and mental health history in its full "richness and detail;" (2) inadequately challenging the government's mental health history; and (3) failing to communicate his fundamental humanity. According to Rodriguez, trial counsel's ineffective performance gave the jury no reason to spare his life.

> 1.  **Overall Mitigation Investigation**

Even though Rodriguez's defense was confined by budget limitations that are part of all capital trials, the record demonstrates that trial counsel conducted an extensive investigation of Rodriguez's history, identified a number of mitigation themes, located highly regarded experts, competently vetted the experts they retained, and presented evidence supporting a number of mitigating factors for the jury's consideration during the penalty phase.  As would be expected, the mitigation evidence evolved as the case was prepared for trial.  But, the record shows the pretrial investigation was broad and included many topics, including: the effects of poverty-migrancy; race and community violence; sexual assault; mental illness-brain damage-learning disabilities; drugs-alcohol; toxins and pesticides from the fields and other health issues; Rodriguez's fear of release; institutional adjustment; institutional failure; "good person mitigation;" cost to family regarding Rodriguez's behavior; and family history. (Doc. #1119, pp. 337–39).

Trial counsel retained mitigation specialist Ingrid Christiansen who performed the essential information gathering and organization to effectively present the mitigation case. Ms. Christiansen was highly experienced, having worked on 45 death penalty cases prior to accepting the Rodriguez assignment.  (Doc. #1119, p. 201).  Because of ongoing budget

discussions, trial counsel was unable to hire a mitigation specialist as early as they would have preferred (Doc. #1118, p. 117); however, Rodriguez has failed to identify any prejudice resulting from the delay.  In fact, Ms. Christiansen interviewed a substantial number of people who were familiar with Rodriguez and the various elements in his life (over 37 people were interviewed, sometimes multiple times).  (Doc. #1119, pp. 227-28; 257–66; 270–326; and interview notes attached as exhibits).  She prepared and revised a chronology for the case that ultimately reached 69 pages.  Id. at p. 211.

At one of the *ex parte* hearings addressing budget issues, trial counsel called as a witness Richard Burr, who was at that time Federal Death Penalty Resource Counsel.  Burr offered the following opinion on Ms. Christiansen's competency:

> Oh, Ingrid, in the sort of upper midwest, Ingrid is one of the best.  She's certainly at the top of her profession in this part of the country.  There are two or three other folks whose work is as good as Ingrid's, but I don't think there's anybody who does better work than she does.

(Doc. #1118, p. 120).  The evidence presented at trial and that which has been developed in this proceeding supports Burr's assessment of Christiansen's proficiency in uncovering and obtaining mitigating evidence.

This is not a case where trial counsel presented scant mitigation evidence.  Trial counsel called experts, including Ms. Christiansen, to explain to the jury the impact and significance of Rodriguez's neglectful childhood, his history of sexual abuse, his history of drug and alcohol abuse, his exposure to toxins, his experiences with race discrimination, his intellectual functioning, and mental health diagnoses—all of which were factors trial counsel argued were reasons to spare Rodriguez's life.  Trial counsel called 25 witnesses.  These witness built the case to submit 30 mitigating factors for the jury to examine and

weigh.  Counsel was successful in persuading the jury to find a number of mitigating factors, some of which the jurors unanimously found.  The special findings of the jury show:

- seven jurors agreed that Rodriguez had been sexually abused as a child

- three jurors found that Rodriguez has brain damage

- six jurors found that Rodriguez had learning problems in school because he grew up in a migrant family that moved from place to place during the school year.

- all 12 jurors found Rodriguez suffers from a mental disorder or impairment

- all 12 jurors also found that Rodriguez was introduced to addictive drugs and alcohol early in life and suffered from alcoholism and drug addiction during his lifetime

- nine jurors agreed that Rodriguez had learning problems in school because he was developmentally delayed as a child

- all 12 jurors agreed that Rodriguez had suffered from racial prejudice during his lifetime

- all 12 jurors also agreed that Rodriguez had responded well to structured environments and would likely make a good adaptation if sentenced to life in prison

- all 12 jurors further agreed that Rodriguez had raised concerns to prison officials about being released from custody in 2003

- all 12 jurors found that Rodriguez showed love and kindness toward his family, including his mother, his sisters, his nephews, and his niece, and that each of them will suffer emotional pain if Rodriguez is executed

- eight jurors believed that considerations of mercy support a sentence of life imprisonment without the possibility of parole

(Doc. #727, pp. 8771–76; Doc. #626, Special Verdict Form).  The jury's verdict demonstrates that trial counsel presented a compelling case on many mitigating factors. Based on the evidence in front of the jurors, during the weighing process, however, the jurors determined that the aggravating factors outweighed the mitigating factors.  That is

neither a reflection on trial counsel's competence nor a demonstration of overall inadequate

performance.

## 2. Specific Complaints About Trial Counsel's Performance - Toxins Exposure

Rodriguez first asserts the toxicologist retained by trial counsel, Dr. Donald Ecobichon,[3] was inadequate because he never examined him and thus could not give a personal account of his history or any connection between exposure to pesticides and propensity to commit violent crime at trial. Trial counsel explained that this was a strategic decision and explained why this decision was made:

> Well, it was my belief at that time that Dr. Froming had done the sort of evaluation that we needed to show the deficits that Alfonso had based on the exposure to neurotoxins. So, I mean, I just didn't consider a second examination necessary. That's one reason.
>
> The second reason is if Dr. Ecobichon had examined Alfonso and was going to testify to his findings about Alfonso's physical or mental state, that we would have had to disclose that examination, file a report, go through 12.2 protocol.
>
> Q. And so by not having Dr. Ecobichon evaluate your client, you avoided having to disclose his report beforehand under Rule 12.2?
>
> A. Yes.
>
> Q. And what matter of disclosure did you give to the prosecution instead of a 12.2 disclosure with respect to Dr. Ecobichon's testifying?
>
> A. Pretty much none. Day before we told the Court and counsel that he was going to testify.

---

[3]Trial counsel retained Donald Ecobichon as their expert on toxin exposure. They received his information from the Federal Death Penalty Project. Dr. Ecobichon wrote a book on the effects on humans of the toxin exposures that were pertinent in this case. (Doc. #1118, pp. 97, 99). There is nothing in the record to suggest that Dr. Ecobichon was not qualified to evaluate the impact toxin exposure had on Rodriguez's health or decision-making ability.

(Doc. #1118, pp. 109–09). Trial counsel also explained what information was provided to Dr. Ecobichon, which formed the bases for his opinion that Rodriguez's symptoms were "more consistent with periodic exposure to organophosphorus/carbamate insecticides, particularly those associated with the central and peripheral nervous systems." Id. at p. 100. Dr. Ecobichon reviewed information gathered by Ms. Christiansen, such as family history of illnesses, symptoms indicative of neurological problems, and also records obtained by trial counsel documenting toxins used in the Red River Valley on sugar beets during the relevant time period. Trial counsel testified:

> I spent a couple of days in a dusty room at the Farm Bureau here going through records of what pesticides were used at various times. So we had a range of things, herbicides and -- pesticides I should say and submitted all that to Dr. Ecobichon.

Id. Trial counsel provided information related to Rodriguez's exposure to pesticides both as a child in the fields and later when he was working in the American Crystal Sugar plant. Id. at pp. 102–03.

Given the evidence in the record, Dr. Ecobichon had sufficient information to form his opinions. While the evidence was not successful in persuading the jury that Rodriguez suffers from the effects of exposure to toxins or that he has neurological or psychological problems that impaired his ability to make good decisions, it does not logically follow that trial counsel's investigation or presentation of evidence at trial on this issue was inadequate. Sometimes perfectly appropriate arguments and theories simply do not persuade a juror.

The Supreme Court recently reiterated the standard courts should apply to ineffective assistance of counsel claims:

> [W]e have often explained that strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness.

115

> Harrington v. Richter, 562 U.S. 86, 104 (2011).  Defense lawyers have 'limited' time and resources, and so must choose from among 'countless' strategic options. Id. at 106–107.  Such decisions are particularly difficult because certain tactics carry the risk of 'harm[ing] the defense' by undermining credibility with the jury or distracting from more important issues. Id., at 108.
>
> The burden of rebutting this presumption 'rests squarely on the defendant,' and '[i]t should go without saying that the absence of evidence cannot overcome [it].' Burt v. Titlow, 571 U.S. 12, 22–23 (2013).  In fact, even if there is reason to think that counsel's conduct 'was far from exemplary,' a court still may not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen. Id. at 23–24.

Dunn v. Reeves, ___ U.S. ___,141 S. Ct. 2405, 2410 (2021).

Rodriguez has not met his burden of rebutting the strong presumption of reasonableness.  The record demonstrates trial counsel's decisions in selecting and retaining the expert, developing expert opinions, and presenting resulting evidence on Rodriguez's toxin exposure to the jury were well-reasoned, tactical decisions that courts give deference to when analyzing ineffective assistance of counsel claims.  Because habeas counsel has come forward with an arguably better strategy or more favorable expert testimony is the type of second-guessing and exploitation with the benefit of hindsight that courts have consistently stated cannot form the basis for a claim of ineffective assistance of counsel.  See Anderson v. United States, 393 F.3d 749, 753 (8th Cir. 2005) (quoting Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir.1997)).

### 3.   Specific Complaints About Trial Counsel's Performance - Mental Health Experts

Rodriguez also asserts trial counsel's decision to instruct his evaluating psychologist and neuropsychologist to refrain from inquiring about the crime was ineffective. According to habeas counsel, this decision sent a message to the jury that even his own defense team

116

did not trust Rodriguez. Whether the jury perceived counsel's limitation in the manner that habeas counsel asserts is unknowable, speculative, and cannot form a basis for relief.

Rodriguez's habeas counsel also claim that the expert testimony presented at trial was actually more harmful than helpful to Rodriguez's cause. This claim is belied by the record. Trial counsel hired two experts to address different aspects of Rodriguez's psychological profile. Trial counsel explained that they decided to retain Dr. Karen Froming, a neuropsychologist, to examine "the functioning of [Rodriguez's] brain in the sense like a machine functions, you know, the deficits, the problems." (Doc. #1118, p. 88). The other expert counsel retained, a clinical psychologist, Dr. Marilyn Hutchinson "was looking past that, although including that, to how [Rodriguez's] behavior has been affected by his growing up, his environment, and other mental issues he might have." Id. at pp. 88–89.

Burr, in support of trial counsel's funding requests, advised the Court that Dr. Froming "is very highly qualified. Among neuropsychologist who practice in death penalty cases around the country, she is in the top two." Id. at pp. 141. Trial counsel had a particular reason in mind for selecting Dr. Froming over others; she was knowledgeable and familiar with the effects of neurotoxins on the brain, which was something Rodriguez's trial counsel believed could be an important consideration in Rodriguez's mitigation case. Id. at pp. 141–42.

While Burr was less familiar with Dr. Hutchinson, he had recently participated in a couple of extended meetings with her in another case. Dr. Hutchinson had "impressed [Burr] very much as a person who knows how to see pattern in a client's life and is able to develop hypotheses that are far beyond what we as lay folks can develop and then lead to

very fruitful, deeper investigation.  She is as good as any expert I've seen in the country at doing that." Id. at p. 144.

The Court, having presided over the trial and reviewed the record, is unconvinced by Rodriguez's argument that the testifying experts did more harm than good when considering their evaluations and opinions about Rodriguez's mental health known to them at that time.  The experts presented themselves to the jury as credible, qualified, and knowledgeable witnesses, which led the jury to find that a number of mitigating factors had been established by the greater weight of the evidence.  The jury necessarily based their findings on the testimony of the expert witnesses that Rodriguez now calls into question.

The Court's findings on the value and competency of Rodriguez's mental health experts do not entirely resolve his claim.  The final aspect of Rodriguez's claim is whether counsel performed deficiently when they crippled the mental health experts' ability to conduct a thorough evaluation by prohibiting the experts from discussing the circumstances of the offense with Rodriguez.  As noted in the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, "the mitigation function is of utmost importance in the defense of capital cases."  36 Hoffstra L. Rev. 677 (2008).  Accordingly, counsel "must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death."  Id. at 689, Guideline 10.11(B).

Trial counsel's decision to place limits on the ability of their own mental health experts to access information pertaining to their client's mental health deprived the experts of important and significant relevant  information, which fundamentally impacted the

presentation of Rodriguez's defense and mitigation case.  By making this decision, trial counsel prevented the experts from developing compelling mitigation evidence and perhaps even an affirmative defense to the crime. (Doc. #763-6; #763-5).  In addition, because they were not provided with the other experts' opinions prior to their testimony, the experts called as witnesses felt unprepared at trial and were subjected to withering cross-examinations.  Id.

While it is true that trial counsel presented evidence through Dr. Hutchinson that indicated Rodriguez suffers from PTSD, the government rebutted that testimony with its own an expert, Dr. Pitt.  Dr. Pitt was dismissive of Dr. Hutchinson's opinion, telling the jury that absolutely nothing supported Dr. Hutchinson's PTSD finding.  (Doc. #724, pp. 8512–13, 8551).  Dr. Pitt discredited Dr. Hutchinson's testing and assessment and expressed  absolute certainty in his conclusion that Rodriguez does not suffer from PTSD.  Specifically, Dr. Pitt responded to defense counsel's question about Rodriguez's PTSD diagnosis, by testifying:

> Sir, it looks like a duck, it walks like a duck, it talks like a duck, it sounds like a duck, it's a duck.  He doesn't have it.

(Doc. #724, p. 8551).  The government also consulted with another expert who did not testify at trial, Dr. Martell, but who prepared a report and assisted the government with topics to cover during cross-examination to discredit Rodriguez's mental health experts.

The evidence adduced in this proceeding paints a very different picture.  The record as now developed contains creditable evidence indicating Rodriguez not only suffers from PTSD, as Dr. Hutchinson testified at trial, but that  Rodriguez's PTSD may be so severe that it causes Rodriguez to enter into full-blown dissociative states.  The only reason that this

evidence was not exposed pretrial is because trial counsel made a conscious decision to limit the experts' ability to talk to Rodriguez about the offense conduct.

The evidence in the record at the time of trial related to Rodriguez's victims and the circumstances of the offense lends support to the possibility that Rodriguez could have been in a dissociative state at the time of this offense.  When allowing the government to introduce evidence of two prior sexual assault convictions under Fed. R. Evid. 413, the Court found the similarity of the victims' age (the prior victims were 18 years old and Sjodin was 22 years old) was alone sufficient to allow the introduction of the convictions under Rule 413.  (Doc. #424).  In addition to the age similarity, the Court noted that Rodriguez attacked, for the purpose of sexually assault, college-aged women who were alone and leaving public places.  Id.

In addition to the Rule 413 evidence, Rodriguez related to the mental health experts who were retained for trial, both by the defense and the government years before Dr. Stewart diagnosed Rodriguez with PTSD-related dissociative experiences, that he had flashbacks from the sexual abuse.  Rodriguez identified situations that trigger his childhood sexual abuse to Dr. Hutchinson and Drs. Pitt and Martell.  He reported to Dr. Hutchinson:

> the sexual flashbacks come primarily as smells: the smell of the barn, oranges and a musky, moldy smell of old blankets prompt memories of the teenager. The scents of lemon pledge and incense from the church, the sight of a nun in a habit and the smell of some perfumes will trigger feelings of claustrophobia.

(Doc. #774, Dr. Hutchinson's mitigation report dated 8/6/2006, p. 15).  Rodriguez reported to the government experts, Drs. Pitt and Martell, that certain people remind him of the person that abused him.  (Doc. #773-3, Transcript of Clinical Interview on 8/4/2006, p. 48).  Rodriguez described the person that sexually abused him as "tall, blond, she was

young. . . . She was 22 or . . . 21, 22, around there somewhere." Id.  When he sees a person

that reminds him of his abuser, Rodriguez feels "panic" and "anger."  Id. at pp. 48–49.

Rodriguez told the government's mental health experts that he started noticing these

reactions when he was 13 years old.  Id. at 50.  Rodriguez detailed to Drs. Pitt and Martell

how the memories of the abuse started surfacing:

> It didn't come to me until I was 13.  I don't remember if there was a wedding
> that I got invited to, or a funeral.  I still can't remember.  But anyway, I went
> into the church, but as soon as I went into the church I got this anxiety, you
> know. I don't know if it was the smell, or just the church itself.  But it never
> happened in a church.  So I figured it was the smell.  Uh, every time I smell
> like what would be Lemon Pledge, I always would get this weird feeling, you
> know.   And then finally it just started coming back.  You know.  And then
> finally I remember it. I didn't tell someone about it. . .I don't think I told
> anybody until I went through treatment.

(Doc. #773-2, Transcript of Clinical Interview on 8/4/2006, p. 81).

The Court notes, as have both sides, that a review of the voluminous evidence in this

case, shows Rodriguez sometimes gave inconsistent responses.  This inconsistency cannot

be explained away by reference to the record as a number of possible reasons exist.  The

inconsistency might be a garden-variety credibility issue.  But it also might be a result of

Rodriguez's attempts to comply with the directions he was given by trial counsel to avoid

discussing certain issues and aspects of the case during the pretrial expert interviews.  It

could also be because of Rodriguez's brain damage and low intellectual functioning.  It

could be something else.   That said, what the record does show is that there was

information provided by Rodriguez to both his own experts and the government's experts

that should have caused counsel and experts to further investigate whether, and to what

extent, the past sexual abuse may have impacted Rodriguez's conduct in this

case—particularly in light of his reported flashbacks and similarity between his abuser and

each of the crime victims.

In most capital habeas corpus cases, the new evidence before the Court is present because habeas counsel hired a more skilled expert or developed a better strategy with the benefit of hindsight. This is not such a case. Rather, this new and significant mitigation evidence pertaining to Rodriguez's mental health was never fully exposed and investigated pretrial because of trial counsel's conscious decision to limit the experts' ability to speak to Rodriguez about the circumstances surrounding the offense. As it does with the Court, trial counsel's limitation on the experts raised concerns for Dr. Froming:

> I was specifically not asked to discuss any elements of the crime with Mr. Rodriguez. I actually found this unusual as the individual's neuro-psychological functioning can be at issue at during the commission of the crime. At no time was under the impression that the attorneys were going to attempt to assert a not guilty defense and seek an acquittal. Therefore, the elements of the crime and Mr. Rodriguez's recollection of it would have been important to me.

(Doc. #763-5, ¶ 18). Although Dr. Froming observed during her evaluation, behavior by Rodriguez that may be consistent with dissociative experiences, she was unable to fully explore it or what impact it might have had on the offense. Instead, she merely noted Rodriguez's behavior and statements in her records:

> It also brings to mind interactions that I had during testing with Mr. Rodriguez in which he made the following comments, 'tests are really hard for me. I kind of like blank out, the tremor is so bad that writing is difficult.' I wrote a comment in which I noted that he not only goes blank but he clearly was so anxious that his hands were sweaty and he wet the paper towels that he had brought in with him. He further commented, 'can't even think or see the word.' This clearly would be consistent with mild dissociation from having to 'perform' with me, a female examiner. He discussed intrusive thoughts with me and that when he had them it would take him '3-4 days to get back to normal.'

Id. at ¶ 20.

When habeas counsel presented Dr. Hutchinson with the additional information obtained from a post-trial interview with Rodriguez, which included Rodriguez's accounting of the circumstances of the offense, Dr. Hutchinson's opinions and trial testimony would have been remarkably different.  She explains:

8.      Had I known Mr. Rodriguez's version of the death of Dru Sjodin, I would have come to the same conclusions as Dr. Stewart - that Mr. Rodriguez suffers from such a severe and debilitating case of PTSD and that illness played such a role in his reaction to Dru Sjodin that he was unable to appreciate the wrongfulness of his actions. Directing Mr. Rodriguez not to discuss the crime with any of the four mental health evaluators had the consequence of skewing the data relied upon by all of us.

9.      Further, I would have been able to more convincingly support my PTSD diagnosis.  I did not have Mr. Rodriguez's own descriptions of his dissociative symptoms and this was effectively exploited by Dr. Pitt's testimony in his descriptions of Mr. Rodriguez's motives, emotions and experiences as well as my competence as an evaluator.

(Doc. #763-6).  Dr. Froming's response to the additional information was similar:

To summarize, my task was very delineated to perform a neuropsychological evaluation. There was no real discussion of what Dr. Hutchinson found, her testing, and his behavior. I never received her report, which would have been helpful to me interpreting not only some of his comments and behavior but also his test behavior. I was given direct instructions to avoid discussing the actual crime. It would have provided with me the opportunity to note traumatic responding if it was there, to note how his neuropsychological deficits related to what happened during the period surrounding the crime. I was never given Drs. Pitt's or Martell's reports.  I was never given the transcript of their interview or a video of their interview. Perhaps that also would have provided me with important information.

(Doc. #763-5, ¶ 22).

In addition to the opinions of Rodriguez's trial experts, Dr. Pablo Stewart conducted an evaluation of Rodriguez and prepared a report at the request of habeas counsel.  (Doc. #763-1).  Dr. Stewart is a physician licensed in California, who specializes in clinical and

forensic psychiatry.  Id. at p. 1.  Put succinctly, Dr. Stewart's professional opinion is that Rodriguez has suffered from a chronic and severe case of PTSD since childhood.  Id. at p. 17.  After considering all pretrial information, evidence presented at trial, and additional information gathered post-trial as well as information gleaned from his clinical interview, Dr. Stewart asserts Rodriguez "overwhelmingly meets the criteria for PTSD." Id. at p. 27.  And that it was Rodriguez's untreated PTSD which led to the kidnapping and murder of Sjodin.  Id.

Unlike the government's expert, Dr. Pitt, who was unwavering in his opinion that there was no possibility that Rodriguez suffers from PTSD, Dr. Stewart concluded "the record is replete with references to Mr. Rodriguez's sexual abuse, anxiety disorder, substance abuse as self-medication, as well as a variety of PTSD-related symptoms, though these symptoms were not linked to PTSD by anyone at trial." Id. at 29.

The government argued *modus operandi* to the jury, claiming that Rodriguez had a pattern of deliberately selecting women of a certain age and type, with a purpose of indulging his "rape fantasies" by sexually assaulting the woman.  This stands in stark contrast to Dr. Stewart's expert opinion, in which Dr. Stewart recounted the information Rodriguez provided him about the offense, which is consistent with the possibility that it was Rodriguez's untreated severe PTSD that triggered the events on November 22, 2003:

> [Rodriguez] recalled that, as he walked towards Marshall Fields at the mall in Grand Forks, he saw a young woman walking out of the store who looked just like the college student who sexually molested him when he was a child.  He reported that he could not stop staring at her and immediately experienced a flood of emotions and physiological reactions.  He described feeling fear followed by anger, and then panic.  He began to dissociate, re-experiencing the abuse of his childhood.  He described confused and chaotic thinking.  At one level, he realized that the woman who abused him would have to be much older than the young woman he saw at the mall.  But, he

> could not convince himself and could not act on that reality. He felt compelled to follow the woman. He described struggling with himself as he followed her. When she got to her car, she sat in the driver's seat talking on her phone with her head turned. As Alfonso approached, she looked up at him and, although he had been telling himself that it couldn't be his abuser, he described feeling shock and a physical reaction of surprise when he realized that she was not the same woman who abused him. He was, by this point, in a full-blown dissociative state.

(Doc. #763-1, p. 27). Like Drs. Froming and Hutchinson, Dr. Stewart detailed the effect of trial counsel's decision to limit the information obtained during the evaluations of Rodriguez's mental health:

> All four doctors were instructed not to ask Alfonso about the kidnapping and murder of Dru Sjodin. Alfonso was told that they would not be asking him about it and advised by counsel not to discuss it. Not only did this omission automatically eliminate PTSD as a potential guilt phase defense, it skewed the data upon which all four mental health professionals were relying for their expert opinions. Since the crime was a direct result of Mr. Rodriguez suffering from PTSD, these instructions necessarily required him to give inconsistent answers regarding his symptoms and history.

Id. at p. 30.

Despite this new evidence now before the Court, the Court recognizes that three things are indisputably true. First, the jury unanimously found that Rodriguez suffers from a mental disorder or impairment. (Doc. #626, Special Verdict Form). Second, although Rodriguez was willing to disclose information about himself, his family, and his past to the evaluating experts, Rodriguez's post-trial disclosures about the circumstances of the offense were not available pretrial to defense counsel because Rodriguez persisted in his claim of innocence. Trial counsel explained:

> Q.    And you've discussed the case with your client both before and after th[e] discovery [of her body]?
>
> A.    I attempted to, yes.

125

Q.     And during some of those discussions Mr. Rodriguez denied involvement in Ms. Sjodin's disappearance?

A.     That's true.

Q.     And he didn't tell you anything about Ms. Sjodin's injuries or the manner in which they were inflicted?

A.     The general response, and I have to paraphrase, that I got from Mr. Rodriguez was that he couldn't help us or couldn't help them locate the body because he wasn't involved or he can't plead guilty to something that he didn't do, words to that effect.

(Doc. #1071, pp. 511-12).

And, third, it is expected that the government would vigorously contest the defense experts' conclusions that Rodriguez suffers from severe PTSD and was in a dissociative state at the time of the offense.  These indisputable aspects of the case, however, are not determinative factors the Court is to consider when analyzing the particular ineffective assistance of counsel claim now before it.  As recently summarized by the Eighth Circuit Court of Appeals, the relevant question in a challenge to a death sentence in the context of a purported inadequate penalty phase mitigation investigation is

> whether there is a reasonable probability that, absent the errors, the factfinder would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.  To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.  This standard applies—and will necessarily require a court to speculate as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase.

Nelson v. United States, 909 F.3d 964, 970 (8th Cir. 2018) (cleaned up).  It is beyond question that the admissible evidence on aggravation and mitigation would look remarkably different today than it did at trial, despite the extensive evidence that was

126

presented on the 30 mitigating factors submitted to the jury.

While the additional mitigation evidence adduced in this proceeding would provide a more complete picture of Rodriguez's mental health issues and intellectual functioning, the Court finds these things, alone, are not enough to show a reasonable probability that the outcome would have been different.  But, there are three things that set Rodriguez's case apart from others that have raised similar issues following the imposition of a death sentence.  First, trial counsel failed to pursue a viable insanity defense because they failed to perform an adequate pretrial investigation.  Second, the inadequate investigation crippled Rodriguez's own mental health experts from accurately assessing his mental health condition and effectively testifying at trial.  Finally, the government's most compelling evidence in aggravation has been deemed inadmissible.

As to the first reason, the inadequate investigation of Rodriguez's mental health conditions, which the ABA Guidelines for death penalty counsel state must be "exhaustive," led to trial counsel's failure to discover evidence of a potential affirmative defense (insanity).  In his report, Dr. Stewart concludes to a reasonable degree of medical and psychiatric certainty that Rodriguez meets the federal standard for insanity, as set forth in 18 U.S.C. § 17. (Doc. #763-1, p. 31).  This is an affirmative defense that was never presented to the jury not because it was tactically abandoned, but because it was never discovered. The failure to discover an affirmative defense because of an inadequate investigation is not a reasonable strategic decision that falls within the bell curve of professional competency, nor can the Court say on this record that pursing such a defense would have been without merit or futile.  See Forsyth, 537 F.3d at 892.

While courts have long rejected ineffective assistance of counsel claims when the

evidence defendant asserts should have been introduced is merely cumulative, see Elam v. Denney, 662 F.3d 1059, 1066 (8th Cir. 2011) (stating "it cannot be deficient performance to fail to present cumulative, no-more-favorable expert testimony"), the evidence at issue here is not cumulative. The government specifically noted the absence of evidence of insanity during its arguments to the jury:

> You must determine what is the appropriate punishment for such intentional acts, such intentional acts by a defendant with a proven record of repeatedly picking out women to victimize for his own sexual gratification, brutalizing them in the process, threatening, choking, stabbing, damaging them for life, and he was just getting warmed up. All that before he chose to ready his knife, locate some cord, drive his car to Grand Forks in search of someone to drag kicking and screaming into his sordid rape fantasies.

> * * *

> The acts of a mad man? Hardly.

> Not even defense witnesses try to make that case. Rather Alfonso Rodriguez cares for those he chooses to care about. He cares for those that he chooses to care about. And he ravages, rapes, sodomizes and terrorizes those who he decides don't matter much to him, those who become the target of obscene phone calls, stalking, his rape fantasies, and then a string of rape attacks.

(Doc. #725, pp. 19-21).

Second, even if Rodriguez was unsuccessful in pursuing an insanity defense, the evidence that he suffers from PTSD that is so severe that the disorder causes him to have dissociative experiences is the type of evidence that could convince at least one juror to strike a different balance. In the Court's re-weighing analysis, it is helpful to start with a review of the government's arguments to the jury and what it perceived was most compelling about its case. And there is no doubt as to what the government believed was the most compelling: it was the evidence related directly to Rodriguez's ability to control

128

and regulate his actions because he was not "a mad man."  For example, the government argued at the eligibility phase that Rodriguez's history and behavior demonstrates a clear intent to harm women: "Don't forget about target.  Waiting, looking.  Perfect opportunity to carry out his plan.  Then across at the mall, try his luck there."  (Doc #717, p. 65).  With no investigation of Rodriguez's mental condition at the time of the offense, trial counsel had no evidence to rebut the government's argument.

At the selection phase, the government again emphasized how Rodriguez's conduct in harming women, including Sjodin, could only have been purposeful, deliberate, intentional, and planned:

> The defendant was 50 years old and on November 22nd, 2003, he decided it was time again to pursue one of his rape fantasies.  He didn't care that Dru Sjodin was just 22, three years out of Pequot High School.  She probably still remembered what it was like to be crowned the Homecoming Queen.  He didn't care.
>
> This is the time for punishment.  Punishment.
>
> * * *
>
> The Rodriguez family is entitled to the sadness that they have expressed for the defendant.  They gave this defendant every chance they could across the many years, but his choices have brought them here to this place.
>
> And when you consider the defendant's list of proposed mitigation, the United States respectfully urges you to conclude that the pain that his intentional acts have caused his family should not be allowed to weigh in his favor now; that he could benefit from what he has caused would be a gross injustice.
>
> The justice of a death sentence in this case is about Alfonso Rodriguez and how he has damaged so many innocent lives and brought raw human tragedy to so many people by intentionally choosing to murder a promising and productive member of our community in the most brutal, the most heinous, and inhumane way.

(Doc. #725, pp. 21–22).  Later on during the same closing argument, the government told

the jury:

> The defendant has impressive control actually.  And this is why, even as you decide - - if you decide that some of the proposed factors are proven factually, they do not mitigate we argue to you in this case because they do not influence the defendant's ability to choose and, therefore, choose differently.

Id. at p. 48.  The government minimized Dr. Hutchinson's PTSD diagnosis, Rodriguez's

mental health condition, and the impact PTSD has on people:

> Ladies and gentlemen, the defendant had been examined by a host of mental health professionals - - we heard a lot about that - - and caseworkers, sex offender programs over the decades of incarceration.  He had also been observed by coworkers in the prison setting, correctional officers that he interacted with.  None of the mental health professions get the same mental health diagnosis of brain damage and posttraumatic stress disorder.  You know, that thing that - - I can't remember if it was 29 or 39 percent of New Yorkers in Manhattan on 9/11 have.  Remember that only one person was asked even, if this were true, what would it mean?  What would it change?  That was yesterday, Dr. Pitt.  Absolutely nothing.

> Insanity is not even alleged in this case by the defense or anyone else.  We need to be clear about that.  So it's not even on the table.

> Nevertheless, though, Dr. Hutchinson took a look at the childhood photograph of the defendant and proclaimed his head to be big.  Big compared to what?  Big how?  No measurements.  No medical records or doctors who examine the defendant.  Nothing direct.  Just inferences.  Just mentioned it.  What utter nonsense in a court of law.  This is the nature of the case in mitigation.  Put it up, hope it sticks.

> Dr. Hutchinson claimed that when kids have big heads, that sometimes can signify autism or retardation.  Of course, you recall that [co-counsel] caught that and asked Dr. Hutchinson whether she was now claiming or had any evidence that the defendant is autistic or retarded.  No was her answer, neither of those.  She should guess not.  I.Q. of 87, able to converse with psychiatrists for five hours, 500 books in a period of a couple years, rattle off all the authors.  Why mention it them?  Just another cloud to blast up into the air hoping that no one is going to notice.

Id. at pp. 41-42.  Over and over again the government focused on the intentional choices

made by Rodriguez:

Then he refused treatment altogether before walking off all of his time, fighting civil commitments, strolling out the door back out of prison, never looking back, never looking for help.  He chose not to care, and he chose to live out his rape fantasy on Dru Sjodin.  She suffered for his pleasure.  She died for his convenience.  All at his choice.

Looking back, whatever our individual circumstances, almost everyone would change certain things that have happened along the way if we could, but regardless of what defense experts are trying to sell you in this case, we also each know that we are surrounded by people, people who have made more of their lives than their troubled beginnings might have supposed. We're surround by them. Choices. Choices and decisions, intentional actions and full consequences for what we choose to do.

Id. at pp. 52-53.

Given the additional evidence presented as part of this proceeding, the intentional choices that the government fixated on with the jury may not be so.  The evidence presented as part of this proceeding is cumulative only in one small aspect—that is, Dr. Hutchinson's diagnosis of PTSD.  But, that diagnosis was quickly and definitively rebutted by the government's expert (even though Rodriguez provided the government's experts information that would suggest Rodriguez suffers from PTSD arising from childhood sexual assault).  It was dismissed out of hand during the government's closing arguments.

Upon careful review and study of the record, the Court finds Rodriguez has presented sufficient evidence to raise a genuine issue for a jury to determine whether his PTSD is so severe that he goes into dissociative states.  In addition, the evidence is sufficient to raise a genuine issue for a jury to determine whether Rodriguez was in a dissociative state at the time of the offense.  These are questions that ought to go to a jury for resolution.

The final reason the Court finds this case is different than other cases challenging counsel's investigation and presentation of mitigation evidence is because of the expert opinions presented by the government that the Court has found inadmissible in Claims 2A,

2B, and 17, the admission of which resulted in a violation of Rodriguez's constitutional rights.

Without McGee's opinions, the objective scientific evidence supporting sexual assault is gone.  Without McGee's opinions, the government's theory that the most likely and plausible cause of death was her throat was slashed and she was left to bleed out in the ravine is speculative and unsupportable by the evidence.  It follows that omission of the government's most compelling evidence in aggravation—Rodriguez slashed Sjodin's throat from ear-to-ear by plunging and repositioning the knife when it was impeded by internal structures in the neck—would change the weight given to the aggravating factors.  Once that evidence is removed from the re-weighing that the Court is required to do, there is a reasonable probability that, absent trial counsel's errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant a death sentence.

The Court bases its finding on two grounds: (1) the change in the evidence that is admissible in aggravation and the value of the new mitigation evidence uncovered in these proceedings that the court has weighed; and (2) the length of the jury's deliberations.  The jury began the final phase of its deliberations on a Wednesday, at 12:27 p.m. (Doc. #615).  It deliberated all day on Thursday, from 9:07 a.m. to 4:30 p.m. (Doc. #624).  It deliberated for two more hours on Friday, from 9:05 a.m. to 11:06 a.m. (Doc. #625).  The length of the jury's deliberations is indicative that weighing the evidence to decide on the appropriate punishment was a difficult decision for the jury.  With the omission of inadmissible evidence and the addition of more mitigating evidence, that decision could be less difficult.

In conclusion, because Rodriguez's death sentence "resulted from a breakdown in

the adversary process that renders the result unreliable" <u>Strickland</u>, 466 U.S. at 687, and a reasonable probability exists that at least one juror would have struck a different balance, the Court finds Rodriguez is entitled to relief on his ineffective assistance of counsel claim based on inadequate investigation of his mental health.  The relief Rodriguez is entitled to is a new penalty phase trial.

**CLAIM 5:**   **BECAUSE THERE IS INCONCLUSIVE EVIDENCE ESTABLISHING RODRIGUEZ SATISFIES THE CRITERIA FOR INTELLECTUAL DISABILITY MANIFESTING BEFORE AGE 18, HIS EIGHTH AMENDMENT CLAIM FAILS AND SO DOES HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM ON THIS ISSUE.**

Rodriguez challenges his death sentence on the ground that he is exempt from execution because he is intellectually disabled[4] and his condition manifested before he turned 18 years old.  The Supreme Court concluded in <u>Atkins v. Virginia</u> that executing intellectually disabled persons serves no penological purpose; runs up against a national consensus against the practice; and creates a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."  536 U.S. 304, 317–321 (2002).

The Court held a nine-day long evidentiary hearing on the issues related to intellectual disability.  The parties submitted post-hearing briefs in December 2020 and January 2021.  (Docs. #1137, 1144, 1148).  The government and its experts assert that Rodriguez has low to average cognitive functioning, but he does not meet the criteria for intellectual disability.  Habeas counsel is adamant that the records and their experts' opinions establish that Rodriguez meets the diagnostic criteria for intellectual disability.

---

[4]Today, "intellectual disability" is the accepted way to identify the medical diagnosis classifying individuals who have below average intelligence and below average conceptual, social, and practical skills.  Individuals with this condition were previously classified as "mentally retarded."

The truth lies somewhere between these two rather stark positions.

Relying mainly on Dr. Michael Welner's findings and testimony, the government advances arguments that, at first blush, cause a reasonably informed person to believe they are based on outdated stereotypes of intellectually disabled individuals. Intellectually disabled people can drive a car. They can carry on conversations with others about events that happened in their life as well as current events existing in society. They can maintain employment. They are not without ability to solve problems. They can learn to use electronic devices. They can cook meals. They can be taught to avoid certain foods to manage a health condition like diabetes. While the government pointed out these types of activities as evidence that Rodriguez does not have sufficient deficits to meet the criteria for intellectual disability, under the guidance for diagnosing intellectual disability, an individual's strengths are not to be balanced against or cancel out their weaknesses. Common sense tells us intellectually disabled people can learn, they can follow instructions, they can develop skills, they can socialize with others, and they have value in our society. When analyzing adaptive functioning for purposes of determining whether a person is intellectually disabled, the point is to look at the complexity and the context in which the tasks and activities are being carried out, not simply end the analysis because an individual is capable of performing an everyday task or activity.

There is some evidence in the record about Rodriguez's ability to function in society. But, because he has spent so much of his life in prison, there is far more evidence about his ability to adapt to prison life. Rodriguez was not as withdrawn and socially isolated as a child as his counsel suggest. He had friends. While his friends might have been two or three years younger than him, they seemingly fit within his peer group in light of his grade

level. His friends have reported that Rodriguez partied with them. Childhood friends have recalled that Rodriguez was liked by others. He had age-appropriate girlfriends. Despite the teasing and bullying, there were children that considered Rodriguez their friend and interacted positively with him.

Rodriguez's own statements create a question about how much weight to give his academic performance. There is no evidence indicating anyone encouraged scholastic achievement at school or in the Rodriguez household (his dad was illiterate; his mother had a 4th grade education; other siblings were also failing in school; and the school records do not document any such efforts). Rodriguez himself has reported that he did not put forth effort into his schoolwork because after awhile he "didn't care." (Doc. #1131, p. 1510). He also reported consuming drugs and alcohol during his school years. It is speculation and surmise to try and divine whether Rodriguez's statements are part of "masking" his lack of ability, or are a way of presenting a "cloak of confidence" to others, or if they are genuine. Additionally, reliance on Rodriguez's school IQ scores should be considered in combination with other record evidence indicating the initial IQ cutoff score established for diagnosing intellectual disability at the time when Rodriguez was in school was later determined by researchers to result in the over-classification of individuals with intellectually disability.

Resolution of the incongruous evidence and each side's competing, firmly held position requires the Court to make a retrospective judgment call about Rodriguez's condition 50 to 60 years ago. Doing so requires analysis of the three core diagnostic criteria for determining whether a defendant qualifies as intellectually disabled for purposes of the Eighth Amendment's proscription on cruel and unusual punishment:

    (1)    intellectual functioning deficits, as indicated by an IQ score;

(2)    adaptive deficits—that is, the inability to learn basic skills and adjust behavior to changing circumstances; and

(3)    the onset of these deficits while still a minor.

Moore v. Texas, ___ U.S. ___, 137 S. Ct. 1039, 1045 (2017) (quoting Hall v. Florida, 572 U.S. 701 (2014)).  "[W]here an IQ score is close to, but above 70, courts must account for the test's "standard error of measurement."  Id. at 1049.  Accounting for the standard error of measurement "reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score."  Id.

The Supreme Court explained in Hall that while the States are tasked with the responsibility of developing appropriate ways to enforce the restriction on executing the intellectually disabled, that discretion is not unfettered.  572 U.S. at 719.  For instance, a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70 because "[i]ntellecutal disability is a condition, not a number."  Id. at 720–23.

In Rodriguez's case, trial counsel investigated whether they could pursue a claim pursuant to the Supreme Court's decision in Atkins.  Atkins was decided four years before Rodriguez was tried.  Atkins did not identify a federal standard for intellectual disability; it left the development of the new constitutional restriction to the States.  Because North Dakota long ago abolished the death penalty, there is no standard in the State of North Dakota for evaluating whether a person is intellectually disabled for purposes of the Eighth Amendment.  Trial counsel thus assessed the information in Rodriguez's school record, including academic performance and IQ scores, and the opinions of their retained experts—neuropsychologist (Dr. Froming) and clinical psychologist (Dr. Hutchinson).  After

an investigation of Rodriguez's intellectual functioning, which took place fifteen years ago, trial counsel concluded they did not have a viable <u>Atkins</u> claim.  (Doc. #1118, p. 21).

During this proceeding, trial counsel has acknowledged the discussions and conclusions about whether Rodriguez could satisfy the criteria for intellectual disability would be far different today and would have been different a few years after Rodriguez's trial.  Trial counsel stated his understanding of the transformation:

> It was a time where the numbers meant a lot prior or at the time of Mr. Rodriguez's case.  In other words we were looking for IQ numbers that at least put us in a clear range of lower functioning with 70 tends to being the magic number, if you will.

> That is not the case now.  If we were looking at Mr. Rodriguez's case today or even three or four years after the case was tried, the numbers would have not been the driving factor based on adaptive functioning review. That would be another issue that we would look at. Not that it wasn't part of the science or the discipline at the time Mr. Rodriguez was tried, it's become now much more an aspect of the review of intellectual disability.

(Doc. #1118, p. 23).

When assessing an ineffective assistance of counsel claim, it is well established under <u>Strickland</u> that the Court must view the facts and law as they existed at the time of counsel's conduct.  <u>Marcrum v. Luebbers</u>, 509 F.3d 489, 502 (8th Cir. 2007).  In this case, trial counsel retained experts to evaluate Rodriguez's intellectual ability.  They consulted with those experts.  Trial counsel was surprised by the results of their expert's IQ testing, explaining:

> Q.     And what was your reaction at first when you heard the scores from Dr. Froming, specifically that the full-scale IQ was 87?

> A.     Sort of really? In the sense that -- that I was surprised.

> Q.     What were you expecting instead?

137

A.      Seventies.

Q.      On what basis were you expecting something in the 70s?

A.      Well, a couple of reasons. The past scores --

        [Objection; overruled]

A.      Okay. Again the past scores that we had seen, the school scores if you will, showed 70s, depending a range from 74 at the lowest up to 80. And my interactions, which at that point had been fairly significant with Alfonso, was my guess would have been he was not functioning at a low average intelligence level which these kind of scores would indicate. So on both those bases I was surprised that we were seeing a score this high.

(Doc. #1118, pp. 84–85).  But, trial counsel had no basis to question Dr. Froming's evaluation, scoring method, or result.  Id.  Nevertheless, after counsel received the results, he engaged in a "significant" discussion with Dr. Froming, seeking answers as to why the score was higher than past testing, why the result was inconsistent with his expectations, and ensuring that the appropriate adjustments, such as the Flynn effect, had been made. Id. at p. 85.

        Dr. Froming advised trial counsel that Rodriguez's intellectual functioning was "low average" but not intellectually disabled. Id. at p. 87.  Similarly, Dr. Hutchinson advised trial counsel that, based on her assessment, Rodriguez was not intellectually disabled. Id. at pp. 87–88.  In light of the confirmation from both Drs. Froming and Hutchinson, trial counsel did not pursue an Atkins claim.  Id.

        There is insufficient evidence to support Rodriguez's claim that trial counsel's investigation of his intellectual functioning was deficient at the time trial counsel made a decision not to pursue an Atkins claim.  Under Strickland, counsel is not obligated to pursue a claim that has no basis in fact or law.  See Mayfield v. United States, 955 F.3d 707,

712 (8th Cir. 2020) (stating that where the law is unsettled or debatable, professionally reasonable counsel is not expected to anticipate developments in the law or to raise issues unsupported by existing precedent). Unable to pursue an Atkins claim, trial counsel turned to a different trial strategy that also accounted for Rodriguez's intellectual functioning, which was summarized by trial counsel in this proceeding:

> The history the defense learned of and developed for trial was Rodriguez has compromised functioning that was characterized in young adulthood as possible organic brain damage, significant exposure to neurotoxins during major portions of his life, sustained repeated head injuries, and demonstrates symptoms characteristic of prolonged exposure to life threatening trauma during critical stages of childhood development.

(Doc. #1118, pp. 80–81).   Counsel also uncovered a number of mitigating risk factors notable in Rodriguez's family history that corroborated their trial strategy, including: "dementia, premature dementia, a lot of cancer in many of his relatives, including is mother has had cancer at least twice, and then alcoholism, male pattern alcoholism.  So on his mother's side practically every man going back three generations was an alcoholic." (Doc. #1119, p. 225).  Although the outcome was not what trial counsel had hoped it would be, counsel pursued theories that accounted for Rodriguez's low intellectual capacity, despite their lack of evidence at the time of trial to support a cognizable Atkins claim.

Rodriguez's Eighth Amendment claim becomes more complex because the law underwent significant development during the pendency of Rodriguez's appeal and post-conviction proceedings.  Courts now are guided to look at intellectual disability differently than they were at the time of Rodriguez's trial.  As trial counsel explained:

> We have the blue book [Intellectual Disability Definition, Classification and Systems of Support 11th Edition of the American Association of Intellectual and Developmental Disabilities ("AAIDD") Definition Manual] which still talks about IQ scores but I guarantee you the world of this science is moving

away from that as determinative.

The 5th edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V")
published by the American Psychiatric Association (2013) states the following about
intellectual disabilities:

> The various levels of severity are defined on the basis of adaptive functioning,
> and not IQ scores, because it is adaptive functioning that determines the level
> of supports required.  Moreover, IQ measures are less valid in the lower end
> of the IQ range.

(Doc. #1118, pp. 179–80; Exhibit 525).

With regard to the guidance available at the time of trial in 2006, trial counsel
pronounced:

> I guarantee you that was not in the DSM-4 or 3, whatever was in next when
> we did the trial. That's where the science now is, that these scores perhaps are
> a guide but they are not determinative of intellectual disability or mental
> retardation, however we want to phrase it.

(Doc. #1118, p, 180).  Rodriguez has raised questions about whether trial counsel complied
with the guidance available at the time of their investigation and their determination to not
pursue an Atkins claim.  Even though adaptive functioning was listed in the resources
available to assess intellectual disability, trial counsel testified that because Dr. Froming's
IQ test score was above the established cutoff range of 70 to 75, they did not consider
examining his adaptive functioning at that time.  (Doc. #1118, p. 187).  Whether Rodriguez's
adaptive functioning deficits, even after the extensive and exhaustive investigation that has
been undertaken by both sides, tips in favor of a diagnosis of intellectual disability requires
close study.

Because there is no definitive standard as to whether a person with Rodriguez's IQ
scores and his adaptive functioning level is intellectually disabled, the determination comes

down to a judgment call. And the experts who have studied the issue have reached contrary conclusions. And for good reason: the question is very close.

Having had the opportunity to study the record and review the various opinions, it is relatively clear that reasonable jurists could reach different conclusions. The Court finds that while Rodriguez is capable of learning, socializing, and making decisions, he has significant cognitive and adaptive deficits that would tend to favor a finding of intellectual disability when one considers the experts' findings and clinical interviews that were conducted for this proceeding. But, there is a lack of evidence showing Rodriguez was intellectually disabled prior to age 18.

The Court makes this finding recognizing that intellectual disability is a lifetime condition. In other words, the Court understands it does not usually develop over time. But, on this record, evidence of Rodriguez intellectual and adaptive deficits prior to age 18 is equivocal. On the record as a whole, the Court cannot rule out other factors that may be contributing to Rodriguez's below average cognitive functioning that is evident today—and these factors may have arisen after he reached 18. To name a few: Rodriguez's history of alcoholism; his family history of dementia; and his brain trauma. While the explanation supporting the Court's ruling that follows is detailed, it is not exhaustive. It is, however, sufficient to explain to the parties and any reviewing court the bases for the Court's decision.

An intellectual cognitive disability analysis consists of three prongs. The first one involves a review of cognitive aspects in intellectual functioning, which is typically measured with standardized tests that produce an IQ range. (Doc. #1120, p. 411). Prong two considers adaptive behaviors and deficits. Id. at p. 412. "A deficit is the inability or the

lack of some kind of functioning that prevents that individual from functioning independently in society." Id. Because individuals have strengths as well as deficits, a person need not have deficits in all three areas that are listed in the guidance in order to satisfy this prong. Id. Prong three focuses on the individual's early developmental period, which has been defined as the period between the ages of zero and 18. Id. at p. 413.

**1.      Evidence of Rodriguez's Functioning**

*a.      Prong One: IQ Testing and Academic Performance*

Beginning with the school environment, Rodriguez's school records demonstrate he had little academic success in school prior to attaining age 18. Once he reached 18 years of age, he dropped out of school, even though he was only in the 9th grade and had mostly failing grades the entire time he was in school. The IQ scores reported on Rodriguez's elementary school records ranged between 74 and 80. Specifically, they were reported as follows:

- in the 1st grade (1961 at age 8), his score was 77;

- in the 2nd grade, it was 80;

- in the 3rd grade, it was 79; and

- in the 5th grade (1965 at age 12), it was 74.

(Doc. #1118, pp. 61-62). In the 1st through 5th grade, Rodriguez's IQ score was calculated using the Kuhlmann-Anderson test, which is a test administered in a group setting and does not satisfy the recommendation for individual testing as set forth in the AAIDD (11th ed.) manual. (Doc. #1123, p. 600; #1127, pp. 1063−64).

Another issue, as noted by the government's expert (Dr. Seward), there is a lack of literature regarding the Kuhlmann-Anderson test from the time period it was used, which

was in the 1950's and 1960's.  (Doc. #1127, pp. 1052, 1058, 1063).  Per the test publisher's website, in 2013 the test was described as "measuring academic potential by assessing cognitive skills related to the learning process."  Id. at p. 1063.

Despite the propriety of relying on this test for an accurate assessment of IQ, it is Rodriguez's expert's (Dr. Weinstein) opinion that Rodriguez's poor academic performance, when coupled with the testing, is consistent with an individual who is intellectually disabled. (Doc. #1123, pp. 454–55).  In other words, even though the Kuhlmann-Anderson scores gathered while Rodriguez was in school test different concepts and may not necessarily support an intellectual disability diagnosis, they are consistent with such a diagnosis. Id. at p. 454.

Another issue raised about reliance on the school IQ scores is that during the time period Rodriguez attended school, intellectual disability was based strictly on IQ scores. Although Dr. Weinstein testified that Rodriguez's school test results satisfied the criteria existing at that time (which was a score of 85 or below) for a diagnosis of intellectual disability, as the years passed and additional research was completed, it was discovered that using a score of 85 resulted in the over-classification of individuals with intellectual disability.  (Doc. #1120, pp. 444–45).  After 1973, the criteria for diagnosing intellectual disability was changed from one standard deviation from the norm to two standard deviations from the norm.  (Doc. #1120, p. 445; Doc. #1123, p. 743). While Rodriguez's school IQ scores are static, his scores fluctuate him between satisfying the cutoff for intellectual disability and then not satisfying the cutoff, even though nothing about his abilities has changed.

Despite his failing grades, with the exception of the 1st and 9th grades which he

repeated, Rodriguez progressed to the next grade each year.  Rodriguez passed the 7th grade with mostly D's.  (Doc. #1118, p. 46.).  Although he attended 165 of 175 school days during his 8th grade year, Rodriguez's grades in 8th grade (at age 16) were mostly F's.  (Id.; Doc. #1123, p. 727).  As pointed out by the government, Rodriguez's  shop teacher did report that Rodriguez demonstrated some skills in shop class, but he had virtually no success in his academic classes.  Rodriguez received a C in shop class; an F in English; an F in math; an F in social studies; a D in science; a C in physical education; a D in health; and a C in music.  (Doc. #1123, pp. 587, 726–27).

In 9th grade, Rodriguez's school record indicate he received an F in English; an F in social studies; an F in science; a D in math; an F in health; and a C in physical education. Id. at pp. 733–34.  In his second year of 9th grade, Rodriguez was in attendance at school 172 days out of a total of 177 school days.  (Doc. #1123, p. 733).  Despite regular attendance, Rodriguez again received mostly F's (a C in physical education; a D- in health; and a zero in math). (Docs. #1118, p. 63; #1123, p. 733).

Because Rodriguez dropped out of school during his second year in the 9th grade, there are no further education records to review.  While Rodriguez has self-reported that he attained a General Educational Development diploma, the records do not definitively support his statement.  Trial counsel testified it was clear Rodriguez had not graduated from high school in the traditional way and they received no evidence indicating Rodriguez earned a GED certificate.  (Doc. #1118, p. 165).  Likewise, Rodriguez's experts failed to identify any record indicating that Rodriguez earned a GED certificate. (Doc. #1123, p. 599; #1125, p. 929).

In records from the Minnesota Security Hospital presented by the government, it is

noted that Rodriguez was "finishing up his high school." (Doc. #1123, p. 598).  Despite this statement, the Minnesota Security Hospital records are inconsistent: in one record, it says Rodriguez earned his GED.  But a month later, the records state Rodriguez was still working on earning his GED.  (Doc. #1125, p, 992).  Three months after that, a notation appears in the record that Rodriguez is still short credits needed for a GED.  Id.  In another record from 1981, one of the "benefits" listed was completion of "GED diploma."  Id. at p. 1003.

Rodriguez reported during his interview with Dr. James Seward that he got a diploma.  (Doc. #1125, pp. 929, 988).  He also reported that got his GED while he was in jail, in a one-on-on program in which he had five years to complete.  Id. at p. 988.

Habeas counsel's office contacted the Minnesota Department of Education seeking a record of Rodriguez's GED certificate or diploma.  No such record exists in the department's files. (Doc. #1127, pp. 1039–40).  Counsel also contacted the St. Peter School District where Rodriguez purportedly was attending classes, and the school district had no record of any GED test being administered to Rodriguez.  Id. at pp. 1041–42.

Despite the substantial effort undertaken by counsel to prove and disprove Rodriguez's achievement of a GED certificate, the evidence is inconclusive.  There is evidence that Rodriguez took classes but no definitive evidence showing Rodriguez's successful completion of a GED program.  The weight of the evidence supports a finding that Rodriguez did not successfully complete a GED program..

A review of the records relating to Rodriguez traditional schooling reveal that Rodriguez regularly attended school so a lack of attendance cannot explain his failing performance.  Nor can his lack of English proficiency explain his failure.  When Rodriguez started school in Laredo, Texas, his classes were in his primary language: Spanish.  In either

language, Rodriguez struggled academically.  When he was in Minnesota, his classes were in English.  But his academic performance did not improve as his English proficiency improved.  Rodriguez's trial team concluded, and the Court agrees, that language was not likely the source of his school failures, as his scores actually got lower as time progressed when it would be expected that he should have become more proficient in English. (Doc. #1118, p. 176; see Doc. #1129, pp. 1297–98, Dr. Seward arriving at same conclusion).

There are three inferences that could reasonably be drawn from the information contained within the records: (1) no one motivated or encouraged Rodriguez to be successful academically so a lack of effort contributed to his academic failure; (2) Rodriguez was capable of doing better but he did not receive the supports he needed to be more successful in school; and (3) Rodriguez did as well as he could and he would not have done better, even with support, because he is intellectually disabled.

In order to determine which inference is most probable, the Court has examined Rodriguez's other IQ test results, which were administered not in a group setting but in the recommended individual setting suggested by the guidance.

Dr. Ricardo Weinstein evaluated Rodriguez's intellectual functioning at the request of habeas counsel.  Prior to preparing his report and in addition to the testing he did, Dr. Weinstein interviewed Rodriguez, interviewed multiple collateral sources, and reviewed 10,000 pages of records, including declarations of individuals, other expert reports, and trial testimony.  Id. at pp. 390, 399, 570–76.

In evaluating Rodriguez's intellectual ability, Dr. Weinstein administered three tests—the Wechsler Adult Intelligence Scales - 4th Edition ("WAIS-IV"); the Test of General Reasoning Ability ("TOGRA"); and the Comprehensive Test of Nonverbal Intelligence - 2nd

Edition ("CTONI-2"). (Doc. #1120, p. 417). Dr. Weinstein, whose primary practice is neuropsychology and forensic neuropsychology with a subspecialty in intellectual development disabilities, testified that during his 20 years of practicing forensic psychology and neuropsychology, he has participated in 130 to 150 death penalty cases. Id. at pp. 373, 378, 556. In addition to this case, he has been qualified by courts to testify as an expert in neuropsychology many times and as an expert in the area of intellectual disability multiple times in both State and federal court. Id. at p. 379.

On the WAIS-IV test, Dr. Weinstein arrived at the conclusion that Rodriguez's standard score was 74, and after the standard error of measurement is applied, he has an IQ score in the range of 69 to 79. Id. at pp. 427–28. Once the Flynn effect (a "norming" process that takes into account research showing IQ in the population tends to increase over time)[5] is applied, Rodriguez's IQ score range is 65 to 75. Id. at pp. 429, 433. Rodriguez's score on this test falls within the diagnostic criteria of prong one for someone who is intellectually disabled. Id. at pp. 433, 465–66.

Before trial, Dr. Froming administered the WAIS-III test to Rodriguez. She determined, and testified at trial, that Rodriguez had an IQ score of 87. (Id. at p. 455; Doc.

---

[5]Questions were raised in this proceeding about whether adjusting IQ scores utilizing the Flynn effect is universally accepted. In an article from the Professional Psychology: Research and Practice Journal entitled Adjusting IQ Scores for the Flynn Effect: Consistent with the Standard of Practice, studies were conducted that reached the conclusion that the Flynn effect should not be applied and that it is controversial to do it. (Doc. #1123, p. 707). Dr. Weinstein testified that in his opinion, and in the field of forensic psychology and Atkins cases, the Flynn effect is not controversial and it is routinely applied and accepted by courts. Id. at pp. 765–66. In light of Rodriguez's scores and the Supreme Court's direction to consider adaptive functioning even if the scores are over the 70 to 75 range, resolution of this case does not turn on whether the Flynn effect is applied or not.

147

#775-6, Dr. Froming report dated June 27, 2006).  In 2011, when Dr. Froming was asked to review her evaluation, she prepared a declaration stating she made scoring errors.  (Doc. #763-5, Froming declaration ¶¶ 13–14).  After correcting the errors, Dr. Froming concluded that Rodriguez's IQ score was 84, not 87.  (Id.; Doc. #1120, p. 456).  Habeas counsel's expert, Dr. Weinstein, has questioned Dr. Froming's result on the basis that she did not apply the Flynn effect and, if she would have done so, Rodriguez's score would fall between 80 and 81, for an IQ range of 75 to 85.[6]  (Doc. #1120, p. 456).

According to Dr. Weinstein, there is a further adjustment suggested by Dr. Flynn specific to the WAIS-III iteration of the test due to a norming error in the test that, while not contained within the AARM (now the AAIDD) manual or the DSM-4, would bring Rodriguez's IQ range to 74 to 84.  Id. at pp. 459–60.  This range is consistent with Dr. Weinstein's IQ score of 74 on the WAIS-IV.  Id. at p. 460.

Dr. James D. Seward, a neuropsychologist and member of The Forensics Panel since 1998, was retained by the government to evaluate Rodriguez for this proceeding.  The Forensics Panel is a multi-specialty consultation practice based in New York that consults on different specialities within the domains of psychiatry, psychology, pathology, toxicology, and several areas of medicine.  (Doc. #1129, p. 1396).  Like Dr. Weinstein, Dr. Seward administered the WAIS-IV test to Rodriguez.  Dr. Seward determined that Rodriguez's IQ score, which was peer reviewed by two other people, was 86, without

---

[6]In a journal published by the American Psychological Association in May 2006, Dr. Flynn wrote in an article entitled Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect that: "It is clear that the WAIS-III inflated IQ scores by about 2.34 points even at the time it was normed.  That is, its normative sample was a bit substandard compared with other IQ tests, and therefore, its average performance was easier to beat."  (Doc. #1120, p. 458).

applying the Flynn effect. (Id. at p. 460; Doc. #1127, p. 1101). With the Flynn effect, Dr. Seward's IQ score would be decreased to 82 or 83, for an IQ range of 77 and 87. (Doc. #1120, pp. 460–61).

Accepting each experts IQ result as they scored it on their chosen iteration of the WAIS test, they are summarized as follows:

- •    Dr. Seward—86;

- •    Dr. Froming—87, which she subsequently re-scored to 84; and

- •    Dr. Weinstein—74.

(Doc. #1127, p. 1169). The WAIS test results, however, do not complete the evidence germane to the first prong. Dr. Weinstein administered two other tests to Rodriguez—one that is indisputably an appropriate IQ test and one that the government disputes its applicability for an IQ determination.

On the TOGRA test, Dr. Weinstein determined that Rodriguez has the equivalent of a full-scale IQ score of 70, and with the Flynn effect a score of 68, resulting in a range of 63 to 73. (Doc. #1120, p. 441). According to Dr. Seward, the TOGRA test is not an appropriate tool to assess an individual's intellectual functioning because it is a test of abstract reasoning recommended for use as a screening tool for areas like academic placement and employee selection. (Doc. #1127, p. 1149). While the result of the TOGRA test has applicability for other considerations regarding Rodriguez's intellectual functioning, in light of the parties' dispute, the Court will not rely on the TOGRA score as evidence of Rodriguez's IQ.

On the final test Dr. Weinstein administered to evaluate Rodriguez's IQ (the CTONI-2), Rodriguez's equivalent full-scale IQ score was determined to be 64, and with the Flynn

149

effect a score of 59, resulting in a range of 54 to 64.  (Doc. #1120, p. 443).  Dr. Weinstein opined that this result also falls within the diagnostic criteria of prong one for intellectually disability.  Id. at pp. 441-43.

The record also contains other test results used to assess Rodriguez's  academic progress and abilities.  During 1st grade, Rodriguez was administered the Metropolitan Achievement Test, which is similar to the Iowa Basic Skills Test.  He scored at a grade equivalent level of 1.7.  (Doc. #1123, pp. 600–01).  Dr. Weinstein interpreted this result as an average, opining that the result shows that after repeating the 1st grade, Rodriguez performed at an average 1st grade equivalent.  Id. at p. 602.

As an adult, Rodriguez has been evaluated multiple times to determine his academic level in basic subjects like reading and arithmetic.  Those testing results are summarized in chronological order as follows:

In 1980 (age 27), while at the Minnesota Department of Corrections, Rodriguez tested at grade level  6.7 in reading and 4.3 in math.  (Doc. #1118, p. 65).

In June 2006 (age 53), Dr. Froming administering the Wide Range Achievement Test - 3rd ed ("WRAT-3") to Rodriguez.  The WRAT test assesses an individual's ability to perform academic skills in reading, writing, and arithmetic.  (Doc. #1120, p. 446).  Dr. Froming concluded that Rodriguez was at the 6th grade level for reading, the 4th grade level for spelling, and the 7th grade level for arithmetic.  (Doc. #1120, pp. 448, 451).  Dr. Froming discovered in 2011 that she made a scoring error on the arithmetic portion of the test and filed a declaration in October 2011, correcting the error to a 2nd grade level.  Id.

In August 2013 (age 60), Dr. Seward tested Rodriguez using the WRAT.  (Id. at p.

150

448; Doc. #1127, p. 1107).  Dr. Seward concluded that Rodriguez was at a 6th grade level for word reading and a 10.9 grade level for sentence comprehension.  (Doc. #1120, p. 451; Doc. #1127, p. 1108).  Further, Dr. Seward concluded that Rodriguez was at a 3.5 grade equivalent in spelling; a 6.9 grade equivalent in math; and a 6th grade equivalent in reading, without comprehension.  Id. at p. 452.  It is Dr. Weinstein's opinion that Dr. Seward made a scoring error on his assessment for sentence comprehension, which overstates Rodriguez's true ability.  Id. at pp. 451–52.

In August 2018 (age 65), Dr. Weinstein administered the WRAT-4 to Rodriguez.  (Doc. #1120, p. 450).  He concluded that Rodriguez was at a 4th grade equivalent for word reading; sentence comprehension was a 5th grade equivalent; spelling was a 2nd grade equivalent; and math was a 5th grade equivalent.  Id. at p. 452.

With the exception of Dr. Seward's result for sentence comprehension, Rodriguez scored at a grade equivalent level of 6 or below on the academic areas that the WRAT test assesses.  Id. at p. 450.  Dr. Weinstein testified that Rodriguez's WRAT scores support the diagnosis of intellectual disability because individuals with intellectual disability typically have academic ability below the 6th grade level.  Id. at p. 453.

Other testing was done while Rodriguez was at the Minnesota Security Hospital for sex offender treatment.  While there, Rodriguez was given what is assumed to be the Shipley Institute of Living Scale test.  Rodriguez's IQ was "estimated" at 85 in a report dated January 29, 1975.  (Doc. #1127, p. 1065).  Another report from the Minnesota Security Hospital dated March 19, 1980, stated:

> The results of the California Psychological Inventory (CPI) are fairly well within the normal limits. Positive traits seem to include his being imaginative, informal, spontaneous, talkative and as having an expressive,

> ebullient nature. He's also likely to be seen as mature, independent and self-reliant. On the negative side, this test seems to indicate that he may be undercontrolled and impulsive in his behavior. Defensiveness, a demanding nature and rebelliousness may become manifest and he may be deceitful in his dealings with others.

Id. at p. 1066.  Notably, the CPI is not a cognitive test.  Id.  Inferences are drawn about intellectual functioning from the test results.  Id.  Similar to this assessment, a progress note during Rodriguez's time at the Minnesota Security Hospital, described Rodriguez's intelligence as "average."  Id. at p. 1069.  The Court gives less weight to the prison records because there is insufficient information about the IQ testing that resulted in a mere "estimate," and the statement that Rodriguez had average intelligence.

At best, over the course of his lifetime, Rodriguez consistently scored in the low-average range for intellectual ability.  While there is no longer a definitive cutoff for diagnosis of intellectual disability, standardized test scores continue to be part of diagnosing the condition.  Test scores in only about 2.2 percent of the population end up at two standard deviations from the mean and thus satisfy the criteria for intellectual disability set forth in the AAIDD manual and the DSM-5.  (Doc. #1123, p. 607).  An IQ score of around 70 to 75, while indicative of a significant limitation in intellectual functioning, must still be interpreted in the context of an individual's adaptive functioning.

Rodriguez's IQ scores are of such a nature that he is on the bubble, necessitating a close consideration of the second prong–his adaptive functioning.

### b.    *Prong Two: Adaptive Functioning*

Both the DSM-5 and the most current AAIDD manual recognize that there is no longer a cutoff score for diagnosing whether an individual is intellectually disabled.  While IQ testing must still be considered, clinical assessment is a more significant part of the

analysis.  The reasoning behind requiring clinical judgment is because an actuarial determination to diagnose intellectual disability is no longer "psychometrically justifiable." (Doc. #1120, pp. 461–63).

Adaptive functioning references an individual's conceptual, social, and practical/independent living considerations such that, without ongoing supports, the person is unable to function at a level that is developmentally appropriate consistent with what would be expected for their peers.  (Doc. #1129, p. 1425).  When assessing these considerations, the evaluator should obtain input from a variety of contexts, including the individual's living environment, work environment, relationship to the community, and school environment.  (Id. at pp. 1425–26; DSM-V, criteria B).  Although the onset must manifest before age 18, the information that may be considered is not limited to the period before the individual reached 18 years old.  It is understood that intellectual disability is a developmental issue.  Gathering all the available data from a person's entire life is key since certain areas of a person's life may be documented or chronicled less than others.  Id. at pp. 1426–27.

Based on his review of the voluminous documents and records gathered in this case in combination with his own interviews, Dr. Weinstein found deficits in all three adaptive functioning domains (conceptual, social, and practical).  (Doc. #1120, pp. 468–538).  Dr. Weinstein found deficits in Rodriguez's conceptual ability, which was demonstrated by his poor academic performance and test scores for basic skills that, even as a 60 plus-year old man, are all at the 6th grade equivalent level or below.

 One of the aspects of Rodriguez's life that Dr. Weinstein highlighted as a practical deficit was evidence that when Rodriguez moved in with his girlfriend, his father would stop

by to collect Rodriguez's laundry because Rodriguez did not know how to wash his own clothes. (Doc. #1120, pp. 521–22).

In the social aspect of Rodriguez's life, Dr. Weinstein pointed to deficits demonstrating that as a child Rodriguez was withdrawn, shy, a loner who had low self-esteem; was willing to accept the blame for misbehavior committed by his peers; was unable to stand up for himself when he was being teased or harassed; his feelings of not fitting in with the Anglo culture but not wanting to belong to the Mexican culture; and his association with a group of "outcasts" during his high school years. Id. at pp. 532–33.

While Dr. J. Arturo Silva did not conduct any neurological testing, based on his review of the records which he was asked to do by Rodriguez's counsel, Dr. Silva opined that to a reasonable degree of psychiatric certainty Rodriguez meets the diagnostic criteria for intellectual disability. (Doc. #1125, p. 906). For many of the same reasons as Dr. Weinstein, Dr. J. Arturo Silva found adaptive deficits plague Rodriguez in all three domains. (Id. at pp. 895–98).

Dr. Weinstein made clear that a review of adaptive deficits is about the presence of weaknesses. (Doc. #1120, p. 484). And, while an individual can meet prong two with a showing of deficits in only one domain, Dr. Weinstein testified that Rodriguez displayed extensive deficits in all three domains. Id. Dr. Weinstein also observed that some of the same deficits in Rodriguez's early life continued to be present in Rodriguez's life after age 18. He noted that while these observations are helpful and demonstrate consistency, they are not diagnostic. Id. at pp. 540–41. Other signs, though also not diagnostic, that Dr. Weinstein observed in Rodriguez's records include the presence of neurocognitive deficits, such as difficulty with abstract reasoning and attention. Id. at p. 542.

In contrast to Dr. Weinstein's and Dr. Silva's findings and conclusions, Dr. Seward, based on his recorded clinical interview with Rodriguez and all the other documents he reviewed, determined that Rodriguez did not have any significant adaptive deficits in any of the three domains.  (Doc. #1127, pp. 1119–47).  The primary bases for Dr. Seward's opinion derive from his clinical interview with Rodriguez, which took place decades after the relevant developmental period (Doc. #1129, p. 1302).  In particular, Dr. Seward reasoned that circumstances involving Rodriguez's time in jail and Rodriguez's ability to get a driver's license and learn to drive a car for the short period of time after he was released from custody demonstrate a lack of adaptive deficits.  Id. at pp. 1313–14.  While it is true that an individual who is diagnosed as intellectually disabled is so for life, Dr. Seward appears to have focused a fair amount of attention on Rodriguez's behavior in prison and his strengths rather than his weaknesses.

Dr. Michael Welner, a psychiatrist and forensic psychiatrist residing in New York who is chairman of The Forensic Panel, also evaluated Rodriguez for this proceeding. (Doc. #1129, pp. 1394, 1396).  He interviewed Rodriguez in June 2013.  Dr. Welner has previously been involved in 10 to 12 capital cases in which intellectual disability was an issue.  Id. at pp. 1411–12.  He has testified in a few cases in a variety of contexts, but only one relating to Atkins issues.  Id. at p. 1417.  Dr. Welner prepared a 215 page report addressing a variety of issues in this case.  Id. at p. 1418.  Because he is not a neuropsychologist, Dr. Welner deferred to Dr. Seward's opinion about the tests he chose to use to evaluate whether Rodriguez is intellectually disabled.  Id. at p. 1419.

Dr. Welner concluded that Rodriguez did not have significant deficits under either prong one or two. He found that during his recorded clinical interview with Rodriguez,

Rodriguez demonstrated the ability to reason both in terms of hypotheticals and in real life experiences. Dr. Welner also believed Rodriguez demonstrated reasoning ability during recorded phone calls with family members. (Doc. #1129, pp. 1434–44). He further found that Rodriguez demonstrated the ability to plan when carrying out criminal conduct and in anticipation of his release from prison in 2003. Dr. Welner identified the following planning activities regarding his anticipated release from custody noteworthy: Rodriguez contemplated moving out of the United States, he wanted to get his driver's license, and he thought about finding work in places like Georgia and New York. Id. at pp. 1446–47.

In reaching his conclusion, Dr. Welner also relied on reports and statements that Rodriguez was successful in balancing, without supports, every day activities like going to work, learning to drive a vehicle, being a typical homeowner, taking care of his mom, and driving his sister's children places. Id. at pp. 1450–51. Dr. Welner concurred in Dr. Seward's assessment that Rodriguez demonstrated abstract thinking by his "sophistication" when discussing the news and current events. Id. at pp. 1456–57. Having reviewed Rodriguez's responses, another reasonable interpretation of Rodriguez's responses is that Rodriguez was repeating what he heard others say about a particular issue, (Doc. #1131, p. 1667), which is not uncommon in individuals who are intellectually disabled.

Dr. Welner also noted Rodriguez's ability to learn while in prison. For instance, Rodriguez learned about glazing, about pottery, about making figurines, about wood lathe, about how to make things with leather, and about training other inmates to work in the prison print shop. (Doc. #1129, p. 1458). And, according to Dr. Welner, about learning from his past criminal conduct in such a way that is reflective of his criminal *modus operandi* in this offense. Id. at pp. 1458–61. In identifying other strengths, Dr. Welner

discussed what he described as the strategies Rodriguez engaged to hide evidence and his involvement in this offense as well as his ability to act in legal self-interest in this case and in prior cases. (Id. at pp. 1475–80; Doc. #1131, p. 1532).

Dr. Welner also found evidence that Rodriguez, without supports, attended to his personal care, was managing his diabetes, and made healthcare decisions (like whether to get a colonoscopy or the flu shot while in prison). According to Dr. Welner, the ability to make these types of decisions weigh against a finding of intellectual disability. (Doc. #1131, pp. 1539–44).

When referring to the AAIDD, Dr. Welner described it as an advocacy organization. Id. at pp. 1571, 1577. He disagrees with the AAIDD's manual, which instructs evaluators not to use a person's past criminal behavior or verbal behavior to infer a level of adaptive behavior. Id. at pp. 1575–75. Relying extensively on Rodriguez's criminal behavior, records while incarcerated, and "criminal cunning," Dr. Welner concluded, like Dr. Seward, that Rodriguez has no appreciable adaptive functioning deficits and is not intellectually disabled.

In the end, while the criteria for diagnosing intellectual disability is plain, its application to the evidence in this case is difficult. The experts are divided; they have expressed varying degrees of criticism as to the other experts' test selections, interpretations, and conclusions that differed from their own. Despite these differences, the Court cannot say there was an expert that stands out as completely lacking in competence, qualifications, or credibility. They each made their own judgment call.

If the Court only had to decide overall whether Rodriguez satisfies the criteria for intellectual disability, it would have little difficulty finding he has shown significant

157

cognitive and adaptive functioning deficits.  Dr. Hutchinson's observation is particularly suitable, consistent with the evidence, and sums up Rodriguez's intellectual and adaptive functioning:

> Mr. Rodriguez does not have the adult capability of being successful in the world.  His minimal attempts to be in the larger social community have not been happy or successful experiences for him.  He has done very well within the structure, isolation and rigidity of incarceration. It is here that he does not have to understand more complex social situations.  It is here that he can find a sufficiently small niche in which to feel somewhat safe.

(Doc. #1118, p. 96).  A finding of significant cognitive and adaptive functioning deficits is not enough under Supreme Court precedent.  Although being intellectually disabled is a lifetime condition, when analyzing an Eighth Amendment claim, Rodriguez must also show his intellectual disability manifested prior to age 18.

### c.   *Prong 3: Onset Prior to Age 18*

The early development period for purposes of an Eighth Amendment claim is defined as prior to age 18.  While there is evidence suggesting borderline intellectual disability while Rodriguez was in school, as previously noted, there are several possible explanations for Rodriguez's poor academic performance and low IQ scores during the relevant developmental period—one of which is intellectual disability, another of which is lack of effort and motivation by Rodriguez, and another of which is whether Rodriguez could have done better with appropriate supports.  In order to demonstrate an Atkins claim, only intellectual disability is qualifying.  Rodriguez's subsequent IQ evaluations as an adult, although he showed good effort and no indication of malingering, are consistent with low-average intellectual functioning, but do not conclusively resolve the abilities of Rodriguez as a child.

In the early days of his life, Rodriguez's mother struggled to find nourishment that Rodriguez would tolerate.  During his first few months of life, Rodriguez failed to thrive. While he outgrew that issue, the family struggled financially and traveled between Texas and Minnesota, requiring Rodriguez to transfer between schools each year until he was 9 years old.  Rodriguez received failing grades, dropping out of school at the 9th grade level.

While the government questioned evidence presented at trial regarding Rodriguez's abnormally large head, there is evidence in the record to find that Rodriguez has a physical condition indicative of disability.  Dr. Silva measured Rodriguez's head.  His head measures three standard deviations from normal.  (Doc. #1125, pp. 914, 996).  Dr. Silva testified that the association between individuals with an enlarged head size that is three standard deviations from the norm and disabilities is "extremely high."  Id. at 996.  Christianson also noted the size of Rodriguez's head and testified cephalitis is "a respecter for intellectual disability."  (Doc. #1119, p. 222).

Without contemporaneous documentation about Rodriguez's adaptive functioning while attending school, the Court is left to examine witnesses' recollections regarding Rodriguez's behavior and social life as a child.  This evidence is inconsistent, rendering it difficult to make an accurate assessment regarding Rodriguez's adaptive functioning prior to age 18.  His family has described Rodriguez as a "loner" with low self-esteem and few friends.  According to family members, the couple of friends Rodriguez had were also lower functioning and "outcasts."  One of Rodriguez's mother's friends corroborated the family's statements, reporting that Rodriguez never joined in playing with other children.  He did not act silly and goofy like other kids; he was watchful.  (Doc. #1118, p. 302).

Rodriguez is seven years older than his youngest sister.  As she got older and

matured, she testified at trial that in her view Rodriguez continues to function like a 13- or 14-year old teenager. (Doc. #1129, p. 1309). According to her, Rodriguez does not act as a typical adult male. Because of that, she has always felt a need to protect Rodriguez. Id. Mitigation specialist Ingrid Christianson, while gathering information about Rodriguez's social life in high school for this proceeding, received a response from Rodriguez that was noteworthy to her:

> A.    It was as though you were talking to a third grader. He obsessed about who was dating who and who went to Secula's Bar with who and just rehashing the things that the kids did and who was in and who was out and it was very immature. I mean, he was 50 years old and he still cared, you know, who was dating who and who was stealing whose girlfriend and those -- it was astonishing to me.

(Doc. #1119, p. 233).

As to this time period, others have described Rodriguez as sociable and well liked by his peers. For instance, one of Rodriguez's childhood friends reported that Rodriguez and he were "party friends" and they fished together. He described Rodriguez as a quiet person who dated a lot of women. He also said other kids liked Rodriguez and he was "good with people." (Doc. #1118, p. 280). Another childhood friend described Rodriguez as quiet, and as a kid that stayed out of trouble. Rodriguez did not "run around with us and be crazy when we were doing bad stuff." Id. at p. 306. Another childhood friend corroborated that Rodriguez did not get into trouble as a child, reporting Rodriguez "was with us all the time, we partied a lot, but he never drank much. I'd drink ten beers, he'd drink two. He'd get buzzed once in a while but not goofy like the rest of us. The family were good people - Sylvia and Frank. His folks were fine." Id. at p. 281.

The record also indicates that Rodriguez had age-appropriate girlfriends while in

160

school.  One girlfriend that Rodriguez dated when he was 13 years old said Rodriguez was "nice and easy-going and quiet as a teenager."  She recalled him getting mad only one time. She described Rodriguez as respectful.  They never had a sexual relationship, and Rodriguez a never forced himself on her sexually.  Id. at p. 292.  Another girlfriend of Rodriguez's said that although he hurt her emotionally when he went out with other women, Rodriguez never hit her or forced her to have a sexual relationship with her.  Id. at pp. 312–14.

While in school (and in prison), Rodriguez tried to make others believe he was more successful than he really was–that is, he utilized the concept of "masking" or, in other words, he donned a "cloak of competence."  For instance, Rodriguez would tell his family that he beat a friend in a race when there never was a race.  While Rodriguez scores at the equivalent of 6th grade level for reading, Rodriguez has reported reading hundreds of book. Rodriguez told Dr. Silva that he likes to read books on war and history.  He identified books that are part of a series.  (Doc. #1125, p. 936).  He discussed Harry Potter with Dr. Silva, which Dr. Silva noted would require some patience and ability to read and interest.  (Id. at p. 934).

In fact, Rodriguez has self-reported reading over 900 books.  (Doc. #1129, p. 1325). He also reported that he read over 500 books in the approximate three years he was in the Cass County Jail while awaiting trial in this case.  (Id. at p. 1325–26).  While acknowledging that Rodriguez has indicated he has read many books, Dr. Silva offered the following opinion:  "I also will cast reservation on exactly how well he knew the  - - and understood the books.  He certainly improved in terms of developing an interest in books, especially when you arrive to jail to spend that many years."  (Doc. #1125, p. 940).

Dr. Seward, in an effort to substantiate his 11th grade reading comprehension score,,

has suggested that Rodriguez's reading comprehension has improved over time based on all the reading Rodriguez has done during his lengthy periods of incarceration. (Doc. #1127, p. 1109). Regardless of Rodriguez's report of voracious reading or his true comprehension level, Dr. Silva testified that it would not impact in any way his diagnosis of intellectual disability. (Doc, #1125, p. 941). Some individuals that are intellectually disabled are capable of learning to read. (Id. at pp. 993–94).

### 2.     Decision

In summary, evidence about Rodriguez's adaptive functioning encompasses a broad spectrum of abilities and gives rise to competing interpretations about his ability to handle the demands of life. He is currently 68 years old. Since reaching the age of 18, Rodriguez has been incarcerated for all but about 3 and a half years of his life. Having spent nearly 70 percent of his life in an artificial environment combined with the inconsistent recollections and scant documentation of Rodriguez's ability as a child, the Court is tasked with making a retrospective decision on Rodriguez's adaptive functioning as it existed 50 to 60 years ago. On this issue, the Court finds the record, as a whole, is equivocal and inconclusive.

While there is evidence that Rodriguez has low-average cognitive functioning and significant adaptive deficits—although perhaps not as profound as Rodriguez's counsel's argue—Rodriguez also exhibits symptoms of obsessive compulsive disorder, he has a history of chemical dependency, he was exposed to neurotoxins, he has a history brain trauma, and a documented family history of dementia. The Court cannot discern on the evidence in the record how these other circumstances may be affecting Rodriguez's functioning. As Dr. Welner explained, other conditions affecting an individual's ability to

function in life can coexist with intellectually disability or they can occur independently of intellectually disability.  But, they are not part of intellectual disability.  (Doc. #1131, pp. 1668–69).  Because the evidence of intellectual disability prior to age 18 is in equipoise, Rodriguez has not carried his burden of satisfying prong 3.  Rodriguez's Eighth Amendment claim that he is categorically barred from being executed under Atkins fails.

**CLAIM 6:** **RODRIGUEZ'S CLAIMS THAT TRIAL COUNSEL WERE INEFFECTIVE IN THE FOLLOWING PARTICULARS ARE WITHOUT MERIT:**

    **A.** **FAILING TO ARGUE ACCIDENT OF GEOGRAPHY AS A MITIGATING FACTOR;**

    **B.** **NOT SEEKING A CORRECTIVE INSTRUCTION WHEN THE GOVERNMENT MISSTATED THE LAW ON MITIGATING EVIDENCE DURING CLOSING ARGUMENT;**

    **C.** **NOT ADEQUATELY CHALLENGING THE "THREE-STEP PROCESS" THAT THE COURT PRONOUNCED TO COUNSEL WAS APPLICABLE FOR MITIGATION EVIDENCE;**

    **D.** **NOT ASSERTING A TENTH AMENDMENT CHALLENGE TO THE FEDERAL KIDNAPPING STATUTE; AND**

    **E.** **FAILING TO EFFECTIVELY ADDRESS THE BURDEN OF PROOF AT THE PENALTY PHASE.**

In a five-part claim, Rodriguez contends trial counsel provided ineffective assistance during the penalty phase of the trial.  Each of Rodriguez's claims are without merit.

### A.   Accident of Geography

Rodriguez committed a federal crime when he kidnapped Sjodin in Grand Forks, North Dakota, and transported her into Minnesota.  According to habeas counsel, federal prosecution for the kidnapping and murder of Sjodin was an "accident of geography."  Rodriguez contends trial counsel should have pointed out to the jury that North Dakota and Minnesota have abolished the death penalty, and argued, as a mitigating factor, that his

eligibility for the death penalty only arose because Sjodin's body was found 20 miles across the border, thereby creating an interstate nexus and federal prosecution.

During the penalty phase of a capital trial, a defendant has the right to present all relevant mitigating evidence. Lockett v. Ohio, 438 U.S. 568, 604 (1978); see Skipper v. South Carolina, 476 U.S. 1 (1986); Eddings v. Oklahoma, 455 U.S. 104 (1982). As the Court explained in Lockett, the Eighth and Fourteenth Amendments require the judge or jury "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. The Supreme Court's decision in Lockett, however, did not disturb "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Id. at 604 n. 12.

Although the sentencer in a capital case is required to consider a broad range of evidence, "relevance marks the outer limit of admissibility for purported mitigating evidence." Williams v. Norris, 612 F.3d 941, 947–48 (8th Cir. 2010) (citing United States v. Paul, 217 F.3d 989, 1000 (8th Cir. 2000) ("There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence.")). Relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Tennard v. Dretke, 542 U.S. 274, 284 (2004).

That the State in which the crime was committed has abolished the death penalty is not relevant to the circumstances of the offense, a defendant's character, or his history. It

tends to prove nothing related to the offense, the defendant's character, or his history and is therefore by definition irrelevant.  The argument that "geographic happenstance" is somehow relevant is without any basis in law or logic.

Rodriguez urges the Court to consider United States v. Gabrion, 648 F.3d 307 (6th Cir. 2011), as lending support for his geographic happenstance argument, but Gabrion has been vacated and reversed en banc.  United States v. Gabrion, 719 F.3d 511, 521 (6th Cir. 2013) (rejecting Eighth Amendment claim based on geography happenstance because the fact that Michigan lacks a death penalty is irrelevant to a reasoned moral response to the defendant's background, character, and crime).  And with good reason because the panel's majority opinion rested solely on the unqualified nature of the Federal Death Penalty Act, which directs that the finder of fact "shall" consider "any mitigating factor" which it claimed must include Michigan's public policy on the death penalty.  But, the panel majority missed the limiting factor—relevance.  And the happenstance of geography simply does not make a fact at issue related to the background, history or crime more or less likely.  At most, it informs a discussion on the public policy of a State vis-a-vis the public policy of the federal government, which is not relevant to the issues to be determined by the finder of fact.  Rodriguez's claim is without merit.

## B.   The Government's Purported Improper Argument About Mitigation Evidence

Rodriguez contends the government misstated the proper standard for the jury to use when considering the defense's proffered evidence in mitigation, suggesting that the evidence had to explain Rodriguez's conduct or reduce his responsibility.  Trial counsel objected to the government's argument and the Court gave what Rodriguez describes as a

"non-specific" instruction rather than a curative instruction.  The Court said:

> Once again, I will remind the jury that I have instructed you on the law that applies to this case. If there is any statement made by any party that is inconsistent with the statements that I have given, you should disregard them and apply the law as I have given it to you.

(Doc. #725, p. 35).  Rodriguez argues trial counsel should have requested a curative instruction, and should have objected again when the government made similar arguments.

In his post-trial motion for a new trial, Rodriguez asserted the government made improper closing arguments about the relevance of mitigating factors.  When addressing the argument, the Court concluded: "Although the government may have been walking close to the line in making some of its arguments, the Court does not believe the boundaries of proper argument were breached.  The jurors were instructed to determine whether factors proven by the defense actually mitigated and, if so, the weight to assign to them." United States v. Rodriguez, No. 2:04 CR 55, 2007 WL 466752, at *43 (D.N.D. Feb. 12, 2007), aff'd, 581 F.3d 775 (8th Cir. 2009).

While he quotes a different portion of the government's argument in this proceeding than he did in his post-trial motion, the overall argument is the same–that is, the government misstated the standard to be applied to mitigation evidence.  To the extent Rodriguez's claim in this proceeding is what he raised on direct appeal, it has been decided, it may not be re-litigated, and it cannot serve as a basis for an ineffective assistance of counsel claim because there was no error.  See United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001); Grubbs v. Delo, 948 F.2d 1459, 1464 (8th Cir. 1991).

Even if the argument is different enough to escape being barred by the relitigation doctrine, Rodriguez has  shown no prejudice.  He cites to one passing reference as a

misstatement of the law.  The Court promptly reminded the jury that it was obligated to follow the Court's instructions.  Because the Court properly instructed the jury on the law related to mitigation and there is no evidence that the jury failed to heed those instructions, Rodriguez's claim is without merit.

## C.  The "Three-Step Process" On Mitigation Evidence

Outside the presence of the jury, the Court explained to the parties what it believed the jury's deliberation process would entail on mitigation evidence: (1) a determination of whether the proffered evidence is proven by a preponderance of the evidence; (2) a determination of whether that proven evidence is actually mitigating in nature; and (3) a determination of how much weight to assign that mitigating evidence.  Rodriguez asserts trial counsel was ineffective when it failed to object to the second step identified by the Court because the issue of whether proffered evidence constitutes relevant mitigation is a question of law for a court to decide.

There was no "step 2" in the jury instructions.  The jury was instructed as follows:

### STEP TWO:   MITIGATING FACTORS

In step two, you must consider whether the defendant has established the existence of any mitigating factors.  Unlike aggravating factors which you must find - - unanimously find - - which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require a unanimous agreement with regard to mitigating factors, any juror persuaded of the existence of a mitigating factor must consider it in this case.  Furthermore, any juror may consider a mitigating factor found by another juror, even if the first juror did not initially find that factor to be mitigating.

It is the defendant's burden to establish any mitigating factors, but only to the greater weight of the evidence.  "Greater weight of the evidence" has been defined for you at Preliminary Instruction Number 3.  The factors which the defendant asserts he has proved by the greater weight of the

evidence to mitigate against a sentence of death are: . .

* * *

The law contemplates that different factors may be given different weights or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death. If one or more of you so find, you must return a sentence of life in prison without the possibility of parole. Similarly, you may unanimously find that a particular aggravating factor sufficient outweighs all mitigating factors combine to justify a sentence of death. You are to decide what weight or what value is to be given to a particular aggravating or mitigating factor in your decision-making process.

(Doc. #725, pp. 11, 16–17).

Rodriguez has not asserted that the Court's statement about whether proven evidence is actually mitigating led to it striking or excluding any of his proffered mitigation evidence. Rodriguez has not argued that the Court improperly instructed the jury on mitigation evidence. Rather, he contends the Court's statement permitted the government to make improper arguments about his mitigation evidence, which prejudiced him by causing the jury to reject some of the mitigating factors listed on the special verdict form.

Rodriguez bore the burden of proving mitigating factors to the greater weight of the evidence. The Eighth Circuit explained it was permissible for the government to argue to the jury that the mitigation evidence should receive little or no weight. Rodriguez, 581 F.3d at 799. Notably, the government did not tell or ask the jury to disregard Rodriguez's proffered mitigating evidence. It argued the mitigating factors should be given less weight than the aggravating circumstances of the offense and Rodriguez's history. The prosecutor said during closing argument:

. . . There is nothing that says you are required to agree to it by way of his mitigation claims. You must consider them, and we encourage you, you must

and you should consider them fully.  We'd argue that the closer that you
inspect them together, deliberating, the more you will see how they fall short.

       Your job is a lot easier, though, Ladies and Gentlemen, when you
recognize that even if the defendant had been able to prove every single one
of his mitigating factors that he alleges, and even if he had been - - even if you
had found that every factor that he offered was that second thing also, worthy
of mitigation, in a case of this magnitude the scale has barely budged.  Barely
budged.  That's how overwhelming the aggravating factors and the evidence
is against this defendant.

(Doc. #725, pp. 45–46).  Rodriguez's counsel argued the opposite—that the mitigating

factors had been proven and they outweighed the aggravating factors such that a sentence

of death was unwarranted.  On rebuttal, the prosecutor reminded the jury to consider the

mitigation evidence: "Consider the mitigators.  Please review them all.  Read through them

once before you even start we would suggest." Id. at p. 103.  The prosecutor again asked the

jury to weigh all the factors:

I believe the evidence shows very clearly that if you apply the evidence and
the aggravating factors and the weighing analysis that Judge Erickson told
you about, apply the law as you have done, go through the weighing as he sets
out in his instructions, which we are all duty bound to follow, if you get
through all of that and the aggravating factors outweigh the mitigating
factors, or if there are no mitigating factors that you find and the aggravating
factors themselves sufficiently - - are sufficient to justify a sentence of death
in this case, you must record your determination that a sentence of death
shall be imposed on the special findings form.

Id. at pp. 105–06.  The prosecutor's final words to the jury were:

Read those mitigators and look at them, all of them, and consider them.  And
when you get to the end of that analysis, the aggravating circumstances and
facts of this case so dramatically - - so dramatically - - outweigh any
mitigation that under the law a sentence of death is justified and shall be
entered.

Id. at p. 107.

       Rodriguez's arguments are belied by the record.  There is nothing on the verdict form

169

that was contrary to the Court's instructions or contrary to the law.  Even in light of the Court's discussion with counsel outside of the jury's presence, the government did not ask the jury to disregard Rodriguez's proffered mitigation evidence.  Nothing suggested to the jury that the jurors should disregard mitigation evidence.  In the instructions, the jury was fully apprised of the latitude it had when considering mitigating factors and then during the weighing process.

On this record, there is only one reasonable interpretation for Rodriguez's mitigation evidence: the jury was not convinced  that the mitigating factors outweighed the aggravating factors.  The jury verdict informs us that Rodriguez had not met his burden of proof by convincing a single juror on some of the claimed mitigating factors, while others were accepted by at least some jurors, and some mitigators were accepted as unanimously proven by the jury.  Even so, in the weighing of the factors that were proven, the jury found the evidence in aggravation outweighed the mitigating factors.

Rodriguez's ineffective assistance of counsel claim regarding the "three-step process" articulated by the Court, outside the presence of the jury and never presented to the jury, is without merit.

### D.    Tenth Amendment Claim

Rodriguez asserts trial counsel were ineffective for failing to bring a Tenth Amendment challenge to the federal kidnapping statute.  For the reasons explained in Claim 13, Rodriguez's ineffective assistance of counsel claim on this issue is without merit. It is well established that failure to raise a meritless claim cannot be the basis for ineffective assistance of counsel.  See Grubbs, 948 F.2d at 1464 (stating counsel cannot be ineffective for raising a meritless claim).

### E.      Burden of Proof At the Penalty Phase

Rodriguez contends his constitutional rights were violated because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty determination in this case, and trial counsel was ineffective for failing to raise this issue.  The merits of Rodriguez's claim are discussed in Claim 15.  In summary, the Court found that the jury instructions given during the penalty phase proceedings were consistent with the FDPA and compatible with Supreme Court precedent.  Because Rodriguez has failed to show the process or the jury's chosen sentence violates the Constitution, his ineffective assistance of counsel claim on this issue also fails.  See Grubbs, 948 F.2d at 1464.

### CLAIM 7:      TRIAL COUNSEL DID NOT DEPRIVE RODRIGUEZ OF EFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO SECURE A SETTLEMENT.

Rodriguez asserts that one of the great tragedies in this case is that competent capital counsel would have avoided trial altogether.  This self-serving assertion is disingenuous and contradicted by the evidence in the record.

To resolve this case without a trial, the government was willing to agree to a life sentence only if Rodriguez led law enforcement to the location of Sjodin's body.  Rodriguez was informed and fully aware that if Sjodin's body was discovered, the United States would be unwilling to make a plea bargain that took the death penalty off the table.  Yet, until these proceedings, Rodriguez's claim was that he was actually innocent.  In furtherance of this assertion, Rodriguez lied to law enforcement about his activities on November 22, 2003.  And he claimed to have no knowledge as to Sjodin or her body.  Months passed with an intensive search ongoing to locate Sjodin's body.  Finally, searchers located Sjodin's body.  Prior to the discovery of Sjodin's body, Rodriguez provided no information about his

involvement in the crime to his appointed counsel. In fact, even after Sjodin's body was found, Rodriguez continued to assert that he was not involved in Sjodin's disappearance and that he had no information about it. As trial counsel explained:

> Q. And you've discussed the case with your client both before and after th[e] discovery [of her body]?
>
> A. I attempted to, yes.
>
> Q. And during some of those discussions Mr. Rodriguez denied involvement in Ms. Sjodin's disappearance?
>
> A. That's true.

(Doc. #1071, pp. 511-12).

Rodriguez now claims that if trial counsel had developed a rapport with him at the time of the initial appointment, he would have accepted the government's offer. There is nothing in the record to support such a claim.

Rodriguez's self-serving statement is not evidence. He has pointed to no evidence anywhere in the record of a strained or incompatible relationship with trial counsel, let alone any behavior by counsel that impacted Rodriguez's ability to decide whether to accept the government's offer. Whatever the reason for Rodriguez's refusal to cooperate in exchange for a life sentence—whether he believed Sjodin's body would not be found, whether he believed there was a lack of evidence connecting him to the crime, whether he believed he would be able to convince a jury that he was not involved—was a decision properly left to Rodriguez and one Rodriguez made.

Counsel could not compel Rodriguez to admit his involvement or lead the government to Sjodin's body. These decisions were entirely within Rodriguez's personal control. The decision to pursue an all or nothing strategy of actual innocence was made by

Rodriguez when he consistently denied to both his trial counsel and his former state-appointed counsel any involvement in Sjodin's disappearance.

Once Rodriguez decided to put the government to its burden of proof, counsel's province is trial management, although even some of those decisions are specifically reserved for the client. The Supreme Court has identified those decisions that rest exclusively with the defendant as: whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. McCoy v. Louisiana, ___ U.S. ___, 138 S. Ct. 1500, 1503 (2018). "Autonomy to decide that the objective of the defense is to assert innocence belongs in this reserved-for-the-client category." Id. Refusing to plead guilty in the face of overwhelming evidence and insisting on maintaining innocence at the guilt phase of a capital trial are not strategic choices; they are decisions relating to the defendant's objectives. Id. Even if counsel reasonably believes a concession of guilt as best suited to avoiding the death penalty, the client may not share that objective. When the objective of his defense is to maintain innocence of the charged criminal acts and pursue an acquittal, counsel must abide by that objective. Id. at 1504.

From the moment Rodriguez was identified as a suspect in Sjodin's disappearance until he was actually convicted, Rodriguez maintained his innocence. He cannot now claim a different objective in the face of an unfavorable result. Rodriguez's ineffective assistance of counsel claim on this issue is without merit.

**CLAIM 8:   THE EIGHTH CIRCUIT COURT OF APPEALS DOES NOT RECOGNIZE CUMULATIVE ERROR AS A BASIS FOR HABEAS RELIEF.**

Rodriguez argues that the cumulative nature of the errors he has asserted demonstrate prejudice and warrant relief. The Eighth Circuit has squarely rejected habeas

petitioners attempt to build a showing of prejudice to satisfy <u>Strickland</u> based on a series of errors. <u>Hall v. Luebbers</u>, 296 F.3d 685, 692–93 (8th Cir. 2002); <u>Scott v. Jones</u>, 915 F.2d 1188, 1191 (8th Cir. 1990) (rejecting cumulative error as a basis for habeas relief in ineffective assistance claims because "each habeas claim must stand or fall on its own.").

Rodriguez's effort to demonstrate prejudice by relying on cumulative error is foreclosed by circuit precedent. The Court is required to analyze, and has done so in this opinion, each of Rodriguez's claims separately. Rodriguez's claim of cumulative error is not a basis upon which the Court can grant relief.

**CLAIM 9:** **RODRIGUEZ'S ASSERTED CONSTITUTIONAL VIOLATIONS PREMISED ON DR. MICHAEL MCGEE'S FALSE AND MISLEADING TESTIMONY IS ADDRESSED AND RESOLVED IN OTHER CLAIMS, AND HIS CLAIM REGARDING FALSE TESTIMONY FROM A WITNESS THAT THE MINNESOTA DEPARTMENT OF CORRECTIONS HAD NO ALTERNATIVE BUT TO RELEASE RODRIGUEZ INTO THE COMMUNITY IS WITHOUT MERIT AND PROCEDURALLY DEFAULTED.**

Rodriguez's claim is two-fold: He first asserts his constitutional rights were violated when Ramsey County Medical Examiner Michael McGee presented false and inaccurate testimony about details of the offense, including his testimony about the scientific evidence of sexual assault and the cause of Sjodin's death. Claims regarding McGee's unreliable and speculative expert opinions have been addressed in Claims 2A, 2B, 3B, 16, and 17 of this opinion. The Court incorporates its analysis of those claims here. Because the false testimony about the cause of death resulted in errors of a constitutional magnitude, Rodriguez is entitled to a new sentencing hearing. For the reasons explained in Claim 2A, the remainder of Rodriguez's claim pertaining to McGee's testimony does not give rise to a basis for relief.

The second part of Rodriguez's claim is that a witness testified falsely at trial when

174

she said there was nothing that could be done by the Minnesota Department of Corrections when Rodriguez expressed fear and concern about living in the community as his release date approached. Rodriguez contends other alternatives existed, including a referral for civil commitment. According to Rodriguez, because the government knew there were alternatives to releasing Rodriguez into the community, it should not have offered knowingly false testimony that there were no alternatives. Rodriguez contends this testimony had a material impact on the mitigation evidence he offered at trial.

Rodriguez presented ample evidence from which a reasonable fact-finder could conclude that the State of Minnesota failed Rodriguez and society when it released Rodriguez from custody, despite the significant fears and concerns expressed by both Rodriguez and his family. The "nothing we can do for him" quote that Rodriguez cites was in relation to possible transitional services to bridge Rodriguez back into the Crookston community where he was going to reside upon his release. The testimony Rodriguez references was not plainly false when understood in that context. More importantly, Rodriguez offered extensive evidence to rebut the purportedly false testimony, showing the reasons why the State of Minnesota failed Rodriguez and placed the public at risk when it decided to release an untreated level 3 sex offender who told a clinical psychologist, while being housed at the Moose Lake (Minnesota) Correctional Facility that he was anxious about his upcoming release and expressed a desire to be "locked up but not locked up." When all the evidence that was presented to the jury is considered, Rodriguez has not shown falsity or prejudice from an isolated statement about the Minnesota Department of Corrections not having alternative release opportunities available for him.

Additionally, Rodriguez's attempt to frame his claim in terms of prosecutorial

misconduct for eliciting false testimony is procedurally barred.  See Massaro v. United States, 538 U.S. 500, 504 (2003) (noting the general rule that claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice). Cause requires a showing of an external impediment that prevented a petitioner from constructing or raising the claim earlier.  Murray v. Carrier, 477 U.S. 478, 492 (1986). And, actual prejudice requires a showing that "the errors of which he complains 'worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Ivy v. Caspari, 173 F.3d 1136, 1141 (8th Cir. 1999) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)).

Rodriguez's claim of prosecutorial misconduct for knowingly presenting false testimony that denied the existence of available alternatives in lieu of Rodriguez's release into the community fails because Rodriguez has shown neither cause nor the requisite level of prejudice.  As a result, his claim has been procedurally defaulted.

### CLAIM 10:   THE GOVERNMENT DID NOT FAIL TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH AMENDMENT AND BRADY V. MARYLAND AND ITS PROGENY.

The Minnesota Attorney General's Office wrote a letter to the Hennepin County Attorney and Ramsey County Attorney dated December 17, 2003, which concluded that the Minnesota Department of Corrections could have, and should have, referred Rodriguez for civil commitment at the conclusion of his prison sentence.  Rodriguez claims that because this letter was not produced to him, the government was able to falsely imply that the State of Minnesota lacked legal means to civilly commit him.

In order to establish a Brady violation, the defendant must show: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence

was material to either guilt or punishment.  Jimerson v. Payne, 957 F.3d 916, 925 (8th Cir. 2020).  Even so, "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." United States v. Beers, 189 F.3d 1297, 1303 (10th Cir. 1999) (quoting Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995)).  The Eighth Circuit has described the evidence that must be produced under Brady as "favorable evidence rising to a material level of importance." Villasana v. Wilhoit, 368 F.3d 976, 979 (8th Cir. 2004).  Materiality for Brady purposes is established if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been affected–that is, different.  United States v. Williams, 951 F.3d 892, 897 (8th Cir. 2020) (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)).

Assuming *arguendo* the letter falls within the scope of Brady, the government asserts: (1) the letter at issue was not in its possession at the time of trial; (2) it had no knowledge of its existence prior to trial; and (3) it did not see the letter until Rodriguez attached it to his § 2255 motion.  Rodriguez does not dispute any of these assertions.  The prosecution has an obligation under Brady and its progeny to reveal information that it has in its possession or knowledge—whether actual or constructive.  Beers, 189 F.3d at 1303. While information possessed by other branches and agencies of the federal government, including investigating officers, is typically imputed to the prosecutors of the case, courts have declined to extend this principle for federal prosecutors to exculpatory materials in the possession of the state government.  See id. at 1304; United States v. Roy, 781 F.3d 416 , 421 (8th Cir. 2015) (citing  United States v. Kern, 12 F.3d 122, 126 (8th Cir.1993) ("We do not accept the defendants' proposal that we impute the knowledge of the State of Nebraska

to a federal prosecutor.")); <u>United States v. Aichele</u>, 941 F.2d 761, 764 (9th Cir. 1991) (finding no <u>Brady</u> violation because material sought was under control of state officials, not federal prosecutor); <u>United States v. Walker</u>, 720 F.2d 1527, 1535 (11th Cir. 1983) (declining to impute knowledge of deal between witness and state officials to the federal prosecutor). The reasoning: "It is unrealistic to expect federal prosecutors to know all information possessed by state officials affecting a federal case, especially when the information results from an unrelated state investigation." <u>Beers</u>, 189 F.3d at 1304.

Even if the Court sets aside its skepticism that the letter from the Minnesota Attorney General's Office to the state prosecutors falls within the purview of <u>Brady</u>, Rodriguez has failed to demonstrate a <u>Brady</u> violation because the letter was not in the government's possession and there is no evidence it was aware of its existence. On these facts, the government did not suppress information or have knowledge, direct or imputed, that it failed to disclose. In fact, the substance of the letter is cumulative to the evidence Rodriguez presented and argued at trial:

> And Mr. Mickelson and she [Dr. St. George] agreed he should be civilly committed, but they did nothing. Am I saying it is all their fault? No. But there was a system failure here. But what it tells you is, despite the inaction of the Department of Corrections, Alfonso was trying to do the right thing, was grappling with these concerns.
>
> Does that show you something about him, his character? I think so. But you need to decide that. Does it show you he just wants to be out on this string of acts the government says? I submit it doesn't. It show you he wants to be a better person. And when we show you that, what we do as a society is not execute people who are trying to be better people, who are trying to be good, who are striving to the best of their abilities. But we know Alfonso's abilities are limited, and that's the other evidence we showed you.

(Doc. #725, pp. 8721–22). The Minnesota Attorney General Office's findings in December

178

2003 are consistent with the evidence and the arguments Rodriguez made at trial. The letter, itself, would have been cumulative and there is no reasonable probability that the outcome would have been different if the letter was discovered before trial and presented at trial. Rodriguez's alleged <u>Brady</u> violation is without merit.

**CLAIM 11:   THE ADMISSION OF MATERIALLY FALSE AND INACCURATE INFORMATION DURING THE PENALTY PHASE VIOLATES THE EIGHTH AMENDMENT.**

In support of his claim, Rodriguez points to Ramsey County Medical Examiner Michael McGee's testimony about the "positive" forensic evidence of the presence of semen indicating Sjodin was sexually assaulted within 24 to 36 hours of her death, and that Sjodin's neck had been "slashed." For the reasons set forth in the analysis of Claims 2A, 2B, 3B, 16, and 17, the Court finds that Rodriguez has demonstrated he is entitled to relief in the form of a new penalty phase trial due to the unreliable, inaccurate, and misleading evidence that Sjodin's neck had been slashed.

**CLAIM 12:   RODRIGUEZ HAS FAILED TO DEMONSTRATE JUROR MISCONDUCT THAT WOULD ENTITLE HIM TO A NEW TRIAL.**

The Court drew a 590-person venire from across North Dakota, excluding the Grand Forks area. Jurors who were selected to continue after completion of an initial "screening" questionnaire traveled to the courthouse in Fargo, North Dakota, to complete a form consisting of 28 pages and 121 questions. Potential jurors were then brought into the courtroom for individual *voir dire*. The Court increased the number of peremptory challenges for each side from 20 to 22, with the two additional challenges to be used to remove alternate jurors. (Doc. #308). In addition, the Court granted Rodriguez's motion for 10 additional peremptory challenges. <u>Id.</u>

Jury selection took place over a 22-day period. Following *voir dire*, the jury pool was reduced to 62 potential regular jurors and eight potential alternates. The Court ultimately empaneled a jury of twelve persons and four alternates.

### 1.    Summary of Decision on this Claim

The heart of Rodriguez's claim for a new trial is whether the verdict was tainted because of juror misconduct. Regardless of whether Rodriguez relies on independent evidence or statements obtained directly from jurors, he is indisputably asserting a challenge to the validity of the verdict, which implicates Fed. R. Evid. 606(b). Rodriguez's evidence, developed years after the trial ended and based on alleged erroneous or dishonest statements made by jurors during *voir dire*, is inadmissible under Rule 606(b) and the Court is precluded from considering it. See Warger v. Shauers, 574 U.S. 40 (2014).

Even setting aside the no-impeachment rule in Fed. R. Evid. 606(b), the record built by Rodriguez through its inquiry of the jurors at issue does not establish juror misconduct warranting a new trial. There is insufficient evidence demonstrating two of the jurors in question were dishonest. Only one of the jurors was shown to be demonstrably dishonest during the jury selection process (and during deliberations). Even so, there was insufficient evidence demonstrating any of the three jurors at issue was biased or that empaneling any one of them as a juror in this case deprived Rodriguez of a fair trial.

### 2.    Admissible Evidence on Juror Misconduct Claim

The Sixth Amendment's guarantee of an impartial jury extends to capital sentencing proceedings. See Morgan v. Illinois, 504 U.S. 719, 727–28, (1992). Accordingly, a jury's verdict must be based on the evidence presented "from the witness stand in a public

courtroom where there is full judicial protection of the defendant's right of confrontation, of cross examination, and of counsel." Parker v. Gladden, 385 U.S. 363, 364 (1966). As the Supreme Court has stated, "[t]his is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station of life which he occupies." Turner v. Louisiana, 379 U.S. 466, 472 (1965) (internal citation omitted).

Rodriguez asserts the guilt, eligibility, and sentencing verdicts were "irretrievably tainted" by four jurors'[7] improper conduct.  Rodriguez claims juror misconduct in two broad areas.  First, misconduct that occurred during the separate stages of *voir dire* when jurors omitted information and provided materially false information,  which deprived counsel of an opportunity to discover their biases.  Second, Rodriguez asserts misconduct occurred during deliberations when one of the jurors introduced and relied on extrinsic evidence to "denigrate and dismiss" Rodriguez's plea for a life sentence.

Rodriguez supports his claim by comparing responses to the questionnaire the jurors completed in advance of jury selection, which began on July 7, 2006, with declarations signed by jurors five years later in July 2011, as well as the testimony received at an evidentiary hearing held on September 8–9, 2015.

Rodriguez argues the withholding of information prevented him from intelligently exercising his peremptory and for-cause challenges depriving him of a fair and impartial jury, in violation of the Fifth, Sixth, and Eighth Amendments.  Rodriguez contends the

---

[7]Rodriguez identified four jurors in its motion but called only three jurors to testify at the evidentiary hearing.  There is no evidence to substantiate Rodriguez's claim that Juror Charmayne Owan was untruthful during jury selection and, by failing to call her at the evidentiary hearing, the Court finds Rodriguez has abandoned his claim of misconduct as to juror Charmayne Owan.

misconduct warrants relief for three reasons: (1) it satisfies the standard in <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548 (1984); (2) it demonstrates actual bias; and (3) it shows implicit bias.

The Court initially allowed information about the juror misconduct claim to be filed under seal in order to protect the integrity of the proceedings. During the hearing when counsel requested that portions of the testimony be sealed and remain under seal, the Court expressed concern, explaining:

> Well, you know, I have deep regrets about what I've done so far to be perfectly blunt. I think that we have tried this thing in secret. None of it should have been. I don't think there's anything particularly damaging. I don't think that there's anything particularly embarrassing. I don't think there's anything that exposes any of these children to any untoward circumstances. They couldn't have been identified from any of the testimony that's actually been deduced and I -- I have real regrets about having done this but I think having gone down this path I'll go ahead and finish it with these two things but this is not going to be secret. This is not the kind of stuff that exposes anyone to public humiliation or harm. It just isn't.

(Doc. #988, p. 221). It is for these reasons that no part of the Court's decision in this proceeding will be filed under seal.

Under Fed. R. Evid. 606(b)(1), a juror is generally prohibited from testifying about statements made or incidents occurring during deliberations as well as any juror's mental processes concerning the verdict or indictment. As a way of balancing Rodriguez's interest in developing the record with the government's assertion that any information obtained from jury deliberations is inadmissible under Rule 606, the Court allowed Rodriguez to elicit testimony regarding his juror misconduct claim while permitting the government to assert a standing objection to "all evidence that relate[d] to any discussions, comments, [or]

conduct during the course of deliberations." (Doc. #987, pp. 9–10).

Although Rodriguez argues Rule 606(b) does not prevent the presentation of juror statements regarding penalty phase deliberations because the Federal Rules of Evidence do not apply in federal capital penalty phase proceedings, citing 18 U.S.C. § 3593, Rule 606(b) has been applied in capital cases in this Circuit.  See, e.g., United States v. Johnson, 495 F.3d 951, 981 (8th Cir. 2007); see also Austin v. Davis, 876 F.3d 757, 787–91 (5th Cir. 2017); Bacon v. Lee, 225 F.3d 470, 485 (4th Cir. 2000); Gosier v. Welborn, 175 F.3d 504, 511 (7th Cir. 1999).

A threshold issue before the Court is what evidence may be considered in the analysis of Rodriguez's juror misconduct claim.  Rodriguez asserts he has presented independent evidence of false statements made by jurors during *voir dire*, which he contends do not require discussion of their deliberations.  The independent evidence relied on by Rodriguez includes, for example, court records or other publicly available documents. However, the heart of Rodriguez's claim for a new trial is whether the verdict was tainted because of juror misconduct.  Regardless of whether Rodriguez relies on independent evidence or statements obtained directly from jurors, he is indisputably asserting a challenge to the validity of the verdict, which implicates Fed. R. Evid. 606(b).

Rule 606(b)(1) sets forth the general rule regarding inquiries into the validity of a verdict:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.

Subject to three enumerated exceptions, the rule specifically prohibits a court from receiving a juror's affidavit or evidence of a juror's statement on these matters.  Fed. R. Evid. 606(b)(1).  The three exceptions to the general rule include: (a) extraneous prejudicial information improperly brought to the jury's attention; (b) an outside influence improperly brought to bear on any juror; or (c) a mistake made in entering the verdict on the verdict form.  Fed. R. Evid. 606(b)(2).  The Eighth Circuit has described "extraneous information" as "objective events such as 'publicity and extra-record evidence reaching the jury room, and communication or contact between jurors and litigants, the court, or other third parties.'"  Stults v. Am. Pop Corn Co., 815 F.3d 409, 416 (8th Cir. 2016) (quoting Warger v. Shauers, 721 F.3d 606, 611 (8th Cir. 2013)).

Since enactment of Rule 606(b), the Supreme Court has addressed under what circumstances the Constitution mandates an exception to the rule.  In the first case, the Court rejected a Sixth Amendment exception for evidence in the form of affidavits indicating some jurors were under the influence of alcohol or drugs during the trial.  Tanner v. United States, 483 U.S. 107 (1987).  In so doing, the Supreme Court noted that the rule "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences."  Id. at 121.  The Tanner Court explained the rationale for the rule as follows:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior.  It is not at all clear, however, that the jury system could survive such efforts to perfect it.  Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupt the finality of the process.  Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by

a barrage of postverdict scrutiny of juror conduct.

Tanner, 483 U.S. at 120–21 (citations omitted).

More recently the United States Supreme Court decided Warger v. Shauers, in which the Supreme Court rejected an attempt to create an exception to the no-impeachment rule when the jury foreperson failed to disclose pro-defendant bias during *voir dire*. The Warger Court, relying on the plain language in Rule 606, unanimously held that "Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." 574 U.S. at 44. The Warger Court reasoned that a post-verdict new trial motion based on *voir dire* dishonesty necessarily "entails 'an inquiry into the validity of the verdict' [because] [i]f a juror was dishonest during *voir dire* and an honest response would have provided a valid basis to challenge that juror for cause, the verdict must be invalidated." Id. (quoting Fed. R. Evid. 606(b)(1)).

Rodriguez's contention that Warger has no impact on his juror misconduct claim because the alleged misconduct relates to dishonesty in *voir dire* is simply at odds with the Supreme Court's decision. This is not to say that a party is without recourse. If a juror lies during *voir dire* to conceal bias, the Supreme Court has identified two paths to address juror partiality: (1) a party may bring to the court's attention evidence of bias before the verdict is rendered, or (2) a party may employ non-juror evidence after the verdict is rendered. Warger, 574 U.S. at 51. Here, the first time Rodriguez asserted a claim for jury misconduct was when he filed the instant § 2255 motion. Rodriguez's counsel developed the claim after interviewing jurors, obtaining their declarations, and comparing the declarations to answers given during jury selection years after the trial ended. Rodriguez's

185

evidence, developed years after the trial ended and based on alleged erroneous or dishonest statements made by jurors during *voir dire*, is inadmissible under Rule 606(b) and not in compliance with the Supreme Court's guidance on challenging juror bias post-verdict.

In contrast to Tanner and Warger, the third and most recently decided case by the Supreme Court carved out a narrow exception to the no-impeachment rule contained in Fed. R. Evid. 606(b).  See Pena-Rodriguez, 137 S. Ct 855, 869 (2017).  The Supreme Court held that a district court, in its "substantial discretion," can set aside the no-impeachment rule upon a threshold showing that a juror made a statement exhibiting overt racial bias, which casts serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict.  Id.  "To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict."  Id.  The Supreme Court reasoned that "[a] constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right."  Id.

Here, there is no suggestion or indication of racial animus or racial bias by any of the jurors in this case.  Without such a showing, Pena-Rodriguez is inapposite.  The Court finds the allegations of juror misconduct in this case, while disappointing and frustrating in light of the substantial effort undertaken to select an impartial jury, are not of such an extreme nature that the usual safeguards are insufficient to protect the integrity of the process.  Warger, 574 U.S. at 53  n.3.  Stated another way, the alleged juror misconduct does not meet the high standard of demonstrating Rodriguez's right to a jury trial was abridged.  Id.  As noted by the Supreme Court, "neither history nor common experience show that the jury

system is rife with mischief of these or similar kinds," and "[t]o attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny." Pena-Rodriguez, 137 S. Ct. at 868.

Finding no applicable Constitutional exception to the no-impeachment rule set forth in Fed. R. Evid. 606(b)(1), the Court turns to Rodriguez's argument that his evidence of juror misconduct is admissible under Rule 606(b)(2)(A) and (B). Although Rodriguez argues the verdict was tainted by extraneous prejudicial information improperly brought to the jury's attention and/or an improper outside influence, Rodriguez has not actually shown that either of those things happened in this case. Extraneous information or outside influences, by definition, derive from a source external to the jury and include evidence outside the record. By contrast, internal matters concern "the general body of experiences that jurors are understood to bring with them to the jury room." Warger, 574 U.S. at 51. It is axiomatic that courts give jurors latitude during their deliberations to permit them to rely on their experiences and use common sense when reaching their verdict. This practice is consistent with Supreme Court precedent, which has made clear that "[j]urors' personal experiences do not constitute extraneous information; it is unavoidable they will bring such innate experiences into the jury room." Id.

The undisclosed extrinsic evidence Rodriguez points to includes:

•  personal views about the death penalty;

•  experiences working with or taking care of children who were emotionally, physically, or sexually abused;

•  experience or knowledge working with people who have behavioral problems; and

- personal experiences as a crime victim.

These previously undisclosed juror opinions and experiences were uncovered post-verdict.  However, each category of evidence pertains to the jurors' general life experiences and opinions.  That jurors bring to their deliberations knowledge and beliefs about matters that find their source in everyday life and experiences is one of the strengths of the jury system, although it can also be one of its weaknesses.  But, it is part of a judicial system that is both legally fundamental and also fundamentally human.  The Supreme Court has expressly recognized this aspect of our judicial system: "Individual jurors bring to their deliberations 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.'" McCleskey v. Kemp, 481 U.S. 279, 311 (1987) (quoting Peters v. Kiff, 407 U.S. 493, 503 (1972) (opinion of MARSHALL, J.)).  Rodriguez has not pointed to any extra-record evidence or outside sources that influenced a juror.  The exceptions set forth in Rule 606(b)(2) do not apply.

In summary, Rodriguez's argument that his juror misconduct claim is different than the claim in Warger because he has independent evidence to prove the falsity of statements made during voir dire is a distinction without a difference.  As in Warger, Rodriguez's juror misconduct claim involves purported false statements made during voir dire, which necessarily amounts to an inquiry into the validity of the verdict.  Fed. R. Evid. 606 applies and prohibits admission of the evidence submitted by Rodriguez to support his juror misconduct claim.  Warger, 574 U.S. at 49.  Rodriguez's post-conviction claims based on juror misconduct are denied.

### 3.   Analysis on the Merits

Even if the no-impeachment bar did not apply under the circumstances presented

here, Rodriguez's juror claim would still fail. In order for a new trial to be warranted on the basis of concealed juror bias, Rodriguez must prove: (1) the juror answered dishonestly, not just inaccurately; (2) the juror was motivated by partiality; and (3) the true facts, if known, would have supported striking the juror for cause. United States v. Ruiz, 446 F.3d 762, 770 (8th Cir. 2006) (citing United States v. Tucker, 137 F.3d 1016, 1026 (8th Cir. 1998) (Tucker I)). "Honesty of the juror and actual bias are factual issues." United States v. Tucker, 243 F.3d 499, 506 (8th Cir. 2001) (Tucker II). The Court has applied this test to the three jurors at issue:

     *a.    Rebecca Vettel*

As Rodriguez aptly argues, the "most egregious" and "most blatant" misconduct was from Juror Rebecca Vettel.[8] (Doc. #760, p. 278). The Court, having had an opportunity to observe Vettel and assess her credibility, is convinced that Vettel lied, rather than was mistaken or inadvertently inaccurate, when responding to questions posed to her during the jury selection process. The substance of the lies, however, do not demonstrate bias or that the truth would have resulted in a successful for-cause challenge. Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) ("[E]ven an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality").

During jury selection, Vettel was dishonest when she failed to disclose she had been the victim of domestic abuse, diminished her criminal history and arrests, minimized her

---

[8]At the time of trial and when she signed a declaration in July 2011, the juror's name was Rebecca Jensen. At the time of the evidentiary hearing in September 2015, she had changed her name to Rebecca Vettel. Previously, she has also been known as Rebecca Zablotney and Rebecca Brandt. The Court will refer to her as Rebecca Vettel, even though some of the supporting documentation references her previous names.

knowledge and involvement in lawsuits, and erroneously reported her employment history. Based on court documents now in the record, it is indisputable that Vettel was the victim of domestic assault during both her first and second marriages, each of which ended in divorce. Vettel obtained one or two restraining orders during her first marriage. (Doc. #987, p. 48). As to her second marriage, divorce and custody proceedings began in 2003 and according to Vettel have been "nonstop" for 12 years. (Doc. #987, pp. 55, 70). Violence was an integral part of the litigation relating to her second marriage. Id. at p. 41. Vettel also asserted in court documents that her daughter was the victim of physical abuse and possible sexual abuse.

Given the protracted nature of the litigation surrounding her second divorce along with the allegations contained within the court documents related to both of her divorces, which included a claim that her daughter had been physically abused and maybe sexually abused by her ex-husband, Vettel's failure to disclose during jury selection that she had been the victim of a crime or that someone close to her had been the victim of a crime was not simply inaccurate, but deliberately untruthful. Had the Court been told the truth, however, Vettel's personal experiences as a victim of domestic assault or her daughter's alleged abuse would not have automatically disqualified her from serving as a juror in this case.

Prospective jurors that had been a victim of an assault or had a close family member or friend who was a victim of an assault were not automatically disqualified, but instead questioned to discern whether those experiences would impact their ability to be fair and impartial. After further inquiry, some jurors were excused for cause and some were not. Some examples include:

- The Court denied a motion to strike a prospective juror for cause based, in part, because a juror indicated:

  (1) she believed all females would be sympathetic toward the victim;

  (2) there's going to be some kind of sympathy when "there's a lot of violence done to another female;"

  (3) "it would be hard to remove" sympathetic feelings; and

  (4) she would not want someone in her state of mind sitting on the jury in this case.

(Doc. #688, pp. 174–79). The Court determined that the prospective juror, who also stated that she could fully and fairly consider the evidence and decide the case, remained qualified to serve as a juror despite her views.

- Another juror who indicated that he could set aside his personal feelings and weigh the evidence, was passed for cause by the parties, even though he listed "significant people" in his life that had been the victims of rape. (Doc. #690, p. 49).

- Another prospective juror who had been a victim of an assault was excused for cause when she was unsure whether she could be impartial. (Doc. #704, pp. 63–67).

- Similarly, a prospective juror whose sister had been the victim of a violent crime was excused for cause when he indicated he could "try" to set aside his sister's experience but had a fixed opinion on what the punishment ought to be if Rodriguez was found guilty. (Doc. #704,

pp. 235–37).

In spite of a prospective juror's life experiences, "impartiality is presumed so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." United States v. Wright, 340 F.3d 724, 733 (8th Cir. 2003) (cleaned up).  The test for assessing impartiality is "whether the prospective juror 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" Id. (quoting United States v. Johnson, 906 F.2d 1285, 1288 (8th Cir. 1990)).  When asked during *voir dire* if she could fully and impartially consider all the evidence presented at each stage of the proceedings, Vettel affirmed that she could carry out that duty.  When asked if she could fairly weigh the aggravating circumstances presented along with the mitigating factors, Vettel said she could do so.  Vettel told the Court and the parties that she had neither decided on a penalty if Rodriguez was found guilty nor possessed a firm opinion about the death penalty.  Given her responses to the Court's and counsel's questions designed to elicit partiality or bias, Vettel's failure to disclose that she had been the victim of domestic assault or that she believed her daughter had been abused by her ex-husband, while troubling and unacceptable, does not demonstrate bias or establish that she would have been stricken for cause.

Rodriguez also points out that during jury selection Vettel failed to disclose her criminal history and arrests.  Vettel's criminal history includes fifteen convictions related to the operation of a motor vehicle, including reckless driving, failing to maintain a safe distance resulting in an accident, running a stop sign, driving with an unrestrained child, driving with expired registration, and numerous speeding citations.  In addition to these convictions, Vettel was arrested for driving without liability insurance (3 times), driving

after suspension, and driving without a license.  Although Vettel did not accurately respond to the questions about her own criminal history, she did report her knowledge about others who had been convicted or pled guilty to a crime, which she disclosed: "Over 10 years ago [her] oldest daughter's dad got into a car accident, reckless driving, served a few weekends in jail and paid restitution."  (Doc. #987, p. 138).

Similarly, it is beyond dispute that Vettel underreported her involvement in litigation and knowledge of the judicial process.  Court records establish Vettel was a plaintiff in two contested divorce-related custody and child support disputes, she was a defendant in a collection action, and she was a plaintiff in a small claims action.  During her testimony at the September 2015 evidentiary hearing, Vettel suggested that while her various divorces involved many hearings, she attended only a few hearings.  Court records belie her testimony.  The minutes and court orders indicate that Vettel was personally present for a majority of the hearings.  (Doc. #999).

Additionally, as Rodriguez notes, Vettel lied about her employment history.  She lied when she stated that she had left her job at Alpha Opportunities (a day program for physically and mentally handicapped adults) only a few months before jury selection began. Her employment records establish that Vettel had been terminated for misconduct a full year prior to the time she reported leaving this job.  Vettel also failed to disclose during jury selection that she worked for the Anne Carlson Center for two years.  This omission was more significant than others when, during deliberations, Vettel advised her fellow jurors that this job at the Anne Carlson Center allowed her to acquire "expertise" in working with and understanding disabled and abused children.

Although the Court and counsel worked diligently to obtain relevant information

from potential jurors in order to ascertain potential biases or other characteristic that could give rise to a for-cause challenge or reason to exercise a peremptory challenge, it is now evident that Vettel thwarted the process by intentionally omitting and misstating information about herself and her past experiences.  Nevertheless, under the Supreme Court standard entitling a party to a new trial for jury misconduct, "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  McDonough Power Equip., Inc., 464 U.S. at 556.

Having considered Vettel's explanations offered during the evidentiary hearing as well as her demeanor during the hearing, the Court finds she purposely withheld information and intentionally lied during jury selection rather than made innocent mistakes.  One could reasonably infer that Vettel's dishonesty regarding so many different areas of inquiry was done for the purpose of increasing her chances of being selected to serve as a juror on this case.  Although the Court takes seriously evidence of juror dishonesty, the focus is on bias and whether Vettel could act impartially.  McDonough Power Equip., 464 U.S. at 556 ("The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."); Fuller v. Bowersox, 202 F.3d 1053, 1056 (8th Cir. 2000) (bias is the focus; juror dishonesty alone is not a sufficient basis for obtaining a new trial).

Honesty is integral in order for the judicial system to function as intended.  Likewise, partiality and bias are difficult to assess when a juror lies.  But, precedent requires that in order to be entitled to a new trial, the movant must demonstrate that a truthful response would have provided a valid basis to make a challenge for cause.  Cannon v. Lockhart, 850 F.2d 437, 440 (8th Cir. 1988) (quoting McDonough, 464 U.S. at 556).

Given her unwavering commitment to consider the evidence from both sides in a fair and impartial manner, if Vettel had been truthful about her employment history, familiarity with court proceedings, criminal history, and as a victim of domestic assault, she would not have been *per se* disqualified from serving as a juror in this case, nor would the Court have dismissed her for cause. These lies told by Vettel during jury selection, while incomprehensible and inexcusable, are insufficient to meet the extremely high standard for a new trial based on jury misconduct, which requires a showing of actual or implied bias.

A juror who has a life experience that she does not disclose during *voir dire* and which corresponds with evidence presented during the trial raises obvious concerns about the juror's possible bias. Sampson v. United States, 724 F.3d 150, 167 (1st Cir. 2013). On its face, if true, due to the correlation with the evidence presented at trial, the Court would have grave concerns about Vettel's undisclosed attempted kidnapping/sexual assault purportedly occurring at the state fair in Minot, North Dakota. While Vettel did not disclose this incident during jury selection, she has admitted to discussing the experience with her fellow jurors during deliberations. During the September 2015 evidentiary hearing, Vettel described an incident lasting six seconds as follows:

> Yes, other people were present. I was just walking down on the midway with some friends and he came up behind me and grabbed me and tried to pull me away and said that to me and they [friends] kind of just pulled harder and - - and then he left.

(Doc. #987, p. 115). When pressed for more details by the Court, Vettel explained that the incident happened when it was light outside, sometime in the afternoon. Id. at p. 140. The perpetrator was a man she had traveled with while working for the fair in Texas during the previous year. Id. at p. 141. According to Vettel, he "just came out from in between the two

195

booths" and grabbed onto her as she and her high school friends were walking by.  Id. at p. 142.  He said, "If I can't have you nobody can."  Id. at p. 143.  Vettel claims she escaped her attacker because her friends grabbed onto her and "pulled me harder than he did and I didn't see him again."  Id.  When asked what happened to her attacker, Vettel responded, "He was gone."  Id.  After the attack, Vettel and her friends "continued walking."  Id.

The Court finds Vettel's tug-of-war story about an unreported, uncorroborated, attempted kidnapping for the purpose of sexually assaulting her, occurring during the afternoon on the midway of the North Dakota State Fair, too implausible to be credited. Her version of events lacked details, was far-fetched, and did not offer any identifiable witness that could corroborate her version of events.  It is extremely unlikely that a tug-of-war over a person occurring during daylight hours in a main area of the State Fair, where many other persons were present, did not draw the attention of any other bystander, nor result in a report to law enforcement by anyone.  Vettel's story is even more unconvincing when one considers that Vettel, herself, has a documented history of calling law enforcement to report conduct by her ex-husband and to report an incident of indecent exposure.  Between April 1996 and June 1997, Vettel made at least seven calls to the police in connection with her relationship with her first husband and another call to report indecent exposure (Doc. #987, pp. 51–55); yet, she now claims she did not call law enforcement to report an attempt to kidnap her.

It is apparent that Vettel fabricated a story during deliberations "to help put [her]self in the shoes of Dru."  Vettel did not disclose this incident involving attempted kidnapping for the purpose of sexually assaulting her on the jury questionnaire or during *voir dire* because it never happened.  Because she was not dishonest during jury selection, this

purported personal experience, which was not concocted until deliberations, is not a basis for granting a new trial.

Further, when it comes to jury deliberations, the rule of secrecy is fundamental to the effective operation of the jury system. "Freedom of debate," as Justice Cardozo wrote, "might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." Clark v. United States, 289 U.S. 1, 13 (1933). Jurors are free to make statements, advance arguments, and tell stories during deliberations. In order to be properly shielded from scrutiny by a court and from the eyes and ears of the parties and the public, the mental processes of a deliberating juror must remain largely beyond examination and second-guessing. To delve deeply into Vettel's motivation for fabricating a story during deliberations or whether Vettel's concocted story had any impact on her fellow jurors would be pure speculation and would intrude improperly on the secrecy of the jury's deliberations.

In summary, the lies told by Vettel, while in no way condoned by the Court, did not rise to a constitutional violation or showing of bias, actual or implicit. Rodriguez's jury misconduct claim as to Juror Rebecca Vettel fails.

      *b.*    *Paulette Cotney*

Rodriguez asserts that during jury selection Juror Paulette Cotney misrepresented her views about the death penalty by falsely portraying herself as a person who could follow the Court's instructions, consider mitigating evidence, and impose a sentence less than death. Evidence in the record reflects Cotney's concern about Rodriguez being released from prison if he received a sentence other than the death penalty, but also demonstrates that, prior to listening to the evidence and the Court's instructions, Cotney had no

preconceived opinion on the appropriate punishment if Rodriguez was found guilty.  As more fully explained below, the record also demonstrates that the jurors did consider and deliberate on the mitigating factors that Rodriguez presented.

As to her pretrial views on the death penalty, Cotney stated on the juror questionnaire: "I feel that if the crime is severe enough, I would be behind it. I also feel it may be hard to do it when it would come down to deciding someone's fate. I'm kind of on the middle." (Doc. #988, p. 182; Pet. Exh. 200).  During individual *voir dire* with Cotney, the Court explained that severity of the crime is not the only factor to be considered when deciding on the appropriate punishment and went through the different phases, asking hypothetical questions in order to ascertain whether Cotney had any preconceived opinions about the case.  Cotney's responses indicated she had not made up her mind about any aspect of the case and was willing and able to give both sides fair and impartial consideration.  (Doc. #684,  pp. 198–204).  Trial counsel also specifically asked Cotney whether she would be open to considering both the circumstances of the offense and Rodriguez's circumstances to which Cotney responded, "of course."  (Doc. #687, p. 205).

Rodriguez focuses his claim on an isolated part of Cotney's questionnaire and responses during *voir dire* where Cotney indicated she would not want a person guilty of this crime to be released to the public again. (Doc. #687, p. 211; Doc. #987, p. 153). Rodriguez interprets this comment as a firmly held belief.  However, when defense counsel explained the two sentencing possibilities and that neither would allow Rodriguez's release back into the community, Cotney indicated she understood.  (Doc. #687, p. 211).  Cotney reaffirmed during her testimony at the evidentiary hearing in September 2015 that prior to listening to the evidence, she had not decided on the appropriate punishment for

Rodriguez if he was found guilty.  (Doc. #988, p. 187).

Despite Cotney's concern about whether a sentence of life without the possibility of parole really meant there was no avenue for Rodriguez to be released from prison, the uncontroverted evidence in the record demonstrates that Cotney:

    (1)    had no preconceived opinions about the death penalty and under what specific circumstances it should be imposed;

    (2)    had no preconceived opinions as to Rodriguez's guilt or the appropriate punishment if he was found guilty;

    (3)    volunteered her own statement on the jury questionnaire that she believed Rodriguez "deserves a fair trial.  Everyone does.";

    (4)    answered all questions posed to her during the jury selection process sincerely and honestly; and

    (5)    considered all evidence, both aggravating and mitigating, before reaching her own decision on the appropriate punishment.

Contrary to Rodriguez's assertion, there is no evidence to support his claim that Cotney falsely answered any question during jury selection or made up her mind before trial about imposing the death penalty.  Significantly, Cotney's declaration states that she felt the death penalty was the appropriate sentence given the facts and circumstances in Rodriguez's case.  She did not say the death penalty is the appropriate sentence for every death-eligible offense.

Although it is true that Cotney expressed concern during jury selection and during deliberations about whether life without parole meant Rodriguez would never be released from prison, (Doc. #987, pp. 156, 160), there is no reason to believe that Cotney failed to

follow the Court's instructions or did not fairly and impartially weigh the evidence. She confirmed that she, and the other jurors, deliberated on the mitigating evidence presented by Rodriguez. (Doc. #988, p. 187).

Even if it was permissible for the Court to consider Cotney's post-trial statements and testimony, Rodriguez's juror misconduct claim would still fail because the record demonstrates Cotney was an impartial juror who fully and fairly considered the evidence, including Rodriguez's mitigating evidence. It was only after listening to the evidence and the Court's instructions, Cotney was convinced that death was the appropriate sentence. The mere fact that Rodriguez's mitigating evidence was insufficient to persuade Cotney to vote against the death penalty does not provide a basis for a new trial.

As to Rodriguez's other claim of juror misconduct related to Cotney, forgetfulness does not indicate a lack of impartiality. See United States v. Edmond, 43 F.3d 472, 474 (9th Cir. 1994) (reversing district court's grant of a new trial when juror forgot until opening statements about being the victim of an armed robbery 26 years earlier because "forgetfulness does not indicate a lack of impartiality" to fall with within the scope of dishonesty as defined by McDonough). When interviewed by Rodriguez's habeas counsel in 2011, Cotney disclosed an incident she discussed during deliberations that happened more than three decades before Rodriguez's trial when Cotney was two years old and her sister was about six years old. Cotney has no memory of the incident but later was told by her mom, when she was an adult, that a man grabbed Cotney's sister and pulled her to the backyard of a neighbor. The neighbor heard Cotney's sister scream, called police, and her sister was fine. Cotney is unsure if anyone was ever apprehended or charged with the "abduction." Cotney says this incident had minimal impact on her or her family, as it was

never part of family conversations and she continued playing outside as a child in the same ways she had before the incident involving her sister.

Cotney testified at the evidentiary hearing that since this incident did not impact her life in any meaningful way, it did not come to her mind during jury selection and she "certainly [did] not" intend to lie or hide this information from counsel. (Doc. #988, p. 177). Cotney happened to think about her sister's childhood incident for the first time during deliberations when other jurors started sharing their personal experiences about assaults or sexual assaults. (Doc. #987, pp. 164–66; Doc. #988, pp. 175–76).

The Court finds Cotney's testimony credible. The failure to disclose her sister's childhood incident during jury selection was an innocent mistake, as it happened decades ago, Cotney was unaware of it until later in life when she was an adult, and it had little, if any, impact on her life or her family's life. Under these circumstances, it is not surprising that the incident did not come to Cotney's mind until other jurors started sharing personal experiences from their life. With no evidence that Cotney failed to answer honestly a material question or that disclosure of this incident would have provided a valid basis to make a challenge for cause, Rodriguez's misconduct claim as to Juror Paulette Cotney fails under the <u>McDonough</u> test.

c.    *Connie Lillejord*

At the time of Rodriguez's trial, Connie Lillejord was a foster parent to two children who were part Hispanic and part Caucasian. They were seven and nine years old at the time of trial. Two individuals associated with Rodriguez's counsel interviewed Lillejord in 2011. One of them was intern Rebecca Ireland. (Doc. #988, p. 217). Ms. Ireland prepared a declaration summarizing her interview with Lillejord, although Lillejord never signed the

statement or otherwise attested to the accuracy of Ireland's summary. Ireland's declaration indicated that Lillejord stated that the two foster children living with her at the time of the Rodriguez trial had been victims of sexual abuse. Id. at 225. Based on the contents of Ireland's declaration, Rodriguez claims that Lillejord failed to answer truthfully during jury selection when she stated that neither she, any member of her family, or anyone close to her had ever been the victim of a crime.

At the evidentiary hearing on this issue, Lillejord testified that she did not recall telling Rodriguez's counsel that the children she was fostering at the time of trial were victims of sexual abuse. (Doc. #988, pp. 196, 197, 201). Lillejord further testified that she did not know if the children were victims of sexual abuse. Id. At the time of the Rodriguez trial, Lillejord was aware only that the children had been removed from their home due to neglect. Id. at p. 198.

It was after the two children had been in her care for a while that one of them shared a concerning incident with Lillejord, which involved the child watching adults engaging in sexual contact. Lillejord did not consider the child's revelation, which she may have learned about after the trial, to be sexual abuse of the child. Id. at pp. 201, 214. In addition, even assuming one or both of the children in Lillejord's care at the time of the trial had been sexually abused, Lillejord questioned whether she would consider her foster children to be family members or close to her since some were in her care for 24 hours, others for a few months, and others for a few years. Id. at p. 208. Further, she did not consider the children to be "victims of crime" even though they suffered neglect and deprivation. Id. at pp. 204–05.

Rodriguez asks the Court to credit the declaration and testimony of intern Ireland

and not Lillejord because he believes Lillejord has a strong incentive to lie since the matter has been made part of a contentious and public proceeding.  The question at issue asked whether "you or any family member or anyone else close to you have ever been a victim of a crime."  Even assuming one or both foster children were the victims of sexual abuse, the record does not establish that Lillejord was aware they had been sexually abused at the time of Rodriguez's trial.  Lillejord has denied knowing the children were sexually abused.  And during Ireland's interview with Lillejord, Ireland never asked Lillejord when the sexual abuse of the children happened.  (Doc. #988, p. 227).

On this record, even if the Court were allowed to consider the declaration, the testimony of Ireland, and Lillejord's testimony, Rodriguez has failed to satisfy the dishonesty prong of McDonough.  In addition, there is simply no evidence in the record from which the Court could find Lillejord was biased because of her experiences as a foster parent and inclusion of her as a juror resulted in an unfair trial.  Rodriguez's claim of juror misconduct as to Connie Lillejord is without merit.

### 4.    Decision

Even setting aside Fed. R. Evid. 606(b), the record built by Rodriguez through its inquiry of the jurors at issue does not establish juror misconduct that warrants a new trial. There is insufficient evidence in the record to demonstrate either juror Paulette Cotney or Connie Lillejord was dishonest.  Only one of the jurors, Rebecca Vettel, was shown to be dishonest.  Even so, there was insufficient evidence demonstrating any of the three jurors at issue was biased or that empaneling any one of them as a juror in this case deprived Rodriguez of a fair trial. Rodriguez's post-conviction relief claim based on juror misconduct is denied in its entirety.

**CLAIM 13:** **RODRIGUEZ'S CLAIM THAT HIS SENTENCE VIOLATES THE TENTH AMENDMENT BECAUSE CONGRESS LACKS THE POWER TO MAKE DEATH AN AVAILABLE SENTENCE IS WITHOUT MERIT.**

Rodriguez asserts the sole reason the federal government decided to prosecute this crime rather than deferring to the pending State prosecution was to seek the death penalty. Rodriguez argues that this interest is an illegitimate infringement on the State's authority to prosecute crimes committed within its borders. It is a matter of historical record that North Dakota and Minnesota abolished the death penalty under most circumstances more than a century ago and have repeatedly turned back efforts to reinstate it.

Rodriguez further asserts that imposing the death penalty for the crime of federal kidnapping, as applied to him, is unconstitutional because the government cannot satisfy the balancing requirements set forth by the United States Supreme Court in United States v. Comstock, 560 U.S. 126 (2010).

Rodriguez failed to bring his constitutional challenge to the federal kidnapping statute (or its provision permitting capital punishment under certain circumstances) on direct appeal. There was no impediment that prevented him from doing so. Generally, Rodriguez would be barred from asserting such a claim on post-conviction relief, unless he can establish a basis for avoiding the procedural default rule. Rodriguez has not demonstrated his claim is so novel that its legal basis was not reasonably available to him at the time he filed his direct appeal. See Reed v. Ross, 468 U.S. 1, 16 (1984) (finding a defendant has demonstrated "cause" excusing his failure to raise a constitutional claim when the claim "is so novel that its legal basis is not reasonably available to counsel").

To the extent Rodriguez contends Comstock provides the legal basis for his claim, that contention is unavailing as other defendants pursued similar claims involving

204

imposition of the death penalty in States that had abolished capital punishment prior to the Comstock decision and prior to the deadline for Rodriguez to file his brief (April 21, 2008). See, e.g., United States v. Tuck Chong, 123 F.Supp. 2d 563 (D. Hawaii, Dec. 7, 1999); United States v. O'Reilly, No. 05-80025, 2007 WL 2421378 (E.D. Mich. Aug. 23, 2007). Rodriguez has defaulted, without excuse, his claim challenging the constitutionality of the federal kidnapping statute, which allows for the imposition of capital punishment even though the State of North Dakota abolished the death penalty long ago.

Even if not procedurally defaulted, Rodriguez's constitutional claim is without merit. The Supreme Court has explained that "[a] facial challenge to a legislative Act is. . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  United States v. Salerno, 481 U.S. 739, 745 (1987).  Recognizing the heavy burden he would bear in order to prevail on a claim that the federal kidnapping statute is not within the scope of Congress' constitutional authority, Rodriguez frames his claim as an as-applied challenge, although he raises several broad arguments about the intent and purpose of the federal kidnapping statute.  For example, Rodriguez  describes the statute as a "tool" available to the federal government only to be used when States cannot chase and apprehend a kidnapper, are unable to prosecute a kidnapper, or for some reason are unable to punish a kidnapper. Nonetheless, facial or as-applied, Rodriguez's Tenth Amendment claim lacks merit.

Rodriguez's overarching theme supporting his claim is the distinction between the State's "police power"—that is, its "broad authority to enact legislation for the public good," and the federal government's limited authority to "exercise only the powers granted to it." Bond v. United States, 572 U.S. 844, 854 (2014).  Indeed, the Tenth Amendment's text is

clear: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." But, this does not mean the federal government lacks the authority to enact or enforce federal criminal legislation. As expressed by the Supreme Court, "[t]he powers delegated to the United States by the Constitution include those specifically enumerated powers listed in Article I along with the implementation authority granted by the Necessary and Proper Clause." Comstock, 560 U.S. at 144 (internal quotation and citation omitted).

The words that have come to define the broad scope of the Necessary and Proper Clause derive from a statement made long ago by Chief Justice Marshall:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

United States v. Kebodeaux, 570 U.S. 387, 394 (2013) (quoting McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819)).

In other words, a federal statute is within the scope of Congress' authority so long as it "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." Comstock, 560 U.S. at 134; see also Kebodeaux, 570 U.S. at 394–95. While it is understood that "Congress cannot punish felonies generally," Bond, 572 U.S. at 854 (quoting Cohens v. Virginia, 19 U.S. 264 (1821)), Congress may create federal crimes under the Necessary and Proper Clause, see Comstock, 560 U.S. at 135–36. Although the Constitution has few explicit references to federal criminal law, the Supreme Court has resolved that:

> [T]he Necessary and Proper Clause nonetheless authorizes Congress, in the implementation of other explicit powers, to create federal crimes, to confine

offenders to prison, to hire guards and other prison personnel, to provide prisoners with medical care and educational training, to ensure the safety of those who may come into contact with prisoners, to ensure the public's safety through systems of parole and supervised release, and, where a federal prisoner's mental condition so requires, to confine that prisoner civilly after the expiration of his or her term of imprisonment.

Kebodeaux, 570 U.S. at 394–95; see also Comstock, 560 U.S. at 136–37.

Applying these principles, the Supreme Court in Comstock rejected a constitutional challenge and upheld a federal civil commitment statute authorizing the continued detention of a mentally ill, sexually dangerous federal prisoner. Id. at 129. In reaching its conclusion, the Court identified five "considerations" that it collectively analyzed, including: (1) the breadth of the Necessary and Proper Clause; (2) the history of federal involvement in a particular arena; (3) the sound reasons for the statute's enactment in light of the government's custodial interest in safeguarding the public; (4) the statute's accommodation of state interests; and (5) the statute's narrow scope. Id. at 149. Rodriguez argues these factors cut in the direction of unconstitutionality in his case. The Court disagrees.

At the outset, the Comstock Court, in its analysis of the constitutionality of the civil commitment statute at issue, concluded the five identified considerations, when taken together, demonstrate the statute's constitutionality. While the Court recognizes these "considerations" must be part of its assessment when resolving a constitutional challenge to a federal statute, the Comstock Court did not describe the considerations as factors to be balanced nor did it require each consideration to be present in order for a statute to be constitutional. In contrast, the listed considerations included every reason supporting the Supreme Court's conclusion as to why the civil commitment statute at issue was constitutional.

Two of the considerations listed in Comstock—the first and third— have long been required in cases decided under the Necessary and Proper Clause. A challenged statute must embody "a means that is rationally related to the implementation of a constitutionally enumerated power." Comstock, 560 U.S. at 134 (quoting Sabri v. United States, 541 U.S. 600, 605 (2004)). Likewise, the statute must reflect a "means reasonably adapted to the attainment of a legitimate end under [an enumerated] power." Id. (quoting Gonzales v. Raich, 545 U.S. 1, 37 (2005) (Scalia, J., concurring) (quoting United States v. Darby, 312 U.S. 100, 121, (1941)).

While the Court will address each Comstock consideration, the Court has little difficulty finding the federal kidnapping statute, including its death penalty provision, meets the long-standing requirements for constitutionality under the Necessary and Proper Clause. In short, the statute is rationally related to the implementation of an enumerated power and reasonably adapted to the attainment of a legitimate end under an enumerated power.

First, as discussed in the preceding paragraphs, the Necessary and Proper Clause grants Congress broad power to enact legislation, including federal criminal laws. Rodriguez has not advanced a colorable argument to the contrary. The Court finds the statute is rationally related to the implementation of an enumerated power.

Second, when considering the history of federal involvement, the Supreme Court looked not only to the history of the specific statute at issue but also to the broader history of federal involvement. Comstock, 560 U.S. 137–38. The Federal Kidnapping Act, 18 U.S.C. § 1201, was first enacted decades ago in 1932. At that time, a majority of the House favored including a capital punishment provision. United States v. Jackson, 390 U.S. 570,

586–87 (1968).  The House, however, yielded to the opposition of the Senate as a matter of expediency.  Id. at 587.

Since initial enactment, the statute's scope has been broadened by amendment several times and a provision was added permitting capital punishment.  Two years after enactment, in 1934, an amendment extended coverage for the interstate transportation of kidnapped persons held not just for "ransom or reward" but also for those held "otherwise, except in the case of a minor by a parent."  United States v. Sriyuth, 98 F.3d 739, 746 n.10 (3d Cir. 1996).  At this same time, a capital punishment provision was added for kidnappers who did not free their victim unharmed.  Jackson, 390 U.S. at 589–90.  While the Supreme Court later determined the initial attempt to permit imposition of the death penalty when "the jury shall so recommend[ed]" was unconstitutional because it discouraged assertion of a defendant's Fifth Amendment right to plead not guilty and deterred exercise of the Sixth Amendment right to demand a jury trial, the Supreme Court noted Congress' insistence on making interstate kidnapping a federal crime:

> The basic problem that had prompted enactment of the law in 1932—the difficulty of relying upon state and local authorities to investigate and prosecute interstate kidnaping—had not vanished during the intervening two years.  It is therefore clear that Congress would have made interstate kidnaping a federal crime even if the death penalty provision had been ruled out from the beginning.

Id. at 588–89.  By striking only the death penalty provision, the Supreme Court concluded that Congress preferred the statute be left in its original form instead of leaving the nation with no federal kidnapping statute.

The statute was broadened by amendment again in 1972 to make "the interstate transportation of a victim 'merely a basis for federal jurisdiction rather than an integral part

of the substantive crime.'"  United States v. Horton, 321 F.3d 476, 479 (4th Cir. 2003)

(quoting United States v. Wills, 234 F.3d 174, 176 (4th Cir. 2000)).  Also, in 1988, the

statute was amended "to provide that the interstate element is satisfied when a person is

willfully transported in interstate commerce regardless of whether the person was alive

when transported across a State boundary if the person was alive when the transportation

began.  Id. at 480 (quotation and citation omitted).

        If the Court was seeking to ascertain the meaning of particular language in the

statute, it would delve more deeply into aspects such as those advanced by Rodriguez,

including its history, structure, and purpose.  But, what is plain is that Congress sought to

provide a federal criminal remedy, which includes capital punishment in certain

circumstances, for the emotional harm, physical injury, and violence involved in

kidnapping.  Consequently, the federal government has had a long history of involvement

in interstate kidnapping, regardless of whether a particular State has abolished the death

penalty or the victim was transported hundreds of miles or two miles across State lines.

        Third, while framed in Comstock as whether sound reasons for the statute's

enactment exist in light of the government's custodial interest in safeguarding the public,

this consideration essentially assesses whether the means chosen are reasonably adapted

to the attainment of a legitimate end under the commerce power or under other powers that

the Constitution grants Congress the authority to implement.  The Constitution addresses

the choice of means, leaving the determination

> primarily. . . to the judgment of Congress. If it can be seen that the means
> adopted are really calculated to attain the end, the degree of their necessity,
> the extent to which they conduce to the end, the closeness of the relationship
> between the means adopted and the end to be attained, are matters for
> congressional determination alone.

Comstock, 560 U.S. at 135 (quoting Burroughs v. United States, 290 U.S. 534, 547–548 (1934)); see also James Everard's Breweries v. Day, 265 U.S. 545, 559 (1924) (stating the Necessary and Proper Clause allows Congress to "adopt any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished and consistent with the letter and spirit of the Constitution").

        As already noted, Congress enacted the federal kidnapping statute to ensure perpetrators were not able to avoid detection or apprehension by crossing State lines. Congress made capital punishment available as a means of encouraging perpetrators to release their victim unharmed.  The federal kidnapping statute is reasonably adapted to (1) Congress' goal of quickly apprehending kidnappers who travel across State lines, and also (2) by including capital punishment as a potential sentence under certain circumstances, deterring kidnappers from harming their victims.  See United States v. Howell, 552 F.3d 713–17 (8th Cir. 2009) (determining section of the Sex Offender Registration and Notification Act containing registration requirements was valid exercise of congressional power under the Necessary and Proper Clause because registration requirements were appropriate and reasonably adapted means by Congress to attain legitimate end of monitoring and regulating interstate movement of sex offenders).

        Fourth, while the federal kidnapping statute does not expressly accommodate state interests, it does not supplant State legislation addressing the same matter.  Instead, like many federal criminal statutes, it creates concurrent jurisdiction.

        Finally, the links between the statute and enumerated Article I power "are not too attenuated" to render it unconstitutional.  See Comstock, 560 U.S. at 146.  The availability of the death penalty in interstate kidnapping cases is narrow—the capital punishment

provision applies only to interstate abductions that result in the victim's death. And if the statutory provision for capital punishment is satisfied, the government must also satisfy the requirements of the Federal Death Penalty Act, 18 U.S.C. §§ 3591–3599.

While Rodriguez believes the federal government's interest in interstate kidnapping cases should be limited to assisting States with their investigations and providing a forum for prosecution only when the states cannot successfully prosecute, this is not the test. Comstock does not stand for the proposition that a State's decision to abolish the death penalty overrides a constitutional exercise of authority under the Necessary and Proper Clause or outweighs the government's interest in determining the permissible punishment for interstate kidnapping that results in a person's death. Rodriguez's challenge to the constitutionality of the federal kidnapping statute (and its provision allowing for capital punishment in certain circumstances) is without merit.

**CLAIM 14:  RODRIGUEZ PRESENTED INADEQUATE EVIDENCE THAT HIS SENTENCE VIOLATES THE FIFTH OR EIGHTH AMENDMENT BECAUSE HE OFFERED NO EVIDENCE DEMONSTRATING RACIAL AND/OR GENDER BIAS OR DISPARITY IN HIS PARTICULAR CASE.**

On direct appeal, Rodriguez raised several constitutional challenges to the federal death penalty. Specifically, he argued the death penalty, as applied in federal cases, is unconstitutional because the government seeks death in a higher percentage of cases involving white victims than minority victims. Rodriguez, 581 F.3d at 815. He also argued the FDPA is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002), because the act does not specifically provide that aggravating factors can be charged in an indictment. Id. at 816. And, he argued the indictment was constitutionally defective because it did not include the non-statutory aggravating factor submitted to the jury. Id. Each of these three

constitutional claims was rejected by the Eighth Circuit Court of Appeals.  Id. at 815–16.

In this proceeding, Rodriguez's constitutional challenge based on race and gender disparity in application of the death penalty is virtually the same as on direct appeal.  Citing statistics, studies, and law review articles, Rodriguez contends the federal capital punishment scheme is unconstitutionally flawed because the government seeks death in a higher percentage of cases involving white victims and seeks it in a higher percentage of cases where the perpetrator is a minority.  Because he is a minority and the victim was white, he also raises as an-applied challenge.

Rodriguez's race and gender disparity claim raised in this proceeding is premised as a violation of the Equal Protection and Due Process Clauses under the Fifth Amendment and an Eighth Amendment violation for cruel and unusual punishment.  Rodriguez contends the statistics, articles, and studies he cites demonstrate the lack of race-neutral application in capital charging decisions while also establishing what has been referred to as the "white victim effect"—that is, the "paternalistic attitude that many prosecutors and juries exhibit[] toward white females, considering them to be more important, worthy, or valuable than other victims."

The government urges the Court to deny Rodriguez's claim by pointing to the wide discretion prosecutors are afforded when it comes to charging decisions and also highlighting Rodriguez's failure to present any evidence of discriminatory animus in his case.  The Court finds Rodriguez's constitutional claim fails for lack of evidence of discriminatory animus or bias in his case.

The Supreme Court in McCleskey v. Kemp, 481 U.S. 279, 291–96 (1987), considered the use of statistical studies to prove discriminatory treatment in capital cases.  In analyzing

the defendant's Eighth and Fourteenth Amendment challenges, the Supreme Court assumed the validity of a study showing disparity in the imposition of death sentences in Georgia but found that evidence was insufficient to give rise to an equal protection claim. The Supreme Court reasoned that the study only demonstrated a "*risk* that the factor of race entered into some capital sentencing decisions and a necessarily lesser risk that race entered into any particular sentencing decision." Id. at 291 n.7 (emphasis in original). The Supreme Court reiterated the defendant's burden, which requires proof of both the existence of purposeful discrimination and a discriminatory effect on the defendant. Id. at 292.

Rodriguez has offered no evidence that the prosecutors in his case or their superiors acted with discriminatory purpose. Likewise, Rodriguez presented no evidence that would support an inference that racial consideration played a part in his sentence. Reliance on statistical evidence, studies, and commentary is insufficient to satisfy Rodriguez's burdens. Because he has made an inadequate showing, Rodriguez's claim, like other defendants that have made similar equal protection claims, fails. See McCleskey, 481 U.S. at 296; United States v. Jones, 287 F.3d 325, 333–35 (5th Cir. 2002); Griffin v. Dugger, 874 F.2d 1397, 1400–02 (11th Cir. 1989); Harris v. Pulley, 885 F.2d 1354, 1375 (9th Cir. 1988); see also United States v. Bass, 536 U.S. 862, 863 (2002) (summarily explaining nationwide statistics demonstrating the United States charged blacks with death-eligible offenses more than twice as often as it charged whites, and the United States' course of conduct of entering into plea bargains more frequently with whites than it did with blacks was insufficient to permit discovery on selective prosecution claim).

Rodriguez's Eighth Amendment claim fares no better. "A successful Eighth

Amendment challenge requires that the race factor was operating in such a pervasive manner that it could fairly be said that the system was irrational, arbitrary and capricious." McCleskey v. Kemp, 753 F.2d 877, 891 (11th Cir. 1985), aff'd, 481 U.S. 279 (1987). The Supreme Court in McCleskey concluded that the death penalty imposed in the defendant's case under Georgia's capital sentencing scheme was not disproportionate within any recognized meaning under the Eighth Amendment because the sentencing procedures focus discretion "on the particularized nature of the crime and the particularized characteristics of the individual defendant." 481 U.S. at 308. The scheme set forth in the Federal Death Penalty Act has rigorous requirements and functions similarly. See 18 U.S.C. §§ 3591, 3592, 3593. Rodriguez's Eighth Amendment challenge is foreclosed by McCleskey.

This is not to say the Court is without concern about the statistical truth: People of color have accounted for a disproportionate percentage of those on death row and thus those that have been executed. The Court recognizes that within the United States, the color of a defendant and the victim's skin has been shown to play a crucial, and unacceptable, role in deciding whether to pursue the death penalty and who receives the death penalty in this country.

Nevertheless, assuming a particular capital sentencing scheme is constitutional, the Supreme Court has decided that resolution of an Eighth Amendment challenge to capital punishment based on race disparity depends on whether the applicable law was applied properly. See McClesky, 481 U.S. at 319 (despite the concerns about racial injustice and the defendant's wide-ranging arguments in McCleskey essentially challenging "the validity of capital punishment in our multiracial society," the dispositive question was whether the law

of Georgia was properly applied in the defendant's case). With that guidance in mind, Rodriguez has pointed to no manner in which the law was not properly applied in his case so as to give rise to a cognizable Eighth Amendment claim. Because the law was carefully and correctly followed in Rodriguez's case, his Eighth Amendment challenge to his death sentence is without merit.

In conclusion, Rodriguez's claim that his sentence violates the Fifth Amendment or the Eighth Amendment because of race and/or gender disparity in application of the death penalty fails for lack of any evidence pointing to discriminatory animus, bias, or improper application of the law in his case.

### CLAIM 15: THE COURT'S JURY INSTRUCTIONS DID NOT VIOLATE RODRIGUEZ'S RIGHTS UNDER THE FIFTH, SIXTH, OR EIGHTH AMENDMENTS.

Rodriguez, citing Ring v. Arizona, 536 U.S. 584, 600 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000), contends his death sentence is unlawful and was obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty decision. On direct appeal, Rodriguez challenged three penalty phase jury instructions:

(1)     Rodriguez argued this Court erroneously allowed jurors to disregard mitigating factors found by other jurors. The Eighth Circuit rejected Rodriguez's claim, concluding the instruction at issue, when read in its entirety, was an accurate statement of the law.

(2)     The Eighth Circuit also rejected Rodriguez's claim that, as a mitigating factor, this Court was required to instruct the jury on "residual doubt" about whether

the victim was alive at the moment transportation began.

(3)     And, significant to this proceeding, Rodriguez claimed on appeal that the
        Court abused its discretion by refusing to give his requested jury instructions
        that stated: (a) even if the jurors find aggravating factors outweigh mitigating
        factors, a sentence of death is not required; and (b) a jury is never required
        to recommend a death sentence.  The Eighth Circuit rejected Rodriguez's
        arguments, concluding: "The proposed instructions are inconsistent with the
        FDPA and [United States v.] <u>Allen</u>,[9] and this court finds no abuse of
        discretion in the district court's ruling."

<u>Rodriguez</u>, 581 F.3d at 812–15.

Rodriguez now in this post-conviction proceeding seeks to re-visit and take another run at the Court's refusal to give his two proposed instructions regarding the jury's burden at the weighing step and when/if a jury is required to find a death sentence is warranted. The Eighth Circuit explicitly resolved the propriety of the Court's instructions pertaining to the weighing step and the jury's discretion to recommend the death penalty. The Eighth Circuit explained:

> Here, the instructions require the jury to review all proposed factors, evaluate their weight and value, and impose a sentence of death if the aggravating factors sufficiently outweigh the mitigating factors. The instructions also explain the converse—that a sentence of life imprisonment without possibility of parole is required if the jury does not unanimously find that aggravating factors sufficiently outweigh the mitigating factors.  Rodriguez's proposed instructions would, in substance, graft the second step rejected in <u>Allen</u> onto the jury's deliberation process: after determining the balancing process mandates a sentence of death, the jury could, in its discretion, elect not to

---

[9]247 F.3d 741 (8th Cir. 2001), <u>vac'd on other grounds</u>, 536 U.S. 953 (2002).

actually impose death because death is never required.

Rodriguez, 581 F.3d at 813–14.  The Eighth Circuit's decision is controlling.

To the extent Rodriguez is attempting to assert a slightly different claim to avoid the relitigation doctrine, Rodriguez has neither pointed to a fact or information that was unavailable to him at the time of direct appeal, nor identified any new Supreme Court case or rule that would excuse his procedural default.  In order to obtain collateral review of a procedurally defaulted issue, Rodriguez has to  show "either cause and actual prejudice, or that he is actually innocent."  Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)).  Rodriguez's general claim that his appellate counsel was ineffective for not raising a claim under Ring and/or Apprendi is insufficient to meet the requisite showing.  Even if not procedurally defaulted, Rodriguez's claim is without merit.

The penalty proceedings were bifurcated into an eligibility phase and a selection phase.  The government charged four statutory aggravating factors: (1) death during commission of another crime; (2) previous conviction of other serious offenses; (3) heinous, cruel, or depraved manner of committing the offense; and (4) substantial planning and premeditation.  See  18 U.S.C. § 3592(c)(1), (4), (6), and (9).  During the eligibility phase, the jury found the government proved three of the four statutory aggravating factors beyond a reasonable doubt.  The jury found the government did not meet its burden that the offense was committed after substantial planning and premeditation.  18 U.S.C. § 3592(c)(9).  Rodriguez acknowledges that the Court properly instructed the jury by requiring the jurors to find the existence of specific aggravating factors by proof beyond a

218

reasonable doubt.

During the selection phase, Rodriguez called 25 witnesses and the government called six. Rodriguez submitted 30 mitigating factors for the jury to consider. The jury found the existence of 25 mitigating factors, including 19 unanimously. The government submitted one non-statutory aggravating factor—loss, injury, and harm to the victim and her family—which the jury found unanimously. After weighing all the factors, the jury recommended a sentence of death, which the Court imposed. See 18 U.S.C. § 3594.

The Court's refusal to include Rodriguez's requested instructions requiring the government to prove beyond a reasonable doubt that the proven aggravating factors outweigh any mitigating factors such that justice cannot be served absent a sentence of death, or that the reasonable doubt standard applies to all sentencing considerations was neither error nor in violation of the Constitution. The Court instructed the jury consistent with the FDPA. See 18 U.S.C. § 3593(e) (providing that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors); Rodriguez, 581 F.3d at 814. Rodriguez's claim that Apprendi, Ring, or the Constitution requires proof beyond a reasonable doubt at the weighing step in capital cases is foreclosed by precedent. See United States v. Coonce, 932 F.3d 623, 645 (8th Cir. 2019) (determining a capital sentencing jury does not need to perform the weighing beyond a reasonable doubt); United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005) (citation omitted) (noting the weighing process mandated by 18 U.S.C. § 3593(e) is "the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding whether the defendant should be sentenced to death, to life

imprisonment without possibility of release or some other lesser sentence").

The jury instructions given during the penalty phase proceedings were consistent with the FDPA and compatible with Supreme Court precedent.  Rodriguez has failed to show the process or the jury's chosen sentence violates the Constitution.

**CLAIM 16:**   **RODRIGUEZ'S CLAIM THAT THE COURT VIOLATED THE CONFRONTATION CLAUSE OF THE SIXTH AMENDMENT AND THE REQUIREMENTS OF THE EIGHTH AMENDMENT BY ALLOWING DR. MICHAEL MCGEE TO TESTIFY AT TRIAL ABOUT LAB TEST RESULTS FROM REGIONS HOSPITAL IS PROCEDURALLY DEFAULTED.**

Rodriguez objects to Ramsey County Medical Examiner Michael McGee's testimony regarding the results of acid phosphatase testing conducted by a lab at Regions Hospital in St. Paul as a violation of the Confrontation Clause because McGee did not perform the test or witness it.  At trial, counsel failed to object to this testimony or raise this issue on direct appeal.

Because Rodriguez failed to raise this claim on direct appeal, it is procedurally barred unless he establishes cause and prejudice, or actual innocence.  Johnson, 278 F.3d at 844.  Rodriguez's only explanation for his failure to raise this claim on appeal is ineffective assistance of appellate counsel.  Cause requires Rodriguez to demonstrate that counsel was prevented by some external impediment  from raising the claim on direct review.  Murray v. Carrier, 477 U.S. 478, 497 (1986).  Ineffective assistance is not an external impediment.  Rodriguez's claim must be dismissed for failure to establish cause for the default.  Id.

Even if it were not procedurally defaulted the claim is without merit for the reasons

220

explained by the Court in Claim 2F.

**CLAIM 17: THE JURY WAS POTENTIALLY ALLOWED TO CONSIDER AN UNSUPPORTABLE STATUTORY AGGRAVATING FACTOR IN VIOLATION OF THE EIGHTH AMENDMENT.**

Rodriguez argues Ramsey Count Medical Examiner Michael McGee offered false, inaccurate, and unreliable testimony about scientific evidence of sexual assault and evidence indicative of knife wounds inflicted by Rodriguez that were found on Sjodin's body at the time of autopsy. Rodriguez contends that if the falsity of the testimony had been known at the time of trial, the government's Rule 413 evidence would have been excluded, the government would have been precluded from arguing Rodriguez had a "propensity" for sexually assaulting women, and there would have been no legitimate basis for the prosecution to offer the statutory aggravating factor that the crime was "especially heinous, cruel, or depraved," or whether it involved "the torture of Dru Sjodin."

For the reasons stated in Sections 2B and 3B, the Court finds that the statutory aggravating factor alleging the kidnapping and murder of Sjodin was committed in an especially heinous, cruel, or depraved manner might have been impermissibly sent to the jury for consideration. The doubt that has been created is due to the indisputable fact that the government's primary evidence supporting the aggravating factor was based on Dr. McGee's testimony, which has now been found by the Court to be demonstrably false and inadmissible. The introduction of an invalid aggravating factor into the jury's weighing process violates a defendant's rights under the Eighth Amendment. See Purkey, 428 F.3d at 762.

The government contends that exclusion of McGee's testimony would not undermine

the penalty phase verdicts because Sjodin's hands were bound behind her back, there was a plastic bag over her head, a ligature tied to hold the bag in place, and "[s]he was, in fact, marched from a car in the dark, cold night, naked from the waist down to a ravine" where she "was left for dead." (Doc. #879, p. 465). The government further argues: "It is clearly as torturous to kill by ligature strangulation, asphyxiation or binding one to leave them to die from the elements as it is to slash her neck. It may in fact be argued that it would be more torturous." Id.

The government's arguments require a weighing of the evidence that only the fact-finder is permitted to do. It is impossible to discern how much weight the jury gave to this aggravating factor and how much weight was given to the other aggravating factors it found were established. While the government now accepts the possibility that death may have been by strangulation, at the time of trial they vigorously opposed that characterization, arguing that McGee "does not believe she was strangled. He believed it was either asphyxiation, the knife wounds to the neck, or that he couldn't rule out the possibility of natural–or not natural. Couldn't rule out the possibility of exposure to the elements." On the one hand, McGee's trial testimony did not rule out possible causes of death outside of the knife wounds to the neck. On the other hand, the government's arguments went to great lengths to focus on the knife wounds that McGee testified existed to convince the jury to rule out other causes of death and impose the death penalty because of the heinous, cruel, and depraved way in which Rodriguez marched Sjodin to the ravine and killed her.

The government's argument that no prejudice resulted from McGee's testimony is unavailing. The problem with the government's arguments is that, without McGee, only

speculation supports the claim that Sjodin was marched to the ravine and killed. There is no evidence that she died at the location where her body was found that would support the government's claims. All theories regarding cause of death, except murder due to neck slashing, were rejected by the government during trial as unlikely, in contravention of common sense, and inconsistent with the evidence. Trial counsel's efforts to advance a possible death by asphyxiation were disparaged by the government during closing arguments.

While the Court has found inadmissible evidence was provided the jury and a new penalty phase trial is constitutionally required, it is beyond this Court's authority to engage in the fact-finding necessary to resolve the parties' claims. The issues unable to be resolved in this proceeding include: (1) absent the inadmissible knife wound testimony, it is unknowable what other evidence and arguments the government would present to support the heinous, cruel, and depraved aggravating factor; (2) it is only after the record is developed that the Court would be in a position to decide whether the government's evidence is sufficient to raise a jury question on an aggravating factor; and (3) if the government presents sufficient evidence to move forward with this aggravating factor, the jury must weigh the admissible evidence to decide whether the statutory aggravating factor has been proven beyond a reasonable doubt and, if necessary, re-weigh all the admissible evidence, both aggravating and mitigating, to determine the appropriate sentence. If, without the knife wound testimony, the evidence is no longer sufficient to raise a jury question on the especially heinous, cruel, and depraved aggravating factor, which given the definitions is a high burden requiring distinctive conduct. That conduct includes, for instance, "extremely wicked or shockingly evil," involves the infliction of "a high degree of

pain" by torturing in addition to killing the victim, and indifference to the suffering of the victim. See Purkey, 428 F.3d at 762. Rodriguez has shown prejudice resulting from the admission of unreliable, misleading, and inaccurate testimony, which the jury weighed during the penalty phases. Rodriguez is entitled to a new sentencing hearing.

As to Rodriguez's additional claim, for the reasons stated in Section 2E, it was neither error nor an abuse of discretion to admit the Rule 413 evidence. Both Rule 413 victims that testified in Rodriguez's case involved conduct similar to this case. They involved Rodriguez approaching a young woman by herself, forcing her into his vehicle under threat of violence, and sexually assaulting her. The Eighth Circuit concluded that the conduct was similar enough to the charged offense such that the Court did not abuse its discretion in admitting the conviction. Rodriguez, 581 F.3d at 796.

Whether or not admissible during the culpability phase, the Rule 413 evidence was admissible under 18 U.S.C. § 3593(c) as a matter relevant to sentencing. Based on his criminal history, there was nothing erroneous, improper, or impermissible about the government's argument that Rodriguez had a propensity for sexually assaulting women.

Because Rodriguez has established a potential Eighth Amendment violation due to McGee's false and inadmissible testimony to the jury that Rodriguez stabbed and slashed from ear-to-ear Sjodin's throat, the Court orders a new penalty phase trial. The ultimate issue of whether, absent McGee's knife wound testimony, the government is able to present sufficient evidence to permit the jury to consider and deliberate on the especially heinous, cruel, and depraved aggravating factor is an issue to be resolved when the record has been developed at the new penalty phase trial. The remainder of Rodriguez's claim is denied.

**CLAIM 18:   BECAUSE THE COURT PROPERLY INSTRUCTED THE JURY ON THE LAW APPLICABLE TO MITIGATION EVIDENCE AND THE GOVERNMENT'S ARGUMENTS ABOUT THE WEIGHT TO GIVE TO RODRIGUEZ'S PROFFERED MITIGATION EVIDENCE WERE PERMISSIBLE, RODRIGUEZ'S CLAIM IS WITHOUT MERIT.**

Rodriguez contends the jury was improperly asked to determine whether certain mitigating evidence presented was, in fact, mitigating before it could consider the evidence during the weighing process. Rodriguez asserts that his constitutional rights were violated when the prosecution invited the jury to improperly reject and ignore mitigating facts—facts that the Court had determined were mitigating as a matter of law.

Rodriguez raised these arguments previously in Claim 6C in the form of ineffective assistance of counsel. Because the jury was properly instructed on the law of mitigation evidence and it was permissible for the government to argue about the weight jurors should give to Rodriguez's particular mitigation evidence, Rodriguez's claim is without merit. For the reasons explained in its analysis of Claim 6C, Rodriguez's constitutional claim is denied.

**CLAIM 19:   RODRIGUEZ CANNOT SHOW PREJUDICE FROM TRIAL COUNSEL'S ALLEGED FAILURE TO SECURE TRANSCRIPTS.**

Rodriguez contends trial counsel failed to ensure several proceedings were transcribed that resulted in him being unable to fully present his claims on appeal. The same lawyers that represented Rodriguez at trial represented him on direct appeal. Those lawyers were present at every proceeding now at issue in which they elected either not to make a record, or decided the preparation of a transcript was unnecessary for appeal.

The Court begins with the observation that the strategic decisions made by counsel come with a "strong presumption that counsel's conduct falls within the wide range of

professionally reasonable assistance." <u>Jackson v. United States</u>, 956 F.3d 1001, 1006 (8th Cir. 2020). Even more problematic than the presumption is Rodriguez's failure to offer any specifics about claims that should have been raised other than a general claim that appellate and habeas counsel were unable to raise all issues concerning jury selection, potential issues about Rodriguez's mental health evidence, and any claims regarding government misconduct surrounding the Rule 12.2 firewall team. Rodriguez identifies nine proceedings that he alleges trial counsel were ineffective for not requesting a transcript be prepared. As more fully explained below, trial counsel waived making a record in three of the proceedings, a transcript was ordered and filed in two other proceedings, and although trial counsel made a strategic decision not to order a transcript of the other proceedings, a recording is available and a transcript could have been prepared upon request of current counsel.

Three of the identified proceedings pertain to *ex parte* budget discussions. At the commencement of each of the discussions on April 20, 2005; December 2, 2005[10]; and March 3, 2006, the Court inquired of counsel as to whether or not they wished to make a record. No record of these particular *ex parte* proceedings was made because trial counsel specifically waived the making of a record. As other portions of the record demonstrate, Rodriguez's trial counsel vigorously advocated for a budget that would ensure effective representation, which included many discussions with the Court and the filing of motions to reconsider and for additional funding (some of which were granted). Significantly,

---

[10]Counsel identified December 5, 2005, as a date of a missing transcript; however, no proceeding was held on that date. The Court assumes the correct date Rodriguez intended was December 2, 2005.

Rodriguez has advanced no claim regarding the budget or identified any deficiency in the budget that would render the discussions at these proceedings material to any cognizable claim he could have brought on appeal or in this collateral proceeding.

Regardless of whether counsel's election to waive the making of a record for these budgetary discussions was deficient, Rodriguez has shown neither a need for a transcript nor prejudice from the lack of a recording on these occasions. See Brownlee v. Haley, 306 F.3d 1043, 1061 (11th Cir. 2002) (citing Strickland, 466 U.S. 668) (even assuming counsel knew portions of the proceedings were not transcribed and their failure to rectify the situation somehow rose to the level of deficient performance, the petitioner has not shown, and cannot show, any omission hindered his ability to defend himself or to appeal his conviction, or undermines confidence in the outcome of the proceedings); Fahy v. Horn, 516 F.3d 169, 190 (3d Cir. 2008) (citations omitted) (noting a complete transcript is required only when the defendant has shown a "colorable need" for it).

Turning to the other missing transcripts, on the afternoon of April 20, 2006, the Court held a public hearing in the courtroom immediately followed by an in-camera session. Counsel for both sides were present as well as Rodriguez. A transcript of the in-court proceeding was ordered, prepared by the court reporter, and filed on August 30, 2007. (Doc. #676). As the transcript demonstrates, the Court announced it was going to proceed two floors down from the courtroom to the jury assembly room with counsel to discuss certain "housekeeping matters that are procedural only." (Doc. #676, p. 3). The Court reasoned that these matters were going to be taken up in-camera so as to not do anything that could impact the jury pool, as jury selection was scheduled to begin in just

over six weeks. Id. at p. 4. The Court identified the matters that were going to be discussed: jury issues and space constraints (who was going to be seated where, when jurors were going to be brought in, where they were going to go); security concerns; and the status of the juror questionnaire. Id. pp. 4–5. Rodriguez waived his right to be present in the jury assembly room for these housekeeping discussions. Id. at p. 5.

While in the courtroom, the Court assured Rodriguez that if the conversation turned to anything substantive it would stop and wait to proceed until Rodriguez was present. Id. The Court further directed that if a dispute arose about the juror questionnaire, such as a particular question or the wording of a question, it would take that matter under advisement, particularly in light of the fact that there was a motion hearing scheduled for the next day. Id. The following day, the Court held a hearing to address a number of pending motions. A transcript of this hearing was ordered, prepared by the court reporter, and filed on August 30, 2007. (Doc. #677).

Since August 30, 2007, Rodriguez had available to him a transcript of the April 21, 2006, hearing and a transcript of the in-court proceeding held the prior day. His claim as to missing transcripts for these proceedings is belied by the record. As to the in-camera session on April 20, 2006, after being fully informed of the issues the Court intended to address, Rodriguez explicitly waived his right to be present. He now has provided no evidence to suggest the Court did anything but comply with its promise to discuss merely housekeeping matters regarding courthouse security; reserved spots in the courtroom during trial (such as for jurors, for the press, for the family); juror issues (such as when the jurors were going to be summoned to the courthouse, where they would go, what they were

expected to do); and the status of the qualifying juror questionnaire for 1,200 prospective jurors. The parties agreed that the only record that would be made of the discussions would be a summary at the conclusion.

Without any evidence that any substantive issue was discussed, let alone stipulated to by the parties or decided by the Court, Rodriguez is merely embarking on a fishing expedition as to whether trial counsel were ineffective. "Mere speculation, entirely unsupported or contradicted by the record, that error may have been committed during an unrecorded part of the trial simply is not enough to support a finding that omissions are substantial and significant." United States v. Preciado-Cordobas, 981 F.2d 1206, 1214 (11th Cir. 1993). Rodriguez has not shown that any omission regarding preparation of a transcript relating to the summary of the in-camera proceeding hindered his ability to defend himself at trial, appeal his conviction, or proceed with a claim in this collateral proceeding.

During the last four proceedings at issue (June 5–8, 2006), groups of potential jurors were summoned to appear at the courthouse to complete a questionnaire. These proceedings took place in the jury assembly room. Each session was recorded, but no transcript was ordered. In addition, on June 6 and 8, 2006, the Court met with counsel to discuss firewall counsel/protocols and related 12.2 mental health evidence of the defendant. But, "[m]ere absence of a perfect transcript does not necessarily deny one due process of law." Mitchell v. Wyrick, 698 F.2d 940, 941 (8th Cir. 1983). Rodriguez has not indicated what, if anything, occurred during any of these proceedings that would demonstrate a colorable claim.

Trial counsel were present at each and every proceeding at issue.  The Court will not second-guess trial counsel's strategic decisions to not order a transcript for (1) a handful of proceedings it apparently deemed insignificant, or (2) budget discussions where preparation of a record was waived.  Rodriguez's mere speculation there might be claims that could have been raised on appeal or in this collateral proceeding is insufficient to demonstrate counsel's omissions were substantial or significant to rise to the level of deficient performance.

Upon careful review of the record combined with the Court's personal knowledge of the nature of the proceedings at issue, Rodriguez has not shown he was prejudiced by his counsel's decisions.  See Bransford v. Brown, 806 F.2d 83, 86 (6th Cir. 1986) (recognizing the difficulty in demonstrating prejudice where transcripts are missing, but requiring "something more than gross speculation that the transcripts were requisite to a fair appeal").

**CLAIM 20:  BECAUSE RODRIGUEZ HAS FAILED TO PRESENT A COGNIZABLE CLAIM THAT TRIAL COUNSEL FAILED TO RAISE ON DIRECT APPEAL, HIS INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL FAILS.**

Rodriguez contends trial counsel failed to raise and effectively argue a number of claims on direct appeal, which violated his rights to due process, effective assistance of appellate counsel, and the Eighth Amendment.  Rodriguez specifically raised the following claims:

- a violation of the confrontation clause for allowing McGee to testify about laboratory results (which the Court rejected on the merits in Claim 2F);

- a proper challenge to the evidence admitted under Fed. R. Evid. 413 (which

the Eighth Circuit addressed and rejected on direct appeal and this Court rejected in Claims 2E and 17);

- a constitutional challenge to the Court's reasonable doubt instruction given during the penalty phase (which the Court rejected on the merits in Claim 15);

- a challenge to the Court's "three-step process" of deliberating on mitigation evidence (which the Court rejected in Claims 6C and 18);

- cumulative errors not raised, which the Eighth Circuit has rejected as a doctrine applicable to post-conviction relief.  Hall, 296 F.3d at 692–93.

Because none of the alleged errors that trial counsel failed to raise on direct appeal have merit, Rodriguez's claim fails as a matter of law.  See Grubbs, 948 F.2d at 1464 (counsel on direct appeal cannot be considered ineffective for having failed to raise a meritless issue).

**CLAIM 21:   RODRIGUEZ IS NOT ENTITLED TO RELIEF BASED ON A CLAIM OF THE CUMULATIVE PREJUDICIAL EFFECT OF MANY ERRORS.**

Because the cumulative error doctrine is not applicable in motions seeking post-conviction relief in the Eighth Circuit, see Hall, 296 F.3d at 692–93, Rodriguez's claim for relief based on the prejudicial effect of multiple errors must be denied.

## **CONCLUSION**

With the exception of two issues, Rodriguez's motion for relief under 28 U.S.C. § 2255 is denied.  The two issues that the Court has found violate the United States Constitution and Rodriguez's right to effective assistance of counsel are:

231

(1) Ramsey County Medical Examiner Michael McGee's unreliable, misleading, and inaccurate testimony about the cause of Sjodin's death; and

(2) Trial counsel's conscious decision to limit the mental health evaluation of Rodriguez, which concealed a possible insanity defense as well as compelling evidence that Rodriguez suffers from severe PTSD.

Under these circumstances, the Court vacates Rodriguez's sentence and finds the law, the Constitution, and justice demand a new penalty phase trial be held.

**IT IS SO ORDERED.**

Dated this 3rd day of January, 2022.

Sitting by Designation:

/s/   Ralph R. Erickson
Ralph R. Erickson, Circuit Judge
Eighth Circuit Court of Appeals

232